```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                      SAN JOSE DIVISION

 4
      MEHEDI,                        )  CV-21-6374-BLF
 5                                   )
                    PLAINTIFF,       )  SAN JOSE, CALIFORNIA
 6                                   )
              VS.                    )  JANUARY 6, 2022
 7                                   )
      VIEW, INC. F/K/A CF FINANCE    )  PAGES 1-23
 8    ACQUISITION CORP. II ET AL,    )
                                     )
 9                  DEFENDANT.       )
                                     )
10    _____

11                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE BETH LABSON FREEMAN
12               UNITED STATES DISTRICT JUDGE

13                   A P P E A R A N C E S

14

15      FOR THE MOVANT:       BY:  KATHLEEN A. HERKENHOFF
                              KAPLAN FOX & KILSHEIMER LLP
16                            1999 HARRISON STREET, SUITE 1560
                              OAKLAND, CA 94612
17

18

19      FOR THE DEFENDANT:    BY:  JOHN MICHAEL GILDERSLEEVE
        VIEW, MULPURI         MUNGER, TOLLES, OLSON LLP
20                            350 S. GRAND AVE., 50TH FL
                              LOS ANGELES, CA 90071
21

22         APPEARANCES CONTINUED ON THE NEXT PAGE

23    OFFICIAL COURT REPORTER:     SUMMER FISHER, CSR, CRR
                                   CERTIFICATE NUMBER 13185
24

25        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
             TRANSCRIPT PRODUCED WITH COMPUTER
```

```
 1          APPEARANCES CONTINUED:

 2          FOR THE MOVANT:          BY:  IVY T. NGO
            SONTHALIA                ROCHE FREEDMAN LLP
 3                                   1 SE 3RD AVENUE, SUITE 1240
                                     MIAMI, FL 33131
 4

 5          FOR THE MOVANT:          BY:  FREDERIC S. FOX
            STADIUM CAPITAL               JASON URIS
 6                                   KAPLAN FOX & KILSHEIMER
                                     850 THIRD AVENUE, 14TH FLOOR
 7                                   NEW YORK, NY 10022

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1            SAN JOSE, CALIFORNIA              JANUARY 6, 2022

2                      P R O C E E D I N G S

3        (COURT CONVENED AT 9:02 A.M.)

4            THE CLERK:  CALLING CASE 21-6374.  MEHEDI V. VIEW

5    INC., ET AL.

6            COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND

7    IF WE COULD BEGIN WITH THE PLAINTIFF AND THEN MOVE TO

8    DEFENDANT.

9            MS. HERKENHOFF:  GOOD MORNING, YOUR HONOR.

10       KATHLEEN HERKENHOFF --

11           THE COURT:  I'M LOSING SOUND HERE.

12       DID THAT CHANGE, TIFFANY, OR WAS THAT MY COMPUTER?

13           THE CLERK:  NO, YOUR HONOR.  IT WAS VERY FAINT.

14           THE COURT:  MS. HERKENOFF, COULD YOU RESTATE THAT.

15           MS. HERKENHOFF:  YES.

16       GOOD MORNING, YOUR HONOR.

17           THE COURT:  NO, YOU'RE THE ONE I'VE LOST.  YOU

18   STARTED OFF STRONG AND THEN IT SWITCHED.

19           MS. HERKENHOFF:  I APOLOGIZE.

20           THE COURT:  ARE YOU USING HEADPHONES?

21           MS. HERKENHOFF:  YES, I AM.

22           THE COURT:  YOU MIGHT TRY JUST -- THE SPEAKER MUST BE

23   TOO FAR AWAY.

24           MS. HERKENHOFF:  LET ME SEE IF I CAN ADJUST THAT,

25   PERHAPS YOU CAN TAKE THE OTHER APPEARANCES FIRST.
```

```
1              MS. NGO:  GOOD MORNING, YOUR HONOR.
2         MY NAME IS IVY NGO ON BEHALF OF ROCHE FREEDMAN ON BEHALF
3    OF LEAD PLAINTIFF, MOVANT, SWETA SONTHALIA.
4              THE COURT:  GOOD MORNING, MS. NGO.
5              MS. NGO:  GOOD MORNING.
6              MS. HERKENHOFF:  GOOD MORNING, YOUR HONOR.
7         CAN YOU HEAR ME NOW?
8              THE COURT:  NO.  I DON'T KNOW WHERE YOUR SPEAKER IS.
9              MS. HERKENHOFF:  I HAVE A SPEAKER IN FRONT OF ME.
10             THE COURT:  WHO ARE YOU REPRESENTING, MS. HERKENHOFF?
11             MS. HERKENHOFF:  MOVANT, STADIUM CAPITAL.
12             THE COURT:  OKAY.  WELL, I DO NEED TO HEAR YOUR
13   ARGUMENT.
14             MS. HERKENHOFF:  YES, THAT WOULD BE HELPFUL.
15        I APOLOGIZE, YOUR HONOR.  I HAVE A MICROPHONE IN FRONT OF
16   ME, I'M NOT SURE WHAT THE ISSUE IS.
17             THE COURT:  I DON'T THINK THE COURT REPORTER COULD
18   TAKE DOWN A RECORD.  LET'S GET EVERYBODY ELSE'S APPEARANCES AND
19   WE WILL SEE WHAT WE CAN DO HERE.
20             MR. FOX:  GOOD MORNING, YOUR HONOR.
21        FREDERICK FOX, CAPLAN FOX & KILSHEIMER.  I'M WITH
22   MS. HERKENHOFF, AND WE REPRESENT THE MOVANT, STADIUM CAPITAL.
23             THE COURT:  GOOD MORNING.
24             MR. URIS:  GOOD MORNING, YOUR HONOR.
25        JASON URIS, ALSO OF CAPLAN FOX & KILSHEIMER ON BEHALF OF
```

```
 1    MOVANT, STADIUM CAPITAL.

 2              THE COURT:  GOOD MORNING.

 3              MR. GILDERSLEEVE:  GOOD MORNING, YOUR HONOR.

 4              THE COURT:  NOW I'VE LOST YOU, MR. GILDERSLEEVE.  I

 5    CAN'T HEAR YOU.

 6              THE CLERK:  HE'S NOT ON MUTE.

 7         COUNSEL, CAN YOU MOMENTARILY MUTE YOURSELF AND THEN

 8    UNMUTE?

 9              MR. GILDERSLEEVE:  YES.  CAN YOU HEAR ME NOW?

10              THE COURT:  YES.

11              MR. GILDERSLEEVE:  I'M SORRY, YOUR HONOR.

12         JOHN GILDERSLEEVE FOR VIEW AND DR. MULPURI, THE

13    DEFENDANTS.

14              THE COURT:  GOOD MORNING.

15         MS. HERKENHOFF, THE ONLY OTHER THING I CAN SUGGEST IS YOU

16    SIGN OFF AND COME BACK IN AND SEE IF THAT CAN MAYBE HELP WITH

17    THE SOUND.

18              MS. HERKENHOFF:  IS IT ON NOW, MAY I ASK?

19              THE COURT:  SO IT'S ON, BUT IT'S SO FAINT.

20              MS. HERKENHOFF:  I WILL TRY WHAT YOU SUGGESTED AND I

21    WILL BE RIGHT BACK.

22              THE COURT:  OKAY.

23              MS. HERKENHOFF:  ARE YOU ABLE TO HEAR ME NOW?

24         (OFF-THE-RECORD DISCUSSION.)

25              THE COURT:  OKAY.  I'M GOING TO GO TO ANOTHER MATTER.
```

1       I'M SO TIGHT ON TIME BECAUSE I HAVE SO MANY HEARINGS.  I'M

2  GOING TO LET YOU ALL DO THIS OFFLINE SO MS. HERKENHOFF CAN TRY

3  TO USE A DIFFERENT DEVICE.

4       LET'S GO ON TO PRESCOTT.  AND WE WILL COME RIGHT BACK, I

5  WILL DO YOURS NEXT, I WON'T MAKE YOU WAIT TOO LONG BECAUSE I

6  KNOW YOU ALL WOULD LIKE TO HAVE THIS HEARD.

7       THE CLERK:  COUNSEL THAT IS ALREADY CONNECTED, YOU

8  CAN JUST TAKE YOUR VIDEOS DOWN AND THEN I WON'T HAVE TO PROMOTE

9  YOU AGAIN.

10      AND MS. HERKENHOFF, IF YOU NEED TO SIGN BACK OUT AND THEN

11  JOIN, I WILL WATCH FOR YOU TO JOIN AS WELL.

12      (THE PROCEEDINGS WERE PAUSED AT 9:08 A.M.)

13      (THE PROCEEDINGS RESUMED AT 9:44 A.M.)

14      THE COURT:  OKAY.  WE WILL GO BACK TO THE MEHEDI

15  CASE.

16      THE CLERK:  COUNSEL, IF YOU WOULD ENGAGE YOUR VIDEOS.

17      MS. HERKENHOFF:  KATHLEEN HERKENHOFF, CAPLAN FOX &

18  KILSHEIMER.  AND WITH ME TODAY ARE FREDERIC FOX AND JASON URIS

19  OF OUR NEW YORK OFFICE.  AND I AM HERE ON BEHALF OF MOVANT,

20  STADIUM CAPITAL, LLC.

21      THE COURT:  ALL RIGHT.  GOOD MORNING.

22      I THINK EVERYONE ELSE MADE THEIR APPEARANCES, AND SO LET'S

23  JUMP IN.  I'M TRYING TO KEEP ON A SCHEDULE.

24      FIRST OF ALL, THANK YOU SO MUCH FOR RESPONDING SO QUICKLY

25  TO MY REQUEST FOR THE CHART.  I FOUND MYSELF TRYING TO PIECE

1    TOGETHER THE DIFFERENT CHARTS, AND THEN IN ONE OF THE REPLY

2    BRIEFS THERE WAS AN ACKNOWLEDGEMENT OF A MATHEMATICAL ERROR

3    WHICH I REALLY APPRECIATE, BUT THEN I REALIZED I WAS LOST ON

4    THE NUMBERS.  AND MY JOB IS NOT THE ARITHMETIC, YOU WOULDN'T

5    WANT TO LEAVE THAT TO ME.

6        SO I HAVE THIS AGREED UPON CHART, THAT UNDER THESE VARIOUS

7    THEORIES, THESE ARE THE NUMBERS, AND SO NOW WHAT WE CAN DO

8    TODAY IS WE CAN FOCUS ON THE PROPER APPROACH THAT I SHOULD

9    APPLY, WHETHER IT WOULD BE THE RECOVERABLE LOSS METHOD OR THE

10   ACTUAL LOSS METHOD UNDER WHAT WE WILL CALL LIFO.  AND FOR OUR

11   COURT REPORTER, THAT'S ALL CAPITALS, L-I-F-O, OR THE DURA,

12   D-U-R-A, ADJUSTED LIFO.

13       I DON'T THINK IT'S ANY SURPRISE TO YOU, I GENERALLY FAVOR

14   IN CASES LIKE THIS WITH THESE FACTUAL CIRCUMSTANCES, THE

15   RECOVERABLE LOSS METHOD SO THAT WE CAN CLEAR OUT THE -- OR BE

16   MORE CERTAIN OF ELIMINATING WHAT I WILL CALL THE NOISE IN THE

17   LOSS CALCULATION.

18       SO LET ME START WITH MS. NGO FOR MS. SONTHALIA ON YOUR

19   ARGUMENT.

20          MS. NGO:  GOOD MORNING, YOUR HONOR.

21       AND I JUST APOLOGIZE IF MY VOICE SOUNDS ODD, I WOKE UP

22   WITH THIS TICKLE.

23          THE COURT:  I CAN HEAR YOU.

24          MS. NGO:  OKAY.  SO UNLIKE IN ENPHASE THE INITIAL

25   COMPLAINT FILED IN THIS CASE ALLEGES A SINGLE CORRECTIVE

1    DISCLOSURE AFTER THE MARKET CLOSED, AND ENDS THE CLASS PERIOD

2    THAT DAY.  SO ANY PURCHASES DURING THE CLASS PERIOD WOULD NOT

3    HAVE ANY IMPACT FROM THE ALLEGED FRAUD BECAUSE THE ALLEGED

4    FRAUD WAS CLOSED AFTER THE MARKET.

5         ENPHASE WAS UNIQUE IN THE SENSE THAT IT INVOLVED A SINGLE

6    ENTRY DATE IN THE CORRECTIVE DISCLOSURE WHICH WAS ALSO INCLUDED

7    IN THE DEFINED CLASS PERIOD.  ALSO IN ENPHASE, THE COMPETING

8    MOVANTS ALL SOLD THEIR REMAINING STOCKS ON THAT DAY.

9         AND SO AS YOUR HONOR IS AWARE, WE WERE THE FIRM THAT

10   PROPOSED THIS ADJUSTED LIFO METHOD.  BUT THAT WAS TO TAKE INTO

11   ACCOUNT, OR TRYING TO HARMONIZE THE CASE LAW IN THIS DISTRICT

12   RELATING TO RECOVERABLE LOSS IN SINGLE DROP CASES.  AND WITH

13   THE FACTS ALLEGED, WHICH WERE THAT THE STOCK WAS -- THE FRAUD

14   WAS DISCLOSED EARLIER IN THE DAY.  AND SO THE METHOD PROPOSED

15   GAVE A CONSISTENT DISCOUNT TO ALL SHARES BOUGHT AND SOLD ON

16   THAT DAY TO TAKE INTO ACCOUNT THE FRAUD IMPACT.

17        AND SO THAT WAS OUR METHOD WE PUT FORTH THERE.  NONE OF

18   THAT EXISTS HERE.  THERE'S NO REASON TO USE AN ARTIFICIAL STOCK

19   PRICE OF JUST BEFORE THE CORRECTED DISCLOSURE.  THIS IS MORE

20   OF, I GUESS YOU WOULD CALL, RUN OF THE MILL CORRECTIVE

21   DISCLOSURE CASES, WHERE THERE IS A CLASS PERIOD WHICH THERE IS

22   CURRENTLY ALLEGED NO IMPACT ON STOCK PRICE RELATING TO FRAUD,

23   OF ANY CORRECTIVE DISCLOSURES.

24            THE COURT:  WHY WOULD YOU CALL THE STOCK PRICE ON THE

25   DATE BEFORE THE DISCLOSURE ARTIFICIAL?  AREN'T YOU RELYING ON

1    THE ACTUAL STOCK PRICE ON THAT DAY?

2              MS. NGO:  WE ARE ON THE METHOD THAT WE ARE PROPOSING,

3    THE RECOVERABLE LOSS, AND YOU CAN SEE THAT IN THE CHART THAT WE

4    SUBMITTED YESTERDAY.

5         SO UNDER THE DURA LIFO, YOU WILL SEE, I GUESS THE

6    ALTERNATIVE PROPOSAL BASED ON THE RETAINED SHARES METHOD, WE

7    ARE USING THE PURCHASE PRICE ON BOTH DAYS.

8         IN STADIUM CAPITAL'S PROPOSAL, THEY ARE USING AS A

9    PURCHASE PRICE, THE STOCK PRICE IMMEDIATELY PRIOR TO THE

10   CORRECTIVE DISCLOSURE.

11             THE COURT:  SO, I MEAN, I'M SORRY FOR THIS TO SOUND

12   SO MUNDANE, BUT IN IGNORANCE OF THE ANNOUNCEMENT TO BE MADE THE

13   NEXT DAY, IF ANY ORDINARY STOCKHOLDER WERE TO LOOK AT THEIR

14   PORTFOLIO ON AUGUST 15TH AND SAID, I THINK I'M GOING TO SELL

15   EVERYTHING, THAT WOULD JUST BE THE NATURAL PRICE OF THE STOCK,

16   UNAFFECTED BY THE DISCLOSURE, CORRECT?

17             MS. NGO:  CORRECT.  BUT THAT WOULD BE IF YOU ACTUALLY

18   SOLD ON THAT DAY.

19             THE COURT:  RIGHT.

20        BUT THAT'S WHY I'M SAYING, SO THE VALUE OF ANY

21   SHAREHOLDER'S PORTFOLIO OF THIS STOCK WAS THE $5.18 PER SHARE

22   THAT STADIUM IS REPRESENTING; IS THAT CORRECT?  YOU DON'T

23   DISAGREE WITH THAT.

24             MS. NGO:  I DON'T DISAGREE THE STOCK PRICE

25   IMMEDIATELY BEFORE THE CORRECTIVE DISCLOSURE WAS $5.18, BUT I

1     THINK THAT'S WHY LOSS CAUSATION THEORIES END UP BEING VERY

2     COMPLICATED IN THESE CASES AND VERY FACT SPECIFIC.

3          SO IN ENPHASE, THE STOCK PRICE DURING THE CLASS PERIOD WAS

4     VARIABLE.  IN, I THINK ANOTHER CASE THAT WE HAD RAISED IN ALL

5     OF OUR PAPERS, WAS THE MARKETTE CASE, AND IN MARKETTE, THE

6     STOCK PRICE INCREASED THROUGHOUT THE CLASS PERIOD.

7          AND SO THE MARKETTE CASE ALSO USED THE PRICE RIGHT BEFORE

8     THE CORRECTIVE DISCLOSURE, BUT THEY DID MAXIMIZE THE POTENTIAL

9     LOSSES OF THE CLAIMANTS, BECAUSE IN THAT CASE, THE STOCK PRICE

10    DECREASED.

11         IN VIEW, IN OUR CURRENT CASE, THE STOCK PRICE ACTUALLY

12    INCREASED THROUGHOUT THE CLASS PERIOD.  SO BY USING THE STOCK

13    PRICE RIGHT BEFORE THE CORRECTIVE DISCLOSURE, YOU ARE NOT

14    HONORING THE CONCEPT OF MAXIMIZING THE LEAD PLAINTIFF'S

15    POTENTIAL DAMAGES IN THIS CASE.

16         THE COURT:  CAN I ASK ANOTHER QUESTION, AND I REALLY

17    APPRECIATE THAT IT APPEARS THAT YOU'VE UPDATED THE AVERAGE

18    VALUE OF THE SHARES FOR THE FULL 90 DAYS, WHICH HAS NOW RUN AND

19    HAD NOT RUN WHEN YOU FILED THE PAPERS.

20         MS. NGO:  CORRECT.

21         THE COURT:  BUT WHAT YOU ARE SHOWING ME IS THAT THE

22    AVERAGE SHARE PRICE OVER THE 90 DAYS AFTER THE ANNOUNCEMENT IS

23    HIGHER THAN IT WAS THE DAY BEFORE THE ANNOUNCEMENT; IS THAT

24    CORRECT?

25         MS. NGO:  THAT IS CORRECT.

1        AND SO WHEN THE PSLRA WAS ENACTED, THIS 90-DAY PERIOD WAS

2   PUT IN IN ORDER TO PUT A LIMIT ON DAMAGES FOR RETAINED SHARES

3   FOR THE OPPOSITE SCENARIO WHEN THE STOCK PRICE CONTINUED TO GO

4   DOWN.  SO IF DEFENDANTS, IF THEY WERE LIABLE FOR SECURITIES

5   FRAUD, WOULD NOT CONTINUE TO BE ON THE HOOK FOR THE CONTINUING

6   DECREASE OF THEIR STOCK PRICE.

7        THE COURT:  THAT'S THE 90 DAYS.

8        MS. NGO:  RIGHT.

9        AND IN THIS CASE, THE 90-DAY AVERAGE DID INCREASE, AND

10  THAT WOULD GENERALLY INDICATE THAT POTENTIALLY POSITIVE NEWS

11  HAD COME OUT DURING THE 90 DAYS THAT INCREASED THE STOCK PRICE.

12       FOR PURPOSES OF SECURITIES FRAUD COMPLAINTS, THE FRAUD

13  THAT IS ALLEGED IS ALLEGED TO BE FULLY DISCLOSED AS OF THE

14  CORRECTIVE DISCLOSURE.

15       THE COURT:  YES, YES.

16       MS. NGO:  SO IT'S IRRELEVANT WHAT HAPPENS IN THE

17  90-DAY PERIOD.

18       NOW IF THE CLASS PERIOD CHANGES, AND THINGS LIKE ANY

19  INCREASES NEED TO BE DEALT WITH LATER, THEN THAT IS A FACT

20  ISSUE FOR LATER DOWN THE ROAD.

21       THE COURT:  OKAY.

22       MS. NGO:  AND I UNDERSTAND --

23       THE COURT:  WHEN YOU ARE TELLING ME ABOUT THE

24  PURCHASE PRICE -- SO THE COST OF THE SHARES WAS 60,424 SHARES

25  TIMES THE PURCHASE PRICE.  AND THE PURCHASE PRICE FOR YOUR

1    CLIENT, FOR MS. SONTHALIA, WAS HOW MUCH?  I'M LOOKING AT THE

2    CHART YOU SENT ME YESTERDAY IN YOUR COLUMN A.

3              MS. NGO:  IT WAS A VARIABLE PRICE, SO IT'S LISTED

4    HERE.

5              THE COURT:  OH, THAT'S WHY, THAT'S FAIR.  RIGHT.

6              MS. NGO:  IN DOCKET 30-2 --

7              THE COURT:  SO YOU ARE JUST TELLING ME THAT OVER THE

8    ENTIRE CLASS PERIOD, YOU'VE TAKEN THE ACTUAL PURCHASE PRICE,

9    YOU'VE DONE THE ARITHMETIC ON THIS.

10             MS. NGO:  CORRECT.

11             THE COURT:  OKAY.  SO I DON'T NEED TO BE CONCERNED

12   WHAT THE ACTUAL WAS, JUST THE TOTAL.

13             MS. NGO:  RIGHT.

14        SO IN THE TWO PROPOSALS MS. SONTHALIA PRESENTS, THE NUMBER

15   OF SHARES IS WHAT CHANGES FOR STADIUM CAPITAL.  MS. SONTHALIA

16   RETAINS ALL HER SHARES, SO THERE'S NO DIFFERENCE BETWEEN THE

17   APPROXIMATE OR ACTUAL LOSS IN THE RETAINED SHARES CALCULATION.

18   THE DIFFERENCE FOR STADIUM CAPITAL IS SIMPLY THAT, I GUESS WHAT

19   YOU WOULD CALL IT, WE CALL IT ZEROED OUT DURING THE CLASS

20   PERIOD THREE TIMES, AND SO YOU ONLY TAKE INTO ACCOUNT THE LAST

21   60,000 SHARES THAT THEY PURCHASED.

22             THE COURT:  OKAY.

23             MS. NGO:  AND THAT'S WHY THAT NUMBER CHANGES, BUT

24   OTHERWISE THE PURCHASE PRICE STAYS THE SAME FOR BOTH METHODS.

25         AND THEN THE SALE PRICE STAYS THE SAME FOR MS. SONTHALIA

1    BECAUSE SHE RETAINED HER SHARES, AND THEN FOR STADIUM CAPITAL,

2    IT INCLUDES THE ACTUAL PURCHASE PRICE OR THE RETAINED PRICE,

3    DEPENDING ON THEIR SHARES.

4           THE COURT:  OKAY.

5        ANYTHING ELSE YOU WOULD LIKE TO ADD?  THANK YOU FOR

6    WALKING ME THROUGH THAT.

7           MS. NGO:  NO WORRIES.

8        AS A YOUNG ATTORNEY, I WAS TOLD THAT LOSS CAUSATION IS THE

9    MOST DIFFICULT THING TO WRAP YOUR HEAD AROUND IN SECURITY FRAUD

10   CASES, SO I DO APPRECIATE YOUR EFFORTS TO GET TO THE BOTTOM OF

11   THIS.

12          THE COURT:  ALL RIGHT.

13       LET ME TURN TO, MS. HERKENHOFF, ARE YOU GOING TO TAKE THE

14   LEAD FOR STADIUM?  OH, YOU ARE ON MUTE.

15          MS. HERKENHOFF:  YOUR HONOR'S COMMENTS WERE VERY

16   TELLING THIS MORNING AND ALIGNED WITH MY ARGUMENT, WHICH IS

17   THAT IF YOU LOOK AT THE LOSS CHART UNDER ANY OF THE VARIOUS

18   CALCULATIONS, IT'S ONLY OUR CLIENT, STADIUM CAPITAL, WHO HAS A

19   LOSS.

20       AND THERE'S A SPECTACLE IN THIS CHART, WHICH IS THE GAIN

21   OF 3,000, THAT'S REFLECTED UNDER WHAT YOUR HONOR'S METHODOLOGY

22   IS IN ENPHASE.

23       AND SPEAKING BROADLY TO THE CHART, THE FALLACY IN THE

24   CHART IS THAT CALLING THE MIDDLE APPROACH A DURA LIFO, AND I

25   UNDERSTAND THE COURTS IN THIS DISTRICT HAVE CALLED IT THAT, AND

1    I'M NOT SAYING THAT IT DOESN'T HAVE ITS PLACE, BUT DURA, IF YOU

2    LOOK AT THE LANGUAGE IN IT, WHICH YOUR HONOR DID SO CAREFULLY

3    IN ENPHASE, IT EMPHASIZES THAT THE PURCHASE PRICE IS OFTEN

4    INFLATED BY THINGS THAT MAY BE UNRELATED TO THE FRAUD.

5         SO YOU REALLY HAVE TO ZERO IN ON THE LOSS CAUSATION AND

6    THE PURCHASE PRICE, PARTICULARLY WHEN IT'S SO FAR BACK IN TIME

7    OF THE CLASS PERIOD, IS NOT INDICATIVE OF WHAT WILL ULTIMATELY

8    BE THE LOSS CAUSATION ANALYSIS AND WHAT WILL HAPPEN HERE.

9         YOUR HONOR HIT THE NAIL ON THE HEAD, HAD THE SAME IDEA

10   THAT I HAD, REALLY IT'S YOUR PORTFOLIO, THAT DAY BEFORE THAT

11   ONE DISCLOSURE COMES OUT, THAT VALUE, THAT IS REALLY WHAT'S

12   FOCUSED ON IN DURA.

13        AND THERE'S SOME LOOSE LANGUAGE IN DURA BELOW THAT SAYS

14   SOMETIMES THE PURCHASE PRICE MAY BE TAKEN INTO ACCOUNT.  BUT IF

15   YOU READ THAT PARAGRAPH FURTHER, IT ACTUALLY IS SORT OF GIVING

16   A POLITE NOD NOT NINTH CIRCUIT AND SAYING, WELL, REALLY THAT'S

17   INSUFFICIENT.

18        AND SO IT'S OUR POSITION THAT CASES THAT TRY TO SAY, UNDER

19   DURA, YOU CAN SOMETIMES LOOK AT THE PURCHASE PRICE, FOR

20   PURPOSES OF THIS CASE, THIS SET OF FACTS, THIS ANALYSIS OF AN

21   ACCOUNTING METHODOLOGY THAT HAS RATIONAL CONSISTENCY APPLIED

22   FOR LEAD STATUS, IT -- YOU REALLY SHOULDN'T BE LOOKING AT

23   PURCHASE PRICES SO FAR BACK IN THE CLASS PERIOD.

24        THE CLASS PERIOD PURCHASE PRICE STARTED FAR HIGHER THAN

25   THEY WERE RIGHT BEFORE THE TRIGGERING EVENT OF LOSS CAUSATION,

1   AND THAT'S WHY IT RESINATED WITH ME WHAT YOUR HONOR SAID ABOUT

2   THE VALUE OF THE PORTFOLIO.

3       AND HERE, AMONG THE MANY DIFFERENT ARGUMENTS WE HAVE ON

4   WHY OUR CLIENT SHOULD BE APPOINTED LEAD, AND THESE GO MORE

5   POSSIBLY TO IF YOUR HONOR WERE INCLINED TO GO WITH THE OTHER

6   MOVANT, YOU HAVE TO THINK ABOUT THE FACT THAT THEY WILL BE

7   SADDLED FROM THE OUTSET, AND THIS CLASS, WITH THIS GAIN THAT

8   SHOWS IN THIS CHART.  AND I KNOW THE GOOD FOLKS AT MUNGER

9   TOLLES WHO ARE HERE TODAY, ARE GOING TO HAVE A FIELD DAY WITH

10  THAT.

11      AND SO WHY START OFF A CASE THAT'S SO IMPORTANT AND BURDEN

12  THE CLASS WITH A LEAD PLAINTIFF WHO HAS THAT SORT OF BAGGAGE,

13  TO BE HONEST.  THERE ARE OTHER QUALITATIVE FACTORS BEYOND THE

14  NUMBERS, IF YOUR HONOR IS SATISFIED WITH THE NUMBER

15  PRESENTATION.  AND AGAIN, AS I REEMPHASIZE, DURA BASICALLY SAYS

16  YOU ARE NOT SUPPOSED TO LOOK AT THAT PURCHASE PRICE, IT COULD

17  BE INFLATED BY OTHER THINGS.

18      AND SO THE TRUEST TEST IS WHAT YOUR HONOR DID IN ENPHASE.

19  IT WAS FOLLOWED BY JUDGE GILLIAM AND MARKETTE, AND VARIOUS

20  OTHER COURTS WE POINTED TO.

21      AND I THINK IT'S ALSO VERY TELLING IF YOU LOOK AT THE

22  PERLMUTTER CASE, WHICH DIDN'T COME UP IN THE INITIAL PAPERS,

23  BUT NOW THEY GLEAN TO IN THEIR CHART.

24          THE COURT:  I HAD PERLMUTTER, BUT I DIDN'T KNOW

25   THAT'S WHAT WE WERE APPLYING HERE.

1          MS. HERKENHOFF:  EXACTLY, YOUR HONOR.  BECAUSE IN THE

2     MOVING PAPERS, NOBODY CITED THAT, AND IT'S REALLY MORE OF THE

3     OLD LIFO ANALYSIS.

4          IF YOU LOOK AT PERLMUTTER AND MANY OF THE OTHER CASES WE

5     DISTINGUISHED IN THE FOOTNOTE OF OUR REPLY BRIEF, THE ISSUE IS,

6     AS JUDGE KOH SO APTLY STATES IT AT STAR FOUR OF THAT OPINION,

7     IN SOME WAYS THE DISTINCTION BETWEEN THESE TWO CATEGORIES IS AN

8     ARTIFICIAL ONE, IN AS MUCH AS BOTH A PLAINTIFF'S ACTUAL LOSS

9     AND A PLAINTIFF'S POTENTIAL RECOVERY METHODS FOR BOTH

10    CATEGORIES SHOULD YIELD THE SAME RESULT.

11         HERE, THEY DO NOT.  AND IT'S GLARINGLY OBVIOUS IN THIS

12    CHART.  AND I REALLY THINK THAT YOUR HONOR WAS VERY WISE TO ASK

13    US TO PUT IN THIS CHART, BECAUSE THE 90-DAY HAD NOT RUN, AND

14    NOW LOOKING AT IT, THERE'S JUST THAT GLARING FIGURE THAT YOU

15    CAN'T GET PAST.

16         AND I, AGAIN, DON'T WANT THIS CLASS, THIS PROPOSED CLASS,

17    BURDENED WITH A REPRESENTATIVE WITH THAT GOING INTO IT.

18              THE COURT:  OKAY.

19              MS. HERKENHOFF:  YOU KNOW, I ALSO CAN'T HELP BUT RAVE

20    ABOUT THE FACT THAT MY PARTICULAR FIRM HAS BEEN IN THIS

21    DISTRICT MORE THAN 20 YEARS, IT'S BEEN LEAD IN SEVERAL CASES,

22    AND OUR CLIENT IS A U.S.-BASED, VERY SOPHISTICATED INVESTOR.

23    AND I AM NOT ATTEMPTING TO DISPARAGE MS. SONTHALIA, BUT SHE IS

24    FROM SINGAPORE, AND I ROUGHLY RAN THE NUMBERS, AND OUR CLIENT,

25    I THINK WAS ALREADY A TRADER AT MORGAN STANLEY AT THE TIME OF

1    HER BIRTH.

2         SO OUR CLIENT HAS THE SOPHISTICATION, HAS LOSS UNDER EVERY

3    POSSIBLE ANALYSIS, HAS A FIRM THAT'S IN THE DISTRICT, AND IS

4    WILLING AND READY WILLING AND ABLE TO MOVE THIS CASE

5    SUCCESSFULLY FORWARD.

6              THE COURT:  ALL RIGHT.

7         SO I'M NOT GOING TO EVALUATE THE COMPETING QUALIFICATIONS

8    OF THE PROPOSED LEAD PLAINTIFFS, BECAUSE IT'S ACTUALLY -- IT

9    ONLY COMES UP AS A REBUTTABLE PRESUMPTION.  AND QUITE FRANKLY,

10   I STILL RECALL ONE OF MY EARLY PATENT TRIALS WHERE THE

11   PRESIDING JUROR WAS A 19-YEAR OLD JUNIOR AT STANFORD

12   UNIVERSITY.  SO MS. SONTHALIA MIGHT ACTUALLY RESONATE MORE FOR

13   A JURY IN SILICON VALLEY, IT'S HARD TO SAY.  BUT NEITHER OF YOU

14   ATTEMPTS TO REBUT THE PRESUMPTION IF YOU ARE NOT THE -- IF YOUR

15   CLIENT DOESN'T HAVE THE GREATEST LOSS.

16        SO I'M NOT GOING TO GO THERE, AND MS. NGO, YOU DON'T HAVE

17   TO RESPOND TO THAT.  THOSE ARE -- YOU KNOW, I DON'T PICK

18   PLAINTIFFS, DEFENDANTS DON'T PICK PLAINTIFFS.  I ONLY HAVE TO

19   BE THE GATE KEEPER IF THERE'S SOME PROBLEM.

20        HOWEVER, THE POINT ON THE GAIN IS NOTED.  I DON'T THINK

21   THAT'S A DEAL BREAKER, BUT IT'S CERTAINLY NOTED.

22             OKAY.  MS. NGO, WOULD YOU LIKE TO MAKE ANY LAST COMMENT?

23             MS. NGO:  YES, YOUR HONOR.

24        I WILL NOTE THAT JUDGE KOH IN THE PERLMUTTER CASE HAD

25   ACTUALLY USED OUR PROPOSED RETAINED SHARES CALCULATION, BECAUSE

1    SHE HAD USED THE ACTUAL PURCHASE PRICE.

2         GENERALLY IN THESE FRAUD CASES, IT ENDS UP BEING A

3    QUESTION FOR THE EXPERT AS TO HOW MUCH, IF FRAUD IMPACTS THE

4    STOCK PRICE EARLY, VERSUS THE MIDDLE, VERSUS THE END, AND AT

5    THIS VERY EARLY STAGE, THERE'S NO REASON TO BASICALLY GIVE A

6    DISCOUNT TO AN ENTIRE CLASS'S DAMAGES BY LIMITING THE ENTIRE

7    CLASS'S PURCHASE PRICE TO THE DAY BEFORE, WHEN THERE COULD HAVE

8    BEEN STATEMENTS MADE EARLY IN THE CLASS PERIOD WHICH ENCOURAGED

9    THEM TO BUY THE STOCK.  AND THAT SHOULD BE INCLUDED IN THEIR

10   POTENTIAL DAMAGE CALCULATIONS.

11        THE COURT:  SO I DID TAKE NOTE OF JUDGE KOH'S COMMENT

12   IN PERLMUTTER ON THIS VERY ISSUE OF EXPERT TESTIMONY, I THOUGHT

13   THAT WAS AN IMPORTANT POINT.  BUT I DON'T BELIEVE THAT IF I

14   WERE TO CHOOSE STADIUM, THAT THE CLASS WILL BE LIMITED, IN ITS

15   DAMAGES PRESENTATION, TO HOW I CHOSE TO DETERMINE THE LEAD

16   PLAINTIFF.

17        AND I GUESS SOMEONE IS ALREADY WRITING THAT IN LIMINE

18   MOTION TO MAKE SURE IT DOESN'T HAPPEN.  BUT WARNING TO

19   DEFENDANTS, I MEAN, THIS IS A DIFFERENT CALCULATION AND IT

20   WOULD BE WITHOUT PREJUDICE TO A FULL DAMAGES MODEL THAT MAY OR

21   MAY NOT BE ABLE TO JUSTIFY A STOCK PURCHASE PRICE THAT'S

22   DIFFERENT THAN THE $5.18 REPRESENTED ON THIS CHART.

23        THESE ARE APPROXIMATIONS, THAT'S WHAT THE LAW SETS UP

24   HERE.  MS. NGO, IT'S ACTUALLY A REALLY GOOD POINT THAT YOU

25   RAISE SO THAT I CAN KIND OF MARK MY PLACE ON THAT RIGHT NOW AND

1    NO ONE IS CONFUSED ABOUT THAT.

2              MS. NGO:  RIGHT.  YES.

3         AND I ALSO WANT TO NOTE THAT THERE IS NO COURT THAT HAS

4    APPLIED THIS STADIUM CAPITAL'S PROPOSAL WITHOUT THE FACTUAL

5    SCENARIO BACKING IT UP.

6         THERE'S HONESTLY NO REASON TO USE THE PURCHASE PRICE, THE

7    DAY BEFORE THE CORRECTIVE -- BEFORE THE CORRECTIVE DISCLOSURE

8    COMES OUT AS THE PURCHASE PRICE.  THE ONLY REASON IT MADE SENSE

9    IN ENPHASE IS BECAUSE IN ENPHASE, IT WAS AN ENTRY DAY

10   DISCLOSURE.

11        AND IF YOUR HONOR RECALLS, AFTER THE LEAD PLAINTIFF BATTLE

12   IN ENPHASE, IN THE AMENDED COMPLAINT IN ENPHASE THEY HAD

13   AMENDED IT TO BE THE DAY BEFORE THE CORRECTIVE DISCLOSURE,

14   WHICH I THINK ALL OF US WHO HAVE DONE THIS FOR A LONG TIME, I

15   HAVE BEEN DOING THIS SINCE 2007, IN ORDER TO NOT CREATE

16   CONFLICTS FOR THE CLASS OR TO CREATE MORE CONSISTENT DAMAGE

17   THEORIES, WAS WHAT SHOULD HAVE BEEN DONE TO BEGIN WITH.

18        AND IF THEY HAD DONE THAT WITH THE FIRST COMPLAINT, WE

19   WOULD HAVE PUT FORTH MORE TRADITIONAL RETAINED SHARES, DURA

20   LIFE CALCULATION, AS THE PROPOSED LOSS THEORY.  THERE WOULD

21   HAVE BEEN NO REASON TO ESSENTIALLY CREATE A NEW LOSS CAUSATION

22   THEORY FOR LEAD PLAINTIFF DAMAGES BECAUSE THERE WOULDN'T HAVE

23   BEEN THE FACTUAL -- HOW TO DEAL WITH THE FACTS, IT WAS AN ENTRY

24   DAY DISCLOSURE.

25              THE COURT:  OKAY.

1          WELL, THOSE ARE EXCELLENT POINTS.  I'M GOING TO REALLY

2     HAVE TO THINK ABOUT THIS, WHETHER I CONTINUE TO USE ENPHASE AND

3     MARKETTE, OR IF I LOOK MORE GENERALLY TO THE LIFO MODEL, YOU

4     HAVE GIVEN ME A LOT OF CASES.

5          I AM STILL LEANING TOWARD THE RECOVERABLE LOSS THEORY.  I

6     THINK THAT I DO HAVE THE DISCRETION, I CERTAINLY HAVE TO SET

7     OUT THE REASONS FOR IT.

8          MS. HERKENHOFF --

9            MS. NGO:  I WOULD JUST LIKE TO NOTE THEY ARE ACTUALLY

10    BOTH RECOVERABLE LOSS, THEY ARE DIFFERENT STRINGS OF

11    RECOVERABLE LOSS.

12         WHAT WE CALL "RETAINED SHARES" IS A RECOVERABLE LOSS, IT'S

13    JUST I WOULD ARGUE THE MORE MAJORITY VERSION OF THE RECOVERABLE

14    LOSS, WHEREAS STADIUM CAPITAL'S IS VERY NARROW INTERPRETATION

15    OF THE RECOVERABLE LOSS THEORY.

16           THE COURT:  OKAY.

17           MS. HERKENHOFF:  YOUR HONOR, I APPRECIATE YOUR TIME.

18         AND AGAIN, THEY LABELED IT DURA LIFO AND THEY HAVE AVOIDED

19    THIS RECOVERABLE LOSS THEORY, WHICH ACTUALLY IN ENPHASE, THEY

20    WERE PROPONENTS OF.

21         YOUR HONOR ALREADY NOTED THE MARKETTE CASE WHERE

22    JUDGE GILLIAM APPLIED THE PRICE THE DAY BEFORE THE CORRECTIVE

23    DISCLOSURE.  SO TO SAY THERE AREN'T CASES THAT DID IT IS

24    INCORRECT.

25         BUT ALSO AGAIN, I THINK YOU HAVE TO LOOK QUALITATIVELY AT

1    THE NUMBERS.  AND HERE WITH THIS CHART, THIS SCENARIO, AND THE

2    DIRECTION IN CAVANAUGH, THAT YOU LOOK AT THE PERSON WHO HAS THE

3    MOST TO GAIN FROM THE LAWSUIT, AND YOU ALSO HAVE TO BASE YOUR

4    CALCULATION ON SOMETHING THAT'S RATIONAL, RIGHT?  IT'S NOT JUST

5    CONSISTENT, IT'S RATIONAL.

6         AND HERE, UNDER THIS ANALYSIS, THE ONLY RATIONAL APPROACH

7    THAT WE SEE IS WHAT YOUR HONOR SO APTLY DID IN ENPHASE, AND WE

8    WOULD ENCOURAGE YOUR HONOR TO DO THE SAME HERE.

9              THE COURT:  OKAY.  ALL RIGHT.

10         THANK YOU ALL.  I APPRECIATE IT.

11         WHEN I PUT THIS ORDER OUT, I PRESUME THAT YOU WILL THEN

12   PROVIDE ME WITH A SCHEDULE FOR PERHAPS AN AMENDED COMPLAINT

13   THAT WILL BE NECESSARY AND A SCHEDULE FOR THE DEFENDANTS TO

14   RESPOND; IS THAT CORRECT?

15             MS. HERKENHOFF:  YES, YOUR HONOR.

16         IF I MAY SPEAK TO THAT.  WE CHECKED YOUR DOCKET AND THE

17   INITIAL COMPLAINT FILED HAD SET A SCHEDULE WHERE WITHIN TEN

18   DAYS OF APPOINTMENT, AND WE CERTAINLY WILL HONOR THAT.

19             THE COURT:  OKAY.  AND IF FOR SOME REASON THOSE DATES

20   DON'T WORK OUT AS WELL, YOU WILL GIVE ME A STIP AND ORDER ON

21   THAT.

22             MS. HERKENHOFF:  YES.

23             THE COURT:  OKAY.  THANK YOU ALL.

24         THIS HAS BEEN VERY HELPFUL.  MS. NGO, THANK YOU FOR THAT

25   REALLY THOUGHTFUL ARGUMENT, I APPRECIATE YOUR KNOWLEDGE ON IT,

1          YOU HELPED ME UNDERSTAND SOME OF THE DETAILS OF THE NUMBERS.  I

2     APPRECIATE THAT.

3                    MS. NGO:  YOU ARE WELCOME.

4               THANK YOU, YOUR HONOR.

5                    THE COURT:  ALL RIGHT.  THANKS.

6               (THE PROCEEDINGS WERE CONCLUDED AT 10:07 A.M.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        **<u>CERTIFICATE OF REPORTER</u>**

5

6

7

8            I, THE UNDERSIGNED OFFICIAL COURT

9    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

10   THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

11   FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

12   CERTIFY:

13            THAT THE FOREGOING TRANSCRIPT,

14   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

15   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

16   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

17   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

18   TRANSCRIPTION TO THE BEST OF MY ABILITY.

19

20

21

22

23

24   _____

25   SUMMER A. FISHER, CSR, CRR
     CERTIFICATE NUMBER 13185          DATED: 1/16/22