UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ASIF MEHEDI, <br>     Plaintiff, <br> v. <br> VIEW, INC., et al., <br>     Defendants. | Case No. 21-cv-06374-BLF <br><br> **ORDER APPOINTING LEAD PLAINTIFF AND LEAD COUNSEL** <br><br> [Re: ECF Nos. 27, 31] |

Before the Court are Sweta Sonthalia and Stadium Capital LLC's ("Stadium") competing Motions for Appointment as Lead Plaintiff and Lead Counsel in this securities class action brought by Plaintiff Asif Mehedi against View, Inc. ("View") and its CEO Rao Mulpuri and CFO Vidul Prakash ("Individual Defendants"). Mr. Mehedi brings claims on behalf of a putative class of investors who bought View securities between November 30, 2020 and August 16, 2021 (the "Class Period") and allegedly suffered losses based on View's making materially false or misleading statements and failing to disclose material adverse facts about the company's business, including warranty costs and internal controls. *See* Complaint, ECF No. 1 ¶¶ 36–41. View's alleged fraud led to a fall in its stock price following an announcement after the market closed on August 16, 2021 that it was beginning an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual (the "Corrective Disclosure"). *See id.* ¶¶ 5–6.

Ms. Sonthalia and Stadium allege that they purchased View securities during the Class Period and suffered losses as a result of Defendants' alleged fraud, and they each move to be appointed as Lead Plaintiff and their counsel to be appointed as Lead Counsel. *See* Sonthalia Motion, ECF No. 27; Stadium Motion, ECF No. 31. Ms. Sonthalia and Stadium dispute who is the presumptive Lead Plaintiff in this case based on the amount of loss suffered, because they calculate

1 loss in different ways. While Ms. Sonthalia proposes "last in, first out" ("LIFO") net loss and *Dura*-
2 adjusted LIFO loss formulas that indicate she suffered a higher economic and recoverable loss from
3 Defendants' alleged fraud, Stadium proposes a loss formula adopted by this Court in the *Enphase*
4 case, which indicates that Stadium suffered the higher value of recoverable loss. *See Hurst v.*
5 *Enphase*, No. 20–cv–04036–BLF, 2020 WL 7025085, at \*\*2–4 (N.D. Cal. Nov. 30, 2020). Ms.
6 Sonthalia requests appointment of her counsel Roche Freedman LLP as Lead Counsel, while
7 Stadium requests appointment of its counsel Kaplan Fox & Kilsheimer LLP ("Kaplan Fox"). *See*
8 Sonthalia Motion, ECF No. 27 at 8–9; Stadium Motion, ECF No. 31 at 7.

Based on the below reasoning, the Court APPOINTS Stadium as Lead Plaintiff and Kaplan Fox as Lead Counsel. All other Motions are DENIED.

**I.  BACKGROUND**

View is a technology company that primarily manufactures a "smart" glass panel that adjusts in response to changing sunlight through dynamic tinting. *See* Complaint, ECF No. 1 ¶ 18. View is a Delaware corporation with its principal place of business in California that trades on the NASDAQ exchange. *See id.* ¶ 14. On August 18, 2021, Plaintiff Asif Mehedi filed the present action, alleging that View and the Individual Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and the Individual Defendants violated Section 20(a) of the Exchange Act, through materially false or misleading statements and failure to disclose material adverse facts about its business during the Class Period. *See id.* ¶¶ 1–8, 54–68. Plaintiff alleges that during the Class Period, View failed to disclose to investors that "(1) View had not properly accrued warranty costs related to its product; (2) that there was a material weakness in View's internal controls over accounting and financial reporting related to warranty accrual; (3) that, as a result, the Company's financial results for prior periods were misstated; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading or lacked a reasonable basis." *Id.* ¶ 33; *see also id.* ¶¶ 21–33. On August 16, 2021, after the market closed, View made the Corrective Disclosure, which stated that View "recently began an independent investigation concerning the adequacy of the Company's previously disclosed warranty accrual." *Id.* ¶ 34. Following the Corrective

1  Disclosure on August 16, 2021, View's share price allegedly fell $1.26, or over 24%, to close at
2  $3.92 per share on August 17, 2021. *See id.* ¶ 35.

3        Mr. Mehedi purchased View stock during the Class Period and allegedly suffered damages
4  as a result of View and the Individual Defendants' alleged securities law violations. *See id.* ¶¶ 8,
5  13, 36, 42, 44–46. Mr. Mehedi brings his claims on behalf of a putative class consisting of "all
6  persons and entities that purchased or otherwise acquired View securities between November 30,
7  2020 and August 16, 2021, inclusive, and who were damaged thereby" (the "Putative Class"). *See*
8  *id.* ¶ 36.

9        On October 18, 2021, five individuals and entities filed Motions to Appoint Lead Plaintiff
10 and Lead Counsel—Feng Li; FirstFire Global Opportunities Fund, LLC; Majdi Mojahed; Ms.
11 Sonthalia; and Stadium. *See* ECF Nos. 18, 22, 26, 27, 31. Three of those original movants—Mr.
12 Mojahed, FirstFire, and Mr. Li—filed statements of non-opposition to the competing Motions and
13 provided no further briefing. *See* ECF Nos. 42, 44, 45. Ms. Sonthalia and Stadium fully briefed
14 their Motions. *See* Stadium Opposition, ECF No. 46; Sonthalia Opposition, ECF No. 47; Stadium
15 Reply, ECF No. 49; Sonthalia Reply, ECF No. 48.

16       The Court considers Ms. Sonthalia and Stadium's competing Motions.

17     **A.**    **Sweta Sonthalia**

18       Ms. Sonthalia is a resident of Singapore who has been investing in securities for over 3 years.
19 *See* Declaration of Ivy T. Ngo ("Ngo Decl."), ECF No. 30, Ex. C ¶ 3. Ms. Sonthalia moves for an
20 order appointing her Lead Plaintiff and Roche Freedman LLP as Lead Counsel for the Class. *See*
21 Sonthalia Motion, ECF No. 27. Ms. Sonthalia indicates that she bought 60,424 shares of View
22 securities, expending a total of $700,202.57, between December 10, 2020 and February 5, 2021.
23 *See id.* at 5–6; Ngo Decl., ECF No. 30, Ex. B. Ms. Sonthalia retained all 60,424 shares until the end
24 of the Class Period and until the end of 90-day period following the Corrective Disclosure on August
25 16, 2021. *See* Joint Submission, ECF No. 61, Ex. A.

26       Based on her $700,202.57 in expenditures, her 60,424 shares in retained stock, and the $5.23
27 average price for View stock during the 90-day period following the Corrective Disclosure, Ms.
28 Sonthalia is asserting under 15 U.S.C. § 78u-4(e) that she had net losses of approximately $384,185

3

1  ($700,203 – 60,424 x $5.23 ≈ $384,185) to Stadium's $330,009. *See id.* Further, Ms. Sonthalia is asserting based on the Supreme Court's ruling in the *Dura* case that her recoverable losses are also equal to $384,185, because she retained all her shares until the end of the Class Period, whereas Stadium's recoverable losses are only $127,048, since it sold all but 60,000 of its shares prior to the Corrective Disclosure. *See id.* (citing *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336 (2005)).

### B. Stadium Capital LLC

Stadium moves for an order appointing it as Lead Plaintiff and Kaplan Fox as Lead Counsel for the Class. *See* Stadium Motion, ECF No. 31. Stadium indicates that it bought 426,235 shares of View securities, expending a total of $3,642,869, between December 1, 2020 and August 12, 2021. *See id.* at 4–5; Declaration of Laurence D. King ("King Decl."), ECF No. 31-1, Ex. 3. Stadium retained 60,000 shares at the end of the Class Period. *See* Stadium Motion, ECF No. 31 at 5. Stadium sold its 60,000 retained shares on August 17, 2021 at a price of $4.2306 following the Corrective Disclosure. *See* King Decl., ECF No. 31-1, Ex. 3.

Stadium asserts that it had $330,010 in net losses based on its purchase of View stock. *See* Stadium Motion, ECF No. 31 at 4. Stadium further asserts that based on the price of View stock on August 16, 2021 just prior to the Corrective Disclosure ($5.18), Stadium's 60,000 retained shares, and its August 17, 2021 sale price of $4.2306, Stadium had a recoverable loss of $56,964 (60,000 x $5.18 – 60,000 x $4.2306 ≈ $56,964). *See* Stadium Opposition, ECF No. 46 at 5–6. Stadium asserts that Ms. Sonthalia did not suffer a recoverable loss—in fact, it asserts that she experienced a gain of $3,022. *See* Joint Submission, ECF No. 61, Ex. A.

## II. LEGAL STANDARD

### A. Lead Plaintiff

The Private Securities Litigation Reform Act of 1995 ("PSLRA") governs the procedure for selection of lead plaintiff in all private class actions under the Exchange Act. 15 U.S.C. § 78u-4(a)(3). Pursuant to the PSLRA, the court shall appoint as lead plaintiff "the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members," also referred to as the "most adequate plaintiff." *Id.* at § 78u-4(a)(3)(B)(i).

4

The PSLRA "provides a simple three-step process for identifying the lead plaintiff." *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002). First, the pendency of the action, the claims made, and the purported class period must be publicized in a "widely circulated national business-oriented publication or wire service." *Id.* (citing 15 U.S.C. § 78u-4(a)(3)(A)(i)). This notice must be published within 20 days of the filing of the complaint. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i). It must also alert members of the purported class that they have 60 days to move for appointment as lead plaintiff. *See id.* at 78u-4(a)(3)(A)(i)(II).

Second, the court must identify the presumptive lead plaintiff. To do so, the court "must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit." *Cavanaugh*, 306 F.3d at 730. In calculating financial stakes, "the court may select accounting methods that are both rational and consistently applied." *Id.* at 730 n.4. The court must then determine whether the individual with the largest financial stake, "based on the information he has provided in his pleadings and declarations," satisfies the requirements of Rule 23(a), "in particular those of 'typicality' and 'adequacy.'" *Id.* at 730. If the plaintiff with the largest financial interest satisfies these requirements, he or she becomes the "presumptively most adequate plaintiff." *Id.*; *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). Finally, the other plaintiffs must have "an opportunity to rebut the presumptive lead plaintiff's showing that [he or she] satisfies Rule 23's typicality and adequacy requirements." *Cavanaugh*, 306 F.3d at 730. Unless a member of the purported plaintiff class provides proof that the presumptive plaintiff "(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class," the court must appoint the presumptively most adequate plaintiff as lead plaintiff. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also Cavanaugh*, 306 F.3d at 732.

### B. Lead Counsel

Under the PSLRA, the lead plaintiff has the right, subject to court approval, to "select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). "[T]he district court should not reject a lead plaintiff's proposed counsel merely because it would have chosen differently." *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 711 (9th Cir. 2009) (citation omitted). "[I]f the lead

plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Id.* at 712 (citations omitted).

### III. DISCUSSION

#### A. Procedural Requirements

Pursuant to the PSLRA, Mr. Mehedi caused to be published via *Business Wire* a notice of the pending action on August 18, 2021. *See* ECF No. 8. The notice announced the pendency of this action, described the claims, specified the Class Period, and advised putative class members that they had 60 days from the date of the notice to file a motion to seek appointment as lead plaintiff in the lawsuit. *Id.*, Ex. A. Thus, the notice complied with the PSLRA's requirements. *See* 15 U.S.C. § 78u-4(a)(3)(A).

As noted above, Ms. Sonthalia and Stadium filed their Motions on October 18, 2021, the last day within the 60-day deadline following publication of the notice. The statutory notice requirements have therefore been met.

#### B. Greatest Financial Loss

In considering which movant for lead plaintiff appointment in a securities class action has the greatest financial interest, courts generally consider a four-factor test: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *Perlmutter v. Intuitive Surgical, Inc.*, No. 10–CV–03451–LHK, 2011 WL 566814, at *7 (N.D. Cal. Feb. 15, 2011) (citations omitted). Courts place the most emphasis on the final factor—the approximate losses suffered. *See id.*

Ms. Sonthalia and Stadium dispute who suffered the greatest losses. The Ninth Circuit has not adopted a specific formula for calculating losses. The only guidance it has provided is that courts "may select accounting methods that are both rational and consistently applied." *Cavanaugh*, 306 F.3d at 730 n.4; *Perlmutter*, 2011 WL 566814, at *3. Courts have used a variety of approaches for calculating losses. *See Mulligan v. Impax Labs., Inc.*, No. C–13–1037 EMC, 2013 WL 3354420, at **4–6 (N.D. Cal. July 2, 2013) (collecting cases). Generally, these approaches can be lumped into two categories—(1) those based on actual economic losses suffered ("Economic Loss")—*i.e.*,

6

1  net losses disregarding the possibility of recovery—and (2) those based on "potential recovery"
2  ("Recoverable Loss"). See *Enphase*, 2020 WL 7025085, at *6.

3        Ms. Sonthalia and Stadium propose three potential formulas for calculating their financial
4  losses. Ms. Sonthalia proposes (1) the LIFO net loss approach (Economic Loss) and (2) the *Dura*-
5  adjusted LIFO net loss approach (Recoverable Loss), which both indicate that she suffered more
6  losses than Stadium. *See* Sonthalia Opposition, ECF No. 47 at 6–7; Sonthalia Reply, ECF No. 48
7  at 3–5; Joint Submission, ECF No. 61, Ex. A. Stadium proposes (3) a different Recoverable Loss
8  formula this Court adopted in *Enphase*, which indicates that Stadium suffered greater losses. *See*
9  Stadium Opposition, ECF No. 46 at 4–6; Joint Submission, ECF No. 61, Ex. A. Stadium argues
10 that the *Enphase* approach better represents the parties' recoverable losses, since it disregards losses
11 the parties suffered that are unrelated to the alleged fraud. *See* Stadium Opposition, ECF No. 46
12 at 5–6; Stadium Reply, ECF No. 49 at 2–3. In response, Sonthalia argues that the *Enphase* approach
13 was formulated (1) to maximize potential damages, which it does not do here, and (2) to address
14 specific factual circumstances in the *Markette* and *Enphase* cases that are not at issue here. *See*
15 Sonthalia Reply, ECF No. 48 at 3–5. The Court will consider each of the three loss formulas
16 proposed by the parties in turn.

17       **i.    Loss Formula #1 – LIFO Net Loss (Sonthalia)**

18       The first proposed formula for calculating the Movants' losses is LIFO net loss, which is an
19 Economic Loss formula. This is the approach both Movants initially used in their Motions, and Ms.
20 Sonthalia continues to advance it as one of her proposed approaches to loss accounting. *See*
21 Sonthalia Motion, ECF No. 27 at 5–6; Stadium Motion, ECF No. 31 4–5; Joint Submission,
22 ECF No. 61, Ex. A. Under the LIFO net loss approach, the Court simply adds up the parties'
23 expenditures on View stock during the Class Period ($700,203 for Ms. Sonthalia; $3,642,869 for
24 Stadium) and subtracts all proceeds from the sale of that stock ($3,312,860 for Stadium). *See* Joint
25 Submission, ECF No. 61, Ex. A. Since Ms. Sonthalia never sold her stock, her subtracted value is
26 based on her number of shares (60,424) multiplied by the average price ($5.23) of View stock during
27 the 90-day period following the Corrective Disclosure—$316,018 (60,424 x $5.23). *See* Joint
28 Submission, ECF No. 61, Ex. A; Ngo Decl., ECF No. 30, Ex. B. Under this approach, Ms. Sonthalia

1    has the greater financial loss—$384,185 ($700,203 – $316,018) to Stadium's $330,009

2    ($3,642,869 – $3,312,860).   *See* Joint Submission, ECF No. 61, Ex. A; Sonthalia Motion,

3    ECF No. 27 at 5; Stadium Motion, ECF No. 31 at 4.[1]

4          The LIFO net loss formula accounts for the total losses experienced by the parties based on their purchase of View stock.  The disadvantage of this approach for a case like the present one with a single Corrective Disclosure is that it takes into account losses that resulted from fluctuations in View stock prior to the Corrective Disclosure that potentially have nothing to do with the inflation resulting from the alleged fraud.  *See Markette v. XOMA Corp.*, No. 15–cv–03425–HSG, 2016 WL 2902286, at *6 (N.D. Cal. 2016) ("When a single disclosure reveals a purported fraud, . . . the retained shares method is more accurate than LIFO, net loss, and other economic loss methods because it excludes losses incurred during the class period that are likely attributable to normal market fluctuations rather than fraud."); *Mulligan*, 2013 WL 3354420, at *7 ("At this stage in the proceedings, the question of whether the fraud premium was constant enough throughout the class period for benefits from early sales to offset losses from shares bought later in the class period is speculative.  The Court thus finds that the . . . retained shares method is a more accurate estimate of the potential plaintiff's financial interest than simply looking at the number of net shares purchased during the class period.")

      For example, as of July 7, 2021, Stadium had lost approximately $202,961 from pre-

---

[1] The Court notes that Ms. Sonthalia initially asserted a net loss of $390,804 in her Motion but now asserts a net loss of $384,185.  *See* Sonthalia Motion, ECF No. 27 at 5; Joint Submission, ECF No. 61, Ex. A.  The discrepancy results from the fact that at the time of her Motion, the 90-day period following August 16, 2021—the date of the Corrective Disclosure—had not fully lapsed, so the average View stock price was only $5.12.  *See* Ngo Decl., Ex. B.  After the full 90-day period lapsed, the average View stock price had increased to $5.23.  *See* Joint Submission, ECF No. 61, Ex. A.  Accordingly, the net loss of Ms. Sonthalia—who retained her 60,424 shares throughout the 90-day period following the Corrective Disclosure—decreased from $390,804 to $384,185 between the date her Motion was filed and the present.

8

Corrective Disclosure fluctuations in the price of View stock. *See* King Decl., ECF No. 31-1, Ex. 3. However, potentially none of this loss can be traced to the inflated stock value or the Corrective Disclosure, because it took place before the Corrective Disclosure. In *Dura*, the Supreme Court held that alleging losses in a securities fraud action based on an inflated purchase price alone is insufficient, including because "if . . . the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342; *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). Accordingly, the LIFO net loss formula accounts for losses that may not be recoverable in the action itself, so it may inflate a party's calculated loss value beyond the actual financial stake the party has in the action.

Based on the above reasoning, the Court declines to adopt the LIFO net loss approach.

### ii. Loss Formula #2 – *Dura*-Adjusted LIFO Loss (Sonthalia)

The second proposed formula for calculating the Movants' losses is *Dura*-adjusted LIFO loss, which is the Recoverable Loss approach advanced by Ms. Sonthalia. *See* Joint Submission, ECF No. 61, Ex. A; Sonthalia Opposition, ECF No. 47 at 6–7. Under this approach, the Court only considers the parties' losses from shares retained at the time of the Corrective Disclosure. *See Dura*, 544 U.S. at 342. Since Ms. Sonthalia retained all the View shares she purchased during the Class Period until the end of the Class Period, this approach does not change her losses from the net loss approach—Ms. Sonthalia's losses are still $384,185. *See* Joint Submission, ECF No. 61, Ex. A. However, since Stadium sold shares and sustained losses during the Class Period which are not included in the *Dura*-adjusted LIFO net loss calculation, its recoverable losses are lower than its total net losses. *See id.* Stadium only retained 60,000 shares at the end of the Class Period. *See* Stadium Motion, ECF No. 31 at 5. Stadium paid $380,884 for these shares and sold them on August 17, 2021 for $253,836 (60,000 x $4.2306). *See* Stadium Opposition, ECF No. 46 at 5. Accordingly, under the *Dura*-adjusted recoverable loss approach, Stadium sustained losses of $127,048 ($380,884 – $253,836). Therefore, under the *Dura*-adjusted LIFO approach, Ms. Sonthalia has the greater recoverable loss—$384,185 to Stadium's $127,048. *See* Sonthalia Reply, ECF No. 48 at 3–4; Joint Submission, ECF No. 61, Ex. A.

9

*Dura*-adjusted LIFO loss partially addresses the Court's concerns with the LIFO net loss approach, since it ignores a portion of the parties' losses that took place before the Corrective Disclosure that may not be linked to the inflation of the stock price caused by the alleged fraud. *See Mulligan*, 2013 WL 3354420, at *6. However, *Dura*-adjusted LIFO loss still takes into account some losses that likely have nothing to do with the alleged fraud.

For example, Ms. Sonthalia bought all her View stock on or before February 5, 2021. *See* Ngo Decl., ECF No. 30, Ex. B. Over the 16 transactions in which Ms. Sonthalia bought View stock, its share price was between $10.49 and $12.85. *See id.* Immediately prior to the Corrective Disclosure, the share price of View stock had plummeted to $5.18. *See* Joint Submission, ECF No. 61, Ex. A. Accordingly, prior to the Corrective Disclosure, Ms. Sonthalia had already experienced a significant loss—her View stock was worth less than half the value it had when she purchased it in late 2020 and early 2021. However, since this loss took place prior to the single Corrective Disclosure alleged in this case, it is likely not linked to the alleged fraud. *See Dura*, 544 U.S. at 342.

The same is true for Stadium—when it purchased the View shares it retained until the Corrective Disclosure, the share price was between $5.95 and $6.67, which was also higher than the $5.18 stock price just before the Corrective Disclosure. *See* King Decl., ECF No. 31-1, Ex. 3. So Stadium had also suffered a loss in the value of its View stock prior to the Corrective Disclosure. By taking into account this pre-Corrective Disclosure loss, the *Dura*-adjusted LIFO loss approach may still inflate the financial interest a party actually has in the litigation.

Based on the above reasoning, the Court declines to adopt the *Dura*-adjusted LIFO loss approach.

### iii. Loss Formula #3 – Recoverable Loss Approach (Stadium)

The third proposed formula for calculating Ms. Sonthalia and Stadium's losses attempts to address the issue the Court described regarding the *Dura*-adjusted LIFO loss approach. The third approach—which Stadium argues the Court should apply—is the Recoverable Loss approach this Court used in the *Enphase* case. *See Enphase*, 2020 WL 7025085, at *4; *see also Markette*, 2016 WL 2902286, at *6. Under this approach, the Court considers the value of each party's

retained stock just before the Corrective Disclosure and subtracts the party's sale proceeds for that stock (or, for stock retained past the 90-day post-Disclosure period, the number of shares multiplied by the average stock price). *See Enphase*, 2020 WL 7025085, at *4; *see also Markette*, 2016 WL 2902286, at *6. The only difference between this approach and the *Dura*-adjusted loss approach is instead of using the actual purchase price of the stock to determine its value before the Corrective Disclosure, the Court uses the stock price just before the Corrective Disclosure.

In this case, since the Corrective Disclosure was made after the market closed on August 16, 2021, under the Recoverable Loss approach, the Court would use the $5.18 price of View stock at the close of trading that day to calculate the pre-Disclosure value of the Movants' stock. *See* Stadium Opposition, ECF No. 46 at 5. Based on this approach, Ms. Sonthalia's View stock was worth approximately $312,996 (60,424 x $5.18) just prior to the Corrective Disclosure and Stadium's was worth approximately $310,800 (60,000 x $5.18). *See* Joint Submission, ECF No. 61, Ex. A. Subtracting from these the relevant values *after* the Corrective Disclosure ($316,018 for Ms. Sonthalia and $253,836 for Stadium—the same as Ms. Sonthalia proposed for the *Dura*-adjusted loss approach) yields the recoverable loss values under the *Enphase* approach—a $3,022 ($312,996 – $316,018) gain for Ms. Sonthalia and a $56,964 ($310,800 – $253,836) loss for Stadium. Accordingly, under the Recoverable Loss approach, Stadium has the greater recoverable loss value—in fact, Ms. Sonthalia shows a gain, not a recoverable loss.

The Court considers the Recoverable Loss approach to be an improvement on both the LIFO net loss and *Dura*-adjusted LIFO approaches. Like the *Dura*-adjusted LIFO approach, the Recoverable Loss approach considers only the shares retained at the time of the Corrective Disclosure, so it does not take into account losses from shares sold previously. Further, it ignores the losses the parties experienced from their stocks depreciating prior to the Corrective Disclosure. Since this loss is potentially not linked to the Corrective Disclosure, the Court does not see why it should be taken into account for determining the parties' financial interest in the litigation. "This is not to say that a causally related loss . . . cannot be proven; but it does make a substantial portion of [the parties' losses] uncertain for purposes of the pending motions." *Isaacs v. Musk*, No. 18–cv–04865–EMC, 2018 WL 6182753, at *4 (N.D. Cal. Nov. 7, 2018).

Ms. Sonthalia argues that the Recoverable Loss approach contradicts some courts' intent to "maximize the potential damages" when calculating financial interest. *See* Sonthalia Reply, ECF No. 48 at 4 (citing *Eichenholtz v. Verifone Holdings, Inc.*, No. C 07–06140 MHP, 2008 WL 3925289, at *4 (N.D. Cal. Aug. 22, 2008)). The Court does not agree that maximizing damages should be the goal of determining the parties' financial stake in the litigation—rather, the goal should be formulating as accurate an estimate of the parties' recoverable loss as possible at this preliminary stage of litigation. Otherwise, as outlined above, the Court is potentially inflating the value of a party's interest in the litigation to a point that may not accurately reflect the value that party will be able to recover, which strikes the Court as contrary to the objective of the financial stake inquiry. *See Eichenholtz*, 2008 WL 3925289, at *4 ("[T]he court finds no reason to include losses in its calculations that would later be considered uncompensable."); *In re McKesson HBOC, Inc. v. Secs. Litig.*, 97 F.Supp.2d 993, 997 (N.D. Cal. 1999) ("One's 'interest' in a litigation is rather directly tied to what one might recover."); *see also Foley v. Transocean Ltd.*, 272 F.R.D. 126, 129 (S.D.N.Y. 2011) (describing accounting approach as disadvantageous because it "may exaggerate losses") (citations omitted). Accordingly, the Court declines to follow other courts that have sought to maximize potential damages in calculating the parties' financial stake.

Ms. Sonthalia further argues that the Recoverable Loss approach "has not been consistently applied," contrary to the Ninth Circuit's guidance in *Cavanaugh*. *See* Sonthalia Reply, ECF No. 48 at 4 (citing *Cavanaugh*, 306 F.3d at 730 n.4). The Court disagrees. First, this Court previously adopted this approach in the *Enphase* case, so it is consistent for this Court to again apply this approach in the present case. *See Enphase*, 2020 WL 7025085, at *4; *Markette*, 2016 WL 2902286, at *6. Second, the Court has applied the Recoverable Loss approach consistently to Ms. Sonthalia and Stadium. As outlined below, any purported inconsistency Ms. Sonthalia identifies is merely the result of the differences in Ms. Sonthalia and Stadium's situations—Stadium sold its stock immediately after the Corrective Disclosure, whereas Ms. Sonthalia retained her shares for more than 90 days following the Corrective Disclosure.

Ms. Sonthalia additionally argues that the Recoverable Loss approach is inapplicable because of factual distinctions between this case and *Markette*, where the Recoverable Loss

12

1    approach was applied. Ms. Sonthalia argues that *Markette* was distinguishable, because all the
2    parties in that case held their shares for at least 90 days following the corrective disclosure, so the
3    same sale price applied to all parties. *See* Sonthalia Reply, ECF No. 48 at 4–5. Here, in contrast,
4    Stadium sold its stock the day after the Corrective Disclosure, whereas Sonthalia held her shares for
5    the 90-day post-Corrective Disclosure period, so different sale prices apply.

6    The Court is puzzled by this argument. Both Ms. Sonthalia and Stadium appear to agree on
7    the relevant sale price for the two parties—they use the same sale price values in the *Dura*-adjusted
8    loss calculation and the calculation based on the Recoverable Loss approach. *See* Joint Submission,
9    ECF No. 61, Ex. A. The sale price is $4.2306 for Stadium, because this was the price Stadium sold
10   its stock for on August 17, 2021. *See id.* And it is $5.23 for Ms. Sonthalia, since she retained her
11   stock, and this is the average daily closing price for View stock during the 90-day period following
12   the Corrective Disclosure. *See id.* This approach is consistent with 15 U.S.C. § 78u-4(e), which
13   Ms. Sonthalia cites repeatedly. *See* Sonthalia Reply, ECF No. 48 at 3; Ngo Decl., ECF No. 30,
14   Ex. B; *see also Mulligan*, 2013 WL 3354420, at *5 (quoting *Eichenholtz*, 2008 WL 3925289, at *4).
15   Further, this approach—using different sale prices for Stadium and Ms. Sonthalia—accounts for
16   their different outcomes: Stadium realized a loss by selling immediately after the Corrective
17   Disclosure, whereas Ms. Sonthalia recuperated some of her loss by retaining her stock during the
18   90-day period following the Corrective Disclosure, during which the stock regained some of its
19   value. *See* Joint Submission, ECF No. 61, Ex. A. Accordingly, the Court does not see why it should
20   use the same sale price for Stadium and Ms. Sonthalia—particularly when the parties appear to agree
21   on using different sale prices in their respective loss calculation formulas. The only dispute appears
22   to be the proper *purchase* price to use—not the proper *sale* price—and the Court has explained why
23   it considers the *Enphase* method to provide the superior approach to determining a purchase price.

24   Ms. Sonthalia also argues that the present case is distinguishable from *Enphase*. *See*
25   Sonthalia Reply, ECF No. 48 at 5. According to Ms. Sonthalia, *Enphase* was distinguishable
26   because there, the class period ended on the same day as the single, *intraday* corrective disclosure,
27   and the competing movant did not contest the approach. *See id.* Here, in contrast, the Corrective
28   Disclosure was *post-market*, and Ms. Sonthalia contests the approach. *See id.* The Court does not

United States District Court
Northern District of California

see why these factual distinctions between *Enphase* and the present case make the Recoverable Loss approach inapplicable. The Court finds that the Recoverable Loss approach is better at disregarding losses that are potentially unrelated to the alleged fraud than the *Dura*-adjusted LIFO loss method, and none of the factual distinctions Ms. Sonthalia points to between this case and prior cases change the Court's conclusion.

Ms. Sonthalia also cites to the *In re Wrap Technologies* case, where a court in the Central District of California rejected an approach for calculating loss similar to the Recoverable Loss approach based in part on the reasoning of a Southern District of New York court that did the same. *See* Sonthalia Reply, ECF No. 48 at 5 (citing *In re Wrap Tech., Inc. Sec. Litig.*, No. CV 20–8760–DMG (RAOx), 2021 WL 71433, at *2 (C.D. Cal. Jan. 7, 2021); *Sallustro v. CannaVest Corp.*, 93 F. Supp. 3d 265, 275–76 (S.D.N.Y. 2015)). First, the Court notes that the *In re Wrap* case involved multiple partially corrective disclosures, unlike the present case, in which both Ms. Sonthalia and Stadium acknowledge a single corrective disclosure is alleged. *See In re Wrap*, 2021 WL 71433, at *2; Sonthalia Reply, ECF No. 48 at 5; Stadium Opposition, ECF No. 46 at 1. This limits the applicability of the *In re Wrap* court's reasoning to the present case. Second, the *In re Wrap* court based its decision on the fact that (1) in *Dura*, the Supreme Court stated that a stock's "higher purchase price will *sometimes* play a role in bringing about a future loss," *In re Wrap*, 2021 WL 71433, at *2 (citing *Dura*, 544 U.S. at 343), and (2) 15 U.S.C. § 78u–4(e)(1) provides for a statutory cap on damages that is calculated based on the "difference between the purchase or sale price paid … by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which [disclosure is made]," *id.* The *Dura* language is too broad to support the fact that the Court should take into account purchase price *in this case*. And the statutory cap is exactly that—a cap—it does not indicate that the Court cannot take into account a *lower* amount of damages than the limit provided by the cap. Accordingly, the Court does not find the *In re Wrap* court's reasoning applicable to the present case.

Based on the above reasoning, the Court finds that the Recoverable Loss approach is the superior method for calculating the parties' losses. Under this approach, Stadium lost $56,964 while Ms. Sonthalia gained $3,022. *See* Joint Submission, ECF No. 61, Ex. A. Accordingly, the Court

14

1  finds that Stadium had the greatest loss. The parties do not provide any briefing regarding the other
2  factors courts consider in the lead plaintiff inquiry—(1) the number of shares purchased during the
3  class period; (2) the number of net shares purchased during the class period; and (3) the total net
4  funds expended during the class period—and the Court finds that the import of these factors is
5  mixed. *See Perlmutter*, 2011 WL 566814, at *7. Under the first factor, Stadium purchased 426,235
6  shares to Ms. Sonthalia's 60,424 shares, so this factor highly favors Stadium. *See* Joint Submission,
7  ECF No. 61, Ex. A. Under the second factor, Stadium purchased a net total of 60,000 shares to Ms.
8  Sonthalia's similar 60,424 shares, so this factor only somewhat favors Ms. Sonthalia. *See* Joint
9  Submission, ECF No. 61, Ex. A. Under the third factor, Stadium expended total net funds of
10 $583,845.58 during the class period to Ms. Sonthalia's $700,202.57, which favors Ms. Sonthalia.
11 *See* Stadium Motion, ECF No. 31 at 5; Sonthalia Motion, ECF No. 27 at 5. Considering that courts
12 primarily weigh the approximate losses suffered more heavily than other factors, and the other
13 factors are not clearly in favor of either party, the Court finds that Stadium has demonstrated the
14 larger financial interest in this litigation and is therefore the presumptive Lead Plaintiff. *See*
15 *Perlmutter*, 2011 WL 566814, at *7.

### C. Rule 23 Requirements

Upon determining the movant with the largest financial interest, the court "must then focus its attention on *that* plaintiff and determine ... whether he [or she] satisfies the requirements of Rule 23(a)." *Cavanaugh*, 306 F.3d at 730 (emphasis in original); *see also* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) requires satisfaction of four factors to serve as a class representative:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). The typicality and adequacy requirements of Rule 23 are the main focus of this determination. *See Cavanaugh*, 306 F.3d at 730. Examination of the remaining requirements

15

is deferred until the lead plaintiff moves for class certification. The movant with the largest financial interest "need only make a prima facie showing [of its] typicality and adequacy." *Veal v. LendingClub Corp.*, No. 18–cv–02599–BLF, 2018 WL 5879645, at *4 (N.D. Cal. Nov. 7, 2018) (citing *Cavanaugh*, 306 F.3d at 731).

Stadium argues that its claims are typical because they are based on the same legal theory and arise out of the same course of events as the other putative class members' claims. *See* Stadium Motion, ECF No. 31 at 6. Further, Stadium argues that it is adequate to serve as Lead Plaintiff because (1) there is no evidence of any conflict between Stadium and the putative class; (2) Stadium has provided a signed Certification evidencing its understanding of the duties it owes to the putative class and its commitment to monitor this action; and (3) Stadium's selected counsel Kaplan Fox is highly experienced in prosecuting complex securities class actions. *See id.* at 6–7. No parties have disputed that Stadium and its counsel meet the requirements of Rule 23. *See, e.g.*, Sonthalia Opposition, ECF No. 47; Sonthalia Reply, ECF No. 48.

First, the Court finds that Stadium has sufficiently shown the typicality of its claims for those of the class. Stadium alleges that it purchased View securities during the Class Period and was subsequently damaged due to Defendants' conduct just like the other members of the putative class. *See* Stadium Motion, ECF No. 31 at 4–5.

Second, to determine Stadium's adequacy, the Court must resolve two questions: (1) whether Stadium and its counsel have any conflicts of interest with other class members and (2) whether Stadium and its counsel will prosecute the action vigorously on behalf of the putative class. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citations omitted). Seeing no evidence of any conflicts between Stadium and its counsel and any other class members, and satisfied based on Stadium's Certification and selected counsel that it will vigorously prosecute this action on behalf of the putative class, the Court finds that Stadium has also sufficiently shown that it is an adequate representative for the putative class.

Accordingly, the Court finds that Stadium has adequately shown that it meets the Rule 23 requirements.

### D. Lead Counsel

No parties have objected to Stadium's selection of Kaplan Fox as counsel. *See, e.g.*, Sonthalia Opposition, ECF No. 47; Sonthalia Reply, ECF No. 48. The Court has reviewed the firm's resume, King Decl., ECF No. 31-1, Ex. 4, and is satisfied that Stadium has made a reasonable choice of counsel. Accordingly, the Court APPROVES Stadium's selection of Kaplan Fox & Kilsheimer LLP as lead counsel.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Stadium Capital LLC is APPOINTED as Lead Plaintiff;
2. Kaplan Fox & Kilsheimer LLP is APPOINTED as Lead Counsel; and
3. All other Motions to Appoint Lead Plaintiff and Lead Counsel are DENIED.

Dated: February 8, 2022

BETH LABSON FREEMAN
United States District Judge

17