Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:  415-772-4707
Emails: *lking@kaplanfox.com*
          *kherkenhoff@kaplanfox.com*
          *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
          *ffox@kaplanfox.com*
          *dhall@kaplanfox.com*
          *juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium Capital*
*LLC and the Proposed Class*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated, <br><br>                Plaintiff, <br><br>     v. <br><br> VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, TOM LEPPERT, HAROLD HUGHES, NIGEL GORMLY, TOBY COSGROVE, LISA PICARD, TOM CHEUNG, TOM PATTERSON, BILL VEGHTE, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., CF GROUP MANAGEMENT, INC., AND PRICEWATERHOUSECOOPERS LLP, <br><br>                Defendants. | Case No.: 5:21-cv-06374-BLF <br><br> **<u>CLASS ACTION</u>** <br><br> **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.      SUMMARY OF THE ACTION .................................................................. 1

II.     JURISDICTION AND VENUE ................................................................ 5

III.    DIVISIONAL ASSIGNMENT ................................................................. 5

IV.     PARTIES .................................................................................................... 5

        A.      Lead Plaintiff ................................................................................ 5

        B.      Defendant View ............................................................................ 6

        C.      Individual View Defendants ......................................................... 6

        D.      CF II Defendants .......................................................................... 8

        E.      Auditor Defendant ...................................................................... 11

V.      OVERVIEW OF THE RESTATEMENT ............................................... 12

VI.     BACKGROUND ...................................................................................... 14

        A.      View's Background and Business ............................................... 14

        B.      Background on CF II .................................................................. 15

        C.      View's Business Combination With CF II ................................. 15

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        MATERIAL OMISSIONS DURING THE CLASS PERIOD ................ 17

        A.      Announcement of the Business Combination on November 30, 2020 ................ 17

        B.      The December 23, 2020 De-SPAC Registration Statement .................. 19

        C.      The January 26, 2021 Amendment to the De-SPAC Registration Statement ....... 21

        D.      View Filings As A Public Company ........................................... 24

                1.      The March 12, 2021 Form 8-K .................................... 24

                2.      The April 7, 2021 Shelf Registration Statement ......... 31

                3.      The May 12, 2021 Press Release .................................. 32

                4.      The May 17, 2021 10-Q ............................................... 33

VIII.   THE TRUTH BEGINS TO EMERGE ................................................... 39

IX.     RELEVANT POST CLASS PERIOD EVENTS ..................................... 44

X.      COUNTS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE
        EXCHANGE ACT AND SECTIONS 11, 12 AND 15 OF THE SECURITIES
        ACT .......................................................................................................... 45

**TABLE OF CONTENTS – cont'd.**

Page

XI.   ADDITIONAL FACTUAL ALLEGATIONS RELATING TO CLAIMS UNDER
      SECTION 10B AND RULE 10-b-5 OF THE EXCHANGE ACT ................................. 58

      A.   Defendants Acted With Knowledge of Deliberate Recklessness ........................ 62

      B.   There Were Numerous Suspiciously-timed Resignations of View
           Executives and Directors .......................................................................... 62

      C.   Smart Glass Was View's Core Product and Its Operations Centered on A
           Relatively Narrow Customer, Supplier, and Manufacturing Framework ............ 63

      D.   View's De-SPAC Registration Statement And Other SEC Filings Alleged
           Herein Included Financial Statements Not In Conformity With GAAP .............. 64

      E.   View's Restatement Is An Admission That The Subject Financials Were
           Materially False As Initially Reported .................................................... 65

      F.   PwC Failed To Comply With PCAOB And GAAS Auditing Standards ............. 67

      G.   PwC Knew and/or Was Reckless in Ignoring Red Flags In Connection
           With Issuance of the December 23, 2020 and March 12, 2021 Audit
           Reports .................................................................................................. 71

      H.   Corporate Scienter and *Respondeat Superior* ........................................ 72

XII.  COUNTS FOR VIOLATIONS OF SECTIONS 10 AND 20(a) OF THE
      EXCHANGE ACT ...................................................................................... 72

XIII. LOSS CAUSATION .................................................................................... 76

XIV.  NO SAFE HARBOR .................................................................................. 77

XV.   APPLICABILITY OF PRESUMPTION OF RELIANCE; FRAUD ON THE
      MARKET .................................................................................................. 78

XVI.  CLASS ACTION ALLEGATIONS ............................................................... 79

XVII. PRAYER FOR RELIEF ............................................................................. 81

XVIII. JURY DEMAND ..................................................................................... 81

Lead Plaintiff Stadium Capital LLC, on behalf of itself and a class of similarly situated investors ("Lead Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: 1) the public filings made by View Inc. ("View" or the "Company") (f/k/a CF Finance Acquisition Corp. II ("CF II")) with the United States Securities and Exchange Commission ("SEC"); 2) press releases and media reports issued by and disseminated by the Company; 3) analyst reports, media reports, and other publicly disclosed reports and information about the Company; 4) conference calls with Company executives, analysts, and investors; and 5) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of View's securities. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE ACTION

1.     This securities class action is brought on behalf of a class consisting of (i) all persons or entities who purchased or otherwise acquired View and/or CF II securities between November 30, 2020 and May 10, 2022, inclusive (the "Class Period"); (ii) all persons or entities who were holders of CF II Class A common stock as of the January 27, 2021 record date (the "Record Date") that were entitled to vote to approve the Business Combination (as defined below) between View and CF II as set forth in the February 16, 2021 Proxy Statement/Prospectus (defined below); and (iii) all persons or entities who purchased or otherwise acquired View securities pursuant or traceable to the De-SPAC Registration Statement (defined below) (the "Class"). Excluded from the Class are persons or entities who held shares of View's privately held common stock and preferred stock outstanding prior to closing of the Business Combination (defined below). As set forth herein, also excluded from the Class are Defendants (as defined herein), or their affiliates or subsidiaries, the current and/or former officers and directors of any non-natural Defendant named herein, members of the immediate family of any excluded person, heirs,

successors and assigns of any excluded person or entity, and any entity in which any excluded person has or had a controlling interest.

2.      Lead Plaintiff brings claims on behalf of the Class against View and certain of its current and former officers and directors, certain former officers and directors of CF II, CF Finance Holdings II, LLC (CF II's sponsor), Cantor Fitzgerald & Co. (CF II's advisor on the Business Combination), Cantor Fitzgerald, L.P. (an affiliate of CF II, CF Finance Holdings II, LLC and of Cantor Fitzgerald & Co., and the sole member of the Sponsor), CF Group Management, Inc. (Cantor Fitzgerald, L.P.'s managing general partner), and PricewaterhouseCoopers LLP (View's outside auditor) (collectively, "Defendants") for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a) and Rules 10b-5 and 14a-9, promulgated thereunder, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9, and for violations of Section 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

3.      View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption in buildings or structures. During the Class Period, View's primary product was a proprietary electrochromic or "smart" glass panel that adjusted in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

4.      CF II was a special purpose acquisition company (or "SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

5.      On March 8, 2021, pursuant to an Agreement and Plan of Merger dated November 30, 2020 ("Merger Agreement"), and the other transactions described in the Merger Agreement, CF II and View combined via a business combination with CF II (now referred to as View) as the surviving, public entity (the "Business Combination").

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants have now admitted that View's financial statements for fiscal years ending 2019-2020 and certain quarterly periods as detailed herein that

are set forth in SEC filings alleged herein, were materially false when issued and, were required to be restated.  These financial statements were misrepresentations of then-existing material facts, that also failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because Defendants excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's insulated glass units ("IGUs"), including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

7.     On August 16, 2021, after the market closed, View announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual."

8.     On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

9.     On January 4, 2022, View announced that the Company expected to issue its restated financials "in the first quarter of 2022."  Then, on March 28, 2022, View announced a delay in the timing of its expected financial restatement, and it indicated that the Company expected to complete its financial restatement "in May 2022."

10.     On March 7, 2022, View reassured investors that the Company had turned the corner, announcing "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies."

11.     Then, only 8 weeks later, on May 10, 2022, after the market closed, View  revealed that in addition to being unable to file its Quarterly Report on Form 10-Q for the period ended

March 31, 2022 within the prescribed time period, "management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K."

12.     Later that same day, at approximately 11:13 p.m. Pacific Time, View announced that ". . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million."

13.     On this news, the Company's share price fell $0.844, or over 62%, to close at $0.516 per share on May 11, 2022, on unusually heavy trading volume.

14.     Finally, on May 31, 2022, View reported that its yet-to-be restated warranty-related accruals would be $53 million, $48 million, and $42 million as of December 31, 2019, 2020, and 2021 respectively, revealing that these key metrics were falsely understated in View's financial statements filed with the SEC by more than 100%.

15.     On June 15, 2022, View filed its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), an amendment to its quarterly report on Form 10-Q/A for the period ended March 31, 2021 (the "1Q21 10-Q/A"), and quarterly reports on Form 10-Q for the periods ended June 30 (the "2Q21 10-Q") and September 30, 2021 (the "3Q21 10-Q"), marking the completion of the financial restatement.  In its 2021 10-K, View announced that in January 2022 the Company was informed that the SEC was conducting a formal investigation of its previously reported warranty accrual.

16.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

## II.      JURISDICTION AND VENUE

17.      The federal law claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9, and under Section 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

18.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

19.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

20.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.      DIVISIONAL ASSIGNMENT

21.      Pursuant to Civil L.R. 3-2(c), this action arises in Santa Clara County because a substantial part of the events or omissions giving rise to the claim occurred in Santa Clara County due to the fact that View is headquartered in Milpitas, California.  Accordingly, this action is properly assigned to the San Jose Division of this District.

## IV.      PARTIES

### A.      Lead Plaintiff

22.      Lead Plaintiff Stadium Capital LLC suffered damages as a result of its Class Period purchases of View securities at artificially inflated prices, as set forth in the PSLRA certification attached hereto.

**B.     Defendant View**

23.     Defendant View is incorporated under the laws of Delaware with its principal executive offices located at 195 S. Milpitas Blvd., Milpitas, California 95035. View's Class A common stock trades on the Nasdaq exchange under the symbol "VIEW." Its redeemable warrants trade on the Nasdaq exchange under the symbol "VIEWW," where each whole warrant is exercisable for one share of Class A common stock at an exercise price of $11.50.

**C.     Individual View Defendants**

24.     Defendant Rao Mulpuri ("Mulpuri") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO").   Mulpuri has served as a director of View since at least November 30, 2020 and was elected to become a View director on the closing of the Business Combination.  Defendant Mulpuri signed View's April 7, 2021 Shelf Registration Statement, and View's 1Q 2021 Form 10-Q (defined below).  Further, Defendant Mulpuri signed certifications pursuant to SOX that were attached as exhibits to the 1Q 2021 Form 10-Q.   Mulpuri also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus. Defendant Mulpuri's last known business address is at View's location of 195 S. Milpitas Blvd., Milpitas, California 95035.

25.     Defendant Vidul Prakash ("Prakash") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Prakash signed View's April 7, 2021 Shelf Registration Statement (defined below), 1Q 2021 Form 10-Q (defined below), and View's Current Report on Form 8-K filed on March 12, 2021.  Further, Defendant Prakash signed certifications pursuant to SOX that were attached as exhibits to the 1Q 2021 Form 10-Q.  In connection with the internal investigation findings, Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

26.     Defendant Tom Leppert ("Leppert") served as a director of View from September 2015 until his resignation of February 22, 2022.  Defendant Leppert signed View's April 7, 2021 Shelf Registration Statement (defined below).  Defendant Leppert served as a member of View's Audit committee from March 8, 2021 to approximately February 22, 2022.  Leppert also solicited and/or permitted the use of his name to solicit consent or authorization for the Business

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Combination by issuing the Proxy Statement/Prospectus.  On February 22, Defendant Leppert submitted his resignation as a director of the Company, effective immediately.

27.    Defendant Harold Hughes ("Hughes") served as a director of View from June 2013 until his resignation on February 22, 2022.  Defendant Hughes served as chair of View's Audit Committee from March 8, 2021 to approximately February 20, 2022.  Defendant Hughes signed View's April 7, 2021 Shelf Registration Statement (defined below).  Hughes also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.   On November 8, 2021, Hughes was appointed as Executive Chair of the Company to assist the CEO and focus on strengthening the Company's financial and accounting functions, including financial statement reporting.  As Executive Chair, Defendant Hughes functioned as the Company's principal executive officer and Board Chair.  In light of his appointment to serve as an executive officer, he resigned from the Audit Committee. On February 22, 2022, Defendant Hughes submitted his resignation as Executive Chair, Principal Executive Officer and director of View, effective immediately.

28.    Defendant Nigel Gormly ("Gormly") served as a director of View since August 2015.   Gormly signed View's April 7, 2021 Shelf Registration Statement (defined below). Defendant Gormly has served as a member of View's Audit committee since March 8, 2021. Gormly also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.  Defendant Gormly was appointed Chair of View's Audit Committee on February 20, 2022.

29.    Defendant Toby Cosgrove ("Cosgrove") served as a director of View since March 8, 2021. Defendant Cosgrove signed View's April 7, 2021 Shelf Registration Statement (defined below).  Cosgrove also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

30.    Defendant Lisa Picard ("Picard") served as a director of View since March 8, 2021. Picard signed View's April 7, 2021 Shelf Registration Statement (defined below).  Picard also solicited and/or permitted the use of her name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

31.     Defendant Tom Cheung ("Cheung") served as a director of View since August 2019. Cheung solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.  On March 19, 2021, Cheung resigned as a member of View's board of directors.

32.     Defendant Tom Patterson served as a director of View from 2014 until on or around March 5, 2021.  Patterson solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

33.     Defendant Bill Veghte served as a director of View from June 2019 until on or around March 5, 2021.  Veghte solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

34.     Defendants Mulpuri, Prakash, Leppert, Hughes, Gormly, Cosgrove, Picard, Cheung, Patterson, and Veghte (collectively the "Individual View Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.

35.     View and the Individual View Defendants are referred to collectively as the "View Defendants."

**D.     CF II Defendants**

36.     Howard W. Lutnick ("Lutnick") was CEO and chairman of the board of CF II and signed the De-SPAC Registration Statement (as defined below).  Defendant Lutnick also signed a November 30, 2020 Current Report filed with the SEC on Form 8-K, which contained an exhibit consisting of an investor presentation that would be used by CF II and View with respect to the transactions contemplated by the merger agreement.  Defendant Lutnick is also the Chairman, President, and Chief Executive Officer of Cantor Fitzgerald, L.P. ("Cantor"), a Delaware limited partnership, an affiliate of CF II and of Cantor Fitzgerald & Co. ("CF&Co.").  Defendant Lutnick solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

37.     Paul Pion ("Pion") was Chief Financial Officer and a director of CF II and signed the De-SPAC Registration Statement (as defined below).  Defendant Pion resigned as CFO, director and member of the Audit Committee of CF II as of January 31, 2021.  Defendant Pion solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

38.     Alice Chan ("Chan") was Chief Financial Officer and a director of CF II and signed the February 11, 2021 Amendment to the De-SPAC Registration Statement (as defined below). Defendant Chan was appointed as Chief Financial Officer and elected as a member of the Board's first class of directors and as member of the audit committee of the Board effective January 31, 2021, replacing Defendant Pion.  Defendant Chan solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

39.     Anshu Jain ("Jain") was President and a director of CF II and signed the De-SPAC Registration Statement (as defined below).  Defendant Jain solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

40.     Robert J. Hochberg ("Hochberg") was a director of CF II and signed the De-SPAC Registration Statement (as defined below).  Defendant Hochberg solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

41.     Charlotte S. Blechman ("Blechman") was a director of CF II and signed the De-SPAC Registration Statement (as defined below).  Defendant Blechman solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

42.     Defendants Lutnick, Pion, Chan, Jain, Hochberg, and Blechman are referred to collectively as the "CF II Individual Defendants."

43.     Defendant CF Finance Holdings II, LLC (the "Sponsor" or "CF Holdings II"), is a Delaware limited liability company that acted as CF II's sponsor for the Business Combination.

Cantor is reportedly the sole member of the Sponsor, and CF Group Management, Inc. ("CFGM") is the managing general partner of Cantor.  Defendant Lutnick is the CEO of CFGM and is the trustee of CFGM's sole stockholder.  As set forth in the Proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor."  Defendant CF Holdings II solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus. During the Class Period, the Sponsor's principal business address was c/o CF Finance Acquisition Corp. II, 110 East 59th Street, New York, NY 10022.

44.     Defendant Cantor Fitzgerald & Co. ("CF&Co.") served as CF II's advisor in connection with the Business Combination, for which it was to be paid a cash fee upon the consummation of the Business Combination in an amount equal to, in the aggregate, 3.5% of the gross proceeds of the base offering and 5.5% of the gross proceeds from the full or partial exercise of the underwriters' overallotment option.  CF&Co. served as the representative of the underwriters for the CF II IPO, and CF II paid a total of $10 million in underwriting discounts and commissions for CF&Co.'s services.  CF II also agreed to a cash fee for CF&Co.'s services as an advisor in connection with the Business Combination, agreeing to pay an amount equal to, in the aggregate, 3.5% of the gross IPO proceeds.  On the consummation of the Business Combination, CF&Co. was slated to receive $17.5 million in marketing fees, $7.5 million in M&A advisory fees payable in CF II common stock, and $4.5 million of placement agent fees.  CF&Co. (and Goldman Sachs & Co. LLC) served as placement agents for the PIPE financing referenced herein.  Defendant CF&Co. solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

45.     Defendant Cantor Fitzgerald, L.P. ("Cantor") is an affiliate of CF II, the Sponsor and of CF&Co.  Defendant Lutnick is the Chairman, President, and CEO of Cantor.  CFGM is the managing general partner of Cantor.  Cantor is the sole member of the Sponsor.  As set forth in the proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor."  Defendant Cantor solicited and/or

permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

46.     Defendant CF Group Management, Inc. ("CFGM") is the managing general partner of Cantor.  Defendant Lutnick, CF II's Chairman and Chief Executive Officer, is the trustee of CFGM's sole stockholder.  As set forth in the proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor."  Defendant CFGM solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus.

47.     CF Holdings II, CF&Co., Cantor and CFGM are referred to collectively as the "CF II Entity Defendants."

48.     The CF II Individual Defendants and the CF II Entity Defendants are collectively referred to as the "CF II Defendants".

**E.      Auditor Defendant**

49.     Defendant PricewaterhouseCoopers LLP ("PwC") served as View's outside auditor at all relevant times and provided audit services to the Company since 2013 and throughout Class Period.  During the Class Period, the San Jose, California office of PwC was listed on certain of the audit opinions set forth herein.  The San Jose, California office of PwC is located at 488 S. Almaden Boulevard, Suite 1800, San Jose, California 95110.

50.     On December 23, 2020 PwC issued an audit report regarding its audit of the consolidated balance sheets of View as of December 31, 2019 and 2018, and the related consolidated statements of comprehensive loss, of redeemable convertible preferred stock and stockholders' deficit and of cash flows for the years then ended, including the related notes ("Dec. 23, 2020 Audit Report").  The December 23, 2020 De-SPAC Registration Statement incorporated by reference the Dec. 23, 2020 Audit Report with the consent of PwC and attached it at page F-35.  The consent of PwC to inclusion of the Dec. 23, 2020 Audit Report is Ex. 23.2 to the De-SPAC Registration Statement.

51.     In its Dec. 23, 2020 Audit Report PwC opined that the "consolidated financial statements present fairly, in all material respects, the financial position of the Company as of

December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

52.     PwC also consented to the inclusion of its Dec. 23, 2020 Audit Report in the later amendments to the Form S-4 identified herein (January 26, 2021 and February 11, 2021 on Form S-4/A), and in the Proxy Statement/Prospectus (defined below).

53.     On March 12, 2021 PwC issued an audit report regarding its audit of the consolidated balance sheets of View as of December 31, 2020 and 2019, and the related consolidated statements of comprehensive loss, of redeemable convertible preferred stock and stockholders' deficit and of cash flows for the years then ended, including the related notes ("Mar. 12, 2021 Audit Report").  The March 12, 2021 Form 8-K and the April 7, 2021 Shelf Registration Statement (defined herein) incorporated by reference the Dec. 23, 2020 Audit Report with the consent of PwC.  In addition, the March 12, 2021 Form 8-K attached, as Exhibit 99.1 thereto, the Mar. 12, 2021 Audit Report.

54.     In its Mar. 12, 2021 Audit Report PwC opined that the "consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America."

55.     The View Defendants, CF II Defendants and PwC are referred to collectively as "Defendants."

**V.     OVERVIEW OF THE RESTATEMENT**

56.     As set forth herein, View's financial statements during the Class Period (and those included in the De-SPAC Registration Statement and Proxy Statement/Prospectus) were false and misleading when issued and have now been restated as summarized below.  This includes restatement of View's financial statements for fiscal year end ("FYE") December 31, 2019 and 2020, as well as for the quarterly periods ending March 31, 2020 and March 31, 2021.

57.     As detailed herein, when a Company restates its financials it revises previously issued financial statements to reflect the correction of an error in those financial statements.  In other words, when a restatement occurs, it indicates that the financials were false at the time they were issued.

58.     On June 15, 2022, View filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K") to correct the Company's reported warranty-related obligations and other misstatements contained in the previously issued 2020 and 2019 financial statements.  As set forth herein, the restatement is principally attributed to a warranty accrual issue related to a quality issue identified in 2019 (before the Business Combination) with certain material purchased from one of its suppliers utilized in the manufacturing of certain of the Company's IGUs. The 2021 10-K at page 107 admits, among other things, that the Company had:

> . . .inappropriately excluded from the warranty obligation the installation labor and freight costs that it had incurred, expected to continue to incur, when replacing the IGUs.  It was also determined that partially offsetting the misstatement which understated the warranty obligation was another misstatement resulting in an overestimate in the estimated failure rates of the impacted IGUs. As a result of these material misstatements, the Company's warranty liabilities were understated by $25.0 million as of December 31, 2020 and the Company's Cost of Revenue and Net Loss were overstated by $3.1 million and understated by $20.9 million for the years ended December 31, 2020 and 2019, respectively, as well as understated by $7.1 million for periods prior to 2019, which has been corrected for as an adjustment to Accumulated Deficit as of December 31, 2018.

59.     As set forth herein, the labor and freight costs were material amounts already "incurred" or "expected" to be incurred at the time of the issuance of the subject financials and

were improperly omitted from the prior warranty accrual amounts set forth in the historic financial statements disseminated to the Class in connection with the Company's SEC filings detailed herein.

60. As a result, the 2021 10-K, for FYE 2020, reported amended and restated financial information as follows (the Warranty Accrual figures set forth in the following chart and similar charts contained herein were reported by the Company in a press release filed on Form 8-K with the SEC on May 31, 2022):

| Financial Metric FYE 2020 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $23 million | $48 million |
| Accrued expenses and other current liabilities | $36.480 million | $42.150 million |
| Other liabilities | $36.731 million | $56.844 million |

61. The 2021 10-K, for FYE 2019, reported amended and restated financial information as follows:

| Financial Metric FYE 2019 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $25 million | $ 53 million |
| Cost of revenue | $179.675 million | $203.732 million |
| Accrued expenses and other current liabilities | $26.779 million | $47.645 million |
| Other liabilities | $34.051 million | $53.290 million |
| Net loss | $289.904 million | $312.109 million |

## VI.   BACKGROUND

### A.   View's Background and Business

62. View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption. Its primary product is a proprietary electrochromic or "smart" glass panel

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

that, in combination with the Company's proprietary network and software, intelligently adjusts in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

**B. Background on CF II**

63. CF II was a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses. Prior to the completion of its merger with View, CF II's Class A Common Stock, Units, and Warrants were listed on Nasdaq under the symbols "CFII", "CFIIU" and "CFIIW", respectively.

**C. View's Business Combination With CF II**

64. On September 1, 2020, CF II, a New York City-based special purpose acquisition company, announced that it consummated its initial public offering of 50 million units at $10 per share, resulting in gross proceeds of $500 million. The units traded on Nasdaq under the ticker symbol "CFIIU". Each unit consisted of one share of CF II's Class A common stock and one-third of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share. When the shares of Class A common stock and warrants began separate trading, they traded on Nasdaq under the symbols "CFII" and "CFIIW."

65. Known as a "blank check" company, CF II was formed by Defendants Lutnick, Jain, and Pion for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses in the diversified resources and industrial materials sectors.

66. On November 30, 2020, CF II announced a definitive agreement for a business combination with Defendant View that would result in View becoming a publicly listed company. To affect the Business Combination, CF II, PVMS Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of CF II, merged with and into View, with View surviving the merger. The transaction was expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CF II's trust account from

its initial public offering. The transaction was further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

67.     Specifically, at the same time as the execution of the Merger Agreement, CF II entered into separate Subscription Agreements with a number of subscribers (each a "Subscriber"), including CF II's sponsor, CF Finance Holdings II, LLC (the "Sponsor"), pursuant to which the Subscribers agreed to purchase, and CF II agreed to sell to the Subscribers, an aggregate of up to 30,000,000 shares of Class A Common Stock (the "PIPE Shares"), for a purchase price of $10.00 per share and an aggregate purchase price of $300 million  (the  "PIPE Investments"), with the Sponsor's Subscription Agreement accounting for $50 million of such aggregate PIPE Investments.

68.     Goldman Sachs & Co. LLC acted as exclusive financial advisor to View in connection with the transaction.  CF&Co. acted as financial and capital markets advisor to CF II in connection with the transaction.  CF&Co. and Goldman Sachs & Co. LLC served as placement agents for the PIPE financing.

69.     On December 23, 2020, CF II filed a registration statement for View on Form S-4 with the SEC (the "De-SPAC Registration Statement"), which De-SPAC Registration Statement was, pursuant to Section 7.2(a) of the Merger Agreement, to be "prepare[d]" by CF II and View. The De-SPAC Registration Statement was amended on January 26, 2021 and February 11, 2021 on Form S-4/A. The CF II Individual Defendants signed the De-SPAC Registration Statement.

70.     The De-SPAC Registration Statement stated that the CF II Board (including, at that time, the CF II Individual Defendants: Lutnick, Pion, Chan, Jain, Hochberg, and Blechman) unanimously recommends that CF II stockholders vote in favor of the Business Combination.  The De-SPAC Registration Statement also stated that the View Board (including, at that time, Defendants Mulpuri, Leppert, Hughes, Gormly, Cheung, Patterson and Veghte) unanimously approved the entry into the Merger Agreement and the Transactions and certain other matters.

71.     On January 11, 2021, Defendants issued a joint press release announcing an additional PIPE investment of $200 million, increasing the fully committed PIPE investment from $300 million to $500 million. With the additional $200 million PIPE investment, the transaction was expected to deliver up to $1 billion of gross proceeds.

72.     On February 16, 2021, Defendants caused CF II to file a proxy statement/consent solicitation statement/prospectus with the SEC on Form 424(b)(3) (the "Proxy Statement/Prospectus"), which was incorporated into and formed part of the De-SPAC Registration Statement. On February 17, 2021, the SEC declared the De-SPAC Registration Statement effective.

73.     The Proxy Statement/Prospectus invited CF II investors to solicit proxies to vote to approve the Business Combination at a special meeting to be held on March 5, 2021. The record date for the special meeting was January 27, 2021.

74.     Upon closing of the transaction, the combined entity would be named "View, Inc." and would remain listed on the Nasdaq and trade under the new ticker symbol "VIEW."  Under the proposed transaction, at closing, View would receive approximately $815.2 million in cash (reportedly $518.3 million after retiring existing debt), which was a combination of CF II cash and cash from the PIPE (private investment in public entity) investment.

75.     The Business Combination was approved by CF II stockholders in a special meeting held March 5, 2021, and the Business Combination was consummated on March 8, 2021.

76.     On March 8, 2021, View announced that it completed the Business Combination with CF II.  Beginning on March 9, 2021, View's common stock and warrants began trading on the Nasdaq under the new ticker symbols "VIEW" and "VIEWW".

## VII.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

### A.     Announcement of the Business Combination on November 30, 2020

77.     On November 30, 2020, the CF II Defendants caused CF II to file with the SEC a Current Report on Form 8-K, with an exhibit consisting of a joint press release, announcing that they had entered into a definitive merger agreement stating, in relevant part:

> View, Inc. ("View"), a Silicon Valley-based smart window company, and CF Finance Acquisition Corp. II (Nasdaq: CFII) ("CF II"), a special purpose acquisition company sponsored by Cantor Fitzgerald, today announced they have entered into a definitive merger agreement. The combined company will be called View, Inc.

and will be publicly listed on the NASDAQ market following the close of the transaction.

* * *

**Transaction Details**

The Board of Directors of each of View and CF Finance Acquisition Corp. II have unanimously approved the transaction. The transaction will require the approval of the stockholders of CF Finance Acquisition Corp. II and View, and is subject to other customary closing conditions, including the receipt of certain regulatory approvals. The transaction is expected to close in the first quarter of 2021.

Assuming no redemptions by CF II stockholders, the transaction is expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CFII's trust account from its initial public offering. The transaction is further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

All cash remaining in CF II at the closing after paying off transaction expenses and CF II liabilities is expected to be used to retire debt and to add cash to View's balance sheet for working capital, growth capex and other general corporate purposes.

78.     Attached to the November 30, 2020 8-K was an investor presentation (the "Investor Presentation") that would be used by CF II and View with respect to the Business Combination. The Investor Presentation included a summary of View's Consolidated Balance Sheet, Consolidated Statements of Comprehensive Loss, and Consolidated Statement of Cash Flows for 2018, 2019, and 2020 for the nine months ended September 30.  The Consolidated Statements of Comprehensive Loss stated that View reported ***cost of sales of $142.646 million in 2018, $179.674***

*million in 2019, and $91.925 million in 2020 for the nine months ended September 30.* The Consolidated Statement of Cash Flows stated that View reported *"Loss contingencies" of $24.471 million in 2019.*

79.     The above statements identified in ¶78 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶56-61, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019.  Additionally, View's cost of revenue was understated by $7.1 million for periods prior to 2019. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and  materially misleading.

## B.     The December 23, 2020 De-SPAC Registration Statement

80.     The merger agreement provided that CF II and View "shall prepare" the "registration statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy Statement. . . ."  On December 23, 2020, CF II filed its De-SPAC Registration Statement on Form S-4 in connection with the Business Combination.

81.     The De-SPAC Registration Statement reported that View recorded a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 and that the Company's cost of revenue decreased year-over-year during the nine months ended September 30, 2020. Specifically, the De-SPAC Registration Statement stated (emphasis added):

> *Cost of revenue decreased by $44.2 million or 32.5%, from $136.0 million in the nine months ended September 30, 2019, to $91.8 million in the nine months ended September 30, 2020. The decrease in the cost of revenue was primarily related to three factors: (a) a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .*

82.     The De-SPAC Registration Statement also reported that View's cost of revenue increased year-over-year in fiscal year 2019.   Specifically, the Registration Statement stated (emphasis added):

> *Cost of revenue increased by $37.0 million, or 26.0%, from $142.6 million in fiscal year 2018 to $179.7 million in fiscal year 2019. The increase in the cost of revenue was primarily due to three factors: (a) a warranty accrual of $24.5 million in fiscal year 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .*

83.     The Notes to View's 2018 and 2019 Consolidated Financial Statements, contained within the De-SPAC Registration Statement, ***reported that View recorded a Warranty accrual for the year ended December 31, 2019 of $23.43 million***.

84.     The above statements identified in ¶¶ 81-83 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶56-61, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the nine months ended September 30. Defendants have admitted that, in contrast to View's

1    reported cost of revenues and warranty accrual outlined above, View's restated warranty-related

2    accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and

3    View's restated cost of revenue was $203.732 million as of December 31, 2019. Furthermore,

4    Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost

5    of revenue associated with the recognition of those liabilities, were materially false and misleading

6    because they excluded expenses View incurred and expected to incur due to significant quality

7    issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue;

8    (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to

9    incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a

10   result, the previously reported liabilities associated with warranty-related obligations and the cost

11   of revenue associated with the recognition of those liabilities were false and  materially misstated;

12   and (5) that as a result of the foregoing, Defendants' positive statements about the Company's

13   business, operations, and prospects were false and  materially misleading.

14        **C.      The January 26, 2021 Amendment to the De-SPAC Registration Statement**

15        85.      On January 26, 2021, CF II filed an amendment to the De-SPAC Registration

16   Statement on Form S-4/A (the "January 26, 2021 Amendment"), which contained substantially

17   similar statements as identified above in ¶¶ 81-83 and contained the same financials alleged to be

18   false in the De-SPAC Registration Statement.

19        86.      The statements identified in ¶ 85 were materially false and misleading, and failed to

20   disclose material adverse facts about the Company at the time they were made, for the same reasons

21   set forth in ¶ 84, *supra*.

22        87.      Additionally, the January 26, 2021 Amendment further clarified that, regarding its

23   warranty accrual, "*[the] estimated cost to calculate the cost to replace the IGUs . . . includes our*

24   *expectations regarding future reductions in production costs which are primarily comprised of*

25   *materials, labor, and factory overhead.*" (emphasis added).

26        88.      The statement identified in ¶ 87 was materially false and misleading, and failed to

27   disclose material adverse facts about the Company at the time they were made, for the same reasons

28   set forth in ¶ 84, *supra*.  Additionally, the statement identified in ¶ 87 failed to disclose to investors

1    that View inappropriately excluded from such "estimated cost" certain costs, including labor and

2    freight costs, it intended to incur when replacing the IGUs.

3        89.    On February 11, 2021, CF II filed an amendment to the De-SPAC Registration

4    Statement on Form S-4/A (the "February 11, 2021 Amendment"), which contained substantially

5    similar statements as identified in ¶¶ 81-83, 87.

6        90.    The statements identified in ¶ 89 were materially false and misleading, and failed to

7    disclose material adverse facts about the Company at the time they were made, for the same reasons

8    set forth in ¶¶ 84, 88, *supra*.

9        91.    On February 16, 2021, the CF II Defendants filed the Proxy Statement/Prospectus

10   on Form 424(b)(3) soliciting stockholders who held as of the January 27, 2021 record date to vote

11   to approve the Business Combination at a special meeting to be held on March 5, 2021.  The Proxy

12   Statement/Prospectus, which was incorporated into and formed part of the De-SPAC Registration

13   Statement, solicited stockholder approval for the Business Combination, and contained

14   substantially the same statements as identified in ¶¶ 81-83, 87. The same day, the De-SPAC

15   Registration Statement was declared effective.

16       92.    The Merger Agreement, Annex A to both the De-SPAC Registration Statement and

17   to the Proxy, provided that CF II and View (*i.e.* Legacy View) "shall prepare" the "registration

18   statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy

19   Statement the 'Registration Statement', with the Proxy Statement contained therein . . . ."

20       93.    The Proxy Statement/Prospectus also included the December 23, 2020 audit report

21   of PwC, which stated in pertinent part:

22           Report of Independent Registered Public Accounting Firm

23           To the Board of Directors and Stockholders of View, Inc.

24           Opinion on the Financial Statements

25           We have audited the accompanying consolidated balance sheets of

26           View, Inc. and its subsidiary (the "Company") as of December 31,

27           2019  and  2018,  and  the  related  consolidated  statements  of

28           comprehensive loss, of redeemable convertible preferred stock and

stockholders' deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

* * *

Basis for Opinion

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

1    Our audits included performing procedures to assess the risks of

2    material misstatement of the consolidated financial statements,

3    whether due to error or fraud, and performing procedures that

4    respond to those risks. Such procedures included examining, on a test

5    basis, evidence regarding the amounts and disclosures in the

6    consolidated financial statements. Our audits also included

7    evaluating the accounting principles used and significant estimates

8    made by management, as well as evaluating the overall presentation

9    of the consolidated financial statements. We believe that our audits

10   provide a reasonable basis for our opinion.

11   /s/ PricewaterhouseCoopers LLP

12   San Jose, California

13   December 23, 2020

14   We have served as the Company's auditor since 2013.

15   94.    On March 8, 2021, View announced that it completed the Business Combination

16   with CF II.

17      **D.    View Filings As A Public Company**

18          **1.    The March 12, 2021 Form 8-K**

19   95.    On March 12, 2021, the Company filed a March 8, 2021 Current Report on Form 8-

20   K (the "March 12, 2021 8-K"), signed by Defendant Prakash.  The March 12, 2021 8-K at Ex. 99.1

21   also included View's consolidated financial statements for the fiscal years ended 2019 and 2020,

22   as well as PwC's audit opinion thereon.  The March 12, 2021 8-K reported that the Company's cost

23   of revenue decreased year-over-year in the year ended December 31, 2020.   Specifically, the

24   March 12, 2021 8-K stated (emphasis added):

25          ***Cost of revenue decreased by $56.6 million or 31.5%, from $179.7***

26          ***million in the year ended December 31, 2019 to $123.1 million in***

27          ***the year ended December 31, 2020. The decrease in the cost of***

28          ***revenue was primarily related to the three following factors:***

- 24 -                                           Case No. 5:21-cv-06374-BLF
AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*(a) A decrease of $25.5 million related to a one-time warranty accrual for faulty materials from one of our suppliers used in the manufacturing of IGUs.* In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. We stopped using the affected materials upon identification in 2019. As of December 31, 2020, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, *we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. . . .*

96.    Regarding View's cash flows from operating activities for the year ended December 31, 2019, the March 12, 2021 8-K reported a *net loss of $289.904 million* for FYE 2019 and further stated that certain non-cash charges from operating activities were offset by "net cash inflows from changes in operating assets and liabilities [that] were *primarily due to a $26.1 million increase in accrued compensation and other liabilities as a result of an increase in accrual for product warranty liability and other expenses consistent with the growth of our operations . . . .*"

97.     The above statements identified in ¶¶ 95-96 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 56-61, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the years ended December 31.  Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019.  Additionally, View's restated net loss for the year ended December 31, 2019 was $312.109 million.  Additionally, statements to the effect that View "estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain costs, including labor and freight costs, it intended to incur when replacing the IGUs.  Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and  materially misleading.

98.     The March 12, 2021 8-K described View's warranty policy and accounting as follows (emphasis added):

**Product Warranties**

The Company provides a standard assurance type warranty that its
IGUs will be free from defects in materials and workmanship for 10

years from the date of delivery to customers. IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty. In resolving warranty claims, the Company has the option of either repairing or replacing the covered product. ***Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The Company accounts for the effect of such changes in estimates prospectively.***

In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. As of December 31, 2019, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time

1   required for the IGU to fail since it was installed, and the
2   geographical region where the IGU was ultimately installed.  Based
3   on this analysis, *the Company estimated the number of IGUs*
4   *expected to fail in the remaining warranty period and applied an*
5   *estimated cost to calculate the cost to replace the IGUs. The*
6   *estimated cost includes the Company's expectations regarding*
7   *future reductions in production costs, which comprise of materials,*
8   *labor, and factory overhead. Based on its analysis, the Company*
9   *recognized $24.5 million of expense for the estimated future cost to*
10  *replace defective IGUs, which was classified in cost of revenue in*
11  *its consolidated statement of comprehensive loss for the year ended*
12  *December 31, 2019. The Company recognized a corresponding*
13  *warranty liability of $1.6 million in accrued expenses and other*
14  *current liabilities and $22.9 million in other liabilities on its*
15  *consolidated balance sheet as of December 31, 2019. As of*
16  *December 31, 2020, the warranty liability related to this matter*
17  *included in accrued expenses and other current liabilities and*
18  *other liabilities was $3.8 million and $18.3 million, respectively, on*
19  *the consolidated balance sheet. It is reasonably possible that the*
20  *amount of costs to be incurred to replace the defective IGUs could*
21  *be materially different from the estimate. Considering the limited*
22  *failure rate data available to-date and the uncertainty inherent in*
23  *the failure analysis, including the projected costs to replace*
24  *defective IGUs in future years, the actual timing of the failures,*
25  *and the number of defective IGUs, the Company is unable to*
26  *estimate the amount of any potential additional losses.*
27
28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*The Company recorded a net credit of $1.0 million for the reduction in product warranties liability and an expense of $24.1 million for product warranties to cost of revenue in the consolidated statements of comprehensive loss for the years ended December 31, 2020 and 2019, respectively.*

99.     The March 12, 2021 8-K reported that View recorded Warranty accruals of $18.694 million and $23.430 million for the years ended December 31, 2020 and 2019, respectively.

100.    The above statements identified in ¶¶ 98-99 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in Paragraphs 56-61, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the years ended December 31.  Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019. Furthermore, statements to the effect that View "estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain costs, including labor and freight costs, it intended to incur when replacing the IGUs.  Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that

1   as a result of the foregoing, Defendants' positive statements about the Company's business,

2   operations, and prospects were false and materially misleading.

3         101.    As noted, the March 12, 2021 Form 8-K, at Exhibit 99.1, included PwC's March 12,

4   2021 audit opinion, which stated in pertinent part:

5           Report of Independent Registered Public Accounting Firm

6           To the Board of Directors and Stockholders of View, Inc.

7           Opinion on the Financial Statements

8              We have audited the accompanying consolidated balance

9           sheets of View Operating Corporation (formerly known as View,

10          Inc.) and its subsidiary (the "Company") as of December 31, 2020

11          and 2019, and the related consolidated statements of comprehensive

12          loss, of redeemable convertible preferred stock and stockholders'

13          deficit and of cash flows for the years then ended, including the

14          related notes (collectively referred to as the "consolidated financial

15          statements"). In our opinion, the consolidated financial statements

16          present fairly, in all material respects, the financial position of the

17          Company as of December 31, 2020 and 2019, and the results of its

18          operations and its cash flows for the years then ended in conformity

19          with accounting principles generally accepted in the United States of

20          America.

21          Basis for Opinion

22

23             These consolidated financial statements are the responsibility

        of the Company's management. Our responsibility is to express an

24          opinion on the Company's consolidated financial statements based

25          on our audits. We are a public accounting firm registered with the

26          Public Company Accounting Oversight Board (United States)

27          (PCAOB) and are required to be independent with respect to the

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1    Company in accordance with the U.S. federal securities laws and the

2    applicable rules and regulations of the Securities and Exchange

3    Commission and the PCAOB.

4         We conducted our audits of these consolidated financial

5    statements in accordance with the standards of the PCAOB and in

6    accordance with auditing standards generally accepted in the United

7    States of America. Those standards require that we plan and perform

8    the audit to obtain reasonable assurance about whether the

9    consolidated financial statements are free of material misstatement,

10   whether due to error or fraud.

11        Our audits included performing procedures to assess the risks

12   of material misstatement of the consolidated financial statements,

13   whether due to error or fraud, and performing procedures that

14   respond to those risks. Such procedures included examining, on a test

15   basis, evidence regarding the amounts and disclosures in the

16   consolidated financial statements. Our audits also included

17   evaluating the accounting principles used and significant estimates

18   made by management, as well as evaluating the overall presentation

19   of the consolidated financial statements. We believe that our audits

20   provide a reasonable basis for our opinion.

21   /s/ PricewaterhouseCoopers LLP

22   San Jose, California March 12, 2021

23   **2.    The April 7, 2021 Shelf Registration Statement**

24        102.   On April 7, 2021, View filed a Shelf Registration Statement on Form S-1 (the

25   "April 7, 2021 Shelf Registration Statement") relating to the issuance of up to 17,033,303 shares

26   of common stock, consisting of (i) up to 366,666 shares of common stock issuable upon the exercise

27   of private placement warrants originally issued in a private placement to CF Finance Holdings II,

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

LLC, in connection with the initial public offering of CF II and (ii) up to 16,666,637 shares of common stock that are issuable upon the exercise of public warrants.

103. The April 7, 2021 Shelf Registration Statement reported that the Company's cost of revenue decreased year-over-year in the year ended December 31, 2020, repeating substantially similar statements as identified above in ¶ 95. The April 7, 2021 Shelf Registration Statement also contained substantially the same statements as identified in ¶ 96.

104. The above statements identified in ¶103 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made. For the same reasons set forth in ¶ 97.

105. The April 7, 2021 Shelf Registration Statement also contained substantially the same statements as identified in ¶¶ 98-99, which statements were materially false and/or misleading for the same reasons set forth in ¶100.

106. The April 7, 2021 Shelf Registration Statement also included PwC's March 12, 2021 Report, described herein at ¶101.

### 3. The May 12, 2021 Press Release

107. On May 12, 2021, in a press release filed on Form 8-K with the SEC, View announced its first quarter 2021 financial results, stating in relevant part:

**First Quarter 2021 Highlights:**

- *GAAP cost of revenue of $29.9 million, a 16% improvement from Q1 2020 and a 5% improvement from Q4 2020 due to production efficiencies.*

- *GAAP loss from operations of ($55.1) million, a 22% improvement compared to Q1 2020 and 4% improvement from Q4 2020.*

108. The above statements identified in ¶107 were materially false and/or misleading, and failed to disclose material adverse facts  about the Company at the time they were made because, as alleged in ¶¶ 56-61, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those

liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million.  Additionally, View's restated GAAP loss from operations for the three months ended March 31, 2021 was ($64.680) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs , including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

### 4.      The May 17, 2021 10-Q

109.    On May 17, 2021, View filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), signed by Defendants Mulpuri and Prakash.  The 1Q21 10-Q reported that the Company's "*Cost of revenue decreased by $5.7 million or 16.0% in the three months ended March 31, 2021 [from $35.57 million] compared to the same period in the prior year, despite the increase in revenue. . . .*"  (emphasis added).

110.    Regarding View's cash flows from operating activities for the three months ended March 31, 2021, the 1Q21 10-Q reported a *net loss of $64.5 million*.

111.    The above statements identified in ¶¶ 109-110 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 56-61, in violation of GAAP, Defendants materially misstated

certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accrual is $48 million as of December 31, 2020, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million. Additionally, View's restated net loss for the three months ended March 31, 2021 was ($74.035) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs , including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

112.    Regarding product warranties, the 1Q21 10-Q stated, in relevant part (emphasis added):

**Product Warranties**

The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for generally 10 years from the date of delivery to customers. IGUs with sloped or laminated glass generally have a warranty of 5 years. Control systems associated with the sale of IGUs typically have a 5-year warranty. In resolving warranty claims, the Company generally has the option of either repairing or replacing the covered product. ***Based on historical experience, the Company accrues for estimated***

*returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the condensed consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the condensed consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead. The Company accounts for the effect of such changes in estimates prospectively.*

In 2019, the Company identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. The Company has had a low warranty claim rate to-date related to this matter. The Company has replaced and expects to continue to replace the affected IGUs for the remainder of the period covered by the warranty. The Company analyzed the risk of failure of the affected IGUs by analyzing historical failure rate as a function of time since the IGU installation. Based on this analysis, *the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an*

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

*estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead.*

*As of March 31, 2021 and December 31, 2020, the warranty liability included in accrued expenses and other current liabilities was $3.8 and $4.0 million and other liabilities was $18.1 million and $18.7 million, respectively, on the condensed consolidated balance sheets. During the three months ended March 31, 2021, the Company recorded a net credit of $0.3 million for the reduction in product warranties and consumption of $0.5 million. During the three months ended March 31, 2020, the Company recognized a warranty expense of $0.5 million and consumption of $0.7 million.*

113.   The above statements identified in ¶ 112 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 56-61, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities for the three months ends March 31, 2021 and 2020.  Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's restated warranty-related accruals are $48 million and $42 million as of December 31, 2020 and 2021, respectively, and $47 million as of the three months ended March 31, 2021. Furthermore, statements to the effect that View "estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors that View inappropriately excluded from such "estimated cost" certain costs, including labor and freight costs, it intended to incur when replacing the IGUs. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded

expenses View incurred and expected to incur due to significant quality issues; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's IGUs, including installation labor and freight costs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

114.    Additionally, Defendants Mulpuri and Prakash appended certifications pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7241 ("SOX") to the 1Q21 10-Q, which were signed by Defendants Mulpuri and Prakash. Each signed a certification that stated, in part, as follows:

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under

our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.   [Paragraph intentionally omitted in accordance with SEC Release Nos.34-47986 and 34-54942];

c.   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

      b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

115. Defendants Mulpuri and Prakash also each signed a certification stating, in part, as follows:

      1.     the Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

      2.     the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

116. Defendants Mulpuri and Prakash's representations were materially false and misleading and failed to disclose material facts at the time they were made because as set forth in ¶¶ 56-61, Defendants Mulpuri and Prakash have effectively admitted that at the time the 1Q21 10-Q was filed, they: 1) had not designed disclosure controls and procedures to ensure that material information relating to View was made known to them; 2) they had not designed internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external disclosure to the SEC and investors in accordance with GAAP; 3) View's disclosure controls and procedures were not effective; 4) they failed to disclose the change in View's internal control over financial reporting that occurred by at least the quarter ended March 31, 2021 that materially, negatively affected View's internal control over financial reporting; and 5) the Company's financial statements for the quarter ended March 31, 2021 were not prepared in accordance with GAAP.

## VIII. THE TRUTH BEGINS TO EMERGE

117. On August 16, 2021, after the market closed, in a press release filed on Form 8-K with the SEC, View announced that the Audit Committee of View's Board of Directors "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual." In an NT 10-Q filed on Form 12b-25 with the SEC filed on August 16, 2021, View stated (emphasis added):

View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the three and six months ended June 30, 2021 ("Second Quarter 10-Q") within the prescribed time period because it requires additional time to complete the investigation described below. The Company is currently unable to predict when it will be able to file its Second Quarter 10-Q, and does not currently expect to file by the extended filing date pursuant to Rule 12b-25.

**The Audit Committee of the Company's Board of Directors ("Audit Committee") recently began an independent investigation concerning the adequacy of the Company's previously disclosed warranty accrual.** The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and advisors to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results or the Company's assessment of its internal control over financial reporting for prior periods. **As a result, the Company has not finalized its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting for the three and six months ended June 30, 2021.** The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation.

118.    On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

119.    On February 24, 2022, in a Current Report filed on Form 8-K with the SEC ("Feb. 24, 2022 8-K"), View announced that Harold Hughes resigned as Executive Chair, Principal Executive Officer and director of View on February 22, 2022, effective immediately.  The Feb. 24, 2022 8-K also announced that Tom Leppert on that same date also submitted his resignation as a director of the Company, effective immediately.  Additionally, View announced that "[i]t is the Company's understanding that Mr. Hughes and Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."

120.    On March 7, 2022, in a press release filed on Form 8-K with the SEC, View announced "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies."

121.    The above statement identified in ¶ 120 was materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose that as a result of the adverse facts set forth above in ¶ 6, and their impact on the Company's cash burn, Defendants' positive statements about the Company's cash balance and expectation of improved cash burn through 2022 were materially misleading and/or lacked a reasonable basis.

122.    On May 10, 2022, after the market closed, in an NT 10-Q filed on Form 12b-25 with the SEC, View stated (emphasis added):

> View, Inc. (the "Company") is unable, without unreasonable effort
> or expense, to file its Quarterly Report on Form 10-Q for the period
> ended March 31, 2022 (the "10-Q"), within the prescribed time
> period for the reasons described below. . . . While the Audit
> Committee investigation is now complete, the Company has not been
> able to finalize its financial statements or corresponding assessment
> of the effectiveness of its disclosure controls and procedures and

1  internal control over financial reporting. **The Company is also**

2  **unable to make a reasonable estimate of changes in results of**

3  **operations in its financial statements at this time; however,**

4  **management anticipates that they will be disclosing substantial**

5  **doubt about the Company's ability to continue as a going**

6  **concern, as the Company does not currently have adequate**

7  **financial resources to fund its forecasted operating costs and**

8  **meet its obligations for at least twelve months from the expected**

9  **issuance date of the 2021 Annual Report on Form 10-K.** While

10  management will look to raise capital, there can be no assurance that

11  the necessary financing will be available or will be available on terms

12  acceptable to the Company. Given the findings of its Audit

13  Committee, the Company also expects to report additional material

14  weaknesses, and is working to determine any additional adjustments

15  to the Company's financial statements that may be required.

16  Although the Company expects that it will finalize its financial

17  statements and file the related 10-Q as soon as practicable, it does

18  not currently expect to file the 10-Q by the extended filing date

19  pursuant to Rule 12b-25.

20  123.  Later that same day, at approximately 11:13 p.m. Pacific Time, View issued a press

21  release stating, in pertinent part, that:

22  . . . its cash position [is] $201 million as of the end of Q1 2022 with

23  no substantial debt on its balance sheet. When the Company issues

24  its 2021 financial statements, it anticipates that its reported cash

25  outflow from operations for the twelve months ended December 31,

26  2021, ranged from $260 million to $270 million.

27

28

The Company anticipates that it will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of its 2021 financial statements. While the Company will look to raise capital, there can be no assurance that the necessary financing will be available or will be available on terms acceptable to the Company.

As previously reported, the investigation of the Company's Audit Committee into its previously reported warranty accrual is now complete. View continues to make substantial progress with its financial restatement and related filings.

To date, outside of the previously reported misstatements in warranty-related accruals, no material errors have been identified in the restatement process, which remains subject to the completion of the Company's financial close process and the completion of the financial statement audit.

As previously reported, Nasdaq has granted View a stay of delisting through the end of May 2022 and completion of its delinquent filings will allow View to regain compliance with applicable Nasdaq listing requirements. The Company will announce an earnings date and dial-in details closer to the date of expected filing.

124.    On this news, the Company's share price fell $.844, or over 62%, to close at $.516 per share on May 11, 2022, on unusually heavy trading volume.

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1    **IX.    RELEVANT POST CLASS PERIOD EVENTS**

2          125.    On May 31, 2022, in a press release filed on Form 8-K with the SEC, View reported

3    that its restated warranty-related accruals would be $53 million, $48 million, and $42 million as of

4    December 31, 2019, 2020, and 2021 respectively.

5          126.    View also announced that "Nasdaq has granted View until June 30, 2022, to file its

6    delinquent 10-K and 10-Q filings, which View expects to file with the SEC on or prior to that date."

7    Those filings include View's 2021 Second Quarter 10-Q, Third Quarter 10-Q, Annual Report on

8    Form 10-K, and 2022 First Quarter 10-Q.

9          127.    On June 15, 2022, View filed its 2021 Annual Report on Form 10-K, and its 1Q21

10   10-Q/A, marking the completion of the financial restatement.  As set forth below, View's true

11   warranty accrual, accrued expenses and other current liabilities, other liabilities, cost of revenue,

12   and net loss were understated by material amounts.

13         128.    For example, for FYE 2020, the 2021 10-K reported amended and restated financial

14   information as follows (the Warranty Accrual figures set forth in this chart and the similar charts

15   herein were reported by the Company in a press release filed on Form 8-K with the SEC on May 31,

16   2022):

| Financial Metric FYE 2020 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $23 million | $48 million |
| Accrued expenses and other current liabilities | $36.480 million | $42.150 million |
| Other liabilities | $36.731 million | $56.844 million |

         129.    For FYE 2019, the 2021 10-K reported amended and restated financial information
as follows:

| Financial Metric FYE 2019 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $25 million | $ 53 million |
| Cost of revenue | $179.675 million | $203.732 million |

| Financial Metric FYE 2019 | As Previously Reported | As Restated |
|---|---|---|
| Accrued expenses and other current liabilities | $26.779 million | $47.645 million |
| Other liabilities | $34.051 million | $53.290 million |
| Net loss | $289.904 million | $312.109 million |

## X.   COUNTS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT AND SECTIONS 11, 12 AND 15 OF THE SECURITIES ACT

### COUNT I
### For Violation of § 14(a) of the Exchange Act and Rule 14a-9
### Against All Defendants (except Prakash)

130.    Lead Plaintiff repeats and re-alleges each and every allegation as set above as if fully set forth herein.  This Count is brought on behalf of all persons or entities who were holders of CF II Class A common stock as of the record date that were entitled to vote to approve the Business Combination between View and CF II as set forth in the February 16, 2021 Proxy Statement/Prospectus.

131.    For purposes of this Count, Lead Plaintiff does not allege that any Defendant named in this Count acted with fraudulent intent and expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

132.    The Proxy Statement/Prospectus, documents attached thereto and/or incorporated by reference therein, and other solicitations described above and herein contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

133.    Defendants named in this Count, jointly and severally, solicited or permitted use of their names in solicitations set forth above in Section IV and/or participated in the drafting of the Proxy Statement/Prospectus. CF II recommended that its shareholders vote "FOR" the proposed transaction(s).

134.    For example, Defendants gave interviews to public media outlets to promote the proposed merger throughout the Class Period.  For example, on November 30, 2020, following the announcement of the proposed merger, Defendant Mulpuri appeared on CNBC to promote the merger and tout View's prospects and technology.

135.    On December 1, 2020, Defendant Lutnick appeared on CNBC's Squawk Box following the announcement of the business combination transaction between View and CF II.  In describing the transaction, Defendant Lutnick touted the deal, noting that "three hundred million dollars has been raised – we have $300 million worth of institutional investors who have already put their money in and committed to the transaction at the $1.6 billion dollar valuation. . . . Here you've got three hundred million dollars of investors who already committed their money, and now the SPAC investors, this morning, get to decide do they want to stay in or go out. So if you're a SPAC investor in CF Finance II's SPAC, you can decide "oh you know what? I like View, I'm sticking in" or "if I didn't like View, I can sell it." So you know the idea is, that SPAC investors have the option to stay in or go? But what they see now is PIPE investors, right? Pre- the transaction, have committed three hundred million dollars. So you know it's a good deal. It's already raised $300 million dollars. And now they have the option to stay in. And I think that's why you're going to see these things trade well. I really like the structured SPACs. You know that Cantor Fitzgerald has been number one in SPACs in 2018 and 2019. And now that SPACs have become so popular, you know, it's just a good way for a high growth company like View and its dynamic glass to go public. And I think you're going to see the investors really like it."

136.    On, February 1, 2021, Defendant Lutnick appeared on Bloomberg.  During the interview, Defendant Lutnick praised SPACs as allowing "private investors to be able to invest in these kind of [private equity type investment] companies through SPACs.  So I think it's really, really exciting. I think it's really exciting for the private investors to be able to invest in these kind of companies through SPACs. I think SPACs are here to stay. I think they are a great product because they fill that void, and they give individual investors the chance to invest. And I think they're going to be great. And you know Cantor was number one in 2017, 2018 and 2019 in SPACs. Now everybody thinks it's popular, but we have an incredible franchise." *See* Cantor Fitzgerald

1   CEO Says SPACs Have Democratized IPO Market,
2   https://www.youtube.com/watch?v=nmpHb6oRJ44.

3   137.   During the interview, Defendant Lutnick went on describe the "opportunity"
4   provided by SPACs: "what it does is, it lets a private equity type investment come in a public
5   wrapper. So a public investor can have access to really cool technology early. Whether that's auto
6   tech or biotech, insure tech, property tech. You know all these sort of high growth opportunities,
7   they present themselves to the public investors and the public investors can decide - do they want
8   to invest in it? They've been excluded from the private equity market. **They've really been**
9   **excluded primarily from the IPO market for a while and this is an inclusive model**. So I think
10  that's the opportunity. You know if you have a lidar company when would the public be able to
11  invest in a lidar company early before they're in cars in 2024? And I think that's what's exciting
12  about the stock market. **It's really amazing and I think it democratizes the IPO market and the**
13  **private equity market**. And I think it's going to do really really well." *Id.*

14  138.   On January 28, 2021, Anshu Jain appeared on Bloomberg.  During the interview, in
15  response to a question regarding SPACs, Jain responded that "retail investors only make up a part
16  of it. The PIPE investors really are key drivers and validators of value. In general retail investors
17  have always driven a section of financial markets and will continue to." *See* Cantor Fitzgerald
18  President Anshu Jain's Outlook for 2021, https://www.bloomberg.com/news/videos/2021-01-
19  29/cantor-fitzgerald-president-anshu-jain-s-outlook-for-2021-video.

20  139.   CF II and View are issuers of the Proxy Statement/Prospectus.  As set forth in the
21  Merger Agreement, each were to participate in the preparation of the Registration Statement, of
22  which the Proxy Statement/Prospectus was a part.

23  140.   CF II and View permitted the use of their names in the Proxy Statement/Prospectus
24  by allowing the Proxy Statement/Prospectus to make false and misleading representations set forth
25  above.

26  141.   Defendant Lutnick signed the Proxy Statement/Prospectus and subsequent
27  amendments, signed the cover letter for the Proxy Statement/Prospectus "By Order of the CF II
28  Board" and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and

solicited the votes of shareholders in the November 30, 2020 press release and 8-K filing, the De-SPAC Registration Statement, the Proxy Statement/Prospectus, and in oral communications to the media.

142.    Defendant Pion signed the Proxy Statement/Prospectus and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

143.    Defendant Chan signed the Proxy Statement/Prospectus and subsequent amendments, and otherwise permitted the use of her name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

144.    Defendant Jain signed the Proxy Statement/Prospectus and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

145.    Defendant Hochberg signed the Proxy Statement/Prospectus and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

146.    Defendant Blechman signed the Proxy Statement/Prospectus and subsequent amendments, and otherwise permitted the use of her name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

147.    Defendant CF Holdings II permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

148.    Defendant CF&Co. permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

149.    Defendant Cantor permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

150.    Defendant CFGM permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

151.    Defendant Mulpuri permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus and in oral communications to the media.

152.    Defendant Leppert permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

153.    Defendant Hughes permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

154.    Defendant Gormly permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

155.    Defendant Cosgrove permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

156.    Defendant Picard permitted the use of her name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

157.    Defendant Patterson permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

158.    Defendant Veghte permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

159.    Defendant PwC also consented to the inclusion of its Dec. 23, 2020 Audit Report in the Proxy Statement/Prospectus at page F-35.    As stated at page 277 of the Proxy Statement/Prospectus:  "The financial statements of View, Inc. as of December 31, 2019 and 2018 and for each of the two years in the period ended December 31, 2019 included in this proxy statement/prospectus have been so included in reliance on the report . . . of PricewaterhouseCoopers LLP, an independent registered public accounting firm, given on the authority of said firm as experts in auditing and accounting."

160.    Each of the Defendants named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued.

161.    The solicitations described herein were essential links in the accomplishment of the Business Combination. As a result of these solicitations, the CF II shareholders approved the Business Combination on March 5, 2021.  Had the true financial condition and operations of View been known, members of the Class eligible to vote on the Business Combination would have voted against it and/or sold their CF II securities.

162.    Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

163.    By reason of the foregoing, the Defendants named in this Count violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

164.    The Defendants named in this Count violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from members of the Class by means of a Proxy Statement/Prospectus that through these Defendants' negligence contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary to make the statements therein not false or misleading.

165.    The Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement/Prospectus and other proxy solicitation materials.

166.    Defendants named in this Count were required to ensure that the Proxy Statement/Prospectus and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. Defendants named in this Count were also required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on March 5, 2021.

167.    By means of the Proxy Statement/Prospectus and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants named in this

Count sought to secure Class members' approval of the Business Combination and solicited proxies from members of the Class.

168.    The false and misleading statements and omissions in the Proxy Statement/Prospectus and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Business Combination and/or whether to exercise their cash conversion right(s). In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement/Prospectus, additional proxy solicitation materials, and in other information reasonably available to stockholders.

169.    Members of the Class eligible to vote on the Business Combination were misled by the false and misleading statements and omissions made by Defendants named in this Count, were denied the opportunity to make a fully informed decision in voting on the Business Combination with CF II without having been advised of material facts. Accordingly, members of the Class suffered damages and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein when the truth was disclosed, and the value of their View securities decreased in value.

170.    By reason of the foregoing, Defendants named in this Count violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, promulgated thereunder, 17 C.F.R. § 240.14a-9.

171.    This Count is brought within the applicable statute of limitations.

**COUNT II**
**For Violation of § 20(a) of the Exchange Act**
**Against the Individual View Defendants and CF II Defendants**

172.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

173.    The CF II Defendants acted as controlling persons of CF II as within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual View Defendants acted as controlling persons of View within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights,

participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause CF II and View to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement/Prospectus there causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

174.    In particular, the CF II Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials (as noted in the Proxy Statement/Prospectus), voted to approve the Business Combination, and solicited the approval of the Business Combination through CF II's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement/Prospectus. Moreover, the Individual View Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement/Prospectus, and solicited the approval of the Business Combination.

175.    As set forth above, the Individual View Defendants and those CFII Defendants that are individuals (the Individual CFII Defendants) in their capacities as officers and/or directors of CF II and View, participated in the misstatements and omissions set forth in Section IV above. Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and View, including the terms of the Business Combination, analysis of View's operating results and financial condition, the valuation of View, and the due diligence that had and had not been performed. As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

176.    As set forth above, Defendants named in Count I violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above. By virtue of their positions as controlling persons, Individual View Defendants and CF II Defendants are liable pursuant to Section 20(a) of the Exchange Act. Individual View Defendants and the CF II Defendants were culpable participants in the violations Section 14(a) alleged herein. As detailed above, during the respective times that these defendants served as officers and/or directors of CF II and View, each

is responsible for the material misstatements and omissions made in the Proxy Statement/Prospectus.

177. Lead Plaintiff and Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy Statement/Prospectus when those statements were revealed to be false and, as alleged herein, View securities declined in value.

178. This Count is brought within the applicable statute of limitations.

**COUNT III**
**For Violation of § 11 of the Securities Act**
**Against All Defendants (Except CF II Entity Defendants, Prakash, Patterson, and Veghte)**

179. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein, however, for purposes of this claim, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct, which are not elements of a Section 11 claim. This claim is based solely on strict liability or negligence.

180. This Count is brought by Lead Plaintiff pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Defendants named in this Count on behalf of itself and members of the Class who purchased or otherwise acquired View securities pursuant and/or traceable to the De-SPAC Registration Statement issued in connection with the Business Combination and were damaged by the acts alleged herein.

181. Defendants' liability under this Count is predicated on the participation of each Defendant named in this Count in conducting the Business Combination pursuant to the De-SPAC Registration Statement, which contained untrue statements of material fact, or omitted to disclose material facts.

182. In violation of the Securities Act, the De-SPAC Registration Statement contained untrue statements of material fact and omitted to state material facts required to be disclosed or necessary to make the statements not misleading as alleged above.

183. CF II (now known as View) was the issuer, within the meaning of Section 11 of the Securities Act and pursuant to the De-SPAC Registration Statement, of the registered securities offered in the Business Combination transaction. As part of the Business Combination, CF II changed its name to View. Legacy View also participated in drafting the De-SPAC Registration Statement as set forth in the Merger Agreement.

184. The CF II Individual Defendants signed the De-SPAC Registration Statement within the meaning of Section 11 of the Securities Act, were CF II directors, and are liable for the misrepresentations and omissions contained in the De-SPAC Registration Statement. The View Individual Defendants named in this count were named as persons about to become directors of View after the closing of the Business Combination.

185. PwC is liable for the statements it made in the De-SPAC Registration Statement, described herein, because it expressly consented to the use of its name and inclusion of its audit report in the De-SPAC Registration Statement and provided a letter dated December 23, 2020 for inclusion in the De-SPAC Registration Statement, which letter consented to the incorporation by reference of the PwC audit report dated December 23, 2020.

186. PwC's statements contain misrepresentations and/or omissions of material fact necessary to make the statements made in the De-SPAC Registration Statement not misleading. To the extent that any of PwC's statements are opinions, they are actionable because (i) they were both objectively and subjectively false; and/or (ii) they implied facts regarding its inquiry or knowledge underlying such opinions, including its compliance with standards of the PCAOB and GAAS in performing its audit and the Company's compliance with GAAP.

187. The View securities described in this Count were issued and offered pursuant to the Registration Statement.

188. All investors who purchased or otherwise acquired the registered securities after the Business Combination are traceable to the De-SPAC Registration Statement.

189. As alleged herein, the De-SPAC Registration Statement contained untrue statements of material fact.

190.     Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the De-SPAC Registration Statement, as set forth above.

191.     In connection with offering the registered securities to the public and the sale of those securities, Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

192.     Class members did not know, nor in the exercise of reasonable diligence could they have known, that the De-SPAC Registration Statement contained untrue statements of material fact or failed to disclose material facts when they purchased or otherwise acquired View securities pursuant and/or traceable to the De-SPAC Registration Statement.

193.     As a direct and proximate result of the acts and omissions of Defendants in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase or acquisition of View securities in the Business Combination.

194.     By reason of the foregoing, the Defendants named in this Count are liable under Section 11 of the Securities Act to the members of the Class who purchased or otherwise acquired View securities pursuant and/or traceable to the De-SPAC Registration Statement.  Lead Plaintiff and the other Class members are entitled to damages under Section 11 as measured by the provisions of Section 11(e) of the Securities Act from the Defendants named in this Count, and each of them, jointly and severally.

195.     This claim is brought within one year of the discovery of the untrue statements in the De-SPAC Registration Statement, and within three years after the issuance of the De-SPAC Registration Statement.

**COUNT IV**
**For Violation of § 12(a)(2) of the Securities Act**
**Against the CF II Entity Defendants**

196.     Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein. Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

197.   This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against the CF II Entity Defendants.

198.   This Count does not sound in fraud. Lead Plaintiff does not allege that the CF II Entity Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

199.   Defendants named in this Count promoted, offered or sold View securities to Lead Plaintiff and other members of the Class for Defendants' financial benefit and the benefit of their associates by means of the Proxy Statement/Prospectus and oral communications which, as alleged above, included untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

200.   The Defendants named in this Count owed Lead Plaintiff and the other members of the Class who purchased or otherwise acquired View securities pursuant to the Proxy Statement/Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Proxy Statement/Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants named in this Count, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Proxy Statement/Prospectus and oral communications as set forth above.

201.   Lead Plaintiff and members of the Class did not know, nor in the exercise of reasonable diligence could Lead Plaintiff and members of the Class have known, of the untruths and omissions contained in the Proxy Statement/Prospectus or oral communications alleged herein at the time of acquisition of View securities at the time Lead Plaintiff acquired View securities.

202.   The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

203.   By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

204.    As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased or otherwise acquired View securities pursuant to the Proxy Statement/Prospectus or oral communications sustained substantial damages in connection with their purchases of stock. Accordingly, Lead Plaintiff and the other members of the Class who purchased or otherwise acquired View securities issued pursuant to the Proxy Statement/Prospectus or oral communications, seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for their shares, and hereby tender their View securities to Defendants named in this Count.

205.    The claim set forth in this Count is brought within one year of the discovery of the untrue statements in the De-SPAC Registration Statement, and within three years after the issuance of the De-SPAC Registration Statement.

**COUNT V**
**For Violation of § 15 of the Securities Act**
**Against the CF II Defendants**

206.    Lead Plaintiff repeats and realleges each and every allegation above on as to the Securities Act Claims. Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. The underlying violations of the Securities Act are based solely on strict liability or negligence.

207.    This Count is brought by Lead Plaintiff pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the CF II Defendants on behalf of themselves and members of the Class who purchased or otherwise acquired View securities pursuant and/or traceable to the De-SPAC Registration Statement and were damaged by the acts alleged herein.

208.    As set forth in Counts III and IV, CF II (now known as View) is liable under Sections 11 and/or 12(a)(2) of the Securities Act for untrue statements of material fact in the De-SPAC Registration Statement.

209.    This Count does not sound in fraud. Lead Plaintiff does not allege that Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

210.     At all relevant times, the CF II Defendants were controlling persons of CF II within the meaning of Section 15 of the Securities Act.

211.     As set forth herein, by virtue of their positions, voting power, ownership, rights as against CF II, and/or specific acts, the CF II Defendants had the requisite power to directly or indirectly control or influence CF II to engage in the acts described herein, including by causing CF II to issue the De-SPAC Registration Statement and close the Business Combination, and exercised such power.

212.     By virtue of their positions as senior officers, or members of CF II's board, or their status as signatories of the De-SPAC Registration Statement, as to the Individual CF II Defendants, each had the power to control, and did control, CF II in closing the Business Combination, including controlling the contents of the De-SPAC Registration Statement, which contained materially false statements.

213.     By reason of the aforementioned conduct and by virtue of their positions as controlling persons of CF II, the CF II Defendants are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as CF II is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired View securities pursuant and/or traceable to the De-SPAC Registration Statement.

214.     As a direct and proximate result of the conduct of the CF II Defendants, members of the Class suffered damages in connection with their purchase or acquisition of View securities.

215.     This Count is brought within the applicable statute of limitations.

**XI.     ADDITIONAL FACTUAL ALLEGATIONS RELATING TO CLAIMS UNDER SECTION 10B AND RULE 10-b-5 OF THE EXCHANGE ACT**

216.     Special purpose acquisition companies, or SPACs, are publicly traded companies with no business activities, formed specifically to acquire an existing operating company. SPACs typically raise capital for the acquisition through an initial public offering ("IPO"), and that capital is held in trust for a specific period of time.

217.     If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC can profit through their ownership of the SPAC's securities

(typically about 20% of the SPAC's stock, in addition to warrants to purchase additional shares). However, if an acquisition is not completed within that time frame, then the SPAC is dissolved and the money held in trust is returned to investors, with no compensation paid to the founders and managers of the SPAC, whose SPAC securities expire worthless. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the benefits of that transaction for the public shareholders of the SPAC are dubious.

218.    Typically, common stockholders of a SPAC are granted voting rights to approve or reject the business combination proposed by the management team. Thus, when the management team identifies a target, a merger proxy statement must be distributed to all SPAC stockholders, which includes the target company's financial statements and the terms of the proposed business combination. Public stockholders in SPACs rely on management of the SPAC and the target company to honestly provide accurate information about any contemplated transactions.

219.    SEC officials have noted widespread concerns including "risks from fees, conflicts, and sponsor compensation, . . . and the potential for retail participation drawn by baseless hype," and additional concerns regarding whether SPAC sponsors have "sufficient incentives to do appropriate due diligence on the target and its disclosures to public investors, especially since SPACs are designed not to include a conventional underwriter." John Coates, *SPACs, IPOs and Liability Risk under the Securities Law* (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

220.    Similarly, SEC Chair Gary Gensler recently testified to Congress, "the surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected? Are retail investors getting the appropriate and accurate information they need . . . ?" Gary Gensler, *Testimony Before the Subcommittee on Financial Services and General Government, U.S. House Appropriations Committee* (May 26, 2021), https://www.sec.gov/news/testimony/gensler-2021-05-26.

221.    Numerous other commentators have similarly noted the conflict of interest between SPAC management and shareholders with respect to the completion of a business combination. For

example, in a paper in the Yale Journal on Regulation, law professors at Stanford and New York University address "misaligned incentives inherent in the SPAC structure," including that "the sponsor has an incentive to enter into a losing deal for SPAC investors if its alternative is to liquidate." *A Sober Look at SPACs*, Klausner, Ohlrogge, Ruan, 39 Yale Journal on Regulation 228 (2022). Based on empirical research of post-merger returns to SPAC shareholders, that paper goes on to conclude that "SPAC sponsors have proposed losing propositions to their shareholders, which is one of the concerns raised by the incentives built into the SPAC structure. . . . [S]ponsors do quite well, even where SPAC shareholders have experienced substantial losses."

222.   As set forth herein, CF II and View exemplify SPAC conflicts of interest because the Defendants were incentivized to, and did, aggressively promote a proposed business combination between CF II and View based on materially false and incomplete information that understated the risks to View's business, overstated View's future prospects, and resulted in a grossly excessive proposed valuation of View, all of which artificially inflated the prices of CF II and View securities during the Class Period.

223.   As   a   May   18,   2022   Bloomberg   article   summarized   (*see* https://www.bloomberg.com/opinion/articles/2022-05-19/view-inc-is-this-the-spac-era-s-worst-deal (last visited July 13, 2022):

> . . .The "smart-window" manufacturer's disastrous $1.6 billion merger with a Cantor Fitzgerald-backed SPAC illustrates why [SEC] reforms are long overdue. Already reeling from an accounting scandal that blew up within months of the SPAC deal closing in March 2021, View last week warned it risked running out of cash. The shares extended their decline to 93%, making it the second-worst performing large SPAC deal from the past two and a half years. The cast of institutions involved with the company and its ill-fated blank-check transaction — Cantor, Goldman Sachs Group Inc., Softbank Group Corp., Credit Suisse Group AG and the now-insolvent Greensill Capital — reads like a game of tech-bubble bingo.

1

* * *

2    The Silicon Valley-based company has racked up around $2 billion

3    of losses since its inception more than a decade ago, and it has

4    negative gross margins — a posh way of saying its smart windows

5    cost more to build than they sell for.

6

7    Yet the SPAC delivered $815 million in gross proceeds, and in

8    November 2020 it confidently predicted View would require "no

9    additional equity capital" before achieving positive free cash flow.

10   However, View said last week its ability to remain a going concern

11   was in "substantial doubt" because its $200 million of cash won't last

12   another 12 months. Whoops.

13   And as View hasn't filed earnings reports since May 2021, it risks

14   having its shares delisted from Nasdaq at the end of this month. The

15   hiatus stems from View's disclosure in August of accounting

16   irregularities related to anticipated repair costs. The inaccurate

17   warranty accruals forced the resignation of its chief financial officer

18   in November. The more realistic liability calculation far exceeded the

19   company's modest annual sales. "Uncovering an issue with the

20   functioning of our finance and accounting organization is painful,"

21   View's CEO Rao Mulpuri wrote in a November letter to employees,

22   adding he took "full ownership" of the problems.

23

* * *

24   . . . despite assurances of "substantial progress" the company still

25   hasn't published restated accounts for 2019 and 2020, nor the

26   accounts for the last four quarters. Whoops again. View did not

27   respond to requests for comment.

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

**A.     Defendants Acted With Knowledge of Deliberate Recklessness**

2        224.    As alleged herein, Defendants acted with scienter since Defendants knew that the

3   public documents and statements issued or disseminated in the name of the Company were

4   materially false and/or misleading; knew that such statements or documents would be issued or

5   disseminated to the investing public; and knowingly and substantially participated or acquiesced in

6   the issuance or dissemination of such statements or documents as primary violations of the federal

7   securities laws. As set forth elsewhere herein in detail, the Individual View Defendants and the

8   CF II Defendants, by virtue of their receipt of information reflecting the true facts regarding View,

9   their control over, and/or receipt and/or modification of View's allegedly materially misleading

10  misstatements and/or their associations with the Company which made them privy to confidential

11  proprietary information concerning View, participated in the fraudulent scheme alleged herein.

12
**B.     There Were Numerous Suspiciously-timed Resignations of View Executives
         and Directors**
13

14       225.    On February 22, 2022, Defendant Hughes resigned as Executive Chair, Principal

15  Executive Officer and director of View. Also on February 22, 2022, Defendant Leppert resigned

16  as a director of the Company.  Defendant Hughes served as chair of View's Audit Committee, and

17  Defendant Leppert served as a member of View's Audit Committee, from March 8, 2021 to

18  approximately February 22, 2022.   In connection with Defendant Hughes and Leppert's

19  resignations, View announced that "[i]t is the Company's understanding that Mr. Hughes and

20  Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully

21  implemented by the Board; they believe that the Board's determination of the responsibilities of

22  Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."

23       226.    Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

24       227.    On January 31, 2021, Defendant Pion resigned as CFO, director, and member of the

25  Audit Committee of CF II.  The timing of Defendant Pion's resignation was suspicious as it

26  occurred during the first quarter ended March 31, 2021 during which View, among other things,

27  materially understated liabilities associated with warranty-related obligations and the cost of

28  revenue associated with the recognition of those liabilities and failed to properly record the

liabilities for warranty-related obligations and cost of revenue.  The timing of Defendant Pion's resignation was also suspicious as it occurred following the due diligence processes the CF II Defendants represented they undertook, and just five weeks prior to the consummation of the Business Combination.

228.    On March 19, 2021, Tom Cheung resigned as a member of View's board of directors.  Tom Cheung had served as a member of View's Board since August 2019.  The timing of Mr. Chung's resignation was suspicious as it occurred just 10 days following the consummation of the Business Combination.

**C.      Smart Glass Was View's Core Product and Its Operations Centered on A Relatively Narrow Customer, Supplier, and Manufacturing Framework**

229.    As alleged herein, Smart Glass or the IGUs were View's core product and, as detailed below, View's operations were relatively narrow such that Lead Plaintiff is entitled to the inference that the adverse facts were in plain view to Company insiders.

230.    First, as set forth in the De-SPAC Registration Statement (defined herein), Defendants represented that as of December 15, 2020, View's Milpitas, California headquarters office "has a strong engineering base and a smaller research and development facility. Our products rely heavily on the strength of our research and development, as well as engineering capabilities, and we have 90 employees focused on these areas."

231.    Second, as of at least February 2021, View manufactured its smart glass product on a single production line.

232.    Third, View's customer and supplier base is relatively narrow.  As set forth in the 1Q21 10-Q, one customer represented 26.3% of total revenue for the three months ended March 31, 2021, and four customers accounted for 65.0% for the three months ended March 31, 2020.

233.    Fourth, as set forth in the 1Q21 10-Q, one customer represented 28.8% of accounts receivable, net as of March 31, 2021, and one customer accounted for 23.6% of accounts receivable, net as of December 31, 2020.  In the 10-K for the fiscal year ended December 31, 2021, filed June 15, 2022, View stated that two customers represented 24% of total revenue, and that for the

years ended December 31, 2020 and December 31, 2019, one customer accounted for 10.2% and 11.2% of total revenue, respectively.

234.    Fifth, the Company purchases materials from a "limited number of suppliers."  For the three months ended March 31, 2021, "two suppliers accounted for 37.3% and 12.7% of total purchases" and for the three months ended March 31, 2020, "one supplier accounted for 48.6% of total purchases."  The glass components used in View products were from a single source supplier.

235.    Sixth, according to the 1Q21 10-Q, the Company "operates and manages its business as one reportable and operating segment."

**D.    View's De-SPAC Registration Statement And Other SEC Filings Alleged Herein Included Financial Statements Not In Conformity With GAAP**

236.    According to the Company's filings with the SEC during the Class Period, View states that its consolidated financial statements were prepared in accordance with GAAP.  By engaging in clear violations of GAAP and the rules established by the SEC, View masked the Company's true financial condition and costs of revenues.  Indeed, given the restatement (discussed herein) and the violations of GAAP, View's financial condition and costs of revenue reported during the Class Period were materially false and misleading.

237.    As a registrant with the SEC, View was responsible for issuing and fairly presenting its consolidated financial statements in accordance with U.S. GAAP and SEC Rules.

238.    GAAP (also referred to herein as U.S. GAAP) is the set of conventions, rules and procedures, which constitute the professional standards of the accounting profession. During the Class Period, authoritative U.S. GAAP were promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC"). U.S. GAAP brings consistency, conformity and, over time, comparability to financial reporting. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules and procedures provide a standard by which to measure financial presentations.

239.    During the Class Period, View, through its management/directors (the Individual View Defendants) and View's external auditor PwC, repeatedly assured investors that the

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1    Company's consolidated financial statements as filed with the SEC were fairly presented in

2    accordance with U.S. GAAP.

3         240.    As set forth in connection with the issuance of the restatement, the Company was

4    caused to state that: 1) its previously reported liabilities associated with warranty-related

5    obligations and the cost of revenue associated with the recognition of those liabilities were

6    materially misstated; 2) there was a failure to properly record the liabilities for warranty related

7    obligations and cost of revenue; and 3) the installation labor and freight costs the Company incurred

8    and expected to continue to incur were inappropriately excluded from the warranty obligation.  See

9    *e.g.*, Form 10-Q/A Amendment No. 1 for period ended March 31, 2021 at page 20; Form 10-K for

10   fiscal year ended December 31, 2021 ("2021 Form 10-K") at page 107.  As noted in the 2021 Form

11   10-K at page 107:

12              As a result of these material misstatements, the Company's warranty

13              liabilities were understated by $25.0 million as of December 31,

14              2020 and the Company's Cost of Revenue and Net Loss were

15              overstated by $3.1 million and understated by $20.9 million for the

16              years ended December 31, 2020 and 2019, respectively, as well as

17              understated by $7.1 million for periods prior to 2019, which has been

18              corrected for as an adjustment to Accumulated Deficit as of

19              December 31, 2018.

20   **E.    View's Restatement Is An Admission That The Subject Financials Were
         Materially False As Initially Reported**

21

22        241.    GAAP requires prompt correction, by way of restatement, of previously issued

23   materially misstated financial statements.  View's statements that it would restate its financial

24   results constitutes an admission by management of the materiality of the misstatements in the

25   Company's previously issued consolidated financial statements.

26        242.    Specifically, an "error in previously issued financial statements" is generally limited

27   to material items under GAAP.  ASC 250, Accounting Changes and Error Corrections ("ASC 250")

28   defines an error in previously issued financial statements as an "error in recognition, measurement,

presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial statements were prepared." ASC 250-10-20.  ASC 250 defines a "[r]estatement" as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." ASC 250-10-20.

243.   Under GAAP, where an error in financial statements discovered after such statements are issued is deemed to be material, GAAP requires that such errors be disclosed. Specifically, ASC 250 requires that such error "be reported as an error correction, by restating the prior-period financial statements." ASC 250-10-45-23.  Restatement requires that:

> • The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented;
>
> • An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period; and
>
> • Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

244.   Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." ASC 250-10-45-23.

245.   The requirement to restate errors in previously issued financial statements does not apply to immaterial errors as ASC 250-10-S99 affirms: "Correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended." ASC 250-10-S99.

246.   Therefore, in accordance with U.S. GAAP, View's restatement conclusion reflects its acknowledgement that for at least those annual and interim reporting periods set forth herein as part of the restatement were material errors at the time of issuance.:

• GAAP misstatements existed in its previously issued financial statements;

• The misstatements were material; and

• These misstatements resulted from oversight or misuse of facts that existed at the time the previously issued financial statements were originally presented.

**F.     PwC Failed To Comply With PCAOB And GAAS Auditing Standards**

247.    PwC was required to comply with applicable auditing standards when performing their audits. As described herein, PwC violated those professional standards and thereby provided audit opinions that allowed the View Defendants to perpetrate the fraudulent scheme described herein.  Accordingly, PwC issued audit opinions that contained false and misleading statements.

248.    The Supreme Court has described the role of an independent auditor as that of a "public watchdog," established to improve the reliability of financial statements, enhance the credibility of those statements and thereby, support the capital markets. *United States v. Arthur Young & Co.*, 465 U.S. 805 (1984).

249.    To oversee independent auditors, the PCAOB was established in connection with the implementation of SOX.  The PCAOB is given the responsibility to establish professional audit standards applicable to audits of certain publicly-traded companies, including View (the "PCAOB Standards").            PCAOB       Standards      are      available      online      at https://pcaobus.org/oversight/standards/auditing-standards, and there are three separate versions depending     on     the     time     period     of     the     audited     financials.     *See* https://pcaobus.org/oversight/standards/auditing-standards (last visited July 10, 2022).  The first set relevant herein are the standards for audits of financial statements for fiscal years ending Dec. 15, 2017       through       Dec.       14,       2020.       See       chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://pcaob-assets.azureedge.net/pcaob-dev/docs/default-source/standards/auditing/documents/auditing-standards-as-of-december-15-2017575662230.pdf?sfvrsn=bc30bcc8_2 (last visited July 10, 2022).  The second is for audits of financial statements for fiscal years ending Dec. 15, 2020 or later.   See https://pcaob-

assets.azureedge.net/pcaob-dev/docs/default-

source/standards/auditing/documents/auditing_standards_audits_after_december_15_2020.pdf?sf

vrsn=5862544e_4 (last visited July 10, 2022).

250.    Prior to December 31, 2016, PCAOB Standards consisted of two types of equally authoritative auditing standards: (a) standards originally issued by the Auditing Standards Board ("ASB") of the American Institute of Certified Public Accountants ("AICPA"), adopted by the PCAOB, collectively referred to as "AU;" and (b) standards issued by the Board referred to as "AS." Effective December 31, 2016, these standards were reorganized, grouped into the following five topical categories and referenced with an "AS" prefix:

> (a)    General Auditing Standards – Standards on broad auditing
> principles, concepts, activities and communications;
> (b)    Audit Procedures – Standards for planning and performing
> audit procedures and for obtaining audit evidence;
> (c)    Auditor Reporting – Standards for auditors' reports;
> (d)    Matters Relating to Filings Under Federal Securities Laws –
> Standards on certain auditor responsibilities relating to SEC filings
> for securities offerings and reviews of interim financial information;
> and
> (e)    Other Matters Associated with Audits – Standards for other
> work performed in conjunction with an audit of an issuer.

251.    PCAOB Standards state that the objective of a financial statement audit is the expression of an opinion on the fairness with which the audited financial statements present, in all material respects, the financial position, results of operations, and the cash flows of the reporting entity, in conformity with GAAP.  AU 110.01 (AS 1001.01, eff. Dec. 31, 2016).

252.    To achieve this objective, PwC was responsible for planning and performing its financial statement audit to obtain "reasonable assurance" [AU110.02 (AS 1001.02 eff. Dec. 31, 2016)] about whether View's consolidated financial statements were free of material misstatement under GAAP, including misstatements caused by fraud.  *Id.*

253. To identify the risks of material misstatements, the PCAOB Standards identified below require auditors to perform the procedures identified in those standards. The following are a sample of the standards, but is not exhaustive.

254. PCAOB Standards AS 12.07 - 12.17 (AS 2110.07 - 2110.17, eff. Dec. 31, 2016) require an auditor to obtain a sufficient understanding of the company and its environment, including steps to "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement."

255. PCAOB Standards AS 12.18 - 12.40 (AS 2110.18 - 2110.40, eff. Dec. 31, 2016) require an auditor to obtain an understanding of internal controls over financial reporting to (a) dentify the types of potential misstatements, (b) assess the factors that affect the risks of material misstatement, and (c) design further audit procedures. An auditor's understanding of internal controls over financial reporting includes evaluating the design of controls that are relevant to the audit and determining whether the controls have been implemented. In this regard, an auditor is required to evaluate the extent to which existing control deficiencies are indicative of a fraud risk factor.

256. PCAOB Standards AS 12.46 - 12.71 (AS 2110.46 - 2110.71, eff. Dec. 31, 2016) require an auditor to perform audit procedures designed to identify areas that might represent specific risks relevant to the audit, including the existence of unusual transactions and events, and amounts, ratios and trends that warrant investigation.

257. PCAOB Standards AS 13.08 and AS 13.13 (AS 2301.08 and AS 2301.13, eff. Dec. 1, 2016) require the auditor to design and perform the audit procedures in a manner that are specifically responsive to evident risks of material misstatement for each relevant assertion of each significant account and disclosure, including fraud risk.

258. PCAOB Standards AU 342.04 and AU 342.09 - 342.10 (AS 2501.04 and AS 2501.09 - 2501.10, eff. Dec. 31, 2016) require the auditor to evaluate the "reasonableness of accounting estimates" made by the company in the "context of the financial statements taken as a whole." The auditor should consider various factors, including "[d]eviations from historical patterns." Further, the auditor should "obtain an understanding of how [the company] developed

the estimate" and, based on that, (a) "[r]eview and test the process used by management to develop the estimate"; (b) [d]evelop an independent expectation of the estimate to corroborate the reasonableness of [the company's] estimate"; and (c) "[r]eview subsequent events or transactions occurring prior to the date of the auditor's report."

259.   PCAOB Standard AU 110.01 (AS 1001.01, eff. Dec. 31, 2016) requires adherence to the objective of a financial statement audit consisting of the expression of an opinion on the fairness with which the financial statements present, in all material respects, the financial position, results of operations and the cash flows of the reporting entity, in conformity with GAAP.

260.   PCAOB Standards AU 230.01 and AU 230.07 - 230.09 (AS 1015.01 and AS 1015.07 - 1015.09, eff. Dec. 31, 2016) and AU 316.13 (AS 2401.13, eff. Dec. 31, 2016) impose upon auditors the responsibility of applying "due professional care," including the appropriate "professional skepticism." Professional skepticism requires the auditors to maintain a questioning mind and critically assess the audit evidence it obtains. In this regard, PCAOB Standards expressly require that the auditors should not be satisfied with less than persuasive evidence beyond simply a belief that management is honest.

261.   PCAOB Standards AS 15.04 and AS 15.29 (AS 1105.04 and AS 1105.29, eff. Dec. 31, 2016) and AS 14.08 (AS 2810.08, eff. Dec. 31, 2016) also prohibit an auditor from issuing any unqualified opinion when it fails to gather sufficient appropriate audit evidence necessary to support its opinion. When audit evidence obtained from one source is inconsistent with that from another, or if the auditor has doubts regarding the reliability of audit evidence, auditors are required to perform additional procedures necessary to resolve the matter.

262.   PCAOB Standard AU 316 (AS 2401, eff. Dec. 31, 2016) establishes that the auditors' responsibility for identifying and responding to risks of material misstatement extended to those risks arising from fraud.  Additional standards PwC violated include, but are not limited to, PCAOB Standard AS2110 (for FYE audits ending December 15, 2017 through December 14, 2020) and PCAOB Standards AS2301, AS2110, AS2301, AS2501 for FYE audits on or after December 15, 2020.

1

**G.     PwC Knew and/or Was Reckless in Ignoring Red Flags In Connection With Issuance of the December 23, 2020 and March 12, 2021 Audit Reports**

2     263.    Throughout the time PwC served as View's auditor (since 2013) and particularly

3     during the Class Period, there were significant red flags regarding View that PwC knew or was

4     reckless in not knowing.  These red flags, whether considered individually or in the aggregate,

5     placed PwC on notice of the facts ultimately revealed in the restatements.  First, as set forth in

6     View's SEC filings alleged herein, PwC was on notice from at least 2019 that View had an issue

7     with the IGUs for which an accrual had already been taken.  Second, the primary focus of the

8     restatement was on the failure to include certain labor and freight costs in connection with the

9     previously recorded accrual.  PwC knew, or was reckless in not knowing, that these cost items

10    existed and/or required recording in that documentation such as contracts with the subject

11    customer(s) or other readily verifiable facts existed.  Third, PwC was on notice that the Company

12    had a history of material weakness in its internal controls.  Fourth, given View's relatively small

13    number of customers and suppliers during the Class Period, PwC was on notice that any warranty

14    issues would have the ability to have a substantial negative impact on View's financial statements,

15    as well as its business and financial condition.  Yet, despite these and other red flags, PwC

16    knowingly and/or recklessly failed to indicate in its audit reports (set forth herein) that View's

17    warranty accruals were materially misstated for the readily known reason that they failed to account

18    for labor and shipping.  For example, page 236 of the Proxy Statement/Prospectus noted that

19    "labor" is one of the components costs related to the warranties:

20              . . . The estimated cost includes our expectations regarding future

21              reductions in production costs, which are primarily comprised of

22              materials, labor, and factory overhead.

23    Based upon the standards requiring PwC to be have a "sufficient understanding of the company

24    and its environment", to "identify areas that might represent specific risks relevant to the audit",

25    and "gather sufficient appropriate audit evidence necessary to support its opinion", among other

26    things, the issuance of the audit opinions identified herein while the "red flags" existed supports

27    the allegation that PwC knowingly and/or recklessly failed to indicate in its audit reports that

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1   View's warranty accruals were materially misstated and that the financial statements of View were

2   not in conformity with GAAP.

3       **H.    Corporate Scienter and *Respondeat Superior***

4       264.    Individual View Defendants Mulpuri and Prakash were high-ranking management-

5   level employee of View that either (i) made the false or misleading statements alleged herein;

6   (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or

7   issuance of the false or misleading statements alleged herein. In so doing, each was acting in their

8   role as an executive employee and representative of View. The scienter of each of these individuals

9   and all other management-level employees of View, is therefore imputed to Defendant View.

10      265.    CF II Individual Defendants Lutnick, Pion, Chan, Jain were high-ranking

11  management-level employee of CF II that either (i) made the false or misleading statements alleged

12  herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making

13  or issuance of the false or misleading statements alleged herein. In so doing, each was acting in

14  their role as an executive employee and representative of CF II (which subsequently was known as

15  View). The scienter of each of these individuals and all other management-level employees of

16  CF II, is therefore imputed to Defendant CF II/View.

17  **XII.    COUNTS FOR VIOLATIONS OF SECTIONS 10 AND 20(a) OF THE EXCHANGE
            ACT**

18

19                                    **COUNT VI**
         **For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b)**
20            **Against Defendants View, Mulpuri, Prakash, and PwC**

21      266.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if

22  fully set forth herein.

23      267.    During the Class Period, Defendants named in this Count disseminated or approved

24  the false statements specified above by use of the means or instrumentalities of interstate

25  commerce, which statements they knew or deliberately disregarded were false and misleading in

26  that they contained misrepresentations and failed to disclose material facts necessary to make the

27  statements made, in light of the circumstances under which they were made, not misleading.

28

268.     In particular, PwC acted as View's independent auditor since 2013.  PwC knew and understood that the December 23, 2020 and March 12, 2021 reports and opinions it issued (alleged herein) concerning View's financial statements would be released to the investing public, and that investors would rely, and had a right to rely, on those reports and opinions.  PwC had access to View and its employees and continuing access to and knowledge of View's confidential corporate, financial, operating and business information.  Despite this access and knowledge, PwC knowingly, or with extreme recklessness, perpetrated and/or concealed the accounting manipulations and other schemes undertaken, and certified and publicly represented that View's financial reports were free from material misstatements (that the financials presented "fairly, in all material respects, the financial position of the Company" and were in "conformity with" GAAP) in order to fraudulently inflate View's financial condition. To the extent that any of PwC's statements are considered to be opinions, they are actionable because (i) they were both objectively and subjectively false; and/or (ii) they implied facts regarding its inquiry or knowledge underlying such opinions, including its compliance with standards of the PCAOB and GAAS in performing its audit and the Company's compliance with GAAP.

269.     Defendants named in this Count violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

270.     Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Lead Plaintiff and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

271.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases

and/or acquisitions of View securities during the Class Period.  The price for View's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

272.    This Count is brought within the applicable statute of limitations.

**COUNT VII**
**For Violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**
**Against View, Mulpuri, Prakash and PwC**

273.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

274.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Lead Plaintiff need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

275.    During the Class Period, Defendants named in this Count carried out a common plan, scheme, and unlawful course of conduct, by the use, means or instrumentalities of interstate commerce and/or of the mails, that was intended to, and did: (i) deceive the investing public, including Lead Plaintiff and the Class; (ii) artificially inflate the price of View securities; and (iii) cause Lead Plaintiff to purchase View securities at artificially inflated prices.

276.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants named in this Count employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices and course of business that operated as a fraud and deceit upon Lead Plaintiff and the Class in connection with their purchases of View securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

277.    Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business including the knowing and/or reckless suppression and concealment of View's true financial condition and the amount of the understatement of the warranty accrual permitted Defendants to take View public and sell shares to members of the investing public at artificially inflated prices.

278.     Lead Plaintiff and the Class reasonably relied on upon the integrity of the market in which View's securities traded.

279.     During the Class Period, Lead Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct and/or the impact of the fraudulent scheme. Had Lead Plaintiff and the Class known the true extent of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased or acquired View's securities, or if they had, would not have done so at the artificially inflated prices of such securities.

280.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of View securities during the Class Period. The price for View's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

281.     This Count is brought within the applicable statute of limitations.

<u>**COUNT VIII**</u>
**For Violation of § 20(a) of the Exchange Act**
**Against Mulpuri, Prakash and the CF II Defendants (Except Blechman and Hochberg)**

282.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein. Defendants Mulpuri, Prakash and the CF II Defendants (except Blechman and Hochberg) are referred to herein as the "Control Defendants."

283.     The Control Defendants acted as controlling persons of CF II and/or View within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Control Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the CF II and View, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Control Defendants were provided with or had unlimited access to copies of the CF II's and View's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after

1   these statements were issued and had the ability to prevent the issuance of the statements or cause

2   the statements to be corrected.

3        284.    In particular, those Control Defendants who are natural persons (*i.e.*, Mulpuri,

4   Prakash and the Individual CFII Defendants) had direct and supervisory involvement in the day-

5   to-day operations of the CF II and/or View and, therefore, had the power to control or influence the

6   particular transactions giving rise to the securities violations as alleged herein, and exercised the

7   same.

8        285.    As set forth above, View (formerly known as CF II), Mulpuri and Prakash, each

9   violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By

10   virtue of their position as controlling persons, Mulpuri, Prakash, and the other Control Defendants

11   are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of

12   Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in

13   connection with their purchases of the Company's securities during the Class Period.

14        286.    This Count is brought within the applicable statute of limitations.

15   **XIII.   LOSS CAUSATION**

16        287.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

17   the economic loss suffered by Lead Plaintiff and the Class. During the Class Period, Lead Plaintiff

18   and the Class purchased View securities at artificially inflated prices. As detailed above, when the

19   truth about Defendants' misconduct was revealed, the value of the Company's stock declined

20   precipitously as the prior artificial inflation no longer inflated the stock's prices. The decline in the

21   price of View securities was the direct result of the nature and extent of Defendants' misconduct

22   finally being revealed to investors and the market. The timing and magnitude of the share price

23   declines negate any inference that the losses suffered by Lead Plaintiff and other members of the

24   Class were caused by changed market conditions, macroeconomic or industry factors, or Company

25   specific facts unrelated to the Defendants' misconduct. The economic loss, i.e., damages, suffered

26   by Lead Plaintiff and other Class members, was a direct result of Defendants' misconduct and the

27   subsequent significant decline in the value of the Company's stock when Defendants' prior

28   misrepresentations and other misconduct was revealed.

288.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose that (1) View expected to incur substantial warranty accrual expenses due to significant quality issues; (2) View failed to properly record the liabilities for warranty-related obligations and cost of revenue; (3) when estimating these liabilities, the Company inappropriately excluded from these liabilities certain costs it intended to incur when replacing the Company's IGUs; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of View securities to be artificially inflated. Lead Plaintiff and other Class members purchased View securities at those artificially inflated prices, causing them to suffer damages.

## XIV.   NO SAFE HARBOR

289.    CF II and/or View's "Safe Harbor" warnings accompanying any forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

290.    Defendants are liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CF II and/or View who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

291.    In addition, the FLS were contradicted by existing, undisclosed material negative facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## XV.    APPLICABILITY OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

292.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(d)    Lead Plaintiff and other members of the Class purchased View securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

293.    At all relevant times, the market for View securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, View filed periodic public reports with the SEC and/or the Nasdaq;

(b)    View regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    View was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the

1   sales force and certain customers of their respective brokerage firms. Each

2   of these reports was publicly available and entered the public marketplace;

3       (d)    The Company was covered by research analysts, including Cantor

4   Fitzgerald, Goldman Sachs, and Raymond James.

5   294.   As a result of the foregoing, the market for View's securities promptly digested

6   current information regarding View from all publicly available sources and reflected such

7   information in View's share price. Under these circumstances, all purchasers of View's securities

8   during the Class Period suffered similar injury through their purchase of View's securities at

9   artificially inflated prices and a presumption of reliance applies.

10   295.   Further, to the extent that Defendants concealed or improperly failed to disclose

11   material facts with the regard to the Company, Lead Plaintiff is entitled to a presumption of reliance

12   in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

13   **XVI.   CLASS ACTION ALLEGATIONS**

14   296.   Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

15   Procedure 23(a) and (b)(3), seeking to pursue remedies under the Exchange Act and Securities Act.

16   The Class consists of:

17   (i) all persons or entities who purchased or otherwise acquired View

18   and/or CF II securities between November 30, 2020 and May 10,

19   2022, inclusive (the "Class Period"); (ii) all persons or entities who

20   were holders of CF II Class A common stock as of the January 27,

21   2021 record date (the "Record Date") that were entitled to vote to

22   approve the Business Combination (as defined herein) between View

23   and CF II as set forth in the February 16, 2021 Proxy

24   Statement/Prospectus (defined herein); and (iii) all persons or entities

25   who purchased or otherwise acquired View securities pursuant or

26   traceable to the De-SPAC Registration Statement (defined herein)

27   (the "Class").

28

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

297.    Excluded from the Class are Defendants, or their affiliates or subsidiaries, the current and/or former officers and directors of any non-natural Defendant named herein, members of the immediate family of any excluded person, heirs, successors and assigns of any excluded person or entity, and any entity in which any excluded person has or had a controlling interest.  Also excluded from the Class are persons who held shares of View's privately held common stock and preferred stock outstanding prior to closing of the Business Combination.

298.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, View's shares actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of View shares were traded publicly during the Class Period on the Nasdaq. Record owners and other members of the Class may be identified from records maintained by View or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

299.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

300.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

301.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about View's business and operations; and

(c)    Whether the price of View's securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

302.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, certifying Lead Plaintiff as class representative, and appointing Lead Plaintiff's undersigned Lead Counsel as class counsel;

B.    Awarding Lead Plaintiff and the members of the Class damages and interest;

C.    Awarding Lead Plaintiff reasonable costs, including attorneys' fees; and

D.    Awarding such equitable injunctive or other relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED:  July 15, 2022

By:    _/s/ Laurence D. King_
Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:  415-772-4707
_lking@kaplanfox.com_

1
2

*kherkenhoff@kaplanfox.com*
*breed@kaplanfox.com*

3

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:   212-687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*juris@kaplanfox.com*

4
5
6
7
8
9

*Lead Counsel for Lead Plaintiff Stadium Capital LLC
and the Proposed Class*

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No. 5:21-cv-06374-BLF
AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

## <u>CERTIFICATION</u>

I, Joseph Zicherman, Managing Director of Stadium Capital LLC ("Stadium Capital"), hereby certify as follows:

1.     I am fully authorized to make a certification on behalf of Stadium Capital. Stadium Capital has been appointed as the lead plaintiff in Case No. 5:21-cv-06374-BLF (the "Action").  I have reviewed the amended complaint to be filed in the Action and I authorize its filing.

2.     Stadium Capital did not purchase the securities that are the subject of this Action at the direction of plaintiff's counsel or in order to participate in this Action or in any other litigation or private action arising under the securities laws of the United States.

3.     Stadium Capital is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial if necessary.

4.     Stadium Capital has made no transactions during the class period in the debt or equity securities that are the subject of the Action except those set forth in the certificate attached hereto as Schedule A.  Stadium Capital's transactions in View Inc. securities (including transactions under its former name, CF Finance Acquisition Corp. II) during the proposed class period in the Action are set forth in Schedule A, which is attached hereto.

5.     Other than the present Action, Stadium Capital has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action, or been appointed lead plaintiff in any other action, involving alleged violations of the federal securities laws, except as set forth in this certification.

6.     Stadium Capital will not accept any payment for serving as representative on behalf of a class in the Action beyond Stadium Capital's pro rata share of any recovery, except as ordered or approved by the court, including any award to a representative plaintiff of reasonable costs and expense directly related to the representation of the class.

7.     I declare under penalty of perjury that the foregoing is true and correct, executed on this 15th day of July, 2022.

Joseph Zicherman
*Managing Director*
*Stadium Capital LLC*

**Schedule A**
**Transactions in View, Inc.**

| Security | CUSIP | Transaction | Trade Date | Quantity | Price |
|---|---|---|---|---|---|
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 12/1/2020 | 37,000 | $11.33 |
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 12/2/2020 | 5,000 | $10.30 |
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 12/3/2020 | 8,000 | $10.41 |
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 12/4/2020 | 30,000 | $10.47 |
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 2/4/2021 | 10,000 | $11.03 |
| CF Finance Acquisition Corp. II | 15725Q104 | Buy | 2/5/2021 | 10,000 | $11.05 |
| CF Finance Acquisition Corp. II | 15725Q104 | Sell | 2/25/2021 | (20,000) | $10.08 |
| CF Finance Acquisition Corp. II | 15725Q104 | Sell | 3/9/2021 | (80,000) | $10.00 |
| View, Inc. | 92671V106 | Buy | 3/18/2021 | 22,921 | $8.51 |
| View, Inc. | 92671V106 | Buy | 3/19/2021 | 2,952 | $8.05 |
| View, Inc. | 92671V106 | Sell | 3/19/2021 | (2,499) | $8.75 |
| View, Inc. | 92671V106 | Buy | 3/22/2021 | 20,000 | $8.23 |
| View, Inc. | 92671V106 | Buy | 3/22/2021 | 6,626 | $8.25 |
| View, Inc. | 92671V106 | Sell | 3/23/2021 | (20,000) | $8.44 |
| View, Inc. | 92671V106 | Sell | 3/24/2021 | (5,000) | $8.00 |
| View, Inc. | 92671V106 | Buy | 3/25/2021 | 20,000 | $7.44 |
| View, Inc. | 92671V106 | Buy | 3/31/2021 | 15,000 | $7.40 |
| View, Inc. | 92671V106 | Sell | 4/1/2021 | (21,015) | $8.34 |
| View, Inc. | 92671V106 | Buy | 4/5/2021 | 25,895 | $8.09 |
| View, Inc. | 92671V106 | Sell | 4/5/2021 | (1,880) | $8.40 |
| View, Inc. | 92671V106 | Sell | 4/14/2021 | (10,000) | $8.73 |
| View, Inc. | 92671V106 | Buy | 4/15/2021 | 10,000 | $7.09 |
| View, Inc. | 92671V106 | Buy | 4/15/2021 | 32,000 | $8.05 |
| View, Inc. | 92671V106 | Sell | 4/20/2021 | (8,000) | $7.19 |
| View, Inc. | 92671V106 | Sell | 4/27/2021 | (7,000) | $9.00 |
| View, Inc. | 92671V106 | Buy | 4/30/2021 | 20,000 | $8.98 |
| View, Inc. | 92671V106 | Buy | 5/10/2021 | 5,841 | $7.00 |
| View, Inc. | 92671V106 | Sell | 5/19/2021 | (5,841) | $8.11 |
| View, Inc. | 92671V106 | Buy | 6/1/2021 | 10,000 | $7.91 |
| View, Inc. | 92671V106 | Sell | 6/1/2021 | (50,000) | $7.25 |
| View, Inc. | 92671V106 | Sell | 6/2/2021 | (60,000) | $7.56 |
| View, Inc. | 92671V106 | Buy | 6/24/2021 | 43,197 | $8.50 |
| View, Inc. | 92671V106 | Buy | 6/25/2021 | 31,803 | $8.50 |
| View, Inc. | 92671V106 | Sell | 7/6/2021 | (33,000) | $7.55 |
| View, Inc. | 92671V106 | Sell | 7/7/2021 | (42,000) | $7.52 |
| View, Inc. | 92671V106 | Buy | 7/19/2021 | 20,000 | $6.67 |
| View, Inc. | 92671V106 | Buy | 7/23/2021 | 10,000 | $6.60 |
| View, Inc. | 92671V106 | Buy | 7/27/2021 | 6,000 | $6.10 |

| View, Inc. | 92671V106 | Buy | 8/5/2021 | 6,000 | $6.04 |
|---|---|---|---|---|---|
| View, Inc. | 92671V106 | Buy | 8/9/2021 | 8,000 | $6.15 |
| View, Inc. | 92671V106 | Buy | 8/12/2021 | 10,000 | $5.95 |
| View, Inc. | 92671V106 | Sell | 8/17/2021 | (60,000) | $4.23 |
| View, Inc. | 92671V106 | Buy | 8/19/2021 | 10,000 | $3.57 |
| View, Inc. | 92671V106 | Buy | 8/19/2021 | 20,000 | $3.52 |
| View, Inc. | 92671V106 | Sell | 8/26/2021 | (30,000) | $4.58 |
| View, Inc. | 92671V106 | Buy | 8/30/2021 | 35,000 | $4.99 |
| View, Inc. | 92671V106 | Sell | 9/24/2021 | (35,000) | $6.10 |
| View, Inc. | 92671V106 | Buy | 11/10/2021 | 30,000 | $5.50 |
| View, Inc. | 92671V106 | Sell | 11/17/2021 | (30,000) | $4.41 |
| View, Inc. | 92671V106 | Buy | 3/4/2022 | 30,000 | $1.50 |
| View, Inc. | 92671V106 | Sell | 3/4/2022 | (30,000) | $1.48 |
| View, Inc. | 92671V106 | Buy | 4/19/2022 | 50,000 | $1.41 |
| View, Inc. | 92671V106 | Buy | 4/22/2022 | 25,000 | $1.40 |
| View, Inc. | 92671V106 | Buy | 4/27/2022 | 10,000 | $1.50 |
| View, Inc. | 92671V106 | Buy | 5/2/2022 | 15,000 | $1.53 |
| View, Inc. | 92671V106 | Sell | 5/10/2022 | (100,000) | $0.78 |