Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
KAPLAN FOX & KILSHEIMER LLP
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
Emails: *lking@kaplanfox.com*
        *kherkenhoff@kaplanfox.com*
        *breed@kaplanfox.com*

[Additional Counsel on Signature Page]

*Lead Counsel for Lead Plaintiff Stadium
Capital LLC and the Proposed Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated, | Case No.: 5:21-cv-06374-BLF |
| Plaintiff, | **CLASS ACTION** |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS [AND REQUEST FOR JUDICIAL NOTICE]** |
| VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, TOM LEPPERT, HAROLD HUGHES, NIGEL GORMLY, TOBY COSGROVE, LISA PICARD, TOM CHEUNG, TOM PATTERSON, BILL VEGHTE, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., CF GROUP MANAGEMENT, INC., AND PRICEWATERHOUSECOOPERS LLP, | Judge:       Hon. Beth L. Freeman<br>Courtroom: 3, 5th Floor<br>Date:         April 20, 2023<br>Time:        9:00 a.m. |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I. NATURE OF PROCEEDINGS ................................................................................................ 1

II. ISSUES TO BE DECIDED ................................................................................................... 1

III. STATEMENT OF FACTS .................................................................................................... 1

IV. ARGUMENT ........................................................................................................................ 3

A. Section 14(a) and Rule 14a-9 Claims Are Alleged ................................................. 4

    1. Plaintiff Alleges Defendants' Negligence For Section 14(a) Claim ........... 6

    2. The CFII Defendants Engaged in Solicitation Pursuant to Section 14(a) ........................................................................................................ 11

    3. Plaintiff's Section 14(a) Claim Is Not Derivative .................................... 12

    4. Plaintiff Pleads Loss Causation for the Section 14(a) Claim .................... 13

    5. Delaware Code Section 102(b)(7) Does Not Apply ................................. 14

B. Section 11 Claims Are Alleged ............................................................................. 14

    1. Plaintiff Has Statutory Standing Under Section 11 .................................. 14

    2. The CFII Defendants' "Due Diligence" Defense Fails ............................. 16

    3. The CFII Defendants' Loss Causation Argument Is Defective ................ 17

    4. PwC's Claim That It Made No False Statement of Material Fact For Section 11 Liability Fails ........................................................................ 17

C. Section 12 Claims Are Alleged as to the CFII Entity Defendants ......................... 21

D. Section 10(b) of the Exchange Act and Rule 10b-5 Claims Are Alleged ............. 22

    1. Plaintiff's Allegations Support a Strong Inference of Scienter ................ 23

    2. Plaintiff Alleges Loss Causation ............................................................. 33

    3. Plaintiff Alleges Scheme Liability .......................................................... 36

E. Control Person Claims Are Adequately Alleged ................................................... 37

    1. Section 20(a) Claims Against the Individual View Defendants and CFII Defendants ..................................................................................... 37

    2. Section 15 Claims Are Alleged As to the CFII Defendants ...................... 39

V. CONCLUSION ................................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 4

*Azar v. Blount Int'l, Inc.*,
No. 3:16-cv-483-SI, 2017 WL 1055966 (D. Or. Mar. 20, 2017)............................... 6

*Batwin v. Occam Networks, Inc.*,
No. CV 07–2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008) ........................... 38

*Baum v. Harman Int'l Indus., Inc.*,
408 F. Supp. 3d 70 (D. Conn. 2019) ...................................................................... 13

*Beck v. Dobrowski*,
559 F.3d 680 (7th Cir. 2009).................................................................................... 6

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 4, 5

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008).................................................................................. 25

*Brown v. Brewer*,
No. CV 06-3731-GHK (JTLx), 2008 WL 6170885 (C.D. Cal. July 14, 2008) ......................... 13

*Brown v. Brewer*,
No. CV 06-3731-GHK (JTLx), 2010 WL 2472182 (C D. Cal. June 17, 2010) ......................... 6

*Burgess v. Premier Corp.*,
727 F.2d 826 (9th Cir. 1984)................................................................................... 38

*California Pub. Employees' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004)...................................................................................... 7

*Chao Sun v. Daqing Han*,
Civil Action No. 15-703 (JLL), 2015 WL 9304542 (D.N.J. Dec. 21, 2015)............................ 31

*Chris-Craft Industries, Inc. v. Independent Stockholders Comm.*,
354 F. Supp. 895 (D. Del. 1973) ............................................................................... 9

*City of Birmingham Relief & Ret. Sys. v. Hastings*,
No. 18-CV-02107-BLF, 2019 WL 3815722 (N.D. Cal. Feb. 13, 2019)......................... 9, 10, 13

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align
Technology, Inc.*,
856 F.3d 605 (9th Cir. 2017)................................................................................ 19, 20, 25

*Cosby v. KPMG, LLP*,
No.: 3:16-CV-121-TAV-DCP, 2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ............ 18, 29, 30

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF AUTHORITIES

**Page(s)**

*Costanzo v. DXC Technology Company*,
Case No. 19-cv-05794-BLF, 2020 WL 4284838 (N.D. Cal. July 27, 2020) ...................... 22, 29

*Croker v. Carrier Access Corp.*,
No. 05CV01011LTB-OES, 2006 WL 2038011 (D. Colo. July 18, 2006)............................... 32

*Dekalb Cty. Pension Fund v. Transocean Ltd.*,
817 F.3d 393 (2d Cir. 2016)..................................................................................................... 6

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) ................................................................................... 14, 33, 34

*Dutton v. Harris Stratex Networks Inc.*,
270 F.R.D. 171 (D. Del. 2010)................................................................................................ 19

*Edgar v. MITE Corp.*
457 U.S. 624 (1982) ................................................................................................................ 14

*Gould v. Am.-Hawaiian S. S. Co.*,
535 F.2d 761 (3d Cir. 1976).......................................................................................................7

*Hefler v. Wells Fargo & Co.*,
No. 16-CV-05479-JST, 2018 WL 1070116 (N.D. Cal. Feb. 27, 2018)................................... 37

*Hertzberg v. Dignity Partners, Inc.*,
191 F.3d 1076 (9th Cir. 1999)................................................................................................. 14

*Ho v. Duoyuan Glob. Water, Inc.*,
887 F. Supp. 2d 547 (S.D.N.Y. 2012)..................................................................................... 27

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000)................................................................................................. 38

*Hunt v. Bloom Energy Corp.*,
Case No. 19-cv-02935-HSG, 2021 WL 4461171 (N.D. Cal. Sept. 29, 2021)......................... 19

*In re Acadia Pharms. Inc. Sec. Litig.*,
No. 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal. June 1, 2020) ........................... 27

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode
Island*, 212 L. Ed. 2d 233, 142 S. Ct. 1227 (2022) ................................................................. 25

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010)............................................................................*passim*

*In re Bradley Pharms., Inc. Sec. Litig.*,
421 F. Supp. 2d 822 (D.N.J. 2006) ......................................................................................... 34

Case No. 5:21-cv-06374-BLF

**Page(s)**

*In re Century Aluminum Co. Sec. Litig.,*
729 F.3d 1104 (9th Cir. 2013)...................................................................................... 14

*In re Charles Schwab Corp. Sec. Litig.,*
257 F.R.D. 534 (N.D. Cal. 2009).................................................................................. 39

*In re ChinaCast Educ. Corp. Sec. Litig.,*
809 F.3d 471 (9th Cir. 2015)........................................................................................ 24

*In re Countrywide Fin. Corp. Sec. Litig.,*
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................. 16, 17

*In re Cylink Sec. Litig.,*
178 F. Supp. 2d 1077 (N.D. Cal. 2001) ....................................................................... 37

*In re Daou Sys.,*
411 F.3d 1006 (9th Cir. 2005)................................................................................. 21, 28

*In re Dynegy, Inc. Sec. Litig.,*
339 F. Supp. 2d 804 (S.D. Tex. 2004) ......................................................................... 16

*In re Enron Corp. Sec., Deriv. & ERISA Litig.,*
Nos. MDL–1446, 2003 WL 230688 (S.D. Tex. Jan. 28, 2003)................................... 39

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
258 F. Supp. 2d 576 (S.D. Tex. 2003) ......................................................................... 39

*In re Finisar Corp. Sec. Litig.,*
646 F. App'x 506 (9th Cir. 2016) .......................................................................... 23, 26

*In re Fuwei Films Sec. Litig.,*
634 F. Supp. 2d 419 (S.D.N.Y. 2009).......................................................................... 17

*In re Giant Interactive Group, Inc. Sec. Litig.,*
643 F. Supp. 2d 562 (S.D.N.Y. 2009).......................................................................... 17

*In re Global Crossing, Ltd. Sec. Litig.,*
313 F. Supp. 2d 189 (S.D.N.Y. 2003).......................................................................... 16

*In re Illumina, Inc. Sec. Litig.,*
2018 WL 500990 (S.D. Cal. Jan. 22, 2018)................................................................. 26

*In re Immune Response Sec. Litig.,*
375 F. Supp. 2d 983 (S.D. Cal. 2005) .................................................................... 14, 15

*In re Intrabiotics Pharm., Inc. Sec. Litig.,*
No. C 04-02675, 2006 WL 708594 (N.D. Cal. Jan. 23, 2006) .................................... 15

*In re JPMorgan Chase Derivative Litig.,*
No. 2:13-CV-02414-KJM, 2014 WL 5430487 (E.D. Cal. Oct. 24, 2014)................... 10

**Page(s)**

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ................................................................... 15

*In re Lehman Bros. Sec. & ERISA Litig.*,
684 F. Supp. 2d 485 (S.D.N.Y. 2010)...................................................................... 16

*In re Lehman Bros. Sec. and ERISA Litig.*,
131 F. Supp. 3d 241 (S.D.N.Y. 2015) ...................................................................... 19

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................ 8, 16, 17

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000*)*.............................................................. 28, 29, 30

*In re MobileMedia Sec. Litig.*,
28 F. Supp. 2d 901 (D.N.J. 1998) ........................................................................... 16

*In re Morgan Stanley Information Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010)..................................................................................... 16

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................................. 28

*In re Oxford Health Plans, Inc. Sec. Litig.*,
51 F. Supp. 2d 290 (S.D.N.Y. 1999)........................................................................ 30

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017).................................................................................. 36

*In re QuantumScape Sec. Class Action Litigation*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) .................................................................... 32

*In re Rent-Way Sec. Litig.,*
209 F. Supp. 2d 493 (W.D. Pa. 2002*)*..................................................................... 20

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012).................................................................................... 11

*In re Romeo Power Inc. Sec. Litig.*,
No. 21 CIV. 3362 (LGS), 2022 WL 1806303 (S.D.N.Y. June 2, 2022), *reconsideration
denied*, No. 21 CIV. 3362 (LGS), 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022). ............. 12, 13

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................................... 27

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................................. 15

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**Page(s)**

*In re SunEdison, Inc. Sec. Litig.*,
300 F. Supp. 3d 444 (S.D.N.Y. 2018)................................................................................. 18

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006)................................................................................................ 31

*In re Tracht Gut, LLC*,
836 F.3d 1146 (9th Cir. 2016)............................................................................................... 4

*In re TrueCar, Inc.*,
2020 WL 5816761 (Del. Ch. Sept. 30, 2020) ..................................................................... 14

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014)*, aff'd in part, rev'd in part,*
669 F. App'x 878 (9th Cir. 2016) ........................................................................................ 15

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................................ 24

*In re Velti PLC Sec. Litig.*,
No. 13-cv-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ......................... 19, 28

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012)........................................................................................ 23, 24

*In re VeriSign, Inc. Sec. Litig.*,
No. C 02-2270-JW (PVT), 2005 WL 889695 (N.D. Cal. Jan. 13, 2005) ............................ 15

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................................. 16

*In re WageWorks, Inc., Sec. Litig.*,
No. 18-CV-01523-JSW, 2020 WL 2896547 (N.D. Cal. June 1, 2020*)* ............................. 27

*In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009)........................................................................... 18

*In re Wells Fargo & Co.,*
2022 WL 345066 at *4 (N.D. Cal. Feb. 4, 2022).................................................................. 14

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964)............................................................................................................... 4

*Johnson v. CBD Energy Limited,*
Civil Action H-15-1668, 2016 WL 3654657 (S.D. Tex. July 6, 2016) ................................ 19

*KBR v. Chevedden*,
478 F. App'x 213 (5th Cir. 2012) .......................................................................................... 8

**TABLE OF AUTHORITIES**

**Page(s)**

*Kelley v. Rambus, Inc.*,
  No. 07-1238, 2008 WL 5170598 (N.D. Cal. Dec. 9, 2008), *aff'd*,
  384 F. App'x 570 (9th Cir. 2010) ...................................................................................... 8

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018)........................................................................................... 35

*Krieger v. Atheros Commc'ns, Inc.*,
   No. 11-CV-00640-LHK , 2012 WL 1933559 (N.D. Cal. May 29, 2012) ............................ 7, 9

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ........................................................................... 37

*Levine v. AtriCure, Inc.*,
  508 F. Supp. 2d 268 (S.D.N.Y. 2007)............................................................................... 17

*Lewis v. Byrnes*,
  538 F. Supp. 1221 (S.D.N.Y. 1982)........................................................................... 8, 9, 11

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016)............................................................................... 25, 34, 35

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014), *as amended* (Sept. 11, 2014)........................................... 34

*Lorenzo v. Sec. & Exch. Comm'n*,
  139 S. Ct. 1094 (2019) ..................................................................................................... 37

*Lowry v. RTI Surgical Holdings, Inc.*,
  532 F. Supp. 3d 652 (N.D. Ill. 2021) ............................................................................... 28

*Luna v. Marvell Tech. Grp.*,
  No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017)................................. 38

*McIntire v. China MediaExpress Holdings, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013)............................................................................... 18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008)..................................................................................... 25, 35

*Miller Inv. Tr. v. Morgan Stanley & Co., LLC*,
  308 F. Supp. 3d 411 (D. Mass. 2018) .............................................................................. 18

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................................. 32

*N.M. State Inv. Council v. Ernst & Young LLP*,
  641 F.3d 1089 (9th Cir. 2011)................................................................................ 28, 29, 30, 31

Case No. 5:21-cv-06374-BLF

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

*N.Y.C. Emples. Ret. Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010), *overruled on other grounds by*
*Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) ........................................................... 5

*NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.,*
693 F.3d 145 (2d Cir. 2012) ........................................................................................... 15

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ...................................................................................... 22, 37

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.,*
367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................................................ 23

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.,*
780 F. App'x 480 (9th Cir. 2019) .................................................................................... 24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................................... 18, 20, 21

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ............................................................................................ 36

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.,*
774 F.3d 598 (9th Cir. 2014) .......................................................................................... 34

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp*,
142 F. Supp. 2d 589 (D.N.J. 2001) .................................................................................. 20

*Paracor Fin.*, *Inc. v. General Elec. Capital Corp.*,
96 F.3d 1151 (9th Cir. 1996) .......................................................................................... 38

*Pinter v. Dahl*,
486 U.S. 622 (1988) ...................................................................................................... 21

*Pirelli Armstrong Tire Corp. Retiree Med Benefits Tr. v. Stumpf*,
2012 WL 424557 (N.D. Cal. Feb. 9, 2012) .......................................................................... 8

*Plaisance v. Schiller*,
Civil Action No. H-17-3741, 2019 WL 1205628 (S.D. Tex. Mar. 14, 2019*)* .................... 19, 20

*Primo v. Pac. Biosciences of Cal., Inc.,*
940 F. Supp. 2d 1105 (N.D. Cal. 2013) ............................................................................ 21

*Querub v. Hong Kong*,
649 F. App'x 55 (2d Cir. 2016) ....................................................................................... 20

*Rabkin v. Lion Biotechnologies, Inc.,*
No. 17-CV-02086-SI, 2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ................................. 36, 37

## TABLE OF AUTHORITIES

**Page(s)**

*Rafton v. Rydex Series Funds*,
No. 10-CV-01171-LHK, 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) .......................................... 39

*Reiger v. Price Waterhouse Coopers LLP*,
117 F. Supp. 2d 1003 (S.D. Cal. 2000) .................................................................................... 31

*Rubke v. Capitol Bancorp Ltd*,
551 F.3d 1156 (9th Cir. 2009) .................................................................................................. 10

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) .................................................................................................... 22

*SEC v. Falstaff Brewing Corp.*,
629 F.2d 62 (D.C. Cir. 1980) .................................................................................................... 11

*Semerenko v. Cendant Corp.*,
223 F.3d 165 (3d Cir. 2000) ...................................................................................................... 34

*Shenwick v. Twitter*, Inc.,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................................... 27

*South Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ................................................................................................ 4, 27

*Spec. Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
243 F. Supp. 3d 1109 (E.D. Cal. 2017) .................................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................................................ 23, 24

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ............................................................................. 28, 40

*Thor Power Tool Co. v. Commissioner of Internal Revenue*,
99 S. Ct. 773 (1979) ............................................................................................................ 19, 20

*Turocy v. El Pollo Loco Holdings, Inc.*,
No. SACV151343DOCKESX, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) .......................... 23

*Varjabedian v. Emulex Corp.*,
888 F.3d 399 (9th Cir. 2018) ...................................................................................................... 6

*Varjabedian v. Emulex Corp.*,
No. SACV1500554CJCJCGX, 2020 WL 1847708 (C.D. Cal. Feb. 25, 2020),
*aff'd sub nom. Mutza v. Emulex Corp.*, 843 F. App'x 951 (9th Cir. 2021) ................................ 6

*Washtenaw Cty. Emps. Ret. Sys. v. AvidTech., Inc.*,
28 F. Supp. 3d 93 (D. Mass. 2014) .......................................................................................... 28

**TABLE OF AUTHORITIES**

**Page(s)**

*Webb v. Solarcity Corp.*,
  884 F.3d 844 (9th Cir. 2018)................................................................................................. 25

*Williams v. Gaylord*,
  186 U.S. 157 (1902) ............................................................................................................. 14

*Wilson v. Great American Industries, Inc.*,
  855 F.2d 987 (2d Cir. 1988) .................................................................................................. 7

*Yamamoto v. Omiya*,
  564 F.2d 1319 (9th Cir. 1977)......................................................................................... 11, 12

*Zamir v. Bridgepoint Educ., Inc.*,
  274 F. Supp. 3d 1057 (S.D. Cal. 2017).................................................................................. 27

**STATUTES**

15 U.S.C.
  §12(a)(1)................................................................................................................................ 21
  §12(a)(2)....................................................................................................................... 3, 4, 21
  §77k................................................................................................................................ *passim*
  §77l............................................................................................................................ 1, 21, 22
  §77l(a)(2) ............................................................................................................................. 21
  §77o.................................................................................................................................. 1, 39
  §78j(b) ............................................................................................................................ *passim*
  §78n(a) ........................................................................................................................... *passim*
  §78t(a) ............................................................................................................................. 1, 37
  §78u-4 ............................................................................................................... 1, 6, 22, 35

8 Del. Code
  §102 (b)(7) .......................................................................................................................... 14

**RULES**

Federal Rules of Civil Procedure
  Rule 12(b)(6)....................................................................................................................... 17
  Rule 8 ...........................................................................................................................  1, 3, 5
  Rule 8(a)............................................................................................................................... 33

Federal Rules of Evidence
  Rule 201 ........................................................................................................................... 1, 22

**REGULATIONS**

17 C.F.R.
  §230.405............................................................................................................................... 39
  §240.10b-5 (Rule 10b-5)....................................................................................................... 1
  §240.14a-9 (Rule 14a-9) .................................................................................................... 1, 4

## I.     NATURE OF PROCEEDINGS

Lead Plaintiff Stadium Capital LLC ("Plaintiff") filed an Amended Complaint For Violations of The Federal Securities Laws (the "Complaint"). All capitalized terms herein have the same meaning as in the Complaint. The Complaint asserts claims against View, current and former officers and directors of View and CF Finance Acquisition Corp. II ("CFII"), CF Finance Holdings II, LLC (CFII's "Sponsor"), Cantor Fitzgerald & Co. ("CF&Co.", CFII's advisor), Cantor Fitzgerald, L.P. ("Cantor", an affiliate of CFII, the Sponsor, and of Cantor, as well as the Sponsor's sole member), CF Group Management, Inc. ("CFGM", Cantor's managing general partner), and PricewaterhouseCoopers LLP (View's auditor since 2013) (collectively, "Defendants"). Plaintiff asserts violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78n(a), and 78t(a) and Rules 10b-5 and 14a-9, promulgated thereunder, 17 C.F.R. §240.10b-5 and 17 C.F.R. §240.14a-9, and violations of Section 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act") (15 U.S.C. §§77k, 77l and 77o). ECF No. 96. All emphasis is added, and quotations and footnotes omitted.  As set forth herein, Plaintiff seeks judicial notice of documents referenced in the Complaint, or documents filed by CFII/View with the Securities and Exchange Commission ("SEC"), which are filed concurrently herewith as exhibits to the Declaration of Kathleen A. Herkenhoff ("Herkenhoff Dec."). *See* Fed. R. Evid. 201.

## II.    ISSUES TO BE DECIDED

1.     Whether Plaintiff's non-fraud Exchange Act and/or Securities Act claims are sufficiently alleged pursuant to Fed. R. Civ. P. Rule 8?

2.     Whether Plaintiff's Section 10(b) allegations meet the requirements of the Private Securities Litigation Reform Act of 1955 (the "PSLRA")?

## III.   STATEMENT OF FACTS

On March 8, 2021, View became a publicly traded company through a merger with CFII, a special purpose acquisition company ("SPAC"). ¶¶5, 63. The Class Period starts a few months prior to View's emergence as a public company. ¶1. Notably, Plaintiff alleges that Defendants made material misrepresentations to investors in, among other filings with the SEC, View's December 23, 2020 De-SPAC Registration Statement, including the two amendments thereto (collectively the

"Reg. Stmt."), concerning a materially misstated and understated warranty accrual related to Legacy View's core product line - "smart windows." ¶¶3, 62, 81-90. The Reg. Stmt. included PwC's December 23, 2020 audit report on Legacy View, which stated that View's financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP") and audited in conformity with PCAOB standards and Generally Accepted Accounting Standards ("GAAS"). ¶¶50-54, 93.  The materially false statements in the Reg. Stmt. were replicated in the February 16, 2021 Proxy Statement/Prospectus ("Proxy"), and Defendants made additional false statements as they sought the vote of CFII shareholders in favor of the Business Combination. ¶¶91-94. The Reg. Stmt. and Proxy were jointly prepared by Legacy View and CFII. ¶¶80, 92.

On the heels of going public, View filed a March 12, 2021 Form 8-K, repeating the false statements in the Reg. Stmt. and Proxy concerning the warranty accrual, as well as setting forth PwC's March 12, 2021 audit opinion, which stated that View's financial statements conformed to GAAP and were audited in conformity with PCAOB standards and GAAS. ¶¶95-101.

In August 2021, just five months after going public, the Company announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual" and that View would not file its Form 10-Q for the second fiscal quarter of 2021 ("2Q21 10-Q"). ¶¶7, 117. This news caused View's stock price to decline precipitously, sparking massive losses in shareholder value. ¶118. In the wake of this revelation, Defendant Prakash resigned as CFO of the Company, effective November 8, 2021. ¶226. By February 2022, View announced that directors Hughes and Leppert resigned. ¶119. View acknowledged that:

> [i]t is the Company's understanding that [Hughes and Leppert] believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided.

¶119.

On March 7, 2022, View reassured investors that the Company had turned the corner, announcing "its [12.31.21] cash balance of $281 million . . . with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies." ¶120. Then, only 8 weeks later, on May 10, 2022, after the market closed, View revealed that in addition to being unable to file its March 31, 2022 Form 10-Q ("1Q22 10-Q"):

> . . . management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K.

¶122. Later that same day, at approximately 11:13 p.m. Pacific Time, View announced that:

> . . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million.

¶123. On this news, the Company's share price fell $0.844, or over 62%, to close at $0.516 per share on May 11, 2022, on unusually heavy trading volume. ¶124.

On May 31, 2022, View reported that its yet-to-be restated warranty-related accruals would be $53, $48, and $42 million as of December 31, 2019, 2020, and 2021 respectively, indicating these key metrics were falsely understated in View's prior financial statements by more than 100%. ¶¶125-128. Ultimately, on June 15, 2022, View filed its December 31, 2021 Form 10-K (the "2021 10-K"), setting forth the Restatement and stating that the SEC was investigating the warranty accrual. ¶15.

## IV.   ARGUMENT

Plaintiff's Section 14(a), 11, and 12(a)(2) claims are based solely on negligence or strict liability. These non-fraud claims are subject to the Rule 8 pleading standard which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to

"give the defendant fair notice of what the ... claim is and the grounds upon which it rests[]". *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. P. 8(a)(2)). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss *does not need detailed factual allegations*." *Bell Atlantic*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (same).

In reviewing a complaint's adequacy, the Court must accept all well-pleaded allegations as true. *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). All reasonable inferences must be drawn in favor of the plaintiff. *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016). The "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl.*, 550 U.S. at 555. A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl.,* 550 U.S. at 556. As set forth below, Plaintiff has far exceeded the Rule 8 pleading standard with respect to its Section 14(a), 11, and 12(a)(2) claims.

## A.     Section 14(a) and Rule 14a-9 Claims Are Alleged

Section 14(a)'s purpose is ". . .  to prevent management or others from obtaining authorization for corporate actions by means of deceptive or inadequate disclosure in proxy solicitation." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). SEC Rule 14a-9 prohibits proxy solicitations from containing statements that are "false or misleading with respect to any material fact" or that omit "any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a). To allege a Section 14(a) claim:

> a plaintiff must establish that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.

*N.Y.C. Emples. Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012) (*en banc*)).

Plaintiff's Section 14(a) claims comply with Rule 8. Plaintiff plausibly pleads that the Proxy contains material misstatements or omissions (¶¶77-116), pleads that damages were suffered as a result of the proxy solicitation (*e.g.,* ¶¶161, 169), and that each of the 14(a) Defendants either issued the Proxy or otherwise permitted the use of their name in the Proxy and solicited the votes of shareholders in the Proxy. ¶¶24, 26-33, 36-41, 43-46. Plaintiff further alleges that CFII and Legacy View each agreed to prepare the Proxy. ¶¶70, 139. The Proxy also recommended that CFII shareholders vote in favor of the Business Combination as being in their best interests. Herkenhoff Dec., Ex. 5 at 1 ("The CF II Board has unanimously approved and adopted the Merger Agreement and unanimously recommends that our stockholders vote 'FOR' each of the Proposals presented to CF II stockholders"); *id*. at 141, 143-44 (describing certain work done by View Board in connection with the Business Combination). Moreover, PwC consented to inclusion of its audit report in the Proxy. ¶¶50-52 (PwC's consent to 12.23.20 audit report inclusion in the Proxy). These allegations provide Defendants with far more than the "fair notice of what the ... claim is and the grounds upon which it rests" required by Rule 8, which again, does not require "*detailed factual allegations.*" *Bell Atl.,* 550 U.S. at 555.

No Defendant (other than PwC) disputes that the Proxy contains materially false or misleading financial statements, and the only attack PwC makes is that its audit reports do not contain false assertions of fact. PwC's contention is addressed in B below. Other than this one narrow argument by PwC, the only arguments raised by Defendants in favor of dismissal of Plaintiff's Section 14(a) claims is that: (1) that Plaintiff has failed to plead a "strong inference" of culpable conduct (View Br. at 9-11; CFII Br. at 3-5); (2) that Plaintiff has failed to plead solicitation as to the CFII Defendants (CFII Br. at 1-2, 7-8); (3) that Plaintiff has failed to plead transaction or loss causation (View Br. at 11-12); (4) that Plaintiff's "damages theory is fundamentally derivative" (View Br. at 12-13); and that (5) as to the CFII Individual Defendants, the Section 14(a) claim is exculpated by Delaware law (CFII Br. at 5).  Each of these arguments should be summarily rejected.

### 1.   Plaintiff Alleges Defendants' Negligence For Section 14(a) Claim

Section 14(a) claims simply require negligence. *Brown v. Brewer*, No. CV 06-3731-GHK (JTLx), 2010 WL 2472182, at \*24 (C D. Cal. June 17, 2010); *Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 WL 1055966, at \*9 (D. Or. Mar. 20, 2017); *see also Varjabedian v. Emulex Corp.*, 888 F.3d 399, 401, 407-08 (9th Cir. 2018) (finding claims under analogous clause of Section 14(e) only requires negligence); *Dekalb Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 409 n.95 (2d Cir. 2016) (collecting the "myriad decisions" supporting Section 14(a) liability due to negligence).

Contrary to Defendants' arguments (View Br. at 9; Leppert/Hughes Br. at 1, 2-3; CFII Br. at 3), the PSLRA's heightened pleading requirements [15 U.S.C. §78u-4(b)(2)], directed to "state of mind", do not apply to negligence claims. Negligence is not a state of mind. *Beck v. Dobrowski*, 559 F.3d 680, 681-82 (7th Cir. 2009) (Posner, J.) (analyzing the PSLRA's reach to negligence-based claims and holding that "Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer. And negligence is not a state of mind . . . ."); *see also Varjabedian*, 888 F.3d at 408 (distinguishing "a negligence standard" from a standard focused "on the state of mind harbored by those issuing a tender offer [recommendation statement].") ; *Varjabedian v. Emulex Corp.*, No. SACV1500554CJCJCGX, 2020 WL 1847708, at \*10 (C.D. Cal. Feb. 25, 2020), *aff'd sub nom. Mutza v. Emulex Corp.*, 843 F. App'x 951 (9th Cir. 2021) ("Negligence is not a state of mind, but a standard of care defined by a defendant's conduct."); *compare with* Hughes/Leppert Br. at 3 (citing *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000)) ("Lead plaintiff concede[d] that the negligence required for a Section 14(a) claim is a 'state of mind.'"); View Br. at 10 (citing only cases that themselves cite to *McKesson* or brought primarily fraud claims); CFII Br. at 4 (citing *McKesson*).

Even if Plaintiff were required to plead a "strong inference" that Defendants acted with negligence in issuing materially false and misleading Proxy solicitations to shareholders, Plaintiff meets this standard. Indeed, Defendants do not challenge Plaintiff's allegations that the 14(a) proxy solicitations were materially misleading—which is all that is required to plead negligence under Section 14(a). *See Azar*, 2017 WL 1055966, at \*10; *Brown*, 2010 WL 2472182, at \*24–25 (directors

and officers negligent "as a matter of law...for failure to notice material omissions upon reading a proxy statement."); *see also Wilson v. Great American Industries, Inc.*, 855 F.2d 987, 995 (2d Cir. 1988); *see also California Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 169 (3d Cir. 2004) (Section 14(a) claim stated based on material misstatements in proxy solicitation); *Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976) (by failing to disclose all material facts, defendants' negligently violated Section 14(a) disclosure obligations). Despite this concession, the View Defendants, for example, argue that Plaintiff:

> fails to allege that any of the View Defendants were involved in the complex accounting judgments necessary to calculate the warranty accrual, much less how any of them acted unreasonably" or "why or how the View Defendants were negligent in [determining whether particular costs to replace to IGUs were probable and reasonably estimable].

View Br. at 10; *see also id.* at 6 (arguing View's warranty accrual was "inherently uncertain"). Not only is this argument factually incorrect, but it ignores that Defendants have already admitted that the warranty accrual was not misstated due to any purported "complex accounting judgments necessary to calculate the warranty accrual," but rather, that installation labor and freight costs that "***it had incurred [and] expected to continue to incur,*** when replacing the IGUs" were "inappropriately excluded from the warranty obligation." ₽58. Whether or not the calculation itself was complex is irrelevant because the costs at issue were entirely excluded from the calculation. Additionally, Defendants were on notice from at least 2019 that View had an issue with the IGUs for which an accrual had already been taken, and therefore were, or should have been, keenly focused on the warranty accrual.

Similarly, View Defendants argue that Plaintiff must allege they "breached a duty to CFII shareholders" in order to state a negligence claim. View Br. at 10. ***First***, the primary case View Defendants in support of their argument is *Krieger v. Atheros Commc'ns, Inc.*, No. 11-CV-00640-LHK , 2012 WL 1933559 (N.D. Cal. May 29, 2012), a case in which plaintiffs *failed to allege any* false or misleading statements.

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

***Second***, and more importantly, View Defendants are wrong to suggest that allegations of materially misleading statements or omissions are not sufficient to plead negligence on the part of directors of the acquired company (*see also* Leppert/Hughes Br. at 3-4). *See, e.g.*, *In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 288 (S.D.N.Y. 2010) ("courts have permitted [14(a)/14a-9] claims to proceed when the management of one company allegedly misstates or omits material facts to the detriment of shareholders or other party to the transaction") (collecting cases); *Pirelli Armstrong Tire Corp. Retiree Med Benefits Tr. v. Stumpf*, 2012 WL 424557, at *7 (N.D. Cal. Feb. 9, 2012) (breach of duty of loyalty where "defendants did not disclose material information within the Board's control" when seeking shareholder action through proxy statements"); *McKesson*, 126 F. Supp. 2d at 1266 (allowing 14(a) claim against target company directors for soliciting proxies containing alleged misstatements that induced action by acquiring company shareholders).

Not surprisingly, Defendants ignore (or incorrectly suggest otherwise) that Section 14(a) attaches liability onto any person that "permit[s] the use of his name to solicit any proxy or consent or authorization in respect of any security." *KBR v. Chevedden*, 478 F. App'x 213, 214 (5th Cir. 2012) (*quoting* 15 U.S.C. § 78n(a)(1)); *Kelley v. Rambus, Inc., No*. 07-1238, 2008 WL 5170598, at *7 (N.D. Cal. Dec. 9, 2008) (finding that, if plaintiff could sufficiently allege a material misstatement, the Complaint adequately alleged a "strong inference of Defendants' negligence" where the defendants "were directors at the time the 2005 proxy statement was released" and "the representations therein can be attributed to these defendants"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010); *Lewis v. Byrnes*, 538 F. Supp. 1221, 1224 (S.D.N.Y. 1982) (all that is needed is that the use of a defendant's name "could have been an inducing factor in a shareholder's grant of his proxy."); Leppert/Hughes Br. at 3-4.

Each of the 14(a) Defendants have permitted the use of their names in the Proxy. Plaintiff has alleged that each of the View Defendants was a member of Legacy View's Board when the Proxy was disseminated, had the opportunity to review and edit the Proxy, recommended that shareholders vote in favor of the Business Combination, unanimously approved the entry into the Merger Agreement, and determined that the Business Combination Proposal is in the best interests

of View and its stockholders. ¶¶24, 26-33, 70, 139; *see also* Herkenhoff Dec. at Ex. 5 (Proxy) at 144 ("View Board . . . determined . . . that the Business Combination Proposal is in the best interests of View and its stockholders"). Following the announcement of the proposed merger, Defendant Mulpuri appeared on CNBC to promote the merger and View. ⁋134. Moreover, as set forth in the Merger Agreement, both CFII and Legacy View were to participate in the preparation of the Reg. Stmnt., of which the Proxy was a part. ⁋139. The View and CFII Individual Defendants (except Prakash) each permitted the use of their name in the Proxy to solicit votes of shareholders. ⁋⁋24, 26-33, 36-41, 151-158. The Reg. Stmt. stated that the View Board (including, at that time, Mulpuri, Leppert, Hughes, Gormly, Cheung, Patterson and Veghte), unanimously approved the entry into the Merger Agreement and the Transactions and certain other matters. ⁋70. No more is required to adequately plead negligence for § 14(a) claims.

What's more, Defendants Mulpuri, Gormly, Hughes, Leppert, Cheung, Cosgrove, and Picard were each seeking to become directors of the combined entity, and therefore their "identit[ies] clearly could have been an inducing factor in a shareholder's grant of his proxy," hence, they can be held liable for misstatements and omissions in the proxy materials, even if they did not make them (they did). *Lewis*, 538 F. Supp. at 1224-1225; *Chris-Craft Industries, Inc. v. Independent Stockholders Comm.*, 354 F. Supp. 895, 915 (D. Del. 1973) ("since the major object of the proxy contest was to install the nominees into positions where they would ostensibly control the corporation, all participants working for their election are in a sense agents of the nominees, and thus the nominees must be expected to assume some responsibility for the actions of their agents.").

Defendants' cases are distinguishable. *See e.g.* View Br. at 10-11; CFII Br. at 3-4. *See Krieger*, 2012 WL 1933559, at *6, 8 (Plaintiff failed to allege that any false or misleading statement in the Proxy or that any specific Defendant breached any duty); *City of Birmingham Relief & Ret. Sys. v. Hastings*, No. 18-CV-02107-BLF, 2019 WL 3815722, at *1, 14 (N.D. Cal. Feb. 13, 2019) (Freeman, J.) (derivative case concerning "an alleged scheme to illegally rig Netflix's performance-bonus compensation plan", noting in *dicta* that that "the Complaint appears to allege a 'rigged' ploy to mislead investors . . . a scheme which sounds in fraud and would require allegations of bad

faith, not mere negligence under the PSLRA."); *In re JPMorgan Chase Derivative Litig.*, No. 2:13-CV-02414-KJM, 2014 WL 5430487, at *23, 25 (E.D. Cal. Oct. 24, 2014) (holding that *where plaintiffs had not alleged any material misstatements in the proxy statements at issue*—which alone is sufficient for a finding of negligence—plaintiffs had not otherwise plead negligence).

Finally, the Defendants argue that Plaintiff's 14(a) "claim sounds in fraud because it alleges the exact same fraud and misrepresentations for its Section 14(a) claim as it does for its Section 10(b) claim." View Br. at 9. *See also* CFII Br. at 3. Defendants Leppert and Hughes also argue that Plaintiff's 14(a) claim "sounds in fraud" because "[t]hroughout the AC, Plaintiff asserts that Leppert and Hughes . . . acted fraudulently." Leppert/Hughes Br. at 1-2. In support of this assertion, Leppert and Hughes cite to just *four paragraphs* (out of three hundred and two) from the Section 10(b) portion of the Complaint. *Id*. at 2; View Br. at 9 (citing to just *three paragraphs* from the entire Complaint). These allegations are explicitly separate from Plaintiff's 14(a) claim. Moreover, courts have also found that claims cannot "be construed to 'sound in fraud' . . when 'plaintiffs have specifically disclaimed any component of fraud," which Plaintiff has done here. *See Bank of Am.*, 757 F. Supp. 2d at 322; ⁋⁋130-31 (re-alleging only the allegations set forth *above*, and stating that Plaintiff "*does not allege* any Defendant named in this Count acted with fraudulent intent and expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct."); ⁋172 (same); ⁋179 (same); ⁋196 (same); ⁋206 (same).

As stated by the Ninth Circuit, "[t]o ascertain whether a complaint 'sounds in fraud,' we must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'" *Rubke v. Capitol Bancorp Ltd,* 551 F.3d 1156, 1161 (9th Cir. 2009) (*quoting Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1103–04 (9th Cir. 2003)) (alterations in original). Here, Plaintiff structured its Complaint from the outset to be clear that it was not alleging "a unified course of fraudulent conduct" as the basis of its Section 14(a) or Securities Act claims. The cases cited by Defendants are distinguishable: *City of Birmingham*, 2019 WL 3815722, at *1 (derivative case concerning "an alleged scheme to illegally rig Netflix's

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

performance-bonus compensation plan"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 886 (9th Cir. 2012) (section 11 claim "grounded in fraud" where Plaintiff relied on the same alleged misrepresentations that the court found *were not false or misleading*, and complaint's structure made clear primary claim was Section 10(b)).

### 2. The CFII Defendants Engaged in Solicitation Pursuant to Section 14(a)

As set forth above, each of the View Individual Defendants and the CFII Individual Defendants signed the Proxy or certain Legacy View Individual Defendants were proposed as directors of View, and thus are liable under Section 14(a). The CFII Entity Defendants suggest that they are not liable for solicitation (CFII Br. at 2), despite the fact that each are named in the Complaint as having engaged in solicitation for the Proxy (¶¶43-46). Further, Defendants ignore allegations such as those that for CF&Co., for example, certain fees were payable on consummation of the Business Transaction (which was achieved via the Proxy). ¶44. Documents concerning CF&Co.'s role admit that CF&Co. was to assist CFII with arranging stockholder meetings, introduce CFII to "potential investors," "assist" CFII's "efforts to obtain any stockholder approval for" the proposed Business Combination, and assist with "press releases and/or filings" related to the Business Combination. Herkenhoff Dec., Ex. 1 (Ex. 1.1 to March 12, 2021 Form 8-K). As the Ninth Circuit indicated in *Yamamoto v. Omiya*, 564 F.2d 1319, 1323 (9th Cir. 1977), solicitation may exist where there is a "substantial connection between the use of the person's name and the solicitation effort." *See e.g. SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68-70 (D.C. Cir. 1980) (Section 14(a) claim stated as to controlling shareholder of acquiring company, mentioned several times by name in the proxy); *Lewis*, 538 F. Supp. at 1223-1225 (rejecting argument that one must be an officer or director of proxy's issuer or involved in drafting to be liable under Section 14(a), and finding claim stated as to individual with "extensive involvement in the transactions underlying the proxy solicitation").

Further, as outlined in the Complaint, the "CFII Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials (as noted in the Proxy), voted to approve the Business Combination, and solicited" shareholders to vote in favor to the Business Combination. ¶¶70, 174. Plaintiff specifically alleges

they had access to View's financial information and the diligence that "had and had not been performed." ¶175. Additionally, following the announcement of the proposed merger, Lutnick made numerous appearances on television, including on CNBC and Bloomberg, to tout the deal and solicit investors. ¶¶135-37.

Plaintiff has exceeded the Rule 8 pleading standard with regard to Solicitation and CFII Defendants' attempt to dispute it is inappropriate at this stage.

### 3.    Plaintiff's Section 14(a) Claim Is Not Derivative

Contrary to Defendants' argument (View Br. at 12-13), Plaintiff's Section 14(a) claim is not derivative. Defendants assert "a Section 14(a) claim that a shareholder received less value in a merger than disclosed in a proxy statement is derivative because any harm was suffered by the company as a whole." View Br. at 12. This misrepresents Plaintiff's Section 14(a) claim. The Complaint alleges that, as a result of Defendants' materially false Proxy, Plaintiff and the Class Members that were entitled to vote on the Business Combination were denied the opportunity to make a fully informed decision in voting without having been advised of material facts and ***were damaged*** as a direct and proximate result of the untrue statements and omissions set forth herein ***when the truth was disclosed, and the value of their View securities decreased in value***. ¶¶162, 169. As *Bank of America* noted:

> the value of [a] corporation's stock may decrease because the corporation was damaged by an action that would not have been approved by fully-informed shareholders. But the value of that corporation's shares also may decrease once a corrective disclosure issues. ***That decrease is not necessarily co-extensive with injury to the corporation***.

*Bank of Am.,* 757 F. Supp. 2d at 292. As such, Plaintiff's Section 14(a) claim must proceed. *See Yamamoto,* 564 F.2d at 1326 ("[I]n light of ... *Borak* and *Mills*, a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both direct and derivative suits. The former action protects the shareholders' interest in 'fair corporate suffrage'").

*Romeo Power* (View Br. at 13) is distinguishable. There, a Section 14(a) claim was derivative where:

- 12 -    <span>Case No. 5:21-cv-06374-BLF</span>

[p]laintiffs [did] not dispute . . . the claim as based on the theory that RMG stockholders were damaged because the proxy statement overstated the value of Romeo. The Complaint itself notes that shareholders 'did not receive their fair share of the value of the assets and business of the combined entity.'

*In re Romeo Power Inc. Sec. Litig.*, No. 21 CIV. 3362 (LGS), 2022 WL 1806303, at \*5 (S.D.N.Y. June 2, 2022), *reconsideration denied*, No. 21 CIV. 3362 (LGS), 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022). The *Romeo* plaintiffs conceded that the damages theory was derivative in nature. *Id*.

### 4.     Plaintiff Pleads Loss Causation for the Section 14(a) Claim

With respect to the "essential link" element, in the context of a merger, a proxy statement is recognized as an essential link in the accomplishment of the transaction (transaction causation). *Brown v. Brewer*, No. CV 06-3731-GHK (JTLx), 2008 WL 6170885, at \*5 (C.D. Cal. July 14, 2008). View Defendants make a convoluted argument based on the premise that "Plaintiff claims the alleged misstatements in the Proxy []were the 'essential links in the accomplishment" of the March 2021 merger vote[.]". View Br. at 11. View Defendants' argument misrepresents Plaintiff's allegations. Plaintiff alleges that "***[t]he solicitations*** described herein were essential links in the accomplishment of the Business Combination." ¶161. "Defendants do not dispute that shareholder approval was required for the acquisition. As such, transaction causation is plainly met." *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 92 (D. Conn. 2019).

"In addition, a plaintiff must establish that the allegedly misleading proxy caused the plaintiff injury in the form of economic loss." *City of Birmingham*, 2019 WL 3815722, at \*13 (Freeman, J.) (*citing Jobs*, 593 F.3d at 1022). As to economic loss (loss causation), as explained in the preceding section, Plaintiff's 14(a) claim is not derivative. As such each of Defendants' cited cases (View Br. at 11-12) are inapposite because they do not involve claims that the plaintiffs ***were damaged*** as a direct and proximate result of the untrue statements and omissions set forth herein ***when the truth was disclosed, and the value of their View securities decreased in value***. ¶¶162, 169. Moreover, despite View Defendants' premature loss causation arguments concerning Plaintiff's trading history, it cannot be credibly disputed that Plaintiff's allegations provide "some

indication of the loss and the causal connection that the plaintiff has in mind." *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Bank of Am.*, 757 F. Supp. 2d at 291-292 (stock price decline from corrective disclosures can form the basis for damage claim under 14(a)).

**5.      Delaware Code Section 102(b)(7) Does Not Apply**

The Exchange Act claims asserted herein fall outside the scope of internal corporate affairs. *See e.g.*, *Williams v. Gaylord*, 186 U.S. 157, 165 (1902) ("when a corporation . . . gives securities, it does business, and a statute regulating such transactions does not regulate the internal affairs of the corporation*."). See also Edgar v. MITE Corp.* 457 U.S. 624, 645 (1982) ("transfers of stock by stockholders to a third party . . . do not themselves implicate the internal affairs of the target company."). The CFII Defendants cite only inapposite shareholder derivative actions including allegations of breach of fiduciary duty claims under Delaware law, and only addressing the exculpation issue as to whether plaintiffs therein sufficiently alleged demand futility. *In re Wells Fargo & Co.,* 2022 WL 345066. at *4 (N.D. Cal. Feb. 4, 2022); *In re TrueCar, Inc.*, 2020 WL 5816761, at *21 (Del. Ch. Sept. 30, 2020);  CFII Br. at 5. Further, Section 102(b)(7), as of the date of the Complaint, only would apply, if at all, to CFII directors in their capacity as such and not to their officer roles (Lutnick, Pion, Chan, and Jain). 8 Del. Code §102(b)(7).

**B.      Section 11 Claims Are Alleged**

**1.      Plaintiff Has Statutory Standing Under Section 11**

Section 11 confers standing on "any person" that acquires securities pursuant to *or* traceable to a materially false or misleading registration statement. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1079-82 (9th Cir. 1999). Section 11 does not require plaintiffs to acquire securities in the offering itself as "those who purchased shares in the aftermarket have standing to sue provided they can trace their shares back to the relevant offering." *In re Century Aluminum Co. Sec. Litig.,* 729 F.3d 1104, 1106 (9th Cir. 2013). At the pleading stage, a plaintiff meets this requirement by alleging facts from which the court can "reasonably infer that shares purchased in the aftermarket *are traceable* to a particular offering." *Id*. at 1107; *see also In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1039 (S.D. Cal. 2005) (allegation that plaintiffs "purchased or

otherwise acquired IRC shares pursuant to the defective Registration Statement and Prospectus . . . sufficient grounds for a presumption of standing."); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171 (C.D. Cal. 2003) (allegation that "plaintiff 'represents a class whose purchases are traceable to the Offering'" sufficient). These allegations need "not prove their standing to a certainty," but must simply be "plausible[.]." *In re Ubiquiti Networks, Inc. Sec. Litig.,* 33 F. Supp. 3d 1107, 1119 (N.D. Cal. 2014)*, aff'd in part, rev'd in part,* 669 F. App'x 878 (9th Cir. 2016). "[W]hether the plaintiff is able to trace its stock is not a question that can be resolved on this motion." *SeeBeyond*, 266 F. Supp. 2d at 1171.

Plaintiff alleges standing under Section 11 by pleading that it: (1) purchased View securities "in or traceable" to the Reg. Stmnt. issued in connection with the Business Combination. ¶180. *SeeBeyond*, 266 F. Supp. 2d at 1171 (allegation that plaintiff purchased shares "pursuant" to an offering is sufficient for §11 standing; a direct purchase is not required); *Immune Response,* 375 F. Supp. 2d at 1039 (allegation that shares were purchased "pursuant to" a false registration statement is sufficient for § 11 standing); *In re Intrabiotics Pharm., Inc. Sec. Litig.,* No. C 04-02675, 2006 WL 708594, at *13 (N.D. Cal. Jan. 23, 2006) (same).

In any event, Defendants' standing arguments do not preclude Plaintiff from maintaining Section 11 claims on behalf of a class of investors who purchased securities pursuant or traceable to the Reg. Stmt. *See, e.g.*, *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1052 (N.D. Cal. 2008) (Section 10(b) plaintiffs had standing to represent the noteholders' Section 11/15 claims based on the same alleged improper conduct); *In re VeriSign, Inc. Sec. Litig.*, No. C 02-2270-JW (PVT), 2005 WL 88969, at *4-5 (N.D. Cal. Jan. 13, 2005); *see also NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 149-149 (2d Cir. 2012) (plaintiffs had "class standing" to represent certificate holders damaged by the same misstatements even though plaintiffs did not purchase in the same offerings as those certificate holders.). Plaintiff alleges securities law violations for which it has standing and should be allowed to represent all purchasers with claims based on the same improper conduct.

Indeed, contrary to View Defendants' argument (which brings in facts from outside the complaint), there are likely to be members of the Class who purchased or otherwise acquired shares

pursuant to or traceable to the Reg. Stmt. ¶1 (defined class includes all persons or entities that purchased or acquired View and/or CFII securities, including those who purchased or otherwise acquired pursuant or traceable to the Reg. Stmt.).

### 2. The CFII Defendants' "Due Diligence" Defense Fails

Because the due diligence defense is grounded on fact-intensive concepts of reasonable investigation (for non-expertised portions) and reasonable grounds to believe (for expertised portions), and these concepts depend on the individual defendant's degree of involvement with the company, courts have repeatedly refused to find the defense met on a motion to dismiss. *See, e.g., In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 379 (S.D.N.Y. 2011) ("due diligence is an affirmative defense and therefore unavailing on a motion to dismiss"); *In re Lehman Bros. Sec. & ERISA Litig.,* 684 F. Supp. 2d 485, 494 (S.D.N.Y. 2010) (directors' and officers' due diligence defense is "an issue inappropriate for consideration on a motion to dismiss"); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 874–75 (S.D. Tex. 2004) (whether director defendants' reliance on the expertised parts of the registration statement was reasonable is a question of fact that cannot be resolved on the pleadings alone); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 933 (D.N.J. 1998) ("It would be premature to dismiss . . . on the grounds Defendants did not know of the false FCC filings."); *In re Morgan Stanley Information Fund Sec. Litig.*, 592 F.3d 347, 359 n.7 (2d Cir. 2010) ("Generally speaking, defendants bear the burden of demonstrating the applicability of [the due diligence defense], which [is] therefore unavailing as a means of defeating a motion to dismiss.").

A court should not dismiss the complaint merely for failure to "negate such an affirmative defense in their pleading." *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003). Only in the unusual circumstance where the defense is clear from the face of the pleading can a court dismiss a Section 11 claim. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1169 (C.D. Cal. 2008) (as an example, cases where plaintiffs' sale their shares at higher price than they paid).  The so-called "due diligence" defense must be rejected at this stage.

CFII Defendants rely heavily on *McKesson*, 126 F. Supp. 2d at 1267-67, in which "there were facts pleaded in the complaint that negated an inference of scienter . . . ." CFII Br. at 4.

However, in *McKesson* the complaint specifically alleged that the auditor was "being kept in the dark about the improprieties by the responsible HBOC executives, who had hidden side letters in places inaccessible to auditors." *Id*. at 1267. CFII Defendants attempt to analogize this case to *McKesson* by mischaracterizing the allegation in ⁋236 (which relates only to Plaintiff's **10(b)** claims) as "alleg[ing] that management of the target (View) actively prevented others—including PwC—from discovering its misstatements." CFII Br. at 5. To the contrary, the allegation merely states that "***by engaging in clear violations of GAAP*** . . .View [f/k/a CFII] masked the Company's true financial condition. . . ." ⁋236.

### 3.    The CFII Defendants' Loss Causation Argument Is Defective

The CFII Defendants also make a cryptic assertion that there is no alleged loss causation for the Section 11 claim. CFII Br. at 5. Loss causation, however, is not a Section 11 element. *See Countrywide*, 588 F. Supp. 2d at 1170. Indeed, "Defendants bear the burden of 'negating' causation, an affirmative defense sometimes referred to as 'negative causation.'" *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 444 (S.D.N.Y. 2009). This burden is "heavy" since the "risk of uncertainty is allocated to defendants." *Id.*

Further, because "an analysis of causation is often fact-intensive," negative causation is generally not an appropriate ground for dismissal on a Rule 12(b)(6) motion. *Levine v. AtriCure, Inc.*, 508 F. Supp. 2d 268, 272-273 (S.D.N.Y. 2007); *In re Giant Interactive Group, Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 572 (S.D.N.Y. 2009) ("Because it is unnecessary to plead loss causation to maintain claims under Section[] 11 … the affirmative defense of negative causation is generally not properly raised on a Rule 12(b)(6) motion."); *Countrywide*, 588 F. Supp. 2d 1132 (negative causation generally established on motion for summary judgment or at trial).

### 4.    PwC's Claim That It Made No False Statement of Material Fact For Section 11 Liability Fails

PwC's audit reports stated: "We conducted our audits in accordance with the standards of the PCAOB [the Public Company Accounting Oversight Board]. . . ." ¶¶93, 101. These statements were false. ¶¶247-263, 268. Assertion of compliance with PCAOB Standards is not a "statement of opinion," but rather than a statement of fact.

An auditor's certification of compliance "is a verifiable factual statement." *In re Washington Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash. 2009) ("[w]hether or not Deloitte employed the PCAOB standards is a verifiable factual statement . . . ."). PwC nonetheless claims that its certifications of compliance with PCAOB Standards do not contain embedded statements of fact because application of the PCAOB Standards involve "subjective judgments." PwC Br. at 4 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015)). Post *Omnicare*, courts have rejected PwC's argument. After all, "the auditor itself is the one tasked with complying with the standards," so "the statement that an auditor has so complied in conducting its audit is best understood as one of fact." *Miller Inv. Tr. v. Morgan Stanley & Co., LLC*, 308 F. Supp. 3d 411, 430 (D. Mass. 2018); *Cosby v. KPMG, LLP*, No.: 3:16-CV-121-TAV-DCP, 2018 WL 3723712 at *8 (E.D. Tenn. Aug. 2, 2018) (auditor's statement of compliance with GAAP and GAAS is a false statement); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 134 (S.D.N.Y. 2013) (audit report was false or materially misleading because plaintiffs adequately alleged auditor "did not conduct its audit for the [company's audit report] in accordance with the standards of the [PCAOB]"). PwC fails to cite applicable cases supporting its "excuse" for failing PCAOB standards. For example, in *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 499 (S.D.N.Y. 2018) (PwC Br. at 4), there was no financial statement alleged to be incorrect (as herein).

Indeed, PwC was required to understand View's business and identify and respond to risks of material misstatements affecting View's financial statements. ¶254. PwC told investors that it audited the "consolidated balance sheets," the "consolidated statements of comprehensive loss, including the "notes" to the financial statements and determined that they "present fairly, in all material respects" the financial condition of View. ¶¶93, 101. PwC affirmed that it "evaluat[ed] the overall presentation of the consolidated financial statements," including "evaluating the accounting principles used and significant estimates made by management." *Id*. Because the audit included the Company's statements regarding the estimates for the warranty accrual, PCAOB Standards required PwC to "evaluate the reasonableness" of those estimates and among other things, "obtain an understanding of how [the company] developed the estimate" and take a series of additional

review and testing steps including developing an "independent expectation of the estimate" and reviewing "subsequent events or transactions occurring prior to the date of the auditor's report." ¶258. As alleged, the issue driving the Restatement was related to events occurring back to 2019 that had already necessitated a warranty accrual, of which PwC knew, in a company PwC knew had weak internal controls and a small customer and supplier base. ¶¶263, 268. And ultimately, a restatement was required because the warranty accrual was materially understated, at the time the financials were issued, due to the basic failure to record labor and freight costs. ¶¶57, 59, 263. Thus, not only does Plaintiff allege PwC made a false assertion of fact in the audit reports about PCAOB, GAAP and GAAS compliance, but also omitted material facts concerning the true amount of the warranty accrual. ¶¶160, 182, 186, 236, 239-246.

These aforementioned facts set this action apart from the cases PwC cites (PwC Br. at 3-6) where there were no restatements (or none indicated in the reported decision), much less an allegation that the auditor had notice of the issue prior to the audit report. *See e.g.*, *In re Velti PLC Sec. Litig.*, Case No. 13-cv-03889-WHO, 2015 WL 5736589, at *1 (N.D. Cal. Oct. 1, 2015) (write off of receivables); *City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Technology, Inc.*, 856 F.3d 605, 611 (9th Cir. 2017) (goodwill impairment charge); *Hunt v. Bloom Energy Corp.,* Case No. 19-cv-02935-HSG, 2021 WL 4461171, at *6-8 (N.D. Cal. Sept. 29, 2021) (classification and accounting for contingent liabilities); *Thor Power Tool Co. v. Commissioner of Internal Revenue*, 99 S. Ct. 773, 777-778 (1979) (IRS determination on write-down of excess inventory); *Johnson v. CBD Energy Limited,* Civil Action H-15-1668, 2016 WL 3654657, at *2 (S.D. Tex. July 6, 2016) (unreported or unaccounted self-dealing transactions); *In re Lehman Bros. Sec. and ERISA Litig.*, 131 F. Supp. 3d 241 (S.D.N.Y. 2015) (allegations company used certain transactions to manipulate earnings). Even in the cited cases by PwC (PwC Br. at 3-5) where there was a restatement, there appear to be no allegations that the auditor had prior notice of the issue, or should have known of the issue, or what were the standards the auditor violated (unlike herein). *See e.g. Plaisance v. Schiller*, Civil Action No. H-17-3741, 2019 WL 1205628, at *12 (S.D. Tex. Mar. 14, 2019) ("missing" from complaint is allegation that auditor "knew or should have known" company lacked documentation required to use cash flow hedge accounting."); *Dutton v. Harris*

*Stratex Networks Inc.*, 270 F.R.D. 171 (D. Del. 2010) (earnings restatement due to unexpected SOX compliance costs, lack of allegations as to what standards auditor violated). Moreover, many of these cases are Section 10(b) cases (*Plaisance*, 2019 WL 1205628, at *1; *Dearborn*, 856 F.3d at 609-610), are summary judgment decisions (*Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016)), or are not Section 11 (or even Section 10(b) cases) such as *Thor*, 99 S. Ct. 773 (IRS proceeding).

In brief, Plaintiff alleges, and is entitled to the inference that, the facts alleged herein demonstrate that PwC failed to comply with the PCAOB Standards. ¶263; s*ee Spec. Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1120-21 (E.D. Cal. 2017) (holding plaintiff alleged material misstatement in stating outside auditor's audit comported with PCAOB standards where plaintiff alleged that the auditor EY "failed to adequately gain an understanding of [the company's] sales contracts because EY only relied on [an executive at the company] to confirm the terms of [the company's] contracts."). *See In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (Auditor's alleged failure to obtain adequate detail and documentation and to expand its audit procedures alleged GAAS violations); *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp*, 142 F. Supp. 2d 589, 606-08 (D.N.J. 2001) ("Plaintiffs charge that [the auditor] failed to obtain direct evidence in connection with [the audited company's] recording of revenue and elimination or reduction of expenses as a result of write offs of merger reserves. Instead, [the auditor] relied largely on management's representations.").

Indeed, in addition to falsely certifying compliance with PCAOB Standards, PwC's audit reports stated that View's financial statements "present fairly, in all material respects, the financial position" of the Company "in conformity with accounting principles generally accepted in the United States of America." ¶¶93, 101. This statement was false because the warranty accrual was not in accordance with GAAP, as evidenced by the Restatement. Either PwC knew of the labor and freight costs, in which case PwC's audit opinions did not "fairly align[] with the information in [PwC's] possession at the time," or PwC knew about the contracts which would include such terms, but made no effort to learn of the contracted labor and freight costs, in which case PwC "lacked the basis for making th[e] statements that a reasonable investor would expect." *Omnicare*, 575 U.S. at

196. In either case, PwC's statements were false under *Omnicare* and for all claims alleged against PwC (Securities Act and Exchange Act claims).  Indeed, Plaintiff alleges that that PwC's statements were objectively and subjectively false. ¶¶186, 268.

### C.    Section 12 Claims Are Alleged as to the CFII Entity Defendants

Plaintiff pleads standing to pursue claims under 12(a)(2) if it alleges that a defendant "offer[ed] or [sold] a security ... by the use of any means or instruments ... in interstate commerce ... by means of a prospectus or oral communication, which include[d] an untrue statement of a material fact ...." 15 U.S.C. § 77l(a)(2). Here, the CFII Entity Defendants challenge Plaintiff's allegation that they are statutory sellers and therefore assert that Plaintiff lacks sufficient privity with the CFII Entity Defendants. To the extent the CFII Entity Defendants challenge that Plaintiff bought pursuant, or traceable to, the Reg. Stmt., those arguments are addressed in Section B above.

In *Pinter v. Dahl*, 486 U.S. 622 (1988), when discussing who may be liable under the related Section 12(a)(1), the Supreme Court held that "[t]he statutory terms ['offer' and 'sell'], which Congress expressly intended to define broadly, ... are expansive enough to encompass the entire selling process, including the seller/agent transaction." *Id*. at 643. The Supreme Court rejected a narrow construction limiting the liability to those who transfer title for value and explicitly included those who "successfully solicit[] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 651.

The Ninth Circuit, in *Daou*, likewise held that the privity requirement under Section 12(a)(2) would be satisfied if plaintiff "show[s] that the defendants solicited purchase of the securities for their own financial gain." *See In re Daou Sys*., 411 F.3d 1006, 1029 (9th Cir. 2005). Thus, the privity requirement under Section 12(a)(2) would be met if defendants are alleged to have had some "direct[] involve [ment]" in the solicitation. *See id*.

Determining whether defendants' direct involvement in the solicitation is a factually intensive exercise. *Pinter* acknowledges that determination of solicitation is a material factual question left to the fact finder. *Pinter*, 486 U.S. at 654-55. *See also Primo v. Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1126 (N.D. Cal. 2013) (seller status under Section 12 is a factual question "not properly decided on a motion to dismiss").

The CFII Entity Defendants may properly be considered sellers because they were financially motivated by a desire to serve their own financial interests from the sale of View stock. ¶¶43-46. In addition, the Proxy not only mentions the Sponsor (CF Holdings II), but there are other solicitation materials that refer to the involvement of the "Cantor" entity. *See* Herkenhoff Dec., at Ex. 5 (Proxy) at 13-14, 256 (referencing role of Sponsor); Herkenhoff Dec., Ex. 6 at Ex. 99.2. Plaintiff requests judicial notice of these documents pursuant to Fed. R. Evid. 201. *See also Costanzo v. DXC Technology Company*, Case No. 19-cv-05794-BLF, 2020 WL 4284838, at *3-*4 (N.D. Cal. July 27, 2020).  Plaintiff also requests judicial notice of the Investor Presentation alleged at ¶¶77-78, including statements that "Cantor Fitzgerald believes View, Inc. represents a unique opportunity to revolutionize the property technology industry with a proven product and a strong management team[.]" and a full page "Overview of Sponsor" as Cantor Fitzgerald, with image of Lutnick and his biographical details featured). Herkenhoff Dec., Ex. 6 at Ex. 99.2. *See also* Herkenhoff Dec. at Ex. 2 at 13-14 and Ex. 5 at 13-14 (pages from the 12.23.20 S-4 and the 2.16.21 Proxy detailing the financial benefits to the Sponsor and Cantor from the Business Combination, *i.e.*, in the discussion entitled "What interests do the Sponsor and CF II's current officers, directors and affiliates have in the Business Combination?"). For Section 12 liability, the CFII Entity Defendants, and CFII Holdings and Cantor in particular, qualify as soliciting the sale based on the facts alleged and those of which the Court may take judicial notice.

### D.      Section 10(b) of the Exchange Act and Rule 10b-5 Claims Are Alleged

For securities fraud claims, "Rule 9 imposes a heightened pleading requirement, which requires that a party state with particularity the circumstances constituting fraud" and the PSLRA "requir[es] that the complaint . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The PSLRA sets a higher pleading standard, but courts should be wary against "rais[ing] the bar of the PSLRA any higher than that which is required." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 946 (9th Cir. 2003).

### 1.   Plaintiff's Allegations Support a Strong Inference of Scienter

Here, the theme of Defendants' various scienter arguments is that Plaintiff has not adequately pled scienter because of the purported absence of certain specific indicia that courts *sometimes* use to support an inference of scienter, such as details about internal documents or confidential witnesses. View Br. at 3-6. But those are not the *only* way to plead scienter. *See, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38-39 (S.D.N.Y. 2019) (finding scienter even absent confidential witness allegations and nothing that "this Court is aware of no authority requiring confidential witness allegations"). For example, the View Defendants and Prakash argue that Plaintiff does not "allege that any individual defendant sold View stock while its price allegedly was artificially inflated" (View Br. at 4; Prakash Br. at 1, 3) while ignoring that they were subject to a lockup, and could only sell their holdings pursuant to a subsequent Registration Statement that was never declared effective. *See Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV151343DOCKESX, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017) ("Defendants were incentivized to play down and/or conceal negative information on May 14, in light of the fact that they were barred from selling stock until May 19."). Regardless, Defendants' argument **ignores** their **admissions** of actual knowledge of the facts regarding the severe quality issues related to View's core product that resulted in expenses View incurred and expected to incur to replace the affected IGUs that demonstrate the falsity and unreliability of the various misstatements. *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 n.2 (9th Cir. 2016) ("An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."). Defendants' admissions alone establish scienter.

Nevertheless, even without Defendants' admissions which clearly satisfy the scienter requirement, Plaintiff alleges a wide range of facts supporting scienter and courts have routinely held the inquiry is "whether all of the facts alleged, **taken collectively**, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007) ("the court's job is not to scrutinize

each allegation in isolation but to assess all the allegations holistically"). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. If the inference of scienter is "at least as compelling" as any plausible opposing inference, the complaint must be sustained. *Id. See also Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (quoting *Tellabs*, inference of scienter is "strong" if it is as likely as any other inference). In the Ninth Circuit, "[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5." *Verifone*, 704 F.3d at 708. *See also In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 973, 976 (N.D. Cal. 2009) (deliberate recklessness suffices to allege scienter).

The Complaint's detailed allegations, taken together, more than adequately raise a strong inference that View, Mulpuri, Prakash, and PwC acted with intent or, at a minimum, deliberate recklessness in making the challenged omissions and misstatements.

At the outset, Defendants have pointed the finger at Prakash, and the public assertions that he and former accounting staff "intentionally failed to disclose certain information . . . regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations." PwC Br. at 2. Of course, this admission alone is sufficient to support a strong inference of scienter as to Prakash and View, as Prakash's scienter as CFO is imputed to the Company. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'") (*citing Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1577 n.28 (9th Cir. 1990)). Prakash, being thrown under the bus by other defendants, makes the inconsistent argument that Plaintiff "must allege facts demonstrating that [he] knowingly and recklessly engaged in an improper accounting practice." Prakash Br. at 2. However, as explained above, Defendants have already admitted that the warranty accrual was not misstated due to any purported "complex accounting judgments necessary to calculate the warranty accrual," but rather, that installation labor and freight costs that "***it had incurred and expected to continue to incur*** when replacing the IGUs were" "inappropriately excluded from the warranty obligation." View Br. at 10; ¶58. Any suggestion that

Prakash, as CFO, was not aware of the costs that View *had already incurred and expected to continue to incur* when replacing its core product should be rejected out of hand. *See, e.g., Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) ("The company's maintenance problems . . . were so important to the company that it was 'absurd to suggest that the Board of Directors would not discuss' them."); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 706 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 212 L. Ed. 2d 233, 142 S. Ct. 1227 (2022) ("we may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue. [] This includes consideration of the executive's access to the information, and, whether, given the importance of the information, 'it would be 'absurd' to suggest that management was without knowledge of the matter.'"). Regardless, Prakash's cases are distinguishable. *Dearborn Heights*, 856 F.3d at 621 ("Plaintiff's theory of scienter based on Defendants' failure to conduct interim goodwill impairment testing illustrates the inability of *GAAP violations alone* to provide evidence of scienter" as "Plaintiff must allege additional facts that call into question the manner in which the corporation conducted its goodwill analysis"); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) ("Although the TAC does draw *its own legal conclusion that the practice was improper* . . . the TAC's factual allegations point *only to disagreement and questioning within Corinthian about the practice*"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) ("the accounting error was so subtle that it appears that even the company's specialized accounting division and professional auditors missed it: The error was not discovered *for seven consecutive quarters*" whereas, here, the error was discovered within 5 months of becoming a publicly traded company.

Indeed, the View Defendants admit that they have been on notice from at least 2019, before the start of the Class Period, that View had an issue with the IGUs for which an accrual had already been taken. Again, these admissions alone demonstrate that View, Mulpuri, Prakash, and PwC issued the false and misleading statements with scienter based on their alleged knowledge, or

deliberate recklessness in not knowing that the statements were materially false and misleading when made. *In re Illumina, Inc. Sec. Litig.*, 2018 WL 500990, at *5 (S.D. Cal. Jan. 22, 2018) ("Plaintiff need not prove anything. It is sufficient if Plaintiff plausibly alleges facts showing that deliberate recklessness or an intention to deceive is no less likely an explanation of Defendants' motivation than an innocent explanation...."); *see also Finisar*, 646 F. App'x at 507 n.2. The following further support an inference of scienter:

*The numerous suspiciously-timed resignations of View executives and directors.* Prakash resigned effective November 8, 2021. ¶¶25, 226. View Defendants argue that that the resignations do not raise an inference of scienter because Plaintiff has not alleged "sufficient information to differentiate between a suspicious change in personnel and a benign one." View Br. at 5; *see also* Prakash Br. at 3. Defendants ignore Plaintiff's allegation that *on the same day as Prakash's resignation*, Hughes was appointed as Executive Chair to assist in strengthening the Company's *financial and accounting functions, including financial statement reporting*. ¶27.

Further, on February 22, 2022, Hughes resigned as Executive Chair, Principal Executive Officer and director at View, and Leppert resigned as a View director. ¶¶27, 225. Hughes and Leppert were both on the Audit Committee, from March 8, 2021 to approximately February 22, 2022. ¶¶26, 27, 225. In connection with Hughes and Leppert's resignations, View announced that:

> [i]t is the Company's understanding that [*Hughes and Leppert] believe that the Audit Committee's remedial recommendations were not fully implemented by the Board*; they believe that the Board's determination of the [Hughes'] responsibilities . . . was inconsistent with what the Board had previously decided.

*Id*. Again, Defendants have *admitted* that Hughes and Leppert resigned because Defendants knowingly refused to implement the Audit Committee's remedial recommendations. This is strong evidence of Defendants' scienter.

Additionally, on January 31, 2021, Pion resigned as CFO, director, and member of the Audit Committee of CFII. ¶227. The timing of Pion's resignation was suspicious as it occurred during the first quarter ended March 31, 2021 during which View, among other things, materially understated liabilities associated with warranty-related obligations and the cost of revenue

associated with the recognition of those liabilities and failed to properly record the liabilities for warranty-related obligations and cost of revenue. *Id*. The timing of Pion's resignation was also suspicious as it occurred following the due diligence processes the CFII Defendants represented they undertook, and just five weeks prior to the consummation of the Business Combination. *Id*. Further, on March 19, 2021, Cheung resigned from the View Board. ¶228. Cheung's resignation was suspicious as it occurred just 10 days after the Business Combination closed. *Id*. Courts have found resignations suspicious in timing and nature adds to the overall pleading of circumstantial evidence of fraud. *See In re WageWorks, Inc., Sec. Litig.*, No. 18-CV-01523-JSW, 2020 WL 2896547, at *6 (N.D. Cal. June 1, 2020); *Shenwick v. Twitter*, Inc., 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394–95 n. 176 (S.D.N.Y. 2007).

***Smart Glass was View's core product and it has a narrow customer, supplier and manufacturing framework***. Courts frequently find scienter where the challenged statements went to the core of the Company's business. *See e.g., In re Acadia Pharms. Inc. Sec. Litig.*, No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *8 (S.D. Cal. June 1, 2020) ("Defendants focused all their attention on successfully commercializing [DSUVIA]. . . .this supports an inference of scienter."); *see also South Ferry,* 542 F.3d at 786 (scienter is adequately pled where the facts are of such prominence that it would be absurd to assume that management would not know about them). Here, among other things, Plaintiff alleges View's glass components were sourced from a single supplier and that a limited number of customers comprised a major portion of revenues and/or accounts receivable during the Class Period. ¶¶229-235. In addition, View "operates and manages its business as one reportable and operating segment" (¶235). In a small company with a narrow customer and supplier base, with one operating segment, and with foreknowledge since 2019 of the quality issue leading to the warranty accrual, it would be "absurd to suggest that management was without knowledge of the matter." *South Ferry,* 542 F.3d at 785–86.

***The SEC is investigating View's warranty accrual*** (¶15). *See Zamir v. Bridgepoint Educ., Inc.*, 274 F. Supp. 3d 1057, 1072 (S.D. Cal. 2017) ("The Court . . . considers Lead Plaintiffs' allegations concerning these government investigations as part of the Court's holistic [scienter]

analysis."). *See also Washtenaw Cty. Emps. Ret. Sys. v. AvidTech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (government investigation "add[s]" to scienter inference); *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021) (SEC and internal audit committee investigations are "additional support for finding that scienter has been adequately pleaded."). View's Form 10-Q for the quarterly period ended June 30, 2022 indicates the Department of Justice is now also making inquiry. *See* Herkenhoff Dec. at Ex. 3 at 23.

***Defendants' GAAP violations support an inference of scienter.*** ¶236-246. GAAP violations provide circumstantial evidence of scienter. *Daou,* 411 F.3d at 1022 ("significant violations of GAAP standards can provide evidence of scienter"); *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) (accounting errors that "dramatically affect[]" a company's financial results, "and in ways that strongly suggest a typical corporate executive should have noticed them," are strongly probative of scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636-38 (E.D. Va. 2000) ("The inference invited by the large magnitude of the misstated financials and the repetitiveness of the GAAP violations takes on added significance if, as the Complaint alleges, the violated GAAP rules and Company accounting policies are, in fact, relatively simple.").

***PwC's failure to comply with PCAOB standards and GAAS supports an inference of scienter.*** ¶247-262. In auditor cases, a plaintiff can demonstrate scienter by alleging facts tending to show that "the accounting practices were so deficient that the audit amounted to no audit at all or that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re New Century*, 588 F. Supp. 2d 1206, 1233 (C.D. Cal. 2008); *MicroStrategy,* 115 F. Supp. 2d at 651 (same). *See also Velti*, 2015 WL 5736589, at *33 (courts may look to "facts that shed light on the mental state of the accountant," including that the accountant helped "falsif[y] the financial statements."). Allegations of recklessness are sufficient where an auditor "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1098-1100 (9th Cir. 2011) ("an equal inference that [the auditor] overlooked significant events without further questioning or investigation. . . . sufficiently pleads an audit so deficient that the audit amounted to no audit at all" and scienter when

the auditor failed to investigate a suspicious option grant and instead "accepted management at its word, never received requested documentation, and issued an unqualified Opinion on the accuracy of [the company's] financial statements").

While PwC attempts to overplay Prakash's purported withholding of information, PCAOB Standards required PwC to apply "professional skepticism" and "critical[ly] assess[] audit evidence" to determine whether the Company's representations were accurate. ¶260. Prakash's purported withholding of information is outside the Complaint, even if the Court takes judicial notice of the assertion, it cannot be considered for its truth at this stage. *Costanzo*, 2020 WL 4284838, at *4.

The breadth of PwC's PCAOB and GAAS violations are indicative of scienter. ¶¶236-263; *See Cosby*, 2018 WL 3723712, at *8 (breadth of GAAP, GAAS and PCAOB violations probative of scienter); *N.M. State*, 641 F.3d at 1102 (noting that PCAOB standards "give strong guidance to auditors to dig deeper once there are questionable circumstances surrounding such material transactions," and finding it "reasonable to infer scienter just as strongly as an innocent inference" when "[c]onsidering the number, magnitude, and multi-year financial impacts" of the material misstatement.). Moreover, the simplicity of the GAAP standards (here matters such as omitting labor and freight costs) implicated demonstrate PwC's scienter. "[I]f the GAAP rules and [the company's] accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard." *MicroStrategy*, 115 F. Supp. 2d at 638.

Lastly, PwC's failure to subject the claimed warranty accrual amount to any meaningful scrutiny in light of how few customers View had and how critical the revenues from each contract were to View was, at the very least, extremely reckless. *See, e.g., N.M. State*, 641 F.3d at 1099 ("[A]n auditor, in fulfilling duties of public trust, should take a long hard look at a transaction of $700 million, roughly a quarter of [the audited company's] reported revenue in 2006 of $2.5 billion."); *MicroStrategy*, 115 F. Supp. 2d at 653 ("It is simply the case that the importance of this 'watershed' agreement to [the Company] and its enormous impact on the Company's financial

- 29 -

status make it less likely that [the] auditors were unaware that revenue from this agreement was recognized before any contract existed between the parties.").

**PwC knew and/or was reckless in ignoring red flags**. Where an auditor is presented with numerous glaring red flags, scienter may be plead. *See also, e.g., N.M. State*, 641 F.3d at 1102 (finding scienter when "the [c]omplaint lists a number of red flags that arguably should have alerted [the auditor] to the [company's] wrongdoing and that [the auditor] would have had to purposely or recklessly overlook," including suspicious facts surrounding the grant dates, approval timing, and pricing of the options at issue.); *In re Oxford Health Plans, Inc. Sec. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (allegations that "the financial statements did not and could not comply with GAAP; that [the auditor] violated GAAS in conducting the audit; and that many red flags existed that at least should have caused the auditor to investigate further before issuing its opinion, . . . g[ave] rise to a strong inference that when [the auditor] . . . issued its clean opinion, it recklessly disregarded or outright ignored the risk of falsity."). *See also MicroStrategy*, 115 F. Supp. 2d at 653 ("Many courts have held that allegations that an auditor ignored 'red flags' is probative of fraudulent intent or recklessness."); *Cosby*, 2018 WL 3723712, at *5 ("[P]laintiffs have alleged numerous red flags including, among others, GAAP, GAAS, and PCAOB violations as well as SEC investigations and public inquiries into [the audited company].").

PwC aware at least as early as 2019 (more than a year before it issued its December 23, 2020 audit report and two years before it issued its March 12, 2021 audit report on View's financial statements), that View had an issue with the IGU's for which an accrual already had to be taken. ¶263. The primary cause of the Restatement was the failure to include certain labor and freight costs in connection with the previously recorded accrual. ¶263. PwC knew, or was reckless in not knowing, that these cost items existed and/or required recording in that the documentation such as contracts with the subject customers or other readily verifiable facts existed. *Id*. Under PCAOB Standards, PwC was responsible for planning and performing its financial statement audit to obtain "reasonable assurance" about whether View's consolidated financial statements were free of material misstatement under GAAP, including misstatements caused by fraud. ¶252. The Complaint further details the procedures the PCAOB requires auditors to follow to assure

compliance. This includes, for example, the auditor must "understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risks of material misstatement" (¶254), identify the "existence of unusual transactions and events" (¶256), and evaluate the "reasonableness of accounting estimates" the company makes in the "context of the financial statements taken as a whole." ¶258. On this latter point, the auditor needs to "obtain an understanding of how [the company] developed the estimate" and "[r]eview and test the process used by management to develop the estimate," "[d]evelop an independent expectation of the estimate to corroborate the reasonableness of [the company's] estimate" and "[r]eview subsequent events or transactions occurring prior to the date of the auditor's report." ¶258.

Nor was PwC new to auditing View, as it had served as Legacy View's auditor since 2013 (¶49), was on notice that the IGUs were View's core product, and that it had a relatively narrow customer and supplier base. ¶263. Further, the Proxy noted that "labor" is one of the component costs related to warranties. ¶263. PwC also knew that View had a history of material weakness in internal controls. ¶263. Even when discussing the concept of "red flags," as opposed to overtly known or knowable facts such as these, "information that would have been available to the public" can be "'strong indicators' of auditor scienter." *Chao Sun v. Daqing Han*, Civil Action No. 15-703 (JLL), 2015 WL 9304542, at *16 (D.N.J. Dec. 21, 2015) (*citing In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 280 (3d Cir. 2006)). PwC would have to disclaim knowing these facts, which it cannot, to suggest that the wool was pulled over its eyes.

Defendants' reliance on cases such as *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003 (S.D. Cal. 2000) (PwC Br. at 6) is misplaced. Plaintiff here specifically alleges that PwC was on notice of the warranty accrual issue and had access to information from View, its customer and/or suppliers which it could use to test View's public disclosures. ¶¶263. *See N.M. State*, 641 F.3d at 1095 (finding scienter when plaintiffs alleged "specific points when [the auditor] was faced with circumstances that would compel a reasonable auditor to further investigate and disclose" the company's fraudulent activity); *In re Suprema*, 438 F.3d at 281 (finding scienter based on allegations that "reasonably suggest that [the auditor] either knew of, or willfully turned a blind eye to, the fraud.").

***Defendants were highly incentivized to inflate View's value.*** While not alone sufficient to establish a strong interference of "deliberate recklessness," allegations of "motive to commit fraud and opportunity to do so provide some reasonable inference of intent . . . ." *In re QuantumScape Sec. Class Action Litigation*, 580 F. Supp. 3d 714, 729 (N.D. Cal. 2022) (*citing Verifone*, 704 F.3d at 701). Here, View (f/k/a CFII), Mulpuri and Prakash had a direct or indirect interest in (i) obtaining shareholder approval to close the Business Combination and (ii) maintaining View's stock price and understated warranty accrual after the Business Combination. As highlighted by the *Wall Street Journal* insiders are highly motivated to push SPAC deals through at all costs because as a "result [of] the unique incentives given to SPAC [sponsors] . . . let the SPAC backers make money even if the company they take public struggles and later investors lose money[.]" *See SPAC Insiders Can Make Millions Even When the Company They Take Public Struggles*, https://www.wsj.com/articles/spac-insiders-can-make-millions-even-when-the-company-they-take-public-struggles-11619343000?mod=article_inline; *see also* ¶¶216-223.

***Defendants Mulpuri's and Prakash's SOX Certifications.*** further Defendants Mulpuri and Prakash signed SOX certifications (¶¶24-25, 109, 114-115), attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud. *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 & n.22 (N.D. Cal. 2020) ("allegations that defendants signed SOX certifications attesting to accuracy of quarterly statements and that management was not maintaining an effective control environment supported scienter) (collecting cases); *Croker v. Carrier Access Corp.*, No. 05CV01011LTB-OES, 2006 WL 2038011, at *11 (D. Colo. July 18, 2006) (SOX certifications "constitute one factor among many that courts may consider, in the totality of the circumstances, to evaluate scienter").

***The timing of Defendants' March 7, 2022 disclosure reassuring investors is indicative of scienter.*** On that day, Defendants reassured investors that the Company had turned the corner, announcing "its [12.31.21] cash balance of $281 million . . . with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies." ¶¶10, 120. View's cash burn was about $70 million per quarter at the time of this disclosure. In fact, View's cash burn was $80 million for

the quarter ended March 31, 2022. Publicly traded companies must disclose a going concern risk if they do not have enough of a cash runway to last 12 months. *See* ASC 205-40-50-4. As such, Defendants View, Mulpuri, Prakash, and PwC ***knew at the time this statement was made*** that View did not have enough cash to last 12 months and that there was a going concern risk. Indeed, had the Company waited just ***two*** more days to make this disclosure, its cash balance would have been below $280 million and the Company would have been required to disclose a going concern risk. These factors, taken individually or together, satisfy the scienter requirement.

### 2.    Plaintiff Alleges Loss Causation

Defendants assert that Plaintiff has failed to "establish" loss causation. View Br. at 6-7. Loss causation allegations are subject to Fed. R. Civ. P. 8(a) and require merely "some indication of the loss and the causal connection that the plaintiff has in mind." *See Dura*, 544 U.S. at 347.

On August 16, 2022, Defendants disclosed for the very first time to its investors and shareholders, that View's Audit Committee began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual ***and*** that View would not file its Quarterly Report on Form 10-Q for the three and six months ended June 30, 2021 ("2Q 2021 10-Q") ¶7. View's share price fell $1.26 on the August 16 revelations, or over 24%, to close at $3.92 per share on August 17, 2021. ¶8. On March 7, 2022, View reassured investors that the Company had turned the corner, announcing "its [12.31.21] cash balance of $281 million with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies." ¶¶10, 120. Then, only 8 weeks later, on May 10, 2022, after the market closed, View revealed that in addition to being unable to file its Quarterly Report on Form 10-Q for the period ended March 31, 2022 within the prescribed time period:

> management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K.

¶11. On this news, the Company's share price fell $0.844, or over 62%, to close at $0.516 per share on May 11, 2022. ¶13. It cannot be credibly disputed that these allegations provide "some indication of the loss and the causal connection that the plaintiff has in mind." *See Dura*, 544 U.S. at 347; *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) (cited with approval in *McCabe, LLP*, 494 F.3d 418 (3d Cir 2007)) (holding that plaintiffs sufficiently pled loss causation by alleging that they "purchased shares of ABI common stock at a price that was inflated due to the alleged misrepresentations, and [] suffered a loss when the truth was made known and the price of ABI common stock returned to its true value"); *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 829 (D.N.J. 2006) (finding loss causation adequately pled where plaintiffs alleged that company's stock price "dropped after the truth regarding Defendants' alleged misrepresentations became known"); *Bank of Am.*, 757 F. Supp. 2d at 291-292 (stock price decline from corrective disclosures can form the basis for damage claim under Sections 10(b) and 14(a)).

Defendants argue that Plaintiff has failed to plead loss causation because "the mere start of an investigation 'cannot form the basis of a viable loss causation theory.'" View Br. at 6. First, the Audit Committee's investigation concerning the adequacy of the Company's warranty accrual was not the only thing announced on August 16, 2021. Rather, the Company also announced that View would not file its 2Q 2021 10-Q on time with the SEC, an ominous sign to investors that the warranty accrual issue was material. ¶117.

Second, Defendants' cited cases are distinguishable. The *Loos* Court itself noted that it "merely h[eld] that the announcement of an [SEC] investigation, '***standing alone and without any subsequent disclosure of actual wrongdoing***, does not reveal to the market the pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'" *Loos v. Immersion Corp.*, 762 F.3d 880, 890 n.3 (9th Cir. 2014), *as amended* (Sept. 11, 2014); s*ee also Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014) (loss causation not plead where "Plaintiffs d[id] not specify which of the Defendants' statements were made untrue by the GAO report."). Here, Defendants do not dispute that View's warranty accrual was false and misleading. *See Lloyd*, 811 F.3d at 1210 (holding that "the announcement of an investigation can 'form the basis for a viable loss causation theory' if the complaint also alleges a subsequent corrective

disclosure by the defendant" because "any other rule would allow a defendant to escape liability by first announcing a government investigation and then waiting until the market reacted before revealing that prior representations under investigation were false.").

Similarly, View Defendants cite *Lloyd* to argue that no specific facts show that the market "perceived the [investigation] to be related to [the] alleged misstatements," while ignoring that the announced Audit Committee investigation *explicitly related* to the adequacy of View's previously disclosed warranty accrual. View Br. at 7. View Defendants' citation to *Corinthian* in support of their premature loss causation argument is inapposite. There, the stock price "rebounded ***within three trading days*** [to reach] an amount that ***exceeded the stock's value before the [corrective disclosure]***" and defendant further "persuasively explain[ed]" why the market did not understand the disclosure "as a revelation of Corinthian's systematic manipulation." *Metzler*, 540 F.3d at 1059, 1065.

Additionally, View Defendants' loss causation argument as to the "March 2022 statements about View's cash balance and cash spend" makes no sense. View Br. at 7. Specifically, View Defendants argue that in May 2022 View "said nothing about View's cash balance or spend as of March 2022." *Id*. View Defendants appear to have missed ¶123, which alleges that View issued a press release stating in part that View's "cash position [is] $201 million as of the end of Q1 2022". ¶123. This implied cash burn of ***$80 million*** in Q1 2022, which was ***worse*** than their "cash flow from operations for the twelve months ended December 31, 2021, rang[ing] from $260 million to $270 million." (implying $***65-67.5 million*** burn per quarter). ¶123.

View Defendants also argue that View's March 2022 disclosure announcing "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet" and that it "expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies" (¶120) is not actionable because Plaintiff failed to allege that the first sentence was false and the second sentence is protected by the PSLRA's safe harbor. View Br. at 7-8. However, it is well-accepted that a statement that is literally true can still be misleading. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) ("[O]nce defendants [choose] to tout positive information to the market, they [are] bound to do so

- 35 -                                   Case No. 5:21-cv-06374-BLF

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

in a manner that wouldn't mislead Plaintiffs, including disclosing adverse information that cuts against the positive information."); *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010) ("The veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers . . . . Some literally accurate statements can, through their context and manner of presentation, [become] devices which mislead investors."). Here, although there is no dispute that View's cash balance was $281 million as of December 31, 2021, the statement (in its entirety) was misleading because, *inter alia*, it failed to disclose that *at the time of the disclosure* View did not have enough cash to last 12 months and that there was an undisclosed going concern risk. Moreover, as discussed above, the portion of View's statement that it "expects to improve cash burn through 2022" lacked a reasonable basis and was inconsistent with then-known facts showing that that View's Q1 2022 was on track to be ***higher than*** its quarterly cash burn in 2021. *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) ("Nor is the safe harbor designed to protect [companies] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement."). Loss causation is amply alleged in the Complaint.

### 3.    Plaintiff Alleges Scheme Liability

View Defendants argue that Plaintiff has failed to sufficiently plead scheme liability because its allegation of Defendants' suppression and concealment of View's true financial condition and the amount of the understatement of the warranty accrual' "fails to show 'manipulative or deceptive acts in furtherance of a scheme to defraud." View Br. at 8-9. This argument again highlights the inconsistency between Defendants motions to dismiss, as other defendants have argued that Defendant Prakash and certain former accounting staff "intentionally failed to disclose certain information to . . . [PwC] regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations." PwC Br. at 2. There can be no reasonable dispute that a purported failure to disclose certain information to View's auditor (which is an action separate from Defendants' ultimate disclosure of false financial information) is a "manipulative or deceptive act in furtherance of a scheme to defraud." *See e.g., Rabkin v. Lion Biotechnologies, Inc.*, No. 17-CV-02086-SI, 2018 WL 905862, at *17 (N.D. Cal.

Feb. 15, 2018) ("additional conduct beyond mere statements raises an inference of scheme liability.") (citing, *e.g.*, *W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 981 (D. Minn. 2014) (finding scheme liability when defendants' "actions manipulating the studies (as opposed to their statements)—had the effect of artificially propping up Medtronic stock prices on account of confidence in ... sales")); *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101-02 (2019) (reiterating that the "expansive" language found in Rules 10b-5(a) and (c) "capture a wide range of conduct."). Indeed, "[t]he fact that some of the[] alleged acts are closely connected to the alleged misrepresentations and omissions or that the alleged conduct was not disclosed until the alleged scheme unraveled does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim." *Rabkin*, 2018 WL 905862, at *17.

### E. Control Person Claims Are Adequately Alleged

#### 1. Section 20(a) Claims Against the Individual View Defendants and CFII Defendants

"[N]umerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status." *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) (collecting cases). To state a claim for "controlling person" liability under 20(a), Plaintiffs need only allege an ability to control or influence (directly or indirectly) a primary violator but need not allege that such defendants actually exercised control or participated in the underlying securities law violation. *See Am. W. Holding*, 320 F.3d at 945 (*quoting Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000)). "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Id.* In fact, "since Howard, "[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage." *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018); *see also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (finding Plaintiffs sufficiently alleged control with allegations that the individual defendants "by virtue of their executive and managerial positions had the power to

control and influence"); *Batwin v. Occam Networks, Inc.*, No. CV 07–2750 CAS (SHx), 2008 WL 2676364, *25 (C.D. Cal. July 1, 2008) ("'The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board,'") (*quoting In re Surebeam Corp. Securities Litigation*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *25 (S.D. Cal. Jan. 3, 2005)). Here, Plaintiffs allege that defendants were in a position to control a primary violator. Here, each of the Defendants signed documents filed with the SEC that contained materially false and misleading statements, and thus it is presumed that each of the Defendants exercised actual authority and control over the contents of those filings.

In addition, the CFII Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials (as noted in the Proxy), voted to approve the Business Combination, and solicited the approval of the Business Combination through CFII's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy. ¶174. Similarly, the Individual View Defendants were responsible for the contents of their financial statements reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy, and solicited the approval of the Business Combination. *Id*. The Proxy also stated that the View Board (including, at that time, Defendants Mulpuri, Leppert, Hughes, Gormly, Cheung, Patterson and Veghte) unanimously approved the entry into the Merger Agreement and the Transactions and certain other matters. ¶70.

Defendants' cases are inapplicable or support Plaintiff. *Howard*, 228 F.3d at 1067 n.13 (decided on *summary judgment*, finding "no showing" of control and citing *Paracor Fin.*, *Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) (finding no control on the part of CEO where plaintiffs introduced "no evidence that [the CEO] exercised direct or indirect control over" the transaction at issue "***in any way***")); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (decision *after trial* where evidence showed director wholly uninvolved with company's business or industry*); Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL 2171273, at *6 (N.D. Cal. May 17, 2017) (finding that allegations that the company was "'family run and controlled' (by [other defendants]), and that the 'couple ... maintained unusually tight control over key decisions' . . . tends to contradict any notion of control by [the CFO]").

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**2.      Section 15 Claims Are Alleged As to the CFII Defendants**

For the same reasons set forth above in Section F(1), Plaintiff has adequately pleaded that the CFII Defendants are control persons of View (f/k/a CFII). Each of the CFII Individual Defendants signed the Reg. Stmt. ¶¶36-41. This is sufficient for a finding of control. *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 WL 31114, at *12 (N.D. Cal. Jan. 5, 2011) ("It is certainly "plausible" that high level officers (like the Independent Trustees) who signed the Registration Statements were in a position to exercise control over the Fund and its disclosures."); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 550 (N.D. Cal. 2009) (denying dismissal of Section 15 claims because "[i]t is a plausible inference, for example, that individuals who were officers of the fund (and other Schwab entities, in some cases) and who signed the registration statements were in a position to exercise power and control over Schwab Investments."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 598 (S.D. Tex. 2003) (outside director that signed false registration statement was a control person).

Additionally, the CFII Entity Defendants' arguments completely ignore facts alleged in the Complaint that demonstrate their control over CFII. *See, e.g., In re Enron Corp. Sec., Deriv. & ERISA Litig.,* Nos. MDL–1446, 2003 WL 230688, at *18 (S.D. Tex. Jan. 28, 2003), ("[a] person should be presumed to be a controlling person . . . if they occupy a status or position that ordinarily bestows authority to control the primary violator generally . . . ."). By regulation, the SEC defines "control" as the "possession, *direct or indirect*, of the power to direct or cause the direction of management and policies of a person, whether through *ownership of voting securities, by contract*, or otherwise." 17 C.F.R. § 230.405. CF Finance Holdings II, LLC (the "Sponsor"), is a Delaware limited liability company that acted as CFII's sponsor for the Business Combination. ¶43. As set forth in the Reg. Stmnt. as of the Record Date, "the Sponsor beneficially owns an aggregate of 21.3% of the outstanding shares of CFII Common Stock." Herkenhoff Dec. at Ex. 2 at 120.

Moreover, CFII's initial Registration Statement admits that the Sponsor controls CFII, stating that "[o]ur initial stockholders *will control the election of our board of directors* until consummation of our initial business combination and will hold a substantial interest in us. As a result, *they will elect all of our directors prior to the consummation of our initial business*

combination and may exert a ***substantial influence on actions requiring a stockholder vote . . . .***" Herkenhoff Dec. at Ex. 4 at 56; *see also id.* at 124 ("our initial stockholders may be able to effectively influence the outcome of all matters requiring approval by our stockholders . . . including approval of our initial business combination"). *See, e.g., Thomas*, 167 F. Supp. 3d at 1048-49 (finding sufficient statements in public filings that "[alleged controlling party] will continue to have significant influence over [the Company's] affairs for the foreseeable future" and "will be able to control most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions").

CFII's "initial stockholders" are the Sponsor and Defendant Lutnick. Herkenhoff Dec. at Ex. 4 at 123. Cantor Fitzgerald, L.P. ("Cantor") is an affiliate of CFII, the Sponsor and of Cantor Fitzgerald & Co. ("CF&Co."). ¶45. Cantor is reportedly the ***sole member*** of the Sponsor, and CF Group Management, Inc. ("CFGM") is the ***managing general partner*** of Cantor. ¶45. Defendant Lutnick is the CEO of CFGM and is the trustee of CFGM's ***sole stockholder***. ¶43. As set forth in the Proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor." ¶43.

Put simply, CFII is controlled by the Sponsor, the Sponsor in controlled by Cantor, CFGM controls Cantor, and Defendant Lutnick controls CFGM. Defendant Lutnick also independently controls each entity. These allegations are sufficient to plead control. In fact, in CFII's initial Registration Statement, CFII admitted "We, our sponsor and CF&Co are controlled by Cantor." Herkenhoff Dec. at Ex. 4 (CFII IPO Reg. Stmnt.) at 27, 152. Plaintiff submits that the alleged facts, and those of which judicial notice is appropriate, amply allege control person liability.

## V.   CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court deny the Motions. If any portion of the Motions are granted, Plaintiff respectfully requests leave to amend.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED: November 14, 2022        By:  /s/  *Laurence D. King*
                                          Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
*lking@kaplanfox.com*
*kherkenhoff@kaplanfox.com*
*breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
850 Third Avenue
New York, NY 10022
Telephone:  212-687-1980
Facsimile:   212-687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium Capital LLC
and the Proposed Class*

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS