# Exhibit 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of report (Date of earliest event reported): March 8, 2021**

---

# VIEW, INC.

**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-39470** | **84-3235065** |
|:---:|:---:|:---:|
| **(State or other jurisdiction** | **(Commission** | **(I.R.S. Employer** |
| **of incorporation)** | **File Number)** | **Identification Number)** |

**195 South Milpitas Blvd**
**Milpitas, California, 95035**
**(Address of principal executive offices, including zip code)**

**Registrant's telephone number, including area code: (408) 263-9200**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| **Class A common stock, par value $0.0001 per share** | **VIEW** | **The Nasdaq Stock Market** |
| **Redeemable warrants, exercisable for Class A common stock at an exercise price of $11.50 per share** | **VIEWW** | **The Nasdaq Stock Market** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**INTRODUCTORY NOTE**

On March 8, 2021 (the "***Closing Date***"), View, Inc., a Delaware corporation (f/k/a CF Finance Acquisition Corp. II ("***CF II***")) (the "***Company***" or "***View***"), consummated the previously announced merger pursuant to an Agreement and Plan of Merger, dated November 30, 2020 (as amended, modified or waived from time to time, the "***Merger Agreement***"), by and among CF II, PVMS Merger Sub, Inc., a Delaware corporation and wholly-owned subsidiary of CF II ("***Merger Sub***"), and View Operating Corporation, a Delaware corporation (f/k/a View, Inc.) ("***Legacy View***").

Pursuant to the Merger Agreement, a business combination between the Company and Legacy View was effected through the merger of Merger Sub with and into Legacy View, with Legacy View surviving as the surviving company and as a wholly-owned subsidiary of CF II (the "***Merger***" and, collectively with the other transactions described in the Merger Agreement, the "***Business Combination***"). On the Closing Date, the Company changed its name from CF Finance Acquisition Corp. II to View, Inc. and Legacy View changed its name from View, Inc. to View Operating Corporation.

In connection with the special meeting of the stockholders of CF II held on March 5, 2021 (the "***Special Meeting***") and the Business Combination, holders of 12,587,893 shares of Company Class A common stock, par value $0.0001 per share (the "***Class A Common Stock***"), exercised their right to redeem their shares for cash at a redemption price of $10.00 per share, for an aggregate redemption amount of approximately $125.88 million.

On March 8, 2021, at the effective time of the Merger (the "***Effective Time***"), and subject to (and except as specifically provided by) the terms of the Merger Agreement, each share of Legacy View common stock, par value $0.0001 per share and each share of Legacy View preferred stock, par value $0.0001 per share, that was issued and outstanding immediately prior to the Effective Time, was automatically cancelled and ceased to exist in exchange for 0.02325 shares (the "***Exchange Ratio***") of Class A Common Stock for each share of Legacy View common stock and Legacy View preferred stock, without interest, subject to rounding up such fractional shares of each holder to the nearest whole share of Class A Common Stock (after aggregating all fractional shares of Class A Common Stock that otherwise would be received by such holder).

At the Effective Time, each share of Merger Sub common stock outstanding immediately prior to the Effective Time, automatically and without any required action on the part of any holder or beneficiary thereof, was converted into and exchanged for one validly issued, fully paid and nonassessable share of Legacy View common stock.

At the Effective Time, each option to purchase shares of Legacy View common stock that was outstanding immediately prior to the Effective Time, whether vested or unvested, was assumed by the Company and converted into an option to purchase that number of shares of Class A Common Stock equal to the product (rounded down to the nearest whole number) of (a) the number of shares of Legacy View common stock subject to the Legacy View option immediately prior to the Effective Time multiplied by (b) the Exchange Ratio. Such assumed option shall have a per share exercise price for each share of Class A Common Stock issuable upon exercise of the assumed option equal to the quotient (rounded up to the nearest whole cent) obtained by dividing (i) the exercise price per share of Legacy View common stock subject to such Legacy View option immediately prior to the Effective Time by (ii) the Exchange Ratio. Except as specifically provided in the Merger Agreement, following the Effective Time, each assumed option is governed by the same terms and conditions (including vesting and exercisability terms) as were applicable to the corresponding former Legacy View option immediately prior to the Effective Time.

At the Effective Time, each Legacy View warrant that was outstanding immediately prior to the Effective Time was assumed by the Company and converted into an assumed warrant exercisable for that number of shares of Class A Common Stock equal to the product (rounded down to the nearest whole number) of (a) the number of shares of Legacy View capital stock subject to the Legacy View warrant immediately prior to the Effective Time multiplied by (b) the Exchange Ratio. Such assumed warrant shall have a per share exercise price for each share of Class A Common Stock issuable upon exercise of the assumed warrant shall be equal to the quotient (rounded up to the nearest whole cent) obtained by dividing (i) the exercise price per share of Legacy View capital stock subject to the Legacy View warrant immediately prior to the Effective Time by (ii) the Exchange Ratio. Except as specifically provided in the Merger Agreement, following the Effective Time, each assumed warrant shall continue to be governed by the same terms and conditions (including vesting and exercisability terms) as were applicable to the corresponding former Legacy View warrant immediately prior to the Effective Time.

2

At the Effective Time, the Sponsor subjected 4,970,000 of its shares of Class B Common Stock (the "*Sponsor Earn-Out Shares*") to vesting and potential forfeiture (and related transfer restrictions) after the Closing based on a five year post-Closing earnout, with (a) 50% of the Sponsor Earn-Out Shares being released if the stock price of Class A Common Stock exceeds $12.50 for 5 out of any 10 trading days, (b) 25% of the Sponsor Earn-Out Shares being released if the stock price of Class A Common Stock exceeds $15.00 for 5 out of any 10 trading days and (c) 25% of the Sponsor Earn-Out Shares being released if the stock price of Class A Common Stock exceeds $20.00 for 5 out of any 10 trading days, in each case, subject to early release for a Combined Entity sale, change of control or going private transaction or delisting after the Effective Time.

Following the Effective Time, View granted 12,500,000 performance-based restricted stock units for shares of Class A Common Stock of the Company (the "*Officer RSUs*") and 5,000,000 options to purchase Class A Common Stock of the Company (the "*Officer Options*" and together with the Officer RSUs, the "*Officer Earnout Awards*") to View's executive officers. The Officer RSUs are subject to both time and market based vesting conditions. The Officer RSUs time vest over a four-year period with 25% to vest on the twelve-month anniversary of the Closing and the remaining 75% to vest on a monthly basis over the following thirty-six months, subject to the following market-based vesting. 50% of the Officer RSUs granted to each executive officer will only vest if the share price hurdle of $15.00 is achieved and the remaining 50% of such Officer RSUs will vest if the share price hurdle of $20.00 is achieved. The Officer Options time vest over a four-year period with 25% to vest on the twelve-month anniversary of the Closing and the remaining 75% will vest on a monthly basis over the following thirty-six months. For further details about the Officer Earnout Awards, see "2021 Equity Incentive Plan Proposal — New Plan Benefits" beginning on page 176 of the proxy statement/prospectus, which is incorporated herein by reference.

Following the Effective Time, View granted a nonqualified stock option award to its CEO to purchase 25,000,000 shares of Class A Common Stock of the Company at an exercise price of $10.00 per share ("*CEO Option Award*"), which will vest in ten equal tranches upon the achievement of certain stock price hurdles as specified for each tranche, subject to the CEO's continued employment. For further details about the CEO Option Award, see "CEO Incentive Plan Proposal — New Plan Benefits" beginning on page 182 of the proxy statement/prospectus, which is incorporated herein by reference.

As of the opening of trading on March 9, 2021, the Class A Common Stock and warrants of View, Inc. (f/k/a CF Finance Acquisition Corp. II), began trading on the Nasdaq Stock Market ("*Nasdaq*") as "VIEW" and "VIEWW", respectively.

A description of the Business Combination and the terms of the Merger Agreement are included in the proxy statement/prospectus filed with the Securities and Exchange Commission (the "*SEC*") on February 16, 2021 in the section entitled "The Business Combination Proposal" beginning on page 125 of the proxy statement/ prospectus incorporated herein by reference.

As previously disclosed, on November 30, 2020, CF II entered into separate Subscription Agreements with a number of subscribers (each an "*Initial Subscriber*"), pursuant to which the Initial Subscribers agreed to purchase, and CF II agreed to sell to the Initial Subscribers, an aggregate of up to 30,000,000 shares of Class A Common Stock (the "*Initial PIPE Shares*"), for a purchase price of $10.00 per share, and on January 11, 2021, CF II entered into a Subscription Agreement with an additional subscriber (the "*Additional Subscriber*" and together with the Initial Subscribers, the "*PIPE Subscribers*"), pursuant to which the Additional Subscriber agreed to purchase, and CF II agreed to sell to the Additional Subscriber, up to 17,777,778 shares of Class A Common Stock (the "*Additional PIPE Shares*" and together with the Initial PIPE Shares, the "*PIPE Shares*"). The closing of the sale of the PIPE Shares pursuant to the Subscription Agreements was contingent upon, among other customary closing conditions, including the substantially concurrent closing of the Business Combination (the "*Closing*"). On March 8, 2021, substantially concurrently with the Closing, the sale of the PIPE Shares was consummated, pursuant to which (after taking into account open market purchases by the Initial Subscribers and the 9.85% cap applicable to the Additional Subscriber), the Initial Subscribers purchased an aggregate of 26,078,242 shares of Class A Common Stock and the Additional Subscriber purchased 16,024,914 shares of Class A Common Stock, for total gross proceeds to the Company of approximately $441.1 million.

3

A description of the PIPE Subscription Agreements is included in the proxy statement/prospectus in the section entitled "The Business Combination Proposal–Related Agreements" beginning on page 137 of the proxy statement/prospectus.

At the Effective Time, the Company repaid, in its entirety, the Revolving Debt Facility, in the amount of approximately $276.8 million, upon which the Revolving Debt Facility was terminated. A description of the Revolving Debt Facility is included in the proxy statement/prospectus beginning on page 230.

As used hereafter in this Current Report on Form 8-K, unless otherwise stated or the context indicates otherwise, the terms the "Company," "Registrant," "we," "us" and "our" refer to View, Inc. (f/k/a CF Finance Acquisition Corp. II), after giving effect to the Business Combination.

**Item 1.01.        Entry into a Material Definitive Agreement**

*Lock-Up Agreements*

On November 30, 2020, concurrently with the execution of the Merger Agreement, CF II and Legacy View entered into separate Lock-Up Agreements (each, a "***Lock-Up Agreement***"), each effective as of the Closing, with a number of Legacy View stockholders, pursuant to which the securities of the Company held by such stockholders are locked-up and subject to transfer restrictions, subject to certain exceptions. The lock-ups will expire on the earlier of: (i) six (6) months after the Closing, or (ii) the date after the Closing on which the Company consummates a liquidation, merger, share exchange, reorganization, tender offer or other similar transaction after the Closing which results in all of the Company's stockholders having the right to exchange their equity holdings in the Company for cash, securities or other property.

A description of the Lock-Up Agreement is included in the proxy statement/prospectus in the section entitled "The Business Combination Proposal–Related Agreements" beginning on page 137 of the proxy statement/prospectus.

The foregoing description of the Lock-Up Agreements is qualified in its entirety by reference to the full text of the form of Lock-Up Agreement, a copy of which is attached hereto as Exhibit 10.2 and incorporated herein by reference.

*Registration Rights Agreement*

On November 30, 2020, concurrently with the execution of the Merger Agreement, CF II and certain Legacy View stockholders (the "***Investors***") entered into a Registration Rights Agreement (the "***Registration Rights Agreement***"), which became effective at the Closing. Pursuant to the terms of the Registration Rights Agreement, the Company is obligated to file one or more registration statements to register the resales of Class A Common Stock held by such Investors, on the terms set forth in the Registration Rights Agreement. Investors holding at least 25% of the registrable securities owned by all Investors are entitled under the Registration Rights Agreement to make a written demand for registration under the Securities Act of all or part of their registrable securities, up to a total of three such demands. In addition, pursuant to the terms of the Registration Rights Agreement and subject to certain requirements and customary conditions, such Investors may demand at any time or from time to time, that the Company files a registration statement on Form S-1 (or any similar short-form registration which may be available at such time) to register the resale of the registrable securities of the Company held by such Investors. The Registration Rights Agreement will also provide such Investors with "piggy-back" registration rights, subject to certain requirements and customary conditions.

A description of the Registration Rights Agreement is included in the proxy statement/prospectus in the section entitled "The Business Combination Proposal–Related Agreements" beginning on page 137 of the proxy statement/prospectus.

The foregoing description of the Registration Rights Agreement is qualified in its entirety by reference to the full text of the Registration Rights Agreement, a copy of which is attached hereto as Exhibit 10.3 and incorporated herein by reference.

4

*Sponsor Registration Rights Agreement*

Prior to the Closing, CF II entered into an amendment (the "***Sponsor RRA Amendment***") to that certain Registration Rights Agreement, dated as of August 26, 2020 (the "***Original Sponsor RRA***" and together with the Sponsor RRA Amendment, the "***Sponsor RRA***"), by and among CF II, CF Finance Holdings II, LLC (the "***Sponsor***") and the other parties thereto, to provide that Sponsor's and the other party's thereto rights thereunder with respect to an Underwritten Offering (as defined in the Sponsor RRA) shall be pari passu to the rights of the holders of registrable securities under the Registration Rights Agreement. The foregoing description of the Sponsor RRA is qualified in its entirety by reference to the full text of the Original Sponsor RRA and the Sponsor RRA Amendment, copies of which are attached hereto as Exhibits 10.4 and 10.5, respectively, and which are incorporated herein by reference.

*Indemnification Agreements*

On the Closing Date, the Company entered into indemnification agreements with its directors and executive officers. These indemnification agreements require the Company to indemnify its directors and executive officers for certain expenses, including attorneys' fees, judgments, fines and settlement amounts incurred by a director or executive officer in any action or proceeding arising out of their services as one of the Company's directors or executive officers or any other company or enterprise to which the person provides services at the Company's request.

The foregoing description of the indemnification agreements is qualified in its entirety by the full text of the form of indemnification agreement, a copy of which is attached hereto as Exhibit 10.8 and incorporated herein by reference.

**Item 1.02      Termination of a Material Definitive Agreement**

Pursuant to the Merger Agreement, on the Closing Date, Legacy View repaid in full all of its indebtedness and other obligations (the "Repayment") under (i) that certain Program Side Agreement, dated as of October 23, 2019 (the "Debt Agreement"), by and between Legacy View and the Finance Provider (as defined in the Debt Agreement) and (ii) that certain Instalment Payment Agreement, dated as of October 15, 2019, by and between Legacy View and the Finance Provider (collectively with the Debt Agreement, the "Program Agreement"). In connection with the Repayment, the Program Agreement was terminated on the Closing Date and all rights and obligations of Legacy View and the Finance Provider under the Program Agreement were terminated on the Closing Date.

**Item 2.01      Completion of Acquisition or Disposition of Assets**

The disclosure set forth in the "*Introductory Note*" above is incorporated by reference into this Item 2.01.

At the Special Meeting, CF II's stockholders approved the Business Combination. On March 8, 2021, the parties to the Merger Agreement completed the Business Combination. Immediately after giving effect to the completion of the Business Combination (including the redemption of 12,587,893 shares of Class A Common Stock), and the issuance of the PIPE Shares, the Company had the following outstanding securities:

- approximately 217,076,713 shares of Class A Common Stock;

- approximately 17,033,034 warrants, each exercisable for one share of Class A Common Stock at a price of $11.50 per share;

- approximately 24,657,302 assumed stock options, which converted from Legacy View stock options and are governed by the same vesting conditions, each exercisable for one share of Class A Common Stock at the weighted average price of $9.33 per share;

- approximately 5,000,000 options, each exercisable for one share of Class A Common Stock at a price of $10.00 per share, subject to certain time-based vesting conditions;

5

- approximately 25,000,000 options, each exercisable for one share of Class A Common Stock at a price of $10.00 per share, subject to certain time- and performance-based vesting conditions;

- approximately 12,500,000 restricted stock units, subject to certain time and performance-based vesting conditions; and

- approximately 3,394,867 assumed warrants, which converted from Legacy View warrants, each exercisable for one share of Class A Common Stock at the weighted average price of $16.60 per share.

The material terms and conditions of the Merger Agreement are described in the section "The Business Combination Proposal" beginning on page 125 of the proxy statement/prospectus, which are incorporated herein by reference.

## FORM 10 INFORMATION

Item 2.01(f) of this Current Report on Form 8-K states that if the predecessor registrant was a shell company, as CF II was immediately before the Business Combination, then the registrant must disclose the information that would be required if the registrant were filing a general form for registration of securities on Form 10. Accordingly, the Company, as the successor registrant to CF II, is providing the information below that would be included in a Form 10 if it were to file a Form 10. Please note that the information provided below relates to the combined company after the consummation of the Business Combination unless otherwise specifically indicated or the context otherwise requires.

**Forward-Looking Statements**

Certain statements included in this Current Report on Form 8-K that are not historical facts are forward-looking statements within the meaning of the federal securities laws, including safe harbor provisions under the United States Private Securities Litigation Reform Act of 1995. Forward-looking statements are sometimes accompanied by words such as "believe," "continue," "project," "expect," "anticipate," "estimate," "intend," "strategy," "future," "opportunity," "predict," "plan," "may," "should," "will," "would," "potential," "seem," "seek," "outlook" and similar expressions that predict or indicate future events or trends or that are not statements of historical matters. Forward-looking statements are predictions, projections and other statements about future events that are based on current expectations and assumptions and, as a result, are subject to risks and uncertainties. These statements are based on various assumptions, whether or not identified in this Current Report on Form 8-K. These forward-looking statements are provided for illustrative purposes only and are not intended to serve as, and must not be relied on by an investor as, a guarantee, an assurance, a prediction or a definitive statement of fact or probability. Actual events and circumstances are difficult or impossible to predict and will differ from assumptions. Many actual events and circumstances are beyond the control of the Company. Many factors could cause actual future events to differ from the forward-looking statements in this Current Report on Form 8-K, including but not limited to: (i) risks that the Business Combination disrupts current plans and operations of the Company and potential difficulties in Company employee retention as a result of the Business Combination, (ii) the outcome of any legal proceedings that may be instituted against the Company related to the Merger Agreement or the Business Combination, (iii) the ability to maintain the listing of the Company stock on Nasdaq, (iv) volatility in the price of the Company's securities, (v) changes in competitive and regulated industries in which the Company operates, variations in operating performance across competitors, changes in laws and regulations affecting the Company's business and changes in the combined capital structure, (vi) the ability to implement business plans, forecasts, and other expectations, and identify and realize additional opportunities, (vii) the potential inability of the Company to increase its manufacturing capacity or to achieve efficiencies regarding its manufacturing process or other costs, (viii) the enforceability of the Company's intellectual property, including its patents and the potential infringement on the intellectual property rights of others, (ix) the risk of downturns and a changing regulatory landscape in the highly competitive industry in which the Company operates, and (x) costs related to the Business Combination and the failure to realize anticipated benefits of the Business Combination or to realize estimated pro forma results and underlying assumptions. These risks and uncertainties may be amplified by the COVID-19 pandemic, which has caused significant economic uncertainty. The foregoing list of factors is not exhaustive. You should carefully consider the foregoing factors and the other risks and uncertainties described in the "Risk Factors" section of the Company's Quarterly Reports on Form 10-Q, the registration statement on Form S-4 and other documents filed by the Company from time to time with the SEC. These filings identify and address other important risks and uncertainties that could cause actual events and results to differ materially from those contained in the forward-looking statements. Forward-looking statements speak only as of the

6

date they are made. Readers are cautioned not to put undue reliance on forward-looking statements, and the Company assumes no obligation and do not intend to update or revise these forward-looking statements, whether as a result of new information, future events, or otherwise. The Company does not give any assurance that it will achieve its expectations.

## Business and Properties

The business and properties of CF II and Legacy View prior to the Business Combination are described in the proxy statement/prospectus in the sections entitled "Information About CF II" beginning on page 186 and "Information About View" beginning on page 204 of the proxy statement/prospectus, which are incorporated herein by reference.

The Company's investor relations website is located at https://investors.view.com/investor-relations. The Company uses its investor relations website to post important information for investors, including news releases, analyst presentations, and supplemental financial information, and as a means of disclosing material non-public information and for complying with its disclosure obligations under Regulation FD. Accordingly, investors should monitor the Company's investor relations website, in addition to following press releases, SEC filings and public conference calls and webcasts. The Company also makes available, free of charge, on its investor relations website at https://investors.view.com/financials-and-filings/sec-filings , its Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to these reports as soon as reasonably practicable after electronically filing or furnishing those reports to the SEC.

## Risk Factors

The risks associated with the Company's business are described in the proxy statement/prospectus in the section entitled "Risk Factors" beginning on page 56 of the proxy statement/prospectus, which is incorporated herein by reference.

## Audited Consolidated Financial Statements

The audited consolidated financial statements as of December 31, 2020 and 2019 and for the years then ended of Legacy View set forth in Exhibit 99.1 hereto have been prepared in accordance with U.S. generally accepted accounting principles ("**GAAP**") and pursuant to the regulations of the SEC.

These audited consolidated financial statements should be read in conjunction with the section entitled "Management's Discussion and Analysis of Financial Condition and Results of Operations" included herein.

## Unaudited Pro Forma Condensed Combined Financial Information

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 and the unaudited pro forma condensed combined statements of comprehensive loss for the year ended March 31, 2020 and the nine months ended December 31, 2020 are set forth in Exhibit 99.2 hereto.

## Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis provides information which the Company's management believes is relevant to an assessment and understanding of Legacy View's consolidated results of operations and financial condition. The discussion should be read together with the historical consolidated financial statements as of December 31, 2020 and 2019 and for the years then ended and the related notes as set forth in Exhibit 99.1 of this Current Report on Form 8-K. This discussion may contain forward-looking statements based upon current expectations that involve risks and uncertainties. Legacy View's actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors, including those set forth under "Risk Factors" or in other parts of the proxy statement/prospectus, which is incorporated herein by reference, and Exhibits 99.1 and 99.2 of this Current Report on Form 8-K. Unless the context otherwise requires, references in this "Management's Discussion and Analysis of Financial Condition and Results of Operations" to "we", "us", "our", and "the Company" are intended to mean the business and operations of Legacy View and its consolidated subsidiary.*

7

**Overview**

View is a technology company that makes buildings smart and connected to improve people's health, productivity and experience, while simultaneously reducing energy consumption. Our market leading innovations and products enable people to lead healthier and more productive lives by allowing in more natural daylight and views while minimizing glare and heat, and simultaneously reducing the building's carbon footprint and energy usage. We have achieved these transformations by designing, manufacturing, and providing electrochromic or "smart" glass panels to which we add a 1 micrometer (approximately 1/100th the thickness of human hair) proprietary electrochromic coating that fundamentally changes the building's thermodynamics and the health of the humans inside it. Through our proprietary network infrastructure, each View Smart Glass window is provided an individual IP-addressable location and when combined with our proprietary software and algorithms, View Smart Glass intelligently adjusts in response to the sun by tinting from clear to dark states, and vice versa. In addition, we now offer a suite of fully integrated, cloud-connected smart-building products that we believe will enable us to further optimize the human experience within buildings ensuring a truly delightful experience.

To date, we have devoted substantially all of our efforts towards the development, manufacture and sale of our product platforms, which we believe have begun to show strong market traction. For fiscal years ended December 31, 2020 and 2019, our revenue was $32.3 million, and $24.3 million, respectively, representing year-over-year growth of 32.8%.

**Key Factors Affecting Operating Results**

*Execution of Growth Strategies*

We believe that we are just beginning to address our market opportunity, which we expect to be driven by four secular megatrends (i) climate change, ESG and sustainability, (ii) a growing focus on human health inside buildings, (iii) increased desire for better human experiences in buildings, and (iv) growing demand for smart buildings.

To capitalize on these trends and our market opportunity, we must execute on multiple growth initiatives, each of which will be propelled by our ability to develop mainstream acceptance of our products, including (i) increasing awareness of our products and its benefits across major markets in North America and internationally, (ii) increasing recurring sales, (iii) expanding our product portfolio, (iv) expanding our sales channels to include real estate brokers, (v) continuing to develop strong relationships with ecosystem partners such as building owners, developers, tenants, architects, contractors, low voltage electricians and glaziers, and (vi) expanding outside North America into international markets.

*Technology Innovation*

With over 1,000 patents and patent filings and 12 years of research and development experience, we have a history of technological innovation. We have a strong research and development team, including employees with expertise in all aspects of the development process, including materials science, electronics, networking, hardware, software, and human factors research. As we have since inception, we intend to continue making significant investments in research and development and hiring top technical and engineering talent to improve our existing products and develop new products, which will increase our differentiation in the market. For example, in 2020, we introduced a new suite of products to complement our market-leading Smart Glass windows and optimize the human experience while making buildings more intelligent:

- View Net. Our high bandwidth power and data network that serves as the backbone to an intelligent building platform.

- View Immersive Experiences. Our transparent, digital, interactive surfaces product that incorporates see-through, high definition displays directly onto the window.

- View Sense. Modules that provide the ability to measure and optimize light, humidity, temperature, air quality, dust and noise to improve occupant wellness.

We expect our research and development expenses to increase in absolute dollars over time to maintain our differentiation.

8

*Competition*

We compete in the commercial window industry, the electrochromic glass industry, as well as within the larger smart building products industry, each of which is highly competitive and continually evolving as participants strive to distinguish themselves within their markets, including through price and product improvement. We believe that our main sources of competition are existing commercial window manufacturers, electrochromic glass manufacturers, and companies developing smart building products and intrusion detection solution technologies. We believe the primary competitive factors in our markets are:

- Technological innovation,

- Product performance,

- Product quality, durability, and price,

- Execution track record, and

- Manufacturing efficiency.

*Capacity*

View Smart Glass panels are currently manufactured at our production facility located in Olive Branch, Mississippi. We operate a sophisticated manufacturing facility designed for performance, scale, durability, and repeatability. Our manufacturing combines talent, equipment, and processes from the semiconductor, flat panel display, solar and glass processing industries. Our proprietary manufacturing facility has been in use since 2010. We currently operate one production line in our facility with a name-plate capacity of approximately 5 million square feet of smart glass per year. In addition, we have partially completed the construction of a second production line at our Olive Branch facility. We expect the name-plate capacity of the second production line to be 7.5 million square feet of smart glass per year, bringing total name-plate capacity of our facility to 12.5 million square feet per year. We believe our facility, including the second production line, will enable us to achieve economies of scale, meet future demand, and achieve profitability. As of December 31, 2020, we have invested $409.6 million in capital expenditures, primarily in our factory. We expect to incur additional factory capital expenditure of up to approximately $160.0 million over the next two to four years with respect to facility automation and completion of the second production line to support the expected growth in demand for our products.

*Capital Needs*

We have incurred net losses and negative cash flows from operations since our inception. To date, we have primarily funded our operations with proceeds from the issuance of redeemable convertible preferred stock, borrowings under our loan facilities and customer payments. Until we achieve profitability, we expect to primarily fund cash needs through a combination of equity and debt financing. See the section on Liquidity and Capital Resources below for our near-term and long-term capital needs.

**Impact of COVID-19**

During March 2020, the World Health Organization declared the rapidly growing coronavirus outbreak (COVID-19) to be a global pandemic. The COVID-19 pandemic has impacted health and economic conditions throughout the United States, including the construction industry. The extent to which COVID-19 impacts our operations will depend on future developments, which cannot be predicted with certainty, including the duration of the outbreak, new information that may emerge concerning the severity of COVID-19 and the actions to contain or treat its impact, among others.

COVID-19's disruptions to the construction industry may reduce or delay new construction projects or result in cancellations or delays of existing planned construction. Supply of certain materials used by the Company in the manufacture of its products that are sourced from a limited number of suppliers may also be disrupted. Any one or a combination of such events could have a material adverse effect on the Company's financial results.

To address these conditions, the Company established effective protocols to continue business operations as an essential industry, insulate its supply chain from delays and disruptions, and assessed its business operations and financial plans as a result of COVID-19. The Company optimized its financial plan by focusing on sales growth and by reducing and delaying incremental spending on operating and capital expenditures compared with the pre-COVID business plan. In particular, the Company has reduced operating costs in absolute dollars through headcount reductions and reduction of operating expenditures for third party contractors.

The long-term effects of COVID-19 on one of our key markets, office space, cannot be accurately predicted as employers design their work-from- home policies. Conversely, we expect to see an accelerated interest in the renovation market, potential increased spending on public buildings and infrastructure, movement to suburban office spaces, and increased investment in life sciences and laboratory buildings. We also expect to see changes in the market in response to COVID-19 including increased aversion to blinds that collect dirt and dust. Finally, we have seen COVID-19 accelerate societal perspective on the importance of the environment on personal health which could drive adoption of our sensor products that measure and monitor health aspects in buildings.

### Components of Results of Operations Revenue

We generate revenue from the manufacturing and sale of insulating glass units ("**IGU**") that are coated on the inside with a proprietary technology and are designed, programmed, and built to customer specifications that include sizes for specific windows, skylights, and doors in specified or designated areas of a building. The IGUs, when combined with the Controls, Software and Services ("**CSS**") which includes commissioning services, that we sell make the specified IGU tint. A full solution to the end-user includes IGU and CSS. The assembly and installation of the IGU and CSS is performed by glaziers and electricians, and is currently not included in our offerings. We do not have a role in arranging for the assembly nor the installation. The entire project is commissioned by us after the final assembly and installation to configure the operation of the windows at the building site and ensure proper functionality. Our revenue primarily relies on securing design wins with end-users of our products and services, which typically are the owners, tenants or developers of buildings. We start the selling process by pitching the View Smart Glass benefits and business outcomes to the building owners, tenants, or developers. The pricing for a project is primarily driven by the make-up, size, shape, and total units of the IGU and associated CSS. The design win is typically secured through a non-binding agreement with the owners, tenants or developers of the buildings. Once a design win is secured, we enter into legally binding agreements with our customers (glaziers, low voltage electricians, owners, tenants, developers of buildings, general contractors or a combination thereof) to deliver IGUs and CSS.

Our IGUs are custom-built and sold to customers through legally binding contracts. Each contract to provide IGUs includes multiple distinct IGUs. We recognize revenue from our IGU contracts overtime as the work progresses and IGUs are produced, using cost-to-cost basis as a measure for percentage-of-completion of the performance obligation.

Our contracts for CSS contain promises to deliver multiple goods and services including sky sensors, window controllers, control panels and embedded software, cables and connectors, electrical connection schema and commissioning services. We recognize revenue allocated to each performance obligation at the time the related performance obligation is satisfied by transferring control of the promised good or service to a customer, which generally occurs upon shipment or delivery. Commissioning services requires acceptance from the customer, and we recognize commissioning revenue when customer acceptance is obtained.

### Cost of Revenue

Cost of revenue consists primarily of the costs to manufacture and source our products, including the costs of materials, customer support, outside services, shipping, personnel expenses, including salaries and related personnel expenses and stock-based compensation expense, equipment and facility expenses including depreciation of manufacturing equipment, rent and utilities, and insurance and taxes, warranty costs, and inventory valuation provisions.

The primary factors that impact our cost of revenue are manufacturing efficiencies, cost of material, and mix of products. Given our advanced investment in capacity to capture future demand, we expect to continue to incur significant fixed costs that will be amortized over larger volumes of production as we scale our business.

10

**Research and Development Expense**

Research and development expenses consist primarily of costs related to research, design, maintenance, and minor enhancements of our software that are expensed as incurred. Research and development expense consist primarily of costs incurred for salaries and related personnel expenses, including stock-based compensation expense, for personnel related to the development of improvements and expanded features for our products, materials and supplies used in development and testing, payments to consultants, outside manufacturers, patent related legal costs, facility costs and depreciation. We expect that our research and development expenses will increase in absolute dollars as our business grows, particularly as we incur additional costs related to continued investments in development of new products and offerings. However, we expect that our research and development expenses will decrease as a percentage of our revenue over time.

**Selling, General, and Administrative Expense**

Selling, general, and administrative expenses consist primarily of salaries and related personnel expenses, including stock-based compensation, related to sales and marketing, finance, legal and human resource functions, contractor and professional services fees, audit and compliance expenses, insurance costs, advertising and promotional expenses and general corporate expenses, including allocated facilities and information technology expenses.

We expect our selling, general, and administrative expenses to increase in absolute dollars for the foreseeable future as we scale headcount with the growth of our business, and as a result of operating as a public company, including compliance with the rules and regulations of the SEC and Nasdaq, legal, audit, higher expenses for directors and officer insurance, investor relations activities, and other administrative and professional services. Over time, we expect our selling, general, and administrative expenses to decline as a percentage of revenue.

**(Income) Loss from Legal Settlement**

(Income) loss from legal settlement in fiscal year 2019 represents a receivable for a malpractice legal settlement from one of our former attorneys.

**Interest and Other Income (Expense), net**

Interest and other income (expense), net comprises interest income, interest expense, other expense, net, (loss) gain arising out of change in fair value of redeemable convertible preferred stock and embedded derivative liabilities and loss on extinguishment of debt.

Interest income consists primarily of interest received or earned on our cash and cash equivalents balances.

Interest expense consists primarily of interest paid on our debt facilities and amortization of debt discounts and issuance costs.

Other expense, net primarily consists of foreign exchange gains and losses and realized gains and losses from the sale of short-term investments.

Our redeemable convertible preferred stock warrant and embedded derivatives liabilities are subject to remeasurement to fair value at each balance sheet date. Changes in fair value of our redeemable convertible preferred stock warrant liabilities are recognized in the consolidated statements of operations. We will continue to adjust the preferred stock warrant liability for changes in fair value until the earlier of the exercise or expiration of the warrants, conversion of our redeemable convertible preferred stock into our common stock, or until the redeemable convertible preferred stock is otherwise no longer redeemable.

Loss on extinguishment of debt comprises a loss arising from the extinguishment of debt from cash redemption or conversion into redeemable convertible preferred stock, if the conversion was not exercised pursuant to original conversion term of the notes, by recording the difference between the reacquisition price and the net carrying amount of the debt being extinguished.

11

**Provision for Income Taxes**

Our provision for income taxes consists of an estimate of federal, state, and foreign income taxes based on enacted federal, state, and foreign tax rates, as adjusted for allowable credits, deductions, uncertain tax positions, changes in deferred tax assets and liabilities, and changes in tax law. Due to the level of historical losses, we maintain a valuation allowance against U.S. federal and state deferred tax assets as we have concluded it is more likely than not that these deferred tax assets will not be realized.

**Results of Operations**

*Comparison of the years ended December 31, 2020 and 2019*

The following table sets forth our historical operating results for the periods indicated (in thousands, except percentages):

| | 2020 | 2019 | Change ($) | Change (%) |
|---|---|---|---|---|
| Revenue | $ 32,302 | $ 24,324 | $ 7,978 | 32.8% |
| Costs and expenses: | | | | |
| Cost of revenue | 123,110 | 179,675 | (56,565) | (31.5)% |
| Research and development | 69,491 | 77,696 | (8,205) | (10.6)% |
| Selling, general, and administrative | 77,445 | 72,905 | 4,540 | 6.2% |
| Income from legal settlement | — | (22,500) | 22,500 | (100.0)% |
| Total costs and expenses | 270,046 | 307,776 | (37,730) | (12.3)% |
| Loss from operations | (237,744) | (283,452) | 45,708 | (16.1)% |
| Interest and other income (expense), net: | | | | |
| Interest income | 499 | 5,591 | (5,092) | (91.1)% |
| Interest expense | (26,820) | (10,594) | (16,226) | 153.2% |
| Other expense, net | (32) | (108) | 76 | (70.4)% |
| Gain on fair value change | 7,155 | 1,750 | 5,405 | 308.9% |
| Loss on extinguishment of debt | — | (3,040) | 3,040 | (100.0)% |
| Interest and other income (expense), net | (19,198) | (6,401) | (12,797) | (199.9)% |
| Loss before provision of income taxes | (256,942) | (289,853) | 32,911 | (11.4)% |
| Provision for income taxes | (40) | (51) | 11 | (21.6)% |
| Net loss | $(256,982) | $(289,904) | $ 32,922 | (11.4)% |

**Revenue**

The following table presents our revenue by geographic area and is based on the shipping address of the customers (in thousands, except percentages):

| | Years Ended December 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2020 | 2019 | | |
| USA | $30,066 | $19,763 | $10,303 | 52.1% |
| Percentage of total revenue | 93.1% | 81.2% | | |
| Canada | 1,351 | 4,474 | (3,123) | (69.8)% |
| Percentage of total revenue | 4.2% | 18.4% | | |
| Other | 885 | 87 | 798 | * |
| Percentage of total revenue | 2.7% | 0.4% | | |
| Total Consolidated | $32,302 | $24,324 | $ 7,978 | 32.8% |

* not meaningful

12

The following table presents our revenue by product and services (in thousands, except percentages):

| | Years Ended December 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2020 | 2019 | | |
| | | | $ | |
| Product | $31,103 | $23,861 | 7,242 | 30.4% |
| Percentage of total revenue | 96.3% | 98.1% | | |
| Commissioning service | 1,199 | 463 | 736 | 159.0% |
| Percentage of total revenue | 3.7% | 1.9% | | |
| Total | $32,302 | $24,324 | $ 7,978 | 32.8% |

Our total revenue increased by $8.0 million or 32.8% from $24.3 million for the year ended 2019 to $32.3 million in the year ended December 31, 2020. Of the total revenue increase, the increase in average selling price resulted in an increase in revenue of $6.2 million, and the increase in volume resulted in an increase in revenue of $1.8 million. The increase in total volume was attributable to a greater market awareness of our products and stronger relationships with our ecosystem partners. The increase in average selling price represents greater recognition of the benefits we bring to the building owners, tenants and developers.

The revenue from the USA as a percentage of total revenue increased from 81.2% to 93.1% due to the growth in the USA. The growth in the USA was driven by increase in design wins in the previous years and converting more design wins to revenue. Revenue in Canada as a percentage of total revenue decreased year over year because of slower conversion of design wins in Canada during the year ended December 31, 2020 as compared to the year ended December 31, 2019. Revenue in other countries increased due to increased sales in Europe.

Product revenue increased by 30.4% in the year ended December 31, 2020 as compared to the year ended December 31, 2019 because of increase in total volume recognized and higher average selling price. Commissioning service revenue increased by 159.0% in the year ended December 31, 2020 as compared to the year ended December 31, 2019 because of increased number of sites commissioned and a higher average selling price per site.

**Cost of Revenue**

Cost of revenue decreased by $56.6 million or 31.5%, from $179.7 million in the year ended December 31, 2019 to $123.1 million in the year ended December 31, 2020. The decrease in the cost of revenue was primarily related to the three following factors:

(a) A decrease of $25.5 million related to a one-time warranty accrual for faulty materials from one of our suppliers used in the manufacturing of IGUs. In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. We stopped using the affected materials upon identification in 2019. As of December 31, 2020, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. During the year ended December 31, 2020, we reduced our estimated liability by $1.0 million based on the updated analysis, primarily due to a reduction in estimated failures over the remaining warranty period because of our historical experience. It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures and the number of defective IGUs, we are unable to estimate the amount of any potential additional losses. See section titled *Critical Accounting Policies and Estimates – Product Warranties*.

(b) A $15.5 million decrease in customer support expense, consisting of a $7.9 million decrease in customer support expenses due to cost reductions efforts and a $7.6 million decrease in customer support expenses primarily comprising of payroll and outside services costs, due to a reassignment of resources from

13

performing activities related to satisfaction of performance obligations under our revenue contracts with customers to performing sales and marketing support activities. The reassignment of resources during the year ended December 31, 2020 was due to the broadening of the scope of customer support organization toward marketing & sales activities such as sales enablement, customer education, site visits, and product optimization. This was accentuated by COVID-19 driven delays in construction projects at our customer sites, and such activities were deemed necessary to restore growth and confidence in our business as the world continues to recover from the impact of COVID-19.

(c) decrease in production cost of $16.0 million, consisting of a decrease in our inventory valuation provision of $14.2 million relating to the production of certain standard inventory units considered excess and obsolete in the year ended December 31, 2019, a decrease of $8.5 million in production costs due to change in the mix of our products manufactured to satisfy customer orders offset by an increase of $6.7 million in inventory reserves relating to lower of cost or net realizable value and excess and obsolete inventory on raw materials purchased to satisfy customer orders.

### Research and Development Expenses

Research and development expenses decreased by $8.2 million or 10.6%, from $77.7 million in the year ended December 31, 2019 to

$69.5 million in the year ended December 31, 2020. This was primarily due to a decrease of $10.9 million in material, personnel and overhead costs offset by an increase in outside services expenses of $3.0 million primarily related to development activities of our new products.

### Selling, General, and Administrative Expenses

Selling, general, and administrative expenses increased by $4.5 million or 6.2%, from $72.9 million in the year ended December 31, 2019 to $77.4 million in the year ended December 31, 2020. The increase was primarily due to an increase of $7.6 million due to the reassignment of resources from performing activities related to satisfaction of performance obligations under our revenue contracts with customers to performing sales and marketing support activities during the year ended December 31, 2020 as described in "Cost of Revenue" above, an increase of $3.0 million due to increase in sales commission expense because of increased customer orders in fiscal year 2020 compared to fiscal year 2019 and an increase of $2.5 million in depreciation expense primarily due to addition of leasehold improvements at our headquarters, offset by a decrease in advertising and promotion expenses of $4.0 million, a decrease of $2.6 million in travel costs due to reduction in travel as a result of COVID-19 related restrictions and a $2.0 million reduction in other costs due to our cost reduction efforts.

### Income from Legal Settlements

In fiscal year 2019, we recognized income of $22.5 million from a malpractice legal settlement from one of our former attorneys which accounted for the reduction in income from legal settlement in the year ended December 31, 2020.

### Interest and Other Income (Expense), net

*Interest Income*

Interest income decreased by $5.1 million or 91.1%, from $5.6 million in the year ended December 31, 2019 to $0.5 million in the year ended December 31, 2020. The decrease was primarily due to a decrease in investments and as a result of reduction in yields.

*Interest Expense*

Interest expense increased by $16.2 million or 153.2% from $10.6 million in the year ended December 31, 2019 to $26.8 million in the year ended December 31, 2020. This was primarily due to the increase of $21.3 million in interest expense related to our revolving debt facility which was offset with a decrease of $4.7 million in interest expense related to our equipment loan, which was repaid in full in October 2019.

14

*Gain on Fair Value Change*

The gain related to change in fair value increased by $5.4 million or 308.9% from $1.8 million in the year ended December 31, 2019 to $7.2 million in the year ended December 31, 2020 due to a reduction in the fair value of our redeemable convertible preferred stock warrant liability as of December 31, 2020.

*Loss on extinguishment of debt*

The loss on extinguishment of debt decreased by $3.0 million or 100.0% from $3.0 million for the year ended December 31, 2019 to nil for the year ended December 31, 2020. In fiscal year 2019, we had recorded a debt extinguishment loss of $3.0 million related to the repayment of our equipment loan.

**Provision for Income Taxes**

The provision for income taxes did not fluctuate materially during the year ended December 31, 2020 as compared to the year ended December 31, 2019.

**Liquidity and Capital Resources**

*Sources of Liquidity*

To date, we have funded our operations primarily with proceeds from the issuance of redeemable convertible preferred stock, borrowings under our debt facilities, and customer payments. From inception to December 31, 2020, we have raised aggregate net cash proceeds of $1,428.0 million from the sale of shares of Series A, Series B, Series C, Series D, Series E, Series F, Series G, Series H and Series H-1 redeemable convertible preferred stock. As of December 31, 2019, and December 31, 2020, we had cash, cash equivalents, and restricted cash of $148.7 million and $63.2 million, respectively. Since inception, we have not achieved profitable operations or positive cash flows from operations. Our accumulated deficit aggregated $1,891.2 million as of December 31, 2020 and we expect to incur substantial losses in future periods.

On March 8, 2021 (the "Closing Date"), CF II, a Delaware corporation, consummated the previously announced merger pursuant to an Agreement and Plan of Merger, dated November 30, 2020 (the "Merger Agreement"), by and among CF II, PVMS Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of CF II ("Merger Sub"), and the Company. Pursuant to the Merger Agreement, a business combination between CF II and the Company was effected through the merger of Merger Sub with and into the Company, with the Company surviving as the surviving company and as a wholly-owned subsidiary of CF II (the "Merger" and collectively with the other transactions described in the Merger Agreement, the "Business Combination"). On the Closing Date, CF II changed its name from CF Finance Acquisition Corp. II to View, Inc. and the Company changed its name to View Operating Corporation. As a result of the Business Combination, we raised gross proceeds of $815.2 million including the contribution of $374.1 million of cash held in CF II's trust account from its initial public offering, net of the redemption of CF II Class A Common Stock held by CF II's public stockholders of $125.9 million, $260.8 million private investment in public equity ("PIPE") at $10.00 per share of CF II's Class A Common Stock, and $180.3 million of additional PIPE at $11.25 per share of CF II's Class A Common Stock.

We plan to finance our operations with a combination of capital raised from the Business Combination equipment financing and revenue from product sales. Further, our future operations are dependent on the success of our development and commercialization efforts and, ultimately, upon market acceptance of our products. There can be no assurance that positive cash flows from operations can be achieved or sustained.

*Debt*

*Term Loan*

As of December 31, 2020, we had $15.4 million outstanding under our term loan debt arrangement. On October 22, 2020, we entered into an amended and restated debt arrangement with the lender. The amended and restated debt arrangement temporarily suspended the payments to resume on June 30, 2022. Starting June 30, 2022, we are required to make semi-annual payments of $0.7 million through June 30, 2032. As of December 31, 2020, the outstanding amount under this arrangement has been classified as a long term liability.

15

The debt arrangement required us to invest certain amount in land, building and equipment and create a certain number of jobs. As of December 31, 2020, we had met the requirements. The debt arrangement, as amended, has customary affirmative and negative covenants. As of December 31, 2020, we were in compliance with all covenants.

*Revolving Debt Facility*

In October 2019, we entered into a secured revolving debt facility pursuant to which we may draw amounts in a maximum aggregate principal amount of $200.0 million until January 3, 2020 and $250.0 million after such date, for the purpose of paying payables and other corporate obligations. As of December 31, 2020, we had drawn $250.0 million under this facility. The facility expires on October 22, 2023, at which time all drawn amounts must be repaid in full. The interest rate applicable to amounts outstanding under the facility is LIBOR, plus 9.05%. As security for the payment and performance of all obligations under the facility, we have granted the finance provider a security interest in substantially all of our assets.

Through October 23, 2022, repaid principal amounts become immediately available to be redrawn under the facility with maturity dates of one year. The maximum draw amount available under the facility is determined by a borrowing base calculated based on a formula consisting of certain eligible assets. As of December 31, 2020, we have classified the outstanding balance of $250.0 million as a current liability because we violated the stockholders' equity covenant which was waived by the finance provider only through March 31, 2021. In conjunction with the Business Combination, on March 8, 2021, the Company repaid in full the revolving debt facility of $276.8 million, including interest due on the notes of $26.8 million prior to the expiration of the limited waiver.

In December 2020, we entered into an amendment to replace thirteen weekly draws of approximately $2.9 million each, aggregating to approximately $37.5 million in principal amount, with four notes of approximately $9.4 million each, aggregating to approximately $37.5 million in principal amount. Prior to the amendment, the Company would have paid a total of $42.0 million, consisting of principal and interest amounts, upon maturity on January 6, 2021 through March 31, 2021. As a result of this amendment, the Company will pay a total amount of $42.2 million, consisting of principal and interest amounts, upon maturity on April 9, 2021 through April 16, 2021.

*Covenant Compliance*

The facility contains customary representations, warranties, and covenants, including covenants that restrict the ability of the Company to create or incur certain liens, incur or guarantee additional indebtedness, merge or consolidate with other companies, amongst others. The facility also includes conditions to draw and certain events of default, upon the occurrence of which events of default and after any applicable grace period, re-payment of outstanding amounts under the facility may be accelerated and the facility may be terminated. Specifically, the facility contains the following financial covenants that if breached, could constitute an event of default:

i. borrowing base is less than $100.0 million as reported monthly;

ii. cash and cash equivalents as of the last day of each financial quarter is less than $50.0 million;

iii. stockholders' equity (calculated as the sum of the balance of Redeemable Convertible Preferred Stock and Total stockholders' deficit) as of the last day of our most recently ended financial quarter is less than $50.0 million; and

iv. permitted indebtedness is greater than $50.0 million.

16

In addition, as a condition to draw under the facility, we must have a stockholders' equity as reflected in its quarterly or annual financial statements most recently delivered to the finance provider under the facility of greater than $75.0 million.

As of December 31, 2020, we were in violation of the stockholders' equity covenant and the stockholders' equity condition to draw, as our stockholders' equity balance was below $50.0 million. On November 27, 2020, the finance provider issued a limited second waiver that waived the above violation of the condition to draw and the stockholders' equity covenant violation through March 31, 2021.

The facility also requires us to furnish within 120 days after the end of each fiscal year the audited consolidated financial statements for such fiscal year without a going concern or like qualification or exception and without any qualification or exception as to the scope of such audit.

Due primarily to the effects of COVID-19, the audited financial statements for the fiscal year ended December 31, 2019 were not furnished within 120 days after the end of fiscal year 2019. In addition, our audited financial statements for the fiscal year ended December 31, 2019 were prepared under the going concern assumption; however, at the time of issuance of the 2019 financial statements there was substantial doubt about our ability to continue as a going concern and as such an explanatory paragraph was included in the Report of Independent Auditors for our 2019 financial statements. As a result of the foregoing, we were in violation of these covenant requirements prior to the date these financial statements were issued or available to be issued.

On July 15, 2020, the finance provider issued a limited waiver valid through March 31, 2021. The limited waiver extended the date by which we were obligated to deliver our audited consolidated financial statements for the year ended December 31, 2019 from April 30, 2020 to July 30, 2020. We delivered the 2019 audited consolidated financial statements on July 29, 2020. The limited waiver also waived the going concern covenant violation solely with respect to the 2019 audited financial statements.

### *Long-Term Liquidity Requirements*

Until we can achieve profitability, we expect to primarily fund cash needs through a combination of equity, equipment financing, government incentives and other debt financing. If we raise funds by issuing equity securities, dilution to stockholders may result. Any equity securities issued may also provide for rights, preferences or privileges senior to those of holders of common stock. If we raise funds by issuing debt securities, these debt securities would have rights, preferences and privileges senior to those of preferred and common stockholders. The terms of debt securities or borrowings could impose significant restrictions on our operations. The capital markets have in the past, and may in the future, experience periods of upheaval that could impact the availability and cost of equity and debt financing.

Our principal uses of cash in recent periods have been funding operations and investing in capital expenditures. Our future capital requirements will depend on many factors, including revenue growth rate, the timing and the amount of cash received from customers, the expansion of sales and marketing activities, the timing and extent of spending to support research and development efforts, capital expenditures associated with our capacity expansion, the introduction of new products and the continuing market adoption of our products. In the future, we may enter into arrangements to acquire or invest in complementary businesses, products and technologies. In the event that we require additional financing, we may not be able to raise such financing on acceptable terms or at all. If we are unable to raise additional capital or generate cash flows necessary to expand our operations and invest in continued innovation, we may not be able to compete successfully, which would harm our business, results of operations and financial condition. If adequate funds are not available, we may need to reconsider our expansion plans or limit our research and development activities, which could have a material adverse impact on our business prospects and results of operations.

**Cash Flows**

*For the Years Ended December 31, 2020 and 2019*

The following table provides a summary of cash flow data (in thousands):

|  | Years Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Net cash used in operating activities | $(165,690) | $(234,015) |
| Net cash used in investing activities | $ (4,772) | $(152,659) |
| Net cash provided by financing activities | $ 96,481 | $ 399,170 |

*Cash Flows from Operating Activities*

Net cash used in operating activities was $165.7 million for the year ended December 31, 2020. The most significant component of our cash used during this period was a net loss of $257.0 million adjusted for non-cash charges of $28.9 million related to stock-based compensation, $26.3 million related to depreciation and amortization and $2.4 million related to accrued interest expense and amortization of debt discount offset by a $7.2 million non-cash gain related to change in fair value of our redeemable convertible preferred stock warrant liability. This was offset by net cash inflows of $40.8 million from changes in operating assets and liabilities. The net cash inflows from changes in operating assets and liabilities were primarily due to a $24.0 million decrease in prepaid expenses and other current assets driven by $22.5 million cash collected on a malpractice legal settlement from one of our former attorneys, a $13.8 million increase in accrued compensation and other liabilities as a result of an increase in the accrual for compensation, interest expense and other expenses consistent with the growth of our operations, a $3.0 million increase in accounts payable due to timing of payments to our suppliers and a $0.9 million increase in deferred revenue due to timing of satisfaction of our performance obligations relating to our revenue generating contracts with customers offset by an increase of $1.4 million in other assets.

Net cash used in operating activities was $234.0 million for the year ended December 31, 2019. The most significant component of our cash used during this period was a net loss of $289.9 million adjusted for non-cash charges of $29.1 million related to stock-based compensation, $24.4 million related to depreciation and amortization, $4.8 million related to other non-cash charges, and a non-cash gain of $22.5 million related to legal settlement. This was offset by net cash inflows of $20.1 million from changes in operating assets and liabilities. The net cash inflows from changes in operating assets and liabilities were primarily due to a $26.1 million increase in accrued compensation and other liabilities as a result of an increase in accrual for product warranty liability and other expenses consistent with the growth of our operations and a $2.2 million increase in accounts payable due to timing of payments to our suppliers offset by an increase in accounts receivable of $4.8 million due to increased revenue and timing of collections and $3.2 million increase in inventory due to timing of material purchases.

*Cash Flows from Investing Activities*

Net cash used in investing activities was $4.8 million for the year ended December 31, 2020 which was primarily due to purchases of property and equipment of $37.6 million mainly related to the expansion of our manufacturing facilities offset by the proceeds from the maturity of short-term investments of $32.9 million.

Net cash used in investing activities was $152.7 million for the year ended December 31, 2019, which was primarily due to purchases of short-term investments of $348.3 million and purchases of property plant and equipment of $119.8 million primarily related to the expansion of our manufacturing facilities offset by proceeds from the maturity from short-term investment of $315.5 million.

*Cash Flows from Financing Activities*

Net cash provided by financing activities was $96.5 million for the year ended December 31, 2020, which was primarily due to proceeds from draws related to revolving debt facility of $250.0 million as reduced by repayments of $150.0 million under the same facility, offset by the repayments of debt obligations of $1.7 million and payment of capital lease obligations of $1.5 million.

Net cash provided by financing activities was $399.2 million for the year ended December 31, 2019, which was primarily due to proceeds from the issuance of redeemable convertible preferred stock of $299.8 million and proceeds from draws related to our revolving debt facility, net of issuance costs, of $146.0 million, offset by the repayments of debt obligations of $44.8 million and payment of capital lease obligations of $2.6 million.

**Contractual Obligations and Commitments**

The following table summarizes our contractual obligations and other commitments as of December 31, 2020, and the years in which these obligations are due (in thousands):

| | Payments Due By Period | | | | |
| | Total | Less than 1 Year | 2 - 3 Years | 4 - 5 Years | More than 5 Years |
|---|---|---|---|---|---|
| **Contractual obligations:** | | | | | |
| Operating lease obligations | $ 62,517 | $ 7,543 | $ 15,627 | $ 16,378 | $ 22,969 |
| Capital lease obligations | 1,501 | 775 | 658 | 68 | — |
| Debt, including interest[1] | 292,193 | 276,763 | 2,939 | 2,939 | 9,552 |
| Total: | $ 356,211 | $ 285,081 | $ 19,223 | $ 19,385 | $ 32,521 |

(1)   Draws under our revolving debt facility were contractually due through October 23, 2023; however, we have classified the outstanding balance of $250.0 million as a current liability as of December 31, 2020 as we violated the stockholders' equity covenant which was waived by the finance provider only through March 31, 2021. We paid off the facility in full in March 2021 prior to the expiration of the limited waiver.

Draws under our revolving debt facility were contractually due through October 23, 2023; however, we have classified the outstanding balance of $250.0 million as a current liability as of December 31, 2020 as we violated the stockholders' equity covenant which was waived by the finance provider only through March 31, 2021. We paid off the facility in full in March 2021 prior to the expiration of the limited waiver.

As of December 31, 2020, our unrecognized tax benefits were $5.8 million, all of which are netted against deferred tax assets. At this time, we are unable to make a reasonably reliable estimate of the timing of payments, if any, in individual years due to uncertainties in the timing or outcomes of either actual or anticipated tax audits. As a result, these amounts are not included in the table above.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

The preparation of financial statements and related disclosures in conformity GAAP requires us to make judgments, assumptions, and estimates that affect the amounts reported in our consolidated financial statements and accompanying notes. Note 1 to the consolidated financial statements describes the significant accounting policies and methods used in the preparation of the consolidated financial statements. The accounting policies described below are significantly affected by critical accounting estimates. Such accounting policies require significant judgments, assumptions, and estimates used in the preparation of the consolidated financial statements, and actual results could differ materially from the amounts reported based on these policies.

The inputs into certain of our judgments, assumptions and estimates considered the economic implications of the COVID-19 pandemic on our critical and significant accounting estimates. The COVID-19 pandemic did not have a material impact on our significant judgments, assumptions and estimates that are reflected in our results for the year ended December 31, 2020. As the COVID-19 pandemic continues to develop, many of our estimates could require increased judgment and carry a higher degree of variability and volatility. As events continue to evolve our estimates may change materially in future periods.

While our significant accounting policies are described in more detail in Note 1 to our consolidated financial statements set forth in Exhibit 99.1 of this Current Report on Form 8-K, we believe the following accounting estimates to be most critical to the preparation of our consolidated financial statements.

19

*Revenue Recognition*

We generate revenue from (i) the manufacturing and sale of IGUs that are coated on the inside with a proprietary technology and are designed and built to customer specifications that include sizes for specific windows, skylights, and doors in specified or designated areas of a building and (ii) selling the CSS, which includes electrical connections schema, sky sensors, window controllers and control panels with embedded software, cables and connectors that when combined with the IGUs enable the IGUs to tint. Also included in CSS is a commissioning service, in which the installed IGUs and CSS components are tested and tinting configurations are set by us.

Our contracts to provide IGUs includes multiple distinct IGUs. Our contracts to deliver CSS contain multiple performance obligations for each promise in the CSS arrangement.

Transaction price is allocated among the performance obligations in a manner that reflects the consideration that we expect to be entitled to for the promised goods or services based on standalone selling prices (SSP). Management judgment is required in determining SSP. SSP is estimated based on the price at which the performance obligation is sold separately. If the SSP is not observable through past transactions, we apply judgment to estimate it taking into account available information, such as internally approved pricing guidelines with respect to geographies, customer type, internal costs, and gross margin objectives, for the related performance obligations. We recognize revenue upon transfer of control of promised goods or services in a contract with a customer in an amount that reflects the consideration we expect to receive in exchange for those products or services. We recognize revenue over time for our IGU performance obligations using cost-to-cost as the basis to measure progress toward satisfying the performance obligation. Management judgment is required to estimate both the total cost to produce and the progress towards completion. Changes in estimated costs to satisfy the IGU performance obligations and the related effect on revenue are recognized using a cumulative catch-up adjustment which recognizes in the current period the cumulative effect of the changes on current and prior periods based on a contract's progress towards fulfilment of the performance obligation.

*Product Warranties*

We provide a standard assurance type warranty that our IGUs will be free from defects in materials and workmanship for 10 years from the date of delivery to customers. IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty. Management judgment is required to estimate the amount of product warranty accrual. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the failure rates, volume of claims compared with our historical experience, and the changes in the cost of servicing warranty claims.

There is uncertainty inherent in the failure rate analysis and the projected costs to replace or repair the defective products in future years, as such we evaluate warranty accruals on an ongoing basis and account for the effect of changes in estimates prospectively.

In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. As of December 31, 2019, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs, which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. We recognized a corresponding warranty liability of $1.6 million in other current liabilities and $22.9 million in other liabilities on our consolidated balance sheet as of December 31, 2019. For the year ended December 31, 2020, we recorded a net credit of $1.0 million for the reduction in product warranties liability. As of December 31, 2020, the warranty liability related to this matter included in accrued expenses other current liabilities and other liabilities was $3.8 million and $18.3 million, respectively, on our consolidated balance sheet.

20

It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures and the number of defective IGUs, we are unable to estimate the amount of any potential additional losses.

*Stock-Based Compensation*

We measure stock-based awards, including stock options, granted to employees and nonemployees based on the estimated fair value as of the grant date. Stock option awards with only service-based vesting conditions are issued. The fair value of stock options are estimated using the Black-Scholes option pricing model, which requires the input of highly subjective assumptions, including the fair value of the underlying common stock, the expected term of the stock option, the expected volatility of the price of our common stock, risk-free interest rates, and the expected dividend yield of our common stock. Changes in the assumptions can materially affect the fair value and ultimately how much stock-based compensation expense is recognized. These inputs are subjective and generally require significant analysis and judgment to develop.

We recognize the fair value of each stock award on a straight-line basis over the requisite service period of the awards. Stock-based compensation expense is based on the value of the portion of stock-based awards that is ultimately expected to vest. As such, our stock-based compensation is reduced for the estimated forfeitures at the date of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.

The following table summarizes the weighted-average assumptions used in estimating the fair value of employee stock options granted during each of the periods presented:

| | Years Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Expected volatility | 70% | 49%–70% |
| Expected terms (in years) | 5.4–6.7 | 5.6–6.7 |
| Expected dividends | 0% | 0% |
| Risk-free rate | 0.4% –1.5% | 1.5%–2.5% |

Expected volatility: As our common stock is not yet publicly traded, the expected volatility for our stock options was determined by using an average of historical volatilities of selected industry peers deemed to be comparable to our business corresponding to the expected term of the awards.

Expected term: The expected term represents the period these stock awards are expected to remain outstanding and is based on historical experience of similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules, and expectations of future employee behavior.

Expected dividend yield: The expected dividend rate is zero as we currently have no history or expectation of declaring dividends on our common stock.

Risk-free interest rate: The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for zero-coupon U.S. Treasury notes with maturities corresponding to the expected term of the awards.

*Common Stock Valuation*

The fair value of our common stock has historically been determined by our board of directors with the assistance of management. In the absence of a public trading market for our common stock, on each grant date, we develop an estimate of the fair value of our common stock based on the information known on the date of grant, upon a review of any recent events and their potential impact on the estimated fair value per share of our, and in part on input from third-party valuations.

21

The valuations of our common stock were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, Valuation of Privately-Held-Company Equity Securities Issued as Compensation. The assumptions used to determine the estimated fair value of our common stock are based on numerous objective and subjective factors, combined with management's judgment, including:

- *valuations of our common stock performed by independent third-party specialists;*

- *the prices, rights, preferences, and privileges of our convertible preferred stock relative to those of our common stock;*

- *the prices paid for common or convertible preferred stock sold to third-party investors by us*

- *for shares repurchased by us in arm's-length transactions;*

- *the lack of marketability inherent in our common stock;*

- *our actual operating and financial performance;*

- *our current business conditions and projections;*

- *the hiring of key personnel and the experience of our management;*

- *the history of the company and the introduction of new products;*

- *our stage of development;*

- *the likelihood of achieving a liquidity event, such as an initial public offering (IPO), a merger, or acquisition of our company given*

- *prevailing market conditions;*

- *the operational and financial performance of comparable publicly traded companies; and*

- *the U.S. and global capital market conditions and overall economic conditions.*

In valuing our common stock, the fair value of our business was determined using various valuation methods, including combinations of income and market approaches with input from management. The income approach estimates value based on the expectation of future cash flows that a company will generate. These future cash flows are discounted to their present values using a discount rate that is derived from an analysis of the cost of capital of comparable publicly traded companies in our industry or similar business operations as of each valuation date and is adjusted to reflect the risks inherent in our cash flows. The market approach estimates value based on a comparison of the subject company to comparable public companies in a similar line of business. From the comparable companies, a representative market value multiple is determined and then applied to the subject company's financial forecasts to estimate the value of the subject company. The valuation methodology also considers both actual transactions of the convertible preferred stock and expected liquidity values where appropriate.

Application of these approaches and methodologies involves the use of estimates, judgments, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows, discount rates, market multiples, the selection of comparable public companies, and the probability of and timing associated with possible future events. Changes in any or all of these estimates and assumptions or the relationships between those assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our common stock.

Following the completion of the business combination, the fair value of our common stock will be based on the closing price as reported on the date of grant on the primary stock exchange on which our common stock is traded.

**Recent Accounting Pronouncements.**

See Note 1 to our consolidated financial statements set forth in Exhibit 99.1 of this Current Report on Form 8-K for more information about recent accounting pronouncements, the timing of their adoption, and our assessment, to the extent we have made one, of their potential impact on our financial condition and our results of operations.

22

**Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of fluctuations in interest rates, foreign currency exchange rates and inflation.

*Interest Rate Risk*

We are exposed to market risk for changes in interest rates applicable to our investments and credit facility. We had invested cash, cash equivalents and restricted cash totaling $74.7 million as of December 31, 2020 in demand deposits, money market funds and certificates of deposits. Our investment policy is focused on the preservation of capital and supporting our liquidity needs. Under the policy, we invest excess cash in highly rated securities, issued by the U.S. government or liquid money market funds. We do not invest in financial instruments for trading or speculative purposes, nor do we use leveraged financial instruments. Due to the short-term maturities and the low-risk profile of our investments a hypothetical 10% change in interest rates would not have a material impact on the value our cash equivalents, restricted cash, net loss or cash flows.

The revolving debt facility matures in October 2023 with monthly interest calculated at 9.05% plus LIBOR. As of December 31, 2020, the outstanding under the credit facility was $250.0 million. We carry the loan at face value less unamortized discount on our consolidated balance sheets, and believe that the fair value of the loan approximates the recorded amount, as the interest rates on the term loan are variable and the rates are based on market interest rates after consideration of default and credit risk. Any changes in market interest rates will generally not affect the carrying value of the loan, but the amount of interest we incur impacts our earnings in the consolidated statements of operations. Based on the outstanding principal indebtedness of $250.0 million under our credit facility as of December 31, 2020, we believe that a 10% hypothetical change in interest rate would not have a significant impact on our results of operations.

*Foreign Currency Risk*

We have foreign currency risks related to our operating expenses denominated in currencies other than the U.S. dollar, primarily the Canadian Dollar, causing our operating results to be impacted by fluctuations in the exchange rates. To date, we have not had material exposure to foreign currency fluctuations and have not hedged such exposure, although it may do so in the future. A hypothetical decrease in all foreign currencies against the U.S. dollar of 10%, would not result in a material foreign currency loss on foreign-denominated balances, as of December 31, 2020 and 2019.

As our foreign operations expand, our results may be more materially impacted by fluctuations in the exchange rates of the currencies in which it does business. At this time, we do not enter into financial instruments to hedge our foreign currency exchange risk but may in the future.

*Inflation Risk*

We do not believe that inflation had a significant impact on our results of operations for any periods presented in our consolidated financial statements. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs through price increases. Our inability or failure to do so could harm our business, financial condition and results of operations.

**Internal Control Over Financial Reporting**

In connection with the preparation and audits of Legacy View consolidated financial statements as of December 31, 2020 and 2019 and for the years then ended, material weaknesses were identified in our internal control over financial reporting. See the subsection titled "Risk Factors — *View has identified material weaknesses in its internal control over financial reporting. If View's remediation of such material weaknesses is not effective, or if it fails to develop and maintain proper and effective internal control over financial reporting, View's ability to produce timely and accurate financial statements, comply with applicable laws and regulations, or access the capital markets could be impaired"* in the proxy statement/prospectus, which is incorporated herein by reference.

23

**Emerging Growth Company Accounting Election**

Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can choose not to take advantage of the extended transition period and comply with the requirements that apply to non-emerging growth companies, and any such election to not take advantage of the extended transition period is irrevocable. View is an "emerging growth company" as defined in Section 2(A) of the Securities Act of 1933, as amended, and has elected to take advantage of the benefits of this extended transition period.

View has elected to use this extended transition period for complying with new or revised accounting standards that have different effective dates for public business entities and non-public business entities until the earlier of the date View (a) is no longer an emerging growth company or (b) affirmatively and irrevocably opts out of the extended transition period provided in the JOBS Act. This may make it difficult or impossible to compare View's financial results with the financial results of another public company that is either not an emerging growth company or is an emerging growth company that has chosen not to take advantage of the extended transition period exemptions because of the potential differences in accounting standards used. See Note 1 of our accompanying audited consolidated financial statements included in Exhibit 99.1 of this Current Report on Form 8-K for the recent accounting pronouncements adopted and the recent accounting pronouncements not yet adopted for the year ended December 31, 2020.

View intends to rely on the other exemptions and reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an emerging growth company, View intends to rely on such exemptions, View is not required to, among other things: (a) provide an auditor's attestation report on View's system of internal control over financial reporting pursuant to Section 404(b) of the Sarbanes-Oxley Act: (b) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act; (c) comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the consolidated financial statements (auditor discussion and analysis); and (d) disclose certain executive compensation-related items such as the correlation between executive compensation and performance and comparisons of the Chief Executive Officer's compensation to median employee compensation.

Following consummation of the Business Combination, View will remain an emerging growth company under the JOBS Act until the earliest of (a) the last day of View's first fiscal year following the fifth anniversary of CF II's IPO, (b) the last date of View's fiscal year in which View has total annual gross revenue of at least $1.07 billion, (c) the date on which View is deemed to be a "large accelerated filer" under the rules of the SEC with at least $700.0 million of outstanding securities held by non-affiliates or (d) the date on which View has issued more than $1.0 billion in non-convertible debt securities during the previous three years.

## Directors and Executive Officers

Information with respect to the Company's directors and executive officers after the Closing is set forth in the proxy statement/prospectus in the sections entitled "Management of Combined Entity Following the Business Combination" beginning on page 241 and "Executive Compensation" beginning on page 246 of the proxy statement/prospectus, which are incorporated herein by reference.

### *Directors*

As previously disclosed, at the Special Meeting, on March 5, 2021, Rao Mulpuri, Tom Cheung, Nigel Gormly, Harold Hughes, Tom Leppert, Toby Cosgrove and Lisa Picard were elected to serve as directors of the Company for a term expiring at the Company's next annual meeting of stockholders. Biographical information for these individuals is set forth in the proxy statement/prospectus in the section entitled "Management of Combined Entity Following the Business Combination" beginning on page 241 of the proxy statement/prospectus, which is incorporated herein by reference. Each of Howard Lutnick, Anshu Jain, Paul Pion, Robert Hochberg and Charlotte Blechman resigned as directors of the Company effective as of the Effective Time.

24

*Independence of Directors*

The board of directors has determined that each of the directors of the Company other than Rao Mulpuri qualify as independent directors, as defined under the listing rules of Nasdaq (the "***Nasdaq listing rules***"), and that the board of directors consists of a majority of "independent directors," as defined under the rules of the SEC and Nasdaq listing rules relating to director independence requirements.

*Committees of the Board of Directors*

The standing committees of the board of directors consist of an audit committee (the "***Audit Committee***"), a compensation committee (the "***Compensation Committee***") and a nominating and corporate governance committee (the "***Nominating Committee***"). Each of the committees reports to the board of directors.

Effective as of the Effective Time, the board of directors appointed Harold Hughes, Nigel Gormly and Tom Leppert to serve on the Audit Committee, with Harold Hughes serving as chair of the Audit Committee. The board of directors appointed Lisa Picard, Toby Cosgrove and Harold Hughes to serve on the Compensation Committee, with Lisa Picard serving as chair of the Compensation Committee. The board of directors appointed Tom Leppert, Toby Cosgrove and Nigel Gormly to serve on the Nominating Committee, with Tom Leppert serving as chair of the Nominating Committee.

*Executive Officers*

In connection with the Business Combination, the board of directors appointed Rao Mulpuri to serve as Chief Executive Officer, Vidul Prakash to serve as Chief Financial Officer, Rahul Bammi to serve as Chief Business Officer, Martin Neumann to serve as Senior Vice President, Operations, Nitesh Trikha to serve as Senior Vice President, IoT Products, Sridhar Kailasam to serve as Senior Vice President, Research & Development, Anshu Pradham to serve as Senior Vice President, Engineering, and Bill Krause to serve as Senior Vice President, General Counsel and Secretary, respectively, effective as of the Effective Time. Biographical information for the new executive officers are set forth in the proxy statement/prospectus in the section entitled "Management of Combined Entity Following the Business Combination" beginning on page 241 of the proxy statement/prospectus, which is incorporated herein by reference.

*Executive Officer and Director Compensation*

The historical compensation for the Company's directors and named executive officers is described in the proxy statement/prospectus in the section entitled "View's Executive Officer and Director Compensation" beginning on page 246 of the proxy statement/prospectus, which is incorporated herein by reference.

**Security Ownership of Certain Beneficial Owners and Management**

The following table sets forth information known to the Company regarding the beneficial ownership of the Company common stock as of the Closing Date by:

- each person who is known by the Company to be the beneficial owner of more than 5% of the outstanding shares of Company common stock;

- each named executive officer and director of the Company; and

- all current executive officers and directors of the Company, as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership percentages set forth in the table below are based on 217,076,713 shares of Company common stock issued and outstanding as of the Closing Date.

Unless otherwise indicated, we believe that all persons named in the table below have sole voting and investment power with respect to the voting securities beneficially owned by them.

25

| Name and Address of Beneficial Owner | Number of Shares of Company Common Stock | % of Outstanding Common Stock |
|---|---|---|
| **Directors and Executive Officers(1)** | | |
| Rao Mulpuri(2) | 8,468,363 | 3.9 |
| Rahul Bammi(3) | 1,450,537 | * |
| Vidul Prakash(4) | 629,689 | * |
| Anshu Pradhan(5) | 629,689 | * |
| Martin Neumann(6) | 299,980 | * |
| Sridhar Kailasam(7) | 293,583 | * |
| Nitesh Trikha(8) | 248,884 | * |
| Bill Krause(9) | 197,638 | * |
| Tom Leppert(10) | 183,680 | * |
| Harold Hughes(11) | 173,800 | * |
| Toby Cosgrove | — | — |
| Lisa Picard | — | — |
| All executive officers and directors as a group (12 individuals) | 12,575,843 | 5.8 |
| **5% or More Shareholders:** | | |
| SVF Excalibur (Cayman) Limited(12) | 66,194,109 | 30.5 |
| Madrone Partners, L.P.(13) | 32,142,010 | 14.8 |
| Guardians of New Zealand Superannuation(14) | 27,183,151 | 12.5 |
| CF Finance Holdings II, LLC(15) | 18,570,000 | 8.6 |
| GIC Private Ltd.(16) | 21,382,056 | 9.9 |

\*       Less than 1%.

(1)    Unless otherwise noted, the business address of each of the following individuals is c/o View, Inc., 195 S. Milpitas Blvd, Milpitas, CA 95035.

(2)    Interests shown consist of (a) options to purchase 8,206,371 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021 and (b) 261,992 shares of Class A Common Stock.

(3)    Interests shown consist of options to purchase 1,450,537 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(4)    Interests shown consist of options to purchase 629,689 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(5)    Interests shown consist of (a) options to purchase 296,642 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021 and (b) 14,532 shares of Class A Common Stock.

(6)    Interests shown consist of (a) options to purchase 296,492 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021 and (b) 3,488 shares of Class A Common Stock.

(7)    Interests shown consist of (a) options to purchase 284,630 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021 and (b) 8,953 shares of Class A Common Stock.

(8)    Interests shown consist of options to purchase 248,884 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(9)    Interests shown consist of options to purchase 197,638 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(10)   Interests shown consist of options to purchase 183,680 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(11)   Interests shown consist of options to purchase 173,800 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021.

(12)   Interests shown consist of (a) 58,694,109 shares of Class A Common Stock issued in exchange for holder's Legacy View shares in the Business Combination, and (b) 7,500,000 shares of Class A Common Stock acquired in the PIPE Investment. The business address of SVF Excalibur (Cayman) Limited is c/o SB Investment Advisers (UK) Limited, 69 Grosvenor Street, London, W1K 3JP, United Kingdom.

26

(13)  Interests shown consist of (a) 25,133,304 shares of Class A Common Stock issued in exchange for holder's Legacy View shares in the Business Combination, (b) warrants to purchase 1,045,542 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021, and (c) 3,750,000 shares of Class A Common Stock acquired in the PIPE Investment. The interests shown also include equity interests owned by View Stakeholders, LLC, an affiliate of Madrone, L.P., consisting of 2,213,164 shares of Class A Common Stock. The business address of both Madrone Partners, L.P. and View Stakeholders, LLC is 3000 Sand Hill Road, Building 1, Suite 150, Menlo Park, CA 94025.

(14)  Interests shown consist of (a) 23,055,670 shares of Class A Common Stock held immediately prior to the Business Combination, (b) warrants to purchase 377,481 shares of Class A Common Stock that are exercisable within 60 days of March 8, 2021, and (c) 3,750,000 shares of Class A Common Stock acquired in the PIPE Investment. The business address of Guardians of New Zealand Superannuation is Level 12, Jarden House, 21 Queen Street, Auckland 1010, New Zealand.

(15)  Interests shown consist of (a) 1,100,000 shares of Class A Common Stock held immediately prior to the Business Combination, (b) 12,470,000 shares of Class A Common Stock issued upon the conversion of CF II Class B Common Stock into Class A Common Stock, and (c) 5,000,000 shares of Class A Common Stock issued to the Sponsor in connection with the PIPE Investment. The business address of CF Finance Holdings II, LLC is 110 East 59th Street, New York, NY 10022.

(16)  Interests shown consist of (a) 5,357,142 shares of Class A Common Stock issued in exchange for holder's Legacy View shares in the Business Combination, and (b) 16,024,914 shares of Class A Common Stock acquired in the PIPE Investment. GIC Private Ltd. is wholly owned by the Government of Singapore and was set up with the sole purpose of managing Singapore's foreign reserves. The Government of Singapore disclaims beneficial ownership of these shares. The business address for GIC Private Ltd. is 168 Robinson Road, #37-01 Capital Tower, Singapore 068912.

**Certain Relationships and Related Transactions**

The certain relationships and related party transactions of the Company are described in the proxy statement/prospectus in the section entitled "Certain Relationships and Related Person Transactions" beginning on page 259 of the proxy statement/prospectus, which is incorporated herein by reference.

**Legal Proceedings**

Information about legal proceedings is set forth in the proxy statement/prospectus in the section entitled "Information About View—Legal Proceedings" on page 214 of the proxy statement/prospectus, which is incorporated herein by reference.

**Market Price of and Dividends on the Registrant's Common Equity and Related Stockholder Matters**

*Market Information and Holders*

The information set forth in the section entitled "Price Range and Dividends of Securities" on page 276 of the proxy statement/prospectus is incorporated herein by reference. Additional information regarding holders of the Company's securities is set forth in the section entitled "Description of Registrant's Securities to be Registered" below.

CF II's units, common stock and warrants were historically quoted on Nasdaq under the symbols "CFIIU", "CFII", and "CFIIW", respectively. On March 9, 2021, the common stock and warrants outstanding after the completion of the Business Combination began trading on Nasdaq under the new trading symbols "VIEW" and "VIEWW," respectively.

In connection with the Closing, all of CF II's outstanding units separated into their component parts of one share of Class A Common Stock and one-third of one warrant to purchase one share of Class A Common Stock at a price of $11.50 per share, and CF II's units ceased trading on Nasdaq.

As of the Closing Date and following the completion of the Business Combination, the Company had 217,076,713 shares of Class A Common Stock issued and outstanding held of record by 51 holders, and 17,033,034 warrants outstanding held of record by 2 holders. The actual number of holders of our Class A Common Stock and warrants is greater than this number of record holders and includes holders who are beneficial owners but whose shares or warrants are held in street name by banks, brokers and other nominees.

27

*Dividends*

The payment of cash dividends in the future will be dependent upon the Company's revenue and earnings, if any, capital requirements and general financial condition. The payment of any cash dividends will be within the discretion of the Company's board of directors.

*Recent Sales of Unregistered Securities*

Reference is made to the disclosure set forth below under Item 3.02 of this Current Report on Form 8-K concerning the issuance and sale by the Company of certain unregistered securities, which is incorporated herein by reference.

**Description of Registrant's Securities to be Registered**

*Common Stock*

A description of the Company common stock is included in the proxy statement/prospectus in the section entitled "Description of Securities After the Business Combination" beginning on page 273 of the proxy statement/prospectus, which is incorporated herein by reference.

*Preferred Stock*

A description of the Company preferred stock is included in the proxy statement/prospectus in the section entitled "Description of Securities After the Business Combination" beginning on page 273 of the proxy statement/prospectus, which is incorporated herein by reference.

*Warrants*

Each warrant that entitles the registered holder to purchase one share of Class A Common Stock at a price of $11.50 per share, subject to adjustment as discussed below, is exercisable at the later of any time commencing 30 days after the consummation of the Business Combination or one year after the closing of the Company's initial public offering. These warrants will expire at 5:00 p.m., New York City time, on the fifth anniversary of the consummation of the Business Combination, or earlier upon redemption or liquidation.

**Indemnification of Directors and Officers**

Information about indemnification of the Company's directors and officers is set forth in the proxy statement/prospectus in the section entitled "Description of Securities After the Business Combination—Limitations on Liability and Indemnification of Officers and Directors" beginning on page 275 of the proxy statement/prospectus, which is incorporated herein by reference.

**Financial Statements and Supplementary Data**

The information set forth in Item 9.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 3.01 Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing**

On the Closing Date, all of CF II's outstanding units separated into their component parts of one share of Class A Common Stock and one-third of one warrant to purchase one share of Class A Common Stock at a price of $11.50 per share, and CF II's units ceased trading on Nasdaq.

**Item 3.02 Unregistered Sales of Equity Securities**

The disclosure set forth in the "Introductory Note" above is incorporated by reference into this Item 3.02.

The securities issued in connection with the PIPE Subscription Agreements have not been registered under the Securities Act of 1933, as amended (the "*Securities Act*") in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act.

**Item 3.03 Material Modification to Rights of Security Holders**

At the Special Meeting, the CF II stockholders considered and approved, among other things, Proposal No. 1-The Pre-Merger Charter Amendment Proposal and Proposal No. 5-The Post-Merger Charter Amendment Proposals, which are described in greater detail in the proxy statement/prospectus beginning on pages 124 and 163, respectively, in the proxy statement/prospectus.

On March 5, 2021, following the Special Meeting, the certificate of incorporation of the Company was amended to increase the authorized share capital of the Company as authorized by the Pre-Merger Charter Amendment Proposal. On March 8, 2021, the certificate of incorporation of the Company was amended and restated (as amended and restated, the "***Certificate of Incorporation***"), and filed with the Secretary of State of the State of Delaware, upon which it became effective. The Certificate of Incorporation includes the amendments proposed by Proposal No. 5-The Post-Merger Charter Amendment Proposals, as described beginning on page 163 of the proxy statement/prospectus. On December 23, 2020, the board approved and adopted the Amended and Restated Bylaws of the Company (the "Bylaws"), which became effective as of the Effective Time.

Copies of the Certificate of Incorporation and the Bylaws are attached hereto as Exhibits 3.3 and 3.5, respectively, and are incorporated herein by reference.

The description of the Certificate of Incorporation, the Bylaws and the general effect of the Certificate of Incorporation and the Bylaws upon the rights of holders of the Company's capital stock are included in the proxy statement/prospectus under the section titled "Description of Securities After the Business Combination" beginning on page 273 of the proxy statement/prospectus is incorporated herein by reference.

**Item 4.01 Changes in Registrant's Certifying Accountant**

On March 12, 2021, the Audit Committee of the Board of Directors of the Company dismissed WithumSmith+Brown, PC ("***Withum***"), who served as the Company's independent registered public accounting firm prior to the Business Combination, and approved the engagement of PricewaterhouseCoopers LLP ("***PwC***") as the Company's independent registered public accounting firm to audit the Company's consolidated financial statements for the year ended December 31, 2020. PwC previously served as the independent registered public accounting firm for Legacy View, which was acquired by the Company on March 8, 2021.

Withum's report on the Company's financial statements as of March 31, 2020 and for the period from September 27, 2019 (inception) until March 31, 2020 did not contain an adverse opinion or disclaimer of opinion, nor were such reports qualified or modified as to uncertainty, audit scope or accounting principles. During the period of Withum's engagement by the Company, there were no disagreements with Withum on any matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements if not resolved to the satisfaction of Withum, would have caused it to make a reference to the subject matter of the disagreement in connection with its reports covering such periods. In addition, no "reportable events," as described in Item 304(a)(1)(v) of Regulation S-K, occurred within the period of Withum's engagement and subsequent interim period preceding Withum's dismissal.

During the period from September 27, 2019 (the Company's inception) through March 12, 2021, neither the Company nor anyone on its behalf consulted PwC regarding either: (i) the application of accounting principles to a specified transaction, either completed or proposed; or the type of audit opinion that might be rendered on the Company's financial statements, and neither a written report was provided to the Company or oral advice was provided that PwC concluded was an important factor considered by the Company in reaching a decision as to the accounting, auditing, or financial reporting issue; or (ii) any matter that was the subject of a disagreement (as described in Item 304(a)(1)(iv) of Regulation S-K) or a "reportable event," as described in Item 304(a)(1)(v) of Regulation S-K.

The Company provided Withum with a copy of the disclosures made pursuant to this Item 4.01 prior to the filing of this Current Report on Form 8-K and requested that Withum furnish a letter addressed to the Securities and Exchange Commission, as required by Item 304(a)(3) of Regulation S-K, which is attached hereto as Exhibit 16.1, stating whether it agrees with such disclosures, and if not, stating the respects in which it does not agree.

**Item 5.01 Changes in Control of the Registrant**

The information set forth in the section entitled "Introductory Note" and in the section entitled "Security Ownership of Certain Beneficial Owners and Management" in Item 2.01 of this Current Report on Form 8-K is incorporated herein by reference. The information set forth under in the section entitled "The Business Combination Proposal" beginning on page 125 of the proxy statement/prospectus and "Introductory Note" and Item 2.01 in this Current Report on Form 8-K is incorporated herein by reference.

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

The information set forth in the sections entitled "Directors and Executive Officers" and "Certain Relationships and Related Transactions" in Item 2.01 of this Current Report on Form 8-K is incorporated herein by reference.

**View, Inc. 2021 Equity Incentive Plan and Officer Awards**

As previously disclosed at the Special Meeting, the stockholders of CF II considered and approved the View, Inc. 2021 Equity Incentive Plan (the "*2021 Equity Incentive Plan*"). The 2021 Equity Incentive Plan was approved, subject to stockholder approval, by the board of directors on November 29, 2020. The 2021 Equity Incentive Plan became effective immediately upon the Closing.

A description of the 2021 Equity Incentive Plan is included in the proxy statement/prospectus in the section entitled "The 2021 Equity Incentive Plan Proposal" beginning on page 167 of the proxy statement/prospectus, which is incorporated herein by reference. The foregoing description of the 2021 Equity Incentive Plan is qualified in its entirety by the full text of the 2021 Equity Incentive Plan, which is attached hereto as Exhibit 10.6 and incorporated herein by reference.

Following the Effective Time, View's executive officers were granted performance-based restricted stock units for shares of Class A Common Stock of the Company ("*Officer RSUs*") and options to purchase Class A Common Stock of the Company ("*Officer Options*" and together with the Officer RSUs, the "*Officer Awards*") under the 2021 Equity Incentive Plan in the amounts set forth next to each executive officer's name in the table below.

| Executive Officer | Officer Options (#) | Officer RSUs (#) |
|---|---|---|
| Rao Mulpuri | 0 | 7,500,000 |
| Rahul Bammi | 700,000 | 700,000 |
| Vidul Prakash | 1,000,000 | 1,000,000 |
| Anshu Pradhan | 700,000 | 700,000 |
| Martin Neumann | 700,000 | 700,000 |
| Sridhar Kailasam | 700,000 | 700,000 |
| Nitesh Trikha | 700,000 | 700,000 |
| Bill Krause | 500,000 | 500,000 |

The Officer RSUs are subject to time- and performance-based vesting conditions. The Officer RSUs time-vest over a four (4)-year period beginning on the Closing Date and performance-vest subject to the following conditions being met during such period: (i) fifty percent (50%) of the Officer RSUs subject to each award vests if the average closing stock price of shares of the Company's Class A Common Stock equals or exceeds $15.00 over a sixty (60) trading day period at any time during the four (4)-year vesting period; and (ii) one hundred percent (100%) of the Officer RSUs subject to each award will be deemed earned if the average closing stock price of shares of Class A Common Stock equals or exceeds $20.00 over a sixty (60) trading day period at any time during the four (4)-year vesting period.

The Officer Options vest as to twenty-five percent (25%) of the shares subject to each executive officer's grant of Officer Options on the twelve (12) month anniversary of the Closing Date, and the remaining seventy-five percent (75%) of the shares subject to each Officer Option vests on a monthly basis over the following thirty-six (36) months.

For further details about the Officer Awards, see "2021 Equity Incentive Plan Proposal — New Plan Benefits" beginning on page 176 of the proxy statement/prospectus, which is incorporated herein by reference.

30

**View, Inc. 2021 Chief Executive Officer Incentive Plan and CEO Option Award**

As previously disclosed at the Special Meeting, the stockholders of CF II considered and approved the View, Inc. 2021 Chief Executive Officer Incentive Plan (the "***CEO Incentive Plan***"). The CEO Incentive Plan was approved, subject to stockholder approval, by the board of directors on November 29, 2020. The CEO Incentive Plan became effective immediately upon the Closing.

A description of the CEO Incentive Plan is included in the proxy statement/prospectus in the section entitled "The CEO Incentive Plan Proposal" beginning on page 179 of the proxy statement/prospectus, which is incorporated herein by reference. The foregoing description of the CEO Incentive Plan is qualified in its entirety by the full text of the CEO Incentive Plan, which is attached hereto as Exhibit 10.7 and incorporated herein by reference.

Following the Effective Time, Rao Mulpuri received an option to purchase 25,000,000 shares of Class A Common Stock of the Company at an exercise price of $10.00 per share under the CEO Incentive Plan (the "***CEO Option Award***"), which vests and becomes exercisable upon satisfaction of the performance conditions set forth in the table below, contingent upon Dr. Mulpuri's continued employment as Chief Executive Officer or as Executive Chairman of the Company on each such vesting date. If Dr. Mulpuri is still employed by the Company in a role other than the specified roles above, the option shares will no longer be able to vest under the option award, but Dr. Mulpuri can continue to hold unexercised vested option shares for the full term of the CEO Option Award.

| Tranche | Option Shares (#) | Average Trading Price per Share of the Combined Entity ($) |
|---|---|---|
| 1 | 2,500,000 | 20.00 |
| 2 | 2,500,000 | 30.00 |
| 3 | 2,500,000 | 40.00 |
| 4 | 2,500,000 | 50.00 |
| 5 | 2,500,000 | 60.00 |
| 6 | 2,500,000 | 70.00 |
| 7 | 2,500,000 | 80.00 |
| 8 | 2,500,000 | 90.00 |
| 9 | 2,500,000 | 100.00 |
| 10 | 2,500,000 | 110.00 |

For further details about the CEO Option Award, see "CEO Incentive Plan Proposal — New Plan Benefits" beginning on page 182 of the proxy statement/prospectus, which is incorporated herein by reference.

**Item 5.03 Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year.**

The information set forth in Item 3.03 of this Current Report on Form 8-K is incorporated herein by reference.

On March 8, 2021, the Board of Directors determined to change the Company's fiscal year end from March 31 of each year to December 31 of each year. The determination was made to align the Company's fiscal year end with that of Legacy View.

**Item 5.05 Amendments to the Registrant's Code of Ethics, or Waiver of a Provision of the Code of Ethics.**

In connection with the Business Combination, on March 8, 2021, the board approved and adopted a new Code of Ethics applicable to all employees, officers and directors of the Company. A copy of the Code of Ethics can be found at https://investors.view.com/corporate-governance/governance-overview.

**Item 5.06 Change in Shell Company Status**

As a result of the Merger, which fulfilled the definition of a business combination as required by the Amended and Restated Certificate of Incorporation of the Company, as in effect immediately prior to the Closing, the Company ceased to be a shell company (as defined in Rule 12b-2 of the Exchange Act) as of the Closing. A description of the Business Combination and the terms of the Merger Agreement are included in the proxy statement/prospectus under the section entitled "The Business Combination Proposal" beginning on page 125 of the proxy statement/prospectus and in the information set forth under "Introductory Note" and in the information set forth under Item 2.01 in this Current Report on Form 8-K, which are incorporated herein by reference.

**Item 9.01 Financial Statements and Exhibits**

**(a)    Financial Statements of Businesses Acquired.**

The audited consolidated financial statements and the related notes thereto of View Operating Corporation (formerly known as View, Inc.) as of December 31, 2020 and 2019 and for the years then ended are set forth in Exhibit 99.1 hereto.

**(b)    Pro Forma Financial Information.**

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 and the unaudited pro forma condensed combined statements of operations for the year ended March 31, 2020 and the nine months ended December 31, 2020 are set forth in Exhibit 99.2 hereto and are incorporated herein by reference.

**(c)    Exhibits.**

| Exhibit No. | Description |
|---|---|
| 1.1 | Business Combination Marketing Agreement, dated August 26, 2020, between CF Finance Acquisition Corp. II and Cantor Fitzgerald & Co. (incorporated by reference to Exhibit 1.2 to CF II's Form 8-K, filed with the SEC on September 1, 2020). |
| 2.1† | Agreement and Plan of Merger, dated as of November 30, 2020, by and among CF Finance Acquisition Corp. II, CF II, PVMS Merger Sub, Inc., and View, Inc. (incorporated by reference to Exhibit 2.1 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on February 11, 2021). |
| 3.1 | Amended and Restated Certificate of Incorporation of CF Finance Acquisition Corp. II (incorporated by reference to Exhibit 3.1 to CF Finance Acquisition Corp. II's Form 8-K, filed with the SEC on September 1, 2020). |
| 3.2* | Amendment to Amended and Restated Certificate of Incorporation of CF Finance Acquisition Corp. II. |
| 3.3* | Amended and Restated Certificate of Incorporation of View, Inc. |
| 3.4 | Bylaws of CF Finance Acquisition Corp. II (incorporated by reference to Exhibit 3.4 to CF Finance Acquisition Corp. II's Form S-1, filed with the SEC on August 7, 2020). |
| 3.5* | Amended and Restated Bylaws of View, Inc. |
| 4.1 | Warrant Agreement, dated August 26, 2020, between Continental Stock Transfer & Trust Company and CF Finance Acquisition Corp. II (incorporated by reference to Exhibit 4.1 to CF Finance Acquisition Corp. II's Form 8-K, filed with the SEC on September 1, 2020). |
| 4.2 | Specimen Warrant Certificate (incorporated by reference to Exhibit 4.3 to CF Finance Acquisition Corp. II's Registration Statement on Form S-1, filed with the SEC on August 14, 2020). |
| 10.1 | Form of Subscription Agreement, by and between CF Finance Acquisition Corp. II, and the undersigned subscriber thereto (incorporated by reference to Exhibit 10.1 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on February 11, 2021). |
| 10.2 | Form of Lock-Up Agreement, by and among CF Finance Acquisition Corp. II, View, Inc., and the undersigned holder thereto (incorporated by reference to Exhibit 10.4 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on February 11, 2021). |

| | |
|---|---|
| 10.3 | Registration Rights Agreement, by and among CF Finance Acquisition Corp. II, and the undersigned investors listed thereto (incorporated by reference to Exhibit 10.5 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on February 11, 2021). |
| 10.4 | Registration Rights Agreement, dated as of August 26, 2020, by and among CF Finance Acquisition Corp. II, CF Finance Holdings II, LLC and the other parties thereto (incorporated by reference to Exhibit 10.3 to CF Finance Acquisition Corp. II's Form 8-K, filed with the SEC on September 1, 2020). |
| 10.5* | First Amendment to Registration Rights Agreement, by and among CF Finance Acquisition Corp. II, CF Finance Holdings II, LLC and the undersigned investors listed thereto. |
| 10.6* | 2021 Equity Incentive Plan. |
| 10.7* | 2021 Chief Executive Officer Incentive Plan. |
| 10.8 | Form of Director Indemnification Agreement, by and between View, Inc. and the undersigned director thereto (incorporated by reference to Exhibit 10.8 to CF Finance Acquisition Corp. II's S-4, filed with the SEC on December 23, 2020). |
| 10.9 | Form of Executive Officer Employment Agreement, by and between View, Inc. and the undersigned executive officer thereto (incorporated by reference to Exhibit 10.9 to CF Finance Acquisition Corp. II's S-4, filed with the SEC on December 23, 2020). |
| 10.10 | Employment Agreement, dated November 21, 2018, by and between View. Inc. and Rao Mulpuri (incorporated by reference to Exhibit 10.10 to CF Finance Acquisition Corp. II's S-4, filed with the SEC on December 23, 2020). |
| 10.11 | Industrial Lease Agreement, dated May 31, 2012, by and between the Company and Bryan Family Partnership II, LTD (incorporated by reference to Exhibit 10.13 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.12 | First Amendment to Industrial Lease Agreement, dated October 7, 2014, by and between the Company and 195 S. Milpitas Boulevard, LLC (incorporated by reference to Exhibit 10.14 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.13 | Second Amendment to Industrial Lease Agreement, dated October 2, 2017, by and between the Company and Jefferson Fields, LLC (incorporated by reference to Exhibit 10.15 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.14 | Industrial Lease Agreement, dated July 30, 2010, by and between Soladigm Inc. and Industrial Developments International, Inc. (incorporated by reference to Exhibit 10.16 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.15 | First Amendment To Industrial Lease Agreement, dated September 10, 2015, by and between the Company and Industrial North American Properties XI, LLC (incorporated by reference to Exhibit 10.17 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.16 | Second Amendment to Industrial Lease Agreement, dated March 1, 2018, by and between the Company and Industrial North American Properties XI, LLC (incorporated by reference to Exhibit 10.18 to CF Finance Acquisition Corp. II's S-4/A, filed with the SEC on January 26, 2021). |
| 10.17 | Subscription Agreement, by and between CF Finance Acquisition Corp. II and the Subscriber named therein (incorporated by reference to Exhibit 10.1 to CF Finance Acquisition Corp. II's Form 8-K, filed with the SEC on January 11, 2021). |
| 16.1* | Letter from WithumSmith+Brown, PC to the Securities and Exchange Commission, dated March 12, 2021. |
| 21.1* | List of Subsidiaries |
| 99.1* | Audited consolidated financial statements of View Operating Corporation (formerly known as View, Inc.) as of December 31, 2020 and 2019 and for the years then ended. |
| 99.2* | Unaudited pro forma condensed combined financial information of the Company as of December 31, 2020 and for the nine months then ended and for the twelve months ended March 31, 2020. |

\*    Filed herewith

†    Certain exhibits and schedules to this Exhibit have been omitted in accordance with Regulation S-K Item 601(b)(2).

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**VIEW, INC.**

By: /s/ Vidul Prakash
      Name:  Vidul Prakash
      Title:    Chief Financial Officer

Dated: March 12, 2021

34

**CERTIFICATE OF AMENDMENT**
**TO**
**THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**
**OF**
**CF FINANCE ACQUISITION CORP. II**

**CF Finance Acquisition Corp. II**, a corporation organized and existing under the laws of the State of Delaware (the "***Corporation***"), does hereby certify as follows as of March 5, 2021:

1.   The name of the Corporation is "CF Finance Acquisition Corp. II".

2.   The original Certificate of Incorporation of the Corporation was filed with the Secretary of State of the State of Delaware on September 27, 2019 (the "***Original Certificate***"). The first certificate of amendment of the Original Certificate was filed with the Secretary of State of the State of Delaware on June 25, 2020. The Original Certificate was amended and restated in its entirety by the Amended and Restated Certificate of Incorporation of the Corporation filed with the Secretary of State of the State of Delaware on August 26, 2020 (the "***Restated Certificate***").

3.   The Board of Directors of the Corporation, acting in accordance with the provisions of Sections 141 and 242 of the General Corporation Law of the State of Delaware ("***DGCL***"), adopted resolutions amending the Restated Certificate as follows:

   a.      Section 4.1 of Article IV of the Restated Certificate is hereby amended and restated to read in its entirety as follows:

   "Section 4.1 Authorized Capital Stock. The total number of shares of all classes of capital stock, each with a par value of $0.0001 per share, which the Corporation is authorized to issue is 421,000,000 shares, consisting of (a) 420,000,000 shares of common stock (the "***Common Stock***"), including (i) 400,000,000 shares of Class A Common Stock (the "***Class A Common Stock***"), and (ii) 20,000,000 shares of Class B Common Stock (the "***Class B Common Stock***"), and (b) 1,000,000 shares of preferred stock (the "***Preferred Stock***")."

4.   This Certificate of Amendment was submitted to the stockholders of the Corporation for their approval and was duly adopted by the stockholders of the Corporation in accordance with the provisions of Sections 228 and 242 of the DGCL.

*{signature page follows}*

**IN WITNESS WHEREOF**, the Corporation has caused this Certificate of Amendment to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

**CF FINANCE ACQUISITION CORP. II**

By: /s/ Alice Chan
      Name: Alice Chan
      Title:  Chief Financial Officer

*[Signature Page to Certificate of Amendment to Amended and Restated Certificate of Incorporation of CF Finance Acquisition Corp. II]*

AMENDED AND RESTATED
CERTIFICATE OF INCORPORATION
OF
CF FINANCE ACQUISITION CORP. II
March 8, 2021

CF Finance Acquisition Corp. II, a corporation organized and existing under the laws of the State of Delaware, does hereby certify as follows:

(1) The name of the corporation is "CF Finance Acquisition Corp. II". The original certificate of incorporation of the corporation was filed with the office of the Secretary of State of the State of Delaware on September 27, 2019.

(2) This Amended and Restated Certificate of Incorporation (the "A&R Certificate"), which both restates and amends the provisions of the Original Certificate, was duly adopted in accordance with Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware, as amended from time to time (the "DGCL").

(3) This A&R Certificate shall become effective on the date of filing with the Secretary of State of the State of Delaware.

(4) The text of the Original Certificate is hereby restated and amended in its entirety to read as follows:

FIRST: The name of the corporation is View, Inc. (the "Corporation").

SECOND: The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle, State of Delaware, 19801. The name of its registered agent at that address is The Corporation Trust Company.

THIRD: The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware (the "DGCL").

FOURTH: (a) <u>Authorized Capital Stock</u>. The total number of shares of all classes of stock which the Corporation shall have authority to issue is 601,000,000, which shall be divided into two classes as follows:

600,000,000 shares of Class A common stock, par value $0.0001 per share (the "Common Stock"), and 1,000,000 shares of preferred stock, par value $0.0001 per share (the "Preferred Stock").

(b) <u>Common Stock</u>. The powers, preferences and rights, and the qualifications, limitations and restrictions, of each class of the Common Stock are as follows:

(1) <u>Voting</u>. Except as otherwise expressly required by law or provided in this A&R Certificate, and subject to any voting rights provided to holders of Preferred Stock at any time outstanding, the holders of any outstanding shares of Common Stock shall vote together as a single class on all matters with respect to which stockholders are entitled to vote under applicable law, this A&R Certificate or the Bylaws of the Corporation, or upon which a vote of stockholders is otherwise duly called for by the Corporation. At each annual or special meeting of stockholders, each holder of record of shares of Common Stock on the relevant record date shall be entitled to cast one vote in person or by proxy for each share of the Common Stock standing in such holder's name on the stock transfer records of the Corporation.

(2) <u>No Cumulative Voting</u>. Holders of shares of Common Stock shall not have cumulative voting rights.

(3) <u>Dividends; Stock Splits</u>. Subject to the rights of the holders of Preferred Stock, and subject to any other provisions of this A&R Certificate, as it may be amended from time to time, holders of shares of Common Stock shall be entitled to receive such dividends and other distributions in cash, stock or property of the Corporation when, as and if declared thereon by the Board of Directors from time to time out of assets or funds of the Corporation legally available therefor.

(4) <u>Liquidation, Dissolution, etc.</u> In the event of any liquidation, dissolution or winding up (either voluntary or involuntary) of the Corporation, the holders of shares of Common Stock shall be entitled to receive the assets and funds of the Corporation available for distribution after payments to creditors and to the holders of any Preferred Stock of the Corporation that may at the time be outstanding, in proportion to the number of shares held by them, respectively.

(5) <u>Merger, etc.</u> In the event of a merger or consolidation of the Corporation with or into another entity (whether or not the Corporation is the surviving entity), the holders of each share of Common Stock shall be entitled to receive the same per share consideration on a per share basis.

(6) <u>No Preemptive or Subscription Rights</u>. No holder of Common Stock shall be entitled to preemptive or subscription rights.

(c) <u>Preferred Stock</u>. The Board of Directors is hereby expressly authorized to provide for the issuance of all or any shares of the Preferred Stock in one or more classes or series, and to fix for each such class or series such voting powers, full or limited, or no voting powers, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issuance of such class or series, including, without limitation, the authority to provide that any such class or series may be (i) subject to redemption at such time or times and at such price or prices; (ii) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or any other series; (iii) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; or (iv) convertible into, or exchangeable for, shares of any other class or classes of stock, or of any other series of the same or any other class or classes of stock, of the Corporation at such price or prices or at such rates of exchange and with such adjustments; all as may be stated in such resolution or resolutions.

(d) <u>Power to Sell and Purchase Shares</u>. Subject to the requirements of applicable law, the Corporation shall have the power to issue and sell all or any part of any shares of any class of stock herein or hereafter authorized to such persons, and for such consideration, as the Board of Directors shall from time to time, in its discretion, determine, whether or not greater consideration could be received upon the issue or sale of the same number of shares of another class, and as otherwise permitted by law. Subject

to the requirements of applicable law, the Corporation shall have the power to purchase any shares of any class of stock herein or hereafter authorized from such persons, and for such consideration, as the Board of Directors shall from time to time, in its discretion, determine, whether or not less consideration could be paid upon the purchase of the same number of shares of another class, and as otherwise permitted by law.

FIFTH: The following provisions are inserted for the management of the business and the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders.

(a) The Business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.

(b) The Board of Directors shall consist of not less than one or more than eleven members, the exact number of which shall be fixed from time to time by resolution adopted by the affirmative vote of a majority of the entire Board of Directors, which number shall initially be seven.

(c) A director shall hold office until the annual meeting for the year in which his or her term expires and until his or her successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office.

(d) Subject to the terms of any one or more classes or series of Preferred Stock, any vacancy on the Board of Directors that results from an increase in the number of directors may be filled by a majority of the Board of Directors then in office, provided that a quorum is present, and any other vacancy occurring on the Board of Directors may be filled by a majority of the Board of Directors then in office, even if less than a quorum, or by a sole remaining director. Any director elected to fill a vacancy shall hold office until the next annual meeting and until his or her successor shall be elected and shall qualify, subject, however, to prior death, resignation, retirement, disqualification or removal from office. Subject to the rights, if any, of the holders of shares of Preferred Stock then outstanding, any or all of the directors of the Corporation may be removed from office at any time, but only for cause and only by the affirmative vote of the holders of at least a majority of the voting power of the Corporation's then outstanding capital stock entitled to vote generally in the election of directors. Notwithstanding the foregoing, whenever the holders

of any one or more classes or series of Preferred Stock issued by the Corporation shall have the right, voting separately by class or series, to elect directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this A&R Certificate applicable thereto.

(e) In addition to the powers and authority hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation, subject, nevertheless, to the provisions of the DGCL, this A&R Certificate, and any Bylaws adopted by the stockholders; provided, however, that no Bylaws hereafter adopted by the stockholders shall invalidate any prior act of the directors which would have been valid if such Bylaws had not been adopted.

SIXTH: No director shall be personally liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the DGCL as the same exists or may hereafter be amended. If the DGCL is amended hereafter to authorize the further elimination or limitation of the liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent authorized by the DGCL, as so amended. Any repeal or modification of this Article SIXTH shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

SEVENTH: The Corporation shall indemnify its directors and officers to the fullest extent authorized or permitted by law, as now or hereafter in effect, and such right to indemnification shall continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of his or her heirs, executors and personal and legal representatives; provided, however, that, except for proceedings to enforce rights to indemnification, the Corporation shall not be obligated to indemnify any director or officer (or his or her heirs, executors or personal or legal representatives) in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board of Directors. The right to indemnification conferred by this Article SEVENTH shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition.

The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and to the advancement of expenses to employees and agents of the Corporation similar to those conferred in this Article SEVENTH to directors and officers of the Corporation.

The rights to indemnification and to the advance of expenses conferred in this Article SEVENTH shall not be exclusive of any other right which any person may have or hereafter acquire under this A&R Certificate, the Bylaws of the Corporation, any statute, agreement, vote of stockholders or disinterested directors or otherwise.

Any repeal or modification of this Article SEVENTH shall not adversely affect any rights to indemnification and to the advancement of expenses of a director or officer of the Corporation existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

EIGHTH: Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation, and the ability of the stockholders to consent in writing to the taking of any action is hereby specifically denied.

NINTH: Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the DGCL) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

TENTH: In furtherance and not in limitation of the powers conferred upon it by the laws of the State of Delaware, the Board of Directors shall have the power to adopt, amend, alter or repeal the Corporation's Bylaws. The affirmative vote of at least a majority of the entire Board of Directors shall be required to adopt, amend, alter or repeal the Corporation's Bylaws. The Corporation's Bylaws also may be adopted, amended, altered or repealed by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the shares entitled to vote at an election of directors.

ELEVENTH: Forum for Adjudication of Certain Disputes. Unless the Corporation consents in writing to the selection of an alternative forum (an "Alternative Forum Consent"), the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a duty (including any fiduciary duty) owed by any current or former director, officer, stockholder, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the Corporation arising out of or relating to any provision of the General Corporation Law of Delaware or the Corporation's Certificate of Incorporation or Bylaws (each, as in effect from time to time), or (iv) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the Corporation governed by the internal affairs doctrine of the State of Delaware; provided, however, that, in the event that the Court of Chancery of the State of Delaware lacks subject matter jurisdiction over any such action or proceeding, the sole and exclusive forum for such action or proceeding shall be another state or federal court located within the State of Delaware, in each such case, unless the Court of Chancery (or such other state or federal court located within the State of Delaware, as applicable) has dismissed a prior action by the same plaintiff asserting the same claims because such court lacked personal jurisdiction over an indispensable party named as a defendant therein. Unless the Corporation gives an Alternative Forum Consent, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. Failure to enforce the foregoing provisions would cause the Corporation irreparable harm and the Corporation shall be entitled to equitable relief, including injunctive relief and specific performance, to enforce the foregoing provisions. Any person or entity purchasing, otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article

ELEVENTH. The existence of any prior Alternative Forum Consent shall not act as a waiver of the Corporation's ongoing consent right as set forth above in this Article ELEVENTH with respect to any current or future actions or claims.

TWELFTH: The Corporation reserves the right to amend, alter, change or repeal any provision contained in this A&R Certificate in the manner now or hereafter prescribed in this A&R Certificate, the Corporation's Bylaws or the DGCL, and all rights herein conferred upon stockholders are granted subject to such reservation; provided, however, that, notwithstanding any other provision of this A&R Certificate (and in addition to any other vote that may be required by law), the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the shares entitled to vote at an election of directors shall be required to amend, alter, change or repeal, or to adopt any provision as part of this A&R Certificate inconsistent with the purpose and intent of Articles FIFTH, EIGHTH and TENTH of this A&R Certificate or this Article TWELFTH.

IN WITNESS WHEREOF, the Corporation has caused this A&R Certificate to be duly executed and acknowledged in its name and on its behalf by an authorized officer as of the date first set forth above.

By: /s/ Bill Krause

Name: Bill Krause
Title: Senior Vice President
General Counsel & Secretary

*(Signature Page to Amended and Restated Certificate of Incorporation)*

AMENDED AND RESTATED
BYLAWS

OF

VIEW, INC.

A Delaware Corporation

Effective March 8, 2021

**TABLE OF CONTENTS**

<u>Page</u>

ARTICLE I

OFFICES

Section 1.    Registered Office                                                    1
Section 2.    Other Offices                                                        1

ARTICLE II

MEETINGS OF STOCKHOLDERS

Section 1.    Place of Meetings                                                    1
Section 2.    Annual Meetings                                                      1
Section 3.    Special Meetings                                                     2
Section 4.    Notice                                                               2
Section 5.    Adjournments and Postponements                                      2
Section 6.    Quorum                                                              3
Section 7.    Voting                                                               3
Section 8.    Proxies                                                              4
Section 9.    Remote Communication.                                               5
Section 10.   List of Stockholders Entitled to Vote                               5
Section 11.   Record Date                                                         6
Section 12.   Stock Ledger                                                         7
Section 13.   Conduct of Meetings                                                 7
Section 14.   Inspectors of Election                                              8
Section 15.   Nature of Business at Meetings of Stockholders                      8
Section 16.   Nomination of Directors                                             11

ARTICLE III

DIRECTORS

Section 1.    Number and Election of Directors                                    15
Section 2.    Vacancies                                                           16
Section 3.    Duties and Powers                                                   16
Section 4.    Meetings                                                            16
Section 5.    Organization                                                        17
Section 6.    Resignations and Removals of Directors                              17
Section 7.    Quorum                                                              18
Section 8.    Actions of the Board by Written Consent                             18
Section 9.    Meetings by Means of Conference Telephone                           19
Section 10.   Committees                                                          19
Section 11.   Subcommittees                                                       20
Section 12.   Compensation                                                        20
Section 13.   Interested Directors                                               20

i

ARTICLE IV

OFFICERS

| Section 1. | General | 21 |
| Section 2. | Election | 21 |
| Section 3. | Voting Securities Owned by the Corporation | 22 |
| Section 4. | Chairman of the Board of Directors | 22 |
| Section 5. | President | 22 |
| Section 6. | Vice Presidents | 23 |
| Section 7. | Secretary | 23 |
| Section 8. | Treasurer | 24 |
| Section 9. | Assistant Secretaries | 24 |
| Section 10. | Assistant Treasurers | 25 |
| Section 11. | Other Officers | 25 |

ARTICLE V

STOCK

| Section 1. | Shares of Stock | 25 |
| Section 2. | Signatures | 26 |
| Section 3. | Lost Certificates | 26 |
| Section 4. | Transfers | 26 |
| Section 5. | Dividend Record Date | 27 |
| Section 6. | Record Owners | 27 |
| Section 7. | Transfer and Registry Agents | 27 |

ARTICLE VI

NOTICES

| Section 1. | Notices | 28 |
| Section 2. | Waivers of Notice | 29 |

ARTICLE VII

GENERAL PROVISIONS

| Section 1. | Dividends | 29 |
| Section 2. | Disbursements | 30 |
| Section 3. | Fiscal Year | 30 |
| Section 4. | Corporate Seal | 30 |

ii

ARTICLE VIII

INDEMNIFICATION

ARTICLE IX

FORUM FOR ADJUDICATION OF CERTAIN DISPUTES

Section 1.   Forum for Adjudication of Certain Disputes                                     31

ARTICLE X

AMENDMENTS

Section 1.   Amendments                                                                    32
Section 2.   Entire Board of Directors                                                     32

iii

BYLAWS

OF

VIEW, INC.

(hereinafter called the "Corporation")

ARTICLE I

OFFICES

Section 1. Registered Office. The registered office of the Corporation within the State of Delaware shall be located at the office of the corporation or individual acting as the Corporation's registered agent in Delaware.

Section 2. Other Offices. The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine.

ARTICLE II

MEETINGS OF STOCKHOLDERS

Section 1. Place of Meetings. Meetings of the stockholders for the election of directors or for any other purpose shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors. The Board of Directors may, in its sole discretion, determine that a meeting of the stockholders shall not be held at any place, but may instead be held solely by means of remote communication as described in Section 10 of these Bylaws in accordance with by Section 211(a)(2) of the General Corporation Law of the State of Delaware (the "DGCL").

Section 2. Annual Meetings. The Annual Meeting of Stockholders for the election of directors shall be held on such date and at such time as shall be designated from time to time by the Board of Directors. Any other proper business may be transacted at the Annual Meeting of Stockholders.

1

Section 3. Special Meetings. Unless otherwise required by law or by the certificate of incorporation of the Corporation, as amended and restated from time to time (the "Certificate of Incorporation"), Special Meetings of Stockholders, for any purpose or purposes, may be called by either (i) the Chairman of the Board of Directors, if there be one, or (ii) the President, (iii) any Vice President, if there be one, (iv) the Secretary or (v) any Assistant Secretary, if there be one, and shall be called by any such officer at the request in writing of (i) the Board of Directors, (ii) a committee of the Board of Directors that has been duly designated by the Board of Directors and whose powers and authority include the power to call such meetings or (iii) stockholders owning a majority of the capital stock of the Corporation issued and outstanding and entitled to vote on the matter for which such Special Meeting of Stockholders is called. Such request shall state the purpose or purposes of the proposed meeting. At a Special Meeting of Stockholders, only such business shall be conducted as shall be specified in the notice of meeting (or any supplement thereto).

Section 4. Notice. Whenever stockholders are required or permitted to take any action at a meeting, a notice of the meeting, in the form of a writing or electronic transmission, shall be given which shall state the place, if any, date and hour of the meeting, the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders entitled to vote at such meeting, if such date is different from the record date for determining stockholders entitled to notice of such meeting and, in the case of a Special Meeting, the purpose or purposes for which the meeting is called. Unless otherwise required by law, notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting as of the record date for determining stockholders entitled to notice of such meeting.

Section 5. Adjournments and Postponements. Any meeting of the stockholders may be adjourned or postponed from time to time by the chairman of such meeting or by the Board of Directors, without the need for approval thereof by stockholders to reconvene or convene, respectively at the same or some other place. Notice need not be given of any such adjourned or postponed meeting if the

2

time and place, if any, thereof, and the means of remote communications, if any, by which stockholders and proxy holders may be deemed to be present in person and vote at such adjourned or postponed meeting are announced at the meeting at which the adjournment is taken or, with respect to a postponed meeting, are publicly announced. At the adjourned or postponed meeting, the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment or postponement is for more than thirty (30) days, notice of the adjourned or postponed meeting in accordance with the requirements of Section 4 hereof shall be given to each stockholder of record entitled to vote at the meeting. If, after the adjournment or postponement, a new record date for stockholders entitled to vote is fixed for the adjourned or postponed meeting, the Board of Directors shall fix a new record date for notice of such adjourned or postponed meeting in accordance with Section 11 hereof, and shall give notice of the adjourned or postponed meeting to each stockholder of record entitled to vote at such adjourned or postponed meeting as of the record date fixed for notice of such adjourned or postponed meeting.

Section 6. <u>Quorum</u>. Unless otherwise required by the DGCL or other applicable law or the Certificate of Incorporation, the holders of a majority of the Corporation's capital stock issued and outstanding and entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business. A quorum, once established, shall not be broken by the withdrawal of enough votes to leave less than a quorum. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, in the manner provided in Section 5 hereof, until a quorum shall be present or represented.

Section 7. <u>Voting</u>. Unless otherwise required by law, the Certificate of Incorporation or these Bylaws, or permitted by the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading, any question brought before any meeting of the stockholders, other than the election of directors, shall be decided by the vote of the holders of a majority of the total number of votes of the Corporation's capital stock present

3

at the meeting in person or represented by proxy and entitled to vote on such question, voting as a single class. Unless otherwise provided in the Certificate of Incorporation, and subject to Section 11(a) of this Article II, each stockholder represented at a meeting of the stockholders shall be entitled to cast one (1) vote for each share of the capital stock entitled to vote thereat held by such stockholder. Such votes may be cast in person or by proxy as provided in Section 8 of this Article II. The Board of Directors, in its discretion, or the chairman of a meeting of the stockholders, in his or her discretion, may require that any votes cast at such meeting shall be cast by written ballot.

Section 8. <u>Proxies</u>. Each stockholder entitled to vote at a meeting of the stockholders may authorize another person or persons to act for such stockholder as proxy, but no such proxy shall be voted upon after three years from its date, unless such proxy provides for a longer period. Without limiting the manner in which a stockholder may authorize another person or persons to act for such stockholder as proxy, the following shall constitute a valid means by which a stockholder may grant such authority:

(i) A stockholder may execute a document authorizing another person or persons to act for such stockholder as proxy. Execution may be accomplished in the manner permitted by the DGCL by the stockholder or such stockholder's authorized officer, director, employee or agent.

(ii) A stockholder may authorize another person or persons to act for such stockholder as proxy by transmitting or authorizing the transmission of an electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission, provided that any such transmission must either set forth or be submitted with information from which it can be determined that the transmission was authorized by the stockholder. If it is determined that such transmissions are valid, the inspectors or, if there are no inspectors, such other persons making that determination shall specify the information on which they relied.

Any copy, facsimile telecommunication or other reliable reproduction of the document (including any electronic transmission) authorizing another person or persons to act as proxy for a stockholder may be substituted or used in lieu of the original document for any and all purposes for which the original document could be used; provided, however, that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original document.

Section 9. Remote Communication.

If authorized by the Board of Directors in its sole discretion, and subject to such guidelines and procedures as the Board of Directors may adopt, stockholders and proxy holders not physically present at a meeting of stockholders may, by means of remote communication:

(a) participate in a meeting of stockholders; and

(b) be deemed present in person and vote at a meeting of stockholders whether such meeting is to be held at a designated place or solely by means of remote communication; provided, that (i) the Corporation shall implement reasonable measures to verify that each person deemed present and permitted to vote at the meeting by means of remote communication is a stockholder or proxyholder; (ii) the Corporation shall implement reasonable measures to provide such stockholders and proxyholders a reasonable opportunity to participate in the meeting and to vote on matters submitted to the stockholders, including an opportunity to read or hear the proceedings of the meeting substantially concurrently with such proceedings; and (iii) if any stockholder or proxyholder votes or takes other action at the meeting by means of remote communication, a record of such vote or other action shall be maintained by the Corporation.

Section 10. List of Stockholders Entitled to Vote. The Corporation shall prepare, at least ten (10) days before every meeting of the stockholders, a complete list of the stockholders entitled to vote at the meeting; provided, however, if the record date for determining the stockholders entitled to vote is less than ten (10) days before the meeting date, the list shall reflect the stockholders entitled to vote as

5

of the tenth (10th) day before the meeting date. Such list shall be arranged in alphabetical order, and show the address of each stockholder and the number of shares registered in the name of each stockholder; provided, that the Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list. Such list shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting (i) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (ii) during ordinary business hours, at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then a list of stockholders entitled to vote at the meeting shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.

Section 11. <u>Record Date</u>. In order that the Corporation may determine the stockholders entitled to notice of any meeting of the stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting. If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination. If no record date is fixed by the Board of Directors, the record date for determining stockholders entitled to notice of and to vote at a meeting of the stockholders shall be at the close of business on the day next preceding the day on

6

which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of the stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of stockholders entitled to vote at the adjourned meeting, and in such case shall also fix, as the record date for stockholders entitled to notice of such adjourned meeting, the same or an earlier date as that fixed for determination of stockholders entitled to vote at the adjourned meeting in accordance with the foregoing provisions of this Section 11.

Section 12. <u>Stock Ledger</u>. The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the list of stockholders required by Section 10 of this Article II or the books and records of the Corporation, or to vote in person or by proxy at any meeting of stockholders. As used herein, the stock ledger of the Corporation shall refer to one (1) or more records administered by or on behalf of the Corporation in which the names of all of the Corporation's stockholders of record, the address and number of shares registered in the name of each such stockholder, and all issuances and transfer of stock of the Corporation are recorded in accordance with Section 224 of the DGCL.

Section 13. <u>Conduct of Meetings</u>. The Board of Directors of the Corporation may adopt by resolution such rules and regulations for the conduct of any meeting of the stockholders as it shall deem appropriate. Meetings of stockholders shall be presided over by the Chairman of the Board of Directors, if there shall be one, or in his or her absence, or there shall not be a Chairman of the Board of Directors or in his or her absence, the President. The Board of Directors shall have the authority to appoint a temporary chairman to serve at any meeting of the stockholders if the Chairman of the Board of Directors or the President is unable to do so for any reason. Except to the extent inconsistent with any rules and regulations adopted by the Board of Directors, the chairman of any meeting of the stockholders shall have the right and authority to prescribe such rules, regulations and procedures and to do all such acts as, in the judgment of such chairman, are appropriate for the proper conduct of the meeting. Such rules, regulations or procedures, whether adopted by the Board of Directors or prescribed by the chairman

7

of the meeting, may include, without limitation, the following: (i) the establishment of an agenda or order of business for the meeting; (ii) the determination of when the polls shall open and close for any given matter to be voted on at the meeting; (iii) rules and procedures for maintaining order at the meeting and the safety of those present; (iv) limitations on attendance at or participation in the meeting to stockholders of record of the Corporation, their duly authorized and constituted proxies or such other persons as the chairman of the meeting shall determine; (v) restrictions on entry to the meeting after the time fixed for the commencement thereof; and (vi) limitations on the time allotted to questions or comments by stockholders.

Section 14. <u>Inspectors of Election</u>. In advance of any meeting of the stockholders, the Board of Directors, by resolution, the Chairman of the Board of Directors or the President shall appoint one or more inspectors to act at the meeting and make a written report thereof. One or more other persons may be designated as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of the stockholders, the chairman of the meeting shall appoint one or more inspectors to act at the meeting. Unless otherwise required by applicable law, inspectors may be officers, employees or agents of the Corporation. Each inspector, before entering upon the discharge of the duties of inspector, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of such inspector's ability. The inspector shall have the duties prescribed by law and shall take charge of the polls and, when the vote is completed, shall execute and deliver to the Corporation a certificate of the result of the vote taken and of such other facts as may be required by applicable law.

Section 15. <u>Nature of Business at Meetings of Stockholders</u>. Only such business (other than nominations for election to the Board of Directors, which must comply with the provisions of Section 15 of this Article II) may be transacted at an Annual Meeting of Stockholders as is either (a) specified in the notice of meeting (or any supplement thereto) given by or at the direction of the Board of Directors (or any duly authorized committee thereof), (b) otherwise properly brought before the Annual Meeting by or at the direction of the Board of Directors (or any duly authorized committee thereof), or (c)

8

otherwise properly brought before the Annual Meeting by any stockholder of the Corporation (i) who is a stockholder of record on the date of the giving of the notice provided for in this Section 15 of this Article II and on the record date for the determination of stockholders entitled to notice of and to vote at such Annual Meeting and (ii) who complies with the notice procedures set forth in this Section 15 of this Article II.

In addition to any other applicable requirements, for business to be properly brought before an Annual Meeting by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

To be timely, a stockholder's notice to the Secretary must be delivered to or be mailed and received at the principal executive offices of the Corporation not less than ninety (90) days nor more than one hundred twenty (120) days prior to the anniversary date of the immediately preceding Annual Meeting of Stockholders; provided, however, that in the event that the Annual Meeting is called for a date that is not within twenty-five (25) days before or after such anniversary date, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs. In no event shall the adjournment or postponement of an Annual Meeting, or the public announcement of such an adjournment or postponement, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

To be in proper written form, a stockholder's notice to the Secretary must set forth the following information: (a) as to each matter such stockholder proposes to bring before the Annual Meeting, a brief description of the business desired to be brought before the Annual Meeting and the proposed text of any proposal regarding such business (including the text of any resolutions proposed for consideration and, if such business includes a proposal to amend these bylaws, the text of the proposed amendment), and the reasons for conducting such business at the Annual Meeting, and (b) as to the stockholder giving notice and the beneficial owner, if any, on whose behalf the proposal is being made, (i) the name and address of

9

such person, (ii) (A) the class or series and number of all shares of stock of the Corporation which are owned beneficially or of record by such person and any affiliates or associates of such person, (B) the name of each nominee holder of shares of all stock of the Corporation owned beneficially but not of record by such person or any affiliates or associates of such person, and the number of such shares of stock of the Corporation held by each such nominee holder, (C) whether and the extent to which any derivative instrument, swap, option, warrant, short interest, hedge or profit interest or other transaction has been entered into by or on behalf of such person, or any affiliates or associates of such person, with respect to stock of the Corporation and (D) whether and the extent to which any other transaction, agreement, arrangement or understanding (including any short position or any borrowing or lending of shares of stock of the Corporation) has been made by or on behalf of such person, or any affiliates or associates of such person, the effect or intent of any of the foregoing being to mitigate loss to, or to manage risk or benefit of stock price changes for, such person, or any affiliates or associates of such person, or to increase or decrease the voting power or pecuniary or economic interest of such person, or any affiliates or associates of such person, with respect to stock of the Corporation; (iii) a description of all agreements, arrangements, or understandings (whether written or oral) between or among such person, or any affiliates or associates of such person, and any other person or persons (including their names) in connection with or relating to (A) the Corporation or (B) the proposal, including any material interest in, or anticipated benefit from the proposal to such person, or any affiliates or associates of such person, (iv) a representation that the stockholder giving notice intends to appear in person or by proxy at the Annual Meeting to bring such business before the meeting; and (v) any other information relating to such person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with the solicitation of proxies by such person with respect to the proposed business to be brought by such person before the Annual Meeting pursuant to Section 14 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the rules and regulations promulgated thereunder.

A stockholder providing notice of business proposed to be brought before an Annual Meeting shall further update and supplement such notice, if necessary, so that the information provided or required

10

to be provided in such notice pursuant to this Section 15 of this Article II shall be true and correct as of the record date for determining the stockholders entitled to receive notice of the Annual Meeting and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for determining the stockholders entitled to receive notice of the Annual Meeting.

No business shall be conducted at the Annual Meeting of Stockholders except business brought before the Annual Meeting in accordance with the procedures set forth in this Section 15 of this Article II; provided, however, that, once business has been properly brought before the Annual Meeting in accordance with such procedures, nothing in this Section 15 of this Article II shall be deemed to preclude discussion by any stockholder of any such business. If the chairman of an Annual Meeting determines that business was not properly brought before the Annual Meeting in accordance with the foregoing procedures, the chairman shall declare to the meeting that the business was not properly brought before the meeting and such business shall not be transacted.

Nothing contained in this Section 15 of this Article II shall be deemed to affect any rights of stockholders to request inclusion of proposals in the Corporation's proxy statement pursuant to Rule 14a-8 under the Exchange Act (or any successor provision of law).

Section 16. <u>Nomination of Directors</u>. Only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the Certificate of Incorporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors in certain circumstances. Nominations of persons for election to the Board of Directors may be made at any Annual Meeting of Stockholders, or at any Special Meeting of Stockholders called for the purpose of electing directors, (a) by or at the direction of the Board of Directors (or any duly authorized committee thereof) or (b) by any stockholder of the Corporation (i) who is a stockholder of record on the date of the giving of the notice provided for in this Section 16 of this Article II and on the record date for the determination of stockholders entitled to notice of and to vote at such Annual Meeting or Special Meeting and (ii) who complies with the notice procedures set forth in this Section 16 of this Article II.

11

In addition to any other applicable requirements, for a nomination to be made by a stockholder, such stockholder must have given timely notice thereof in proper written form to the Secretary of the Corporation.

To be timely, a stockholder's notice to the Secretary must be delivered to or be mailed and received at the principal executive offices of the Corporation (a) in the case of an Annual Meeting, not less than ninety (90) days nor more than one hundred twenty (120) days prior to the anniversary date of the immediately preceding Annual Meeting of Stockholders; provided, however, that in the event that the Annual Meeting is called for a date that is not within twenty-five (25) days before or after such anniversary date, notice by the stockholder in order to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which such notice of the date of the Annual Meeting was mailed or such public disclosure of the date of the Annual Meeting was made, whichever first occurs; and (b) in the case of a Special Meeting of Stockholders called for the purpose of electing directors, not later than the close of business on the tenth (10th) day following the day on which notice of the date of the Special Meeting was mailed or public disclosure of the date of the Special Meeting was made, whichever first occurs. In no event shall the adjournment or postponement of an Annual Meeting or a Special Meeting called for the purpose of electing directors, or the public announcement of such an adjournment or postponement, commence a new time period (or extend any time period) for the giving of a stockholder's notice as described above.

To be in proper written form, a stockholder's notice to the Secretary must set forth the following information: (a) as to each person whom the stockholder proposes to nominate for election as a director (i) the name, age, business address and residence address of such person, (ii) the principal occupation or employment of such person, (iii) (A) the class or series and number of all shares of stock of the Corporation which are owned beneficially or of record by such person and any affiliates or associates of such person, (B) the name of each nominee holder of shares of all stock of the Corporation owned

12

beneficially but not of record by such person or any affiliates or associates of such person, and the number of such shares of stock of the Corporation held by each such nominee holder, (C) whether and the extent to which any derivative instrument, swap, option, warrant, short interest, hedge or profit interest or other transaction has been entered into by or on behalf of such person, or any affiliates or associates of such person, with respect to stock of the Corporation and (D) whether and the extent to which any other transaction, agreement, arrangement or understanding (including any short position or any borrowing or lending of shares of stock of the Corporation) has been made by or on behalf of such person, or any affiliates or associates of such person, the effect or intent of any of the foregoing being to mitigate loss to, or to manage risk or benefit of stock price changes for, such person, or any affiliates or associates of such person, or to increase or decrease the voting power or pecuniary or economic interest of such person, or any affiliates or associates of such person, with respect to stock of the Corporation, (iv) such person's written representation and agreement that such person (A) is not and will not become a party to any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the Corporation, will act or vote on any issue or question, (B) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the Corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director of the Corporation that has not been disclosed to the Corporation in such representation and agreement and (C) in such person's individual capacity, would be in compliance, if elected as a director of the Corporation, and will comply with, all applicable publicly disclosed confidentiality, corporate governance, conflict of interest, Regulation FD, code of conduct and ethics, and stock ownership and trading policies and guidelines of the Corporation and (v) any other information relating to such person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with solicitations of proxies for election of directors pursuant to Section 14 of the Exchange Act, and the rules and regulations promulgated thereunder; and (b) as to the stockholder giving the notice, and the beneficial owner, if any, on whose behalf the nomination is being made, (i) the name and record address of the stockholder giving

13

the notice and the name and principal place of business of such beneficial owner; (ii) (A) the class or series and number of all shares of stock of the Corporation which are owned beneficially or of record by such person and any affiliates or associates of such person, (B) the name of each nominee holder of shares of the Corporation owned beneficially but not of record by such person or any affiliates or associates of such person, and the number of shares of stock of the Corporation held by each such nominee holder, (C) whether and the extent to which any derivative instrument, swap, option, warrant, short interest, hedge or profit interest or other transaction has been entered into by or on behalf of such person, or any affiliates or associates of such person, with respect to stock of the Corporation and (D) whether and the extent to which any other transaction, agreement, arrangement or understanding (including any short position or any borrowing or lending of shares of stock of the Corporation) has been made by or on behalf of such person, or any affiliates or associates of such person, the effect or intent of any of the foregoing being to mitigate loss to, or to manage risk or benefit of stock price changes for, such person, or any affiliates or associates of such person, or to increase or decrease the voting power or pecuniary or economic interest of such person, or any affiliates or associates of such person, with respect to stock of the Corporation; (iii) a description of (A) all agreements, arrangements, or understandings (whether written or oral) between such person, or any affiliates or associates of such person, and any proposed nominee, or any affiliates or associates of such proposed nominee, (B) all agreements, arrangements, or understandings (whether written or oral) between such person, or any affiliates or associates of such person, and any other person or persons (including their names) pursuant to which the nomination(s) are being made by such person, or otherwise relating to the Corporation or their ownership of capital stock of the Corporation, and (C) any material interest of such person, or any affiliates or associates of such person, in such nomination, including any anticipated benefit therefrom to such person, or any affiliates or associates of such person; (iv) a representation that the stockholder giving notice intends to appear in person or by proxy at the Annual Meeting or Special Meeting to nominate the persons named in its notice; and (v) any other information relating to such person that would be required to be disclosed in a proxy statement or other filings required to be made in connection with the solicitation of proxies for election of directors pursuant

14

to Section 14 of the Exchange Act and the rules and regulations promulgated thereunder. Such notice must be accompanied by a written consent of each proposed nominee to being named as a nominee and to serve as a director if elected.

A stockholder providing notice of any nomination proposed to be made at an Annual Meeting or Special Meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 16 of this Article II shall be true and correct as of the record date for determining the stockholders entitled to receive notice of the Annual Meeting or Special Meeting, and such update and supplement shall be delivered to or be mailed and received by the Secretary at the principal executive offices of the Corporation not later than five (5) business days after the record date for determining the stockholders entitled to receive notice of such Annual Meeting or Special Meeting.

No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth in this Section 16 of this Article II. If the chairman of the meeting determines that a nomination was not made in accordance with the foregoing procedures, the chairman shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

ARTICLE III

DIRECTORS

Section 1. <u>Number and Election of Directors</u>. The Board of Directors shall consist of not less than one nor more than eleven members, each of whom shall be a natural person, the exact number of which shall initially be fixed by the Incorporator and thereafter from time to time by the Board of Directors. Except as provided in Section 2 of this Article III, directors shall be elected by a plurality of the votes cast at each Annual Meeting of Stockholders and each director so elected shall hold office until the next Annual Meeting of Stockholders and until such director's successor is duly elected and qualified, or until such director's earlier death, resignation or removal.

Section 2. <u>Vacancies</u>. Unless otherwise required by law or the Certificate of Incorporation, vacancies on the Board of Directors or any committee thereof resulting from the death, resignation or removal of a director, or from an increase in the number of directors constituting the Board of Directors or such committee or otherwise, may be filled only by a majority of the directors then in office, though less than a quorum, or by a sole remaining director. The directors so chosen shall, in the case of the Board of Directors, hold office until the next annual election and until their successors are duly elected and qualified, or until their earlier death, resignation or removal and, in the case of any committee of the Board of Directors, shall hold office until their successors are duly appointed by the Board of Directors or until their earlier death, resignation or removal.

Section 3. <u>Duties and Powers</u>. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors which may exercise all such powers of the Corporation except as may be otherwise provided in the DGCL, the Certificate of Incorporation, these Bylaws or required by the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading.

Section 4. <u>Meetings</u>. The Board of Directors and any committee thereof may hold meetings, both regular and special, either within or without the State of Delaware. Regular meetings of the Board of Directors or any committee thereof may be held without notice at such time and at such place as may from time to time be determined by the Board of Directors or such committee, respectively. Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors, if there be one, the President, or by any director. Special meetings of any committee of the Board of Directors may be called by the chairman of such committee, if there be one, the President, or any director serving on such committee. Notice of any special meeting stating the place, date and hour of the meeting shall be given to each director (or, in the case of a committee, to each member of such committee) not less than twenty-four hours before the date of the meeting, by telephone, or in the form of a writing or electronic transmission, or on such shorter notice as the person or persons calling such meeting may deem necessary or appropriate in the circumstances.

16

Section 5. <u>Organization</u>. At each meeting of the Board of Directors or any committee thereof, the Chairman of the Board of Directors or the chairman of such committee, as the case may be, or, in his or her absence or if there be none, a director chosen by a majority of the directors present, shall act as chairman of such meeting. Except as provided below, the Secretary of the Corporation shall act as secretary at each meeting of the Board of Directors and of each committee thereof. In case the Secretary shall be absent from any meeting of the Board of Directors or of any committee thereof, an Assistant Secretary shall perform the duties of secretary at such meeting; and in the absence from any such meeting of the Secretary and all the Assistant Secretaries, the chairman of the meeting may appoint any person to act as secretary of the meeting. Notwithstanding the foregoing, the members of each committee of the Board of Directors may appoint any person to act as secretary of any meeting of such committee and the Secretary or any Assistant Secretary of the Corporation may, but need not if such committee so elects, serve in such capacity.

Section 6. <u>Resignations and Removals of Directors</u>. Any director of the Corporation may resign from the Board of Directors or any committee thereof at any time, by giving notice in writing or by electronic transmission to the Chairman of the Board of Directors, if there be one, the President or the Secretary of the Corporation and, in the case of a committee, to the chairman of such committee, if there be one. Such resignation shall take effect when delivered or, if such resignation specifies a later effective time or an effective time, determined upon the happening of an event or events, in which case, such resignation takes effect upon such effective time. Unless otherwise specified in such resignation, the acceptance of such resignation shall not be necessary to make it effective. A resignation which is conditioned upon the director failing to receive a specified vote for reelection as a director may provide that it is irrevocable. Except as otherwise required by applicable law and subject to the rights, if any, of the holders of shares of preferred stock then outstanding, any director or the entire Board of Directors may be removed from office at any time, but only for cause, and only by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) in voting power of the issued and outstanding capital stock of the Corporation entitled to vote in the election of directors. Any director serving on a committee of the Board of Directors may be removed from such committee at any time by the Board of Directors.

17

Section 7. <u>Quorum</u>. Except as otherwise required by law, or the Certificate of Incorporation or the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading, at all meetings of the Board of Directors or any committee thereof, a majority of the entire Board of Directors or a majority of the directors constituting such committee, as the case may be, shall constitute a quorum for the transaction of business and the vote of a majority of the directors or committee members, as applicable, present at any meeting at which there is a quorum shall be the act of the Board of Directors or such committee, as applicable. If a quorum shall not be present at any meeting of the Board of Directors or any committee thereof, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting of the time and place of the adjourned meeting, until a quorum shall be present.

Section 8. <u>Actions of the Board by Written Consent</u>. Unless otherwise provided in the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all the members of the Board of Directors or such committee, as the case may be, consent thereto in writing or by electronic transmission. Any person, whether or not then a director, may provide, through instruction to an agent or otherwise, that a consent to action will be effective at a future time (including a time determined upon the happening of an event) no later than sixty (60) days after such instruction is given or such provision is made and such consent shall be deemed to have been given at such effective time so long as such person is then a director and did not revoke the consent prior to such time. Any such consent shall be revocable prior to its becoming effective. After an action is taken, the consent or consents relating thereto shall be filed with the minutes of the proceedings of the Board of Directors, or the committee thereof, in the same paper or electronic form as the minutes are maintained.

18

Section 9. <u>Meetings by Means of Conference Telephone</u>. Unless otherwise provided in the Certificate of Incorporation or these Bylaws, members of the Board of Directors of the Corporation, or any committee thereof, may participate in a meeting of the Board of Directors or such committee by means of a conference telephone or other communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Section 9 shall constitute presence in person at such meeting.

Section 10. <u>Committees</u>. The Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Each member of a committee must meet the requirements for membership, if any, imposed by applicable law and the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of any such committee. Subject to the rules and regulations of any securities exchange or quotation system on which the securities of the Corporation are listed or quoted for trading, in the absence or disqualification of a member of a committee, and in the absence of a designation by the Board of Directors of an alternate member to replace the absent or disqualified member, the member or members thereof present at any meeting and not disqualified from voting, whether or not such member or members constitute a quorum, may unanimously appoint another qualified member of the Board of Directors to act at the meeting in the place of any absent or disqualified member. Any such committee, to the extent permitted by law and provided in the resolution establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; provided, however, that no such committee shall have the power or authority to (i) approve, adopt, or recommend to the stockholders any action or matter (other than the election or removal of directors) expressly required by the DGCL to be submitted to stockholders for approval, or (ii) adopt, amend, or repeal any of these Bylaws. Each committee shall keep regular minutes and report to the Board

19

of Directors when required. Notwithstanding anything to the contrary contained in this Article III, the resolution of the Board of Directors establishing any committee of the Board of Directors and/or the charter of any such committee may establish requirements or procedures relating to the governance and/or operation of such committee that are different from, or in addition to, those set forth in these Bylaws and, to the extent that there is any inconsistency between these Bylaws and any such resolution or charter, the terms of such resolution or charter shall be controlling.

Section 11. Subcommittees. Unless otherwise provided in the Certificate of Incorporation, these Bylaws, or the resolution of the Board of Directors designating a committee, such committee may create one or more subcommittees, each subcommittee to consist of one or more members of the committee, and delegate to a subcommittee any or all of the powers and authority of the committee. Except for references to committees and members of committees in Section 10 of this Article III, every reference in these Bylaws to a committee of the Board of Directors or a member of a committee shall be deemed to include a reference to a subcommittee or member of a subcommittee.

Section 12. Compensation. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary for service as director, payable in cash or securities. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for service as committee members.

Section 13. Interested Directors. No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because any such director's or officer's vote is counted for such purpose if: (i) the material facts as to the director's or officer's relationship or interest

20

and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to the director's or officer's relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes such contract or transaction.

ARTICLE IV

OFFICERS

Section 1. <u>General</u>. The officers of the Corporation shall be chosen by the Board of Directors and shall be a President, a Secretary and a Treasurer. The Board of Directors, in its discretion, also may choose a Chairman of the Board of Directors (who must be a director) and one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers and other officers. Any number of offices may be held by the same person, unless otherwise prohibited by law, the Certificate of Incorporation or these Bylaws. The officers of the Corporation need not be stockholders of the Corporation nor, except in the case of the Chairman of the Board of Directors, need such officers be directors of the Corporation.

Section 2. <u>Election</u>. The Board of Directors, at its first meeting held after each Annual Meeting of Stockholders, shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and each officer of the Corporation shall hold office until such officer's successor is elected and qualified, or until such officer's earlier death, resignation or removal. Any officer elected by the Board of Directors may be removed at any time by the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors. The salaries of all officers of the Corporation shall be fixed by the Board of Directors.

21

Section 3. <u>Voting Securities Owned by the Corporation</u>. Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any Vice President or any other officer authorized to do so by the Board of Directors and any such officer may, in the name of and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation or other entity in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present. The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

Section 4. <u>Chairman of the Board of Directors</u>. The Chairman of the Board of Directors, if there be one, shall preside at all meetings of the stockholders and of the Board of Directors. The Chairman of the Board of Directors shall be the Chief Executive Officer of the Corporation, unless the Board of Directors designates the President as the Chief Executive Officer, and, except where by law the signature of the President is required, the Chairman of the Board of Directors shall possess the same power as the President to sign all contracts, certificates and other instruments of the Corporation which may be authorized by the Board of Directors. During the absence or disability of the President, the Chairman of the Board of Directors shall exercise all the powers and discharge all the duties of the President. The Chairman of the Board of Directors shall also perform such other duties and may exercise such other powers as may from time to time be assigned by these Bylaws or by the Board of Directors.

Section 5. <u>President</u>. The President shall, subject to the oversight and control of the Board of Directors and, if there be one, the Chairman of the Board of Directors, have general supervision of the business of the Corporation and shall see that all orders and resolutions of the Board of Directors are carried into effect. The President shall execute all bonds, mortgages, contracts and other instruments

22

of the Corporation requiring a seal, under the seal of the Corporation, except where required or permitted by law to be otherwise signed and executed and except that the other officers of the Corporation may sign and execute documents when so authorized by these Bylaws, the Board of Directors or the President. In the absence or disability of the Chairman of the Board of Directors, or if there be none, the President shall preside at all meetings of the stockholders and, if the President is also a director, the Board of Directors. If there be no Chairman of the Board of Directors, or if the Board of Directors shall otherwise designate, the President shall be the Chief Executive Officer of the Corporation. The President shall also perform such other duties and may exercise such other powers as may from time to time be assigned to such officer by these Bylaws or by the Board of Directors.

Section 6. <u>Vice Presidents</u>. At the request of the President or in the President's absence or in the event of the President's inability or refusal to act (and if there be no Chairman of the Board of Directors), the Vice President, or the Vice Presidents if there are more than one (in the order designated by the Board of Directors), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe. If there be no Chairman of the Board of Directors and no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the President or in the event of the inability or refusal of the President to act, shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President.

Section 7. <u>Secretary</u>. The Secretary shall attend all meetings of the Board of Directors and all meetings of the stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for committees of the Board of Directors when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors or the President, under whose supervision the Secretary shall be. If the Secretary shall be unable or shall refuse to cause to be

23

given notice of all meetings of the stockholders and special meetings of the Board of Directors, and if there be no Assistant Secretary, then either the Board of Directors or the President may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be one, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of the Secretary or by the signature of any such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest to the affixing by such officer's signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

Section 8. <u>Treasurer</u>. The Treasurer shall have the custody of the Corporation's funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors or the President taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of the Treasurer and for the restoration to the Corporation, in case of the Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Treasurer's possession or under the Treasurer's control belonging to the Corporation.

Section 9. <u>Assistant Secretaries</u>. Assistant Secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Secretary, and in the absence of the Secretary or in the event of the Secretary's inability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

24

Section 10. Assistant Treasurers. Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Treasurer, and in the absence of the Treasurer or in the event of the Treasurer's inability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer. If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of the office of Assistant Treasurer and for the restoration to the Corporation, in case of the Assistant Treasurer's death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in the Assistant Treasurer's possession or under the Assistant Treasurer's control belonging to the Corporation.

Section 11. Other Officers. Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors. The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

ARTICLE V

STOCK

Section 1. Shares of Stock. The shares of capital stock of the Corporation shall be represented by a certificate, unless and until the Board of Directors of the Corporation adopts a resolution permitting shares to be uncertificated. Every holder of capital stock of the Corporation theretofore represented by certificates shall be entitled to have a certificate for shares of capital stock of the Corporation signed by, or in the name of, the Corporation by any two (2) authorized officers of the Corporation, certifying the number of shares owned by such stockholder in the Corporation. The Corporation shall not have power to issue a certificate in bearer form.

25

Section 2. <u>Signatures</u>. Any or all of the signatures on a certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

Section 3. <u>Lost Certificates</u>. The Board of Directors may direct a new certificate or uncertificated shares be issued in place of any certificate theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issuance of a new certificate or uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or such owner's legal representative, to advertise the same in such manner as the Board of Directors shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate or uncertificated shares.

Section 4. <u>Transfers</u>. Stock of the Corporation shall be transferable in the manner prescribed by applicable law and in these Bylaws. Transfers of stock shall be made on the books of the Corporation, and in the case of certificated shares of stock, only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefor, properly endorsed for transfer and payment of all necessary transfer taxes; or, in the case of uncertificated shares of stock, upon receipt of proper transfer instructions from the registered holder of the shares or by such person's attorney lawfully constituted in writing, and upon payment of all necessary transfer taxes and compliance with appropriate procedures for transferring shares in uncertificated form; provided, however, that such surrender and endorsement, compliance or payment of taxes shall not be required in

26

any case in which the officers of the Corporation shall determine to waive such requirement. With respect to certificated shares of stock, every certificate exchanged, returned or surrendered to the Corporation shall be marked "Cancelled," with the date of cancellation, by the Secretary or Assistant Secretary of the Corporation or the transfer agent thereof. No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

Section 5. <u>Dividend Record Date</u>. In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than sixty (60) days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

Section 6. <u>Record Owners</u>. The Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise required by law.

Section 7. <u>Transfer and Registry Agents</u>. The Corporation may from time to time maintain one or more transfer offices or agencies and registry offices or agencies at such place or places as may be determined from time to time by the Board of Directors.

ARTICLE VI

NOTICES

Section 1. Notices. Whenever written notice is required by law, the Certificate of Incorporation or these Bylaws, to be given to any director, member of a committee or stockholder, such notice may be given in writing directed to such director's, committee member's or stockholder's mailing address (or by electronic transmission directed to such director's, committee member's or stockholder' electronic mail address, as applicable) as it appears on the records of the Corporation and shall be given: (a) if mailed, when the notice is deposited in the United States mail, postage prepaid, (b) if delivered by courier service, the earlier of when the notice is received or left at such director's, committee member's or stockholder's address or (c) if given by electronic mail, when directed to such director's, committee member's or stockholder's electronic mail address unless such director, committee member or stockholder has notified the corporation in writing or by electronic transmission of an objection to receiving notice by electronic mail or such notice is prohibited by the under applicable law, the Certificate of Incorporation or these Bylaws. Without limiting the manner by which notice otherwise may be given effectively to stockholders, but subject to Section 232(e) of the DGCL, any notice to stockholders given by the Corporation under applicable law, the Certificate of Incorporation or these Bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice or electronic transmission to the Corporation. Notice given by electronic transmission, as described above, shall be deemed given: (i) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (ii) if by a posting on an electronic network, together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to the stockholder. Notwithstanding the foregoing, a notice may not be given by an electronic transmission from and after the time that (i) the Corporation is unable to deliver by such electronic transmission two consecutive notices given by the Corporation and (ii) such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice, provided, however, the inadvertent failure to discover such inability shall not invalidate any meeting or other action.

28

Section 2. <u>Waivers of Notice</u>. Whenever any notice is required, by applicable law, the Certificate of Incorporation or these Bylaws, to be given to any director, member of a committee or stockholder, a waiver thereof in writing, signed by the person or persons entitled to notice, or a waiver by electronic transmission by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed equivalent thereto. Attendance of a person at a meeting, present in person or represented by proxy, shall constitute a waiver of notice of such meeting, except where the person attends the meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Annual or Special Meeting of Stockholders or any regular or special meeting of the directors or members of a committee of directors need be specified in any written waiver of notice or any waiver by electronic transmission unless so required by law, the Certificate of Incorporation or these Bylaws.

ARTICLE VII

<u>GENERAL PROVISIONS</u>

Section 1. <u>Dividends</u>. Dividends upon the capital stock of the Corporation, subject to the requirements of the DGCL and the provisions of the Certificate of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting of the Board of Directors (or any action by written consent in lieu thereof in accordance with Section 8 of Article III hereof), and may be paid in cash, in property, or in shares of the Corporation's capital stock. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the Corporation, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any proper purpose, and the Board of Directors may modify or abolish any such reserve.

29

Section 2. <u>Disbursements</u>. All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 3. <u>Fiscal Year</u>. The fiscal year of the Corporation shall be fixed by resolution of the Board of Directors.

Section 4. <u>Corporate Seal</u>. The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

## ARTICLE VIII

## <u>INDEMNIFICATION</u>

The Corporation shall indemnify its directors and officers to the fullest extent authorized or permitted by applicable law, as now or hereafter in effect, and such right to indemnification shall continue as to a person who has ceased to be a director or officer of the Corporation and shall inure to the benefit of his or her heirs, executors and personal and legal representatives; provided, however, that, except for proceedings to enforce rights to indemnification, the Corporation shall not be obligated to indemnify any director or officer (or his or her heirs, executors or personal or legal representatives) in connection with a proceeding (or part thereof) initiated by such person unless such proceeding (or part thereof) was authorized or consented to by the Board of Directors. The right to indemnification conferred by this Article VIII shall include the right to be paid by the Corporation the expenses incurred in defending or otherwise participating in any proceeding in advance of its final disposition upon receipt by the Corporation of an undertaking by or on behalf of the director or officer receiving advancement to repay the amount advanced if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation under this Article VIII.

The Corporation may, to the extent authorized from time to time by the Board of Directors, provide rights to indemnification and to the advancement of expenses to employees and agents of the Corporation similar to those conferred in this Article VIII to directors and officers of the Corporation.

30

The rights to indemnification and to the advancement of expenses conferred in this Article VIII shall not be exclusive of any other right which any person may have or hereafter acquire under this Certificate of Incorporation, the Bylaws of the Corporation, any statute, agreement, vote of stockholders or disinterested directors or otherwise.

Any repeal or modification of this Article VIII by the stockholders of the Corporation shall not adversely affect any rights to indemnification and to the advancement of expenses of a director, officer, employee or agent of the Corporation existing at the time of such repeal or modification with respect to any acts or omissions occurring prior to such repeal or modification.

ARTICLE IX

FORUM FOR ADJUDICATION OF CERTAIN DISPUTES

Section 1. Forum for Adjudication of Certain Disputes. Unless the Corporation consents in writing to the selection of an alternative forum (an "Alternative Forum Consent"), the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a duty (including any fiduciary duty) owed by any current or former director, officer, stockholder, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the Corporation arising out of or relating to any provision of the General Corporation Law of Delaware or the Corporation's Certificate of Incorporation or Bylaws (each, as in effect from time to time), or (iv) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the Corporation governed by the internal affairs doctrine of the State of Delaware; *provided, however*, that, in the event that the Court of Chancery of the State of Delaware lacks subject matter jurisdiction over any such action or proceeding, the sole and exclusive forum for such action or

31

proceeding shall be another state or federal court located within the State of Delaware, in each such case, unless the Court of Chancery (or such other state or federal court located within the State of Delaware, as applicable) has dismissed a prior action by the same plaintiff asserting the same claims because such court lacked personal jurisdiction over an indispensable party named as a defendant therein. Any person or entity purchasing, otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Section 9.1 of Article IX. The existence of any prior Alternative Forum Consent shall not act as a waiver of the Corporation's ongoing consent right as set forth above in this Section 9.1 of Article IX with respect to any current or future actions or claims.

ARTICLE X

AMENDMENTS

Section 1. <u>Amendments</u>. In furtherance and not in limitation of the powers conferred upon it by the laws of the State of Delaware, the Board of Directors shall have the power to adopt, amend, alter or repeal the Corporation's Bylaws. The affirmative vote of at least a majority of the entire Board of Directors shall be required to adopt, amend, alter or repeal the Corporation's Bylaws. The Corporation's Bylaws also may be adopted, amended, altered or repealed by the affirmative vote of the holders of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the shares entitled to vote in connection with the election of directors of the Corporation.

Section 2. <u>Entire Board of Directors</u>. As used in this Article X and in these Bylaws generally, the term "entire Board of Directors" means the total number of directors which the Corporation would have if there were no vacancies.

\* \* \*

Adopted as of: March 8, 2021

Last Amended as of: September 27, 2019

32

## FIRST AMENDMENT TO REGISTRATION RIGHTS AGREEMENT

**THIS FIRST AMENDMENT TO REGISTRATION RIGHTS AGREEMENT** (this "*Amendment*") is made and entered into as of March 8, 2021, and shall be effective as of the Closing (defined below), by and among (i) **CF Finance Acquisition Corp. II**, a Delaware corporation (the "*Company*"), (ii) **CF Finance Holdings II, LLC**, a Delaware limited liability company (the "*Sponsor*") and (iii) each of the other undersigned individuals (together with the Sponsor and any person or entity who hereafter becomes a party to the Registration Rights Agreement (as defined below) pursuant to Section 5.2 of the Registration Rights Agreement, a "*Holder*" and collectively the "*Holders*"). Capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Registration Rights Agreement.

### RECITALS

**WHEREAS**, the Company, Sponsor and the other undersigned Holders are parties to that certain Registration Rights Agreement, dated as of August 26, 2020 (the "*Original Agreement*" and, as amended by this Amendment, the "*Registration Rights Agreement*"), pursuant to which the Company granted certain registration rights to the Holders with respect to the Company's securities;

**WHEREAS**, on November 30, 2020, the Company, PVMS Merger Sub, Inc., a Delaware corporation and a direct wholly-owned subsidiary of the Company ("*Merger Sub*"), and View, Inc., a Delaware corporation (together with its successors, the "*Target*"), entered into that certain Agreement and Plan of Merger (as amended from time to time in accordance with the terms thereof, the "*Merger Agreement*"), pursuant to which, among other matters, upon the consummation of the transactions contemplated thereby (the "*Closing*"), Merger Sub will merge with and into the Target, with the Target continuing as the surviving entity and a wholly-owned subsidiary of the Company (the "*Merger*"), and as a result of which all of the issued and outstanding capital stock of the Target immediately prior to the Closing shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, in exchange for the right to receive newly issued shares of Class A common stock, par value $0.0001 per share, of the Company ("*Class A Common Stock*"), all upon the terms and subject to the conditions set forth in the Merger Agreement and in accordance with the applicable provisions of the Delaware General Corporation Law;

**WHEREAS**, in connection with the execution of the Merger Agreement, the Company and certain equity holders of the Target named therein (together with their successors and permitted assigns, the "*Sellers*") entered into a Registration Rights Agreement, dated as of November 30, 2020 (as amended from time to time in accordance with the terms thereof, the "*Seller Registration Rights Agreement*") for the Company to grant to the Sellers certain registration rights with respect to the shares of Class A Common Stock received by the Sellers in the Merger and any other shares of Class A Common Stock held by the Sellers or other "Registrable Securities" of the Sellers as defined therein (collectively, the "*Seller Securities*");

**WHEREAS**, the parties hereto desire to amend the Original Agreement to revise the terms thereof in order to reflect the transactions contemplated by the Merger Agreement, including the Company's entrance into the Seller Registration Rights Agreement; and

**WHEREAS**, pursuant to Section 5.5 of the Original Agreement, the Original Agreement can be amended with the written consent of the Company and the holders of a majority of the Registrable Securities at the time in question.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1. <u>Amendments to Registration Rights Agreement</u>. The Parties hereby agree to the following amendments to the Registration Rights Agreement:

a. The defined terms in this Amendment, including in the preamble and recitals hereto, and the definitions incorporated by reference from the Merger Agreement, are hereby added to the Registration Rights Agreement, to the extent that they are not already included therein, as if they were set forth therein.

b. The following defined term is hereby added to Section 1.1 of the Registration Rights Agreement:

""***Person***" means any individual, firm, corporation, partnership, limited liability company, incorporated or unincorporated association, trust, estate, joint venture, joint stock company, governmental authority or instrumentality or other entity of any kind."

c. Section 2.1.4 of the Original Agreement is hereby deleted in its entirety and replaced with the following:

"2.1.4 <u>Reduction of Offering</u>. If the managing Underwriter or Underwriters for a Demand Registration that is to be an underwritten offering, in good faith, advises the Company, the Demanding Holders and the Requesting Holders (if any) in writing that the dollar amount or number of Registrable Securities which the Demanding Holders and the Requesting Holders (if any) desire to sell, taken together with all other shares of Common Stock or other securities which the Company desires to sell and the shares of Common Stock or other securities, if any, as to which Registration by the Company has been requested pursuant to written contractual piggy-back registration rights held by other security holders of the Company who desire to sell, exceeds the maximum dollar amount or maximum number of shares that can be sold in such offering without adversely affecting the proposed offering price, the timing, the distribution method, or the probability of success of such offering (such maximum dollar amount or maximum number of securities, as applicable, the "***Maximum Number of Securities***"), then the Company shall include in such Registration: (i) first, (A) the Registrable Securities as to which Demand Registration has been requested by the Demanding Holders and the Requesting Holders (if any) and (B) the Seller Securities for the account of any Persons who have exercised demand registration rights pursuant to the Seller Registration Rights Agreement during the period under which the Demand Registration hereunder is ongoing (all pro rata in accordance with the number of securities that each applicable Person has requested be included in such registration, regardless of the number of securities held by each such Person, as long as they do not request to include more securities than they own (such proportion is referred to herein as "***Pro Rata***")), that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), Registrable Securities of Holders as to which registration has been requested pursuant to Section 2.2 and Seller Securities as to which registration has been requested pursuant to the written contractual piggy-back registration rights under the Seller Registration Rights Agreement, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the shares of Common Stock or other securities that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i),

2

(ii) and (iii), the shares of Common Stock or other Company securities for the account of other Persons that the Company is obligated to register pursuant to written contractual arrangements with such Persons (other than this Agreement or the Seller Registration Rights Agreement) that can be sold without exceeding the Maximum Number of Securities. In the event that Company securities that are convertible into shares of Common Stock are included in the offering, the calculations under this Section 2.1.4 shall include such Company securities on an as-converted to Common Stock basis."

d. Section 2.2.2 of the Original Agreement is hereby deleted in its entirety and replaced with the following:

"2.2.2 Reduction of Offering. If the managing Underwriter or Underwriters for a Piggyback Registration that is to be an underwritten offering, in good faith, advises the Company and Holders holding Registrable Securities proposing to distribute their Registrable Securities through such Piggyback Registration in writing that the dollar amount or number of shares of Common Stock or other Company securities which the Company desires to sell, taken together with the shares of Common Stock or other Company securities, if any, as to which registration has been demanded pursuant to written contractual arrangements with Persons other than the Holders holding Registrable Securities hereunder, the Registrable Securities as to which registration has been requested under this Section 2.2, and the shares of Common Stock or other Company securities, if any, as to which registration has been requested pursuant to the written contractual piggy-back registration rights of other security holders of the Company, exceeds the Maximum Number of Securities, then the Company shall include in any such registration:

(a) If the registration is undertaken for the Company's account: (i) first, the shares of Common Stock or other securities that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), Registrable Securities of Holders as to which registration has been requested pursuant to this Section 2.2 and Seller Securities as to which registration has been requested pursuant to the written contractual piggy-back registration rights under the Seller Registration Rights Agreement, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the shares of Common Stock or other equity securities for the account of other Persons that the Company is obligated to register pursuant to separate written contractual arrangements with such Persons (other than this Agreement or the Seller Registration Rights Agreement) that can be sold without exceeding the Maximum Number of Securities;

(b) If the registration is a "demand" registration undertaken at the demand of Demanding Holders pursuant to Section 2.1: (i) first, the shares of Common Stock or other securities for the account of the Demanding Holders and the Requesting Holders (if any) and the Seller Securities for the account of any Persons who have exercised demand registration rights pursuant to the Seller Registration Rights Agreement during the period under which the Demand Registration hereunder is ongoing, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), Registrable Securities of Holders as to which registration has been requested pursuant to Section 2.2 and the Seller Securities as to which registration has been requested pursuant to the written contractual piggy-back registration rights under the Seller Registration Rights Agreement, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in

3

such registration, that can be sold without exceeding the Maximum Number of Securities; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the shares of Common Stock or other securities that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i), (ii), and (iii), the shares of Common Stock or other equity securities for the account of other Persons that the Company is obligated to register pursuant to separate written contractual arrangements with such Persons (other than this Agreement or the Seller Registration Rights Agreement) that can be sold without exceeding the Maximum Number of Securities;

(c) If the registration is a "demand" registration undertaken at the demand of holders of Seller Securities under the Seller Registration Rights Agreement: (i) first, the Seller Securities for the account of the demanding holders under the Seller Registration Rights Agreement and the Registrable Securities for the account of Demanding Holders and the Requesting Holders (if any) who have exercised demand registration rights pursuant to Section 2.1 during the period under which the demand registration under the Sellers Registration Rights Agreement is ongoing, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), Registrable Securities of Holders as to which registration has been requested pursuant to this Section 2.2 and the Seller Securities as to which registration has been requested pursuant to the written contractual piggy-back registration rights under the Seller Registration Rights Agreement, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the shares of Common Stock or other securities that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i), (ii) and (iii), the shares of Common Stock or other equity securities for the account of other Persons that the Company is obligated to register pursuant to separate written contractual arrangements with such Persons (other than this Agreement or the Seller Registration Rights Agreement) that can be sold without exceeding the Maximum Number of Securities; and

(d) If the registration is a "demand" registration undertaken at the demand of Persons other than either Demanding Holders under Section 2.1 or the holders of Seller Securities exercising demand registration rights under the Seller Registration Rights Agreement: (i) first, the shares of Common Stock or other securities for the account of the demanding Persons that can be sold without exceeding the Maximum Number of Securities; (ii) second, to the extent that the Maximum Number of Securities has not been reached under the foregoing clause (i), Registrable Securities of Holders as to which registration has been requested pursuant to this Section 2.2 and Seller Securities as to which registration has been requested pursuant to the written contractual piggy-back registration rights under the Seller Registration Rights Agreement, Pro Rata among the holders thereof based on the number of securities requested by such holders to be included in such registration, that can be sold without exceeding the Maximum Number of Securities; (iii) third, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i) and (ii), the shares of Common Stock or other securities that the Company desires to sell that can be sold without exceeding the Maximum Number of Securities; and (iv) fourth, to the extent that the Maximum Number of Securities has not been reached under the foregoing clauses (i), (ii) and (iii), the shares of Common Stock or other equity securities for the account of other Persons that the Company is obligated to register pursuant to separate written contractual arrangements with such Persons (other than this Agreement or the Seller Registration Rights Agreement) that can be sold without exceeding the Maximum Number of Securities.

4

In the event that Company securities that are convertible into shares of Common Stock are included in the offering, the calculations under this Section 2.2.2 shall include such Company securities on an as-converted to Common Stock basis."

e. Section 5.1 of the Registration Rights Agreement is hereby amended to delete the address of the Company for notices thereunder and provide that the following address shall be used for notices to the Company under the Registration Rights Agreement after the Closing:

| *If to the Company, to:* | *With copies to (which shall not constitute notice):* |
|---|---|
| View, Inc. | Skadden Arps, Slate, Meagher & Flom LLP |
| 195 S. Milpitas Blvd | 525 University Avenue, Suite 1400 |
| Milpitas, CA 95035 | Palo Alto, CA 94301 |
| Attn: Bill Krause, Senior Vice President, | Attn: Michael J. Mies, Esq. |
|     General Counsel and Secretary | Email: Michael.mies@skadden.com |
| Email: bill.krause@view.com | |

f. Section 5.3 of the Registration Rights Agreement is hereby amended by adding the following sentence at the end of Section 5.3: "The use of the word "including", "include" or "includes" in this Agreement shall be by way of example rather than by limitation, and shall be deemed in each case to be followed by the words "without limitation"."

2. <u>Acknowledgement of Other Registration Rights</u>. The Holders hereby acknowledge and agree that, notwithstanding Section 5.6 of the Registration Rights Agreement, in connection with the Merger Agreement, the Company is entering into the Seller Registration Rights Agreement with respect to the Seller Securities, and consent to the foregoing. The Holders hereby further acknowledge that, notwithstanding Section 5.6 of the Registration Rights Agreement, the Company has granted resale registration rights to PIPE Investors (as defined in the Merger Agreement) in the PIPE Subscription Agreements (as defined in the Merger Agreement) with respect to the shares of Class A Common Stock to be purchased thereunder, and that nothing in the Registration Rights Agreement shall restrict the ability of the Company to fulfill its resale registration obligations under the PIPE Subscription Agreements.

3. <u>Effectiveness</u>. This Amendment shall only become effective upon the Closing. In the event that the Merger Agreement is terminated in accordance with its terms prior to the Closing, this Amendment and all rights and obligations of the parties hereunder shall automatically terminate and be of no further force or effect.

4. <u>Miscellaneous</u>. Except as expressly provided in this Amendment, all of the terms and provisions in the Original Agreement are and shall remain in full force and effect, on the terms and subject to the conditions set forth therein. This Amendment does not constitute, directly or by implication, an amendment or waiver of any provision of the Original Agreement, or any other right, remedy, power or privilege of any party thereto, except as expressly set forth herein. Any reference to the Registration Rights Agreement in the Original Agreement or any other agreement, document, instrument or certificate entered into or issued in connection therewith shall hereinafter mean the Registration Rights Agreement, as amended by this Amendment (or as the Registration Rights Agreement may be further amended or modified in accordance with the terms thereof). The terms of this Amendment shall be governed by, enforced and construed and interpreted in a manner consistent with the provisions of the Original Agreement, including Section 5.4 thereof.

*{[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]*

5

**IN WITNESS WHEREOF**, each party hereto has signed or has caused to be signed by its officer thereunto duly authorized this First Amendment to Registration Rights Agreement as of the date first above written.

*The Company:*

**CF FINANCE ACQUISITION CORP. II**

By: /s/ Howard W. Lutnick
    Name: Howard W. Lutnick
    Title:  Chief Executive Officer

*Holders:*

**CF FINANCE HOLDINGS II, LLC**

By: /s/ Howard W. Lutnick
    Name: Howard W. Lutnick
    Title:  Chief Executive Officer

/s/ Robert J. Hochberg
**ROBERT J. HOCHBERG**

/s/ Charlotte Blechman
**CHARLOTTE BLECHMAN**

*{Signature Page to First Amendment to IPO Registration Rights Agreement}*

**VIEW, INC.**

**2021 EQUITY INCENTIVE PLAN**

1. <u>Purposes of the Plan</u>. The purposes of this Plan are (a) to attract and retain the best available personnel to ensure the Company's success and accomplish the Company's goals; (b) to incentivize Employees, Directors and Independent Contractors of the Company and the Company's Subsidiaries with long-term equity-based compensation to align their interests with the Company's stockholders; and (c) to promote the success of the Company's business.

The Plan permits the grant of Incentive Stock Options, Nonstatutory Stock Options, Restricted Stock, Restricted Stock Units, Stock Appreciation Rights and Stock Bonus Awards.

2. <u>Definitions</u>. As used herein, the following definitions will apply:

(a) "*Administrator*" means the Board or any of its Committees as will be administering the Plan, in accordance with Section 4 of the Plan.

(b) "*Applicable Laws*" means all applicable laws, rules, regulations and requirements, including, but not limited to, all applicable U.S. federal or state laws, rules and regulations, the rules and regulations of any stock exchange or quotation system on which the Common Stock is listed or quoted, and the applicable laws, rules and regulations of any other country or jurisdiction where Awards are, or will be, granted under the Plan or Participants reside or provide services to the Company or any Subsidiary, as such laws, rules, and regulations shall be in effect from time to time.

(c) "*Award*" means, individually or collectively, a grant under the Plan of Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units or Stock Bonus Award.

(d) "*Award Agreement*" means the written or electronic agreement setting forth the terms and provisions applicable to each Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(e) "*Board*" means the Board of Directors of the Company.

(f) "*Cause*" means, with respect to any Participant, (i) in the case where there is no employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or a Subsidiary of the Company and the Participant at the time of the grant of the Award (or where there is such an agreement but it does not define "cause" (or words of like import) or where it only applies upon the occurrence of a change in control and one has not yet taken place): (A) any material breach by Participant of any written agreement between Participant and the Company or any Subsidiary or any provision of any such agreement; (B) any failure by Participant to comply, in any material respect, with any of the Company's or any Subsidiary's written policies or rules as they may be in effect from time to time; (C) neglect or persistent unsatisfactory performance of Participant's duties; (D) Participant's repeated or material failure to follow reasonable and lawful instructions from the Board or Participant's direct or indirect supervisor(s); (E) Participant's commission of, indictment for, conviction of, or

plea of guilty or nolo contendre to, any felony, any crime involving moral turpitude or dishonesty or any felony against the Company or any of its Subsidiaries; (F) Participant's commission of or participation in an act of fraud, dishonesty, theft, embezzlement, misappropriation, misconduct or breach of fiduciary duty against the Company or any of its Subsidiaries; (G) Participant's unlawful use (including being under the influence) or possession of illegal drugs; or (H) Participant's unauthorized use or disclosure of any proprietary information or trade secrets of the Company, any Subsidiary or any other party to whom the Participant owes an obligation of nondisclosure as a result of his or her relationship with the Company or any Subsidiary; or (ii) in the case where there is an employment agreement, consulting agreement, change in control agreement or similar agreement in effect between the Company or a Subsidiary and the Participant at the time of the grant of the Award that defines "cause" (or words of like import), "cause" as defined under such agreement; provided, however, that with regard to any agreement under which the definition of "cause" only applies on occurrence of a change in control, such definition of "cause" shall not apply until a change in control actually takes place and then only with regard to a termination thereafter. For purposes of clarity, a termination without "Cause" does not include any termination that occurs solely as a result of Participant's death or Disability. The determination as to whether a Participant's status as a Service Provider for purposes of the Plan has been terminated for Cause shall be made in good faith by the Company and shall be final and binding on the Participant. The foregoing definition does not in any way limit the Company's ability (or that of any Subsidiary or any successor thereto, as appropriate) to terminate a Participant's employment or consulting relationship at any time, subject to Applicable Laws.

(g) "***Change in Control***" except as may otherwise be provided in an Award Agreement or other applicable agreement, means the occurrence of any of the following:

(i) The consummation of a merger or consolidation of the Company with or into another entity or any other corporate reorganization, if the Company's stockholders immediately prior to such merger, consolidation or reorganization cease to directly or indirectly own immediately after such merger, consolidation or reorganization at least a majority of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or reorganization;

(ii) The consummation of the sale, transfer or other disposition of all or substantially all of the Company's assets (other than (x) to a corporation or other entity of which at least a majority of its combined voting power is owned directly or indirectly by the Company, (y) to a corporation or other entity owned directly or indirectly by the shareholders of the Company in substantially the same proportions as their ownership of the Common Stock of the Company or (z) to a continuing or surviving entity described in Section 2(g)(i) in connection with a merger, consolidation or reorganization which does not result in a Change in Control under Section 2(g)(i));

(iii) A change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election; or

2

(iv) The consumption of any transaction as a result of which any Person becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing at least fifty percent (50%) of the total voting power represented by the Company's then outstanding voting securities. For purposes of this Section 2(g), the term "*Person*" shall have the same meaning as when used in Sections 13(d) and 14(d) of the Exchange Act but shall exclude:

(1) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a Subsidiary;

(2) a corporation or other entity owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of the Common Stock of the Company;

(3) the Company; and

(4) a corporation or other entity of which at least a majority of its combined voting power is owned directly or indirectly by the Company.

A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transactions. In addition, if any Person (as defined above) is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered to cause a Change in Control. If required for compliance with Section 409A of the Code, in no event will a Change in Control be deemed to have occurred if such transaction is not also a "change in the ownership or effective control of" the Company or "a change in the ownership of a substantial portion of the assets of" the Company as determined under Treasury Regulation Section 1.409A-3(i)(5) (without regard to any alternative definition thereunder).

(h) "*Code*" means the Internal Revenue Code of 1986, as amended. Reference to a specific section of the Code or regulation thereunder shall include such section or regulation, any valid regulation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

(i) "*Committee*" means a committee of Directors or of other individuals satisfying Applicable Laws appointed by the Board in accordance with Section 4 hereof.

(j) "*Common Stock*" means the Class A common stock of the Company.

(k) "*Company*" means View, Inc., a Delaware corporation, or any successor thereto.

(l) "*Corporate Transaction*" means the occurrence of any of the following events:

(i) a transfer of all or substantially all of the Company's assets;

3

(ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, entity or person;

(iii) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the Company's then outstanding capital stock; or

(iv) a Change in Control.

(m) "**Determination Date**" means any time when the achievement of the Performance Goals associated with the applicable Performance Period remains substantially uncertain; provided, however, that without limiting the foregoing, that if the Determination Date occurs on or before the date on which 25% of the Performance Period has elapsed, the achievement of such Performance Goals shall be deemed to be substantially uncertain.

(n) "**Director**" means a member of the Board.

(o) "**Disability**" means total and permanent disability as defined in Section 22(e)(3) of the Code in the case of Incentive Stock Options, and for all other Awards, as determined pursuant to the terms of the long-term disability plan maintained by the Company; provided however, that if the Participant resides outside of the United States, "*Disability*" shall have such meaning as is required by Applicable Laws.

(p) "**Effective Date**" means the effective date of this Plan, which is the date of the closing of the transactions contemplated by the Agreement and Plan of Merger by and among CF Acquisition Corp. II, PVMS Merger Sub, Inc. and the Company, dated as of November 30, 2020, provided that this Plan is approved by the Company's stockholders prior to such date.

(q) "**Employee**" means any person, including Officers and Directors, employed by the Company or any Subsidiary of the Company. Neither service as a Director nor payment of a director's fee by the Company will be sufficient to constitute "employment" by the Company.

(r) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(s) "**Exchange Program**" means a program under which outstanding Awards are amended to provide for a lower exercise price or surrendered or cancelled in exchange for (i) Awards with a lower exercise price, (ii) a different type of Award or awards under a different equity incentive plan, (iii) cash, or (iv) a combination of (i), (ii) and/or (iii). Notwithstanding the preceding, the term Exchange Program does not include (i) any action described in Section 15 or any action taken in connection with a Change in Control transaction nor (ii) any transfer or other disposition permitted under Section 14. For the purpose of clarity, each of the actions described in the prior sentence, none of which constitute an Exchange Program, may be undertaken (or authorized) by the Administrator in its sole discretion without approval by the Company's stockholders.

(t) "**Fair Market Value**" means, as of any date, the value of Common Stock determined as follows:

4

(i) If the Common Stock is listed on any established stock exchange or a national market system, its Fair Market Value will be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in such source as the Administrator deems reliable;

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share will be the mean between the high bid and low asked prices for the Common Stock on the day of determination, as reported in such source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock, the Fair Market Value will be determined in good faith by the Administrator in compliance with Applicable Laws and regulations and in a manner that complies with Section 409A of the Code.

(u) "*Fiscal Year*" means the fiscal year of the Company.

(v) "*Incentive Stock Option*" means an Option that by its terms qualifies and is intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(w) "*Independent Contractor*" means any person, including an advisor, consultant or agent, engaged by the Company or a Subsidiary to render services to such entity or who renders, or has rendered, services to the Company, or any Subsidiary and is compensated for such services.

(x) "*Inside Director*" means a Director who is an Employee.

(y) "*Insider*" means an officer or director of the Company or any other person whose transactions in Common Stock are subject to Section 16 of the Exchange Act.

(z) "*Nonstatutory Stock Option*" means an Option that by its terms does not qualify or is not intended to qualify as an Incentive Stock Option.

(aa) "*Officer*" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(bb) "*Option*" means a stock option granted pursuant to the Plan.

(cc) "*Outside Director*" means a Director who is not an Employee.

(dd) "*Parent*" means any corporation (other than the Company) in an unbroken chain of corporations ending with the Company if each of the corporations other than the Company owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Parent on a date after the adoption of the Plan shall be considered a Parent commencing as of such date.

(ee) "*Participant*" means the holder of an outstanding Award.

5

(ff) "*Performance Goal*" means, for a Performance Period, each goal established in writing by the Administrator with respect to each Performance Period, and which may relate to any business criteria with respect to the Company, any Subsidiary or any division or operating unit thereof, including, but not limited to, the following: (1) sales or non-sales revenue; (2) return on revenues; (3) operating income; (4) income or earnings including operating income; (5) income or earnings before or after taxes, interest, depreciation and/or amortization; (6) income or earnings from continuing operations; (7) net income; (8) pre-tax income or after-tax income; (9) net income excluding amortization of intangible assets, depreciation and impairment of goodwill and intangible assets and/or excluding charges attributable to the adoption of new accounting pronouncements; (10) raising of financing or fundraising; (11) project financing; (12) revenue backlog; (13) gross margin; (14) operating margin or profit margin; (15) capital expenditures, cost targets, reductions and savings and expense management; (16) return on assets (gross or net), return on investment, return on capital, or return on stockholder equity; (17) cash flow, free cash flow, cash flow return on investment (discounted or otherwise), net cash provided by operations, or cash flow in excess of cost of capital; (18) performance warranty and/or guarantee claims; (19) stock price or total stockholder return; (20) earnings or book value per share (basic or diluted); (21) economic value created; (22) pre-tax profit or after-tax profit; (23) strategic business criteria, consisting of one or more objectives based on meeting specified market penetration or market share, completion of strategic agreements such as licenses, joint ventures, acquisitions, and the like, geographic business expansion, objective customer satisfaction or information technology goals, intellectual property asset metrics; (24) objective goals relating to divestitures, joint ventures, mergers, acquisitions and similar transactions; (25) objective goals relating to staff management, results from staff attitude and/or opinion surveys, staff satisfaction scores, staff safety, staff accident and/or injury rates, compliance, headcount, performance management, completion of critical staff training initiatives; (26) objective goals relating to projects, including project completion, timing and/or achievement of milestones, project budget, technical progress against work plans; and (27) enterprise resource planning. Awards issued to Participants may take into account other criteria (including subjective criteria). Performance Goals may differ from Participant to Participant, Performance Period to Performance Period and from Award to Award. Any criteria used may be measured, as applicable, (i) in absolute terms, (ii) in relative terms (including, but not limited to, any increase (or decrease) over the passage of time and/or any measurement against other companies or financial or business or stock index metrics particular to the Company), (iii) on a per share and/or share per capita basis, (iv) against the performance of the Company as a whole or against any Subsidiary(ies), or a particular segment(s), a business unit(s) or a product(s) of the Company or individual project company, (v) on a pre-tax or after-tax basis, (vi) on a GAAP or non-GAAP basis, and/or (vii) using an actual foreign exchange rate or on a foreign exchange neutral basis.

(gg) "*Performance Period*" means the time period during which the Performance Goals or other vesting provisions must be satisfied for Awards. Performance Periods may be of varying and overlapping duration, at the sole discretion of the Administrator.

(hh) "*Period of Restriction*" means the period during which the transfer of Shares of Restricted Stock is subject to restrictions and therefore, the Shares are subject to a substantial risk of forfeiture. Such restrictions may be based on the passage of time, the achievement of target levels of performance, or the occurrence of other events as determined by the Administrator.

6

(ii) "**Plan**" means this 2021 Equity Incentive Plan.

(jj) "**Restricted Stock**" means Shares issued pursuant to a Restricted Stock award under Section 7 of the Plan.

(kk) "**Restricted Stock Unit**" means a bookkeeping entry representing an amount equal to the Fair Market Value of one Share, granted pursuant to Section 8. Each Restricted Stock Unit represents an unfunded and unsecured obligation of the Company.

(ll) "**Rule 16b-3**" means Rule 16b-3 of the Exchange Act or any successor to Rule 16b-3, as in effect when discretion is being exercised with respect to the Plan.

(mm) "**Section 16(b)**" means Section 16(b) of the Exchange Act.

(nn) "**Service Provider**" means an Employee, Director or Independent Contractor.

(oo) "**Share**" means a share of the Common Stock, as adjusted in accordance with Section 15 of the Plan.

(pp) "**Stock Appreciation Right**" means an Award, granted alone or in connection with an Option, that pursuant to Section 9 is designated as a Stock Appreciation Right.

(qq) "**Stock Bonus Award**" means an Award granted pursuant to Section 10 of the Plan.

(rr) "**Subsidiary**" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

(ss) "**Tax-Related Items**" means income tax, social insurance or other social contributions, national insurance, social security, payroll tax, fringe benefits tax, payment on account or other tax-related items.

3. Stock Subject to the Plan.

(a) Stock Subject to the Plan. Subject to the provisions of Section 15 of the Plan, the maximum aggregate number of Shares that may be issued under the Plan is 58,631,907 Shares, which number is the sum of (i) 27,500,000 Shares, plus (ii) the number of shares of common stock that, as of the Effective Date, have been reserved but not issued pursuant to any awards granted under the Company's Amended and Restated 2018 Equity Incentive Plan, the Company's 2009 Equity Incentive Plan (as amended through August 25, 2016) and the Company's 2007 Stock Plan (the "Existing Plans") and are not subject to any awards granted

7

thereunder in an amount not to exceed 6,051,304 Shares, plus (iii) the number of Shares subject to awards or issued under the Existing Plans that otherwise would have been returned to the Existing Plans on or after the Effective Date on account of the expiration, cancellation, forfeiture or repurchase of awards granted thereunder in an amount not to exceed 25,080,603 Shares. The Shares may be authorized, but unissued, or reacquired Common Stock. Notwithstanding the foregoing, subject to the provisions of Section 15 below, in no event shall the maximum aggregate number of Shares that may be issued under the Plan pursuant to Incentive Stock Options exceed the number set forth in this Section 3(a) plus, to the extent allowable under Section 422 of the Code and the regulations promulgated thereunder, any Shares that again become available for issuance pursuant to Sections 3(b) and 3(c).

(b) Lapsed Awards. If all or any part of an Award expires, lapses or is terminated, exchanged for or settled in cash, surrendered, repurchased, canceled without having been fully exercised or forfeited, in any case, in a manner that results in the Company acquiring Shares covered by the Award at a price not greater than the price (as adjusted pursuant to Section 15(a)) paid by the Participant for such Shares or not issuing any Shares covered by the Award, the unused Shares covered by the Award will, as applicable, become or again be available for Award grants under the Plan. The payment of dividend equivalents in cash in conjunction with any outstanding Awards shall not count against the share limit set forth in Section 3(a). Notwithstanding anything to the contrary contained herein, the following Shares shall not be added to the Shares authorized for grant under Section 3(a) and shall not be available for future grants of Awards: (i) Shares subject to a Stock Appreciation Right that are not issued in connection with the stock settlement of the Stock Appreciation Right on exercise thereof; and (ii) Shares purchased on the open market with the cash proceeds from the exercise of Options; and (iii) Shares delivered (either by actual delivery or attestation) to the Company by a Participant to satisfy the applicable exercise or purchase price of an Award and/or to satisfy any applicable tax withholding obligation with respect to an Award (including Shares retained by the Company from the Award being exercised or purchased and/or creating the tax obligation).

(c) Assumption or Substitution of Awards by the Company. The Administrator, from time to time, may determine to substitute or assume outstanding awards granted by another company, in connection with an acquisition, merger or consolidation of such other company, by either: (a) assuming such award under this Plan or (b) granting an Award under this Plan in substitution of such other company's award. Such assumption or substitution will be permissible if the holder of the substituted or assumed award would have been eligible to be granted an Award under this Plan if the other company had applied the rules of this Plan to such grant. In the event the Administrator elects to assume an award granted by another company, subject to the requirements of Section 409A of the Code, the purchase price or the exercise price, as the case may be, and the number and nature of Shares issuable upon exercise or settlement of any such Award will be adjusted appropriately. In the event the Administrator elects to grant a new Option in substitution rather than assuming an existing option, such new Option may be granted with a similarly adjusted exercise price. Any awards that are assumed or substituted under this Plan shall not reduce the number of Shares authorized for grant under the Plan or authorized for grant to a Participant in any fiscal year.

8

4. <u>Administration of the Plan</u>.

(a) <u>Procedure</u>.

(i) <u>Multiple Administrative Bodies</u>. Different Committees with respect to different groups of Service Providers may administer the Plan.

(ii) <u>Rule 16b-3</u>. To the extent desirable to qualify transactions hereunder as exempt under Rule 16b-3, the transactions contemplated hereunder will be structured to satisfy the requirements for exemption under Rule 16b-3.

(iii) <u>Other Administration</u>. Other than as provided above, the Plan will be administered by (A) the Board or (B) a Committee, which committee will be constituted to satisfy Applicable Laws.

(b) <u>Powers of the Administrator</u>. Subject to the provisions of the Plan, the Administrator will have the authority, in its discretion:

(i) to determine the Fair Market Value in accordance with Section 2(t)(iii);

(ii) to select the Service Providers to whom Awards may be granted hereunder;

(iii) to determine the number of Shares to be covered by each Award granted hereunder;

(iv) to approve forms of Award Agreements for use under the Plan;

(v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Award granted hereunder; such terms and conditions include, but are not limited to, the exercise price, the time or times when Awards may be exercised (which may be based on Performance Goals), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Award or the Shares relating thereto, based in each case on such factors as the Administrator will determine;

(vi) to institute and determine the terms and conditions of an Exchange Program; provided however, that the Administrator shall not implement an Exchange Program without the approval of the holders of a majority of the Shares that are present in person or by proxy and entitled to vote at any annual or special meeting of the Company's stockholders;

(vii) to construe and interpret the terms of the Plan and Awards granted pursuant to the Plan;

(viii) correct any defect, supply any omission or reconcile any inconsistency in this Plan, any Award or any Award Agreement;

(ix) to prescribe, amend and rescind rules and regulations relating to the Plan, including rules and regulations established for the purpose of satisfying non-U.S. Applicable Laws, for qualifying for favorable tax treatment under applicable non-U.S. Applicable Laws or facilitating compliance with non-U.S. Applicable Laws (sub-plans may be created for any of these purposes);

(x) to modify or amend each Award (subject to Section 22 of the Plan), including but not limited to the discretionary authority to extend the post-termination exercisability period of Awards, to accelerate vesting and to extend the maximum term of an Option (subject to Section 6(d) of the Plan regarding Incentive Stock Options);

(xi) adjust Performance Goals to take into account changes in Applicable Laws or in accounting or tax rules, or such other extraordinary, unforeseeable, nonrecurring or infrequently occurring events or circumstances as the Administrator deems necessary or appropriate to avoid windfalls or hardships;

(xii) to allow Participants to satisfy tax withholding obligations in such manner as prescribed in Section 16 of the Plan;

(xiii) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of an Award previously granted by the Administrator;

(xiv) to allow a Participant to defer the receipt of the payment of cash or the delivery of Shares that would otherwise be due to such Participant under an Award; and

(xv) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) Effect of Administrator's Decision. The Administrator's decisions, determinations and interpretations will be final and binding on all Participants and any other holders of Awards. Any dispute regarding the interpretation of the Plan or any Award Agreement shall be submitted by the Participant to the Company for review. Any Officer of the Company, including but not limited to Insiders, shall have the authority to review and resolve disputes with respect to Awards held by Participants who are not Insiders, and such resolution shall be final and binding on the Company and the Participant. Only the Committee shall have the authority to review and resolve disputes with respect to Awards held by Participants who are Insiders, and such resolution shall be final and binding on the Company and the Participant.

(d) Delegation. To the extent permitted by Applicable Laws, the Board or Committee, in its sole discretion and on such terms and conditions as it may provide, may delegate all or any part of its authority and powers under the Plan to one or more Directors or officers of the Company. To the extent permitted by Applicable Laws, the Board or Committee may delegate to one or more Officers who may be (but are not required to be) Insiders, the authority to do any of the following (i) designate Employees who are not Insiders to be recipients of Awards, (ii) determine the number of Shares to be subject to such Awards granted to such designated Employees, and (iii) take any and all actions on behalf of the Board or Committee other than any actions that affect the amount or form of compensation of Insiders or have material tax, accounting, financial, human resource or legal consequences to the Company or its Subsidiaries; provided, however, that the Board or Committee resolutions regarding any delegation with respect to (i) and (ii) will specify the total number of Shares that may be subject to the Awards granted by such Officer and that such Officer may not grant an Award to himself or herself. Any

10

Awards will be granted on the form of Award Agreement most recently approved for use by the Board or Committee, unless otherwise provided in the resolutions approving the delegation authority.

(e) Administration of Awards Subject to Performance Goals. The Administrator will, in its sole discretion, determine the Performance Goals, if any, applicable to any Award (including any adjustment(s) thereto that will be applied in determining the achievement of such Performance Goals) on or prior to the Determination Date. The Performance Goals may differ from Participant to Participant and from Award to Award. The Administrator shall determine and approve the extent to which such Performance Goals have been timely achieved and the extent to which the Shares subject to such Award have thereby been earned.

(f) Section 16 of the Exchange Act. Awards granted to Participants who are Insiders must be approved by two or more "non-employee directors" of the Board (as defined in the regulations promulgated under Section 16 of the Exchange Act).

(g) Indemnification. In addition to such other rights of indemnification as they may have as Directors or members of the Committee, and to the extent allowed by Applicable Laws, the Administrator shall be indemnified by the Company against the reasonable expenses, including attorney's fees, actually incurred in connection with any action, suit or proceeding or in connection with any appeal therein, to which the Administrator may be party by reason of any action taken or failure to act under or in connection with the Plan or any Award granted under the Plan, and against all amounts paid by the Administrator in settlement thereof (provided, however, that the settlement has been approved by the Company, which approval shall not be unreasonably withheld) or paid by the Administrator in satisfaction of a judgment in any such action, suit or proceeding, except in relation to matters as to which it shall be adjudged in such action, suit or proceeding that such Administrator did not act in good faith and in a manner which such person reasonably believed to be in the best interests of the Company, or in the case of a criminal proceeding, had no reason to believe that the conduct complained of was unlawful; provided, however, that within 60 days after the institution of any such action, suit or proceeding, the Administrator shall, in writing, offer the Company the opportunity at its own expense to handle and defend such action, suit or proceeding.

5. Award Eligibility. Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Stock Units and Stock Bonus Awards may be granted to Service Providers. Incentive Stock Options may be granted only to Employees.

6. Options.

(a) Grant of Options. Subject to the terms and conditions of the Plan, an Option may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion. Notwithstanding the above, Incentive Stock Options may only be granted to Employees.

(b) Option Agreement. Each Award of an Option will be evidenced by an Award Agreement that will specify whether the award is designated as an Incentive Stock Option or a Nonstatutory Stock Option, the exercise price, the term of the Option, the number of Shares subject to the Option, the exercise restrictions, if any, applicable to the Option, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

11

(c) <u>Limitations</u>. Each Option will be designated in the Award Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Stock Options are exercisable for the first time by the Participant during any calendar year (under all plans of the Company and any Subsidiary) exceeds one hundred thousand dollars ($100,000), such Options will be treated as Nonstatutory Stock Options. For purposes of this Section 6(c), Incentive Stock Options will be taken into account in the order in which they were granted. The Fair Market Value of the Shares will be determined as of the date the Option with respect to such Shares is granted. With respect to the Administrator's authority in Section 4(b)(x), if, at the time of any such extension, the exercise price per Share of the Option is less than the Fair Market Value of a Share, the extension shall, unless otherwise determined by the Administrator, be limited to the earlier of (1) the maximum term of the Option as set by its original terms, or (2) ten (10) years from the grant date. Unless otherwise determined by the Administrator, any extension of the term of an Option pursuant to this Section 6(c) shall comply with Section 409A of the Code to the extent necessary to avoid taxation thereunder.

(d) <u>Term of Option</u>. The term of each Option will be stated in the Award Agreement. In the case of an Incentive Stock Option, the term will be ten (10) years from the date of grant or such shorter term as may be provided in the Award Agreement. Moreover, in the case of an Incentive Stock Option granted to a Participant who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Subsidiary, the term of the Incentive Stock Option will be five (5) years from the date of grant or such shorter term as may be provided in the Award Agreement.

(e) <u>Option Exercise Price and Consideration</u>.

(i) <u>Exercise Price</u>. The per share exercise price for the Shares to be issued pursuant to exercise of an Option will be determined by the Administrator, subject to the following:

(1) In the case of an Incentive Stock Option

(A) granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Subsidiary, the per Share exercise price will be no less than one hundred ten percent (110%) of the Fair Market Value per Share on the date of grant.

(B) granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

12

(2) In the case of a Nonstatutory Stock Option, the per Share exercise price will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

(3) Notwithstanding the foregoing, Options may be granted with a per Share exercise price of less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant pursuant to a transaction described in, and in a manner consistent with, Section 424(a) of the Code.

(ii) <u>Waiting Period and Exercise Dates</u>. At the time an Option is granted, the Administrator will fix the period within which the Option may be exercised and will determine any conditions that must be satisfied before the Option may be exercised. An Option may become exercisable upon completion of a specified period of service with the Company or a Subsidiary and/or based on the achievement of Performance Goals during a Performance Period as set out in advance in the Participant's Award Agreement. If an Option is exercisable based on the satisfaction of Performance Goals, then the Administrator will: (x) determine the nature, length and starting date of any Performance Period for such Option; (y) select the Performance Goals to be used to measure the performance; and (z) determine what additional vesting conditions, if any, should apply.

(iii) <u>Form of Consideration</u>. The Administrator will determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator will determine the acceptable form of consideration at the time of grant. Such consideration for both types of Options may consist entirely of: (1) cash; (2) check; (3) promissory note, to the extent permitted by Applicable Laws, (4) other Shares, provided that such Shares have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which such Option will be exercised and provided that accepting such Shares will not result in any adverse accounting consequences to the Company, as the Administrator determines in its sole discretion; (5) consideration received by the Company under a broker-assisted (or other) cashless exercise program (whether through a broker or otherwise) implemented by the Company in connection with the Plan; (6) by net exercise; (7) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws; or (8) any combination of the foregoing methods of payment.

(f) <u>Exercise of Option</u>.

(i) <u>Procedure for Exercise; Rights as a Stockholder</u>. Any Option granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the Administrator and set forth in the Award Agreement. An Option may not be exercised for a fraction of a Share. An Option will be deemed exercised when the Company receives: (A) a notice of exercise (in such form as the Administrator may specify from time to time) from the person entitled to exercise the Option, and (B) full payment for the Shares with respect to which the Option is exercised (together with full payment of any applicable taxes or other amounts required to be withheld or deducted with respect to the Option). Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan. Shares issued upon exercise of an Option will

13

be issued in the name of the Participant or, if requested by the Participant, in the name of the Participant and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to an Option, notwithstanding the exercise of the Option. The Company will issue (or cause to be issued) such Shares promptly after the Option is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 15 of the Plan.

(ii) <u>Termination of Relationship as a Service Provider</u>. If a Participant ceases to be a Service Provider, other than upon the Participant's termination as the result of the Participant's death, Disability or Cause, the Participant may exercise his or her Option within such period of time as is specified in the Award Agreement to the extent that the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement). In the absence of a specified time in the Award Agreement, the Option will remain exercisable for three (3) months following the Participant's termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified by the Administrator, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iii) <u>Disability of Participant</u>. If a Participant ceases to be a Service Provider as a result of the Participant's Disability, the Participant may exercise his or her Option within such period of time as is specified in the Award Agreement to the extent the Option is vested on the date of termination (but in no event later than the expiration of the term of such Option as set forth in the Award Agreement). In the absence of a specified time in the Award Agreement, the Option will remain exercisable for twelve (12) months following the Participant's termination. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If after termination the Participant does not exercise his or her Option within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

(iv) <u>Death of Participant</u>. If a Participant dies while a Service Provider, the Option may be exercised following the Participant's death within such period of time as is specified in the Award Agreement to the extent that the Option is vested on the date of death (but in no event may the Option be exercised later than the expiration of the term of such Option as set forth in the Award Agreement), by the Participant's designated beneficiary, provided such beneficiary has been designated prior to Participant's death in a form acceptable to the Administrator. If no such beneficiary has been designated by the Participant, then such Option may be exercised by the personal representative of the Participant's estate or by the person(s) to whom the Option is transferred pursuant to the Participant's will or in accordance with the laws of descent and distribution. In the absence of a specified time in the Award Agreement, the Option will remain exercisable for twelve (12) months following Participant's death. Unless otherwise provided by the Administrator, if on the date of termination the Participant is not vested as to his or her entire Option, the Shares covered by the unvested portion of the Option will revert to the Plan. If the Option is not so exercised within the time specified herein, the Option will terminate, and the Shares covered by such Option will revert to the Plan.

14

(v) <u>Termination for Cause</u>. If a Participant ceases to be a Service Provider as a result of being terminated for Cause, any outstanding Option (including any vested portion thereof) held by such Participant shall immediately terminate in its entirety upon the Participant being first notified of his or her termination for Cause and the Participant will be prohibited from exercising his or her Option from and after the date of such termination. All the Participant's rights under any Option, including the right to exercise the Option, may be suspended pending an investigation of whether Participant will be terminated for Cause.

7. <u>Restricted Stock</u>.

(a) <u>Grant of Restricted Stock</u>. Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Shares of Restricted Stock to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b) <u>Restricted Stock Agreement</u>. Each Award of Restricted Stock will be evidenced by an Award Agreement that will specify the Period of Restriction, the number of Shares granted, and such other terms and conditions as the Administrator, in its sole discretion, will determine.

(c) <u>Restricted Stock Terms</u>. Unless the Administrator determines otherwise, the Company as escrow agent will hold Shares of Restricted Stock until the restrictions on such Shares have lapsed. These restrictions may lapse upon the completion of a specified period of service with the Company or a Subsidiary and/or based on the achievement of Performance Goals during a Performance Period as set out in advance in the Participant's Award Agreement. If the unvested Shares of Restricted Stock are being earned upon the satisfaction of Performance Goals, then the Administrator will: (x) determine the nature, length and starting date of any Performance Period for each unvested Share; (y) select the Performance Goals to be used to measure the performance; and (z) determine what additional vesting conditions, if any, should apply.

(d) <u>Transferability</u>. Except as provided in this Section 7 or the Award Agreement, Shares of Restricted Stock may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated until the end of the applicable Period of Restriction.

(e) <u>Other Restrictions</u>. The Administrator, in its sole discretion, may impose such other restrictions on Shares of Restricted Stock as it may deem advisable or appropriate.

(f) <u>Removal of Restrictions</u>. Except as otherwise provided in this Section 7, Shares of Restricted Stock covered by each Restricted Stock grant made under the Plan will be released from escrow as soon as practicable after the last day of the Period of Restriction or at such other time as the Administrator may determine. The Administrator, in its discretion, may accelerate the time at which any restrictions will lapse or be removed.

15

(g) <u>Voting Rights</u>. During the Period of Restriction, Service Providers holding Shares of Restricted Stock granted hereunder may exercise full voting rights with respect to those Shares, unless the Administrator determines otherwise.

(h) <u>Dividends and Other Distributions</u>. During the Period of Restriction, Service Providers holding Shares of Restricted Stock will be entitled to receive all dividends and other distributions paid with respect to such Shares, unless the Administrator provides otherwise. If any such dividends or distributions are paid in Shares, the Shares will be subject to the same restrictions, including, without limitation, restrictions on transferability and forfeitability, as the Shares of Restricted Stock with respect to which they were paid.

(i) <u>Return of Restricted Stock to Company</u>. On the date set forth in the Award Agreement, the Restricted Stock for which restrictions have not lapsed will be cancelled and returned as unissued Shares to the Company and again will become available for grant under the Plan.

8. <u>Restricted Stock Units</u>.

(a) <u>Grant of Restricted Stock Units</u>. Subject to the terms and provisions of the Plan, the Administrator, at any time and from time to time, may grant Restricted Stock Units to Service Providers in such amounts as the Administrator, in its sole discretion, will determine.

(b) <u>Restricted Stock Unit Agreement</u>. Each Award of Restricted Stock Units will be evidenced by an Award Agreement that will specify the terms, conditions, and restrictions (if any) related to the grant, including the number of Restricted Stock Units.

(c) <u>Vesting Criteria and Other Terms</u>. The Administrator will set vesting criteria in its discretion, which, depending on the extent to which the criteria are met, will determine the number of Restricted Stock Units that will be paid out to the Participant. A Restricted Stock Unit Award may vest upon completion of a specified period of service with the Company or a Subsidiary and/or based on the achievement of Performance Goals during a Performance Period as set out in advance in the Participant's Award Agreement. If Restricted Stock Units vest based upon satisfaction of Performance Goals, then the Administrator will: (x) determine the nature, length and starting date of any Performance Period for the Restricted Stock Units; (y) select the Performance Goals to be used to measure the performance; and (z) determine what additional vesting conditions, if any, should apply.

(d) <u>Earning Restricted Stock Units</u>. Upon meeting the applicable vesting criteria, the Participant will be entitled to receive a payout as determined by the Administrator. Notwithstanding the foregoing, at any time after the grant of Restricted Stock Units, the Administrator, in its sole discretion, may reduce or waive any vesting criteria that must be met to receive a payout.

(e) <u>Dividend Equivalents</u>. The Administrator may, in its sole discretion, award dividend equivalents in connection with the grant of Restricted Stock Units that may be settled in cash, in Shares of equivalent value, or in some combination thereof.

16

(f) <u>Form and Timing of Payment</u>. Payment of earned Restricted Stock Units will be made upon the date(s) determined by the Administrator and set forth in the Award Agreement. The Administrator, in its sole discretion, may only settle earned Restricted Stock Units in cash, Shares, or a combination of both.

(g) <u>Cancellation</u>. On the date set forth in the Award Agreement, all Shares underlying any unvested, unlapsed unearned Restricted Stock Units will be forfeited to the Company for future issuance.

9. <u>Stock Appreciation Rights</u>.

(a) <u>Grant of Stock Appreciation Rights</u>. Subject to the terms and conditions of the Plan, a Stock Appreciation Right may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b) <u>Stock Appreciation Right Agreement</u>. Each Stock Appreciation Right grant will be evidenced by an Award Agreement that will specify the exercise price, the term of the Stock Appreciation Right, the conditions of exercise, and such other terms and conditions as the Administrator, in its sole discretion, will determine. A Stock Appreciation Right may become exercisable upon completion of a specified period of service with the Company or a Subsidiary and/or based on the achievement of Performance Goals during a Performance Period as set out in advance in the Participant's Award Agreement. If a Stock Appreciation Right is exercisable based on the satisfaction of Performance Goals, then the Administrator will: (x) determine the nature, length and starting date of any Performance Period for such Stock Appreciation Right; (y) select the Performance Goals to be used to measure the performance; and (z) determine what additional vesting conditions, if any, should apply.

(c) <u>Number of Shares</u>. The Administrator will have complete discretion to determine the number of Stock Appreciation Rights granted to any Service Provider.

(d) <u>Exercise Price and Other Terms</u>. The per share exercise price for the Shares to be issued pursuant to exercise of a Stock Appreciation Right will be determined by the Administrator and will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant. Otherwise, the Administrator, subject to the provisions of the Plan, will have complete discretion to determine the terms and conditions of Stock Appreciation Rights granted under the Plan.

(e) <u>Expiration of Stock Appreciation Rights</u>. A Stock Appreciation Right granted under the Plan will expire upon the date determined by the Administrator, in its sole discretion, and set forth in the Award Agreement. Notwithstanding the foregoing, the rules of Section 6(d) relating to the maximum term and Section 6(f) relating to exercise also will apply to Stock Appreciation Rights.

(f) <u>Payment of Stock Appreciation Right Amount</u>. Upon exercise of a Stock Appreciation Right, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

(i) The difference between the Fair Market Value of a Share on the date of exercise over the exercise price; times

17

(ii) The number of Shares with respect to which the Stock Appreciation Right is exercised.

At the discretion of the Administrator, the payment upon Stock Appreciation Right exercise may be in cash, in Shares of equivalent value, or in some combination thereof.

10. Stock Bonus Awards.

(a) Grant of Stock Bonus Awards. Subject to the terms and conditions of the Plan, a Stock Bonus Award may be granted to Service Providers at any time and from time to time as will be determined by the Administrator, in its sole discretion.

(b) Stock Bonus Award Agreement. Each Award of Stock Bonus Awards will be evidenced by an Award Agreement that will specify the terms and conditions, and restrictions (if any) related to the grant, including the number of Stock Bonus Awards.

(c) Terms of Stock Bonus Awards. The Administrator will determine the number of Shares to be awarded to the Participant under a Stock Bonus Award.

(d) Form of Payment to Participant. Payment may be made in the form of cash, whole Shares, or a combination thereof, based on the Fair Market Value of the Shares subject to the Stock Bonus Award on the date of payment, as determined in the sole discretion of the Administrator.

11. Outside Director Limitations. Stock awards granted during a single fiscal year under the Plan or otherwise, taken together with any cash fees paid during such fiscal year for services on the Board, shall not exceed $750,000 in total value for any Outside Director (calculating the value of any such stock awards based on the grant date fair value of such stock awards for financial reporting purposes). Such applicable limit shall include the value of any stock awards that are received in lieu of all or a portion of any annual committee cash retainers or other similar cash based payments. Stock awards granted to an individual while he or she was serving in the capacity as an Employee or while he or she was an Independent Contractor but not an Outside Director will not count for purposes of the limitations set forth in this Section 11.

12. Leaves of Absence/Transfer Between Locations. The Administrator shall have the discretion to determine at any time whether and to what extent the vesting of Awards shall be suspended during any leave of absence; provided, however, that in the absence of such determination, vesting of Awards shall continue during any paid leave and shall be suspended during any unpaid leave (unless otherwise required by Applicable Laws). A Participant will not cease to be an Employee in the case of (i) any leave of absence approved by the Participant's employer or (ii) transfers between locations of the Company or between the Company or any Subsidiary. If an Employee is holding an Incentive Stock Option and such leave exceeds three (3) months then, for purposes of Incentive Stock Option status only, such Employee's service as an Employee shall be deemed terminated on the first (1st) day following such three (3) month period and the Incentive Stock Option shall thereafter automatically treated for tax purposes as a

18

Nonstatutory Stock Option in accordance with Applicable Laws, unless reemployment upon the expiration of such leave is guaranteed by contract or statute, or unless provided otherwise pursuant to a written Company policy.

13. Change in Time Commitment. In the event a Participant's regular level of time commitment in the performance of his or her services for the Company or any Subsidiaries is reduced (for example, and without limitation, if the Participant is an Employee of the Company and the Employee has a change in status from full-time to part-time or takes an extended leave of absence) after the date of grant of any Award, the Committee or the Administrator, in that party's sole discretion, may, subject to Applicable Laws, (x) make a corresponding reduction in the number of Shares or cash amount subject to any portion of such Award that is scheduled to vest or become payable after the date of such change in time commitment, and (y) in lieu of or in combination with such a reduction, extend the vesting schedule applicable to such Award (in accordance with Section 409A of the Code, as applicable). In the event of any such reduction, the Participant will have no right with respect to any portion of the Award that is so amended.

14. Transferability of Awards. Unless determined otherwise by the Administrator, an Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will or by the laws of descent or distribution and may be exercised, during the lifetime of the Participant, only by the Participant. If the Administrator makes an Award transferable, such Award will contain such additional terms and conditions as the Administrator deems appropriate provided, however, that in no event may any Award be transferred for consideration to a third-party financial institution.

15. Adjustments; Dissolution or Liquidation; Merger or Change in Control.

(a) Adjustments. In the event of a stock split, reverse stock split, stock dividend, combination, consolidation, recapitalization (including a recapitalization through a large nonrecurring cash dividend) or reclassification of the Shares, subdivision of the Shares, a rights offering, a reorganization, merger, spin-off, split-up, repurchase, or exchange of Common Stock or other securities of the Company or other significant corporate transaction, or other change affecting the Common Stock occurs, the Administrator, in order to prevent dilution, diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan, will, in such manner as it may deem equitable, adjust the number, kind and class of securities that may be delivered under the Plan and/or the number, class, kind and price of securities covered by each outstanding Award. Notwithstanding the forgoing, all adjustments under this Section 15 shall be made in a manner that does not result in taxation under Section 409A of the Code.

(b) Dissolution or Liquidation. In the event of the proposed winding up, dissolution or liquidation of the Company, the Administrator will notify each Participant as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised or settled, an Award will terminate immediately prior to the consummation of such proposed action.

(c) Corporate Transaction. In the event of a Corporate Transaction, each outstanding Award (vested or unvested) will be treated as the Administrator determines, which determination

19

may be made without the consent of any Participant and the Administrator need not treat all outstanding Awards (or portion thereof) in an identical manner. Such determination, without the consent of any Participant, may provide (without limitation) for one or more of the following in the event of a Corporate Transaction: (A) the continuation of such outstanding Awards by the Company (if the Company is the surviving corporation); (B) the assumption of such outstanding Awards by the surviving corporation or its parent; (C) the substitution by the surviving corporation or its parent of new equity awards with substantially the same terms of the substituted Awards; (D) the cancellation of such Awards in exchange for a payment to the Participants equal to the excess of (1) the Fair Market Value of the Shares subject to such Awards as of the closing date of such Corporate Transaction over (2) the exercise price or purchase price paid or to be paid (if any) for the Shares subject to the Awards; provided, that, if the exercise price or purchase price for such Awards equals or exceeds the Fair Market Value of the Shares subject to such Awards, then the Awards may be terminated without payment. Provided further, that at the discretion of the Administrator, such payment may be subject to the same conditions that apply to the consideration that will be paid to holders of Shares in connection with the transaction; provided, however, that any payout in connection with a terminated award shall comply with Section 409A of the Code to the extent necessary to avoid taxation thereunder; (E) the full or partial acceleration of exercisability or vesting and accelerated expiration of an outstanding Award and lapse of the Company's right to repurchase or re-acquire Shares acquired under an Award or lapse of forfeiture rights with respect to Shares acquired under an Award; or (F) the opportunity for Participants to exercise their then-exercisable Options prior to the occurrence of the Corporate Transaction and the termination (for no consideration) upon the consummation of such Corporate Transaction of any Options not exercised prior thereto (whether or not exercisable prior to the consummation of the Corporate Transaction).

(d) <u>Change in Control</u>. An Award may be subject to additional acceleration of vesting and exercisability upon or after a Change in Control as may be provided in the Award Agreement for such Award or as may be provided in any other written agreement between the Company or any Subsidiary and the Participant, but in the absence of such provision, no such acceleration will occur.

16. <u>Tax</u>.

(a) <u>Withholding Requirements</u>. Prior to the delivery of any Shares or cash pursuant to an Award (or exercise thereof) or prior to any time the Award or Shares are subject to taxation or other Tax-Related Items, the Company and/or the Participant's employer will have the power and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy any Tax-Related Items or other items that are required to be withheld or deducted or otherwise applicable with respect to such Award.

(b) <u>Withholding Arrangements</u>. The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit a Participant to satisfy such withholding or deduction obligations or any other Tax-Related Items, in whole or in part by (without limitation) (a) paying cash, (b) electing to have the Company withhold otherwise deliverable cash or Shares, or (c) delivering to the Company already-owned Shares; provided that, unless specifically permitted by the Company, any proceeds derived from a cashless

20

exercise must be an approved broker-assisted cashless exercise or the cash or Shares withheld or delivered must be limited to avoid financial accounting charges under applicable accounting guidance or Shares must have been previously held for the minimum duration required to avoid financial accounting charges under applicable accounting guidance. The Fair Market Value of the Shares to be withheld or delivered will be determined based on such methodology that the Company deems to be reasonable and in accordance with Applicable Laws.

(c) Compliance With Section 409A of the Code. Awards will be designed and operated in such a manner that they are either exempt from the application of, or comply with, the requirements of Section 409A of the Code such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Section 409A of the Code. The Plan and each Award Agreement under the Plan is intended to meet the requirements of Section 409A of the Code (or an exemption therefrom) and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Administrator. To the extent that an Award or payment, or the settlement or deferral thereof, is subject to Section 409A of the Code the Award will be granted, paid, settled or deferred in a manner that will meet the requirements of Section 409A of the Code (or an exemption therefrom), such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Section 409A of the Code. In no event will the Company be responsible for or reimburse a Participant for any taxes or other penalties incurred as a result of applicable of Section 409A of the Code.

(d) Limitation on Payments. If any payment or benefit that a Participant would receive from the Company, any Subsidiary or any other party whether in connection with the provisions in this Plan or otherwise (the "*Payment*") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "*Excise Tax*"), then the Payment shall be equal to the Best Results Amount. The "Best Results Amount" shall be either (x) the full amount of the Payment or (y) a lesser amount that would result in no portion of the Payment being subject to the Excise Tax, whichever of those amounts, taking into account the applicable federal, state and local employment taxes, income taxes and the Excise Tax, results in the Participant's receipt, on an after-tax basis, of the greater amount. If a reduction in payments or benefits constituting parachute payments is necessary so that the Payment equals the Best Results Amount, reduction shall occur in the following order: reduction of cash payments; cancellation of accelerated vesting of stock awards; reduction of employee benefits. In the event that acceleration of vesting of stock award compensation is to be reduced, the acceleration of vesting shall be cancelled in the reverse order of the date of grant of the Participant's equity awards. Participants shall be solely responsible for the payment of all personal tax liability that is incurred as a result of the payments and benefits received under this Plan, and Participants shall not be reimbursed by the Company for any of those payments of personal tax liability.

17. No Effect on Employment or Service. Neither the Plan nor any Award will confer upon a Participant any right with respect to continuing the Participant's relationship as a Service Provider with the Company or any Subsidiary, nor will they interfere in any way with the Participant's right or the Company's or any Subsidiary's right to terminate such relationship at any time, with or without cause, to the extent permitted by Applicable Laws.

21

18. <u>Date of Grant</u>. The date of grant of an Award will be, for all purposes, the date on which the Administrator makes the determination granting such Award, or such other later date as is determined by the Administrator. Notice of the determination will be provided to each Participant within a reasonable time after the date of such grant.

19. <u>Corporate Records Control</u>. In the event that the corporate records (e.g., Board consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (e.g., exercise price, vesting schedule or number of Shares) that are inconsistent with those in the Award Agreement or related grant documents as a result of a clerical error in the papering of the Award Agreement or related grant documents, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Award Agreement or related grant documents.

20. <u>Clawback/Recovery</u>. The Administrator may specify in an Award Agreement that the Participant's rights, payments, and/or benefits with respect to an Award will be subject to reduction, cancellation, forfeiture, and/or recoupment upon the occurrence of certain specified events, in addition to any applicable vesting, performance or other conditions and restrictions of an Award. Notwithstanding any provisions to the contrary under this Plan, an Award granted under the Plan shall be subject to the Company's clawback policy as may be established and/or amended from time to time. The Administrator may require a Participant to forfeit or return to and/or reimburse the Company for all or a portion of the Award and/or Shares issued under the Award, any amounts paid under the Award, and any payments or proceeds paid or provided upon disposition of the Shares issued under the Award, pursuant to the terms of such Company policy or as necessary or appropriate to comply with Applicable Laws.

21. <u>Term of Plan</u>. Subject to Section 25 of the Plan, the Plan will become effective as of the Effective Date. The Plan will continue in effect for a term of ten (10) years measured from the earlier of the date the Board approves this Plan or the approval of this Plan by the Company's stockholders, unless terminated earlier under Section 22 of the Plan.

22. <u>Amendment and Termination of the Plan</u>.

(a) <u>Amendment and Termination</u>. The Administrator may at any time amend, alter, suspend or terminate the Plan.

(b) <u>Stockholder Approval</u>. The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c) <u>Effect of Amendment or Termination</u>. No amendment, alteration, suspension or termination of the Plan will materially impair the rights of any Participant, unless mutually agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Awards granted under the Plan prior to the date of such termination.

22

23. <u>Conditions Upon Issuance of Shares</u>.

(a) <u>Legal Compliance</u>. Shares will not be issued pursuant to the exercise or vesting (as applicable) of an Award unless the exercise or vesting of such Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

(b) <u>Investment Representations</u>. As a condition to the exercise of an Award, the Company may require the person exercising such Award to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

24. <u>Inability to Obtain Authority</u>. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

25. <u>Stockholder Approval</u>. The Plan will be subject to approval by the stockholders of the Company within twelve (12) months after the date the Plan is adopted by the Board. Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

26. <u>Governing Law</u>. The Plan and all Awards hereunder shall be construed in accordance with and governed by the laws of the State of Delaware, but without regard to its conflict of law provisions.

23

**VIEW, INC.**

**2021 CHIEF EXECUTIVE OFFICER INCENTIVE PLAN**

1. <u>Purposes of the Plan</u>. The purposes of this Plan are (a) to incentivize the Chief Executive Officer of the Company with long-term equity-based compensation and to align his interests with the Company's stockholders; and (b) to promote the success of the Company's business.

The Plan permits the grant of the Option Award to the Chief Executive Officer of the Company pursuant to the terms set forth in <u>Exhibit A</u>.

2. <u>Definitions</u>. As used herein, the following definitions will apply:

(a) "***Administrator***" means the Board or any of its Committees as will be administering the Plan, in accordance with Section 4 of the Plan.

(b) "***Applicable Laws***" means all applicable laws, rules, regulations and requirements, including, but not limited to, all applicable U.S. federal or state laws, rules and regulations, the rules and regulations of any stock exchange or quotation system on which the Common Stock is listed or quoted, and the applicable laws, rules and regulations of any other country or jurisdiction where the Option Award is, or will be, granted under the Plan or where the Participant resides or provides services to the Company or any Subsidiary, as such laws, rules, and regulations shall be in effect from time to time.

(c) "***Award Agreement***" means the written or electronic agreement setting forth the terms and provisions applicable to the Option Award granted under the Plan. The Award Agreement is subject to the terms and conditions of the Plan.

(d) "***Board***" means the Board of Directors of the Company.

(e) "***Cause***" has such meaning as in the Chief Executive Officer's employment agreement with the Company, dated November 21, 2018.

(f) "***Change in Control***" except as may otherwise be provided in the Award Agreement or other applicable agreement, means the occurrence of any of the following:

(i) The consummation of a merger or consolidation of the Company with or into another entity or any other corporate reorganization, if the Company's stockholders immediately prior to such merger, consolidation or reorganization cease to directly or indirectly own immediately after such merger, consolidation or reorganization at least a majority of the combined voting power of the continuing or surviving entity's securities outstanding immediately after such merger, consolidation or reorganization;

(ii) The consummation of the sale, transfer or other disposition of all or substantially all of the Company's assets (other than (x) to a corporation or other entity of which at least a majority of its combined voting power is owned directly or indirectly by the Company,

(y) to a corporation or other entity owned directly or indirectly by the shareholders of the Company in substantially the same proportions as their ownership of the Common Stock of the Company or (z) to a continuing or surviving entity described in Section 2(f)(i) in connection with a merger, consolidation or reorganization which does not result in a Change in Control under Section 2(f)(i));

        (iii) A change in the effective control of the Company which occurs on the date that a majority of members of the Board is replaced during any twelve (12) month period by Directors whose appointment or election is not endorsed by a majority of the members of the Board prior to the date of the appointment or election; or

        (iv) The consummation of any transaction as a result of which any Person becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing at least fifty percent (50%) of the total voting power represented by the Company's then outstanding voting securities. For purposes of this Section 2(f), the term "*Person*" shall have the same meaning as when used in Sections 13(d) and 14(d) of the Exchange Act but shall exclude:

        (1) a trustee or other fiduciary holding securities under an employee benefit plan of the Company or a Subsidiary;

        (2) a corporation or other entity owned directly or indirectly by the stockholders of the Company in substantially the same proportions as their ownership of the Common Stock of the Company;

        (3) the Company; and

        (4) a corporation or other entity of which at least a majority of its combined voting power is owned directly or indirectly by the Company.

A transaction shall not constitute a Change in Control if its sole purpose is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately before such transactions. In addition, if any Person (as defined above) is considered to be in effective control of the Company, the acquisition of additional control of the Company by the same Person will not be considered to cause a Change in Control. If required for compliance with Section 409A of the Code, in no event will a Change in Control be deemed to have occurred if such transaction is not also a "change in the ownership or effective control of" the Company or "a change in the ownership of a substantial portion of the assets of" the Company as determined under Treasury Regulation Section 1.409A-3(i)(5) (without regard to any alternative definition thereunder).

(g) "*Chief Executive Officer*" means Rao Mulpuri, the Company's chief executive officer as of the Effective Date.

(h) "*Closing Date*" means the date of the closing of the transactions described in that certain Agreement and Plan of Merger by and among CF Finance Acquisition Corp. II, PVMS Merger Sub, Inc. and View, Inc. dated as of November 30, 2020.

2

(i) "*Code*" means the Internal Revenue Code of 1986, as amended. Reference to a specific section of the Code or regulation thereunder shall include such section or regulation, any valid regulation promulgated under such section, and any comparable provision of any future legislation or regulation amending, supplementing or superseding such section or regulation.

(j) "*Committee*" means a committee of Directors or of other individuals satisfying Applicable Laws appointed by the Board in accordance with Section 4 hereof.

(k) "*Common Stock*" means the Class A common stock of the Company.

(l) "*Company*" means View, Inc., a Delaware corporation, or any successor thereto.

(m) "*Corporate Transaction*" means the occurrence of any of the following events:

(i) a transfer of all or substantially all of the Company's assets;

(ii) a merger, consolidation or other capital reorganization or business combination transaction of the Company with or into another corporation, entity or person;

(iii) the consummation of a transaction, or series of related transactions, in which any "person" (as such term is used in Sections 13(d) and 14(d) of the Exchange Act) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than 50% of the Company's then outstanding capital stock; or

(iv) a Change in Control.

(n) "*Director*" means a member of the Board.

(o) "*Effective Date*" means the effective date of this Plan, which is the Closing Date, provided that this Plan is approved by the Company's stockholders prior to such date.

(p) "*Employee*" means any person, including Officers and Directors, employed by the Company or any Subsidiary of the Company. Neither service as a Director nor payment of a director's fee by the Company will be sufficient to constitute "employment" by the Company.

(q) "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

(r) "*Fair Market Value*" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, its Fair Market Value will be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system on the day of determination, as reported in such source as the Administrator deems reliable;

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share will be the mean between the high bid and low asked prices for the Common Stock on the day of determination, as reported in such source as the Administrator deems reliable; or

3

(iii) In the absence of an established market for the Common Stock, the Fair Market Value will be determined in good faith by the Administrator in compliance with Applicable Laws and regulations and in a manner that complies with Section 409A of the Code.

(s) "*Officer*" means a person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(t) "*Option Award*" means the stock option granted to the Chief Executive Officer pursuant to the Plan, which is not intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder.

(u) "*Participant*" means the Chief Executive Officer while he is the holder of the outstanding Option Award.

(v) "*Performance Goal*" means, the performance goals set forth in Exhibit A.

(w) "*Performance Period*" means, the performance period set forth in Exhibit A.

(x) "*Period of Restriction*" means the eighteen-month period, beginning on the date of vesting during which the transfer of Shares acquired pursuant to the exercise of the Option Award (in whole or in part) is subject to a transfer restriction.

(y) "*Plan*" means this 2021 Chief Executive Officer Incentive Plan.

(z) "*Rule 16b-3*" means Rule 16b-3 of the Exchange Act or any successor to Rule 16b-3, as in effect when discretion is being exercised with respect to the Plan.

(aa) "*Share*" means a share of the Common Stock, as adjusted in accordance with Section 10 of the Plan.

(bb) "*Subsidiary*" means any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company if each of the corporations other than the last corporation in the unbroken chain owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain. A corporation that attains the status of a Subsidiary on a date after the adoption of the Plan shall be considered a Subsidiary commencing as of such date.

(cc) "*Tax-Related Items*" means income tax, social insurance or other social contributions, national insurance, social security, payroll tax, fringe benefits tax, payment on account or other tax-related items.

4

3. <u>Stock Subject to the Plan</u>.

(a) <u>Maximum Number</u>. Subject to the provisions of Section 10 of the Plan, the maximum aggregate number of Shares that may be issued under the Plan shall not exceed 25,000,000 Shares. The Shares may be authorized, but unissued, or reacquired Common Stock.

(b) <u>No Share Recycling</u>. The Option Award issued under this Plan shall not be returned to the Plan and shall not become available for future issuance under the Plan under any circumstance.

4. <u>Administration of the Plan</u>.

(a) <u>Procedure</u>.

(i) <u>Rule 16b-3</u>. To the extent desirable to qualify transactions hereunder as exempt under Rule 16b-3, the transactions contemplated hereunder will be structured to satisfy the requirements for exemption under Rule 16b-3.

(ii) <u>Other Administration</u>. Other than as provided above, the Plan will be administered by (A) the Board or (B) a Committee, which committee will be constituted to satisfy Applicable Laws.

(b) <u>Powers of the Administrator</u>. Subject to the provisions of the Plan, the Administrator will have the authority:

(i) to grant the Option Award to the Chief Executive Officer pursuant to the terms set forth in <u>Exhibit A</u>;

(ii) to approve the form of Award Agreement for use under the Plan;

(iii) to construe and interpret the terms of the Plan and the Option Award granted pursuant to the Plan;

(iv) correct any defect, supply any omission or reconcile any inconsistency in this Plan, the Option Award or the Award Agreement;

(v) to prescribe, amend and rescind rules and regulations relating to the Plan;

(vi) to modify or amend the Option Award (subject to Section 10 of the Plan), including but not limited to the discretionary authority to accelerate vesting of the Option Award;

(vii) to allow the Participant to satisfy tax withholding obligations in such manner as prescribed in Section 11 of the Plan;

(viii) to authorize any person to execute on behalf of the Company any instrument required to effect the grant of the Option Award previously granted by the Administrator;

(ix) to allow the Participant to defer the receipt of the payment of cash or the delivery of Shares that would otherwise be due to such Participant under the Option Award; and

5

(x) to make all other determinations deemed necessary or advisable for administering the Plan.

(c) <u>Effect of Administrator's Decision</u>. The Administrator's decisions, determinations and interpretations will be final and binding on the Participant. Any dispute regarding the interpretation of the Plan or the Award Agreement shall be submitted by the Participant to the Company for review. Only the Committee shall have the authority to review and resolve disputes with respect to the Option Award held by the Participant, and such resolution shall be final and binding on the Company and the Participant.

(d) <u>Administration of Option Awards Subject to Performance Goals</u>. The Administrator shall determine and approve the extent to which the Performance Goals have been timely achieved and the extent to which the Shares subject to the Option Award have thereby been earned.

5. <u>Award Eligibility</u>. Only the Chief Executive Officer is eligible to receive the Option Award under this Plan.

6. <u>Option Award</u>.

(a) <u>Grant</u>. The Option Award will be granted to the Chief Executive Officer on the Closing Date, subject to his employment with the Company on such date.

(b) <u>Vesting Criteria and Other Terms</u>. The Option Award will vest pursuant to the criteria set forth in <u>Exhibit A</u>.

(c) <u>Option Award Exercise Price and Consideration</u>.

(i) <u>Exercise Price</u>. The per share exercise price for the Shares to be issued pursuant to exercise of the Option Award will be no less than one hundred percent (100%) of the Fair Market Value per Share on the date of grant.

(ii) <u>Waiting Period and Exercise Dates</u>. The Option Award may become exercisable upon completion of a specified period of service with the Company or a Subsidiary and/or based on the achievement of the Performance Goals during the Performance Period as set forth in <u>Exhibit A</u>.

(iii) <u>Form of Consideration</u>. The Administrator will determine the acceptable form of consideration for exercising the Option Award, including the method of payment. Such consideration may consist entirely of: (1) cash; (2) check; (3) promissory note, to the extent permitted by Applicable Laws, (4) other Shares, provided that such Shares have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which the Option Award will be exercised and provided that accepting such Shares will not result in any adverse accounting consequences to the Company, as the Administrator determines in its sole discretion; (5) consideration received by the Company under a broker-assisted (or other) cashless exercise program (whether through a broker or otherwise) implemented by the Company in connection with the Plan; (6) by net exercise; (7) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws; or (8) any combination of the foregoing methods of payment.

6

(d) Exercise of Option Award.

(i) Procedure for Exercise; Rights as a Stockholder. The Option Award granted hereunder will be exercisable according to the terms of the Plan and at such times and under such conditions as set forth in Exhibit A. The Option Award may not be exercised for a fraction of a Share.

The Option Award will be deemed exercised when the Company receives: (i) a notice of exercise (in such form as the Administrator may specify from time to time) from the person entitled to exercise the Option Award, and (ii) full payment for the Shares with respect to which the Option Award is exercised (together with full payment of any applicable taxes or other amounts required to be withheld or deducted with respect to the Option Award). Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Award Agreement and the Plan. Shares issued upon exercise of the Option Award will be issued in the name of the Participant or, if requested by the Participant, in the name of the Participant and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder will exist with respect to the Shares subject to the Option Award, notwithstanding the exercise of the Option Award. The Company will issue (or cause to be issued) such Shares promptly after the Option Award is exercised. No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided in Section 10 of the Plan.

7. Leaves of Absence/Transfer Between Locations. The Administrator shall have the discretion to determine at any time whether and to what extent the vesting of the Option Award shall be suspended during any leave of absence; provided, however, that in the absence of such determination, vesting of the Option Award shall continue during any paid leave and shall be suspended during any unpaid leave (unless otherwise required by Applicable Laws). The Option Award will not cease to vest in the case of (i) any leave of absence approved by the Administrator or (ii) transfers between locations of the Company or between the Company or any Subsidiary.

8. Transferability of Option Award. Unless determined otherwise by the Administrator, the Option Award may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner.

9. Restrictions on Shares Acquired Pursuant to the Option Award. Shares acquired upon the exercise of the Option Award (in whole or in part) may not be sold, transferred, pledged, assigned or otherwise alienated or hypothecated until the end of the Period of Restriction.

7

10. Adjustments; Dissolution or Liquidation; Merger or Change in Control.

(a) Adjustments. In the event of a stock split, reverse stock split, stock dividend, combination, consolidation, recapitalization (including a recapitalization through a large nonrecurring cash dividend) or reclassification of the Shares, subdivision of the Shares, a rights offering, a reorganization, merger, spin-off, split-up, repurchase, or exchange of Common Stock or other securities of the Company or other significant corporate transaction, or other change affecting the Common Stock occurs, the Administrator, in order to prevent dilution, diminution or enlargement of the benefits or potential benefits intended to be made available under the Plan, will, in such manner as it may deem equitable, adjust the number, kind and class of securities that may be delivered under the Plan and/or the number, class, kind and price of securities covered by the Option Award. Notwithstanding the forgoing, all adjustments under this Section 10 shall be made in a manner that does not result in taxation under Section 409A of the Code.

(b) Dissolution or Liquidation. In the event of the proposed winding up, dissolution or liquidation of the Company, the Administrator will notify the Participant as soon as practicable prior to the effective date of such proposed transaction. To the extent it has not been previously exercised, the Option Award will terminate immediately prior to the consummation of such proposed action.

(c) Corporate Transaction. In the event of a Corporate Transaction, the Option Award (vested or unvested) will be treated as the Administrator determines, which determination may be made without the consent of the Participant. Such determination, without the consent of the Participant, may provide (without limitation) for one or more of the following in the event of a Corporate Transaction: (A) the continuation of the Option Award by the Company (if the Company is the surviving corporation); (B) the assumption of the Option Award by the surviving corporation or its parent; (C) the substitution by the surviving corporation or its parent of new options or other equity awards for the Option Award; (D) the cancellation of the Option Award in exchange for a payment to the Participant equal to the excess of (1) the Fair Market Value of the Shares subject to the Option Award as of the closing date of such Corporate Transaction over (2) the exercise price or purchase price paid or to be paid (if any) for the Shares subject to the Option Award; provided, that, if the exercise price or purchase price for the Option Award equals or exceeds the Fair Market Value of the Shares subject to the Option Award, then the Option Award may be terminated without payment. Provided further, that at the discretion of the Administrator, such payment may be subject to the same conditions that apply to the consideration that will be paid to holders of Shares in connection with the transaction; provided, however, that any payout in connection with a terminated award shall comply with Section 409A of the Code to the extent necessary to avoid taxation thereunder; (E) the full or partial acceleration of exercisability or vesting and accelerated expiration of the Option Award; or (F) the opportunity for the Participant to exercise the Option Award prior to the occurrence of the Corporate Transaction and the termination (for no consideration) upon the consummation of such Corporate Transaction of the Option if not exercised prior thereto.

(d) Change in Control. The Option Award may be subject to additional acceleration of vesting and exercisability upon or after a Change in Control or as may be provided in any other written agreement between the Company or any Subsidiary and the Participant, but in the absence of such provision, no such acceleration will occur.

8

11. Tax.

(a) <u>Withholding Requirements</u>. Prior to the delivery of any Shares or cash pursuant to the Option Award (or exercise thereof) or prior to any time the Option Award or Shares are subject to taxation or other Tax-Related Items, the Company and/or the Participant's employer will have the power and the right to deduct or withhold, or require the Participant to remit to the Company, an amount sufficient to satisfy any Tax-Related Items or other items that are required to be withheld or deducted or otherwise applicable with respect to the Option Award.

(b) <u>Withholding Arrangements</u>. The Administrator, in its sole discretion and pursuant to such procedures as it may specify from time to time, may permit the Participant to satisfy such withholding or deduction obligations or any other Tax-Related Items, in whole or in part by (without limitation) (a) paying cash, (b) electing to have the Company withhold otherwise deliverable cash or Shares, or (c) delivering to the Company already-owned Shares. The Fair Market Value of the Shares to be withheld or delivered will be determined based on such methodology that the Company deems to be reasonable and in accordance with Applicable Laws.

(c) <u>Compliance With Section 409A of the Code</u>. The Option Award will be designed and operated in such a manner that it is either exempt from the application of, or complies with, the requirements of Section 409A of the Code such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Section 409A of the Code. The Plan and the Award Agreement under the Plan is intended to meet the requirements of Section 409A of the Code (or an exemption therefrom) and will be construed and interpreted in accordance with such intent, except as otherwise determined in the sole discretion of the Administrator. To the extent that the Option Award or payment is subject to Section 409A of the Code the Option Award will be granted, paid, settled or deferred in a manner that will meet the requirements of Section 409A of the Code (or an exemption therefrom), such that the grant, payment, settlement or deferral will not be subject to the additional tax or interest applicable under Section 409A of the Code. In no event will the Company be responsible for or reimburse a Participant for any taxes or other penalties incurred as a result of the application of Section 409A of the Code.

(d) <u>Limitation on Payments</u>. If any payment or benefit that the Participant will receive from the Company, any Subsidiary or any other party whether in connection with the provisions in this Plan or otherwise (the "**Payment**") would (i) constitute a "parachute payment" within the meaning of Section 280G of the Code and (ii) but for this sentence, be subject to the excise tax imposed by Section 4999 of the Code (the "**Excise Tax**"), then the Payment shall be equal to the Best Results Amount. The "Best Results Amount" shall be either (x) the full amount of the Payment or (y) a lesser amount that would result in no portion of the Payment being subject to the Excise Tax, whichever of those amounts, taking into account the applicable federal, state and local employment taxes, income taxes and the Excise Tax, results in the Participant's receipt, on an after-tax basis, of the greater amount. If a reduction in payments or benefits constituting parachute payments is necessary so that the Payment equals the Best Results Amount, reduction shall occur in the following order: reduction of cash payments; cancellation of accelerated vesting of stock awards; reduction of employee benefits. In the event that acceleration of vesting of stock award compensation is to be reduced, the acceleration of vesting shall be cancelled in the reverse order of the date of grant of the Participant's equity

9

awards. Participants shall be solely responsible for the payment of all personal tax liability that is incurred as a result of the payments and benefits received under this Plan, and Participants shall not be reimbursed by the Company for any of those payments of personal tax liability.

12. No Effect on Employment or Service. Neither the Plan nor the Option Award will confer upon the Participant any right with respect to continuing the Participant's relationship as an Employee with the Company or any Subsidiary, nor will they interfere in any way with the Participant's right or the Company's or any Subsidiary's right to terminate such relationship at any time, with or without Cause, to the extent permitted by Applicable Laws.

13. Date of Grant. The date of grant of the Option Award will be, for all purposes, the Closing Date.

14. Corporate Records Control. In the event that the corporate records (e.g., Board consents, resolutions or minutes) documenting the corporate action constituting the grant contain terms (e.g., exercise price, vesting schedule or number of Shares) that are inconsistent with those in the Award Agreement or related grant documents as a result of a clerical error in the papering of the Award Agreement or related grant documents, the corporate records will control and the Participant will have no legally binding right to the incorrect term in the Award Agreement or related grant documents.

15. Clawback/Recovery. The Administrator may specify in the Award Agreement that the Participant's rights, payments, and/or benefits with respect to the Option Award will be subject to reduction, cancellation, forfeiture, and/or recoupment upon the occurrence of certain specified events, in addition to any applicable vesting, performance or other conditions and restrictions of the Option Award. Notwithstanding any provisions to the contrary under this Plan, the Option Award granted under the Plan shall be subject to the Company's clawback policy as may be established and/or amended from time to time. The Administrator may require the Participant to forfeit or return to and/or reimburse the Company for all or a portion of the Option Award and/or Shares issued under the Option Award, any amounts paid under the Award, and any payments or proceeds paid or provided upon disposition of the Shares issued under the Option Award, pursuant to the terms of such Company policy or as necessary or appropriate to comply with Applicable Laws.

16. Term of Plan. Subject to Section 20 of the Plan, the Plan will become effective as of the Effective Date. The Plan will continue in effect until the Option Award granted hereunder is no longer outstanding.

17. Amendment and Termination of the Plan.

(a) Amendment and Termination. The Administrator may at any time amend, alter, suspend or terminate the Plan.

(b) Stockholder Approval. The Company will obtain stockholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

(c) Effect of Amendment or Termination. No amendment, alteration, suspension or termination of the Plan will materially impair the rights of the Participant, unless mutually

10

agreed otherwise between the Participant and the Administrator, which agreement must be in writing and signed by the Participant and the Company. Termination of the Plan will not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to the Option Award granted under the Plan prior to the date of such termination.

18. Conditions Upon Issuance of Shares. Shares will not be issued pursuant to the exercise or vesting (as applicable) of the Option Award unless the exercise or vesting of the Option Award and the issuance and delivery of such Shares will comply with Applicable Laws and will be further subject to the approval of counsel for the Company with respect to such compliance.

19. Inability to Obtain Authority. The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, will relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority will not have been obtained.

20. Stockholder Approval. The Plan will be subject to approval by the stockholders of the Company. Such stockholder approval will be obtained in the manner and to the degree required under Applicable Laws.

21. Governing Law. The Plan and the Option Award hereunder shall be construed in accordance with and governed by the laws of the State of Delaware, but without regard to its conflict of law provisions.

11

March 12, 2021

Office of the Chief Accountant
Securities and Exchange Commission
100 F Street, NE
Washington, D.C. 20549

Ladies and Gentleman:

We have read View, Inc.'s (formerly known as CF Finance Acquisition Corp. II) statements included under Item 4.01 of its Form 8-K dated March 12, 2021. We agree with the statements concerning our Firm under Item 4.01, in which we were informed of our dismissal on March 12, 2021, following completion of the Company's quarterly review for the period ended December 31, 2020, which consists only of the accounts of the pre-Business Combination Special Purpose Acquisition Company. We are not in a position to agree or disagree with other statements contained therein.

Very truly yours,

/s/ WithumSmith+Brown, PC

New York, NY

**Exhibit 21.1**

**View, Inc.**
**List of Subsidiaries**

| Subsidiary | Jurisdiction |
| --- | --- |
| View Operating Corporation | Delaware |
| View Smart Building Technology, Inc. | Canada |

**View Operating Corporation (formerly known as View, Inc.)**

**Consolidated Financial Statements**

**December 31, 2020 and 2019**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|  | **Page(s)** |
|---|---|
| Report of Independent Registered Public Accounting Firm | 1 |
| Consolidated Financial Statements |  |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Comprehensive Loss | 3 |
| Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Deficit | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Notes to Consolidated Financial Statements | 6 |

i

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of View, Inc.

*Opinion on the Financial Statements*

We have audited the accompanying consolidated balance sheets of View Operating Corporation (formerly known as View, Inc.) and its subsidiary (the "Company") as of December 31, 2020 and 2019, and the related consolidated statements of comprehensive loss, of redeemable convertible preferred stock and stockholders' deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers LLP

San Jose, California
March 12, 2021

We have served as the Company's auditor since 2013.

**View Operating Corporation**
**(formerly known as View, Inc.)**

**Consolidated Balance Sheets**

*(in thousands, except share and per share data)*

| | December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 63,232 | $ 138,218 |
| Short-term investments | — | 32,866 |
| Accounts receivable, net of allowances of $224 and $200 as of December 31, 2020 and 2019, respectively | 12,252 | 12,147 |
| Inventories | 6,483 | 7,049 |
| Receivable from litigation settlement | — | 22,500 |
| Prepaid expenses and other current assets | 6,881 | 9,425 |
| Total current assets | 88,848 | 222,205 |
| Property and equipment, net | 282,560 | 278,595 |
| Restricted cash | 10,461 | 8,456 |
| Deposits with suppliers | 1,084 | 3,074 |
| Other assets | 7,862 | 2,118 |
| Total assets | $ 390,815 | $ 514,448 |
| **Liabilities, Redeemable Convertible Preferred Stock, and Stockholders' Deficit** | | |
| Current liabilities | | |
| Accounts payable | $ 14,562 | $ 18,488 |
| Accrued expenses and other current liabilities | 36,480 | 19,999 |
| Accrued compensation | 14,665 | 9,233 |
| Deferred revenue | 2,111 | 1,197 |
| Debt, current | 247,248 | 5,143 |
| Total current liabilities | 315,066 | 54,060 |
| Debt, non-current | 15,430 | 158,233 |
| Redeemable convertible preferred stock warrant liability | 12,323 | 19,478 |
| Other liabilities | 36,731 | 43,817 |
| Total liabilities | 379,550 | 275,588 |
| Commitments and contingencies (Note 7) | | |
| Redeemable convertible preferred stock, $0.0001 par value; 9,652,026,330 shares authorized as of December 31, 2020 and 2019; 5,222,852,052 and 5,223,031,714 shares issued and outstanding as of December 31, 2020 and 2019, respectively; aggregate liquidation preference of $1,749,201 and $1,749,261 as of December 31, 2020 and 2019, respectively | 1,812,678 | 1,812,724 |
| Stockholders' deficit: | | |
| Common stock, $0.0001 par value; 11,303,106,892 and 11,303,106,892 shares authorized as of December 31, 2020 and 2019, respectively; 73,482,831 and 71,000,340 shares issued and outstanding as of December 31, 2020 and 2019, respectively | 7 | 7 |
| Additional paid-in capital | 89,782 | 60,349 |
| Accumulated deficit | (1,891,202) | (1,634,220) |
| Total stockholders' deficit | (1,801,413) | (1,573,864) |
| Total liabilities, redeemable convertible preferred stock, and stockholders' deficit | $ 390,815 | $ 514,448 |

The accompanying notes are an integral part of these consolidated financial statements

2

**View Operating Corporation**
**(formerly known as View, Inc.)**

**Consolidated Statements of Comprehensive Loss**

*(in thousands, except share and per share data)*

| | Year Ended December 31, | |
| | 2020 | 2019 |
|---|---|---|
| Revenue | $ 32,302 | $ 24,324 |
| Costs and expenses | | |
|     Cost of revenue | 123,110 | 179,675 |
|     Research and development | 69,491 | 77,696 |
|     Selling, general and administrative | 77,445 | 72,905 |
|     Income from legal settlement | — | (22,500) |
|       Total costs and expenses | 270,046 | 307,776 |
| Loss from operations | (237,744) | (283,452) |
| Interest and other income (expense), net | | |
|     Interest income | 499 | 5,591 |
|     Interest expense | (26,820) | (10,594) |
|     Other expense, net | (32) | (108) |
|     Gain on fair value change | 7,155 | 1,750 |
|     Loss on extinguishment of debt | — | (3,040) |
|       Interest and other income (expense), net | (19,198) | (6,401) |
| Loss before provision of income taxes | (256,942) | (289,853) |
| Provision for income taxes | (40) | (51) |
| Net and comprehensive loss | $ (256,982) | $ (289,904) |
| Net loss per share, basic and diluted | $ (3.56) | $ (4.29) |
| Weighted-average shares used in calculation of net loss per share, basic and diluted | 72,176,256 | 67,571,844 |

The accompanying notes are an integral part of these consolidated financial statements

3

**View Operating Corporation**
**(formerly known as View, Inc.)**

**Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Deficit**

*(in thousands)*

| | Redeemable Convertible Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | |
| **Balances as of December 31, 2018** | 4,541,214 | $ 1,512,915 | 59,128 | $ 6 | $ 30,531 | $ (1,344,316) | $ (1,313,779) |
| Issuance of Series H redeemable convertible preferred stock, net of issuance costs of $191 | 681,818 | 299,809 | — | — | — | — | — |
| Issuance of common stock upon exercise of common stock warrants | — | — | 6,675 | 1 | 66 | — | 67 |
| Issuance of common stock upon exercise of stock options | — | — | 5,197 | — | 676 | — | 676 |
| Stock-based compensation | — | — | — | — | 29,076 | — | 29,076 |
| Net loss | — | — | — | — | — | (289,904) | (289,904) |
| **Balances as of December 31, 2019** | 5,223,032 | 1,812,724 | 71,000 | 7 | 60,349 | (1,634,220) | (1,573,864) |
| Cancellation of Series A, Series B, and Series E redeemable convertible preferred stock | (180) | (46) | — | — | 46 | — | 46 |
| Issuance of common stock upon exercise of stock options | — | — | 2,483 | — | 455 | — | 455 |
| Stock-based compensation | — | — | — | — | 28,932 | — | 28,932 |
| Net loss | — | — | — | — | — | (256,982) | (256,982) |
| **Balances as of December 31, 2020** | 5,222,852 | $ 1,812,678 | 73,483 | $ 7 | $ 89,782 | $ (1,891,202) | $ (1,801,413) |

The accompanying notes are an integral part of these consolidated financial statements

4

**View Operating Corporation**
**(formerly known as View, Inc.)**

**Consolidated Statements of Cash Flows**

*(in thousands)*

| | Year Ended December 31, | |
| --- | ---: | ---: |
| | 2020 | 2019 |
| Cash flows from operating activities: | | |
| Net loss | $ (256,982) | $ (289,904) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 26,258 | 24,379 |
| Gain on fair value change | (7,155) | (1,750) |
| Accrued interest expense and amortization of debt discount | 2,379 | 3,523 |
| Loss on extinguishment of debt | — | 3,040 |
| Stock-based compensation | 28,932 | 29,076 |
| Income from legal settlement | — | (22,500) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (105) | (4,811) |
| Inventories | 566 | (3,243) |
| Prepaid expenses and other current assets | 24,044 | (467) |
| Other assets | (1,361) | 226 |
| Accounts payable | 3,005 | 2,175 |
| Deferred revenue | 914 | 122 |
| Accrued compensation | 5,432 | (660) |
| Accrued expenses and other liabilities | 8,383 | 26,779 |
| **Net cash used in operating activities** | **(165,690)** | **(234,015)** |
| Cash flows from investing activities: | | |
| Purchases of property and equipment | (37,638) | (119,793) |
| Purchase of short-term investments | — | (348,322) |
| Maturities of short-term investments | 32,866 | 315,456 |
| **Net cash used in investing activities** | **(4,772)** | **(152,659)** |
| Cash flows from financing activities: | | |
| Proceeds from draws related to revolving debt facility, net of issuance costs | 250,000 | 145,981 |
| Repayment of revolving debt facility | (150,000) | — |
| Repayment of other debt obligations | (1,714) | (44,750) |
| Payments of obligations under capital leases | (1,515) | (2,613) |
| Proceeds from issuance of common stock upon exercise of stock options and warrants | 455 | 743 |
| Payment of transaction costs | (745) | — |
| Proceeds from issuance of redeemable convertible preferred stock, net of issuance costs | — | 299,809 |
| **Net cash provided by financing activities** | **96,481** | **399,170** |
| Net (decrease) increase in cash, cash equivalents and restricted cash | (73,981) | 12,496 |
| Cash, cash equivalents and restricted cash, beginning of period | 148,674 | 136,178 |
| **Cash, cash equivalents and restricted cash, end of period** | **$ 74,693** | **$ 148,674** |
| **Supplemental disclosure of cash flow information:** | | |
| Cash paid for interest | $ 12,703 | $ 4,356 |
| Cash paid for income taxes | $ 40 | $ 51 |
| **Non-cash investing and financing activities:** | | |
| Change in accounts payable balance and other liabilities related to purchase of property and equipment | $ (9,455) | $ 7,921 |
| Change in property and equipment acquired under capital lease | $ — | $ 781 |
| Deferred transaction costs included in accounts payable and accrued expenses and other current liabilities | 3,687 | — |

The accompanying notes are an integral part of these consolidated financial statements

**View Operating Corporation**
**(formerly known as View, Inc.)**

**Notes to Consolidated Financial Statements**

**1.    Organization and Summary of Significant Accounting Policies**

**Organization**

View Operating Corporation (formerly known as View, Inc.) and its wholly-owned subsidiary (collectively "View" or the "Company") is a technology company that manufactures smart building products to improve people's health, productivity, and experience, while simultaneously reducing energy consumption. View's primary product is a proprietary electrochromic or "smart" glass panel that, when combined with View's proprietary network infrastructure and software, intelligently adjusts in response to the sun by tinting from clear to dark states, and vice versa, thereby reducing heat and glare. The Company is devoting substantially all of its efforts towards the manufacturing, sale and further development of its product platforms, and marketing of both custom and standardized product solutions.

The Company is headquartered in Milpitas, California, and was incorporated in the state of Delaware on April 9, 2007 as eChromics, Inc. In October 2007, the Company changed its name to Soladigm, Inc. and in 2012, the Company changed its name to View, Inc.

On March 8, 2021 (the "Closing Date"), CF Finance Acquisition Corp. II ("CF II"), a Delaware corporation, consummated the previously announced merger pursuant to an Agreement and Plan of Merger, dated November 30, 2020 (the "Merger Agreement"), by and among CF II, PVMS Merger Sub, Inc., a Delaware corporation and wholly owned subsidiary of CF II ("Merger Sub"), and the Company. Pursuant to the Merger Agreement, a business combination between CF II and the Company was effected through the merger of Merger Sub with and into the Company, with the Company surviving as the surviving company and as a wholly-owned subsidiary of CF II (the "Merger" and collectively with the other transactions described in the Merger Agreement, the "Business Combination"). On the Closing Date, CF II changed its name from CF Finance Acquisition Corp. II to View, Inc. and the Company changed its name to View Operating Corporation. As a result of the Business Combination, the Company raised gross proceeds of $815.2 million, including the contribution of $374.1 million of cash held in CF II's trust account from its initial public offering, net of the redemption of CF II Class A Common Stock held by CF II's public stockholders of $125.9 million, $260.8 million private investment in public equity ("PIPE") at $10.00 per share of CF II's Class A Common Stock, and $180.3 million of additional PIPE at $11.25 per share of CF II's Class A Common Stock.

**Basis of Presentation**

The consolidated financial statements and accompanying notes have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP"). The Company's consolidated financial statements include the accounts of View Operating Corporation (formerly known as View, Inc.) and its wholly-owned subsidiary. All intercompany balances and transactions have been eliminated in consolidation. The Company's fiscal year ends on December 31.

During March 2020, the World Health Organization declared the rapidly growing coronavirus outbreak (COVID-19) to be a global pandemic. The COVID-19 pandemic has impacted health and economic conditions throughout the U.S., including the construction industry. The extent to which COVID-19 impacts the Company's operations will depend on future developments, which cannot be predicted with certainty, including the duration of the outbreak, new information that may emerge concerning the severity of COVID-19 and the actions to contain or treat its impact, among others. COVID-19's disruptions to the construction industry may reduce or delay new construction projects or result in cancellations or delays of existing planned construction. Supply of certain materials used by the Company in the manufacture of its products that are sourced from a limited number of suppliers may also be disrupted. In addition, long-term effects of COVID-19 on employer work-from-home policies and therefore demand for office space cannot be predicted. Any one or a combination of such events could have a material adverse effect on the Company's financial results.

To address these conditions, the Company established effective protocols to continue business operations as an essential industry, insulate its supply chain from delays and disruptions, and assessed its business operations and financial plans as a result of COVID-19. The Company optimized its financial plan by focusing on sales growth and by reducing and delaying incremental spending on operating and capital expenditures compared with the pre-COVID business plan. In particular, the Company has reduced operating costs through headcount reductions and reduction of operating expenditures for third-    party contractors.

6

*Liquidity*

On October 18, 2018, the Company entered into a purchase agreement whereby an investor purchased Series H and Series H-1 redeemable convertible preferred stock, $0.0001 par value per share ("Financing Transaction") for net cash proceeds of $1,096.4 million. On November 21, 2018, the first closing of the Financing Transaction was completed with $796.6 million in cash paid to the Company for the issuance of 305,967,185 shares of Series H and 1,512,214,633 shares of Series H-1 redeemable convertible preferred stock. In January 2019, the Company received $299.8 million from the second closing of the Financing Transaction and issued 681,818,182 shares of Series H-1 redeemable convertible preferred stock. See Note 10 for further information.

On October 15, 2019, the Company entered into a revolving debt facility, pursuant to which the Company may draw amounts in a maximum aggregate principal amount not to exceed $250.0 million in total, and not to exceed $200.0 million until January 3, 2020, for a total period of 4 years maturing on October 22, 2023. In October 2019, the Company drew a principal amount of $150.0 million under this credit facility. In May 2020, the Company drew the remaining principal amount of $100.0 million under this credit facility. See Note 9 for further information.

On March 8, 2021, the Company completed the Business Combination and raised net proceeds of $771.2 million, net of transaction costs of $44.0 million. In conjunction with the Business Combination, the Company repaid in full the revolving debt facility of $276.8 million, including interest due on the notes of $26.8 million.

Since inception, the Company has not achieved profitable operations or positive cash flows from operations. The Company's accumulated deficit aggregated to $1,891.2 million through December 31, 2020 and it expects to incur substantial losses in future periods. The Company's operations have been financed with a combination of capital from investors, loans from financial institutions, and revenue from product sales. The Company's future operations are also dependent on the success of the Company's development and commercialization efforts and, ultimately, upon the market acceptance of the Company's products.

These consolidated financial statements have been prepared on a going concern basis. Management believes that the Company's current cash and cash equivalents are adequate to meet its needs, including any debt balances due at maturity, for the next twelve months from the issuance of these consolidated financial statements.

## Summary of Significant Accounting Policies

### Use of Estimates

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts and disclosures in the consolidated financial statements and accompanying notes. Significant estimates include warranty accrual, the fair value of common stock and other assumptions used to measure stock-based compensation, the determination of standalone selling price of various performance obligations and estimation of costs to complete the performance obligations under the insulating glass units ("IGU") contracts for revenue recognition, and valuation of deferred tax assets and uncertain income tax positions. The Company bases its estimates on historical experience, the current economic environment, and on assumptions that it believes are reasonable under the circumstances. The Company adjusts such estimates and assumptions when facts and circumstances dictate. Changes in those estimates resulting from continuing changes in the economic environment will be reflected in the financial statements in future periods. Actual results could differ significantly from these estimates.

### Concentration of Credit Risk and Other Risks and Uncertainties

Financial instruments which potentially subject the Company to concentration of credit risk consist primarily of cash and cash equivalents, restricted cash, and accounts receivable. Cash and cash equivalents are held by domestic financial institutions with high credit standings. Such deposits may, at times, exceed federally insured limits. Short-term investments consist of investments in money market funds and U.S. treasury bills that carry high-credit ratings and, accordingly, minimal credit risk exists with respect to these balances. As of December 31, 2020, the Company has not experienced any losses on its deposits of cash and cash equivalents and short-term investments.

For the years ended December 31, 2020 and 2019, one customer accounted for 10.3% and 11.0% of total revenue, respectively. One customer accounted for 23.6% of accounts receivable, net as of December 31, 2020 and two customers accounted for 20.9% and 14.4% of accounts receivable, net as of December 31, 2019. Accounts receivable are stated at the amount the Company expects to collect. The Company generally does not require collateral or other security in support of accounts receivable. To reduce credit risk, management performs ongoing credit evaluations of its customers' financial condition.

Certain materials used by the Company in the manufacturing of its products are purchased from a limited number of suppliers. Shortages could occur in these materials due to an interruption of supply or increased demand in the industry. One supplier accounted for 42.8%, and 42.6% of total product purchases, for the years ended December 31, 2020 and 2019, respectively.

**Cash, Cash Equivalents, and Short-term Investments**

The Company considers all highly liquid investments with original maturities from the date of purchase of three months or less to be cash equivalents. Cash equivalents are invested in demand deposits, U.S. Treasury bills and money market mutual funds. The Company considers investments with original maturities greater than three months and remaining maturities less than one year to be short-term investments. The short-term investments consist of U.S. Treasury bills which are classified as available-for-sale.

Demand deposits and U.S Treasury bills are carried at cost, which approximates fair value and money market funds are reported at fair value based upon quoted market prices. Unrealized gains and losses on available-for-sale securities have not been material as of December 31, 2020. Realized gains and losses earned upon the sale or maturity of available-for-sale securities are derived using the specific-identification method, and amortization of premiums and accretion of discounts are reported in other expense, net in the consolidated statements of comprehensive loss.

*Other-than-temporary Impairment*

The Company evaluates its short-term investments with unrealized losses for other-than-temporary impairment. When assessing short-term investments for other-than-temporary declines in value, the Company considers factors such as, among other things, the extent and length of time the investment's fair value has been lower than its cost basis, the financial condition and near-term prospects of the investee, the Company's ability and intent to retain the investment for a period of time sufficient to allow for any anticipated recovery in fair value, and the expected cash flows from the security. If any adjustment to fair value reflects a decline in the value of the investment that the Company considers to be "other than temporary," the Company reduces the investment to fair value through a charge to the consolidated statements of comprehensive loss. No such adjustments were necessary during the periods presented.

**Restricted Cash**

The Company is required by its bank to collateralize letters of credit issued to the Company's lessors, suppliers, customers, utility providers, and for the Company's purchasing card program. All amounts in restricted cash as of December 31, 2020 and 2019 represent funds held in certificates of deposit and are stated at cost, which approximates fair value. Restricted cash is classified as current or non-current on the consolidated balance sheets based on the remaining term of the restriction.

**Fair Value Measurement of Financial Assets and Liabilities**

Fair value is defined as an exchange price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. When determining the fair value measurements for assets and liabilities required or permitted to be either recorded or disclosed at fair value, the Company considers the principal or most advantageous market in which it would transact, and it also considers assumptions that market participants would use when pricing the asset or liability.

8

The Company maximizes the use of observable inputs and minimizes the use of unobservable inputs when measuring fair value. U.S. GAAP establishes a fair value hierarchy based on the level of independent, objective evidence surrounding the inputs used to measure fair value. A financial instrument's categorization within the fair value hierarchy is based upon the lowest level of input that is significant to the fair value measurement. The fair value hierarchy is as follows:

Level 1 Observable inputs such as quoted prices in active markets for identical assets or liabilities that the Company has the ability to access at the measurement date.

Level 2 Inputs other than the quoted prices in active markets that are observable either directly or indirectly.

Level 3 Unobservable inputs in which there are little or no market data and which require the Company to develop its own assumptions.

Cash equivalents relating to demand deposits and U.S. Treasury bills, accounts receivable, and accounts payable are carried at cost, which approximates fair value due to the short maturity of these instruments. Short- term and long-term debt is carried at amortized cost, which approximates its fair value. See Note 4, for further information.

**Accounts Receivable, net**

Accounts receivable consist of current trade receivables due from customers recorded at invoiced amount, net of allowances for doubtful accounts. Judgment is required in assessing the realization of these receivables, including the current creditworthiness of each customer and related aging of the past-due balances. The Company establishes allowance for losses on accounts receivable if it determines that it will not collect all or part of the outstanding balance. The Company regularly reviews accounts receivable for collectability and establishes or adjusts the allowance for doubtful accounts as necessary using the specific identification method based on the available facts. The allowance for doubtful accounts as of both December 31, 2020 and 2019 was $0.2 million.

**Inventories**

Inventories consist of finished goods and stated at the lower of cost or net realizable value. Costs are measured on a first-in, first out basis using standard cost, which approximates actual cost. Net realizable value is the estimated selling price of the Company's products in the ordinary course of business less reasonably predictable costs of completion, disposal, and transportation. Inventories are written down to their net realizable value if they have become obsolete, have a cost basis in excess of expected net realizable value, or are in excess of expected demand. Once inventory is written down, its new value is maintained until it is sold, scrapped, or written down for further valuation losses. The valuation of inventories requires the Company to make judgments based on currently available information about the likely method of disposition and current and future product demand relative to the remaining product life. Inventory valuation losses are classified as cost of revenue in the consolidated statements of comprehensive loss. During the years ended December 31, 2020 and 2019, the Company recorded $11.2 million and $22.4 million, respectively, to reserve for excess and obsolete inventories and adjust ending inventories to net realizable value to cost of revenue in the consolidated statements of comprehensive loss.

**Property and Equipment, net**

Property and equipment are stated at cost less accumulated depreciation. Depreciation is calculated using the straight-line method over the estimated useful lives of the assets, generally two to fifteen years. The Company reassesses the useful lives of the assets at each reporting period to determine whether events or circumstances may indicate that a revision to the useful life is warranted. Leasehold improvements are stated at cost and amortized using the straight-line method over the estimated useful life of the assets or the remaining lease term, whichever is shorter. Maintenance and repairs that do not extend the life or improve the asset are expensed as incurred. In 2020, the Company recorded a loss of $1.1 million, of which $0.1 million was included in cost of revenue, $0.7 million was included in research and development and $0.3 million was included in selling, general and administrative expenses in the consolidated statement of comprehensive loss for assets that were no longer in service and had no alternative use. In 2019, the Company recorded a loss of $3.9 million in research and development expenses in the consolidated statement of comprehensive loss for an asset that was no longer in service and had no alternative use.

**Software Development Costs**

Software development costs include costs to develop software to be used to meet internal needs and applications used to deliver the Company's products. Costs incurred during the application development stage for internal-use software are capitalized if it is probable that the project will be completed and the software will be used to perform the function intended. Capitalized software development costs are amortized using the straight-line amortization method over the estimated useful life of the applicable software. Such software development costs required to be capitalized have not been material through December 31, 2020.

**Impairment of Long-Lived Assets**

The Company evaluates long-lived assets for impairment whenever events indicate that a potential impairment may have occurred. If such events arise, the Company will compare the carrying amount of the asset group comprising the long-lived assets to the estimated future undiscounted cash flows expected to be generated by the asset group. If the estimated aggregate undiscounted cash flows are less than the carrying amount of the asset group, an impairment charge is recorded as the amount by which the carrying amount of the asset group exceeds the fair value of the assets, as based on the expected discounted future cash flows attributable to those assets. Long-lived assets to be disposed of are reported at the lower of carrying amount or fair value less costs to sell. There were no impairments of long-lived assets during the years ended December 31, 2020 and 2019.

**Leases**

Leases are evaluated and recorded as capital leases if one of the following is true at inception: (a) the present value of minimum lease payments meets or exceeds 90% of the fair value of the asset, (b) the lease term is greater than or equal to 75% of the economic life of the asset, (c) the lease arrangement contains a bargain purchase option, or (d) title to the property transfers to the Company at the end of the lease. The Company records an asset and liability for capital leases at present value of the minimum lease payments based on the incremental borrowing rate. Assets are depreciated over the useful life in accordance with the Company's depreciation policy while rental payments and interest on the liability are accounted for using the effective interest method.

Leases that are not classified as capital leases are accounted for as operating leases. Operating lease agreements that have tenant improvement allowances are evaluated for lease incentives. For leases that contain rent abatements or escalating rent payments, the Company recognizes rent expense on a straight-line basis over the lease term, with any lease incentives amortized as a reduction of rent expense over the lease term.

**Redeemable Convertible Preferred Stock**

The Company records all shares of redeemable convertible preferred stock at their respective fair values less issuance costs on the dates of issuance. The redeemable convertible preferred stock is recorded outside of stockholders' deficit because, in the event of certain liquidation events considered not solely within the Company's control, such as a change in control event and sale of all or substantially all of the Company's assets, the redeemable convertible preferred stock will become redeemable at the option of the holders. If it becomes probable that the shares will become redeemable, the Company will re-measure the carrying value of the shares to the redemption value to the redemption date. As of December 31, 2020 and 2019, no remeasurements were required, as Management determined that the shares were not probable of becoming redeemable.

**Redeemable Convertible Preferred Stock Warrants**

Warrants to purchase shares of the Company's redeemable convertible preferred stock are classified as liabilities on the consolidated balance sheets as the underlying preferred stock is contingently redeemable and may require the Company to transfer assets upon exercise. The warrants were recorded at fair value upon issuance and are subject to remeasurement to fair value at each balance sheet date. Changes in fair value of the redeemable convertible preferred stock warrant liability are recorded in the consolidated statements of comprehensive loss as part of Interest and other income (expense). The Company will continue to adjust the liability for changes in fair value until the earlier of the exercise or expiration of the warrants, conversion of redeemable convertible preferred stock into common stock, or until the redeemable convertible preferred stock is otherwise no longer redeemable. At that time, the redeemable convertible preferred stock warrant liability will be reclassified to redeemable convertible preferred stock or additional paid-in capital, as applicable.

10

**Common Stock Warrants**

Warrants to purchase shares of the Company's common stock are equity classified and recognized within additional paid-in capital upon issuance with no subsequent remeasurement. The issuance date fair value of warrants issued through December 31, 2020 have not been material.

**Revenue Recognition**

The Company generates revenue from (i) the manufacturing and sale of insulating glass units ("IGU") that are coated on the inside with a proprietary technology and are designed and built to customer specifications that include sizes for specific windows, skylights, and doors in specified or designated areas of a building and (ii) selling the Controls, Software and Services ("CSS"), which includes electrical connections schema, sky sensors, window controllers and control panels with embedded software, cables and connectors that when combined with the IGUs enable the IGUs to tint. Also included in CSS is a commissioning service, in which the installed IGUs and CSS components are tested and tinting configurations are set by the Company.

The IGUs and CSS are typically sold separately to glaziers and low-voltage electricians ("LVE"), respectively. The assembly and installation of the IGUs and the electrical components included in the CSS is performed by the third-party, glaziers and LVEs, respectively, and is not included in the Company's offerings. The Company does not have a role in arranging for the assembly nor the installation. The entire project is commissioned by the Company after the IGUs and CSS electrical components are installed. The commissioning service is provided by the Company to configure and test the operation of the windows at the building site and ensure proper functionality.

The Company's revenue is highly dependent on securing design wins with end-users of the Company's products and services, which typically are the owners, tenants or developers of buildings. The design win is typically secured through a non-binding memorandum of understanding. Once a design-win is secured, the Company enters into separate legally binding agreements with its customers (glaziers, LVEs, owners, tenants, developers of buildings, general contractors ("GC") or a combination thereof) to deliver IGUs and CSS. The legally binding agreements with each customer constitute the revenue contract with its customers.

The Company's accounting policy for its contracts with its customers is as follows:

The Company accounts for revenue in accordance with Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts with Customers (ASC 606) for all periods presented. Under ASC 606, revenue is recognized as or when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that are within the scope of ASC 606, the Company performed the following five steps:

Step 1: Identify the contract(s) with a customer;

Step 2: Identify the performance obligations in the contract;

Step 3: Determine the transaction price;

Step 4: Allocate the transaction price to the performance obligations in the contract; and

Step 5: Recognize revenue as or when the entity satisfies a performance obligation.

*Insulating glass units (IGUs)*

IGUs are designed and fabricated to building-site specifications and typically sold to glaziers, who are subcontracted by the building general contractor. Each contract to provide IGUs includes multiple distinct IGUs. Each unit is separately identifiable, does not modify or customize one another and each unit is not highly interdependent or interrelated. The Company determines the transaction price based on the consideration expected to be received, which is the contractual selling price. There is no variable consideration. The building-site specific IGUs have no alternative

11

use to the Company once production has commenced as at that time they cannot practically be redirected to another customer. The Company has contractually enforceable rights to proportionate payment of the transaction price for performance completed to date. As such, the Company recognizes revenue over time as the IGU is fabricated, using cost-to-cost as the basis to measure the Company's progress toward satisfying the performance obligation. Recognizing revenue as costs are incurred provides an objective measure of progress and thereby best depicts the extent of transfer of control to the customer. Management judgment is required to estimate both the total cost to produce and the progress towards completion. Production cost is recognized as incurred. Changes in estimated costs to fabricate the IGU and the related effect on revenue are recognized using a cumulative catch-up adjustment which recognizes in the current period the cumulative effect of the changes on current and prior periods based on a contract's progress towards fulfilment of the performance obligation. The cumulative catch-up adjustments have not been material for the years ended December 31, 2020 and 2019.

The average term of the contract is less than 12 months and is dependent on the size of the project and the associated construction schedule. Payment terms are generally net 30 upon invoicing, which coincides with shipment of completed IGUs.

*Controls, Software and Services (CSS)*

Contracts with customers for CSS contain multiple promised goods and services including electrical connections schema, sky sensors, window controllers and control panels with embedded software, cables and connectors, and commissioning services. The customer in these arrangements is typically the LVE, GC, building owner or in some limited cases the glazier. The Company assesses whether each promised good or service is distinct for the purpose of identifying the performance obligations in the contract. This assessment requires management to make judgments about the individual promised good or service and whether such good or service is separable from the other aspects of the contractual relationship. Performance obligations in a contract are identified based on the promised goods or services that will be transferred to the customer that are both capable of being distinct, whereby the customer can benefit from the goods or service either on its own or together with other resources that are readily available from third parties or from the Company, and are distinct in the context of the contract, whereby the transfer of the goods or services is separately identifiable from other promises in the contract. If these criteria are not met, the promised goods and services are accounted for as a combined performance obligation.

The Company's contracts to deliver CSS contain multiple performance obligations for each promise in the CSS arrangement. Each of the identified promises, including electrical connections schema, sky sensors, window controllers and control panels with embedded software, cables and connectors, and commissioning services are capable of being distinct and each promise is separately identifiable in the context of the contract. The transaction price is allocated to each performance obligation on a relative standalone selling price basis. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company applies judgment to estimate the standalone selling price taking into account available information, such as internally approved pricing guidelines with respect to geographies, customer type, internal costs, and gross margin objectives, for the related performance obligations. The Company determines the transaction price based on the consideration expected to be received, which is the contractual selling price. There is no variable consideration. Payment terms are generally net 30 upon invoicing, which typically occurs upon delivery of electrical connections schema or shipment of electrical components and completion of the commissioning service.

The Company recognizes revenue allocated to each performance obligation at the time the related performance obligation is satisfied by transferring control of the promised good or service to a customer, which generally occurs upon shipment or delivery of the control panel and electrical components. The commissioning services and the delivery of the electrical connections schema require acceptance from the customer. The Company recognizes revenue from each of these two performance obligations when customer acceptance is obtained, as that is the point in time when control has been deemed to have transferred.

*Shipping and Handling Costs*

The Company considers shipping and handling activities as costs to fulfill the sales of products. Freight charged to customers is included in revenue when control of the product is transferred to the customer, and the related shipping and handling costs are included in cost of revenue.

12

*Taxes*

Taxes imposed by governmental authorities on the Company's revenue producing activities with customers, such as sales taxes and value added taxes, are excluded from revenue.

*Contract Costs*

The Company incurs incremental costs of obtaining contracts, primarily sales commissions and related fringe benefits. Incremental costs to obtain contracts are evaluated for recoverability using the expected consideration of both IGU and CSS contracts as the incremental costs are associated with both contracts. The Company currently incurs significant losses on its offerings and as such incremental costs to obtain contracts are not recoverable and have been expensed as incurred.

The Company does not incur significant costs to fulfill contracts prior to transferring control of the products or services.

**Product Warranties**

The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for 10 years from the date of delivery to customers. IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty. In resolving warranty claims, the Company has the option of either repairing or replacing the covered product. Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The Company accounts for the effect of such changes in estimates prospectively.

In 2019, the Company identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. The Company had a low warranty claim rate to-date related to this matter. The Company has replaced and expects to continue to replace affected IGUs for the remainder of the period covered by the warranty. The Company analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs, which comprise of materials, labor, and factory overhead. Based on its analysis, the Company recognized $24.5 million of expense for the estimated future cost to replace defective IGUs, which was classified in cost of revenue in its consolidated statement of comprehensive loss for the year ended December 31, 2019. The Company recognized a corresponding warranty liability of $1.6 million in accrued expenses and other current liabilities and $22.9 million in other liabilities on its consolidated balance sheet as of December 31, 2019. As of December 31, 2020, the warranty liability related to this matter included in accrued expenses and other current liabilities and other liabilities was $3.8 million and $18.3 million, respectively, on the consolidated balance sheet. It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures, and the number of defective IGUs, the Company is unable to estimate the amount of any potential additional losses.

The Company recorded a net credit of $1.0 million for the reduction in product warranties liability and an expense of $24.1 million for product warranties to cost of revenue in the consolidated statements of comprehensive loss for the years ended December 31, 2020 and 2019, respectively.

13

**Research and Development Expenses**

Research and development costs are expensed as incurred. Research and development expenses include salaries and related personnel expenses, including stock-based compensation, materials and supplies used in pilot operations, payments to consultants, outside manufacturers, patent related legal costs, facility costs, depreciation, and travel expenses.

**Stock-Based Compensation**

The Company measures stock-based awards, including stock options, granted to employees and nonemployees based on the estimated fair value as of the grant date. Nonemployee stock-based awards have not been material through December 31, 2020. The Company has only granted stock option awards with service-based vesting conditions. Accordingly, the fair value of stock options are estimated using the Black-Scholes option pricing model, which requires the input of highly subjective assumptions, including the fair value of the underlying common stock, the expected term of the stock option, the expected volatility of the price of the Company's common stock, risk-free interest rates, and the expected dividend yield of the Company's common stock. Changes in the assumptions can materially affect the fair value and ultimately how much stock-based compensation expense is recognized. These inputs are subjective and generally require significant analysis and judgment to develop.

The Company recognizes the fair value of each stock award on a straight-line basis over the requisite service period of the awards. Stock-based compensation expense is based on the value of the portion of stock-based awards that is ultimately expected to vest. As such, the Company's stock-based compensation is reduced for the estimated forfeitures at the date of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates.

**Employee Benefit Plan**

The Company maintains a 401(k) retirement plan which is intended to be a tax-qualified defined contribution plan under Section 401(k) of the Internal Revenue Code. Employees are eligible to participate in the 401(k) plan on the first day of the month following the month in which they commence employment. Participants in the 401(k) plan are allowed to defer a portion of their compensation, not to exceed the Internal Revenue Service (the IRS) annual allowance contribution. In February 2019, the Company started making discretionary matching contributions to the 401(k) plan on behalf of employees who are eligible to participate in the 401(k) plan. The matching contribution is determined as 50% of employee's salary deferral or 3% of employee's 401(k) eligible earnings, whichever is less. The Company's matching contribution in the year ended December 31, 2020 and 2019 was $1.5 million and $1.8 million, respectively.

**Advertising Costs**

All costs of advertising are expensed as incurred. Advertising and promotion expenses included in selling, general and administrative were $0.8 million and $3.8 million for the years ended December 31, 2020 and 2019, respectively.

**Income Taxes**

Income tax expense has been provided using the asset and liability method. Deferred tax assets and liabilities are determined based on the estimated future tax consequences attributable to differences between the financial statement carrying amounts and tax bases of existing assets and liabilities. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. Deferred tax expense or benefit is the result of changes in the deferred tax asset and liability. The Company provides a valuation allowance against net deferred tax assets if, based upon the available evidence, it is more likely than not that the deferred tax assets will not be realized. In evaluating the Company's ability to recover deferred tax assets, the Company considers all available positive and negative evidence, including historical operating results, ongoing tax planning, and forecasts of future taxable income on a jurisdiction-by-jurisdiction basis.

The Company recognizes a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized in the Company's consolidated financial statements from such positions are measured based on the largest benefit that has a greater than 50% likelihood of being realized. The Company recognizes interest and penalties associated with tax matters as part of the income tax provision and includes accrued interest and penalties with the related income tax liability within account payable and accrued liabilities on its consolidated balance sheets.

14

**Segment Reporting**

Operating segments are defined as components of an entity where discrete financial information is evaluated regularly by the chief operating decision maker in deciding how to allocate resources and in assessing performance. The Company operates and manages its business as one reportable and operating segment. The Company's chief executive officer ("CEO"), who is the chief operating decision maker, reviews financial information on a consolidated basis for purposes of allocating resources and assessing performance. All long-lived assets are maintained in the U.S. See "Concentration of Credit Risk and Other Risks and Uncertainties" for further information on revenue by customer and Note 3, for further information on revenue by geography and categorized by products and services.

**Deferred Transaction Costs**

Deferred transaction costs consist of underwriting, legal, accounting and other expenses incurred through the balance sheet date that are directly related to the Business Combination and that will be charged to stockholders' equity upon the completion of the Business Combination. These deferred transaction costs are included in as part of other assets in the consolidated balance as of December 31, 2020. There were no such costs as of December 31, 2019.

**Other Comprehensive Loss**

For the years ended December 31, 2020 and 2019, there was no difference between net loss and total comprehensive loss.

**Net Loss per Share**

Basic and diluted net loss per share is presented in conformity with the two-class method required for participating securities such that net income is attributed to common stockholders and participating securities based on their participation rights. All outstanding redeemable convertible preferred stock are considered to be participating securities as such stockholders participate in undistributed earnings with common stockholders. Under the two-class method, the net loss attributable to common stockholders is not allocated to the redeemable convertible preferred stock as the holders of its redeemable convertible preferred stock do not have a contractual obligation to share in the Company's losses. Basic net loss per share attributable to common stockholders is computed by dividing the net loss attributable to common stockholders by the weighted-average number of shares of common stock outstanding during the period. Diluted net loss per share attributable to common stockholders is computed by giving effect to all potentially dilutive securities outstanding for the period. For purposes of calculating the diluted net loss per share attributable to common stockholders, the redeemable convertible preferred stock, redeemable convertible preferred stock warrants, common stock warrants, and common stock options are considered to be potentially dilutive securities. Because the Company reported a net loss for the years ended December 31, 2020 and 2019, the inclusion of the potentially dilutive securities would be antidilutive, and, accordingly, diluted net loss per share is the same as basic net loss per share for both periods presented.

**Accounting Pronouncements**

The Company is provided the option to adopt new or revised accounting guidance as an "emerging growth company" under the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act") either (1) within the same periods as those otherwise applicable to public business entities, or (2) within the same time periods as non-public business entities, including early adoption when permissible. With the exception of standards the Company elected to early adopt, when permissible, the Company has elected to adopt new or revised accounting guidance within the same time period as non-public business entities, as indicated below.

*Recent Accounting Pronouncements Adopted*

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows (Topic 230), Restricted Cash* ("ASU 2016-18"). ASU 2016-18 provides guidance on the presentation of restricted cash and restricted cash equivalents in the statement of cash flows. Under ASU 2016-18, the statement of cash flows shall explain the change during the

15

period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. Therefore, amounts generally described as restricted cash and cash equivalents should now be included with cash and cash equivalents when reconciling the beginning-of-period and end-of-period amounts shown on the statements of cash flows. The Company adopted this ASU beginning on January 1, 2019 using a retrospective transition method to each period presented. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

In June 2018, the FASB issued ASU No. 2018-07, *Compensation-Stock Compensation (Topic 718): Improvements to Nonemployee Share-Based Payment Accounting*, to include share-based payment transactions for acquiring goods and services from non-employees. The amendments specify that the guidance applies to all share-based payment transactions in which a grantor acquires goods or services to be used or consumed in a grantor's own operations by issuing share-based payment awards. The amendments are effective for fiscal years beginning after December 15, 2019, early adoption is permitted. The Company adopted this guidance on January 1, 2020. The adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework-Changes to the Disclosure Requirements for Fair Value Measurement*, to modify the disclosure requirements on fair value measurements based on the concepts in the FASB Concepts Statements, including the consideration of costs and benefits. The amendments in the update are effective for fiscal years beginning after December 15, 2019. The adoption of the new guidance will require the Company to present, on a prospective basis, narrative information regarding the uncertainty of the fair value measurements from the use of unobservable inputs used in recurring fair value measurements categorized in Level 3 of the fair value hierarchy, to disclose the amount of gains and losses recognized in other comprehensive income (loss) for the period for financial instruments categorized within Level 3 of the fair value hierarchy, and quantitative information for the significant unobservable inputs used to develop the Level 3 fair value measurements. The adoption of the new guidance will also allow the Company to discontinue the presentation of information regarding transfers between Level 1 and Level 2 of the fair value hierarchy. As of December 31, 2020 and 2019, the only financial instrument of the Company for which the recurring fair value measurements are categorized in Level 3 of the fair value hierarchy is its redeemable convertible preferred stock warrant liability. The Company adopted this guidance on January 1, 2020 and the adoption of this guidance did not have a material impact on the Company's consolidated financial statements.

*Recent Accounting Pronouncements Not Yet Adopted*

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*, and has since issued several updates, amendments, and technical improvements to ASU 2016-02. The guidance requires recognition of lease right-of-use ("ROU") assets and lease liabilities by lessees for those leases previously classified as operating. The standard also requires additional disclosures about leasing arrangements related to discount rates, lease terms, and the amount, timing, and uncertainty of cash flows arising from leases. Topic 842 is effective for financial statements issued for fiscal years beginning after December 15, 2021. The Company expects to adopt this guidance in fiscal year 2022. The adoption of this guidance will result in recognition of ROU assets and leases liabilities on the consolidated balance sheets. The Company is currently evaluating whether this guidance will have a significant impact on its consolidated financial statements.

In June 2016, FASB issued an ASU No. 2016-13, *Financial Instruments-Credit Losses (Topic 326)*, *Measurement of Credit Losses on Financial Instruments*. The FASB also issued amendments and the initial ASU, and all updates are included herein as the Credit Losses standard or Topic 326. The new standard generally applies to financial assets and requires those assets to be reported at the amount expected to be realized. The ASU is effective for fiscal years beginning after December 15, 2022 and interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating whether this guidance will have a significant impact on its consolidated financial statements.

In March 2020, the FASB issued, ASU No. 2020-04, *Reference Rate Reform (Topic 848): Facilitation of the Effects of Reference Rate Reform on Financial Reporting,* as modified in January 2021. The ASU is intended to help stakeholders during the global market-wide reference rate transition period. The new guidance provides optional expedients and exceptions for applying generally accepted accounting principles to contract modifications and hedging relationships, subject to meeting certain criteria, that reference LIBOR or another reference rate expected to be discontinued. The guidance also establishes (1) a general contract modification principle that entities can apply in

16

other areas that may be affected by reference rate reform and (2) certain elective hedge accounting expedients. The amendment is effective for all entities starting March 12, 2020 and can be adopted through December 15, 2022. The Company has not yet decided the date of adoption of this standard. LIBOR is used to calculate the interest on borrowings under the Company's 2019 Revolving Debt Facility which terminates on October 22, 2023. The Company is currently evaluating whether this guidance will have a significant impact on its consolidated financial statements.

In August 2020, the FASB issued No. ASU 2020-06, Debt—Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging — Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity ("ASU 2020-06"). This ASU simplifies accounting for convertible instruments by removing major separation models required under current U.S. GAAP. Consequently, more convertible debt instruments will be reported as a single liability instrument and more convertible preferred stock as a single equity instrument with no separate accounting for embedded conversion features. The ASU removes certain settlement conditions that are required for equity contracts to qualify for the derivative scope exception, which will permit more equity contracts to qualify for it. The ASU also simplifies the diluted earnings per share ("EPS") calculation in certain areas. ASU 2020-06 is effective for fiscal years beginning after December 15, 2023 including interim periods within those fiscal years. Early adoption is permitted but no earlier than fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. The Company has not yet decided the date of adoption of this standard. The Company is currently evaluating whether this guidance will have a significant impact on its consolidated financial statements.

## 2.    Cash, Cash Equivalents, and Restricted Cash

Cash, cash equivalents, and restricted cash consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Cash | $24,658 | $ 33,007 |
| Cash equivalents: | 38,574 | 105,211 |
| Cash and cash equivalents | 63,232 | 138,218 |
| Restricted cash included in prepaid expenses and other current assets | 1,000 | 2,000 |
| Restricted cash | 10,461 | 8,456 |
| Total cash, cash equivalents, and restricted cash | $74,693 | $148,674 |

## 3.    Revenue

*Disaggregation of Revenue*

The Company disaggregates revenue by geographic market and between products and services that depict the nature, amount, and timing of revenue and cash flows.

The following table summarizes the Company's revenue by geographic area, which is based on the shipping address of the customers (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Revenue:** | | |
| USA | $30,066 | $19,763 |
| Canada | 1,351 | 4,474 |
| Other | 885 | 87 |
| Total | $32,302 | $24,324 |

17

The following table summarizes the Company's revenue by products and services (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Revenue:** | | |
| Products | $31,103 | $23,861 |
| Commissioning services | 1,199 | 463 |
| Total | $32,302 | $24,324 |

*Remaining Performance Obligations*

Remaining performance obligations represent the amount of contracted future revenue, including both deferred revenue and non-cancelable contracted amounts that will be invoiced in future periods, not yet recognized as revenue as the amount has been allocated to performance obligations not yet completed, or only partially completed, as of the end of the reporting period. The Company applies the practical expedient to not disclose information about remaining performance obligations that are part of a contract that has an original expected duration of one year or less. The transaction price allocated to remaining performance obligations as of December 31, 2020 and 2019 was $7.3 million and $7.1 million, respectively, that the Company expects to recognize as it satisfies the performance obligations over the next 12 to 24 months which are, among other things, dependent on the construction schedule of the site for which the Company's products and services are delivered.

*Contract Assets and Liabilities*

Contract assets consist of accounts receivables and unbilled receivables and are recorded when revenue is recognized in advance of scheduled billings to customers. Accounts receivables relate to the Company's right to consideration for performance obligations completed (or partially completed) for which the Company has an unconditional right to consideration.

Contract assets related to unbilled receivables as of December 31, 2020 and 2019 were $1.2 million and $1.1 million, respectively, and were included in prepaid expenses and other current assets on the consolidated balance sheets.

Contract liabilities relate to amounts invoiced or consideration received from customers for the Company's CSS contracts in advance of the Company's satisfaction of the associated performance obligation. Such contact liabilities are recognized as revenue when the performance obligation is satisfied. Contract liabilities are presented as deferred revenue on the consolidated balance sheets.

Revenue recognized during the years ended December 31, 2020 and 2019, which was included in the opening contract liability balance as of January 1, 2020 and 2019, was $0.6 million and $0.7 million, respectively.

## 4.   Fair Value

The following table presents information about the Company's financial assets and liabilities measured at fair value on a recurring basis (in thousands):

| | December 31, 2020 | | | |
| --- | --- | --- | --- | --- |
| | Level 1 | Level 2 | Level 3 | Total |
| Cash equivalents: | | | | |
| Money market funds | $38,574 | $ — | $ — | $38,574 |
| Total cash equivalents | 38,574 | — | — | 38,574 |
| Restricted cash: | | | | |
| Certificates of deposit | $ — | $11,461 | $ — | $11,461 |
| Total assets measured at fair value | $ — | $11,461 | $ — | $11,461 |
| Redeemable convertible preferred stock warrant liability | $ — | $ — | $12,323 | $12,323 |
| Total liabilities measured at fair value | $ — | $ — | $12,323 | $12,323 |

18

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | December 31, 2019 | | |
| Cash equivalents: | | | | |
| Treasury bills | $ 69,848 | $ — | $ — | $ 69,848 |
| Money market funds | 35,363 | — | — | 35,363 |
| Total cash equivalents | 105,211 | — | — | 105,211 |
| Restricted cash: | | | | |
| Certificates of deposit | — | 10,456 | — | 10,456 |
| Short-term investments in treasury bills: | 32,866 | — | — | 32,866 |
| Total assets measured at fair value | $138,077 | $10,456 | $ — | $148,533 |
| Redeemable convertible preferred stock warrant liability | $ — | $ — | $19,478 | $ 19,478 |
| Total liabilities measured at fair value | $ — | $ — | $19,478 | $ 19,478 |

There were no transfers between Level 1, Level 2 or Level 3 during the years ended December 31, 2020 and 2019.

*Valuation of redeemable convertible preferred stock warrants*

As of December 31, 2020, the Company used a combination of Black-Scholes option-pricing enterprise allocation model (OPM) and transaction value scenario by assigning 80% weighting to the transaction value scenario described below and 20% weighting to the OPM. As of December 31, 2019, the Company used the OPM, which incorporates assumptions and estimates, to allocate value to the redeemable convertible preferred stock warrants. The enterprise value was estimated utilizing the discounted cash flow model and then allocated to the various securities including the redeemable convertible preferred stock warrants. In the transaction value scenario, the Company determined the fair value per share of the underlying security by taking into consideration trading price of the proposed merger partner and the implied value of the Company and utilized a Black-Scholes option pricing model that includes the term, corresponding volatility and risk-free rate. As a private company, specific historical and implied volatility information of its stock is not available. Therefore, the Company estimates its expected stock volatility based on the historical volatility of publicly traded peer companies for a term equal to the expected term of the redeemable convertible preferred stock warrant. The risk-free interest rate is determined by reference to the U.S. Treasury yield curve for time periods approximately equal to the expected term of the redeemable convertible preferred stock warrant. The Company estimated a 0% expected dividend yield based on the fact that the Company has never paid or declared dividends and does not intend to do so in the foreseeable future.

The market-based assumptions used in the valuations include the following:

| | December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Expected volatility | 70% | 70% |
| Discount rate | 11%—55% | 20%—55% |
| Expected term | 2.0 years | 2.0 years |
| Expected dividends | 0% | 0% |
| Risk-free rate | 0.1% | 1.6% |

19

The following table provides a reconciliation of the beginning and ending balances for the level 3 redeemable convertible preferred stock warrant liability measured at fair value using significant unobservable inputs (in thousands):

| | Redeemable convertible preferred stock warrant liability |
|---|---|
| Balance as of December 31, 2018 | $ 21,228 |
| Change in fair value | (1,750) |
| Balance as of December 31, 2019 | $ 19,478 |
| Change in fair value | (7,155) |
| Balance as of December 31, 2020 | $ 12,323 |

## 5. Property and Equipment, net

Property and equipment, net consisted of the following (in thousands):

| | Estimated Useful Lives (in Years) | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Testing and chamber equipment | 7 | $ 15,853 | $ 15,050 |
| Tenant improvements | 2—15 | 41,756 | 24,006 |
| Plant and manufacturing equipment | 7—12 | 174,416 | 163,660 |
| Computer hardware and software | 5 | 20,269 | 18,158 |
| Furniture and fixtures | 7 | 3,434 | 1,821 |
| Construction in progress | | 151,618 | 156,169 |
| Property and equipment, gross | | 407,346 | 378,864 |
| Less: Accumulated depreciation | | (124,786) | (100,269) |
| Property and equipment, net | | $ 282,560 | $ 278,595 |

The Company recorded depreciation expense of $26.2 million and $24.3 million, including $1.1 million and $3.9 million related to assets which were no longer in service and had no alternative use for the years ended December 31, 2020 and 2019, respectively.

## 6. Accrued Compensation, Accrued Expenses and Other Current Liabilities and Other Liabilities

Accrued compensation consisted of the following (in thousands):

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Accrued vacation | $ 3,990 | $3,839 |
| Other | 10,675 | 5,394 |
| Accrued compensation | $14,665 | $9,233 |

Accrued expenses and other current liabilities consisted of the following (in thousands):

| | December 31, 2020 | December 31, 2019 |
|---|---|---|
| Accrued interest | $14,540 | $ 3,088 |
| Other | 21,940 | 16,911 |
| Accrued expenses and other current liabilities | $36,480 | $19,999 |

20

Other liabilities consisted of the following (in thousands):

| | December 31, | |
| | 2020 | 2019 |
|---|---|---|
| Warranty accrual | $18,694 | $23,430 |
| Legal settlement liability (1) | 9,658 | 11,294 |
| Other | 8,379 | 9,093 |
| Other liabilities | $36,731 | $43,817 |

1)    In December 2014, the Company finalized the terms of a litigation settlement with a third-party whereby the Company agreed to pay the other party a total of $32.0 million periodically over the next ten years. The Company recorded the present value of future payments as a liability and records interest expense as it accretes the liability. Under the terms of the settlement, the Company paid $2.0 million for each of the years ended December 31, 2020 and 2019. As of December 31, 2020, the Company has to pay the remaining liability amount of $16.0 million through 2025.

## 7.    Commitments and Contingencies

*Operating Leases*

The Company had an operating lease of approximately 6,000 square feet of office space in Milpitas, California which expired on December 31, 2020.

The Company has an operating lease of approximately 77,200 square feet of office space in Milpitas, California. The lease will expire on September 30, 2028. The lease requires a letter of credit in the amount of $1.0 million. The letter of credit was issued by the Company's primary commercial bank and is fully secured by a certificate of deposit. The Company has classified this certificate of deposit as restricted cash on the consolidated balance sheets.

In July 2010, the Company entered into an operating lease with Industrial Developments International for approximately 300,000 square feet of manufacturing space in Olive Branch, Mississippi, which expires in March 2026. The lease requires, in addition to the minimum payments noted below, a letter of credit in the amount of $0.4 million in lieu of a deposit. The letter of credit was issued by the Company's primary commercial bank and is fully secured by a certificate of deposit. The Company has classified this certificate of deposit as restricted cash on the consolidated balance sheets. In September 2015, the Company amended the lease for an additional 267,300 square feet effective from March 2016. In March 2018, the Company entered into a second amendment for an additional 236,804 square feet, which lease expiring on March 31, 2028.

In January 2019, the Company entered into an industrial facility operating lease with IDIG Crossroads I, LLC for manufacturing space of 510,350 square feet in Olive Branch, Mississippi which expires in February 2029. The lease requires a security deposit in the amount of $1.0 million. The Company has classified this security deposit within other assets on the consolidated balance sheets.

The Company recorded facility rent expense of $7.2 million and $7.5 million for the years ended December 31, 2020 and 2019, respectively.

The future minimum payments at December 31, 2020 under all operating leases are as follows (in thousands):

| Year Ending December 31, | Operating Leases |
|---|---|
| 2021 | $ 7,543 |
| 2022 | 7,722 |
| 2023 | 7,905 |
| 2024 | 8,093 |
| 2025 | 8,285 |
| Thereafter | 22,969 |
| Total minimum lease payments | $ 62,517 |

*Indemnifications*

From time to time, the Company enters into certain types of contracts that contingently require the Company to indemnify the Company's officers, directors, and employees for liabilities arising out of their employment relationship. Generally, a maximum obligation under these contracts is not explicitly stated. Because the maximum amounts associated with these agreements are not explicitly stated, the overall maximum amount of the obligation cannot be reasonably estimated. The Company has not been required to make payments under these obligations, and no liabilities have been recorded for these obligations on the Company's consolidated balance sheets.

*Standby Letter of Credit*

During the course of business, the Company's banking vendor issues standby letters of credit on behalf of the Company to certain vendors of the Company. As of December 31, 2020, and 2019, the total value of the letters of credit issued by the banking vendor are $11.5 million and $10.5 million, respectively. No amounts have been drawn under the standby letter of credit.

*Litigation Settlements*

The Company has alleged claims for legal malpractice in relation to legal representation and related services provided by a law firm to the Company in connection with certain corporate matters. Both the Company and the law firm settled their dispute via a mediation regarding claims alleged by the Company against the law firm and signed a formal written settlement agreement in December 2019. Per the terms of the signed agreement, the law firm agreed to pay an amount of $22.5 million as consideration to settle the dispute. The Company recorded $22.5 million as a receivable as part of current assets on the consolidated balance sheet as of December 31, 2019 and income reflecting the recovery of previously incurred losses from the legal settlement in the consolidated statement of comprehensive loss for the year ended December 31, 2019. The Company received this amount in January 2020.

*Contractual Commitments*

The Company has a non-cancelable commitment to pay a certain vendor $2.0 million for purchase of certain license subscriptions, of which $1.0 million is due to be paid in April 2021 and the remaining $1.0 million in January 2023.

## 8.    Capital Leases

The Company leases certain of its manufacturing equipment under capital leases. The Company records an asset and liability for capital leases at present value of the minimum lease payments. For the years ended December 31, 2020 and 2019, the Company recorded depreciation expense of $0.8 million and $0.8 million, respectively, related to assets under capital leases in cost of revenue in the consolidated statements of comprehensive loss.

The future minimum payments at December 31, 2020 under all capital leases are as follows (in thousands):

| Year Ending December 31, | Capital Leases |
|---|---|
| 2021 | $  775 |
| 2022 | 360 |
| 2023 | 298 |
| 2024 | 68 |
| Thereafter | — |
| Total minimum lease payments | 1,501 |
| Less: Amounts representing interest | (89) |
| Present value of minimum lease payments | 1,412 |
| Less: long-term portion | (727) |
| Current portion | $  685 |

22

## 9.    Debt

Debt outstanding consisted of the following (in thousands):

| | Interest Rate- December 31, 2020 | December 31, 2020 | December 31, 2019 |
|---|---|---|---|
| Term loan, due June 30, 2032 | 0% | $ 15,430 | $ 17,145 |
| Revolving debt facility, expires October 22, 2023 | LIBOR+9.05% | 250,000 | 150,000 |
| Debt discount | — | (2,752) | (3,769) |
| Total Debt | | 262,678 | 163,376 |
| Current portion of long-term debt | | 247,248 | 5,143 |
| Long-term debt | | $ 15,430 | $158,233 |

Principal payments on all debt outstanding as of December 31, 2020 are estimated as follows (in thousands):

| Year Ending December 31, | Total |
|---|---|
| 2021 (1) | $250,000 |
| 2022 | 1,470 |
| 2023 | 1,470 |
| 2024 | 1,470 |
| 2025 and thereafter | 11,020 |
| Total | $265,430 |

1)    Represents principal payments related to revolving debt facility, as the Company violated the stockholders' equity covenant which was waived by the finance provider only through March 31, 2021. In conjunction with the Business Combination, the Company repaid in full the revolving debt facility of $276.8 million, including interest due on the notes of $26.8 million prior to the expiration of the limited waiver.

### Term Loan

On November 22, 2010, the Company entered into a debt arrangement with a lender, in an amount of $40.0 million ("Term Loan"), for the purpose of financing equipment and tenant improvements at its manufacturing facility in Olive Branch, Mississippi. Pursuant to the original terms, the loan provides for interest-free debt to be repaid in semi-annual payments due on the June 30 and December 31 each year. The first installment became due on December 31, 2012. The loan was originally being paid over 24 semi-annual installments through June 30, 2024.

On October 22, 2020, the Company entered into an amended and restated debt arrangement with the lender. The amended and restated debt arrangement temporarily suspended the payments. Starting June 30, 2022, the Company is required to make semi-annual payments of $0.7 million through June 30, 2032.

The term loan agreement, as amended, contains requirements of the Company to: i) invest at least $133.0 million in land, building, and equipment no later than December 31, 2016; and ii) create 330 new full-time jobs within five years of the start of commercial production, no later than December 31, 2017, with an average annual wage of at least $48 thousand per job. Failure to meet these requirements, in whole or in part, may result in acceleration of debt repayment. At the time of issuance of these consolidated financial statements, the Company has met the requirements and was not in default of any of the terms of the debt arrangement.

The term loan agreement, as amended, also carries a covenant for audited consolidated financial statements to be delivered to the lender within 210 days of December 31 of each of the Company's fiscal year. The Company was in compliance with this covenant at the time of issuance of these financial statements.

### Equipment Loan

On June 13, 2017, the Company entered into an Equipment Loan Agreement with a lender for a committed facility up to $60.0 million ("Equipment Loan"), within which $20.0 million was subject to further approval by the lender. In 2017, the Company drew down proceeds of $40.0 million in the form of promissory note. The loan bore interest at a rate of 12.25% to 12.5% per annum, compounded on a monthly basis and is payable over 48 months with principal payments starting the 13th month from the drawdown date. The last month's principal and interest amount were paid in advance. The loan contained an end of term balloon payment of $5.6 million and the facility fees are $0.3 million

23

each year until the secured obligations are paid in full. The loan is collateralized by specific fixed assets purchased with the proceeds. For the year ended December 31, 2019, the Company recorded interest expense of $4.8 million. In October 2019, the loan and end of term balloon amount were repaid in full prior to its maturity. Upon the prepayment of the term loan, the Company recorded $3.0 million as a loss on extinguishment of debt in the consolidated statement of comprehensive loss.

**Revolving Debt Facility**

In October 2019, the Company entered into a secured revolving debt facility pursuant to which the Company may draw amounts in a maximum aggregate principal amount of $200.0 million until January 3, 2020 and $250.0 million after such date, for the purpose of paying payables and other corporate obligations ("Revolving Debt Facility"). In October 2019, the Company drew a principal amount of $150.0 million under the facility with weekly maturity dates ranging from 8 days to 364 days. In May 2020, the Company drew the remaining principal amount of $100.0 million available under the facility, which is repayable in May 2021. The facility expires on October 22, 2023, at which time all drawn amounts must be repaid in full. The interest rate applicable to amounts outstanding under the facility is LIBOR, plus 9.05%. As security for the payment and performance of all obligations under the facility, the Company has granted the finance provider a security interest in substantially all of the Company's assets.

Through October 23, 2022, repaid principal amounts become immediately available to be redrawn under the facility with maturity dates of one year. The maximum draw amount available under the facility is determined by a borrowing base calculated based on a formula consisting of certain eligible assets of the Company. As of December 31, 2020 and 2019, the Company's available borrowing capacity was nil and $50.0 million, respectively, pursuant to the terms of the debt facility including borrowing base limitation and compliance with other applicable terms. As of December 31, 2019, the Company classified the outstanding balance of $150.0 million as a long-term liability as it had the intent and ability to continuously refinance successive weekly draws after repayment of principal and interest installments at each maturity date, through October 23, 2022, as described above. As of December 31, 2020, the Company has classified the outstanding balance of $250.0 million as a current liability because the Company was in violation of the stockholders' equity covenant as of such date and the limited waiver from the finance provider waived such violation only through March 31, 2021. Further, the facility has been repaid in full upon close of the Business Combination.

In October 2019, upon the initial draw of $150.0 million, the Company recognized a liability equal to the proceeds received, net of issuance costs. Costs and expenses associated with the closing of this facility are incremental costs related to debt instruments and treated as debt issuance costs. The debt issuance costs are amortized over the life of the debt instrument using the effective interest rate method. There were no costs incurred for the May 2020 drawdown.

In December 2020, the Company entered into an amendment to replace thirteen weekly draws of approximately $2.9 million each, aggregating to $37.5 million in principal amount, with four notes of approximately $9.4 million each, aggregating to $37.5 million in principal amount. Before the amendment, the Company would have paid a total of $42.0 million, consisting of principal and interest amounts, upon maturity on January 6, 2021 through March 31, 2021. As a result of this amendment, the Company will pay a total amount of $42.2 million, consisting of principal and interest amounts, upon maturity on April 9, 2021 through April 16, 2021.

*Covenant Compliance*

The facility contains customary representations, warranties, and covenants, including covenants that restrict the ability of the Company to create or incur certain liens, incur or guarantee additional indebtedness, merge or consolidate with other companies, amongst others. The facility also includes conditions to draw and certain events of default, upon the occurrence of which events of default and after any applicable grace period, re-payment of outstanding amounts under the facility may be accelerated and the facility may be terminated. Specifically, the facility contains the following financial covenants that if breached, could constitute an event of default:

i.     borrowing base is less than $100.0 million as reported monthly;

ii.    cash and cash equivalents as of the last day of each financial quarter is less than $50.0 million;

24

iii.  stockholders' equity (calculated as the sum of the balance of redeemable convertible preferred stock and Total stockholders' deficit) as of the last day of the Company's most recently ended financial quarter is less than $50.0 million; and

iv.  permitted indebtedness is greater than $50.0 million.

In addition, as a condition to draw under the facility, the Company must have a stockholders' equity as reflected in its quarterly or annual financial statements most recently delivered to the finance provider under the facility of, greater than $75.0 million.

Due primarily to the effects of COVID-19, the audited financial statements were not furnished within 120 days after the end of fiscal year 2019. In addition, the Company's audited financial statements for the fiscal year ended December 31, 2019 were prepared under the going concern assumption; however, based on the conditions discussed in the Company's audited financial statements for the year ended December 31, 2019, there was substantial doubt about the Company's ability to continue as a going concern and as such an explanatory paragraph was included in the Report of Independent Auditors on those consolidated financial statements. As a result of the foregoing, the Company was in violation of these covenant requirements as of the date the 2019 financial statements were issued or available to be issued.

On July 15, 2020, the finance provider issued a limited waiver valid through March 31, 2021. The limited waiver extended the date by which the Company was obligated to deliver its audited consolidated financial statements as of and for the year ended December 31, 2019, from April 30, 2020 to July 30, 2020. The Company delivered the 2019 audited consolidated financial statements on July 29, 2020. The limited waiver also waived the going concern covenant violation for the audited consolidated financial statements for the year ended December 31, 2019. As of September 30, 2020, the Company was in violation of the condition to draw as the Company's stockholders' equity balance was below $75.0 million and the Company anticipated the stockholders' equity balance to fall below $50.0 million by the end of fiscal 2020. On November 27, 2020, the finance provider issued a limited second waiver that waived the above violation of the condition to draw and the anticipated stockholders' equity covenant violation through March 31, 2021. As of December 31, 2020, the Company was in violation of the condition to draw as well as financial covenant related to stockholders' equity but these violations have been waived through March 31, 2021 by the limited waiver issued on November 27, 2020.

The facility also requires the Company to furnish within 120 days after the end of each fiscal year the audited consolidated financial statements without a going concern or like qualification or exception and without any qualification or exception as to the scope of such audit. The Company is in compliance of this covenant requirement as of the date the 2020 consolidated financial statements were issued or available to be issued.

## 10.  Redeemable Convertible Preferred Stock, Repurchases, and Stockholders' Deficit

*Issuance of Redeemable Convertible Preferred Stock for Cash*

On October 18, 2018, the Company entered into a purchase agreement whereby an investor agreed to purchase $1,096.4 million in Series H and Series H-1 redeemable convertible preferred stock, $0.0001 par value per share at a per share price of $0.44. The first closing of the Financing Transaction was completed in November 2018, whereby the investor purchased 305,967,185 shares of Series H redeemable convertible preferred stock and 1,512,214,633 shares of Series H-1 redeemable convertible preferred stock for $796.6 million. The second closing of the Financing Transaction was completed in January 2019, whereby the investor purchased 681,818,182 shares of Series H-1 redeemable convertible preferred stock in exchange for $299.8 million.

25

*Redeemable Convertible Preferred Stock.*

Redeemable convertible preferred stock consisted of the following (in thousands, except share and per share data):

| Series | Shares Authorized December 31, 2020 and 2019 | Liquidation Preference per Share December 31, 2020 and 2019 | Shares Outstanding December 31, 2020 | Shares Outstanding December 31, 2019 | Carrying Value December 31, 2020 | Carrying Value December 31, 2019 | Liquidation Preference December 31, 2020 | Liquidation Preference December 31, 2019 |
|---|---|---|---|---|---|---|---|---|
| A | 999,999 | $ 0.3000 | 793,165 | 929,665 | $ 166 | $ 195 | $ 238 | $ 279 |
| B | 67,604,204 | 0.3600 | 52,346,933 | 52,372,210 | 19,210 | 19,219 | 18,845 | 18,854 |
| C | 97,839,400 | 0.4365 | 26,155,627 | 26,155,627 | 11,495 | 11,495 | 11,417 | 11,417 |
| D | 114,997,875 | 0.5020 | 26,365,354 | 26,365,254 | 13,263 | 13,263 | 13,235 | 13,235 |
| E | 320,000,000 | 0.6024 | 198,141,237 | 198,159,222 | 100,225 | 100,233 | 119,361 | 119,371 |
| E-1 | 5,659,523 | 0.6626 | — | — | — | — | — | — |
| E-2 | 4,980,080 | 0.7530 | — | — | — | — | — | — |
| F | 450,000,000 | 0.9000 | 209,103,548 | 209,103,548 | 175,182 | 175,182 | 188,193 | 188,193 |
| G | 2,700,000,000 | 0.1125 | 2,059,431,740 | 2,059,431,740 | 330,466 | 330,466 | 231,686 | 231,686 |
| G-1 | 40,000,000 | 0.9000 | — | — | — | — | — | — |
| H | 3,233,440,076 | 0.4400 | 456,481,633 | 456,481,633 | 197,488 | 197,488 | 200,852 | 200,852 |
| H-1 | 2,616,505,173 | 0.4400 | 2,194,032,815 | 2,194,032,815 | 965,183 | 965,183 | 965,374 | 965,374 |
| | 9,652,026,330 | | 5,222,852,052 | 5,223,031,714 | $1,812,678 | $1,812,724 | $1,749,201 | $1,749,261 |

*Voting*

The holders of redeemable convertible preferred stock, except for Series H-1 which is non-voting, are entitled to the number of votes equal to the number of shares of common stock into which their preferred shares are convertible.

*Conversion*

Each outstanding share of Series A, B, C, D, E, E-1, E-2, F, G, G-1, H, and H-1 redeemable convertible preferred stock has the right to convert into an equal number of shares of common stock on a one-to-one basis. The conversion rate is subject to adjustments for any stock dividends, combination, or splits with respect to such shares.

*Liquidation*

In the event of a liquidation, dissolution, or winding up of the Company, either voluntary or involuntary, the holders of Series A, B, C, D, E, E-1, E-2, F, G, G-1, H, and H-1 redeemable convertible preferred stock are entitled to be paid out of the assets of the Company, prior to and in preference to common stock.

If the assets of the Company are insufficient to make payment in full to all holders of redeemable convertible preferred stock, then the entire remaining assets of the Company legally available for distribution shall be distributed with equal priority and pro rata among the holders of the redeemable convertible preferred stock in proportion to the full amounts they would otherwise be entitled to receive. After payment of the full liquidation preference to the holders of redeemable convertible preferred stock, the remaining assets of the Company are to be distributed pro rata among holders of the common stock in proportion to the number of shares of common stock held by them.

*Dividends*

The holders of the Series A, B, C, D, E, E-1, E-2, F, G, G-1, H, and H-1 redeemable convertible preferred stock are entitled to receive dividends, when and if declared by the Board of Directors, in the amount of $0.024, $0.0288, $0.0349, $0.0402, $0.0482, $0.0530, $0.0602, $0.072, $0.072, $0.072, $0.0352, and $0.0352 per share, respectively, in each case, subject to adjustment for stock splits, stock dividends, combination of shares, reorganization, recapitalization, reclassification, or other similar event. The dividends are payable in preference and priority to any payment of any dividend on the common stock of the Company and are noncumulative. In addition to the preferred dividends, the holders of redeemable convertible preferred stock also participate with the common stockholders' in additional dividends in proportion to the number of shares of common stock which would be held by each such holder at the time of declaring such divided on an as converted basis at the then effective conversion rate. No dividends were declared by the Board of Directors for the years ended December 31, 2020 and 2019, respectively.

**Common Stock Reserved for Future Issuance**

The Company had the following shares of common stock available for future issuance on an as-if converted basis:

| | December 31, | |
|---|---|---|
| | 2020 | 2019 |
| Redeemable convertible preferred stock | 5,222,852,052 | 5,223,031,714 |
| Common stock options outstanding | 1,071,604,323 | 1,151,795,097 |
| Shares reserved for issuance under the 2018 Plan | 245,620,133 | 167,911,850 |
| Common stock warrants | 1,726,983 | 1,726,983 |
| Redeemable convertible preferred stock warrants | 144,290,003 | 145,689,640 |
| | 6,686,093,494 | 6,690,155,284 |

**Stock Warrants**

The following table summarizes the redeemable convertible preferred stock and common stock warrants, issued to various service providers, lenders, investors, at various points in time:

| Warrant issue date | Types of shares | Number of Warrants outstanding December 31, 2020 | Number of Warrants outstanding December 31, 2019 | Exercise Price per Warrant | Expiry Date |
|---|---|---|---|---|---|
| August 2010—June 2011 | Series B redeemable convertible preferred stock | 1,999,999 | 1,999,999 | $ 0.3600 | Note 1 |
| August 2011 – January 2012 | Series C redeemable convertible preferred stock | 2,290,946 | 3,092,778 | 0.4365 | Note 2 |
| August 2012 | Series D redeemable convertible preferred stock | 1,952,191 | 2,549,800 | 0.5020 | Note 3 |
| December 2013 | Series E redeemable convertible preferred stock | 2,722,443 | 2,722,443 | 0.6024 | Note 1 |
| April 2015—April 2016 | Series F redeemable convertible preferred stock | 6,944,446 | 6,944,446 | 0.9000 | Through December 2022 |
| April 2016—November 2018 | Series H redeemable convertible preferred stock | 48,834,523 | 48,834,719 | 0.4400 | Note 4 |
| March 2017 | Series H redeemable convertible preferred stock | 79,545,455 | 79,545,455 | 0.3000 | March 2027 |
| March 2014 | Common stock | 100,000 | 100,000 | 0.2200 | March 2024 |
| August 2015 | Common stock k | 555,555 | 555,555 | 0.2700 | August 2025 |
| December 2018 | Common stock | 1,071,428 | 1,071,428 | 0.2100 | December 2028 |
| | Total stock warrants | 146,016,986 | 147,416,623 | | |

Note 1 – Expire two years from the effective date of an initial public offering.

Note 2 – In March 2020, 801,832 warrants expired. The remaining 2,290,946 warrants expire two years from the effective date of an initial public offering.

Note 3 – In June 2020, 597,609 warrants expired. The remaining 1,952,191 warrants expire two years from the effective date of an initial public offering.

Note 4 – Of the total warrants outstanding as of December 31, 2020, 32,414,068 warrants expire in April 2026, 11,875,000 warrants expire in November 2028 and the remaining 4,545,455 warrants expire two years from the effective date of an initial public offering.

The warrants to purchase redeemable convertible preferred stock are classified as liabilities. At the end of each reporting period, the Company determines the fair value of all Series of its outstanding redeemable convertible preferred stock warrants recorded as liabilities and records the change in fair value in interest and other income (expense), net in its consolidated statements of comprehensive loss. The Company recorded a gain of $7.2 million and $1.8 million for the years ended December 31, 2020 and 2019, respectively.

27

**Common Stock Warrants**

In January 2019, concurrent with the second closing of the Financing Transaction, the Company issued warrants to purchase a total of 6,675,774 shares of common stock with an exercise price of $0.01 per share. These warrants were fully exercised as of December 31, 2019.

**11.    Stock-Based Compensation**

In July 2007, the Company established the 2007 Stock Plan (the "2007 Plan") in which 6,666,667 shares of common stock were reserved for the issuance of incentive stock options ("ISOs") and non-statutory stock options ("NSOs") to employees, directors, or consultants. In March 2009, the Company replaced the 2007 Stock Plan with the 2009 Equity Incentive Plan (the "2009 Plan"). Upon approval of the 2009 Plan, any shares that, as of the date of stockholder approval, were reserved but not issued pursuant to any awards granted under the Company's 2007 Plan were rolled into the 2009 Plan. In addition, any shares subject to stock options or similar awards granted under the 2007 Plan that expire or otherwise terminate without having been exercised in full and shares issued pursuant to awards granted under the 2007 Plan that are forfeited or repurchased by the Company shall roll into the 2009 Plan. In October 2018, the Company renamed the 2009 Plan to the Amended and Restated 2018 Equity Incentive Plan (the "2018 Plan"). The 2018 Plan provides for the discretionary grant of incentive stock options, non-statutory stock options, stock appreciation rights, restricted stock, and restricted stock unit awards. Upon the approval of the 2018 Plan, the Company had a total of 1,339,006,755 shares of common stock reserved for issuance of ISOs and NSOs to employees, directors, or consultants under the 2018 Plan. As of December 31, 2020, the Company had 245,620,133 shares of common stock reserved for future issuance of equity awards to employees, officers, directors, or consultants under the 2018 Plan. Per the 2018 Plan, the exercise price of options granted to a stockholder who at the time of grant owns stock representing more than 10% of the voting power of all classes of the stock of the Company shall be no less than 110% of the fair market value per share of the common stock on the date of grant.

*Vesting*

The options issued under the 2007 Plan and 2009 Plan generally vest 20% upon completion of one year of service and 1/60 per month thereafter. New options issued under the 2018 Plan generally vest 25% upon completion of one year of service and 1/48 per month thereafter. Options under all plans generally expire 10 years from the date of grant. However, in the case of an incentive stock option issued to an optionee who at the time of grant owns stock representing more than 10% of the voting power of all classes of the stock of the Company, the term of the option will be no more than five years. Stock bonus awards and rights to immediately purchase stock may also be granted under the 2018 Plan, with terms, conditions, and restrictions determined by the Board of Directors.

The following table summarizes the activity under the Company's stock option plan (in thousands, except per share data and contractual term):

| | | Options Outstanding | | | |
| | Shares Available for Future Grant | Number of Shares Subject to Stock Options Outstanding | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Term (in years) | Aggregate Intrinsic Value |
|---|---|---|---|---|---|
| Outstanding as of December 31, 2019 | 167,912 | 1,151,795 | $ 0.22 | 8.46 | $ 194 |
| Options granted | (51,040) | 51,040 | 0.20 | — | — |
| Exercised | — | (2,482) | 0.18 | — | — |
| Canceled/forfeited | 128,748 | (128,748) | 0.22 | — | — |
| Outstanding as of December 31, 2020 | 245,620 | 1,071,605 | $ 0.22 | 7.59 | $ 20,564 |
| Options vested and expected to vest as of December 31, 2020 | | 997,812 | $ 0.22 | 7.55 | $ 19,007 |
| Exercisable as of December 31, 2020 | | 594,531 | $ 0.22 | 7.18 | $ 10,591 |

28

The weighted-average grant date fair value per share of stock options granted was $0.12 for each of the years ended December 31, 2020 and 2019. The total grant date fair value of stock options vested was $27.0 million and $25.5 million during the years ended December 31, 2020 and 2019, respectively.

*Valuation*

The Company records stock-based compensation expense for stock options based on the estimated fair value of stock options on the date of the grant using the Black-Scholes option-pricing model.

The absence of a public market for the Company's common stock requires the Company's board of directors to estimate the fair value of its common stock for purposes of granting options and for determining stock-based compensation expense by considering several objective and subjective factors, including contemporaneous third-party valuations, actual and forecasted operating and financial results, market conditions and performance of comparable publicly traded companies, developments and milestones in the Company, the rights and preferences of redeemable convertible preferred stock and common, and transactions involving the Company's stock. The fair value of the Company's common stock was determined in accordance with applicable elements of the American Institute of Certified Public Accountants guide, Valuation of Privately Held Company Equity Securities Issued as Compensation.

The estimated grant date fair values of the employee stock options were calculated using the Black-Scholes option-pricing models based on the following assumptions:

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Expected volatility | 70% | 49%—70% |
| Expected terms (in years) | 5.4–6.7 | 5.6–6.7 |
| Expected dividends | 0% | 0% |
| Risk-free rate | 0.4%—1.5% | 1.5%—2.5% |

Expected volatility: As the Company is not publicly traded, the expected volatility for the Company's stock options was determined by using an average of historical volatilities of selected industry peers deemed to be comparable to the Company's business corresponding to the expected term of the awards.

Risk-free interest rate: The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for zero-coupon U.S. Treasury notes with maturities corresponding to the expected term of the awards.

Expected dividend yield: The expected dividend rate is zero as the Company currently has no history or expectation of declaring dividends on its common stock.

Expected term: The expected term represents the period these stock awards are expected to remain outstanding and is based on historical experience of similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules, and expectations of future employee behavior.

*Stock-based Compensation Expense*

The Company estimates the number of options that are expected to vest. The Company applies an estimated forfeiture rate based on an analysis of its actual forfeitures and will continue to evaluate the adequacy of the forfeiture rate based on its actual forfeiture experience, an analysis of employee turnover behavior, and other factors. The impact from a forfeiture rate adjustment will be recognized in full in the period of adjustment.

The Company's stock-based compensation included in its consolidated statements of comprehensive loss was as follows (in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Cost of revenue | $ 2,240 | $ 3,084 |
| Research and development | 4,438 | 4,113 |
| Selling, general and administrative | 22,254 | 21,879 |
| Total | $28,932 | $29,076 |

No income tax benefit was recognized for this compensation expense in the consolidated statements of comprehensive loss, as the Company does not anticipate realizing any such benefit in the future.

As of December 31, 2020, total unrecognized compensation cost related to unvested stock options, net of estimated forfeitures, was $41.3 million and is expected to be recognized over a weighted-average service period of 2.0 years. To the extent that the actual forfeiture rate is different than what the Company has anticipated, stock-based compensation related to these awards will be different from expectations.

## 12.   Income Taxes

Income (loss) before income taxes was as follows (in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Domestic | $(257,029) | $(289,957) |
| Foreign | 87 | 104 |
| **Total** | $(256,942) | $(289,853) |

The components of the provision for income taxes were as follows (in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| **Current income tax provision:** | | |
| Federal | $ — | $ — |
| State | — | — |
| Foreign | 40 | 51 |
| Total Current Provision for Income Taxes | 40 | 51 |
| **Deferred income tax provision:** | | |
| Federal | — | — |
| State | — | — |
| Foreign | — | — |
| Total Deferred Provision for Income Taxes | — | — |
| Total Provision for Income Taxes | $ 40 | $ 51 |

30

A reconciliation of the U.S. federal statutory income tax rate to the Company's effective tax rate was as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Tax at statutory rate | 21.00% | 21.00% |
| State tax, net of federal benefit | (0.02)% | 0.05% |
| Permanent differences | 0.51% | 1.62% |
| Stock-based compensation | (0.03)% | (0.35)% |
| Change in valuation allowance | (21.81)% | (19.09)% |
| Research credit not benefitted | 0.37% | 0.38% |
| Other | (0.04)% | (3.62)% |
| Total rate | (0.02)% | (0.01)% |

The Company's net deferred tax assets consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Net operating loss carryforwards | $ 332,443 | $ 272,194 |
| Intangibles | 6,684 | 7,923 |
| Research and development credits | 5,119 | 3,505 |
| Accruals and other reserves | 8,827 | 10,240 |
| Inventory reserve | 20,872 | 19,868 |
| Stock-based compensation | 16,551 | 9,777 |
| Other | — | 2,256 |
| Deferred tax assets before valuation allowance | 390,496 | 325,763 |
| Valuation allowance | (378,637) | (312,772) |
| Deferred tax assets after valuation allowance | 11,859 | 12,991 |
| Deferred tax liability on fixed assets | (11,859) | (12,991) |
| Net deferred tax assets | $    — | $    — |

As of December 31, 2020, the Company maintained a valuation allowance of $378.6 million for the deferred tax assets that it does not expect to be realized. The valuation allowance on the Company's net deferred tax assets increased by $65.9 million and $70.9 million during the years ended December 31, 2020 and 2019, respectively. The changes in valuation allowance are primarily due to additional U.S. deferred tax assets and liabilities incurred in the respective year. The Company continues to monitor the realizability of the U.S. deferred tax assets taking into account multiple factors, including the results of operations and magnitude of excess tax deductions for stock-based compensation. The Company intends to continue maintaining a full valuation allowance on the Company's U.S. deferred tax assets until there is sufficient evidence to support the reversal of all or some portion of these allowances. Release of all, or a portion, of the valuation allowance would result in the recognition of certain deferred tax assets and a decrease to income tax expense for the period the release is recorded.

As of December 31, 2020, the Company had $1,296.1 million and $1,052.6 million of federal and state net operating loss carryforwards net of a Section 382 limitation, respectively, available to offset future taxable income. The federal and state net operating loss carryforwards, if not utilized, will generally begin to expire in 2021 through 2027. Of the total federal net operating loss carryforwards, $811.7 million were generated post December 31, 2017 and have no expiration.

As of December 31, 2020, the Company had research and development tax credits available to offset federal and California tax liabilities in the amount of $6.1 million and $5.2 million, respectively. Federal credits will begin to expire in 2027 and California state tax credits have no expiration.

31

Federal and state laws can impose substantial restrictions on the utilization of net operating loss and tax credit carry-forwards in the event of an "ownership change," as defined in Section 382 of the Internal Revenue Code. The Company performed a Section 382 study as of December 31, 2020 and determined there will be a Section 382 limitation placed on the utilization of the Company's net operating loss and tax credit carry-forwards due to prior ownership changes.

No deferred tax liabilities for foreign withholding taxes have been recorded relating to the earnings of the Company's foreign subsidiaries since all such earnings are intended to be indefinitely reinvested. The amount of the unrecognized deferred tax liability associated with these earnings has not been material.

On March 27, 2020, the Coronavirus Aid, Relief and Economic Security ("CARES") Act was signed into law. The CARES Act includes provisions relating to refundable payroll tax credits, net operating loss carryback periods, alternative minimum tax credit refunds, modifications to the net interest deduction limitations and technical corrections to the tax depreciation methods for qualified improvement property. The CARES Act had an immaterial impact on the Company's income taxes in fiscal year 2020.

*Uncertain Tax Positions*

The Company establishes reserves for uncertain tax positions based on the largest amount that is more-likely-than-not to be sustained. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained. The Company performs a two-step approach to recognizing and measuring uncertain tax positions. The first step is to evaluate the tax position for recognition by determining if the weight of available evidence indicates that it is more likely than not that the position will be sustained on audit, including resolution of related appeals or litigation processes, if any. The second step is to measure the tax benefit as the largest amount that is more than 50% likely of being realized upon settlement.

Although the Company believes it has adequately reserved for its uncertain tax positions, no assurance can be given that the final tax outcome of these matters will not be different. The Company adjusts these reserves in light of changing facts and circumstances, such as the closing of a tax audit or the refinement of an estimate. To the extent that the final tax outcome of these matters is different than the amounts recorded, such differences will impact the provision for income taxes in the period in which such determination is made. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate, as well as the related net interest and penalties.

The following table summarizes the activity related to the Company's gross unrecognized tax benefits (in thousands):

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2020 | 2019 |
| Balance at beginning of year | $3,979 | $1,917 |
| Decreases related to prior year tax positions | — | — |
| Increases related to prior year tax positions | — | 138 |
| Increases related to current year tax positions | 1,794 | 1,924 |
| Balance at end of year | $5,773 | $3,979 |

The balance of gross unrecognized tax benefits as of December 31, 2020 and 2019 was $5.8 million and $3.9 million, respectively, none of which would affect the Company's income tax expense if recognized. The Company does not expect its unrecognized tax benefits to change significantly over the next 12 months. It is the Company's policy to recognize interest and penalties related to income tax matters in income tax expense. As of December 31, 2020, the Company had no accrued interest and penalties related to uncertain tax positions.

The Company currently has no federal, state or foreign tax examinations in progress nor has it had any federal, state or foreign examinations since inception. The Company files U.S., state, and foreign income tax returns in jurisdictions with varying statutes of limitations. The 2007 through 2020 tax years generally remain subject to examination by U.S. federal and California state tax authorities due to the Company's net operating loss and credit carryforwards. For significant foreign jurisdictions, the 2016 through 2020 tax years generally remain subject to examination by their respective tax authorities.

32

**13.  Net Loss per Share**

The following table sets forth the computation of basic and diluted net loss per share (in thousands, except share and per share data):

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Net loss | $ (256,982) | $ (289,904) |
| Total weighted-average shares outstanding, basic and diluted | 72,176,256 | 67,571,844 |
| Net loss per share, basic and diluted | $ (3.56) | $ (4.29) |

The following outstanding shares of common stock equivalents were excluded from the computation of diluted net loss per share for the periods presented because including them would have had an anti-dilutive effect:

|  | December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Redeemable convertible preferred stock (on an if-converted basis) | 5,222,852,052 | 5,223,031,714 |
| Stock options to purchase common stock | 1,071,604,323 | 1,151,795,097 |
| Warrants to purchase common stock | 1,726,983 | 1,726,983 |
| Warrants to purchase redeemable convertible preferred stock (on an if-converted basis) | 144,290,003 | 145,689,640 |
| Total | 6,440,473,361 | 6,522,243,434 |

**14.  Subsequent Events**

The Company evaluated subsequent events through March 12, 2021, the date these consolidated financial statements were issued, and concluded that no subsequent events have occurred that would require recognition in the Company's consolidated financial statements or disclosures in the notes to the consolidated financial statements herein, except as follows: on March 8, 2021, CF II consummated the previously announced merger pursuant to the Merger Agreement, by and among CF II, Merger Sub, and the Company. Pursuant to the Merger Agreement, a merger between CF II and the Company was effected through the merger of Merger Sub with and into the Company, with the Company surviving as the surviving company and as a wholly-owned subsidiary of CF II. On the Closing Date, CF II changed its name from CF Finance Acquisition Corp. II to View, Inc. and the Company changed its name to View Operating Corporation. As a result of the Business Combination, the Company raised $815.2 million of gross proceeds including the contribution of $374.1 million of cash held in CF II's trust account from its initial public offering, net of redemption of CF II Class A Common Stock held by CF II's public stockholders of $125.9 million, $260.8 million private investment in public equity ("PIPE") at $10.00 per share of CF II's Class A Common Stock, and $180.3 million of additional PIPE at $11.25 per share of CF II's Class A Common Stock.

Upon the consummation of the Business Combination, all holders of common stock, redeemable convertible preferred stock warrants, and stock options received (or have the right to receive) shares of the combined entity Class A Common Stock at a deemed value of $10.00 per share after giving effect to the exchange ratio of 0.02325 based on the following transactions contemplated by the Merger Agreement:

- the cancellation of each issued and outstanding share of the Company common stock and the conversion into the right to receive a number of shares of the combined entity Class A Common stock;

33

- the conversion of all outstanding redeemable convertible preferred stock warrants into warrants exercisable for shares of the combined entity Class A Common Stock with the same terms except for the number of shares exercisable and the exercise price; and

- the conversion of all outstanding vested and unvested stock options into options exercisable for shares of the combined entity Class A Common Stock with the same terms except for the number of shares exercisable and the exercise price, each of which was adjusted using the Exchange Ratio.

The Business Combination will be accounted for as a reverse recapitalization in accordance with U.S. GAAP. Under this method of accounting, CF II will be treated as the "acquired" company for financial reporting purposes. This determination is primarily based on holders of View capital stock comprising a relative majority of the voting power of the combined entity upon consummation of the Business Combination and having the ability to nominate the majority of the governing body of the combined entity, View's senior management comprising the senior management of the combined entity, and View's operations comprising the ongoing operations of the combined entity. Accordingly, for accounting purposes, the financial statements of the combined entity upon consummation of the Business Combination will represent a continuation of the financial statements of View with the Business Combination treated as the equivalent of View issuing stock for the net assets of CF II, accompanied by a recapitalization. The net assets of CF II will be stated at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Business Combination will be presented as those of View in future reports of the combined entity.

Additionally, at the Closing Date,

- the Company granted a nonqualified stock option award to its CEO to purchase 25,000,000 shares of the Company Class A Common Stock in ten separate tranches of 2,500,000 shares of the Company Class A Common Stock, which will vest upon the achievement of certain stock price hurdle specified for each tranche. The vesting of the awards is contingent upon the continued employment of the CEO at each vesting date. The vested shares will be subject to an eighteen-month holding period;

- the Company granted 17,500,000 equity awards underlying the Company Class A Common Stock, of which 12,500,000 equity awards were granted as restricted stock units ("Officer RSUs") and 5,000,000 equity awards were granted as stock options ("Officer Options" and collectively with the Officer RSUs, the "Officer Earnout Awards"). The Officer RSUs are subject to both time and market based vesting conditions. The Officer RSUs time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing Date and the remaining 75% to vest on a monthly basis over the following thirty-six months, subject to the market based vesting. 50% of the Officer RSUs granted will only vest if the share price hurdle of $15.00 is achieved and the remaining 50% of the Officer RSUs will vest if the share price hurdle of $20.00 is achieved. Officer Options time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing Date and the remaining 75% to vest on a monthly basis over the following thirty-six months; and

- the Company repaid in full the revolving debt facility of $276.8 million, including interest due on the notes of $26.8 million.

Per the terms of the Merger Agreement, CF Finance Holdings II, LLC (the "Sponsor") will subject 4,970,000 shares ("Earn-out Shares") to vesting, potential forfeiture and transfer restrictions after the Closing Date based on a five year post-closing earnout, with (a) 50% of Sponsor Earn-Out Shares being released if the stock price of Company Class A Common Stock exceeds $12.50 for 5 out of any 10 trading days, (b) 25% of Sponsor Earn-Out Shares being released if the stock price of Company Class A Common Stock exceeds $15.00 for 5 out of any 10 trading days and (c) 25% of Sponsor Earn-Out Shares being released if the stock price of Company Class A Common Stock exceeds $20.00 for 5 out of any 10 trading days, in each case, subject to early release for a CF II sale, change of control or going private transaction or delisting after the Closing Date (collectively, the "Earn-Out Triggering Events"). Until and unless the Earn-out Shares are forfeited, Sponsor will have full ownership rights to the Earn-out Shares, including the right to vote such shares and to receive dividends and distributions thereon. These Sponsor Earn-Out Shares will be accounted for as liability classified instruments because the Earn-Out Triggering Events that determine the number of Sponsor Earn-Out Shares to be earned back by the Sponsor include events that are not solely indexed to the common stock of combined entity post consummation of the Business Combination. The preliminary estimated fair value of the Sponsor Earn-Out Shares is $39.5 million.

34

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

*Unless otherwise indicated or the context otherwise requires, references to: (a) "View Inc." refers to CF II and its consolidated subsidiaries after giving effect to the Business Combination, (b) "Legacy View" refers to View Operating Corporation (formerly known as View, Inc.), a Delaware corporation, prior to the Closing and (c) "CFII" refers to CF Finance Acquisition Corp. II, a Delaware corporation, prior to the Closing. Capitalized terms used but not defined in this Exhibit 99.2 shall have the meanings ascribed to them in the Current Report on Form 8-K (the "Form 8-K") filed with the Securities and Exchange Commission (the "SEC") on March 12, 2021 and, if not defined in the Form 8-K, the proxy statement/prospectus filed with the Securities and Exchange Commission (the "SEC") on February 16, 2021.*

The unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X, as amended by the final rule, Release No. 33-10786, and presents the combination of the historical financial information of CF II and Legacy View adjusted to give effect to the Business Combination and the other events contemplated by the Merger Agreement.

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 combines the historical unaudited condensed balance sheet of CF II as of December 31, 2020 with the historical audited consolidated balance sheet of Legacy View as of December 31, 2020 on a pro forma basis as if the Business Combination and the other events contemplated by the Merger Agreement, summarized below, had been consummated on December 31, 2020.

CF II and Legacy View have different fiscal years. CF II's fiscal year ends on March 31, whereas Legacy View's fiscal year ends on December 31. Concurrent with the consummation of the Business Combination, CF II changed its fiscal year end to December 31. The unaudited pro forma condensed combined statement of operations for the nine months ended December 31, 2020 combines the historical unaudited condensed statement of operations of CF II for the nine months ended December 31, 2020 with the historical unaudited condensed consolidated statement of operations of Legacy View for the nine months ended December 31, 2020. Legacy View's financial results for the nine months ended December 31, 2020 have been derived by removing its results of operations for the three months ended March 31, 2020 from its results of operations for the year ended December 31, 2020. Legacy View's revenue and net loss for the three months ended March 31, 2020 that were excluded in deriving the financial results for the nine months ended December 31, 2020 were $9.2 million and ($70.9) million, respectively. The unaudited pro forma condensed combined statement of operations for the twelve months ended March 31, 2020 has been prepared utilizing period ends that are within one fiscal quarter of CFII's year end, as permitted by Rule 11-02 of Regulation S-X, as amended by the final rule, Release No. 33-10786. The unaudited pro forma condensed combined statement of operations for the twelve months ended March 31, 2020 combines the audited historical statement of operations of CF II for the period from September 27, 2019 (inception) through March 31, 2020 with the audited historical consolidated statement of operations of Legacy View for the twelve months ended December 31, 2019. The unaudited pro forma condensed combined statement of operations is presented on a pro forma basis as if the Business Combination and the other events contemplated by the Merger Agreement, as summarized below, had been consummated on April 1, 2019.

The unaudited pro forma condensed combined financial information was derived from and should be read in conjunction with the following historical financial statements and the accompanying notes:

- the historical audited financial statements of CF II as of March 31, 2020 and for the period from September 27, 2019 (inception) to March 31, 2020 included in the proxy statement/prospectus filed with the SEC on February 16, 2021 incorporated herein by reference;

- the historical unaudited condensed financial statements of CF II as of and for the nine months ended December 31, 2020 included in CFII's Quarterly Report on Form 10-Q filed with the SEC on February 16, 2021 incorporated herein by reference;

- the historical audited consolidated financial statements of Legacy View as of and for the years ended December 31, 2020 and December 31, 2019 included in this Form 8-K as Exhibit 99.1; and

- other information relating to CF II and Legacy View included in the proxy statement/prospectus filed with the SEC on February 16, 2021, including the Merger Agreement and the description of certain terms thereof set forth under the section titled "The Business Combination" incorporated herein by reference.

The unaudited pro forma condensed combined financial information should also be read together with "Management's Discussion and Analysis of Financial Condition and Results of Operations of CF II," "Management's Discussion and Analysis of Financial Condition and Results of Operations of Legacy View" and other financial information included in the proxy statement/prospectus filed with the SEC on February 16, 2021 incorporated herein by reference, and the "Management's Discussion and Analysis of Financial Condition and Results of Operations of Legacy View" included in this Form 8-K pursuant to Item 2.01(f) of Form 8-K under the section titled "Form 10 Information."

**Description of the Business Combination**

Pursuant to the Merger Agreement, Merger Sub merged with and into Legacy View, with Legacy View surviving the Merger. Legacy View became a wholly owned subsidiary of CF II and was immediately renamed "View Operating Corporation" and CF II was immediately renamed "View, Inc." Upon the consummation of the Business Combination, all holders of Legacy View Capital Stock, Legacy View Warrants, and Legacy View Options received (or have the right to receive) shares of View Inc. Class A Common Stock at a deemed value of $10.00 per share after giving effect to the Exchange Ratio of 0.02325 resulting in 123,211,450 shares of View Inc. Class A Common Stock being immediately issued and outstanding and 28,052,169 shares reserved for the potential future issuance of View Inc. Class A Common Stock upon the exercise of View Inc. stock options and upon the exercise of View Inc. warrants, based on the following transactions contemplated by the Merger Agreement:

- the cancellation of each issued and outstanding share of Legacy View Capital Stock and the conversion into the right to receive a number of shares of View Inc. Class A Common Stock equal to the Exchange Ratio;

- the conversion of all outstanding Legacy View Warrants into warrants exercisable for shares of View Inc. Class A Common Stock with the same terms except for the number of shares exercisable and the exercise price, each of which was adjusted using the Exchange Ratio; and

- the conversion of all outstanding vested and unvested Legacy View Options into options exercisable for shares of View Inc. Class A Common Stock with the same terms except for the number of shares exercisable and the exercise price, each of which was adjusted using the Exchange Ratio.

**Other Events in connection with the Business Combination**

Other events that took place in connection with the Business Combination are summarized below:

- the issuance and sale of (i) 26,078,242 shares of View Inc. Class A Common Stock at a purchase price of $10.00 per share under the Initial PIPE Subscription Agreement and (ii) 16,024,914 shares of CF II Class A Common Stock at a purchase price of $11.25 per share, under the Additional PIPE Subscription Agreement;

- the repayment of $276.8 million to settle all amounts outstanding under Legacy View's revolving debt facility following the Closing;

- the payment of the $17.5 million business combination marketing fees, $7.5 million of M&A advisory fees payable in shares of View Inc. Class A Common Stock, $4.9 million of placement agent fees in relation to the PIPE financing and $5.6 million in legal fees;

- at Closing, View Inc. granted a nonqualified stock option award to its CEO to purchase 25,000,000 shares of View Inc. Class A Common Stock in ten separate tranches of 2,500,000 shares of View Inc. Class A Common Stock ("CEO Option Award"), which will vest upon the achievement of certain stock price hurdle specified for each tranche. The vesting of the awards is contingent upon the continued employment of the CEO at each such market condition vesting date. The vested shares will be subject to an eighteen-month holding period. The issuance of the shares upon vesting and exercise will dilute all View Inc. Class A Common Stock outstanding at that time;

2

- at Closing, View Inc. granted 17,500,000 equity awards underlying View Inc. Class A Common Stock, of which 12,500,000 equity awards was granted as restricted stock units ("Officer RSUs") and 5,000,000 equity awards was granted as stock options ("Officer Options" and collectively with the Officer RSUs, the "Officer Earnout Awards"). The Officer RSUs are subject to both time and market based vesting conditions. The Officer RSUs time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing and the remaining 75% to vest on a monthly basis over the following thirty-six months, subject to the market based vesting. Additionally, 50% of the Officer RSUs granted will only vest if the share price hurdle of $15.00 is achieved and the remaining 50% of the Officer RSUs will vest if the share price hurdle of $20.00 is achieved. Officer Options time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing and the remaining 75% to vest on a monthly basis over the following thirty-six months. The issuance of the shares upon vesting and exercise of the Officer Earnout Awards will dilute all View Inc. Class A Common Stock outstanding at that time; and

- at Closing, the Sponsor has subjected 4,970,000 Sponsor Earn-Out Shares to vesting and potential forfeiture (and related transfer restrictions) based on a five year post-Closing earnout, with (a) 50% of the Sponsor Earn-Out Shares being released if the stock price of View Inc. Class A Common Stock exceeds $12.50 for 5 out of any 10 trading days, (b) 25% of the Sponsor Earn-Out Shares being released if the stock price of View Inc. Class A Common Stock exceeds $15.00 for 5 out of any 10 trading days and (c) 25% of the Sponsor Earn-Out Shares being released if the stock price of View Inc. Class A Common Stock exceeds $20.00 for 5 out of any 10 trading days, in each case, subject to early release for a View Inc. sale, change of control or going private transaction or delisting after the Closing (collectively, the "Earn-Out Triggering Events").

**Expected Accounting Treatment of the Business Combination**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, CF II will be treated as the "acquired" company for financial reporting purposes. This determination is primarily based on holders of Legacy View Capital Stock comprising a relative majority of the voting power of View Inc. and having the ability to nominate the majority of the governing body of View Inc., Legacy View's senior management comprising the senior management of View Inc., and Legacy View's operations comprising the ongoing operations of View Inc. Accordingly, for accounting purposes, the financial statements of View Inc. will represent a continuation of the financial statements of Legacy View with the Business Combination treated as the equivalent of Legacy View issuing stock for the net assets of CF II, accompanied by a recapitalization. The net assets of CF II will be stated at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Business Combination will be presented as those of Legacy View in future reports of View Inc.

The contingently forfeitable Sponsor Earn-Out Shares will be accounted for as liability classified instruments because the Earn-Out Triggering Events that determine the number of Earn-Out Shares upon settlement include events that are not solely indexed to the fair value of common stock of View Inc.

**Basis of Pro Forma Presentation**

The unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X, as amended by the final rule, Release No. 33-10786. The adjustments in the unaudited pro forma condensed combined financial information have been identified and presented to provide relevant information consistent with GAAP necessary for an illustrative understanding of View Inc. upon consummation of the Business Combination. Assumptions and estimates underlying the unaudited pro forma adjustments set forth in the unaudited pro forma condensed combined financial information are described in the accompanying notes.

The unaudited pro forma condensed combined financial information has been presented for illustrative purposes only and is not necessarily indicative of the operating results and financial position that would have been achieved had the Business Combination occurred on the dates indicated, and do not reflect adjustments for any anticipated synergies, operating efficiencies, tax savings or cost savings. Any cash proceeds remaining after the consummation of the Business Combination and the other events contemplated by the Merger Agreement are expected to be used for general corporate purposes. The unaudited pro forma condensed combined financial information does

3

not purport to project the future operating results or financial position of View Inc. following the completion of the Business Combination. The unaudited pro forma adjustments represent management's estimates based on information available as of the date of filing this Form 8-K and is subject to change as additional information becomes available and analyses are performed. CF II and Legacy View have not had any historical relationship prior to the transactions. Accordingly, no pro forma adjustments were required to eliminate activities between the companies.

The unaudited pro forma condensed combined financial information reflects CFII's stockholders' approval of the Business Combination on March 5, 2021, and that CFII public stockholders holding 12,587,893 shares have elected to redeem their shares prior to the Closing.

The following summarizes the pro forma View Inc. Class A Common Stock issued and outstanding immediately after the Business Combination:

| | Pro Forma Combined | % |
|---|---|---|
| CF II Class A stockholders[1] | 39,262,107 | 18.1 |
| CF II Class B stockholders (converted to Class A Common Stock at Closing)[2] | 12,500,000 | 5.8 |
| Former Legacy View stockholders[3] | 123,211,450 | 56.8 |
| PIPE Investment[4] | 42,103,156 | 19.3 |
| Total | 217,076,713 | 100.0 |

(1) Includes 750,000 shares issued to CF&Co. upon consummation of the Business Combination pursuant to the Engagement Letter Amendment.

(2) Includes 4,970,000 Sponsor Earn-out Shares subject to forfeiture if the closing stock price of View Inc. Class A Common Stock does not achieve certain stock price threshold for any five trading days within any ten consecutive trading day during the five-year period following the Closing, as further described herein.

(3) Former Legacy View stockholders along with View Inc. Class A Common Stock purchased in the PIPE Investment (see note 4 below) will own 64.3%.

(4) Includes 16,275,000 shares and 5,000,000 shares of View Inc. Class A Common Stock issued to existing Former Legacy View stockholders and CF II stockholders, respectively, that participated in the PIPE Investment.

The unaudited pro forma condensed combined balance sheet and statement of operations are based on the assumption that there are no adjustments for the outstanding CFII Warrants issued in connection with the IPO as such securities are not exercisable until August 26, 2021, which is 12 months from the closing of the CF II initial public offering. These warrants will expire on August 26, 2025. There are also no adjustments for the 28,052,169 shares reserved for the potential future issuance of View Inc. Class A Common Stock upon the exercise of View Inc. stock options and upon the exercise of View Inc. warrants to be issued to holders of Legacy View Stock Options and Legacy View Warrant holders upon the consummation of the Business Combination, as such events have not yet occurred.

4

**Unaudited Pro Forma Condensed Combined Balance Sheet**
**December 31, 2020**
**(in thousands)**

| | December 31, 2020 CFII (Historical) | December 31, 2020 Legacy View (Historical) | Transaction Accounting Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 32 | $ 63,232 | $ 500,012 | A | $557,965 |
| | | | (276,763) | B | |
| | | | (18,909) | C | |
| | | | (24,310) | D | |
| | | | 441,062 | E | |
| | | | (125,879) | L | |
| | | | (512) | N | |
| Accounts receivable, net | — | 12,252 | — | | 12,252 |
| Inventories | — | 6,483 | — | | 6,483 |
| Prepaid expenses and other current assets | 396 | 6,881.00 | — | | 7,277 |
| Total current assets | 428 | 88,848 | 494,701 | | 583,977 |
| Cash equivalents held in Trust account | 500,012 | — | (500,012) | A | — |
| Property and equipment, net | — | 282,560 | — | | 282,560 |
| Restricted cash | — | 10,461 | — | | 10,461 |
| Deposits with suppliers | — | 1,084 | — | | 1,084 |
| Other assets | — | 7,862 | (4,432) | C | 3,430 |
| Total Assets | $ 500,440 | $ 390,815 | $ (9,743) | | $881,512 |
| **LIABILITIES, REDEEMABLE CONVERTIBLE PREFERRED STOCK, AND STOCKHOLDERS' EQUITY (DEFICIT)** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ — | $ 14,562 | $ — | | $ 14,562 |
| Accrued expenses and other current liabilities | 32 | 36,480 | (14,540) | B | 18,282 |
| | | | (3,690) | C | |
| Payables to related parties | 150 | — | (140) | D | — |
| | | | (10) | N | |
| Sponsor loan—promissory notes | 160 | — | (160) | N | — |
| Franchise tax payable | 66 | — | — | | 66 |
| Accrued compensation | — | 14,665 | — | | 14,665 |
| Deferred revenue | — | 2111 | — | | 2,111 |
| Debt, current | — | 247,248 | (247,248) | B | — |

5

| | | | | | |
|---|---|---|---|---|---|
| Total current liabilities | 408 | 315,066 | (265,788) | | 49,686 |
| Debt, noncurrent | — | 15,430 | | | 15,430 |
| Redeemable convertible preferred stock warrant liability | — | 12,323 | (12,323) | K | — |
| Earnout liability | — | — | 39,502 | M | 39,502 |
| Other liabilities | — | 36,731 | — | | 36,731 |
| Total liabilities | 408 | 379,550 | (238,609) | | 141,349 |
| Commitments and contingencies | | | | | |
| Redeemable convertible preferred stock | — | 1,812,678 | (1,812,678) | G | — |
| Class A Common stock subject to possible redemption | 495,032 | — | (495,032) | F | — |
| Stockholders' equity (deficit): | | | | | — |
| Class A Common Stock | — | — | 5 | E | 22 |
| | | | 5 | F | |
| | | | 1 | H | |
| | | | 12 | I | |
| | | | (1) | L | |
| Class B Common Stock | 1 | — | (1) | H | — |
| View Common Stock | — | 7 | 522 | G | — |
| | | | (529) | I | |
| Additional paid-in capital | 5,372 | 89,782 | (19,651) | C | 2,646,318 |
| | | | (24,170) | D | |
| | | | 441,057 | E | |
| | | | 495,027 | F | |
| | | | 1,812,156 | G | |
| | | | 517 | I | |
| | | | (373) | J | |
| | | | 12,323 | K | |
| | | | (125,878) | L | |
| | | | (39,502) | M | |
| | | | (342) | N | |
| Accumulated deficit | (373) | (1,891,202) | (14,975) | B | (1,906,177) |
| | | | 373 | J | |
| Total stockholders' equity (deficit) | 5,000 | (1,801,413) | 2,536,576 | | 740,163 |
| Total liabilities, redeemable convertible preferred stock and stockholders' equity (deficit) | $500,440 | $ 390,815 | $ (9,743) | | $ 881,512 |

See accompanying notes to the unaudited pro forma condensed combined financial information.

6

**Unaudited Pro Forma Condensed Combined Statement of Comprehensive Loss**
**For the twelve months ended March 31, 2020**
**(in thousands, except share and per share amounts)**

| | For the period from September 27, 2019 (inception) through March 31, 2020 | Twelve months ended December 31, 2019 | Transaction Accounting | | Pro Forma |
| | CF II (Historical) | Legacy View (Historical) | Adjustments | | Combined |
|---|---|---|---|---|---|
| Revenue | $ — | $ 24,324 | $ — | | $ 24,324 |
| Cost and expenses: | | | | | |
| Cost of revenue | — | 179,675 | 4,509 | AA | 184,184 |
| Research and development | — | 77,696 | 9,052 | AA | 86,748 |
| Selling, general, and administrative | — | 72,905 | 61,403 | AA | 134,308 |
| Income from legal settlement | — | (22,500) | — | | (22,500) |
| Total cost and expenses | — | 307,776 | 74,964 | | 382,740 |
| Loss from operations | — | (283,452) | (74,964) | | (358,416) |
| Interest and other income (expense), net: | | | | | — |
| Interest income | — | 5,591 | — | | 5,591 |
| Interest expense | — | (10,594) | (11,282) | BB | (21,876) |
| Other expense, net | (1) | (108) | — | | (109) |
| Gain on fair value change | — | 1,750 | (1,750) | CC | — |
| Loss on extinguishment of debt | — | (3,040) | — | | (3,040) |
| Interest and other income (expense), net | | | $ | | |
| | $ (1) | $ (6,401) | (13,032) | | $ (19,434) |
| Loss before provision of income taxes | (1) | (289,853) | (87,996) | | (377,850) |
| Provision for income taxes | — | (51) | — | | (51) |
| Net and comprehensive loss | | $ | $ | | |
| | $ (1) | (289,904) | (87,996) | | $ (377,901) |
| Weighted average shares of CF II Class A Common Stock outstanding | | | | | 212,106,713 |
| Net loss per share of CF II Class A Common Stock—basic and diluted | | | | | $ (1.78) |

See accompanying notes to the unaudited pro forma condensed combined financial information.

7

**Unaudited Pro Forma Condensed Combined Statement of Comprehensive Loss**
**For the nine months ended December 31, 2020**
**(in thousands, except share and per share amounts)**

| | CFII (Historical) | Legacy View (Historical) | Transaction Accounting Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|
| Revenue | $ — | $ 23,135 | $ — | | $ 23,135 |
| Cost and expenses: | | | | | — |
| Cost of revenue | — | 87,538 | 2,505 | AA | 90,043 |
| Research and development | — | 48,232 | 5,029 | AA | 53,261 |
| Selling, general, and administrative | 318 | 54,610 | 36,967 | AA | 91,895 |
| Franchise tax expense | 67 | — | — | | 67 |
| Total cost and expenses | 385 | 190,380 | 44,501 | | 235,266 |
| Loss from operations | (385) | (167,245) | (44,501) | | (212,131) |
| Interest and other income (expense), net: | | | | | |
| Gain on investments held in Trust Account | 12 | — | (12) | DD | — |
| Interest income | — | 54 | — | | 54 |
| Interest expense | — | (21,535) | 20,173 | EE | (1,362) |
| Other expense, net | — | (9) | — | | (9) |
| Gain on fair value change | — | 2,728 | (2,728) | CC | — |
| Interest and other income (expense), net | 12 | $ (18,762) | $ 17,433 | | $ (25,535) |
| Loss before provision of income taxes | (373) | (186,007) | (27,068) | | (213,448) |
| Provision for income taxes | — | (34) | — | | (34) |
| Net and comprehensive loss | $ (373) | $ (186,041) | $ (27,068) | | $ (213,482) |
| Weighted average shares of CF II Class A Common Stock outstanding | | | | | 212,106,713 |
| Net loss per share of CF II Class A Common Stock—basic and diluted | | | | | $ (1.01) |

See accompanying notes to the unaudited pro forma condensed combined financial information.

8

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL STATEMENTS**

**1. Basis of Presentation**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, CF II will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the financial statements of View Inc. will represent a continuation of the financial statements of Legacy View with the Business Combination treated as the equivalent of Legacy View issuing stock for the net assets of CF II, accompanied by a recapitalization. The net assets of CF II will be stated at historical cost, with no goodwill or other intangible assets recorded. Operations prior to the Business Combination will be presented as those of Legacy View in future reports of View Inc.

The unaudited pro forma condensed combined balance sheet as of December 31, 2020 gives pro forma effect to the Business Combination as if it had been consummated on December 31, 2020. The unaudited pro forma condensed combined statements of operations for the nine months ended December 31, 2020 and twelve months ended March 31, 2020 give pro forma effect to the Business Combination as if it had been consummated on April 1, 2019.

CF II and Legacy View have different fiscal years. CF II's fiscal year ends on March 31, whereas Legacy View's fiscal year ends on December 31. Concurrent with the consummation of the Business Combination CF II changed its fiscal year end to December 31. The unaudited pro forma condensed combined statement of operations for the nine months ended December 31, 2020 combines the historical unaudited condensed statement of operations of CF II for the nine months ended December 31, 2020 with the historical unaudited condensed consolidated statement of operations of Legacy View for the nine months ended December 31, 2020. Legacy View's financial results for the nine months ended December 31, 2020 have been derived by removing its results of operations for the three months ended March 31, 2020 from its results of operations for the year ended December 31, 2020. Legacy View's revenue and net loss for the three months ended March 31, 2020 that were excluded in deriving the financial results for the nine months ended December 31, 2020 were $9.2 million and ($70.9) million, respectively. The unaudited pro forma condensed combined statement of operations for the twelve months ended March 31, 2020 has been prepared utilizing period ends that are within one fiscal quarter of CFII's year end, as permitted by Rule 11-02 of Regulation S-X, as amended by the final rule, Release No. 33-10786. The unaudited pro forma condensed combined statement of operations for the twelve months ended March 31, 2020 combines the audited historical statement of operations of CF II for the period from September 27, 2019 (inception) through March 31, 2020 with the audited historical consolidated statement of operations of Legacy View for the twelve months ended December 31, 2019.

The unaudited pro forma condensed combined financial information was derived from and should be read in conjunction with the following historical financial statements and the accompanying notes:

- the historical audited financial statements of CF II as of March 31, 2020 and for the period from September 27, 2019 (inception) to March 31, 2020 included in the proxy statement/prospectus filed with the SEC on February 16, 2021 incorporated herein by reference;

- the historical unaudited condensed financial statements of CF II as of and for the nine months ended December 31, 2020 included in CFII's Quarterly Report on Form 10-Q filed with the SEC on February 16, 2021 incorporated herein by reference;

- the historical audited consolidated financial statements of Legacy View as of and for the years ended December 31, 2020 and December 31, 2019 included in this Form 8-K as Exhibit 99.1; and

- other information relating to CF II and Legacy View included in the proxy statement/prospectus filed with the SEC on February 16, 2021, including the Merger Agreement and the description of certain terms thereof set forth under the section titled "The Business Combination" incorporated herein by reference.

Management has made significant estimates and assumptions in its determination of the pro forma adjustments based on information available as of the date of filing this Form 8-K. As the unaudited pro forma condensed combined financial information has been prepared based on these preliminary estimates, the final amounts recorded may differ materially from the information presented as additional information becomes available. Management considers this basis of presentation to be reasonable under the circumstances.

9

One-time direct and incremental transaction costs anticipated to be incurred prior to, or concurrent with, the Closing are reflected in the unaudited pro forma condensed combined balance sheet as a direct reduction to View Inc.'s additional paid-in capital ("APIC") and are assumed to be cash settled.

**2. Adjustments to Unaudited Pro Forma Condensed Combined Financial Information**

*Adjustments to Unaudited Pro Forma Condensed Combined Balance Sheet*

The adjustments included in the unaudited pro forma condensed combined balance sheet as of December 31, 2020 were as follows:

(A)    Reflects the liquidation and reclassification of $500.0 million of investments held in the Trust Account to cash and cash equivalents that becomes available for general use by View Inc. following the Closing, prior to redemptions. See adjustment note 2 (L) below for actual redemptions in connection with the closing of the Business Combination.

(B)    Reflects the repayment and settlement of all amounts outstanding under View's revolving debt facility, including $26.8 million of interest due pursuant to the terms of the revolving debt facility, following the Closing.

(C)    Represents the direct and incremental transaction costs of $19.7 million incurred by View prior to, or concurrent with the Closing. Such costs are reflected in the unaudited pro forma condensed combined balance sheet as a direct reduction to the View Inc.'s APIC and are cash settled. As of December 31, 2020, View had deferred transaction costs of $4.4 million, of which $3.7 million was unpaid.

(D)    Represents the direct and incremental transaction costs of $24.3 million incurred by CF II prior to, or concurrent with the Closing which includes $17.5 million in business combination marketing fees, $4.2 million of placement agent fees paid to CF&Co., and $2.6 million in legal and other advisory fees in relation to the transactions contemplated by the Merger Agreement. Such costs are reflected in the unaudited pro forma condensed combined balance sheet as a direct reduction to View Inc's APIC and are assumed to be cash settled. Through December 31, 2020, CFII had recorded costs in connection with the Business Combination of $0.1 million in its statement of operations, for which it had a payable to a related party of $0.1 million as of December 31, 2020. Such payable to related party was settled in cash at Closing.

(E)    Reflects the proceeds of $441.1 million comprising (i) $260.8 million from the issuance and sale of 26.1 million shares of Class A Common Stock at $10.00 per share pursuant to the Initial PIPE Subscription Agreements entered into in connection with the Initial PIPE Investment and (ii) $180.3 million from the issuance and sale of approximately 16.0 million shares of Class A Common Stock at $11.25 per share pursuant to the Additional PIPE Subscription Agreement entered into in connection with the Additional PIPE Investment.

Included within the $24.3 million of transaction costs mentioned in (D) above are expenses of $5.0 associated with the PIPE Investment. Such costs are reflected in the unaudited pro forma condensed combined balance sheet as a direct reduction to the View Inc.'s APIC and are assumed to be cash settled.

(F)    Reflects the reclassification of Class A Common Stock subject to possible redemption to permanent equity immediately prior to the Closing.

(G)    Reflects the conversion of Legacy View Preferred Stock into Legacy View Common Stock pursuant to the Merger Agreement.

(H)    Reflects the conversion of 12,500,000 shares of Class B Common Stock into shares of View Inc. Class A Common Stock concurrent with the Closing.

10

(I)     Represents the recapitalization of common shares between Legacy View's Common Stock, View Inc. Class A Common Stock and APIC.

(J)     Reflects the elimination of CF II's historical retained earnings.

(K)     Reflects the reclassification of Legacy View's redeemable convertible preferred stock warrant liability to APIC as a result of Legacy View Warrants being exchanged for View Inc. Warrants to purchase shares of View Inc. Class A Common Stock.

(L)     Represents the cash disbursed to redeem 12,587,893 shares of Class A Common Stock for $125.9 million allocated to common stock and APIC, using a par value of $0.0001 per share at a redemption price of $10.00 per share.

(M)     Reflects the fair value of the Sponsor Earn-Out Shares contingently issuable to the Sponsor as of the Closing. The fair value was determined based on information available as of the date of these unaudited pro forma condensed combined financial information. Refer to Note 5 for more information.

(N)     Reflects settlement of obligations of CF II at Closing for operating expenses incurred by certain parties on behalf of CF II.

*Adjustments to Unaudited Pro Forma Condensed Combined Statements of Operations*

The adjustments included in the unaudited pro forma condensed combined statements of operations for the twelve months ended March 31, 2020 and nine months ended December 31, 2020 were as follows:

(AA)     Represents the stock-based compensation charge related to the CEO Option Award, Officer RSUs and Officer Options granted at Closing. The grant date fair values of the equity awards were determined using preliminary valuation techniques and are subject to change as additional information becomes available and additional analyses are performed. See Note 4 for further information.

(BB)     Reflects (i) elimination of interest expense of $3.7 million related to Legacy View's revolving debt facility as a result of the repayment of the facility at the Closing and (ii) a charge of $15.0 million for interest due pursuant to the terms of the revolving debt facility as a result of repayment and settlement of all amounts outstanding under the revolving debt facility following the Closing.

(CC)     Reflects the elimination of the (gain) loss on remeasurement of redeemable convertible preferred stock warrant liability for the twelve month period ended March 31, 2020 and nine month period ended December 31, 2020, as a result of Legacy View Warrants being exchanged for View Inc. Warrants at the Closing and as a result, no longer being liability classified.

(DD)     Represents the elimination of investment income related to the investments held in the CFII Trust Account.

(EE)     Reflects elimination of interest expense related to Legacy View's revolving debt facility as a result of the repayment of the facility at the Closing.

**3. Loss per Share**

Represents the net loss per share calculated using the basic and diluted weighted average shares of common stock outstanding as a result of the pro forma adjustments. As the Business Combination is being reflected as if it had occurred as of April 1, 2019, the calculation of weighted average shares outstanding for basic and diluted net loss per share assumes the shares to be issued and outstanding upon the Closing have been outstanding for the entire periods presented.

11

Basic and diluted net loss per share attributable to common stockholders is presented in conformity with the two-class method required for participating securities. The 4,970,000 Sponsor Earn-Out Shares issued and outstanding are participating securities that contractually entitle the holders of such shares to participate in nonforfeitable dividends. The financial statements reflect a net loss in all periods presented and no loss amounts have been allocated to the Sponsor Earn-Out Shares because they do not have a contractual obligation to share in losses. The 4,970,000 Sponsor Earn-Out Shares are excluded from basic and diluted pro forma net loss per share as such shares are contingently recallable until the share price of View Inc. exceeds specified thresholds that have not been achieved.

The unaudited pro forma condensed combined financial information has been prepared based on the following information:

| | Twelve Months Ended March 31, 2020 | Nine Months Ended December 31, 2020 |
|---|---|---|
| Pro forma net loss | $ (377,901) | $ (213,482) |
| Weighted average shares outstanding – basic and diluted | 212,106,713 | 212,106,713 |
| Net loss per share – basic and diluted[1] | $ (1.78) | $ (1.01) |
| **Weighted average shares outstanding – basic and diluted** | | |
| CF II Class A stockholders | 39,262,107 | 39,262,107 |
| CF II Class B stockholders | 7,530,000 | 7,530,000 |
| PIPE Investors | 42,103,156 | 42,103,156 |
| Former Legacy View stockholders | 123,211,450 | 123,211,450 |
| | 212,106,713 | 212,106,713 |

The following shares of common stock equivalents were excluded from the computation of pro forma diluted net loss per share for all the periods and scenarios presented above because including them would have had an anti-dilutive effect:

| | |
|---|---|
| CF II warrants to purchase shares of Class A Common Stock | 17,033,334 |
| Legacy View Options that will convert into a right to purchase shares of Class A Common Stock | 24,657,302 |
| Legacy View Warrants that will convert into a right to purchase shares of Class A Common Stock | 3,394,867 |
| Officer Options to be granted at close to purchase shares of Class A Common Stock | 5,000,000 |
| Total | 50,085,503 |

The 25,000,000 shares and the 12,500,000 shares of common stock equivalents subject to the CEO Option Award and the Officer RSUs, respectively, are excluded from the pro forma anti-dilutive table as the underlying shares are contingently issuable until the share price of View Inc. exceeds the specified thresholds that have not been achieved.

## 4. CEO Option Award, Officer RSUs, Officer Options

The **CEO Option Award** vests upon the achievement of a market condition for each tranche and is also contingent upon the continued employment of the CEO at each vesting date. The **Officer RSUs** time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing and the remaining 75% to vest on a monthly basis over the following thirty-six months, subject to the market condition and continued employment. The **Officer Options** time vest over a four-year period with 25% to vest on the twelve month anniversary of the Closing and the remaining 75% to vest on a monthly basis over the following thirty-six months.

12

The estimated grant date fair value for each tranche of **CEO Option Award** and **Officer RSUs** is determined by using the Monte Carlo Simulation valuation model and the assumptions below. The estimated grant date fair value of the **Officer Options** is determined using the Black-Scholes option-pricing model. The valuation models incorporated the following key assumptions:

| | CEO Options | Officer RSUs | Officer Options |
|---|---|---|---|
| Expected stock price | $ 9.19 | $ 9.19 | $ 9.19 |
| Expected volatility | 60.0% | 65.0% | 62.5% |
| Risk-free rate | 1.59% | 0.60% | 1.07% |
| Expected term (in years) | 10.0 | 4.0 | 6.0 |
| Expected dividends | 0% | 0% | 0% |
| Discount for lack of marketability ("DLOM") | 20% | n/a | n/a |

*Expected stock price*: the expected stock price is determined based on an assumed share price of $9.19 of Class A Common Stock of View Inc. as of the consummation of the business combination based on the closing trading price of CF II Class A Common Stock as of March 8, 2021.

*Expected volatility:* the expected volatility was determined by using an average of historical volatilities of selected industry peers deemed to be comparable to the Legacy View's business corresponding to the expected term of the awards.

*Risk-free interest rate*: The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of grant for zero-coupon U.S. Treasury notes with maturities corresponding to the expected term of the awards.

*Expected term:* The expected term for valuation of the CEO Option Awards and the Officer RSUs is their contractual terms of 10 years and 4 years, respectively. The expected term for the Officer Options represents the period these awards are expected to remain outstanding and is based on historical experience of similar awards, giving consideration to the contractual terms of the stock-based awards, vesting schedules, and expectations of future employee behavior.

*Expected dividend yield*: The expected dividend rate is zero as there is no history or expectation of declaring dividends.

*DLOM:* The shares underlying the CEO Option Award are subject to an eighteen month holding period. The DLOM was determined utilizing the Finnerty Model.

The aggregate estimated grant date fair value of the CEO Option Award, Officer RSUs and Officer Options is $102.8 million, $83.8 million and $25.3 million, respectively.

The derived service period under the Monte Carlo Simulation models was determined based on the median vesting time for the simulations that achieved the vesting hurdle. Stock-based compensation expense associated with each tranche under the CEO Option Award and the Officer RSUs is recognized over the longer of (i) derived service period of the tranche and (ii) expected service period, using the accelerated expense recognition method. The stock-based compensation expense for the CEO Option Award and the Officer RSUs will be recognized over 4.84 years and 4.0 years, respectively. Stock-based compensation expense associated with the Officer Options is recognized on a straight-line basis over the vesting term of four years.

**5. Sponsor Earn-Out Shares**

These Sponsor Earn-Out Shares are expected to be accounted for as liability classified instruments because the Earn-Out Triggering Events that determine the number of Sponsor Earn-Out Shares to be earned back by the Sponsor include events that are not solely indexed to the common stock of View Inc. The preliminary estimated fair value of the Sponsor Earn-Out Shares is $39.5 million.

The preliminary estimated fair value of the Sponsor Earn-Out Shares was determined using a Monte Carlo simulation valuation model using the following assumptions:

*Current stock price:* the stock price was set at $9.19 per share for Class A Common Stock of View Inc. based on the closing price as of the valuation date of March 8, 2021, which was the date of Closing.

*Expected volatility:* the volatility rate was determined by using an average of historical volatilities of selected industry peers deemed to be comparable to Legacy View's business corresponding to the expected term of the awards.

*Risk-free interest rate:* The risk-free interest rate is based on the U.S. Treasury yield curve in effect at the time of issuance for zero-coupon U.S. Treasury notes with maturities corresponding to the expected five-year term of the earnout period.

*Expected term:* The expected term is the five-year term of the earnout period.

*Expected dividend yield:* The expected dividend rate is zero as View currently has no history or expectation of declaring dividends.

14

EX-1.2 3 ea126256ex1-2_cffinance.htm BUSINESS COMBINATION MARKETING AGREEMENT, DATED AUGUST 26, 2020, BY AND BETWEEN THE COMPANY AND CANTOR

**Exhibit 1.2**

**Cantor Fitzgerald & Co.**
**499 Park Avenue**
**New York, New York 10022**

August 26, 2020

CF Finance Acquisition Corp. II
110 East 59th Street
New York, NY 10022
Attn: CEO

Ladies and Gentlemen:

This is to confirm our agreement whereby CF Finance Acquisition Corp. II, a Delaware corporation ("**Company**"), has requested Cantor Fitzgerald & Co. (the "**Advisor**") to assist it in connection with the Company merging with, acquiring shares of, engaging in a share exchange, share reconstruction, recapitalization and amalgamation, purchasing all or substantially all of the assets of, entering into contractual arrangements, or engaging in any other similar business combination (in each case, a "**Business Combination**") with one or more businesses or entities (each a "**Target**") as described in the Company's Registration Statement on Form S-1 (File No. 333-241727) filed with the Securities and Exchange Commission ("**Registration Statement**") in connection with its initial public offering ("**IPO**").

1. <u>Services and Fees</u>.

    (a) The Advisor will, from time to time, upon the Company's request:

        (i)    Assist the Company in arranging meetings with its stockholders to discuss one or more potential Business Combinations, including discussions of the applicable potential Target's attributes;

        (ii)    Introduce the Company to potential investors to purchase the Company's securities in connection with the Business Combination;

        (iii)    Provide financial advisory services to assist the Company in the Company's efforts to obtain any stockholder approval for one or more Business Combinations, until such time as the Company has completed an initial Business Combination; and

        (iv)    Assist the Company with any press releases and/or filings related to the Business Combination or the Target.

(b) As compensation for the foregoing services, the Company will pay the Advisor a cash fee equal to 3.5% of the gross proceeds of the base offering amount received by the Company in the IPO and 5.5% of the gross proceeds of the over-allotment offering amount received by the Company in the IPO ("**Fee**"). The Fee is due and payable to the Advisor by wire transfer at the closing of the Business Combination ("**Closing**"). If a proposed Business Combination is not consummated for any reason, no Fee shall be due or payable to the Advisor hereunder. The Fee shall be exclusive of any finder's or other fees which may become payable to the Advisor pursuant to any subsequent agreement between the Advisor and the Company or the Target.

2. Expenses.

At the Closing, the Company shall reimburse the Advisor for all reasonable costs and expenses incurred by the Advisor (including reasonable fees and disbursements of counsel) in connection with the performance of its services hereunder. Reimbursable expenses shall be due and payable to the Advisor by wire transfer at the Closing from the Trust Account.

3. Company Cooperation.

The Company will provide full cooperation to the Advisor as may be necessary for the efficient performance by the Advisor of its obligations hereunder, including, but not limited to, providing to the Advisor and its counsel, on a timely basis, all documents and information regarding the Company and Target that the Advisor may reasonably request or that are otherwise relevant to the Advisor's performance of its obligations hereunder (collectively, the "**Information**"); making the Company's management, auditors, consultants and advisors available to the Advisor; and, using commercially reasonable efforts to provide the Advisor with reasonable access to the management, auditors, suppliers, customers, consultants and advisors of Target. The Company will promptly notify the Advisor of any change in facts or circumstances or new developments affecting the Company or Target or that might reasonably be considered material to the Advisor's engagement hereunder. The Advisor shall not share with third parties any Information, presentations and/or materials about the Company, its stockholders and/or affiliates, the initial Business Combination and any Targets, to the extent that any such information is not already provided to the public in the Registration Statement unless the Advisor obtains the Company's prior written approval (which may be provided via email).

4. Representations; Warranties and Covenants.

The Company represents, warrants and covenants to the Advisor that all Information it makes available to the Advisor by or on behalf of the Company in connection with the performance of its obligations hereunder will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading as of the date thereof and as of the consummation of the Business Combination.

2

5. Indemnity.

The Company shall indemnify the Advisor and its affiliates and its and their respective directors, officers, employees, shareholders, representatives and agents in accordance with the indemnification provisions set forth in Annex I hereto, all of which are incorporated herein by reference.

Notwithstanding the foregoing and Annex I, the Advisor agrees, if there is no Closing, (i) that it does not have any right, title, interest or claim of any kind in or to any monies in the Company's trust account ("**Trust Account**") established in connection with the IPO with respect to this Agreement, including the foregoing indemnity (each, a "**Claim**"); (ii) to waive any Claim it may have in the future; and (iii) to not seek recourse against the Trust Account with respect to any Claim.

6. Use of Name and Reports.

Without the Advisor's prior written consent, neither the Company nor any of its affiliates (nor any director, officer, manager, partner, member, employee, representative or agent thereof) shall quote or refer to (i) the Advisor's name or (ii) any advice rendered by the Advisor to the Company or any communication from the Advisor in connection with performance of their services hereunder, except as required by applicable federal or state law, regulation or securities exchange rule.

7. Status as Independent Contractor.

The Advisor shall perform its services as an independent contractor and not as an employee of the Company or affiliate thereof. It is expressly understood and agreed to by the parties that the Advisor shall have no authority to act for, represent or bind the Company or any affiliate thereof in any manner, except as may be expressly agreed to by the Company in writing. In rendering such services, the Advisor will be acting solely pursuant to a contractual relationship on an arm's-length basis. This Agreement is not intended to create a fiduciary relationship between the parties and neither the Advisor nor any of the Advisor's officers, directors or personnel will owe any fiduciary duty to the Company or any other person in connection with any of the matters contemplated by this Agreement.

8. Potential Conflicts.

The Company acknowledges that the Advisor is a full-service securities firm engaged in securities trading and brokerage activities and providing investment banking and advisory services from which conflicting interests may arise. In the ordinary course of business, the Advisor and its affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities of the Company, its affiliates or other entities that may be involved in the transactions contemplated hereby. Nothing in this Agreement shall be construed to limit or restrict the Advisor or any of its affiliates in conducting such business.

9. <u>Entire Agreement</u>.

This Agreement constitutes the entire understanding between the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect thereto. This Agreement may not be modified or terminated orally or in any manner other than by an agreement in writing signed by the parties hereto.

10. <u>Notices</u>. All communications hereunder shall be in writing and shall be mailed, hand delivered or delivered by facsimile transmission and confirmed to the parties hereto as follows:

If to the Representative:

Cantor Fitzgerald & Co.
499 Park Avenue
New York, New York 10022
Attn: General Counsel
Facsimile: (212) 829-4708

If to the Company:

CF Finance Acquisition Corp. II
110 East 59th Street
New York, NY 10022
Attn: Chief Executive Officer
Facsimile: (212) 829-4708

Each party to this Agreement may change such address for notices by sending to the parties to this Agreement written notice of a new address for such purpose. Each such notice or other communication shall be deemed given (i) when delivered personally or by verifiable facsimile transmission (with an original to follow) on or before 4:30 p.m., New York City time, on a Business Day or, if such day is not a Business Day, on the next succeeding Business Day, (ii) on the next Business Day after timely delivery to a nationally-recognized overnight courier and (iii) on the Business Day actually received if deposited in the U.S. mail (certified or registered mail, return receipt requested, postage prepaid). For purposes of this Agreement, "Business Day" shall mean any day on which the commercial banks in the City of New York are open for business.

11. <u>Successors and Assigns</u>.

This Agreement may not be assigned by either party without the written consent of the other party. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and, except where prohibited, to their successors and assigns.

4

12. <u>Non-Exclusivity</u>.

Nothing herein shall be deemed to restrict or prohibit the engagement by the Company of other consultants providing the same or similar services or the payment by the Company of fees to such other consultants. The Company's engagement of any other consultant(s) shall not affect the Advisor's right to receive the Fee and reimbursement of expenses pursuant to this Agreement.

13. <u>Applicable Law; Venue</u>.

This Agreement shall be construed and enforced in accordance with the laws of the State of New York without giving effect to conflict of laws. In the event of any dispute under this Agreement, then and in such event, each party hereto agrees that the dispute shall be brought and enforced in the courts of the State of New York, County of New York under the accelerated adjudication procedures of the Commercial Division, or the United States District Court for the Southern District of New York, in each event at the discretion of the party initiating the dispute. Each party irrevocably submits to such jurisdiction, which jurisdiction shall be exclusive. Each party hereby waives any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum. Any such process or summons to be served upon a party may be served by transmitting a copy thereof by registered or certified mail, postage prepaid, addressed to such party at the address set forth at the beginning of this Agreement. Such mailing shall be deemed personal service and shall be legal and binding upon the party being served in any action, proceeding or claim. The Company agrees that the Advisor shall be entitled to recover all of their reasonable attorneys' fees and expenses relating to any action or proceeding and/or incurred in connection with the preparation therefor if it is the prevailing party in such action or proceeding. EACH PARTY HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

14. <u>Counterparts</u>.

This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement, and shall become effective when one or more counterparts has been signed by each of the parties hereto and delivered to each of the other parties hereto. Delivery of a signed counterpart of this Agreement by facsimile or email/pdf transmission shall constitute valid and sufficient delivery thereof.

[SIGNATURE PAGE FOLLOWS]

5

If the foregoing correctly sets forth the understanding between the Advisor and the Company with respect to the foregoing, please so indicate your agreement by signing in the place provided below, at which time this letter shall become a binding contract.

CANTOR FITZGERALD & CO.

By:    /s/ Mark Kaplan
Name:  Mark Kaplan
Title:  Chief Operating Officer

AGREED AND ACCEPTED BY:

CF FINANCE ACQUISITION CORP. II

By:    /s/ Howard W. Lutnick
Name:  Howard W. Lutnick
Title:  Chief Executive Officer

[Signature Page to Business Combination Marketing Agreement]

6

ANNEX I

**Indemnification**

In connection with the Company's engagement of Cantor Fitzgerald & Co. (the "**Advisor**") pursuant to that certain letter agreement ("**Agreement**") of which this Annex forms a part, CF Finance Acquisition Corp. II (the "**Company**") hereby agrees, subject to the second paragraph of Section 5 of the Agreement, to indemnify and hold harmless the Advisor and its affiliates and their respective directors, officers, shareholders, agents, controlling persons (within the meaning of the federal securities laws) and employees of any of the foregoing (collectively the "**Indemnified Persons**"), from and against any and all claims, actions, suits, proceedings (including those of stockholders), damages, liabilities and expenses incurred by any of them (including the reasonable fees and expenses of counsel), as incurred (collectively a "**Claim**"), that (A) are related to or arise out of (i) any actions taken or omitted to be taken (including any untrue statements made or any statements omitted to be made) by the Company, or (ii) any actions taken or omitted to be taken by any Indemnified Person in connection with the Company's engagement of the Advisor, or (B) otherwise relate to or arise out of the Advisor's activities on the Company's behalf under the Advisor's engagement, and the Company shall reimburse any Indemnified Person for all fees, costs, expenses (including the reasonable fees and expenses of counsel) as incurred by such Indemnified Person in connection with investigating, preparing or defending any such claim, action, suit or proceeding, whether or not in connection with pending or threatened litigation in which any Indemnified Person is a party. The Company will not, however, be responsible for any portion of any such Claim that is finally judicially determined by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the bad faith, gross negligence or willful misconduct of any person seeking indemnification for such Claim. The Company further agrees that no Indemnified Person shall have any liability (including without limitation, liability for any losses, claims, damages, obligations, penalties, judgments, awards, liabilities, costs, expenses or disbursements) to the Company or any person claiming through the Company for or in connection with the Company's engagement of the Advisor except where such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted primarily and directly from the bad faith, gross negligence or willful misconduct of such Indemnified Person.

The Company further agrees that it will not, without the prior written consent of the Advisor, settle, compromise or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification may be sought hereunder (whether or not any Indemnified Person is an actual or potential party to such Claim), unless such settlement, compromise or consent includes an unconditional, irrevocable release of each Indemnified Person from any and all liability arising out of such Claim.

Promptly upon receipt by an Indemnified Person of notice of any complaint or the assertion or institution of any Claim with respect to which indemnification is being sought hereunder, such Indemnified Person shall notify the Company in writing of such complaint or of such assertion or institution but failure to so notify the Company shall not relieve the Company from any obligation it may have hereunder, except and only to the extent such failure results in the forfeiture by the Company of substantial rights and defenses. If the Company so elects or is requested by such Indemnified Person, the Company will assume the defense of such Claim, including the employment of counsel reasonably satisfactory to such Indemnified Person and the payment of the fees and expenses of such counsel. In the event, however, that legal counsel to such Indemnified Person reasonably determines that having common counsel would present such counsel with a conflict of interest or if the defendant in, or target of, any such Claim, includes an Indemnified Person and the Company, and legal counsel to such Indemnified Person reasonably concludes that there may be legal defenses available to it or other Indemnified Persons different from or in addition to those available to the Company, then such Indemnified Person may employ its own separate counsel to represent or defend him, her or it in any such Claim and the Company shall pay the reasonable fees and expenses of such counsel. Notwithstanding anything herein to the contrary, if the Company fails timely or diligently to defend, contest, or otherwise protect against any Claim, the relevant Indemnified Party shall have the right, but not the obligation, to defend, contest, compromise, settle, assert crossclaims, or counterclaims or otherwise protect against the same, and shall be fully indemnified by the Company therefor, including without limitation, for the reasonable fees and expenses of its counsel and all amounts paid as a result of such Claim or the compromise or settlement thereof.

7

In addition, with respect to any Claim in which the Company assumes the defense, the Indemnified Person shall have the right to participate in such Claim and to retain his, her or its own counsel therefor at his, her or its own expense.

The Company agrees that if any indemnity sought by an Indemnified Person hereunder is held by a court to be unavailable for any reason then (whether or not the Advisor is an Indemnified Person), the Company and the Advisor shall contribute to the Claim for which such indemnity is held unavailable in such proportion as is appropriate to reflect the relative benefits to the Company, on the one hand, and the Advisor on the other, in connection with the Advisor's engagement referred to above, subject to the limitation that in no event shall the amount of the Advisor's contribution to such Claim exceed the amount of Fees actually received by the Advisor from the Company pursuant to such engagement. The Company hereby agrees that the relative benefits to the Company, on the one hand, and the Advisor on the other, with respect to the Advisor's engagement shall be deemed to be in the same proportion as (a) the total value paid or proposed to be paid or received by the Company or its stockholders as the case may be, pursuant to the transaction (whether or not consummated) for which the Advisor is engaged to render services bears to (b) the Fee paid or proposed to be paid to the Advisor in connection with such engagement.

The Company's indemnity, reimbursement and contribution obligations under this Agreement (a) shall be in addition to, and shall in no way limit or otherwise adversely affect any rights that any Indemnified Party may have at law or at equity and (b) shall be effective whether or not the Company is at fault in any way.

8