# EXHIBIT A

58 F.4th 1048
United States Court of Appeals, Ninth Circuit.

IN RE: FINJAN HOLDINGS,
INC. Securities Litigation,
Robert Grier, Plaintiff-Appellant,

v.

Finjan Holdings, Inc., and Philip
Hartstein, Defendants-Appellees.

No. 21-16702
|
Argued and Submitted November
30, 2022 San Francisco, California
|
Filed January 20, 2023

**Synopsis**
**Background:** Former shareholder in acquired corporation brought action against corporation and its chief executive officer (CEO) alleging violation of Securities Exchange Act section prohibiting use of false or misleading statements in connection with a tender offer. The United States District Court for the Northern District of California, Edward M. Chen, J., 2021 WL 4148682, dismissed for failure to state a claim. Shareholder appealed.

**Holdings:** The Court of Appeals, Bea, Senior Circuit Judge, held that:

particularity requirement for pleading fraud under rule of civil procedure applied;

particularity requirement of Private Securities Litigation Reform Act (PSLRA) for allegations of untrue statements of material fact applied;

PSLRA's pleading requirement for state-of-mind allegations did not apply; and

shareholder failed to plausibly allege subjective falsity in pre-sale statements by corporation's management.

Affirmed.

**\*1051** Appeal from the United States District Court for the Northern District of California, Edward M. Chen, District Judge, Presiding, D.C. No. 3:20-cv-04289-EMC

**Attorneys and Law Firms**

Juan E. Monteverde (argued), Monteverde & Associates PC, New York, New York, for Plaintiff-Appellant.

James L. Jacobs (argued) and Valerie M. Wagner, GCA Law Partners LLP, Mountain View, California, for Defendants-Appellees.

Before: Michael Daly Hawkins, Carlos T. Bea, and Jacqueline H. Nguyen, Circuit Judges.

**OPINION**

BEA, Circuit Judge:

In the summer of 2020, the board of directors of Finjan Holdings, Inc. ("Finjan"), struck a deal with Fortress Investment Group LLC ("Fortress") for Fortress to purchase all Finjan shares at $1.55 per share. Finjan's shareholders subsequently approved the deal.

Robert Grier, a Finjan shareholder at the time of the sale, then sued Finjan, its CEO Philip Hartstein, and members of the Finjan board of directors, alleging that revenue predictions and share-value estimations sent by Finjan management to shareholders before the sale had been false. Grier alleged that Finjan management knowingly provided deflated numbers to create the appearance that the sale price offered by Fortress was a good bargain for Finjan shareholders, thereby to convince shareholders to accept the sale.

Grier alleged that Finjan management was afraid of a hostile takeover of Finjan by a third party known as Party B, which Grier alleged would have removed Finjan management from their employment positions. In the deal with Fortress, however, Finjan management retained their positions. Thus, Grier alleged that Finjan management had a motive to provide deflated revenue projections and estimated share values to shareholders: to keep their jobs at Finjan after the sale to Fortress.

Grier based his claim on Section 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(e),

which prohibits the use of false or misleading statements in connection with a tender offer. As we explained in *Varjabedian v. Emulex Corp.*, 888 F.3d 399 (9th Cir. 2018), there are significant differences between Section 14(e) and Section 10(b)—the securities fraud provision most commonly addressed in our jurisprudence that deals generally with falsities in the purchase and sale of securities.

As explained below, Section 14(e) and relevant Supreme Court precedent have established four elements for Grier's claim. Grier must plausibly allege that (1) Finjan management did not actually believe the revenue projections/share-value estimations they issued to the Finjan shareholders ("subjective falsity"), (2) the revenue **\*1052** projections/share-value estimations did not reflect the company's likely future performance ("objective falsity"), (3) shareholders foreseeably relied on the revenue projections/share-value estimations in accepting the tender offer, and (4) shareholders suffered an economic loss as a result of the deal with Fortress.

The district court characterized Grier's claim as sounding in fraud and applied three heightened pleading standards, discussed further below. The district court then dismissed Grier's first amended complaint with leave to amend for failure to plead sufficient factual material to support the requisite inference of subjective falsity. Grier filed a second amended complaint, which the district court dismissed on the same grounds, this time without leave to amend.

We review a district court's dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure de novo. *Varjabedian*, 888 F.3d at 403.

The district court held that the subjective falsity element of Grier's claim requires allegations of a conscious, fraudulent state-of-mind, also called "scienter." Thus, the district court required that Grier's allegations include enough factual material to create a "strong inference" of subjective falsity. *See* 15 U.S.C. § 78u-4(b)(2)(A). However, the subjective falsity required by Section 14(e) is not equivalent to the scienter requirement referenced in 15 U.S.C. § 78u-4(b)(2)(A) nor that required by, for example, Section 10(b). Therefore Grier's allegations need provide only enough factual material to create a "reasonable inference"—not a "strong inference"—of subjective falsity, in addition to various particularity requirements. *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); *see Varjabedian*, 888 F.3d at 404.

Nonetheless, Grier's allegations do not create even a "reasonable inference" of subjective falsity. It is not reasonable to infer from the allegations of the second amended complaint that Finjan management believed that the sale price was too low. Thus, Grier failed sufficiently to allege subjective falsity, a critical element of his claim. We affirm the district court's dismissal of Grier's second amended complaint despite the district court's erroneous application of a "strong inference" requirement for subjective falsity.

## I. FACTS AND PROCEDURAL HISTORY[1]

Finjan holds itself out as a "cybersecurity" company. It develops security technologies for mobile devices and invests in intellectual property related to mobile and computer security. However, Finjan does not use this intellectual property to **\*1053** produce any products of its own. Instead, Finjan derives most of its revenue from lawsuits accusing others of infringing on its intellectual property or from extracting licenses for use of the intellectual property under threat of a patent infringement lawsuit.

Finjan became a publicly traded company in 2013 and was listed on the Nasdaq in 2014. Since 2014, Philip Hartstein has served as its President and Chief Executive Officer.

In March 2018, Finjan's board of directors initiated and announced a "strategic review process," which included an exploration of opportunities to sell Finjan to another entity. Finjan hired Atlas Technology Group LLC ("Atlas")—a technology-focused investment bank—to act as its financial advisor with respect to the possible sale of Finjan shares and to assist in communication with potential buyers. On the day Finjan announced that it hired Atlas, Finjan's common stock closed trading at $3.94 per share on Nasdaq.

From August 2018 through November 2018, Atlas contacted more than fifty parties to explore if they had any interest in a transaction with Finjan. Several parties expressed interest, including Fortress and an entity known as Party B.

In Fall 2018, Finjan received offers to purchase all Finjan shares for prices from $4.29 to $5.10 per share. However, Finjan's stock, which had traded at around $3.50 to $4.50 per share for most of 2018, sunk to around $2.50 to $3.00 per share in December 2018, which stalled negotiations. After further business setbacks in December 2018, offers received in early 2019 were as low as $1.86 per share.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In April 2019, Finjan started a new effort to reach out to potential acquirers, but only Fortress and Party B expressed further interest. Over the next several months, bids from Fortress and Party B decreased from $3.00 to $3.40 per share to $2.30 to $2.60 per share. During this time, Party B sent a letter to the Finjan board of directors with criticisms of Finjan's sale process.

In December 2019, Finjan management delivered a presentation to shareholders in which Finjan management projected that Finjan's patent licensing and enforcement business line would generate $200 million to $400 million in revenue from 2019 through 2022.

Significant setbacks hampered Finjan operations in early 2020, including an adverse decision in a case in which Finjan was the plaintiff and the onset of COVID-19, which caused delays of Finjan's patent enforcement trials.

On February 3, 2020, Party B sent a letter to the Finjan board of directors indicating that Party B wished to deal directly with the board of directors on any further discussions. The parties here disagree on who Party B wanted to circumvent by dealing directly with the board, but it was presumably Atlas, Hartstein, or both. Members of the board did meet with representatives for Party B after receiving Party B's letter, but no deal resulted from the discussions.

On March 4, 2020, Finjan publicly announced an end to the strategic review process. On a call with investors that day, Hartstein commented on the close of the strategic review process, saying: "As you most likely read in the press release today, this process is now formally concluded. While we didn't consummate a transaction, we are confident in our path forward as an independent entity." On March 18, 2020, Finjan's stock closed trading at $0.78 per share.

On April 1, 2020, Party B informed Finjan of its intent to purchase enough Finjan **\*1054** shares in the open market to increase its ownership of Finjan to an amount greater than five percent of the company, which purchase would have triggered a requirement for Party B to notify the Securities and Exchange Commission of its shares purchase. *See* 17 C.F.R. § 240.13d-1. The purchase of shares in the open market sometimes presages a hostile takeover. But Party B also offered to purchase all Finjan shares for $1.50 per share and asked for an opportunity to reopen negotiations.

On April 12, 2020, Finjan contacted Fortress to ask whether Fortress had an interest in resuming acquisitions discussions. The next day, Finjan agreed to provide Party B with exclusivity in negotiations through April 20, 2020 for the purchase and sale of shares. Party B agreed to halt any open-market purchases of Finjan shares.

On April 29, 2020, Party B informed Finjan that it was no longer willing to pursue a transaction at $1.50 per share and proposed restructuring the transaction as a purchase of Finjan assets rather than of Finjan shares. After confirming that Fortress was still interested in negotiating a purchase of Finjan's shares, Finjan's board instructed Atlas to pursue further negotiations with Fortress.

Fortress submitted a proposal for $1.50 per share, and later raised the proposal to $1.55 per share. On June 9, 2020, Finjan's board approved the purchase and sale agreement, opening a period for shareholders to tender their shares to Fortress and agreeing to recommend that shareholders do so. On that day, Finjan's stock closed trading at $1.33 per share on the open market.

Finjan management directed Atlas to prepare an opinion to provide to shareholders as to the fairness of the agreement, including Atlas's assessment of the value of Finjan shares. Finjan management provided financial data to Atlas and instructed Atlas to assume certain facts as true, including a projected total revenue of $166 million from 2020 to 2024 —considerably less than the 2019–2022 revenue projections Finjan had presented to shareholders in December 2019 (pre-COVID). Grier alleges that this projected revenue was unreasonable and was known to Finjan management to be unreasonable.

Atlas conducted various calculations based on the financial information provided by Finjan management and data from similar transactions to estimate the value of Finjan's shares. These various calculations are discussed in greater detail in the discussion section below. In its cash flow analysis, which relied heavily on the projected revenue figures provided by Finjan management, Atlas concluded that the sale price of $1.55 per share was with the range of reasonable prices. Grier alleges that this estimation of the value of Finjan's shares was unreasonable and was known to Finjan management to be unreasonable.

Finjan management included the projected revenue figures and Atlas's estimation of the share value in a statement to

shareholders. The statement said that the projected revenue figures and share-value estimations were "reasonable" based on Atlas's cash flow analysis. The statement recommended that shareholders approve the agreement with Fortress. Finjan shareholders accepted the agreement, and the sale occurred on July 22, 2020.

On June 29, 2020, Robert Grier, then a Finjan shareholder, filed this putative class action on behalf of Finjan shareholders against Finjan, Hartstein, and several other members of the Finjan board, alleging that the defendants had violated Section 14(e) by issuing the revenue projections and share-value estimations to **\*1055** shareholders. The district court ordered that two related class actions filed by other Finjan shareholders be consolidated with Grier's and ordered Grier to file a consolidated amended complaint. Grier filed the amended complaint, which the district court dismissed with leave to amend.

Grier then filed a second amended complaint, now the operative pleading. Grier's second amended complaint brought claims against Finjan and Hartstein, but not the other members of Finjan's board of directors. On September 13, 2021, the district court dismissed the second amended complaint without leave to amend and entered final judgment. On October 12, 2021, Grier timely filed a notice of appeal.

## II. DISCUSSION

Under Section 14(e), it is

> unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

15 U.S.C. § 78n(e).

To state a claim under Section 14(e), a plaintiff must allege that (1) the defendant made a false statement of material fact or misleadingly incomplete statement, (2) shareholders relied on the false or misleadingly incomplete statement in accepting or rejecting the tender offer, and (3) shareholders suffered an economic loss as a result of the acceptance or rejection of the

tender offer.[2] *See* 15 U.S.C. § 78u-4(b); *see also Varjabedian*, 888 F.3d at 404–08; *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615–16 (9th Cir. 2017).

Grier challenged three statements made by Finjan management in the communication to Finjan shareholders. First, Grier alleged that the revenue projections provided by Finjan management to Atlas, projecting a total revenue of $166 million through 2024, were false. Second, Grier alleged that Atlas's estimation of the value of Finjan's shares, which concluded that the sale price of $1.55 per share was within the range of reasonable prices, was false. Third, Grier alleged that statements by Finjan management in their communication to Finjan shareholders, which endorsed the revenue projections and estimated share values as "reasonable," were false.

The statements challenged by Grier are all statements of opinion. Because the Exchange Act regulates statements of "material *fact*," a statement of *opinion* will run afoul of the Act only in special circumstances. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188–89 (9th Cir. 2021); *In re Atossa Genetics Inc Sec. Litig.*, 868 F.3d 784, 802 (9th Cir. 2017). The Supreme Court has identified three such special circumstances: subjective falsity, embedded statements of fact,[3] and misleading omissions.[4] *See* **\*1056** *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184–89, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015).

In this case, both parties agree that the statements challenged by Grier could be false only under a theory of subjective falsity. Subjective falsity attacks the basic factual assertion that underlies all statements of opinion: the assertion that the author holds and believes the stated opinion. Take, for example, the statement "I believe our TVs have the highest resolution available." The phrase "*I believe*" asserts a fact: that the author holds the belief. No matter whether the TVs in fact have the highest resolution available, if the author of the statement did not *believe* that his company's TVs had the highest resolution available, then the statement would contain a false statement of fact. *See id.* at 184, 135 S.Ct. 1318.

However, the Supreme Court has held that subjective falsity alone is not enough to impose liability: "to recognize liability on mere disbelief or undisclosed motive without any demonstration that the ... statement was false or misleading about its subject would authorize ... litigation confined solely to what one skeptical court spoke of as the 'impurities' of a director's 'unclean heart.' " *Virginia Bankshares, Inc. v.*

*Sandberg*, 501 U.S. 1083, 1096, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (quoting *Stedman v. Storer*, 308 F. Supp. 881, 887 (S.D.N.Y. 1969)). This rule is akin to a harmless error rule. Take again, for example, the statement "I believe our TVs have the highest resolution available." If the author's TVs *do* have the highest resolution available, then it is of little consequence whether the author *believed* that the TVs have the highest resolution available. The listener has not been misled as to the resolution quality of the TVs.

Thus, where a plaintiff relies on a theory of subjective falsity, the plaintiff must allege "both that 'the speaker did not hold the belief she professed' and that the belief is objectively untrue." *Dearborn Heights*, 856 F.3d at 615–16 (quoting *Omnicare*, 575 U.S. at 186, 135 S.Ct. 1318). These are known as the "subjective falsity" and "objective falsity" requirements, respectively. *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1162 (9th Cir. 2009).

In sum, Grier must plausibly allege that (1) Finjan management did not believe the revenue projections/share-value estimations (subjective falsity), (2) the revenue projections/share-value estimations did not reflect Finjan's likely future performance (objective falsity), (3) shareholders foreseeably relied on the revenue projections/share-value estimations in accepting the tender offer, and (4) shareholders suffered an economic loss as a result of the deal with Fortress.

### A. Pleading Standard

Except where a heightened pleading standard applies, a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is analyzed using the plausibility pleading standards of Rule **\*1057** 8(a), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The district court applied the heightened pleading standards of Rule 9(b) and of two provisions in the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b). We address the applicability of each heightened standard in turn.

### 1. Rule 9(b)

Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "To comply with Rule 9(b), allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.' " *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)). "The complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner*, 6 F.3d at 672.

Rule 9(b) applies where a claim is "grounded in fraud" or "sound[s] in fraud," even if fraud is not an essential element of the cause of action. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003). In other words, if "a plaintiff ... choose[s] ... to allege in the complaint that the defendant has engaged in fraudulent conduct," then "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103–04.

Because Grier's claim asserts that Finjan management *knew* that the revenue predictions they gave to Atlas were incorrect and that they endorsed the predictions and the resulting analysis of Atlas as "reasonable" to convince shareholders to accept the sale to Fortress, Grier's claim "sounds in fraud." Thus, the pleading of his claim must comply with Rule 9(b), even if fraud is not an essential element of the claim. The district court was correct to apply Rule 9(b).

### 2. PSLRA Part One: Particularity Requirements for Allegations of Untrue Statements of Material Fact

The district court applied two pleading standards from the PSLRA, separate from Rule 9(b)'s pleading requirements for fraud allegations, in its analysis of the sufficiency of the allegations. First, the district court applied a heightened standard which requires increased particularity for allegations of untrue statements of material fact:

> In any private action arising under [the Exchange Act] in which the plaintiff alleges that the defendant ... made an untrue statement of a material fact ... the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1) ("Section 4(b)(1)"). We have said that Section 4(b)(1) commands a plaintiff to "reveal 'the sources of [his] information,' " *Rubke*, 551 F.3d at 1166 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999), *as amended* (Aug. 4, 1999)), and requires a complaint to "include ... corroborating details." *Silicon Graphics*, 183 F.3d at 985. The particularity requirements of Section 4(b)(1) and Rule 9(b) are not identical, but they are similar.

 **\*1058**  It is undisputed that Section 4(b)(1) applies to all Section 14(e) actions, including this one. *See Rubke*, 551 F.3d at 1167. The district court was correct to apply Section 4(b)(1).

### 3. PSLRA Part Two: Plausibility Requirement for State-of-Mind Allegations

Second, the district court applied a heightened pleading standard applicable to state-of-mind allegations:

> [I]n any private action arising under [the Exchange Act] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate [the Exchange Act], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2)(A) ("Section 4(b)(2)").

Unlike Section 4(b)(1), Section 4(b)(2) substantially increases the pleading requirement. "PSLRA's 'strong inference' requirement has teeth. It is an 'exacting' pleading obligation that 'presents no small hurdle for the securities fraud plaintiff.' " *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (alteration adopted) (first quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), then quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)). The "strong inference" requirement is exacting because the Supreme Court has said that a "strong" inference "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). Thus, unlike the *particularity* requirements of Rule 9(b) and Section 4(b)(1), Section 4(b)(2) increases the *plausibility* requirement, setting a bar significantly above the pleading requirements of *Twombly* and *Iqbal*.

To determine whether Section 4(b)(2) applies, we must decide whether Grier's Section 14(e) claim requires "proof that the defendant acted with a particular state of mind." This kind of state-of-mind requirement involved in fraud cases is referred to as a "scienter" requirement. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter as "an allegation of intent to deceive, manipulate, or defraud on the part of the defendant"). It is not enough that the complaint "sounded in fraud" or that the allegations tend to expound a theory of fraud. The question is instead whether the cause of action itself has scienter as a required element.

In *Varjabedian*, a panel of this court was faced with a question similar to the one here—whether Section 4(b)(2) applies in Section 14(e) cases. 888 F.3d at 404. Analyzing the text of Section 14(e), the panel concluded that a Section 14(e) plaintiff could succeed with proof of negligence, and that proof of scienter is not necessary. *Id.* at 407. Because negligence does not require proof of a mental state, *see DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002), Section 4(b)(2) does not apply as a pleading standard to a Section 14(e) case. *Varjabedian*, 888 F.3d at 409–10.

Yet here, the district court nonetheless held that Grier's Section 14(e) claim had a scienter requirement and accordingly applied Section 4(b)(2). The district court gave two reasons for doing so. Neither is convincing.

First, the district court noted that "as a factual matter, [Grier has] put forward a theory that Defendants knew that the financial  **\*1059**  projections given to Atlas were false."

Grier indeed alleged that Finjan management knowingly misrepresented the value of Finjan. However, the question is whether Section 14(e) itself requires a plaintiff to make such allegations of fraud to state a proper claim for relief. Section 4(b)(2)'s pleading standard takes effect only in a "private action ... in which the plaintiff may recover money damages *only* on proof [of scienter]." § 78u-4(b)(2)(A) (emphasis added). The language of Section 4(b)(2) focuses on the proof demanded by the nature of the "action," not on the particularities of the allegations in the complaint. Thus, the mere fact that a plaintiff has included allegations of fraud will not by itself add a scienter element to every cause of action alleged in the complaint. *See Vess*, 317 F.3d at 1103.

Second, the district court noted that "where opinions are at issue, a plaintiff must plead not only objective falsity but also subjective falsity, which is essentially a state-of-mind requirement."

As mentioned above, because the statements at issue in this case are statements of opinion, Grier must allege, *inter alia*, that "the speaker did not hold the belief [the speaker] professed." *Omnicare*, 575 U.S. at 186, 135 S.Ct. 1318. It is rare for a speaker to express an opinion without knowing that he is doing so. But it is not impossible. For example, an individual could negligently issue a statement that includes an opinion that the speaker does not hold. If a corporate executive prepares a statement truthfully indicating that he believes his corporation will have a revenue of $400 million over the next year, but through a scrivener's error the statement is released to the public with the figure instead reading $40 million, then the corporate executive has perhaps negligently released a statement to the public with an opinion that the corporate executive does not believe. Were this to happen, then the statement would be subjectively false, but the author would not have acted with scienter.

Because an author could negligently state an opinion in which he does not subjectively believe, subjective falsity does not necessarily require scienter. Thus, Section 14(e) can be satisfied without scienter, even when the statements at issue are statements of opinion. *Varjabedian* is thus indistinguishable, and we are bound by it[5]: Section 4(b)(2) does not apply in Section 14(e) actions, even when the challenged statement is a statement of opinion.

We now proceed to an analysis of the case using Rule 9(b), Section 4(b)(1) of PSLRA, and *Twombly*/*Iqbal*—the proper pleading standards. As discussed below, even under these less exigent pleading requirements, Grier failed to allege facts sufficient to state a plausible claim to relief. Thus, although the district court erroneously applied Section 4(b)(2), the error was harmless.

## B. Grier's Allegations of Subjective Falsity

At issue is whether Grier included factual allegations sufficient to create a reasonable inference that Finjan management did not believe the sale price of $1.55 per share was reasonable.[6] Grier's complaint and the documents incorporated by **\*1060** reference into the complaint provided ten facts that tend to represent Finjan's true value.

To determine whether these facts give rise to a reasonable inference that Finjan management did not believe in the reasonableness of the $1.55 sale price, "we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a [reasonable] inference of [subjective falsity]; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a [reasonable] inference of [subjective falsity]." *Zucco Partners*, 552 F.3d at 992.

1. After an open sale process involving the solicitation of bids from more than fifty entities, the final share-purchase offers were $1.50 per share from Party B (which Party B later withdrew in favor of a proposal to purchase Finjan assets) and $1.55 per share from Fortress.

This strongly supports the conclusion that Finjan management did not believe the sale price was too low. As the Delaware Supreme Court has recognized, a "price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value." *M.P.M. Enterprises, Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999).[7] Finjan's management would presumably hold the same belief.

2. In the year prior to the sale, Finjan's shares were trading on the open market for prices ranging from $0.78 to $2.36 per share.

These numbers are of no great use because they vary widely, and as revealed by Atlas's studies, the sale price of a company sold through tender offer can be drastically different from the open-market price.

3. Finjan conducted an analysis of its liquidation value and concluded that a sale of Finjan's assets would result in a net value of $0.70 per share.

This number is of no great use because the complaint does not indicate any typical relationship between a liquidation valuation and reasonable sale price. However, the liquidation valuation does imply that the sale price of $1.55 per share would have offered a better deal to shareholders than a sale of Finjan's assets, which Party B had offered to Finjan shortly before Finjan finalized the deal with Fortress.

4. Atlas conducted a "Premiums Paid Analysis," which looked at acquisitions of twenty-one other publicly traded technology companies in the United States since January 1, 2017, with transaction values between $15 million and $100 million. Atlas compared the sale price of these transactions to the open-market price of the acquired company's shares one day prior, one week prior, and one month prior to the announcement of the transaction. Finding that the sale price typically exceeds the trading price by 18.4% (one day prior), 21.0% (one week prior), and 33.2% (one month prior) per share, Atlas concluded that Finjan's sale price would be expected to be between $1.56 per share and $1.64 per share.

This analysis is inconclusive. Historic sales are not necessarily indicative of the reasonableness of a particular sale price, and even assuming they are, the estimated range of values in the Premiums Paid Analysis had a low end of $1.56 per share—only one cent above the sale price.

 **\*1061**  5. Atlas conducted a "Discounted Cash Flow Analysis," a complicated analysis that involved an assessment of the cash that each Finjan asset is expected to generate and when it is expected to generate the cash. This analysis relied on the projected revenue figures provided by Finjan management. It was conducted using two different sets of assumptions, with the first set resulting in a predicted share value of $1.27 to $1.68 and the second resulting in a predicted share value of $1.42 to $1.55. Even Grier acknowledges that the Discounted Cash Flow Analysis is "recognized as the most important valuation."

This analysis strongly supports the conclusion that Finjan management did not believe the sale price for $1.55 was too low because $1.55 falls within the range of reasonable shares under either set of assumptions used by Atlas.

Grier attacks the Discounted Cash Flow Analysis on the basis that it relied on the revenue projections from Finjan management that materially differed from the December 2019 revenue projections. But for the reasons discussed below, the December 2019 revenue projections are too remote to have been used as a basis for assessing Finjan's value after the onset of the COVID-19 pandemic in 2020, and there are no factual allegations tending to show that Finjan management continued to believe in the December 2019 revenue projections after the onset of the pandemic. Grier provides no other basis for inferring that the Discounted Cash Flow Analysis was objectively false or believed to be false by Finjan management.

6. Atlas conducted an analysis of "Selected Public Company Trading Multiples." This analysis compared the revenue and open-market share prices of four similar publicly traded technology companies. Using Finjan's historic revenue data, Atlas predicted a share value of $1.62 to $1.63 for Finjan's shares. Atlas provided this prediction to shareholders alongside several clearly stated caveats, including that the four other companies are not exactly similar to Finjan, that there was limited financial data on the selected companies, and that comparisons among companies with intellectual property licensing business models using historical and projected data may not be meaningful because their revenue events can span years.

Because Atlas's own statements suggested that this analysis had low utility, it is not reasonable to infer that Finjan's management put much faith in this analysis.

7. An article from a "sophisticated Finjan investor" predicted that Finjan's shares were worth 4.8 to 10 times the $1.50 share price. The complaint alleges that this article relied on "public statements made by [Finjan] and management," but there is no allegation regarding how the "sophisticated Finjan investor" calculated the estimated share value, nor what specific "public statements" made by Finjan were relied upon by the "sophisticated Finjan investor."

This article is irrelevant because there is no allegation that Finjan management knew of the article. There is no way to infer whether Finjan management could have reached the same conclusion because there are no allegations regarding how the "sophisticated Finjan investor" reached his conclusion.

8. An article from a financial investment website in May 2020 claimed that Finjan was worth $5.00 per share. The complaint alleges that this figure represents an average of multiple estimations by "Wall Street analysts," but again there is no allegation regarding who were the analysts nor how they conducted their own calculations of the estimated share value.

 **\*1062**  This article is also irrelevant because there is no allegation that Finjan management knew of the article. There is no way to infer whether Finjan management could have reached the same conclusion because there are no allegations regarding how the financial investment website reached its conclusion.

9. Finjan told shareholders in December 2019 (pre-COVID) that Finjan's licensing and enforcement division would generate $200 to $400 million total revenue over the next three years. Grier uses these revenue predictions to calculate that Finjan's shares were worth $4.36 to $15.50 per share.

The December 2019 revenue projections carry little weight for two reasons. First, these projections were made before the COVID-19 pandemic. Although Finjan management expressed optimism in the face of the pandemic,[8] Grier's complaint also details many ways in which the pandemic affected Finjan's operations, including delaying Finjan's patent enforcement trials and forcing Finjan to reduce non-litigation expenses by 25%. Grier points out that, as of May 2020, Finjan's enforcement trials were still expected to occur by 2024, within the timeframe for the revenue projections Finjan provided to Atlas. Nevertheless, delays involve uncertainty, and in any event, the completion of a trial is not guaranteed to generate revenue even were Finjan to prevail if, for example, the defendant appeals or fails immediately to pay the judgment. Thus, the pre-COVID revenue figures are too remote to create the reasonable inference that Finjan's post-COVID revenue would be similar.

Second, Grier's own calculations show that the pre-COVID revenue figures would support a valuation of $4.36 to $15.50 per share. This figure is anomalous when read alongside the considerably lower valuations provided by every other calculation (except the unexplained calculations by the "sophisticated Finjan investor"). Even had Finjan management once believed in these pre-COVID revenue projections, Grier has failed to allege sufficient facts to infer that such revenue predictions continue to hold any water or that Finjan management continued to believe those projections were accurate.

10. Grier's complaint also includes a motive allegation relevant to this assessment of subjective falsity: Grier alleges that Finjan management feared a hostile takeover by Party B because Party B would remove the then-leaders of Finjan from their positions. Party B was a strategic acquirer with its own management team already in place, and Grier alleges that Party B therefore would not have needed the then-existing Finjan leadership. Grier also alleges that, by asking to deal directly with the Finjan board and by criticizing the sale process, Grier alleges that Party B had expressed displeasure with the then-existing Finjan leadership. Further, Grier alleges that Party B's threat of purchasing more shares

on the open market caused Finjan's board to reopen the sales process only weeks after closing it.[9]

**\*1063** Grier's motive allegation is implausible. Grier essentially alleges that Party B's April 1, 2020 communication (notifying Finjan's board of Party B's intent to acquire additional shares in the open market) triggered a dash for Finjan to secure a deal with Fortress, with Finjan management manipulating revenue figures to convince Finjan shareholders that the deal with Fortress should be accepted. This is not plausible for four reasons:

First, the allegedly faulty revenue predictions were generated on April 25, 2020, updated on May 27, 2020, and provided to Fortress before the agreement was executed on June 10, 2020. Thus, if Finjan management were falsely to lowball Finjan's revenue predictions, it could have convinced Fortress that the deal was bad just as much, if not more, than it would have convinced shareholders that the deal was good.

Second, Finjan management did not need false revenue figures to steer the deal toward Fortress. Party B had withdrawn its final offer for $1.50 per share, but Fortress was willing to go through with a deal for $1.55 per share. Fortress simply offered the better deal.[10]

Third, on April 13, 2020—weeks after Party B threatened to acquire additional shares—Finjan entered into an agreement with Party B, providing Party B with the exclusive right to negotiate with Finjan through April 20, 2020. This demonstrates that Finjan was not averse to dealing with Party B despite the alleged threat of a hostile takeover.

Fourth, Grier's factual allegations are insufficient to create a reasonable inference that Finjan management would lose their jobs in a deal with Party B. The complaint asserts that Party B is "a publicly traded strategic acquirer" and therefore would not need the Finjan management team. This is too great of an inferential leap. That Party B is "a publicly traded strategic acquirer" does not imply any particular leadership structure for Party B, nor does it imply that Finjan management could not continue in leadership positions after the sale.

\* \* \*

Thus, none of the allegations, standing alone, creates a reasonable inference of subjective falsity—a reasonable inference that Finjan management believed that the

revenue projections or share-value estimations provided to shareholders were inaccurate.

Even taking Grier's factual allegations together, it is not reasonable to infer subjective falsity. The only facts that have any tendency to support this conclusion are Finjan's pre-COVID open-market share prices and Finjan's December 2019 revenue predictions. However, it is not reasonable to infer from the allegations of the complaint that Finjan management still believed these figures were predictive post-COVID. Finjan management's announcement of a 25% reduction in non-litigation **\*1064** expenses indicates that it believed COVID had a serious impact on Finjan.

Any minimal faith in the old revenue predictions must have been defeated as Finjan management watched the sale process play out. More than fifty parties were contacted, and several engaged in negotiations; that $1.55 per share was the best final offer received "is a very strong indication" that this share price was a "fair value." *Gilbert*, 731 A.2d at 797. It is unreasonable to infer from these factual allegations that Finjan management subjectively believed that the revenue projections or the estimated share values produced therefrom were too low.

Accordingly, Grier failed to provide a plausible allegation of subjective falsity, a critical element of his Section 14(e) claim.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's dismissal of Grier's second amended complaint.

### All Citations

58 F.4th 1048, Fed. Sec. L. Rep. P 101,531, 2023 Daily Journal D.A.R. 446

Footnotes

1   The facts are related as stated in Grier's second amended complaint and in the various documents incorporated into the second amended complaint by reference. When a general conclusion in a complaint contradicts specific facts retold in a document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, those specific facts are controlling. Similarly, where a complaint incorrectly summarizes or characterizes a legally operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the document itself is controlling. *See Ott v. Home Sav. & Loan Ass'n*, 265 F.2d 643, 646 n.1 (9th Cir. 1958); *Imported Liquors Co. v. Los Angeles Liquor Co.*, 152 F.2d 549, 552 (9th Cir. 1945); *Alexander v. De Witt*, 141 F.2d 573, 576 (9th Cir. 1944). But if specific facts alleged in the complaint contradict specific facts related in a non-legally-operative document attached to the complaint, incorporated by reference in the complaint, or subject to judicial notice, the conflict is resolved in the plaintiff's favor. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1003 (9th Cir. 2018).

2   We refer to these last two requirements together as "loss causation." *See* 15 U.S.C. § 78u-4(b)(4).

3   Take, for example, the statement "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access." If the author of this statement did not in fact have a patented technology to which his competitors do not have access, then the statement would be false. Although the sentence begins with an assertion of opinion, the last half of the sentence qualifies as an assertion of fact. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185, 135 S.Ct. 1318, 191 L.Ed.2d 253 (2015).

4   Take, for example, the statement "We believe our TV sales practices comply with the law." If the author of this statement makes this assertion "without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to reason on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere." *Id.* at 188, 135 S.Ct. 1318.

5   *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

6   Grier challenges both the estimated share values and the projected revenue figures. However, the projected revenue figures are a factor subsumed into the discussion of the estimated share values.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In re Finjan Holdings, Inc., 58 F.4th 1048 (2023)

Fed. Sec. L. Rep. P 101,531, 2023 Daily Journal D.A.R. 446

7   There are no claims of collusion, strictly speaking, because Grier did not allege any collusive communication between Fortress and Finjan management.

8   In a March 2020 presentation to investors, Hartstein stated that he had "average to possibly even high expectations that [Finjan's licensing] portfolio will certainly yield more profit than it did expense." In the same presentation, a slide displayed Finjan's response to the pandemic, noting that Finjan would continue to conduct "Business as Usual"—meaning that Finjan would continue to pursue licensing deals and litigation settlements.

9   Grier's complaint also contains allegations that Hartstein was motivated by the monetary compensation that he received as a result of the sale under his Finjan employment contract. However, Grier abandoned this theory below when it became clear that Hartstein would have received more monetary benefits from a deal with Party B than he received in the deal with Fortress, thus undermining Grier's theory. Grier does not raise the issue on appeal.

10  At oral argument, Grier's counsel argued that Finjan management should have avoided any sale of the company. This argument contradicts one of the core allegations in Grier's complaint: Finjan management allegedly believed that a failure to sell the company would result in a hostile takeover by Party B. A sale to Fortress for $1.55 per share was better for shareholders than a hostile takeover by Party B, in which shareholders would have presumably received only the market rate for their shares, $1.33—a clearly inferior option.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.