1

2

3                    **UNITED STATES DISTRICT COURT**

4                   **NORTHERN DISTRICT OF CALIFORNIA**

5                          **SAN JOSE DIVISION**

6

7    ASIF MEHEDI, et al.,                    Case No.  21-cv-06374-BLF

8                    Plaintiffs,

9           v.                               **ORDER GRANTING MOTIONS TO**
                                             **DISMISS WITH LEAVE TO AMEND**
10   VIEW, INC., et al.,
                                             [Re:  ECF Nos. 135, 137, 139, 141, 146]
11                   Defendants.

12

13          This is a putative class action for securities fraud against View, Inc.[1]; current and former

14   officers and directors of View and CF Finance Acquisition Corp. II ("CFII"); CF Finance

15   Holdings II, LLC (CFII's "Sponsor"); Cantor Fitzgerald & Co. ("CF&Co.", CFII's advisor);

16   Cantor Fitzgerald, L.P. ("Cantor", an affiliate of CFII, the Sponsor, and of Cantor, as well as the

17   Sponsor's sole member); CF Group Management, Inc. ("CFGM", Cantor's managing general

18   partner); and PricewaterhouseCoopers LLP ("PWC", View's auditor since 2013) (collectively,

19   "Defendants").  Lead Plaintiff Stadium Capital LLC has filed an Amended Complaint alleging

20   violations of Sections 11, 12, and 15 of the Securities Act of 1933 ("Securities Act") and Sections

21   10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  ECF No. 96

22   ("AC").

23          Defendants filed five motions to dismiss.  ECF Nos. 135 ("View MTD"), 154 ("View

24   Reply"); ECF Nos. 137 ("Prakash MTD"), 151 ("Prakash Reply"); ECF Nos. 139 ("LH MTD");

25   152 ("LH Reply"); ECF Nos. 146 ("CF MTD"), 150 ("CF Reply"); ECF Nos. 141 ("PWC MTD"),

26

27   ───────────────
     [1] Defendant View's Class A common stock trades on the Nasdaq exchange under the symbol
28   "VIEW" and its redeemable warrants trade on the Nasdaq exchange under the symbol "VIEWW."
     AC ¶ 23.

United States District Court
Northern District of California

153 ("PWC Reply").  Plaintiffs oppose the motions.  ECF No. 149 ("Opp.").  For the reasons discussed at the April 20, 2023, motion hearing and further explained below, the Court GRANTS the motions to dismiss WITH LEAVE TO AMEND.

## I.   BACKGROUND

View is a technology company that manufactures smart building products, including a "smart" glass panel ("smart panels") that adjusts in response to the sun.  AC ¶ 3.  On March 8, 2021, View became a publicly traded company through a merger with CFII, a special purpose acquisition company ("SPAC").  *Id.* ¶¶ 5, 63.  Plaintiff alleges that Defendants made material misrepresentations to investors in, among other filings with the SEC, View's December 23, 2020 De-SPAC Registration Statement, including the two amendments thereto (collectively the "De-SPAC Registration Statement"), concerning a materially misstated and understated warranty accrual related to Legacy View's "smart panels."  *Id.* ¶¶ 3, 62, 81-90.  The De-SPAC Registration Statement included PWC's December 23, 2020 audit report on Legacy View, which stated that View's financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP") and audited in conformity with PCAOB standards and Generally Accepted Accounting Standards ("GAAS").  *Id.* ¶¶ 50-54, 93.  The materially false statements in the De-SPAC Registration Statement were replicated in the February 16, 2021 Proxy Statement/Prospectus ("Proxy"), and Defendants allegedly made additional false statements as they sought the vote of CFII shareholders in favor of the Business Combination.  *Id.* ¶¶ 91-94.  Plaintiff alleges that the De-SPAC Registration Statement and Proxy were jointly prepared by Legacy View and CFII.  *Id.* ¶¶ 80, 92.

On the heels of going public, View filed a March 12, 2021 Form 8-K, allegedly repeating the false statements in the De-SPAC Registration Statement and Proxy concerning the warranty accrual, as well as setting forth PWC's March 12, 2021 audit opinion, which stated that View's financial statements conformed to GAAP and were audited in conformity with PCAOB standards and GAAS.  AC ¶¶ 95-101.

In August 2021, five months after going public, the Company announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's

United States District Court
Northern District of California

previously disclosed warranty accrual" and that View would not file its Form 10-Q for the second fiscal quarter of 2021 ("2Q21 10-Q").  AC ¶¶ 7, 117.  The following day, View's stock price fell $1.26, or over 24%, to close at $3.92.  *Id.* ¶ 118.  Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.  *Id.* ¶ 226.  On February 24 2022, View announced that directors Hughes and Leppert had resigned on February 22, 2022.  *Id.* ¶ 119. View acknowledged that:

> [i]t is the Company's understanding that [Hughes and Leppert] believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided.

*Id.*

On March 7, 2022, View announced "its [12.31.21] cash balance of $281 million . . . with no substantial debt on the balance sheet. View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies." AC ¶ 120.  Then, only eight weeks later, on May 10, 2022, after the market closed, View revealed that in addition to being unable to file its March 31, 2022 Form 10-Q ("1Q22 10-Q"):

> . . . management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K.

*Id.* ¶ 122.  Later that same day, at approximately 11:13 p.m. Pacific Time, View announced that:

> . . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million.

*Id.* ¶ 123.  On this news, the Company's share price fell $0.844, or over 62%, to close at $0.516 per share on May 11, 2022, on unusually heavy trading volume.  *Id.* ¶ 124.

On May 31, 2022, View reported that its yet-to-be restated warranty-related accruals would be $53, $48, and $42 million as of December 31, 2019, 2020, and 2021 respectively.  AC ¶¶ 125-28.  Ultimately, on June 15, 2022, View filed its December 31, 2021 Form 10-K (the "2021 10-

3

1    K"), setting forth the Restatement and stating that the SEC was investigating the warranty accrual.

2    *Id.* ¶ 15, 127.

3         Plaintiff filed suit against: View, Inc. ("View"), f/k/a CF Finance Acquisition Corp. II

4    ("CFII"); current and former officers and directors of View and CFII ("CFII"); CF Finance

5    Holdings II, LLC ("CF Holdings II," CFII's "Sponsor"); Cantor Fitzgerald & Co. ("CF&Co.",

6    CFII's advisor); Cantor Fitzgerald, L.P. ("Cantor", an affiliate of CFII, the Sponsor, and of Cantor,

7    as well as the Sponsor's sole member); CF Group Management, Inc. ("CFGM", Cantor's

8    managing general partner); and PricewaterhouseCoopers LLP ("PWC", View's auditor since

9    2013) (collectively, "Defendants").  The individual View Defendants include: Rao Mulpuri,

10   View's Chief Executive Officer at all relevant times; Vidul Prakash, View's Chief Financial

11   Officer at all relevant times; Tom Leppert, a director of View from September 2015 until February

12   22, 2022; Harold Hughes, a director of View from June 2013 until February 22, 2022; Nigel

13   Gormly, a director of View since August 2015; Toby Cosgrove, a director of View since March 8,

14   2021; Lisa Picard, a director of View since March 8, 2021; Tom Cheung, a director of View since

15   August 2019; Tom Patterson, a director of View from 2014 until on or around March 5, 2021; and

16   Bill Veghte, a director of View from June 2019 until on or around March 5, 2021 (collectively,

17   "Individual View Defendants" and collectively, with View, "View Defendants").  AC ¶¶ 24-35.

18   The individual CF Defendants include: Howard Lutnick, CEO and chairman of the board of CFII;

19   Paul Pion, CFO and a director of CFII; Alice Chan, CFO and a director CFII; Anshu Jain,

20   President and a director of CFII; Robert J. Hochberg, a director of CFII; Charlotte S. Blechman, a

21   director CFII (collectively, "Individual CF Defendants").  *Id.* ¶¶ 36-42.  The entity CF Defendants

22   include: CF Finance Holdings II, LLC ("Sponsor" or "CF Holdings II"); Cantor Fitzgerald & Co.

23   ("CF&Co.", CFII's advisor); Cantor Fitzgerald, L.P. ("Cantor", an affiliate of CFII, the Sponsor,

24   and of Cantor, as well as the Sponsor's sole member); and CF Group Management, Inc.

25   ("CFGM", Cantor's managing general partner) (collectively, "Entity CF Defendants" and

26   collectively, with Individual CF Defendants, "CF Defendants").  *Id.* ¶¶ 43-48.

27        On February 8, 2022, the Court appointed Stadium Capital LLC as Lead Plaintiff.  ECF

28   No. 67.  On July 15, 2022, Plaintiff filed the operative Amended Complaint.  *See* AC.  Plaintiff

United States District Court
Northern District of California

asserts eight claims:

| Claim | Section | Defendants | AC ¶¶ |
|---|---|---|---|
| 1 | § 14(a); Rule 14a-9 | All Defendants *except* Prakash | 130-71 |
| 2 | § 20(a) | Individual View Defendants, CF Defendants | 172-78 |
| 3 | § 11 | All Defendants *except* Entity CF Defendants, Prakash, Patterson, and Veghte | 179-95 |
| 4 | § 12(a)(2) | Entity CF Defendants | 196-205 |
| 5 | § 15 | CF Defendants | 206-15 |
| 6 | § 10(b); Rule 10b-5(b) | View, Mulpuri, Prakash, and PWC | 266-72 |
| 7 | § 10(b); Rule 10b-5(a), (c) | View, Mulpuri, Prakash, and PWC | 273-81 |
| 8 | § 20(a) | Mulpuri, Prakash, and CF Defendants *except* Blechman and Hochberg | 282-86 |

In October 2022, Defendants filed motions to dismiss. There are five separate motions, each brought by a different Defendant or group of Defendants: (1) a motion to dismiss brought by Defendants View, Mulpuri, Gormly, Cosgrove, Picard, Cheung, Patterson, and Veghte, *see* View MTD; (2) a motion to dismiss brought by Defendant Prakash, *see* Prakash MTD; (3) a motion to dismiss brought by Defendants Leppert and Hughes, *see* LH MTD; (4) a motion to dismiss brought by Defendants Lutnick, Pion, Chan, Jain, Hochberg, Blechman, CF Holdings II, CF&Co., Cantor, and CFGM, *see* CF MTD; and (5) a motion to dismiss brought by Defendant PWC, *see* PWC MTD. Plaintiff opposes all five motions. *See* Opp. The Court held a hearing on the motions on April 20, 2023. *See* ECF No. 161.

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

United States District Court
Northern District of California

5

inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

In deciding whether to grant leave to amend, the Court must consider the factors set forth by the Supreme Court in *Foman v. Davis*, 371 U.S. 178 (1962), and discussed at length by the Ninth Circuit in *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003).  A district court ordinarily must grant leave to amend unless one or more of the *Foman* factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, or (5) futility of amendment.  *Eminence Capital*, 316 F.3d at 1052.  "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." *Id.*  However, a strong showing with respect to one of the other factors may warrant denial of leave to amend.  *Id.*

### B.   Rule 9(b) and the Private Securities Litigation Reform Act of 1995

In addition to the pleading standards discussed above, a plaintiff asserting a private securities fraud action must meet the heightened pleading requirements imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also In re VeriFone Holdings*, 704 F.3d at 701.  That is, "the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud." *In re Bare Escentuals, Inc. Sec. Litig.*, 745

1    F. Supp. 2d 1052, 1065 (N.D. Cal. 2010).

2        Similarly, under the PSLRA "the complaint shall specify each statement alleged to have

3    been misleading, the reason or reasons why the statement is misleading, and, if an allegation

4    regarding the statement or omission is made on information and belief, the complaint shall state

5    with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).  The PSLRA

6    further requires that "in any private action arising under this chapter in which the plaintiff may

7    recover money damages only on proof that the defendant acted with a particular state of mind, the

8    complaint shall, with respect to each act or omission alleged to violate this chapter, state with

9    particularity facts giving rise to a strong inference that the defendant acted with the required state

10   of mind."  *Id.* § 78u-4(b)(2)(A).  "To satisfy the requisite state of mind element, 'a complaint must

11   allege that the defendant[ ] made false or misleading statements either intentionally or with

12   deliberate recklessness.'"  *In re VeriFone Holdings*, 704 F.3d at 701 (alteration in original)

13   (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)).  The

14   scienter allegations must give rise not only to a plausible inference of scienter, but to an inference

15   of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent

16   intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## III.    REQUEST FOR JUDICIAL NOTICE

18        While the scope of review on a motion to dismiss is generally limited to the contents of the

19   complaint, under Evidence Rule 201, courts may take judicial notice of facts that are "not subject

20   to reasonable dispute."  F. R. Evid. 201(b).  Courts have taken judicial notice of documents on

21   which complaints necessarily rely, *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001),

22   publicly available financial documents such as SEC filings, *Metzler Inv. GMBH v. Corinthian*

23   *Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008), and publicly available articles or other news

24   releases of which the market was aware, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971,

25   981 n.18 (9th Cir. 1999).

26        All Defendants except Prakash request that the Court take judicial notice of fifteen exhibits

27   in support of their motions to dismiss.  *See* Declaration of Brian Boessenecker, ECF No. 136

28   ("Boessenecker Decl.") ¶ 1.  The exhibits are (1) CFII's Form S-1/A, filed with the SEC on

August 18, 2020 (Boessenecker Decl. Ex. 1); (2) CFII's Form S-4, filed with the SEC on December 23, 2020, referenced in AC ¶¶ 1, 36-41, 50, 56, 69-70, 72, 80-84, 91-92 (Boessenecker Decl. Ex. 2); (3) Exhibit 3.1 to CFII's Form S-4, filed with the SEC on December 23, 2020, which contains CFII's Amended and Restated Certificate of Incorporation dated August 26, 2020 ("Boessenecker Decl. Ex. 3); (4) CFII's Rule 424(b)(3) amended prospectus ("Proxy"), filed with the SEC on February 16, 2021, referenced in AC ¶¶ 1, 24, 26-33, 36-41, 43-46, 91-93, 130-171 (Boessenecker Decl. Ex. 4); (5) View's Form 8-K, filed with the SEC on March 8, 2021, referenced in AC ¶¶ 76, 94 (Boessenecker Decl. Ex. 5); (6) View's Form 8-K, filed with the SEC on March 12, 2021, refenced in AC ¶¶ 25, 53, 95-101, 106 (Boessenecker Decl. Ex. 6); (7) View's Form S-1, filed with the SEC on April 7, 2021, referenced in AC ¶¶ 24-30, 53, 102-06 (Boessenecker Decl. Ex. 7); (8) the Financial Accounting Standards Board's ("FASB") publicly available Accounting Standards Codification ("ASC") Section 460-10-25, which contains subsection 450-10-25-2 (Boessenecker Decl. Ex. 8); (9) the FASB's publicly available ASC Section 450-20-25, which contains subsection 450-20-25-2 (Boessenecker Decl. Ex. 9); (10) Exhibit 99.1 to View's Form 8-K, filed with the SEC on March 7, 2022, referenced in AC ¶¶ 10, 120-21 (Boessenecker Decl. Ex. 10); (11) View's Form 8-K, filed with the SEC on May 31, 2022, referenced in AC ¶¶ 14, 60, 125-26, 128 (Boessenecker Decl. Ex. 11); (12) View's Form 10-K, filed with the SEC on June 15, 2022, referenced in AC ¶¶ 15, 58, 127-29, 233, 240 (Boessenecker Decl. Ex. 12); (13) a copy of a table of daily share price data for View (VIEW) from August 16, 2021 to September 30, 2021, obtained from Yahoo! Finance (Boessenecker Decl. Ex. 13); (14) View's Form 8-K, filed with the SEC on November 9, 2021 (Boessenecker Decl. Ex. 14); (15) View's Request for Withdrawal of Registration Statement on Form S-1, filed with the SEC on March 2, 2022 (Boessenecker Decl. Ex. 15).  Boessenecker Decl. ¶¶ 2-16.

Plaintiff requests that the Court take judicial notice of six exhibits in support of its opposition to the motion to dismiss.  Opp. at 1; Declaration of Kathleen Herkenhoff, ECF No. 149-1 ("Herkenhoff Decl.") ¶ 1.  The exhibits are (1) View's Form 8-K, filed with the SEC on March 12, 2021, referenced in AC ¶ 95 (Herkenhoff Decl. Ex. 1); (2) CFII's Form S-4, filed with the SEC on December 23, 2020, referenced in AC ¶ 80 (Herkenhoff Decl. Ex. 2); (3) View's Form

10-Q, filed with the SEC on August 9, 2022 (Herkenhoff Decl. Ex. 3); (4) CFII's Form S-1/A, filed with the SEC on August 18, 2020 (Herkenhoff Decl. Ex. 4); (5) CFII's Rule 424(b)(3) amended prospectus ("Proxy"), filed with the SEC on February 16, 2021, referenced in AC ¶ 91 (Herkenhoff Decl. Ex. 5); and (6) CFII's Form 8-K, filed with the SEC on November 30, 2020, referenced in AC ¶¶ 77-78 (Herkenhoff Decl. Ex. 6).  *See* Herkenhoff Decl. ¶¶ 2-7.

These documents are attached to or referenced in the complaint or are matters of public record.  Plaintiff does not object to the request for judicial notice made by all Defendants except Prakaash, and Defendants do not object to Plaintiff's request for judicial notice.  And the Court notes that the parties request judicial notice of some of the same documents.  Accordingly, the Court takes notice of Exhibits 1-15 to the Boessenecker Declaration, *see* ECF No. 136, and Exhibits 1-6 to the Herkenhoff Declaration, *see* ECF No. 149.  The Court does not take notice of the truth of any of the facts asserted in these documents.

## IV.  DISCUSSION

Defendants move to dismiss each of Plaintiff's eight claims. The Court addresses each claim in turn.

### A.  Section 11 Claim (Count 3)

Defendants seek dismissal of Plaintiff's Section 11 claim.  Plaintiff brought a claim under Section 11 against all Defendants except the Entity CF Defendants, Prakash, Patterson, and Veghte.  AC ¶¶ 179-95.  Section 11 of the Securities Act contains a private right of action for purchasers of a security if the issuer publishes a registration statement in connection with the security that "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements not misleading."  15 U.S.C. § 77k(a).  "To prevail in such an action, a plaintiff must prove '(1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment.'"  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009) (quoting *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005)).  "By definition, a plaintiff must show that a purported misstatement in a registration statement was misleading at the time the registration

1    statement was issued." *In re: Resonant Inc. Sec. Litig.*, No. 15-CV-01970 SJO (PJWx), 2016 WL

2    1737959, at *7 (C.D. Cal. Feb. 8, 2016).  For example, "[a] claim under section 11 based on the

3    omission of information must demonstrate that the omitted information existed at the time the

4    registration statement became effective."  *Rubke*, 551 F.3d at 1164.

5            Defendants make several arguments, which the Court will address in turn.

6            **1.  Statutory Standing**

7            View Defendants and CF Defendants argue that the claim should be dismissed because

8    there is no traceability.  View MTD at 13-15; LH MTD at 4; CF MTD at 5.

9            "Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides a cause of action to

10   any person who buys a security issued under a materially false or misleading registration

11   statement."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).

12   "Plaintiffs need not have purchased shares in the offering made under the misleading registration

13   statement; those who purchased shares in the aftermarket have standing to sue provided they can

14   trace their shares back to the relevant offering."  *Id.* (citing *Hertzberg v. Dignity Partners, Inc.*,

15   191 F.3d 1076, 1080 (9th Cir. 1999); *Lee v. Ernst & Young, LLP*, 294 F.3d 969, 978 (8th Cir.

16   2002)).  "To have standing to bring a Section 11 claim, plaintiffs must be able to trace their shares

17   back to an allegedly misleading registration statement."  *In re Ubiquiti Networks, Inc. Sec. Litig.*,

18   33 F. Supp. 3d 1107, 1117 (N.D. Cal. 2014) (citing *In re Century Aluminum*, 729 F.3d at

19   1106), *rev'd in part on other grounds*, No. 14-15962, 2016 WL 6156043 (9th Cir. Oct. 24, 2016).

20   "Plaintiffs' failure to plead the traceability of their shares means they lack *statutory* standing under

21   § 11, [and] failure to allege statutory standing results in failure to state a claim on which relief can

22   be granted."  *In re Century Aluminum*, 729 F.3d at 1109 (emphasis in original).

23           "When all of a company's shares have been issued in a single offering under the same

24   registration statement, this 'tracing' requirement generally poses no obstacle."  *In re Century*

25   *Aluminum*, 729 F.3d at 1106 (citing *Hertzberg,* 191 F.3d at 1082).  "But when a company has

26   issued shares under more than one registration statement, the plaintiff must prove that her shares

27   were issued under the allegedly false or misleading registration statement, rather than some other

28   registration statement."  *Id.* (citing *Hertzberg*, 191 F.3d at 1080 n.4).  Here, shares had been issued

United States District Court
Northern District of California

10

1   under two different registration statements: the SPAC Registration Statement, which registered the

2   initial offering of the SPAC's shares when it went public, and the De-SPAC Registration

3   Statement, which registered additional SPAC shares to be provided to Legacy View's former

4   shareholders in connection with the merger.  AC ¶¶ 64, 69.  The Section 11 claim is based only on

5   the De-SPAC Registration Statement, not the SPAC Registration Statement.  *Id.* ¶ 180.  Therefore,

6   Plaintiff must "prove that the shares [it] purchased came from the pool of shares issued in the

7   secondary offering, rather than from the pool of previously issued shares."  *See In re Century*

8   *Aluminum*, 729 F.3d at 1106.

9           A plaintiff could satisfy the above requirement in one of two ways.  *In re Century*

10  *Aluminum*, 729 F.3d at 1106.  First, a plaintiff could show it purchased the shares in the secondary

11  offering itself, which "would obviously eliminate any questions about the lineage of plaintiff['s]

12  shares."  *Id.*  Second, a plaintiff "could prove that their shares, although purchased in the

13  aftermarket, can be traced back to the secondary offering."  *Id.*  As the Ninth Circuit recognized,

14  the second option "is easier said than done."  *Id.*  This is because it would require a plaintiff to

15  trace the chain of title for their shares back to the secondary offering, "starting with their own

16  purchases and ending with someone who bought directly in the secondary offering."  *Id.* at 1106-

17  07.  "Courts have long noted that tracing shares in this fashion is 'often impossible,' because

18  'most trading is done through brokers who neither know nor care whether they are getting newly

19  registered or old shares,' and 'many brokerage houses do not identify specific shares with

20  particular accounts but instead treat the account as having an undivided interest in the house's

21  position.'"  *Id.* at 1107 (quoting *Barnes v. Osofsky*, 373 F.2d 269, 271-72 (2d Cir. 1967)).

22          As in *In re Century Aluminum*, the question here is whether Plaintiff has alleged that its

23  shares are traceable to the secondary offering.  "The level of factual specificity needed to satisfy

24  this pleading requirement will vary depending on the context."  *In re Century Aluminum*, 729 F.3d

25  at 1107.  If all of the company's shares were offered in one offering under a single registration

26  statement, then an allegation that the plaintiff's shares are "directly traceable" to the offering may

27  be sufficient.  *Id.*  But "[w]hen a company has issued shares in multiple offerings under more than

28  one registration statement, . . . a greater level of factual specificity will be needed before a court

11

United States District Court
Northern District of California

can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *Id.* And the Ninth Circuit recognized that "experience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering." *Id.* at 1107-08 (emphasis in original). As in that case, Plaintiff here must "allege facts from which [the Court] can reasonably infer that [this] situation is different." *Id.* at 1108.

Plaintiff alleges: "All investors who purchased or otherwise acquired the registered securities after the Business Combination are traceable to the De-SPAC Registration Statement." AC ¶ 188. This allegation is clearly insufficient under *In re Century Aluminum*. *See* 729 F.3d at 1108. In that case, the Ninth Circuit stated that "the conclusory allegation that plaintiffs 'purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual content." *Id.* The allegation here is similarly conclusory. Plaintiff does not provide any specific allegations tracing its purchase of shares to the De-SPAC Registration Statement. Plaintiff therefore has not alleged statutory standing.

Plaintiff asserts that the allegations are sufficient. Opp. at 14-15. But as noted by certain Defendants, the cases that Plaintiff relies on in arguing that its allegations were sufficient were from before *In re Century Aluminum*. Opp. at 15 (citing *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150 (C.D. Cal. 2003); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983 (S.D. Cal. 2005); *In re Intrabiotics Pharms., Inc. Sec. Litig.*, No. C 04-02675, 2006 WL 708594 (N.D. Cal. Jan. 23, 2006)). The allegations are clearly insufficient under the more recent Ninth Circuit case.

Plaintiff also argues that it can maintain Section 11 claims on behalf of other class members who did purchase securities that were traceable to the De-SPAC Registration Statement. Opp. at 15-16. But, as noted by Defendants, this argument is at odds with *In re Century Aluminum*, in which the Ninth Circuit affirmed dismissal of the case where the lead plaintiffs had not sufficiently alleged traceability. 729 F.3d at 1109-10. And again, as noted by Defendants, the cases cited by Plaintiff in support of its argument pre-dated *In re Century Aluminum* and/or were

1    otherwise distinguishable.  *See* Opp. at 15-16; *In re Juniper Networks, Inc. Sec. Litig.*, 542 F.

2    Supp. 2d 1037, 1052 (N.D. Cal. 2008); *In re VeriSign, Inc. Sec. Litig.*, No. C 02-2270-JW(PVT),

3    2005 WL 88969, at *4-5 (N.D. Cal. Jan. 13, 2005); *NECA-IBEW Health & Welfare Fund v.*

4    *Goldman Sachs & Co.*, 693 F.3d 145, 149 (2d Cir. 2012)).

5            Defendants argue that Plaintiff should not be given leave to amend the Section 11 claim

6    because it would be futile, as there is no way that Plaintiff could allege statutory standing.  View

7    MTD at 13-15.  Defendants assert that there were 50 million CFII securities registered under the

8    SPAC Registration Statement and that, given that volume, as well as the fact that shares are

9    usually held in "street name," Plaintiff will not be able to allege that its shares are traceable to the

10   De-SPAC Registration Statement.  *Id.* at 14.

11           Because this is the first motion to dismiss, the Court will grant Plaintiff an opportunity to

12   amend the Section 11 claim.  But Plaintiff should only do so if it can properly allege traceability.

13                          **2.  Loss Causation**

14           View Defendants and CF Defendants also argue that Plaintiff has not alleged loss

15   causation for the Section 11 claim.  View MTD at 15; CF MTD at 5.  They argue that the absence

16   of loss causation is apparent from the face of the AC.  View MTD at 15.  Plaintiff argues that issue

17   is not proper to decide on a motion to dismiss.  Opp. at 17.

18           A plaintiff need not allege loss causation for a Section 11 claim.  *In re Shoretel Inc., Sec.*

19   *Litig.*, No. C 08-00271 CRB, 2009 WL 248326, at *4 (N.D. Cal. Feb. 2, 2009).  But the

20   defendants "may prove as an affirmative defense that plaintiffs' loss, or some portion thereof, was

21   not caused by the alleged misstatements or omissions."  *Id.*  Under the statute, "[i]f the defendant

22   proves that any portion or all of such damages represents other than the depreciation in value . . .

23   resulting from such part of the registration statement[] with respect to which his liability is being

24   asserted, . . . such portion or all of such damages shall not be recoverable."  *Id.* at *5 (quoting 15

25   U.S.C. § 77k(e)).  It is "sometimes referred to as the 'negative causation' defense and courts have

26   characterized the defendant's burden as 'heavy.'"  *Id.* (quoting *In re Worlds of Wonder Sec. Litig.*,

27   35 F.3d 1407, 1421-22 (9th Cir. 1994)).  But "if the facts as alleged by plaintiffs, and documents

28   which the court may take judicial notice of, establish the affirmative defense as a matter of law

United States District Court
Northern District of California

13

1    then the motion to dismiss may be granted" on this basis.  *Id.* (collecting cases).

2         The De-SPAC Registration Statement was filed with the SEC on December 23, 2020.  AC

3    ¶ 80.  CFII filed amendments to the De-SPAC Registration Statement on January 26, 2021 and

4    February 11, 2021.  *Id.* ¶¶ 85, 89.  As of December 23, 2020, Plaintiff owned 80,000 shares in

5    CFII.  *Id.* ¶ 1, Sch. A.  Plaintiff purchased 10,000 shares on February 4, 2021 and 10,000 shares on

6    February 5, 2021.  *Id.*  Plaintiff then sold 20,000 shares on February 25, 2021 and its additional

7    80,000 shares on March 9, 2021, such that Plaintiff had no remaining shares.  *Id.*  Plaintiff then

8    continued to buy and sell shares throughout 2021 and 2022.  *Id.*

9         As stated above, the Court cannot determine which of the stock purchases were traceable

10   to the De-SPAC Registration Statement.  Because Plaintiff has not alleged that any specific

11   purchase was traceable to the De-SPAC Registration Statement, there can be no loss causation.

12   The facts establish the affirmative defense as a matter of law.

13              **3.  Due Diligence**

14        Individual CF Defendants argue that the due diligence defense applies.  CF MTD at 5-6.

15   They argue that the Section 11 claim should be dismissed because it is based on expertised

16   portions of the De-SPAC Registration Statement, and the AC does not allege that the CF

17   Defendants' reliance on the PWC and View management accounting statements was unreasonable.

18   *Id.*

19        "Section 11 provides a due diligence defense."  *In re Countrywide Fin. Corp. Sec. Litig.*,

20   588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008) (citing 15 U.S.C. § 77k(b)(3)).  "The defense is

21   calibrated to the objective reasonable person in each defendant's position."  *Id.* at 1174-75 (citing

22   *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir. 1994); *Escott v. BarChris Const. Corp.*,

23   283 F. Supp. 643 (S.D.N.Y. 1968)).  While reasonableness is a fact issue not usually suited for a

24   motion to dismiss, a court may grant a motion to dismiss if a defendant has a due diligence

25   defense on the face of the complaint as a matter of law.  *Id.* at 1175.  The defense is available to

26   directors, officers, and underwriters.  *State Treasurer of Mich. v. Countrywide Fin. Corp.*, No.

27   CV-11-00809-MRP-MAN, 2011 WL 13220150, at *6 (C.D. Cal. Aug. 22, 2011) (citing *In re

28   Worlds of Wonder*, 35 F.3d at 1421).  A party "may reasonably rely on auditors' statements,

United States District Court
Northern District of California

14

absent red flags that the [party was] in a position to see." *In re Countrywide Fin. Corp.*, 588 F. Supp. 2d at 1175.  A plaintiff must "adequately allege that [defendants'] reliance on [the auditor's] and [management's] accounting related statements . . . was unreasonable." *Id.* at 1182.

Plaintiff counters that the Court should not consider this affirmative defense on a motion to dismiss.  Opp. at 16-17.  Plaintiff also seeks to distinguish this case from *McKesson*, Opp. at 16-17, but Individual CF Defendants do not rely on that case in support of this argument, CF MTD at 5-6.

The Court determines that the due diligence defense is appropriate to consider on a motion to dismiss if it is established as a matter of law from the face of the complaint.  *See In re Countrywide Fin. Corp.*, 588 F. Supp. 2d at 1174-75; *see also Feyko v. Yuhe Int'l, Inc.*, No. CV 11-05511 DDP (PJWX), 2013 WL 816409, at *8-9 (C.D. Cal. Mar. 5, 2013).  Here, Plaintiff has not made any allegations indicating that it was unreasonable for the Individual CF Defendants to rely on the statements of PWC or View.  *See AC.*  Nor does Plaintiff argue in its opposition that it made any such allegations.  *See Opp.* at 16-17.  Plaintiff must plead red flags that the Individual CF Defendants were in a position to see and that made it unreasonable to rely on the statements of PWC and/or View.  *See In re Countrywide Fin. Corp.*, 588 F. Supp. 2d at 1174-75, 1181-82.

### 4.  PWC

Defendant PWC argues that the Section 11 claim against it should be dismissed.  PWC MTD at 2-4.  It argues that the Court should apply the framework laid out by the Supreme Court in *Omnicare* and, under that framework, Plaintiff has failed to state a claim against it.  *Id.*; *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 135 S. Ct. 1318 (2015).

As explained by the Ninth Circuit, *Omnicare* establishes three standards for pleading falsity of opinion statements:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that "the speaker did not hold the belief she professed" and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that "the supporting fact [the speaker] supplied [is] untrue." Third, when a plaintiff relies on a theory of omission, the

United States District Court
Northern District of California

> plaintiff must allege "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (alterations in original) (internal citations omitted) (quoting *Omnicare*, 135 S. Ct. at 1327, 1332).

Plaintiff's Section 11 claim against PWC is based on PWC's Audit Report, dated December 23, 2020 ("Audit Report"), which was incorporated by reference into the De-SPAC Registration Statement with PWC's consent.  AC ¶ 185.  Plaintiff alleges that the Audit Report contains "misrepresentations and/or omission of material fact necessary to make the statements in the De-SPAC Registration Statement not misleading." *Id.* ¶ 186.  Plaintiff specifically points to PWC's statements as to "its compliance with standards of the [Public Company Accounting Oversight Board] and [Generally Accepted Auditing Standards] in performing its audit and the Company's compliance with [Generally Accepted Auditing Principles]." *Id.*  The Audit Report was titled "Opinion on Financial Statements." *Id.* ¶ 93.  As alleged in the AC, in the Audit Report, PWC stated, in the section labeled "Basis for Opinion": "We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB and in accordance with auditing standards generally accepted in the United States of America." *Id.*  And the Report further stated: "In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for the years then ended in conformity with accounting principle generally accepted in the United States of America." *Id.*  At the end, it states: "We believe that our audits provide a reasonable basis for our opinion." *Id.*

PWC argues that Plaintiff has failed to allege that these statements violate any of the three prongs from the *Omnicare* framework: (1) Plaintiff has not alleged subjective falsity, (2) the Audit Report does not include any embedded statements of fact, and (3) the Audit Report does not omit any material facts.  MTD at 3-4.  Plaintiff argues that the statements about compliance with the PCAOB, GAAS, and GAAP are statements of fact.  Opp. at 18-21.  Plaintiff also argues that PWC omitted material facts about the true amount of the warranty accrual.  Opp. at 19.

1   First, the Court finds that *Omnicare* applies here.  *See Hunt v. Bloom Energy Corp.*, No.

2   19-cv-02935-HSG, 2021 WL 4461171, at \*14-15 (N.D. Cal. Sept. 29, 2021); *Johnson v. CBD*

3   *Energy Ltd.*, No. CV H-15-1668, 2016 WL 3654657, at \*10 (S.D. Tex. July 6, 2016) (collecting

4   cases).  As in *Bloom Energy*, it "matters under *Omnicare* that PWC's audit report . . . [was]

5   explicitly identified as opinion[]."  *See Bloom Energy Corp.*, 2021 WL 4461171, at \*14; *accord*

6   *Querub v. Moore Stephens Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) ("Audit reports,

7   labeled 'opinions' and involving considerable subjective judgment, are statements of opinion

8   subject to the *Omnicare* standard for Section 11 claims.").  The Audit Report here is titled

9   "Opinion on Financial Statements," as it was in *Bloom Energy*.  AC ¶ 93; *Bloom Energy Corp.*,

10   2021 WL 4461171, at \*14.  Similarly, the paragraph about compliance with the GAAP begins, "In

11   our opinion, . . . ."  AC ¶ 93; *Bloom Energy Corp.*, 2021 WL 4461171, at \*14.  The language

12   about the PCAOB and GAAS are in a paragraph titled "Basis for Opinion."  AC ¶ 93.  And as

13   another court has recognized, "both GAAS and GAAP are a collection of broad standards that are

14   'couched in rather general and in some cases inherently subjective terms . . . to which reasonable

15   professionals planning or conducting an audit reasonably and frequently could disagree.'"

16   *Buttonwood Tree Value Partners, LP v. Sweeney*, No. SACV 10-00537-CJC(MLGx), 2012 WL

17   2086607, at \*2 (C.D. Cal. June 7, 2012) (quoting *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.

18   Supp. 2d 258, 301 (S.D.N.Y. July 27, 2011)).

19   Plaintiff points the Court to a case in which the Western District of Washington stated that

20   a certification of compliance with the PCAOB "is a verifiable factual statement."  Opp. at 18; *see*

21   *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1224 (W.D. Wash.

22   2009).  But this case, decided before *Omnicare*, has been expressly rejected by other courts in the

23   Ninth Circuit.  *See, e.g.*, *In re Silver Wheaton Corp. Sec. Litig.*, No. 2:15-cv-5146-CAS (JEMx),

24   2019 WL 1512269, at \*12 (C.D. Cal. Mar. 25, 2019); *Hufnagle v. Rino Int'l Corp.*, No. CV 10-

25   08695 DDP VBKx), 2013 WL 160223, at \*2 (C.D. Cal. Jan. 14, 2013).  The Court determines that

26   the Audit Opinion is a statement of opinion to which *Omnicare* applies.

27   Plaintiff appears to assert that PWC's statements constitute "embedded statements of fact"

28   under *Omnicare*.  Opp. at 17-21.  But the Court agrees with other courts that have held that similar

United States District Court
Northern District of California

17

1   statements about PCAOB, GAAS, and GAAP do not include any embedded statements of fact.

2   *See Bloom Energy Corp.*, 2021 WL 4461171, at *15; *Johnson*, 2016 WL 3654657, at *12.  In

3   *Omnicare*, the Supreme Court gave the following example as a statement with an embedded

4   statement of fact: "I believe our TVs have the highest resolution available because we use a

5   patented technology to which our competitors do not have access." 135 S. Ct. at 1327.  This is

6   clearly distinguishable.  *See Johnson*, 2016 WL 3654657, at *12.  The conclusion there "rested on

7   an underlying, verifiable fact: that the company uses a patented technology that its competitors do

8   not have access to." *Id.*  The statements challenged by Plaintiff do not incorporate any similar

9   factual statements.  *See id.*  The Court therefore rejects this argument.

10      To plead falsity of an opinion under *Omnicare*, "the plaintiff must allege both that 'the

11  speaker did not hold the belief she professed' and that the belief is objectively untrue." *Dearborn*

12  *Heights*, 856 F.3d at 615-16 (quoting *Omnicare*, 135 S. Ct. at 1327).  Plaintiff has not alleged that

13  PWC did not sincerely believe the identified statements included in the Audit Report.  *See AC.*

14  Therefore, Plaintiff's Section 11 claim cannot proceed on this theory.  *See Bloom Energy Corp.*,

15  2021 WL 4461171, at *15.  Further, within the Section 11 claim, Plaintiff disclaims any

16  allegations of fraud.  AC ¶ 179.  This allegation would be inconsistent with any allegation that

17  PWC knew that its statements were false.  *See Johnson*, 2016 WL 3654657, at *12; *Omnicare*,

18  135 S. Ct. at 1327.

19      Finally, PWC argues that it did not omit any material facts.  PWC MTD at 4.  Under

20  *Omnicare*, "when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to

21  the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue

22  misleading to a reasonable person reading the statement fairly and in context.'" *Dearborn*

23  *Heights*, 856 F.3d at 616 (quoting *Omnicare*, 135 S. Ct. at 1332).  Plaintiff alleges that the Audit

24  Report contains "omission of material fact necessary to make the statements in the De-SPAC

25  Registration Statement not misleading."  AC ¶ 186.  Section 11 creates liability where the

26  registration statement "omits material facts about the issuer's inquiry into or knowledge

27  concerning a statement of opinion" and "those facts conflict with what a reasonable investor

28  would take from the statement itself." *Omnicare*, 135 S. Ct. at 1329.  Here, Plaintiff has not

18

1    alleged that PWC omitted any material facts about its inquiry or knowledge.  *See* AC.

2          The Court therefore GRANTS PWC's motion to dismiss the Section 11 claim.

3          **5.  Conclusion**

4          For the reasons stated above, the Section 11 claim is DISMISSED WITH LEAVE TO

5    AMEND.

6          **B.      Section 12(a)(2) Claim (Count 4)**

7          Plaintiff brought a claim under Section 12(a)(2) against the Entity CF Defendants.  AC ¶¶

8    196-205.  Entity CF Defendants seek dismissal of Plaintiff's Section 12(a)(2) claim.  *See* CF MTD

9    at 6-8.

10         Section 12(a)(2) functions as the "sibling" to Section 11, allowing plaintiffs to bring suit

11   against parties who are statutory sellers of securities pursuant to misrepresentations in a

12   prospectus.  *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 925 (N.D. Cal. 2015).  "To plead a

13   claim under Section 12(a)(2), the plaintiff must allege that (1) the defendant is a statutory seller;

14   (2) the sale was effected by means of a prospectus or oral communication; and (3) the prospectus

15   or oral communication contained a material misstatement or omission."  *Maine State Ret. Sys. v.*

16   *Countrywide Fin. Corp.*, No. 10-cv-00302, 2011 WL 4389689, at *8 (C.D. Cal. May 5,

17   2011) (citing 15 U.S.C. § 77*l*(a)(2)).

18         Entity CF Defendants assert that the claim should be dismissed because Plaintiff does not

19   have standing and the Entity CF Defendants are not statutory sellers.  CF MTD at 6-8.  The Court

20   will address each argument in turn.

21         **1.  Standing**

22         Entity CF Defendants argue that Plaintiff does not have statutory standing to pursue a

23   claim under Section 12.  CF MTD at 6-7.

24         "A plaintiff establishes standing to sue under Section 12 by showing she purchased its

25   shares in a public offering, as opposed to the secondary market."  *In re Ubiquiti*, 33 F. Supp. 3d at

26   1126 (citing *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 577 (1995)).  Here, Plaintiff has not

27   alleged that it purchased its shares in a public offering.  *See* AC.  Therefore, the Court will dismiss

28   the Section 12 claim for lack of statutory standing.

United States District Court
Northern District of California

19

### 2. Statutory Sellers

Entity CF Defendants also argue that the Section 12 claim should be dismissed because they are not statutory sellers. CF MTD at 7-8. Again, the Entity CF Defendants are CF Holdings II ("Sponsor"); CF&Co.; Cantor; and CFGM.

"A 'statutory seller' is 'one who either transferred title to the purchaser or successfully solicited the purchase for financial gain.'" *Rieckborn*, 81 F. Supp. 3d at 925 (quoting *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, 692 F. Supp. 2d 387, 391 (S.D.N.Y. 2010)); *see also Pinter v. Dahl*, 486 U.S. 622, 643-44 n.21 (1988) (stating that § 12 "imposes liability on only the buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers"). Entity CF Defendants argue they satisfy neither basis. CF MTD at 7-8. Plaintiff argues that the Entity CF Defendants are statutory sellers on the latter basis—solicitation. Opp. at 21-22.

As the Ninth Circuit has explained, to state a claim based on solicitation, "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchases of the securities for their own financial gain." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1029 (9th Cir. 2005), *abrogated in part on other grounds as recognized by Glazer Cap. Mgmt, L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023); *see also In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549 (N.D. Cal. 2009) (finding that mere participation in a solicitation or sale does not suffice). Additionally, "the defendant [must] be alleged to have had some 'direct' role in the solicitation of the plaintiff." *In re Charles Schwab Corp.*, 257 F.R.D. at 549.

Entity CF Defendants argue that Plaintiff has not sufficiently alleged that they solicited Plaintiff's purchase. CF MTD at 7-8. They also argue that Plaintiff improperly grouped the Entity CF Defendants together in the allegations and provided "no particularized allegations" as to the direct role of each of the Entity CF Defendants in soliciting Plaintiff's purchases. *Id.* Finally, Defendants argue that there are no allegations as to their financial benefit. *Id.* at 8.

Plaintiff counters that whether the Defendants had direct involvement in the solicitation is a "factually intensive exercise" that should not be decided on a motion to dismiss. Opp. at 21. Plaintiff further argues that the Entity CF Defendants were motivated by a desire to serve their

own financial interests through the sale of View stock.  *Id.* at 22.  And Plaintiff argues that the Proxy mentions the Sponsor (CF Holdings II) and that other solicitation materials refer to the involvement of Cantor.  *Id.*  As to Cantor, Plaintiff asserts that the Investor Presentation mentioned in the AC includes statements about Cantor, including that "Cantor Fitzgerald believes View, Inc. represents a unique opportunity to revolutionize the property technology industry with a proven product and a strong management team" as well as a full page "Overview of Sponsor" about Cantor.  *Id.*

In Reply, the Entity CF Defendants note that Plaintiff made no argument as to CF&Co. or CFGM.  CF Reply at 5.  And it argues that the Plaintiff's argument as to Cantor fails because Plaintiff did not plead in the AC that solicitation materials included Cantor; being mentioned in solicitation materials does not constitute solicitation; and, at most, the materials show Cantor assisted in others' solicitation efforts, which is insufficient.  *Id.*

Plaintiff alleges: "Defendant named in this Count promoted, offered or sold View securities to Lead Plaintiff and other members of the Class for Defendants' financial benefit and the benefit of their associates by means of the Proxy Statement/Prospectus and oral communications . . . ."  AC ¶ 199.  For each Entity CF Defendant, Plaintiff also alleges that the Defendant "solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus," AC ¶¶ 43-46, and that the Defendant "permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus," AC ¶¶ 147-50.

Plaintiff has not alleged that each individual Entity CF Defendant played a direct role in the solicitation of the Plaintiff.  *See* AC.  This is true for the two Entity CF Defendants that Plaintiff focuses on in the Opposition—CF Holdings II and Cantor.  *See* Opp. at 22.  Plaintiff's argument as to Cantor in Opposition—namely, that it is included in the Investor Presentation—is not alleged in the AC.  *See* Opp. at 22 (citing Herkenhoff Decl. Ex. 6 at Ex. 99.2); AC.  Plaintiff must include specific factual allegations as to Cantor in the AC.  And the same is true for CF Holdings II.  The AC includes only conclusory allegations as to CF Holdings II, the Sponsor.  *See* AC.  In amending the AC, Plaintiff must keep in mind that it is not sufficient to "participate in

21

soliciting the purchase" or to "merely assist in another's solicitation efforts." *Pinter*, 486 U.S. at 651 n.27.

### 3. Conclusion

For the reasons stated above, the Section 12(a)(2) claim is DISMISSED WITH LEAVE TO AMEND.

### C.   Section 14(a) and Rule 14a-9 Claim (Count 1)

Plaintiff brought a claim under Section 14(a) and Rule 14a-9 against all Defendants except Prakash. AC ¶¶ 130-71. All Defendants against whom this claim was alleged seek dismissal of Plaintiff's Section 14 claim. *See* View MTD at 9-13; LH MTD at 1-3; CF MTD at 2-5; PWC MTD at 4-5.

"To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish that '(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" *New York City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010), *overruled on the other grounds by Lacey v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) (quoting *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007)). There is also a loss causation requirement. *Id.*

#### 1.   Culpable Conduct

View Defendants and CF Defendants argue that the Plaintiff has failed to plead culpable conduct under Section 14. View MTD at 9-11; LH MTD at 1-4; CF MTD at 3-5. The parties disagree as to the applicable pleading standard for this claim. Plaintiff asserts that it need only allege negligence and that it has adequately done so. Opp. at 6-11.

The Ninth Circuit recently addressed the pleading standard for a Section 14 claim where the claim is "grounded in fraud." *In re Finjan Holdings, Inc.*, 58 F.4th 1048 (9th Cir. 2023). While that claim was brought under Section 14(e), the same analysis applies here. The court there looked at whether Rule 9(b) and different provisions of the PSLRA applied. *Id.* at 1057-59. First, the Ninth Circuit held that "Rule 9(b) applies where a claim is 'grounded in fraud' or 'sound[s] in fraud,' even if fraud is not an essential element of the cause of action." *Id.* at 1057 (alteration in

original) (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003)). "In other words, if 'a plaintiff . . . choose[s] . . . to allege in the complaint that the defendant has engaged in fraudulent conduct,' then 'the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b).'" *Id.* (alterations in original) (quoting *Vess*, 317 F.3d at 1103-04). Second, the Ninth Circuit stated that the particularity requirements of Section 4(b)(1) of the PSLRA applied to a Section 14(e) action. *Id.* at 1157-58. The same is true for this Section 14(a) action. Finally, the Ninth Circuit addressed whether the requirements of Section 4(b)(2) of the PSLRA applied. *Id.* at 1058-59. The court determined that Section 4(b)(2) did not apply even though the claim sounded in fraud; the plaintiff needed only to plead negligence, not scienter. *Id.* at 1058-59. This was because Section 14(e) required only negligence. *Id.* Because the same is true of a Section 14(a) claim, the same reasoning applies here and, even if the claim sounds in fraud, scienter is not required.

The Court must determine whether the AC sounds in fraud. To determine whether a complaint sounds in fraud, the Court "must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'alleges a unified course of fraudulent conduct' and 'relies entirely on that course of conduct as the basis of a claim.'" *Rubke*, 551 F.3d at 1161 (quoting *Vess*, 317 F.3d at 1103-04). "Where . . . a complaint employs the exact same factual allegations to allege violations of section [14] as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud." *Id.*

The Court determines that, as currently pled, the Section 14 claim sounds in fraud because it is based on the same course of conduct as the Section 10(b) claims. *See* AC. Here, Plaintiff's Section 14 and Section 10(b) claims rely largely on the same factual allegations, and the Section 10(b) claim is based on misstatements of the warranty accrual, which were made in the Proxy. *See id.* ¶¶ 91-93. The conduct forming the basis of Plaintiffs Section 14 claim, is the same as the conduct Plaintiffs forming the basis of the Section 10(b) claims, which confirms that the Section 14 claim is grounded in fraud and therefore subject to Rule 9(b)'s heightened pleading standard. *See In re Bare Escentuals*, 745 F. Supp. 2d at 1068 (heightened pleading standard applies where "there is a remarkable similarity between the conduct forming the basis for plaintiffs' section 11

claims, and the conduct forming a basis for plaintiffs' section 10(b) claims").

The Court finds unconvincing Plaintiff's assertion that for purposes of Count 1, it "does not allege that any Defendant named in this Count acted with fraudulent intent and expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct." AC ¶ 131.  The Ninth Circuit has held that "a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." *See In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.2 (9th Cir. 1996)).  The same reasoning applies to a Section 14 claim.  The Court therefore rejects Plaintiffs' nominal attempt to disclaim fraud allegations regarding their Section 14 claim.

Accordingly, the Court finds that Plaintiffs' Section 14 claim sounds in fraud and therefore must be pled in accordance with Rule 9(b)'s heightened pleading standards.  But, as the Ninth Circuit made clear in *In re Finjan Holdings, Inc.*, Plaintiff does not need to allege scienter.  58 F.4th at 1058-59.

The Court determines that Plaintiff has not adequately alleged negligence with particularity for the Section 14 claim.  Plaintiff must make individualized allegations of negligence.  For each Defendant, Plaintiff must allege the duty that they owed to the Plaintiff and how that duty was breached.

### 2.  Loss Causation

View Defendants and CF Defendants argue that the Plaintiff has not alleged facts to show loss causation.  View MTD at 11-12; LH MTD at 4; CF MTD at 2.  Plaintiff argues that the loss causation arguments are premature. Opp. at 13-14.

As stated above, a plaintiff must establish that the allegedly misleading proxy caused the plaintiff injury in the form of economic loss.  *New York City Emps.' Ret. Sys.*, 593 F.3d at 1022. Defendants argue that Plaintiff has not alleged loss causation because it sold all the shares it held as of the record date months before the alleged stock-price decline.  View MTD at 12.  Plaintiff held 80,000 shares of CFII stock on the Record Date.  AC ¶ 1, Sch. A at 2.  It sold all of these

United States District Court
Northern District of California

shares on March 9, 2021.  *Id.*  The first alleged stock-price decline occurred in August 2021.  AC ¶ 118.  The Plaintiff bought more View stock, but economic harm from those purchases was not caused by the Proxy Statement because those purchases occurred after the vote solicited by the Proxy Statement.

Plaintiff has not alleged loss causation.

### 3.  Damages Claim Derivative

View Defendants except Leppert and Hughes and CF Defendants also argue that the Section 14 claim should be dismissed because the claim is derivative.  View MTD at 11-12; CF MTD at 2.  Defendants argue that, to the extent the AC is read to plead that the merger resulted in CFII shareholders receiving a worse bargain than they thought at the time of the vote, it would be derivative under Delaware law.  View MTD at 12.  Therefore, Plaintiff had to plead demand futility under Rule 23.1, but it did not do so.  *Id.*  Plaintiff asserts that Defendants misrepresent its theory.  Opp. at 12-13.

Defendant argues that "a Section 14(a) claim that a shareholder received less value in a merger than disclosed in a proxy statement is derivative because any harm was suffered by the company as a whole."  View MTD at 12.  View is incorporated in Delaware.  AC ¶ 23.  Under Delaware law, whether a claim is derivative depends on "(1) who suffered the alleged harm (the corporation or the stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1263 (Del. 2021) (quoting *Tooley v. Donaldson, Lufkin & Jennette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004)).  The Southern District of New York dismissed a similar claim involving a SPAC merger where the "essence of Plaintiffs' § 14(a) claim is that proxy statements overstated the value of [the SPAC target], and as a result, [SPAC shareholders] received less in value from the merger than they expected when they approved it."  *In re Romeo Power Inc. Sec. Litig.*, No. 21 Civ. 3362 (LGS), 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022).

Plaintiff argues that the Defendants misunderstand their theory of the claim.  Opp. at 12-13.  It asserts that the theory is that "as a result of Defendants' materially false Proxy, Plaintiff and

the Class Members that were entitled to vote on the Business Combination were denied the opportunity to make a fully informed decision in voting without having been advised of material facts and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein when the truth was disclosed, and the value of their View securities decreased in value." Opp. at 12 (citing AC ¶¶ 162, 169).  Plaintiff argues that *Romeo Power* is distinguishable because there the plaintiffs conceded that the alleged damage under Section 14 was that the proxy statement overstated the value of the company. *Id.* at 12-13.  Defendants do not raise this argument in the reply. *See* View Reply.  The Court determines that, given Plaintiff's theory of the damage under the Section 14 claim, the damages are not derivative, and it was not required to plead demand futility. *See also In re Bank of Am. Corp. Secs., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 292 (S.D.N.Y. 2010) ("[M]aterial omissions from a proxy statement could directly injure the corporation as well as the corporation's shareholders." (citing *Yamamoto v. Omiya*, 564 F.2d 1319, 1326 (9th Cir. 1977)).

### 4.  Solicitation by Entity CF Defendants

Entity CF Defendants argue that the Section 14 claim should be dismissed as to them because Plaintiff did not adequately allege solicitation.  CF MTD at 2-3.

Section 14(a) applies to those who "solicit" or "permit the use of [their] name to solicit" stockholder votes.  15 U.S.C. § 78n(a)(1).  Plaintiff must allege "a substantial connection between the use of [defendant's] name and the solicitation effort." *Yamamoto*, 564 F.2d at 1323.

Plaintiff alleges that Defendant Lutnick signed the Proxy Statement/Prospectus, and he signed the cover letter for the Proxy Statement/Prospectus "By Order of the CFII Board."  AC ¶ 141.  Plaintiff alleges that each Entity CF Defendant "permitted the use of its name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus." *Id.* ¶¶ 147-50.  Plaintiff also alleges that each "solicited and/or permitted the use of its name to soicit consent or authorization for the Business Combination by issuing the Proxy Statement/Prospectus." *Id.* ¶¶ 43-46.  Entity CF Defendants assert that these allegations are insufficient.  CF MTD at 2-3.  The Court agrees that these conclusory allegations are insufficient to survive a motion to dismiss. *See Yamamoto*, 564 F.2d at 1323.

In Opposition, Plaintiff points to its allegation in Paragraph 174, which states: "CFII Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials (as noted in the Proxy Statement/Prospectus), voted to approve the Business Combination, and solicited the approval of the Business Combination through CFII's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement/Prospectus."  Opp. at 11; AC ¶ 174.  But this does not identify the role of the individual Entity Defendants.  In Opposition, Plaintiff also argues that it makes sufficient allegations as to CF&Co.  Opp. at 11.  But Plaintiff points to only one allegation in the AC—its allegation that "certain fees were payable [to CF&Co.] on summation of the Business Transaction (which was achieved via the Proxy)."  Opp. at 11 (citing AC ¶ 44).  This allegation is not sufficient to allege solicitation.

Plaintiff has not alleged solicitation by the Entity CF Defendants.

### 5.  Exculpation for Individual CF Defendants

Individual CF Defendants also argue that the Section 14 claim should be dismissed as to them because CFII's certificate of incorporation contained an exculpation provision pursuant to 8 Delaware Code Section 102(b)(7) that shields its directors from liability for negligence.  CF MTD at 5.  Plaintiff has not adequately alleged negligence as to the Individual CF Defendants, so the Court declines to address whether such a claim would be exculpated.

### 6.  PWC

PWC argues that the Section 14 claim against it must fail under *Omnicare*, for the same reasons as it provided for the Section 11 claim.  PWC MTD at 4-5.  Plaintiff argues that the Section 14 claim is adequately pled as to PWC for the same reasons that it asserts the Section 11 claim is adequately pled.  Opp. at 5.  For the reasons discussed above with respect to Section 11, the Court determines that Plaintiff has not adequately pled a Section 14 claim against PWC.  The Court will therefore grant PWC's motion to dismiss the Section 14 claim.

### 7.  Conclusion

For the reasons stated above, the Section 14 claim is DISMISSED WITH LEAVE TO AMEND.

**D.    Section 10(b) and Rule 10b-5 Claims (Counts 6 and 7)**

Plaintiff alleges two claims under Section 10(b).  First, it alleges a claim under Section 10(b) and Rule 10b-5(b) against Defendants View, Mulpuri, Prakash, and PWC.  AC ¶¶ 266-72.  Second, it alleges a claim under Section 10(b) and Rule 10b-5(a) and (c) for scheme liability against Defendants View, Mulpuri, Prakash, and PWC.  AC ¶¶ 273-81.

Section 10(b) makes it unlawful "for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]"  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the SEC under the authority of Section 10(b), in turn makes it unlawful for any person:

> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a securities fraud claim, a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Dearborn Heights*, 856 F.3d at 613 (quoting *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014)).

Plaintiff alleges that these Defendants materially misstated and understated the warranty accrual for Legacy View's smart panels.  *See, e.g.*, AC ¶¶ 81-83.

**1.  Scienter**

Defendants View, Mulpuri, and Prakash all argue that Plaintiff has not alleged facts sufficient to support a strong inference of scienter.  View MTD at 3-6; Prakash MTD at 1-4.

Scienter is a "mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  To plead scienter, the complaint must "state

28

with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter is adequately pled when "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. 323. This means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. "Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants." *Apollo*, 774 F.3d at 607.

The Court will first address the 2021 10-K. The parties disagree as to whether and how the Court should consider the following statement in that document:

> As previously disclosed on August 16, 2021, the Audit Committee of the Company's Board of Directors (the "Audit Committee") initiated an independent investigation concerning the adequacy of the Company's previously reported warranty accrual (the "Investigation").
>
> Based on the independent investigation, the Audit Committee concluded that (i) the Company's previously reported liabilities associated with warranty related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated, (ii) the Company's former Chief Financial Officer and certain former accounting staff negligently failed to properly record the liabilities for warranty-related obligations and cost of revenue, and (iii) the Company's former Chief Financial Officer and certain former accounting staff intentionally failed to disclose certain information to the Board of Directors and the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP ("PwC") regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations.
>
> As reported in the Current Report on Form 8-K filed with the SEC on November 9, 2021, the Audit Committee concluded, with the concurrence of management that certain financial statements of the Company should no longer be relied upon and would require restatement in order to correct misstatements in those financial statements relating to the recording and reporting of the warranty-related obligations. In connection with this restatement, the Company is also correcting other immaterial prior period misstatements.

Boessenecker Decl. Ex. 12. While the 2021 10-K is incorporated by reference in the AC, Plaintiff does not plead facts related to the result of the Audit Committee's independent investigation. *See* AC. In the opposition brief, Plaintiff does mention this portion of the 2021 10-K. *See* Opp. at 24-

25.  But Plaintiff for the most part ignores this statement, likely because it is inconsistent with the theory pled in the AC.  At the hearing Prakash asked the Court not to consider the statement for purposes of the motion to dismiss.[2]  The Court will proceed on the theory pleaded in the AC for purposes of this motion to dismiss.  In amending the complaint, Plaintiff must make it clear on what theory it is proceeding.

Defendants argue that Plaintiff has not alleged facts giving rise to a strong inference of scienter.  And the Court agrees.  Plaintiff first argues that the Court can find scienter because the Defendants admitted they had actual knowledge that there were quality issues as to the smart panels that required a warranty accrual.  Opp. at 23-26.  But this argument is unconvincing because Defendants disclosed the warranty accrual, albeit inaccurately.  The fact that Defendants were aware of a problem with the panels such that a warranty accrual was required does not mean that they were aware that the warranty accrual calculation omitted installation labor and freight costs.  Plaintiff has not alleged scienter on this basis.

Plaintiff also argues that many other allegations support scienter.  Opp. at 26-33.  The Court will address each in turn, and then all of them holistically.

Resignations

Plaintiff alleges that there were suspiciously-timed resignations.  AC ¶¶ 225-28.  "[P]laintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one."  *Zucco*, 553 F.3d at 1002.  "[A]n employee's resignation supports an inference of scienter only when 'the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances.'"  *Dearborn Heights*, 856 F.3d at 622 (quoting *Zucco*, 553 F.3d at 1002).

Plaintiff points to the resignations of Leppert, Hughes, Prakash, Pion, and Cheung.  AC ¶¶ 225-28; Opp. at 26-27.  Plaintiff alleges that on February 22, 2022, Hughes resigned as Executive Chair, Principal Executive Officer, and a director of View, and Leppert resigned as a director of

---

[2] PWC asks the Court to treat this statement as true.  *See* PWC MTD at 8.  As discussed below, the Court will dismiss the claims against PWC on other grounds and need not reach this argument for PWC.

United States District Court
Northern District of California

View.  AC ¶ 225.  Hughes was chair of the Audit Committee and Leppert was a member of the Audit Committee.  *Id.*  In connection with the resignations, View stated that "[i]t is the Company's understanding that Mr. Hughes and Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."  *Id.*  Plaintiff alleges that Prakash resigned as CFO on November 8, 2021.  *Id.* ¶ 226.  The same day, Hughes was appointed as Executive Chair to assist in helping the Company's financial and accounting functions.  *Id.* ¶ 27.  As argued by Defendants, Plaintiff does not allege how these resignations were suspicious or how they indicate that the Defendants had knowledge of that the warranty accrual misstatements were false at the time they were made.  *See* Prakash MTD at 3; View MTD at 5.

Plaintiff also alleges that the resignations of Pion and Cheung were suspicious.  AC ¶¶ 227-28.  Plaintiff alleges that Pion resigned as CFO, director, and member of the Audit Committee of CFII on January 31, 2021.  *Id.* ¶ 227.  It alleges that this was suspicious because it occurred during the first quarter of 2021, which was when View made misstatements as to the warranty accrual, and it occurred after the CFII due diligence processes, just five weeks prior to the merger.  *Id.*  And Plaintiff alleges that Cheung resigned as a member of View's board of directors on March 19, 2021.  *Id.* ¶ 228.  Plaintiff alleges this timing was suspicious because it was only ten days after the merger was completed.  *Id.*  The Court determines that Plaintiff has not pled why these resignations were suspicious.  There is nothing inherently suspicious about the timing of these resignations.

Core operations

Plaintiff also alleges that the Court can infer scienter on the basis that smart glass was View's core product and View had a narrow customer, supplier, and manufacturing framework.  AC ¶¶ 229-35.  The "core operations" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers.  *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018).  "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis."  *S.*

*Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  "[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."  *Metzler Inv. GMBH*, 540 F.3d at 1068.  On the other hand, "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements . . . is sufficient under the PSLRA."  *S. Ferry*, 542 F.3d at 785.

"In summary, allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances.  First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. . . .  Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information. . . .  Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  *S. Ferry*, 542 F.3d at 785-86 (citations omitted).

Defendants argue that Plaintiff cannot proceed on this theory because it makes only generalized allegations about View's "single production line" and customer and supplier base.  View MTD at 5.  The Court agrees that the generalized allegations in the AC are insufficient to indicate that the identified Defendants were aware of the facts related to the misstatements.

Restatement

Plaintiff alleges that the fact of the restatement supports scienter.  AC ¶ 241-46.  But "the mere publication of a restatement is not enough to create a strong inference of scienter."  *Zucco*, 552 F.3d at 1000.

SEC investigation, GAAP violations, incentives, and SOX certifications

Plaintiff also alleges that the Court can infer scienter from its allegations that (1) there is an SEC investigation into the warranty accrual issue; (2) Defendants violated GAAP; (3) Defendants had a financial incentive to inflate View's value; and (4) Defendants Mulpuri and Prakash signed

SOX certifications.  AC ¶ 15 (SEC investigation), 236-40 (GAAP violations), 24-25, 109, 114-15 (SOX certifications); Opp. at 27-28, 32.  Defendants argue that these allegations, standing alone, do not give rise to a strong inference of scienter.  View Reply at 3-4.

The Court agrees.  The SEC investigation says nothing about what the Defendants knew at the time of the misstatements.  "It is true that specific allegations of significant GAAP violations will sometimes support an inference of scienter."  *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1362 (C.D. Cal. 2014).  But the violations of GAAP here do not support scienter because there are no allegations that the accounting standards were "so basic that a court can infer scienter from the mere fact [that the accrual] was reported improperly."  *Id.* at 1363.  But the Ninth Circuit has recognized that allegations as to the signing of the SOX certifications "add nothing substantial to the scienter calculus."  *Zucco*, 552 F.3d at 1004.  They "are not enough to create a strong inference of scienter and do not make [plaintiff's] otherwise insufficient allegations more compelling by their presence in the same complaint."  *Id.*

Holistic Review

After having determined that none of Plaintiffs' allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations holistically.  *See Zucco*, 552 F.3d at 992.  The Court finds that taken together, the facts do not evince such fraudulent intent or deliberate recklessness as to make the inference of scienter cogent.  *Tellabs*, 551 U.S. at 323.  Because Plaintiff has not alleged scienter as to any individual, it also has not alleged scienter as to View.

### 2.  Loss Causation

Defendants View, Mulpuri, and Prakash all argue that Plaintiff has not alleged loss causation.  View MTD at 6-7; Prakash MTD (joining View MTD).

Loss causation, "i.e., a causal connection between the material misrepresentation and the loss" experienced by the plaintiff, is a necessary element of pleading a securities fraud claim under Section 10(b) of the Exchange Act.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to

drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2406 (2014)). To be corrective, the disclosure must "relate back to the misrepresentation and not to some other negative information about the company." *In re Nuveen Funds/City of Alameda Sec. Litig.*, No. 08-cv-4575-SI, 2011 WL 1842819, at *10 (N.D. Cal. May 16, 2011) (*In re Williams Sec. Litig.— WCG Subclass*, 558 F.3d 1130, 1139-40 (10th Cir. 2009)). Federal Rule of Civil Procedure 9(b) requires a plaintiff to state with particularity the elements of a securities fraud claim, including loss causation. *Apollo*, 774 F.3d at 605.

Defendants argue that Plaintiff has not pled loss causation. View MTD at 6-7. Plaintiff alleges that on August 16, 2021, View disclosed that its Audit Committee began an investigation concerning the adequacy of the previous warranty accrual and View would not file its Form 10-Q for the three and six months ended June 30, 2021. AC ¶¶ 7, 117. And, Plaintiff alleges, the following day, August 17, 2021, the share price fell $1.26, or over 24%, to close at $3.92 per share. *Id.* ¶¶ 8, 118. Defendants argue that the start of an investigation cannot be the basis of a loss causation theory and that the quick recovery of the stock price refutes the loss causation allegations. View MTD at 6-7. Plaintiff argues that its allegations are sufficient. Opp. at 33-35.

Defendants point the Court to *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014). View MTD at 6-7. In *Loos*, the Ninth Circuit held that "[t]he announcement of an investigation does not 'reveal' fraudulent practices to the market." 762 F.3d at 890. The Ninth Circuit explained that "at the moment an investigation is announced, the market cannot possibly know what the investigation will ultimately reveal," and the disclosure of an investigation "simply puts investors on notice of a *potential* future disclosure of fraudulent conduct." *Id.* (emphasis in original). "Consequently, any decline in a corporation's share price following the announcement of an investigation can only be attributed to market speculation about whether fraud has occurred." *Id.* "This type of speculation cannot form the basis of a loss causation theory." *Id.* The court thus held "that the announcement of an investigation, without more, is insufficient to establish loss causation." *Id.* But the Ninth Circuit made clear that it did "not mean to suggest that the announcement of an investigation can never form the basis of a viable loss causation theory." *Id.*

34

1    at 890 n.3.  Instead, it was holding that "the announcement of an investigation, 'standing alone and

2    without any subsequent disclosure of any wrongdoing, does not reveal to the market the pertinent

3    truth of anything, and therefore does not qualify as a corrective disclosure.'"  *Id.* (quoting *Meyer v.*

4    *Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013)).  In *Loos*, the plaintiff tried to save the loss

5    causation theory by arguing that two disclosures after the class period confirmed the fears that

6    were prompted by the investigation announcement.  *Id.* at 890.  The Ninth Circuit determined that

7    the argument failed because the impact of the later events on the stock price was not alleged in the

8    operative complaint.  *Id.*

9          The Ninth Circuit addressed the issue again in *Lloyd v. CBF Financial Corp.*, 811 F.3d

10   1200 (9th Cir. 2016).  In that case, the plaintiff alleged that the fall in the defendant's share price

11   occurred after the announcement of an SEC subpoena.  811 F.3d at 1209.  The Ninth Circuit

12   recognized that in *Loos*, it "held that 'the announcement of an investigation, standing alone and

13   without any subsequent disclosure of actual wrongdoing, does not reveal to the market the

14   pertinent truth of anything, and therefore does not qualify as a corrective disclosure.'"  *Id.* at 1209-

15   1210 (quoting *Loos*, 762 F.3d at 890 n.3).  But it noted that *Loos* "left open whether the

16   announcement of an investigation can 'form the basis for a viable loss causation theory' if the

17   complaint also alleges a subsequent corrective disclosure by the defendant.'"  *Id.* at 1210 (quoting

18   *Loos*, 762 F.3d at 890 n.3).  And the Ninth Circuit in *Lloyd* "answer[ed] that question in the

19   affirmative."  *Id.*  The court held that much more was alleged in *Lloyd* than in *Loos*.  *Id.*  The

20   Ninth Circuit specifically noted that about a month after announcing the SEC subpoena, the

21   defendant disclosed that it was charging off millions in loans from a certain borrower, and "the

22   market reacted hardly at all to [the defendant's] bombshell disclosure about its largest borrower,

23   confirming that investors understood the SEC announcement as at least a partial disclosure of the

24   inaccuracy of the [alleged misstatements]."  *Id.*  The court ultimately determined that loss

25   causation was sufficient pleaded, noting that "any other rule would allow a defendant to escape

26   liability by first announcing a government investigation and then waiting until the market reacted

27   before revealing that prior representations under investigation were false."  *Id.*

28          Defendants argue that Plaintiff's allegations are insufficient because *Loos* held that an

United States District Court
Northern District of California

35

1    investigation cannot form the basis of a loss causation theory.  View MTD at 6-7.  Defendants also

2    argue that Plaintiff did not plead that the investigation was related to the alleged misstatements.

3    *Id.* at 7.  Plaintiff argues that it alleges not only the announcement of the investigation, but also the

4    announcement about the Form 10-Q.  Opp. at 34.  Plaintiff also argues that *Loos* is distinguishable

5    because here, there was actual wrongdoing.  *Id.* at 34-35.  And Plaintiff argues that the

6    investigation explicitly related to the alleged misstatements.  *Id.* at 35.

7    　　　　Plaintiff has not adequately alleged loss causation.  Plaintiff alleges that on August 16,

8    2021, View announced an audit investigation and announced that it would not file its Form 10-Q.

9    The announcement stated that View would not file its Form 10-Q based on the investigation, so it

10   would not suggest anything to the market above and beyond the investigation.  *See* AC ¶ 117.  As

11   to the announcement of the audit investigation itself, the Court determines that the allegations are

12   insufficient under *Loos*.  Plaintiff seeks to distinguish *Loos* on the basis that here, the warranty

13   accrual actually was false.  Opp. at 34-35.  In the AC, Plaintiff alleges that, after the class period,

14   View restated its financials and indicated that the warranty accruals were false.  AC ¶¶ 125-29.

15   But in *Loos*, the Ninth Circuit rejected the plaintiff's argument "that two post-class period

16   disclosures 'solidif[ied] the causative link' between the fraud and his loss" because "the impact of

17   these events on [the defendant's] stock price was not alleged" in the operative pleading.  762 F.3d

18   at 890.  Here, Plaintiff makes a similar argument, but faces the same problem—the AC includes

19   no allegations about the effect of these later disclosures on the stock price.  *See* AC ¶¶ 125-29.

20   The Court does agree with Plaintiff that the investigation was explicitly related to the alleged

21   misstatements.  *See* Opp. at 35.  And the Court need not reach the argument about the alleged

22   rebound of the stock price because Plaintiff has not alleged loss causation in the first instance.

23   　　　　Plaintiff has not adequately alleged loss causation under Section 10(b).

24   　　　　　　　　**3.   March 2022 Statements**

25   　　　　Defendants View, Mulpuri, and Prakash argue that to the extent the Section 10(b) claim is

26   based on March 2022 statements, the claim fails.  View MTD at 7-8; Prakash MTD (joining View

27   MTD).  The parties disagree about falsity and loss causation.

28   　　　　Plaintiff alleges that on March 7, 2022, View filed a press release on a Form 8-K with the

36

SEC.  AC ¶ 120.  In this document, View announced "its cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet.  View expects to improve cash burn through 2022 on higher volumes and revenues combined with associated improvements in operational efficiencies."  *Id.*  Plaintiff alleges that this statement was materially false and/or misleading because View failed to disclose that as a result of the warranty accrual problem, the positive statements about the cash balance and expectation of improved cash burn were misleading and/or lacked a reasonable basis.  *Id.* ¶ 121.  On May 10, 2022, View filed an NT 10-Q on Form 12b-25 with the SEC.  *Id.* ¶ 122.  It stated:

> View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the period ended March 31, 2022 (the "10-Q"), within the prescribed time period for the reasons described below. . . . While the Audit Committee investigation is now complete, the Company has not been able to finalize its financial statements or corresponding assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting. The Company is also unable to make a reasonable estimate of changes in results of operations in its financial statements at this time; however, management anticipates that they will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K. While management will look to raise capital, there can be no assurance that the necessary financing will be available or will be available on terms acceptable to the Company. Given the findings of its Audit Committee, the Company also expects to report additional material weaknesses, and is working to determine any additional adjustments to the Company's financial statements that may be required. Although the Company expects that it will finalize its financial statements and file the related 10-Q as soon as practicable, it does not currently expect to file the 10-Q by the extended filing date pursuant to Rule 12b-25.

*Id.*  Later the same day, View issued a press release, which stated:

> . . . its cash position [is] $201 million as of the end of Q1 2022 with no substantial debt on its balance sheet. When the Company issues its 2021 financial statements, it anticipates that its reported cash outflow from operations for the twelve months ended December 31, 2021, ranged from $260 million to $270 million.
>
> The Company anticipates that it will be disclosing substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of its 2021 financial

statements. While the Company will look to raise capital, there can be no assurance that the necessary financing will be available or will be available on terms acceptable to the Company.

As previously reported, the investigation of the Company's Audit Committee into its previously reported warranty accrual is now complete. View continues to make substantial progress with its financial restatement and related filings.

To date, outside of the previously reported misstatements in warranty-related accruals, no material errors have been identified in the restatement process, which remains subject to the completion of the Company's financial close process and the completion of the financial statement audit.

As previously reported, Nasdaq has granted View a stay of delisting through the end of May 2022 and completion of its delinquent filings will allow View to regain compliance with applicable Nasdaq listing requirements. The Company will announce an earnings date and dialin details closer to the date of expected filing.

*Id.* ¶ 123.  The following day, on May 11, 2022, the share price fell over 62%.  *Id.* ¶ 124.

Defendants argue that Plaintiff has not alleged that the March 2022 statement is false. View MTD at 7-8.  And Defendants assert that the second sentence is protected by the PSLRA's safe harbor provision.  *Id.* at 8.  As to the first sentence, both parties agree that the statement was true—View did have a cash balance of $281 million as of December 31, 2021 with no substantial debt on the balance sheet.  *See* AC ¶ 121; *see* Opp. at 36.  Plaintiff's argument is that the statement that View expected to improve cash burn through 2022 was misleading, as demonstrated by the fact that by May 10, 2022, View was unsure of its ability to continue as a going concern.  Plaintiff argues that the May 10, 2022 statement shows that View had a high cash burn in the first quarter of 2022, and Defendants therefore should have known at the time they made the statement on March 31, 2022 that the forward-looking statement was misleading.  Opp. at 36.

The Court determines that Plaintiff has not adequately alleged that the March 2022 statement was false or misleading.  The PSLRA safe harbor precludes liability for forward-looking statements in either of two circumstances: (1) "if they were identified as forward-looking statements and accompanied by meaningful cautionary language," or (2) "if the investors fail to prove the projections were made with actual knowledge that they were materially false or misleading."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111-12 (9th Cir. 2010); *see* 15 U.S.C. § 78u–5(c)(1).  A forward-looking statement is "a statement containing a projection of revenues,

income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items." 15 U.S.C. § 78u–5(i)(1)(A). The statement identified by Plaintiff is forward-looking, and Plaintiff has not adequately alleged that the projections were made with knowledge that they were materially false or misleading. Plaintiff has not alleged falsity for the March 2022 statements.

Defendants also argue that Plaintiff has not alleged loss causation for the March 2022 statements. View MTD at 7. Defendants argue that the May 2022 statement was not a corrective disclosure for the March 2022 statements and that Plaintiff did not tie the loss after the May 2022 statement back to the alleged March 2022 misstatements. *Id.* The Court agrees that Plaintiff has not alleged loss causation as to the March 2022 statements. Loss causation requires that a plaintiff "trac[e] the loss back to the very facts about which the defendant [allegedly] lied." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 (9th Cir. 2022) (quoting *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 752 (9th Cir. 2018)). Because Plaintiff has not alleged that the March 2022 statements were false or misleading, it also cannot allege loss causation.

Plaintiff's has not alleged a Section 10(b) claim as to the March 2022 statements.

### 4. PWC

Defendant PWC argues that the Section 10(b) claim fails because Plaintiff has not alleged any false statements or scienter. PWC MTD at 5-8. The Court will address each argument in turn.

#### a. False Statements

PWC argues that Plaintiff has not alleged any false statements in either the 2020 or 2021 Audit Report, and therefore the Section 10(b) claim against it must be dismissed. PWC MTD at 5. For the reasons stated above with respect to Section 11, the 2020 Audit Report does not include any false statements by PWC. *See Golub v. Gigamon Inc.*, 994 F.3d 1102, 1107 (9th Cir. 2021) ("[T]he *Omnicare* standard applies to claims under section 10(b) and Rule 10b-5."). And based on Plaintiff's allegations, the 2021 Audit Report contains the same relevant language as the 2020 Audit Report such that the above reasoning also applies. *Compare* AC ¶ 101 (2021 Audit Report excerpt) *with* AC ¶ 93 (2020 Audit Report excerpt). Plaintiff has not alleged any false statements by PWC, so the Section 10(b) claim fails.

United States District Court
Northern District of California

b.   Scienter

PWC also argues that the Section 10(b) claim against it should be dismissed because Plaintiff has not adequately alleged scienter.  PWC MTD at 5-8.

As stated above, to plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  And scienter is adequately pled when "all of the facts alleged, taken collectively give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 323.

Plaintiff points to two bases for scienter: (1) PWC failed to comply with PCAOB standards and GAAS and (2) PWC knew of and/or was reckless in ignoring red flags.  Opp. at 28-31; AC ¶¶ 247-63.   PWC argues that these two categories of allegations are insufficient, and the more compelling inference is that PWC did not have fraudulent intent.  PWC MTD at 6-8.   The Court will address each in turn.

Auditing Standards Violations

Plaintiff alleges that PWC did not comply with PCAOB standards and generally accepted auditing standards.  AC ¶¶ 247-62; *see* Opp. at 28-30.  PWC argues that these allegations are insufficient because Plaintiff merely "recites a number of such standards and then vaguely asserts that PWC somehow violated them."  PWC MTD at 6.  The Court agrees that Plaintiff's allegations that PWC violated auditing standards are insufficient.  Plaintiff provides conclusory allegations that PWC violated several different PCAOB standards.  More specific factual allegations are required to give rise to a strong inference of scienter.

Red Flags

Plaintiff also alleges that PWC knew of and/or was reckless in ignoring red flags in connection with issuance of the 2020 and 2021 Audit Reports.  AC ¶ 263; *see* Opp. at 30-31. First, Plaintiff alleges that PWC was on notice from at least 2019 that View had an issue with the IGUs for which an accrual had been taken.  AC ¶ 263.  Second, Plaintiff alleges that PWC knew, or was reckless in not knowing, that the excluded labor and freight costs existed because "documentation such as contracts with the subject customer(s) or other readily verifiable facts existed."  *Id.*  Third, Plaintiff alleges that PWC was on notice that View had a history of material

1    weakness in its internal controls. *Id.* And fourth, PWC was on notice that warranty issues could

2    have a substantial negative impact on View's financial statements, given View's relatively small

3    number of customers and suppliers during the class period. *Id.*

4    　　PWC argues that none of these allegations is sufficient to give rise to a strong inference of

5    scienter. PWC MTD at 6-8. The Court agrees. As to the first alleged red flag, the fact that there

6    was a warranty accrual at all was not a red flag that the warranty accrual was incorrectly

7    calculated.

8    　　As to the second red flag, PWC argues that Plaintiff does not identify any documents,

9    conversation, or witness to support the conclusory allegation that documentation of excluded labor

10    and freight costs existed. PWC MTD at 6-7. Plaintiff does point to the following statement in the

11    Proxy Statement/Prospectus: "The estimated cost includes our expectations regarding future

12    reductions in production costs, which are primarily comprised of materials, labor, and factory

13    overhead." AC ¶ 263. But PWC argues that this statement is irrelevant, as it is about production

14    labor costs. As PWC points out, the restatement did not arise from production costs, but rather

15    "the exclusion of 'installation labor and freight costs' incurred in installing the IGUs." PWC

16    MTD at 7 (citing AC ¶ 58). The Court finds that Plaintiff's allegation that PWC knew, or was

17    reckless in not knowing, that the excluded labor and freight costs existed because "documentation

18    such as contracts with the subject customer(s) or other readily verifiable facts existed" is

19    conclusory. *See* AC ¶ 263. The Court notes that the statement from the Proxy

20    Statement/Prospectus does not show that PWC was on notice of, or reckless in not knowing of, the

21    installation labor and freight costs.

22    　　The third alleged red flag is that PWC was on notice that View had a history of material

23    weaknesses in its internal controls. AC ¶ 263. As PWC notes, other courts in this Circuit have

24    rejected this allegation as "boilerplate." *See Buttonwood Tree Value Partners*, 2012 WL 2086607,

25    at *2; *In re Peregrine Sys., Inc. Sec. Litig.*, No. 02CV870-BEN (RBB), 2005 WL 8158825, at *53,

26    67 (S.D. Cal. Mar. 30, 2005) (collecting cases).

27    　　Finally, the Court finds that Plaintiff's fourth alleged red flag as to the size of View's

28    business is insufficient. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir.

United States District Court
Northern District of California

1   2008).

2          The totality of Plaintiff's allegations do not give rise to a strong inference of scienter by

3   PWC.

4                  c.   Conclusion

5          Plaintiff has not adequately alleged a Section 10(b) claim against PWC.

6          **5.   Scheme Liability**

7          Plaintiff pleads a "scheme liability" claim under Section 10(b) and Rule 10b-5(a) and (c).

8   AC ¶¶ 273-81.  Defendants View, Mulpuri, and Prakash argue that the scheme liability claim fails

9   for the same reason as the other Section 10(b) claim.  View MTD at 8-9; Prakash MTD at 4.  A

10  claim for scheme liability requires the same elements as the other Section 10(b) claim.  *See In re*

11  *Aqua Metals, Inc. Sec. Litig.*, No. 17-cv-07142-HSG, 2019 WL 3817849, at *8 (N.D. Cal. Aug.

12  14, 2019).  For the reasons stated above, the scheme liability claim fails.

13         **6.   Conclusion**

14         For the reasons stated above, the Section 10(b) claims are DISMISSED WITH LEAVE TO

15  AMEND.

16         **E.   Section 15 and Section 20(a) Claims (Counts 2, 5, and 8)**

17         Plaintiff alleges a Section 20(a) claim against Individual View Defendants and CF

18  Defendants.  AC ¶¶ 172-78.  Plaintiff alleges a Section 20(a) claim against Mulpuri, Prakash, and

19  CF Defendants except Blechman and Hochberg.  *Id.* ¶¶ 282-86.  And Plaintiff alleges a Section 15

20  claim against CF Defendants.  *Id.* ¶¶ 206-15.  Defendants move to dismiss these claims.  View

21  MTD at 15; Prakash MTD at 4; LH MTD at 4; CF MTD at 8-9.

22         Section 20(a) and Section 15 both require underlying primary violations of the securities

23  laws.  *Rigel*, 697 F.3d at 886; *see also* 15 U.S.C. §§ 77*o*, 78t(a).  Because Plaintiff here has failed

24  to adequately plead a violation of the federal securities laws, it follows that Plaintiff has have

25  failed to adequately plead violations of Section 20(a) and Section 15.  In an amended pleading,

26  Plaintiff must plead control violations Defendant by Defendant.

27         The Section 20(a) and 15 claims are DISMISSED WITH LEAVE TO AMEND.

28

*United States District Court*
*Northern District of California*

## V.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' Motions to Dismiss are GRANTED WITH LEAVE TO AMEND.  Any amended complaint shall be filed within 90 days of the entry of this order.

The amended complaint shall include a chart listing numerically each alleged false or misleading statement, the speaker, date, reason for claim of falsity and scienter.  The chart shall also cite the paragraphs in the amended complaint where the allegations are made.  Plaintiffs shall also provide the Court a redlined version of the amended complaint.


Dated:  May 22, 2023

_____
BETH LABSON FREEMAN
United States District Judge