Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:  415-772-4707
Emails: *lking@kaplanfox.com*
         *kherkenhoff@kaplanfox.com*
         *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
         *ffox@kaplanfox.com*
         *dhall@kaplanfox.com*
         *juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium Capital*
*LLC, Plaintiff David Sherman and the Proposed Class*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>    v.<br><br>VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., AND CF GROUP MANAGEMENT, INC.,<br><br>             Defendants. | Case No.: 5:21-cv-06374-BLF<br><br><u>**CLASS ACTION**</u><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF THE ACTION ............................................................................. 1

II.  JURISDICTION AND VENUE ......................................................................... 6

III.  DIVISIONAL ASSIGNMENT ........................................................................... 6

IV.  PARTIES ............................................................................................................ 7

    A.  Lead Plaintiff and Additional Plaintiff .................................................. 7

    B.  Defendant View ..................................................................................... 7

    C.  Individual View Defendants .................................................................. 7

    D.  CF II Defendants ................................................................................... 9

V.  OVERVIEW OF THE RESTATEMENT ........................................................ 13

VI.  BACKGROUND ............................................................................................... 15

    A.  View's Background and Business .......................................................... 15

    B.  Background on CF II .............................................................................. 15

    C.  View's Business Combination With CF II ............................................ 15

    D.  View Decides to Cover Costs of Installing Replacement Windows ..................... 19

    E.  The Audit Committee of the Board of Directors Finds Both Negligent and Intentional Conduct Causing The Company's Warranty Accruals to Be Materially Misstated ............................................................................. 21

VII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD ......................... 22

    A.  Announcement of the Business Combination on November 30, 2020 ................ 22

    B.  The December 23, 2020 De-SPAC Registration Statement, of Which the Proxy Statement Formed a Part ........................................................... 24

    C.  The January 26, 2021 Amendment to the De-SPAC Registration Statement, of which the Proxy Statement Formed a Part ...................................... 27

    D.  View Filings As A Public Company ...................................................... 28

        1.  The March 12, 2021 Form 8-K ................................................. 28

        2.  The April 7, 2021 Shelf Registration Statement ....................... 34

        3.  The May 12, 2021 Press Release ............................................... 34

        4.  The May 17, 2021 10-Q ............................................................. 36

VIII.  THE TRUTH BEGINS TO EMERGE ............................................................ 42

**TABLE OF CONTENTS – cont'd.**

Page

IX.     RELEVANT POST CLASS PERIOD EVENTS ............................................... 44

X.      LOSS CAUSATION ...................................................................................... 46

        A.      The August 16 and November 9, 2021 Corrective Disclosures Concerning
                View's Misstated Warranty Accruals ................................................. 47

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE; FRAUD ON THE
        MARKET ....................................................................................................... 48

XII.    CLASS ACTION ALLEGATIONS ................................................................ 50

XIII.   COUNTS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE
        EXCHANGE ACT .......................................................................................... 52

XIV.    ADDITIONAL FACTUAL ALLEGATIONS RELATING TO CLAIMS UNDER
        SECTION 10B AND RULE 10-b-5 OF THE EXCHANGE ACT ................... 61

        A.      Defendants View and Prakash Acted With Knowledge or Deliberate
                Recklessness .................................................................................... 61

                1.      Defendants View and Prakash Were Aware of the Installation Costs
                        and Failed to Ensure the Ensure They Were Included in View's
                        Warranty Liability ................................................................. 62

        B.      There Were Numerous Suspiciously-timed Resignations of View
                Executives and Directors ................................................................... 65

        C.      Smart Glass Was View's Core Product and Its Operations Centered on A
                Relatively Narrow Customer, Supplier, and Manufacturing Framework ............ 66

        D.      View's Proxy Statement And Other SEC Filings Alleged Herein Included
                Financial Statements Not In Conformity With GAAP ......................... 67

        E.      View's Restatement Is An Admission That The Subject Financials Were
                Materially False As Initially Reported ................................................ 68

        F.      Corporate Scienter and *Respondeat Superior* ...................................... 70

XV.     NO SAFE HARBOR ...................................................................................... 70

XVI.    COUNTS FOR VIOLATIONS OF SECTIONS 10 AND 20(a) OF THE
        EXCHANGE ACT .......................................................................................... 71

XVII.   PRAYER FOR RELIEF .................................................................................. 73

XVIII. JURY DEMAND ............................................................................................ 73

Lead Plaintiff Stadium Capital LLC, on behalf of itself and a class of similarly situated investors ("Lead Plaintiff") and Plaintiff David Sherman (collectively "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are each alleged upon personal knowledge. Plaintiffs' information and belief is based upon, *inter alia*, counsel's investigation, which included review and analysis of: 1) the public filings made by View Inc. ("View" or the "Company") (f/k/a CF Finance Acquisition Corp. II ("CF II")) with the United States Securities and Exchange Commission ("SEC"); 2) press releases and media reports issued by and disseminated by the Company; 3) analyst reports, media reports, and other publicly disclosed reports and information about the Company; 4) conference calls with Company executives, analysts, and investors; 5) the complaint on file in *Securities and Exchange Commission v. Prakash*, Case 3:23-cv-03300 (N.D. Cal.) (the "SEC Action") and the complaint on file in the SEC Action (the "SEC Cpt."); 6) the pleadings and record in *In the Matter of View, Inc*., Administrative Proceeding File No. 3-21505 pending before the Securities and Exchange Commission (the "SEC Admin. Proc. Action") and the Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order (the "July 3, 2023 C&D Order"); and 7) publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of View's securities. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     SUMMARY OF THE ACTION

1.     This securities class action is brought on behalf of a class consisting of (i) all persons or entities who purchased or otherwise acquired View and/or CF II securities between November 30, 2020 and November 9, 2021, inclusive (the "Class Period"); and (ii) all persons or entities who were holders of CF II Class A common stock as of the January 27, 2021 record date (the "Record Date") that were entitled to vote to approve the Business Combination (as defined below) between View and CF II as set forth in the February 16, 2021 Proxy Statement (defined below) (the "Class").

2.      Plaintiffs bring claims on behalf of the Class against View and certain of its current and former officers and directors, certain former officers and directors of CF II, CF Finance Holdings II, LLC (CF II's sponsor), Cantor Fitzgerald & Co. (CF II's advisor on the Business Combination), Cantor Fitzgerald, L.P. (an affiliate of CF II, CF Finance Holdings II, LLC and of Cantor Fitzgerald & Co., and the sole member of the Sponsor), and CF Group Management, Inc. (Cantor Fitzgerald, L.P.'s managing general partner) (collectively, "Defendants") for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a) and Rules 10b-5 and 14a-9, promulgated thereunder, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9.

3.      View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption in buildings or structures. During the Class Period, View's primary product was a proprietary electrochromic or "smart" glass panel that adjusted in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

4.      CF II was a special purpose acquisition company (or "SPAC") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.

5.      On March 8, 2021, pursuant to an Agreement and Plan of Merger dated November 30, 2020 ("Merger Agreement"), and the other transactions described in the Merger Agreement, CF II and View combined via a business combination with CF II (now referred to as View) as the surviving, public entity (the "Business Combination").

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants have now admitted that View's financial statements for fiscal years ending 2019-2020 and certain quarterly periods as detailed herein that are set forth in SEC filings alleged herein, were materially false when issued and, were required to be restated.  These financial statements were misrepresentations of then-existing material facts, that also failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading

because Defendants excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows (the "Defect"); (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities certain costs it incurred and intended to incur when replacing the Company's insulated glass units ("IGUs"), including installation labor and freight costs (the "Installation Costs") that View's leadership, including Defendant Rao Mulpuri ("Mulpuri") and its Chief Business Officer ("CBO"), Rahul Bammi ("Bammi"), determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

7.     Similarly, throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the standard assurance type warranty provided by View for 10 years from the date of delivery to customers. These statements were misrepresentations of then-existing material facts, that also failed to disclose to investors that in addition to warrantying the IGUs' materials and workmanship, View's leadership, including Defendant Mulpuri and Bammi, determined by no later than early 2020 that View would also cover the Installation Costs for all customers whose windows had the Defect. Defendant Mulpuri admitted this after the Class Period, stating on a May 31, 2022 conference call with analysts and investors that "While we solved the problem [with the Defect] going forward [after 2019], we needed to support the customers that experienced failed IGUs due to this issue. Our standard warranty contractually covers only the parts we supply, and we have honored every contract by providing replacements. ***In addition, we voluntarily went above and beyond our contractual obligation to care for affected customers, and as a result, incurred additional costs.***"

8.     The Company's decision to cover all Installation Costs related to the Defect was made at the highest levels of the Company and was discussed at executive staff meetings throughout

2019 to 2021.  The decision was widely known, including at least by View's leadership (including CEO Mulpuri, CBO Bammi, and Chief Financial Officer Vidul Prakash), the Defect Response Team (as further discussed herein, this team tracked Defects at customer sites, managed the process of replacing the windows, and trained View's Customer Success Department), the Customer Success Department (as further discussed herein, this department was responsible for managing the replacement of windows with the Defect at customer sites), and the Finance department.

9.      In addition to accounting department records, the Installation Costs that were excluded from the Company's warranty accrual were widely available from numerous sources at View, including in the purchase requisitions themselves (the requests to buy services for Installation Costs), from the Customer Success Department (the department that submitted purchase requisitions for the Installation Costs), the Finance department (the department through which purchase requisitions for the Installation Costs were submitted), the Defect Response Team, and were also contained and/or reflected in View's budget for Installation Costs which was prepared by Bammi.

10.      On August 16, 2021, after the market closed, View announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual."

11.      On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

12.      On November 9, 2021, after the market closed, View announced that the Audit Committee "has now substantially completed its independent investigation and has concluded that the Company's previously reported liabilities associated with all warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated." As a result, the Company will be restating its previously issued 2019 and 2020 annual and certain unaudited interim financial statements and its Q1 2021 and 2020 unaudited interim financial statements."  View further announced that it expected to restate its previously reported $22 million warranty-related accrual as of March 31, 2021, to an amount in the range of $40 to $58 million over

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

the course of the same ten-year product warranty period.  View further announced that Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

13.     On this news, the Company's share price fell $0.77, or 13.68%, to close at $5.63 per share on November 10, 2021 on unusually heavy trading volume.  The Company's share price fell an additional $0.22, or 3.9%, to close at $5.41 on November 11, 2021 on heavy trading volume.

14.     On January 4, 2022, View announced that the Company expected to issue its restated financials "in the first quarter of 2022."  Then, on March 28, 2022, View announced a delay in the timing of its expected financial restatement, and it indicated that the Company expected to complete its financial restatement "in May 2022."

15.     Finally, on May 31, 2022, View reported that its yet-to-be restated warranty-related accruals would be $53 million, $48 million, and $42 million as of December 31, 2019, 2020, and 2021 respectively, revealing that these key metrics were falsely understated in View's financial statements filed with the SEC by more than 100%.

16.     On June 15, 2022, View filed its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 10-K"), an amendment to its quarterly report on Form 10-Q/A for the period ended March 31, 2021 (the "1Q21 10-Q/A"), and quarterly reports on Form 10-Q for the periods ended June 30 (the "2Q21 10-Q") and September 30, 2021 (the "3Q21 10-Q"), marking the completion of the financial restatement.  In its 2021 10-K, View announced that in January 2022 the Company was informed that the SEC was conducting a formal investigation of its previously reported warranty accrual.

17.     On July 3, 2023, the SEC announced that it settled charges against View for failing to disclose $28 million in projected warranty-related liabilities to address a particular defect in its windows.  The SEC Order found that View violated negligence-based antifraud, proxy disclosure, reporting, books and records, internal accounting controls, and disclosure controls provisions of the federal securities laws, including Section 14(a) of the Exchange Act.  The SEC also announced charges against View's former CFO, Vidul Prakash, for his failure to ensure that the warranty-related liabilities were disclosed.  The SEC's complaint charges him with violating negligence-

based antifraud, proxy disclosure, and books and records provisions of the federal securities laws, including Section 14(a) of the Exchange Act.

18.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and members of the Class have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

19.     The federal law claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.     DIVISIONAL ASSIGNMENT

23.     Pursuant to Civil L.R. 3-2(c), this action arises in Santa Clara County because a substantial part of the events or omissions giving rise to the claim occurred in Santa Clara County due to the fact that View is headquartered in Milpitas, California.  Accordingly, this action is properly assigned to the San Jose Division of this District.

## IV.   PARTIES

### A.   Lead Plaintiff and Additional Plaintiff

24.   Lead Plaintiff Stadium Capital LLC suffered damages as a result of its Class Period purchases of View securities at artificially inflated prices, as set forth in the PSLRA certification attached hereto as Exhibit B.

25.   Plaintiff David Sherman suffered damages as a result of his Class Period purchases of View securities at artificially inflated prices, as set forth in the PSLRA certification attached hereto as Exhibit C.

### B.   Defendant View

26.   Defendant View is incorporated under the laws of Delaware with its principal executive offices located at 195 S. Milpitas Blvd., Milpitas, California 95035. View's Class A common stock trades on the Nasdaq exchange under the symbol "VIEW." Its redeemable warrants trade on the Nasdaq exchange under the symbol "VIEWW," where each whole warrant is exercisable for one share of Class A common stock at an exercise price of $11.50.

### C.   Individual View Defendants

27.   Defendant Rao Mulpuri ("Mulpuri") is, and at all relevant times was, the Company's Chief Executive Officer ("CEO").   Mulpuri has served as a director of View since at least November 30, 2020 and was elected to become a View director on the closing of the Business Combination.   Defendant Mulpuri signed the Merger Agreement, which was attached to the Proxy Statement, on behalf of Legacy View.   Defendant Mulpuri signed View's April 7, 2021 Shelf Registration Statement, and View's 1Q 2021 Form 10-Q (defined below).   Further, Defendant Mulpuri signed certifications pursuant to SOX that were attached as exhibits to the 1Q 2021 Form 10-Q.   Mulpuri also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and in oral communications to the media.   Mulpuri's name was used throughout the Proxy Statement: his name was mentioned over 50 times in the Proxy/Prospectus was View's CEO; the statement included his biography, which touted his relevant experience and credentials and stated that "View believes Mr. Mulpuri is qualified to serve as a member of the Combined Entity Board due to his extensive executive

management and technology industry leadership experience as well as his deep knowledge of View's technology and business operations"; and the Proxy/Statement Prospectus stated that Mulpuri would also be an executive officer (CEO) and Chairman of the Board of the merged entity. Attached to the November 30, 2020 8-K was an investor presentation (the "November 30, 2020 Investor Presentation") that would be used by CF II and View with respect to the Business Combination.  Mulpuri was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary" and one-page "Overview of Sponsor") in a slide titled "Overview of View Executives" which touted that he "[b]uilt View from the ground up over the last 12 years" as well has his relevant experience and credentials.  Defendant Mulpuri's last known business address is at View's location of 195 S. Milpitas Blvd., Milpitas, California 95035.

28.     Defendant Vidul Prakash ("Prakash") was the Company's Chief Financial Officer ("CFO") at all relevant times.  Prakash also solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.  Prakash's name was used throughout the Proxy Statement: his name was mentioned over 20 times in the Proxy Statement as View's CFO; the statement included his biography, which noted that he joined View "with over 25 years of global finance and operations experience in private and public companies ranging from startups to Fortune 100"; and the Proxy Statement stated that Prakash would also be an executive officer (CFO) of the merged entity (specifically noting at page 38 that "executive officers" such as Prakash "have interests in" the proposals in the Proxy Statement). Prakash was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary" and one-page "Overview of Sponsor") in a slide titled "Overview of View Executives" which touted his "25 years of finance & operations experience scaling private and public companies" as well as his relevant experience and credentials.  Prakash signed View's Current Report on Form 8-K filed on March 12, 2021, View's April 7, 2021 Shelf Registration Statement (defined below), View's Current Report on Form 8-K filed on May 12, 2021, and 1Q 2021 Form 10-Q (defined below).  Further, Defendant Prakash signed certifications pursuant to SOX that were attached as exhibits to the 1Q 2021 Form 10-Q.  In

connection with the internal investigation findings, Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

29.     Defendants Mulpuri and Prakash (collectively the "Individual View Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.

30.     View and the Individual View Defendants are referred to collectively as the "View Defendants."

**D.     CF II Defendants**

31.     Howard W. Lutnick ("Lutnick") was CEO and chairman of the board of CF II and signed the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined below) formed a part.  Defendant Lutnick also signed a November 30, 2020 Current Report filed with the SEC on Form 8-K, which contained an exhibit consisting of an investor presentation that would be used by CF II and View with respect to the transactions contemplated by the merger agreement.  Defendant Lutnick is also the Chairman, President, and Chief Executive Officer of Cantor Fitzgerald, L.P. ("Cantor"), a Delaware limited partnership, an affiliate of CF II and of Cantor Fitzgerald & Co. ("CF&Co.").  Defendant Lutnick solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement and in oral communications to the media.  Lutnick was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary") in a slide titled "Overview of Sponsor" which touted that he joined Cantor Fitzgerald in 1983 and was appointed President and CEO in 1991, and named Chairman in 1996 as well as his relevant experience and credentials.  The slide also touted that Cantor Fitzgerald, L.P. "is a leading investment Bank led by a highly experienced executive team in Howard Lutnick, Chairman and CEO and Anshu Jain, President.  Cantor [Fitzgerald, L.P.] is a leading SPAC franchise and the top SPAC underwriter in 2019" as well as Cantor Fitzgerald, L.P.'s relevant credentials.

32.     Paul Pion ("Pion") was Chief Financial Officer and a director of CF II and signed the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined

below) formed a part.  Defendant Pion signed the Merger Agreement, which was attached to the Proxy Statement, on behalf of CF II.  Defendant Pion resigned as CFO, director and member of the Audit Committee of CF II as of January 31, 2021.  Defendant Pion solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

33.     Alice Chan ("Chan") was Chief Financial Officer and a director of CF II and signed the February 11, 2021 Amendment to the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined below) formed a part.  Defendant Chan was appointed as Chief Financial Officer and elected as a member of the Board's first class of directors and as member of the audit committee of the Board effective January 31, 2021, replacing Defendant Pion. Defendant Chan solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

34.     Anshu Jain ("Jain") was President and a director of CF II and signed the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined below) formed a part.  Defendant Jain solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

35.     Robert J. Hochberg ("Hochberg") was a director of CF II and signed the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined below) formed a part.  Defendant Hochberg solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

36.     Charlotte S. Blechman ("Blechman") was a director of CF II and signed the De-SPAC Registration Statement (as defined below), of which the Proxy Statement (as defined below) formed a part.  Defendant Blechman solicited and/or permitted the use of his name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

37.     Defendants Lutnick, Pion, Chan, Jain, Hochberg, and Blechman are referred to collectively as the "CF II Individual Defendants."

38.     Defendant CF Finance Holdings II, LLC (the "Sponsor" or "CF Holdings II"), is a Delaware limited liability company that acted as CF II's sponsor for the Business Combination.

Cantor is reportedly the sole member of the Sponsor, and CF Group Management, Inc. ("CFGM") is the managing general partner of Cantor.  Defendant Lutnick is the CEO of CFGM and is the trustee of CFGM's sole stockholder.  As set forth in the Proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor."  CF II's initial registration statement admits that Sponsor controls CF II, stating that "[o]ur initial stockholders[, Sponsor and Lutnick,] will control the election of our board of directors until consummation of our initial business combination and will hold a substantial interest in us. As a result, they will elect all of our directors prior to the consummation of our initial business combination and may exert a substantial influence on actions requiring a stockholder vote . . . ."  CF II's initial registration statement also admits that "our initial stockholders may be able to effectively influence the outcome of all matters requiring approval by our stockholders . . . including approval of our initial business combination".  Defendant CF Holdings II solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.  During the Class Period, the Sponsor's principal business address was c/o CF Finance Acquisition Corp. II, 110 East 59th Street, New York, NY 10022.

39.     Defendant Cantor Fitzgerald & Co. ("CF&Co.") served as CF II's financial and capital markets advisor in connection with the Business Combination, for which it was to be paid a cash fee upon the consummation of the Business Combination in an amount equal to, in the aggregate, 3.5% of the gross proceeds of the base offering and 5.5% of the gross proceeds from the full or partial exercise of the underwriters' overallotment option.   CF&Co. served as the representative of the underwriters for the CF II IPO, and CF II paid a total of $10 million in underwriting discounts and commissions for CF&Co.'s services.  CF II also agreed to a cash fee for CF&Co.'s services as an advisor in connection with the Business Combination, agreeing to pay an amount equal to, in the aggregate, 3.5% of the gross IPO proceeds.  On the consummation of the Business Combination, CF&Co. was slated to receive $17.5 million in marketing fees, $7.5 million in M&A advisory fees payable in CF II common stock, and $4.5 million of placement agent fees. CF&Co. (and Goldman Sachs & Co. LLC) served as placement agents for the PIPE financing referenced herein.  Defendant CF&Co. solicited and/or permitted the use of its name to solicit

consent or authorization for the Business Combination by issuing the Proxy Statement. CF&Co.'s role was, at least in part, to assist CFII with arranging stockholder meetings, introduce CFII to potential investors, assist CFII's efforts to obtain any stockholder approval for the proposed Business Combination, and assist with press releases and/or filings related to the Business Combination.

40.     Defendant Cantor Fitzgerald, L.P. ("Cantor") is an affiliate of CF II, the Sponsor and of CF&Co. Defendant Lutnick is the Chairman, President, and CEO of Cantor. CFGM is the managing general partner of Cantor. Cantor is the sole member of the Sponsor. As set forth in the proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor." CF II's initial registration statement admits that "We, our sponsor [CF Holdings II] and CF&Co are controlled by Cantor." Defendant Cantor solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement. Cantor was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary") in a slide titled "Overview of Sponsor" which touted that Cantor "is a leading investment Bank led by a highly experienced executive team in Howard Lutnick, Chairman and CEO and Anshu Jain, President. Cantor [Fitzgerald, L.P.] is a leading SPAC franchise and the top SPAC underwriter in 2019" as well as Cantor's relevant credentials.

41.     Defendant CF Group Management, Inc. ("CFGM") is the managing general partner of Cantor. Defendant Lutnick, CF II's Chairman and Chief Executive Officer, is the trustee of CFGM's sole stockholder. As set forth in the proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor." Defendant CFGM solicited and/or permitted the use of its name to solicit consent or authorization for the Business Combination by issuing the Proxy Statement.

42.     CF Holdings II, CF&Co., Cantor and CFGM are referred to collectively as the "CF II Entity Defendants."

43.     The CF II Individual Defendants and the CF II Entity Defendants are collectively referred to as the "CF II Defendants".

44.     The View Defendants and CF II Defendants are referred to collectively as "Defendants."

## V.     OVERVIEW OF THE RESTATEMENT

45.     As set forth herein, View's financial statements during the Class Period (and those included in the Proxy Statement) were false and misleading when issued and have now been restated as summarized below.  This includes restatement of View's financial statements for fiscal year end ("FYE") December 31, 2019 and 2020, as well as for the quarterly periods ending March 31, 2020 and March 31, 2021.

46.     As detailed herein, when a Company restates its financials it revises previously issued financial statements to reflect the correction of an error in those financial statements.  In other words, when a restatement occurs, it indicates that the financials were false at the time they were issued.

47.     On June 15, 2022, View filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K") to correct the Company's reported warranty-related obligations and other misstatements contained in the previously issued 2020 and 2019 financial statements.  As set forth herein, the restatement is principally attributed to a warranty accrual issue related to a quality issue (the Defect) identified in 2019 (before the Business Combination) with certain material purchased from one of its suppliers utilized in the manufacturing of certain of the Company's IGUs. The 2021 10-K at page 107 admits, among other things, that the Company had:

>          . . .inappropriately excluded from the warranty obligation the installation labor and freight costs that it had incurred, expected to continue to incur, when replacing the IGUs.  It was also determined that partially offsetting the misstatement which understated the warranty obligation was another misstatement resulting in an overestimate in the estimated failure rates of the impacted IGUs. As a result of these material misstatements, the Company's warranty liabilities were understated by $25.0 million as of December 31, 2020 and the Company's Cost of Revenue and Net Loss were

overstated by $3.1 million and understated by $20.9 million for the years ended December 31, 2020 and 2019, respectively, as well as understated by $7.1 million for periods prior to 2019, which has been corrected for as an adjustment to Accumulated Deficit as of December 31, 2018.

48.     As set forth herein, by no later than early 2020, several months prior to the November 30, 2020 Merger Agreement, View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined that View, in addition to warrantying the IGUs' materials and workmanship, would cover the Installation Costs for all customers whose windows had the Defect.  Such costs were material amounts already "incurred" or "expected" to be incurred at the time of the issuance of the subject financials and were improperly omitted from the prior warranty accrual amounts set forth in the historic financial statements disseminated to the Class in connection with the Company's SEC filings detailed herein.

49.     As a result, the 2021 10-K, for FYE 2020, reported amended and restated financial information as follows (the Warranty Accrual figures set forth in the following chart and similar charts contained herein were reported by the Company in a press release filed on Form 8-K with the SEC on May 31, 2022):

| Financial Metric FYE 2020 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $23 million | $48 million |
| Accrued expenses and other current liabilities | $36.480 million | $42.150 million |
| Other liabilities | $36.731 million | $56.844 million |

50.     The 2021 10-K, for FYE 2019, reported amended and restated financial information as follows:

| Financial Metric FYE 2019 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $25 million | $ 53 million |

| Cost of revenue | $179.675 million | $203.732 million |
|---|---|---|
| Accrued expenses and other current liabilities | $26.779 million | $47.645 million |
| Other liabilities | $34.051 million | $53.290 million |
| Net loss | $289.904 million | $312.109 million |

## VI.   BACKGROUND

### A.   View's Background and Business

51.     View is a technology company that manufactures smart building products that are purportedly designed to improve people's health, productivity, and experience while reducing energy consumption. Its primary product is a proprietary electrochromic or "smart" glass panel that, in combination with the Company's proprietary network and software, intelligently adjusts in response to the sun by tinting from clear to dark states, thereby reducing heat and glare.

### B.   Background on CF II

52.     CF II was a special purpose acquisition company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses.  Prior to the completion of its merger with View, CF II's Class A Common Stock, Units, and Warrants were listed on Nasdaq under the symbols "CFII", "CFIIU" and "CFIIW", respectively.

### C.   View's Business Combination With CF II

53.     On September 1, 2020, CF II, a New York City-based special purpose acquisition company, announced that it consummated its initial public offering of 50 million units at $10 per share, resulting in gross proceeds of $500 million. The units traded on Nasdaq under the ticker symbol "CFIIU". Each unit consisted of one share of CF II's Class A common stock and one-third of one warrant, with each whole warrant enabling the holder thereof to purchase one share of Class A common stock at a price of $11.50 per share. When the shares of Class A common stock and warrants began separate trading, they traded on Nasdaq under the symbols "CFII" and "CFIIW."

54.     Known as a "blank check" company, CF II was formed by Defendants Lutnick, Jain, and Pion for the purpose of entering into a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more businesses in the diversified resources and industrial materials sectors.  Upon the consummation of the IPO, CF II's management team commenced an active search for prospective businesses to acquire in its initial business combination.  View was identified as an acquisition target through the networks of relationships of its management team, the Sponsor and their affiliates (including CF&Co.).  In July 2020, View and CF Finance Acquisition Corp., a prior special purpose acquisition company sponsored by an affiliate of Cantor ("CF I"), were introduced to each other. Preliminary conversations were held on July 15, 2020 and the parties entered into a non-disclosure agreement on July 17, 2020.  View and CF I had additional discussions after executing the non-disclosure agreement but did not move forward with entering into a business combination because CF I executed a transaction agreement with another target business on August 2, 2020 at which time it ceased discussions with other potential target businesses, including View.

55.     On November 30, 2020, CF II announced a definitive agreement for a business combination with Defendant View that would result in View becoming a publicly listed company. To affect the Business Combination, PVMS Merger Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of CF II, merged with and into View, with View surviving the merger.  The transaction was expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CF II's trust account from its initial public offering. The transaction was further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

56.     Goldman Sachs & Co. LLC acted as exclusive financial advisor to View in connection with the transaction.  CF&Co. acted as financial and capital markets advisor to CF II in connection with the transaction.  CF&Co. and Goldman Sachs & Co. LLC served as placement agents for the PIPE financing.

57.     Each of the CF II Defendants was provided reasonable access to all of View's properties, books, contracts, tax returns, records and appropriate officers and employees of View,

including View's books of account, ledgers, order books, and other financial documents reflecting all material information relating to View's business and the nature of all transactions giving rise to its obligations, as well as representatives with all financial and operating data and other information concerning the affairs of View that were in the possession of the View.

58.     The Proxy Statement describes at pages 138 to 151 the "Background of the Business Combination" and the "CF II Board's Reasons for Approval of the Business Combination". Each of the CF II Defendants were permitted access to a virtual data room containing diligence materials during the week of September 14, 2020 (the "Data Room"). Between November 25 to November 29, 2020, each of the respective boards of Legacy View and CFII approved entry into the Merger Agreement to undertake the Business Combination.

59.     On September 7, 2020, View began preparing the Data Room to provide CF II with the due diligence materials it had requested from View.

60.     During the week of September 14, 2020, CF II and its representatives were invited into the Data Room so that CF II could begin its diligence of View.  Beginning on September 18, 2020 and continuing through the next several weeks, the CF II management team and its advisors continued its due diligence of View, including reviewing all materials in the Data Room, requesting additional documentation, reviewing additional information provided, and holding various due diligence video and telephonic conferences with View's management team, employees and advisors. Additional information was provided in the Data Room and a number of follow-up diligence calls were hosted over the next several weeks as requested by CF II during which CF II and View discussed an overview of View and its current and future products, View's technology, operations, sales and marketing, View's corporate legal structure and material contracts, View's intellectual property portfolio, View's factory and environmental matters, View's historical, current and projected financial condition and financial modeling, View's employment structure, human resources and related matters and other diligence matters. Further detailed information provided by View included detailed financial and reporting backup, detailed contract and legal documentation, and a full projection model.  Such diligence continued as requested by CF II up through negotiation and finalization of the definitive documentation and associated schedules.

61.     While CF II engaged CF&Co. as its financial advisor for the Business Combination, CF II did not obtain a third-party valuation or fairness opinion in connection with the Business Combination, and waived "any conflicts" arising from the role of Goldman Sachs as financial advisor to View for the Business Combination and role as placement agents for the PIPE Investment.

62.     On December 23, 2020, CF II filed a proxy statement/prospectus (the "Proxy Statement") as part of a registration statement for View on Form S-4 with the SEC (the "De-SPAC Registration Statement") which was, pursuant to Section 7.2(a) of the Merger Agreement, to be "prepare[d]" by CF II and View.  The De-SPAC Registration Statement, of which the Proxy Statement formed a part, was amended on January 26, 2021 and February 11, 2021 on Form S-4/A. The CF II Individual Defendants signed the De-SPAC Registration Statement.

63.     The Proxy Statement stated that the CF II Board (including, at that time, the CF II Individual Defendants: Lutnick, Pion, Chan, Jain, Hochberg, and Blechman) unanimously recommends that CF II stockholders vote in favor of the Business Combination.  The Proxy Statement also stated that the View Board (including, at that time, Defendants Mulpuri, Gormly, Cheung, Patterson and Veghte) unanimously approved the entry into the Merger Agreement and the Transactions and certain other matters.

64.     Before reaching its decision, the CF II Board reviewed the results of the due diligence conducted by its management, employees of Cantor and CF II's advisors, which included: (1) extensive meetings and calls with the management team and advisors of View regarding, among other things, operations and forecasts; (2) review of material contracts and other material matters; (3) financial, tax, legal, insurance, accounting, operational, business and other due diligence; (4) consultation with CF II management and its legal counsel and financial advisors; (5) review of historical financial performance of View (including audited and unaudited financials) and View's management projections for View's business; and (6) financial and valuation analyses of View and the Business Combination.

65.     On January 11, 2021, Defendants issued a joint press release announcing an additional PIPE investment of $200 million, increasing the fully committed PIPE investment from

$300 million to $500 million. With the additional $200 million PIPE investment, the transaction was expected to deliver up to $1 billion of gross proceeds.

66.     On February 16, 2021, Defendants caused CF II to file an amendment to Proxy Statement with the SEC on Form 424(b)(3), which was incorporated into and formed part of the De-SPAC Registration Statement. On February 17, 2021, the SEC declared the De-SPAC Registration Statement effective.

67.     The Proxy Statement invited CF II investors to solicit proxies to vote to approve the Business Combination at a special meeting to be held on March 5, 2021. The record date for the special meeting was January 27, 2021.

68.     The Proxy Statement recommended that CFII shareholders vote in favor of the Business Combination as being in their best interests and also stated that the View Board determined that the Business Combination Proposal is in the best interests of View and its stockholders.

69.     Upon closing of the transaction, the combined entity would be named "View, Inc." and would remain listed on the Nasdaq and trade under the new ticker symbol "VIEW."  Under the proposed transaction, at closing, View would receive approximately $815.2 million in cash (reportedly $518.3 million after retiring existing debt), which was a combination of CF II cash and cash from the PIPE (private investment in public entity) investment.

70.     The Business Combination was approved by CF II stockholders in a special meeting held on March 5, 2021, and the Business Combination was consummated on March 8, 2021.

71.     On March 8, 2021, View announced that it completed the Business Combination with CF II.  Beginning on March 9, 2021, View's common stock and warrants began trading on the Nasdaq under the new ticker symbols "VIEW" and "VIEWW".

**D.     View Decides to Cover Costs of Installing Replacement Windows[1]**

72.     In 2019, View discovered a defect in the sealing component manufactured by a third-party supplier for some of its windows (the "Defect").  Upon discovering the Defect, View stopped using that defective seal for its windows.

---

[1] The allegations in this section are based on the pleadings and other filings in the SEC Action.  In

73.     View's standard 10-year written warranty obligated View to provide replacement windows for those that had failed due to the Defect, but did not require View to pay the costs of installing or shipping the replacement windows. Nonetheless, when View identified the Defect, its leadership, including its Chief Executive Officer (Defendant Mulpuri) and its Chief Business Officer (Rahul Bammi) decided that View would incur the costs of installing and shipping the replacement windows (the "Installation Costs") for all customers whose windows had the Defect.

74.     As CFO, Prakash attended regular meetings of View's executive staff, which also included Defendant Mulpuri, and non-defendant Rahul Bammi and other View executives. The Defect was discussed at executive staff meetings throughout 2019 to 2021. During those meetings, the executives discussed View's decision to cover Installation Costs and how to communicate with View's customers about the Defect.

75.     By no later than early 2020, several months prior to the November 30, 2020 Merger Agreement, View's CBO had told Defendant Prakash that View had decided to cover Installation Costs for its customers, even though View's management did not believe the warranty obligated it to do so.

76.     Around early 2020, Bammi assembled a team (the "Defect Response Team") to manage View's response to the Defect, including tracking Defects at customer sites, managing the process of replacing the windows, and training View's Customer Success department – the View staff responsible for managing the replacement of windows with the Defect at customer sites.

77.     When View learned that a customer had a window with the Defect, View's Customer Success department advised the customer that View would cover the customer's Installation Costs (in addition to providing the customer replacement windows, as required under View's written warranty).

---

the SEC Action, View provided the Commission staff with, *inter alia*, documents and witnesses (including both informal interviews and subpoenaed testimony) and detailed explanations and summaries of specific factual issues at all stages of the SEC staff's investigation. *See* July 3, 2023 C&D Order at 6-7.  These allegations are further corroborated by Defendant Mulpuri's admission that View "voluntarily went above and beyond our contractual obligation to care for affected customers, and as a result, incurred additional costs."

78.     View's Customer Success department did not apply an individualized assessment to determine whether it would pay Installation Costs for any particular customer.

79.      The Customer Success department hired third-party window installers, known as glaziers, to perform the actual installation of the replacement windows. To hire glaziers, the Customer Success department staff submitted purchase requisitions – a request to buy services – for the Installation Costs, through View's finance department.

80.     Defendant Prakash approved several purchase requisitions for Installation Costs for glaziers to install replacement windows from 2019 through 2021.

81.     Defendant Prakash never denied a purchase requisition for glaziers. In approving the purchase requisitions for glaziers, Prakash never questioned the Customer Success department's decision to cover Installation Costs for the particular customer at issue; he also did not question, or ask them to provide, the criteria they had applied, if any, in deciding to cover those costs.

82.     The Defect Response Team sent Defendant Prakash weekly updates tracking which customers had windows with the Defect, the number of windows affected, how many windows had already been replaced, and how many windows remained to be replaced.

83.     View spent more than $2 million dollars on Installation Costs in each of 2019, 2020 and 2021.  These costs were reflected in View's books and records.

**E.     The Audit Committee of the Board of Directors Finds Both Negligent and Intentional Conduct Causing The Company's Warranty Accruals to Be Materially Misstated**

84.     On November 9, 2021, after the market closed, View filed with the SEC a Current Report on Form 8-K, with an exhibit consisting of a press release, announcing that the Audit Committee had concluded its investigation concerning the adequacy of the Company's previous reported warranty accrual:

> The investigation is now substantially complete and the Audit Committee has made its findings. Specifically, the Audit Committee has concluded that (i) the Company's previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially

1            misstated, (ii) the Company's now former Chief Financial Officer

2            and certain former accounting staff negligently failed to properly

3            record the liabilities for warranty-related obligations and cost of

4            revenue, and (iii) the Company's now former Chief Financial Officer

5            and certain former accounting staff intentionally failed to disclose

6            certain information to the Board of Directors and the Company's

7            independent registered public accounting firm, Pricewaterhouse

8            Coopers LLP ("PwC"), regarding the applicable costs incurred and

9            expected to be incurred in connection with the warranty-related

10           obligations.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

### A.    Announcement of the Business Combination on November 30, 2020

85.    On November 30, 2020, the CF II Defendants caused CF II to file with the SEC a Current Report on Form 8-K, with an exhibit consisting of a joint press release, announcing that they had entered into a definitive merger agreement stating, in relevant part:

> View, Inc. ("View"), a Silicon Valley-based smart window company, and CF Finance Acquisition Corp. II (Nasdaq: CFII) ("CF II"), a special purpose acquisition company sponsored by Cantor Fitzgerald, today announced they have entered into a definitive merger agreement. The combined company will be called View, Inc. and will be publicly listed on the NASDAQ market following the close of the transaction.
>
>                 * * *
>
> **Transaction Details**
>
> The Board of Directors of each of View and CF Finance Acquisition Corp. II have unanimously approved the transaction. The transaction will require the approval of the stockholders of CF Finance

Acquisition Corp. II and View, and is subject to other customary closing conditions, including the receipt of certain regulatory approvals. The transaction is expected to close in the first quarter of 2021.

Assuming no redemptions by CF II stockholders, the transaction is expected to deliver up to $800 million of gross proceeds including the contribution of up to $500 million of cash held in CFII's trust account from its initial public offering. The transaction is further supported by a $300 million private investment in public equity ("PIPE") at $10.00 per share.

All cash remaining in CF II at the closing after paying off transaction expenses and CF II liabilities is expected to be used to retire debt and to add cash to View's balance sheet for working capital, growth capex and other general corporate purposes.

86.     Attached to the November 30, 2020 8-K was an investor presentation (the "November 30, 2020 Investor Presentation") that would be used by CF II and View with respect to the Business Combination.  The Investor Presentation included a summary of View's Consolidated Balance Sheet, Consolidated Statements of Comprehensive Loss, and Consolidated Statement of Cash Flows for 2018, 2019, and 2020 for the nine months ended September 30.  The Consolidated Statements of Comprehensive Loss stated that View reported ***cost of sales of $142.646 million in 2018, $179.674 million in 2019, and $91.925 million in 2020 for the nine months ended September 30***.  The Consolidated Statement of Cash Flows stated that View reported ***"Loss contingencies" of $24.471 million in 2019***.

87.     The above statements identified in ¶86 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶45-50, Defendants materially misstated certain of View's warranty-related obligations,

and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019.  Additionally, View's cost of revenue was understated by $7.1 million for periods prior to 2019. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities the Installation Costs that View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

**B.    The December 23, 2020 De-SPAC Registration Statement, of Which the Proxy Statement Formed a Part**

88.    The Merger Agreement provided that CF II and View (*i.e.*, Legacy View) "shall prepare" the "registration statement on Form S-4 (as amended or supplemented from time to time, and including the Proxy Statement. . .)".   On December 23, 2020, CF II filed its De-SPAC Registration Statement, of which the Proxy Statement formed a part, on Form S-4 in connection with the Business Combination.

89.    The Proxy Statement reported that View recorded a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 and that the Company's cost of

revenue decreased year-over-year during the nine months ended September 30, 2020. Specifically, the Proxy Statement stated (emphasis added):

> *Cost of revenue decreased by $44.2 million or 32.5%, from $136.0 million in the nine months ended September 30, 2019, to $91.8 million in the nine months ended September 30, 2020. The decrease in the cost of revenue was primarily related to three factors: (a) a one-time warranty accrual of $24.5 million during the nine months ended September 30, 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .*

90.    The Proxy Statement also reported that View's cost of revenue increased year-over-year in fiscal year 2019.  Specifically, the Proxy Statement stated (emphasis added):

> *Cost of revenue increased by $37.0 million, or 26.0%, from $142.6 million in fiscal year 2018 to $179.7 million in fiscal year 2019. The increase in the cost of revenue was primarily due to three factors: (a) a warranty accrual of $24.5 million in fiscal year 2019 related to faulty materials from one of our suppliers used in the manufacturing of IGUs . . .*

91.    The Notes to View's 2018 and 2019 Consolidated Financial Statements, contained within the Proxy Statement, *reported that View recorded a Warranty accrual for the year ended December 31, 2019 of $23.43 million*.

92.    The above statements identified in ¶¶ 89-91 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶45-50, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the nine months ended September 30.  Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated cost of revenue was $203.732 million as of December 31, 2019. Furthermore,

Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities the Installation Costs that View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and  materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and  materially misleading.

93.     The Proxy Statement also described View's warranty policy as follows (emphasis added):

> *Product Warranties*
>
> **We provide a standard assurance type warranty that our IGUs will be free from defects in materials and workmanship for 10 years from the date of delivery to customers.** IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty.

94.     The statement identified in ¶ 93 was materially false and misleading, and failed to disclose to investors that by this time View had determined that, in addition to warrantying the IGUs' materials and workmanship, it would also cover the Installation Costs for all customers whose windows had the Defect.

**C.**   **The January 26, 2021 Amendment to the De-SPAC Registration Statement, of which the Proxy Statement Formed a Part**

95.     On January 26, 2021, CF II filed an amendment to the De-SPAC Registration Statement, of which the Proxy Statement formed a part, on Form S-4/A (the "January 26, 2021 Amendment"), which contained substantially similar statements as identified above in ¶¶ 89-91, 93 and contained the same financials alleged to be false in the Proxy Statement.

96.     The statements identified in ¶ 95 were materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made, for the same reasons set forth in ¶¶ 92, 94, *supra*.

97.     Additionally, the January 26, 2021 Amendment to further clarified in the Proxy Statement that, regarding its warranty accrual, "***[the] estimated cost to calculate the cost to replace the IGUs . . . includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead.***" (emphasis added).

98.     The statement identified in ¶ 97 was materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made, for the same reasons set forth in ¶ 92, 94, *supra*.   Additionally, the statement identified in ¶ 97 failed to disclose to investors that View inappropriately excluded from such "estimated cost" the Installation Costs it intended to incur when replacing the IGUs.

99.     On February 11, 2021, CF II filed an amendment to the De-SPAC Registration Statement, of which the Proxy Statement formed a part, on Form S-4/A (the "February 11, 2021 Amendment"), which contained substantially similar statements as identified in ¶¶ 89-91, 93, 97.

100.     The statements identified in ¶ 99 were materially false and misleading, and failed to disclose material adverse facts about the Company at the time they were made, for the same reasons set forth in ¶¶ 92, 94, 98, *supra*.

101.     On February 16, 2021, the CF II Defendants filed an amendment to the Proxy Statement on Form 424(b)(3) soliciting stockholders who held as of the January 27, 2021 record date to vote to approve the Business Combination at a special meeting to be held on March 5, 2021. The Proxy Statement solicited stockholder approval for the Business Combination, and contained

substantially the same statements as identified in ¶¶ 89-91, 93, 97. In addition, the February 16, 2021 Amendment provided in the Proxy Statement that "[t]here was no significant change in the warranty accrual in the nine months ended September 30, 2020".  The same day, the De-SPAC Registration Statement, of which the Proxy Statement formed a part, was declared effective.

102.    The Business Combination was approved by CF II stockholders in a special meeting held on March 5, 2021, and Defendants Mulpuri, Gormly, Cosgrove and Picard were elected to serve as directors of the Company for a term expiring at the Company's next annual meeting of stockholders.

103.    On March 8, 2021, View announced that it completed the Business Combination with CF II.

**D.    View Filings As A Public Company**

**1.    The March 12, 2021 Form 8-K**

104.    On March 12, 2021, the Company filed a March 8, 2021 Current Report on Form 8-K (the "March 12, 2021 8-K"), signed by Defendant Prakash.  The March 12, 2021 8-K at Ex. 99.1 also included View's consolidated financial statements for the fiscal years ended 2019 and 2020. The March 12, 2021 8-K reported that the Company's cost of revenue decreased year-over-year in the year ended December 31, 2020.  Specifically, the March 12, 2021 8-K stated (emphasis added):

> *Cost of revenue decreased by $56.6 million or 31.5%, from $179.7 million in the year ended December 31, 2019 to $123.1 million in the year ended December 31, 2020. The decrease in the cost of revenue was primarily related to the three following factors:*
>
> *(a) A decrease of $25.5 million related to a one-time warranty accrual for faulty materials from one of our suppliers used in the manufacturing of IGUs.* In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. We stopped using the affected materials upon identification in 2019. As of December 31, 2020, we

had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed. Based on this analysis, ***we estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes our expectations regarding future reductions in production costs which are primarily comprised of materials, labor, and factory overhead. Based on our analysis, we recognized $24.5 million of expense for the estimated future cost to replace defective IGUs classified in cost of revenue in our consolidated statement of comprehensive loss for the year ended December 31, 2019. . . .***

105.     Regarding View's cash flows from operating activities for the year ended December 31, 2019, the March 12, 2021 8-K reported a ***net loss of $289.904 million*** for FYE 2019 and further stated that certain non-cash charges from operating activities were offset by "net cash inflows from changes in operating assets and liabilities [that] were ***primarily due to a $26.1 million increase in accrued compensation and other liabilities as a result of an increase in accrual for product warranty liability and other expenses consistent with the growth of our operations . . . .***"

106.     The above statements identified in ¶¶ 104-105 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 45-50, Defendants materially misstated certain of View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities in 2019 and 2020 for the years ended December 31.  Defendants have admitted that, in contrast to View's reported warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and View's restated

cost of revenue was $203.732 million as of December 31, 2019. Additionally, View's restated net loss for the year ended December 31, 2019 was $312.109 million. Additionally, statements to the effect that View "estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors that View inappropriately excluded from such "estimated cost" the Installation Costs it intended to incur when replacing the IGUs. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities the Installation Costs that View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

107.   The March 12, 2021 8-K described View's warranty policy as follows: (emphasis added):

> **Product Warranties**
>
> ***The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for 10 years from the date of delivery to customers.*** IGUs with sloped or laminated glass have a warranty of 5 years. Control systems associated with the sale of IGUs have a 5-year warranty. In resolving warranty claims, the Company has the option of either repairing or replacing the covered product.

108.    The statement identified in ¶ 107 was materially false and misleading, and failed to disclose to investors that by this time View had determined that, in addition to warrantying the IGUs' materials and workmanship, it would also cover the Installation Costs for all customers whose windows had the Defect.

109.    The March 12, 2021 8-K described View's warranty policy and accounting as follows (emphasis added):

> ***Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the consolidated balance sheet. Warranty accruals are based on estimates that are updated on an ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The Company accounts for the effect of such changes in estimates prospectively.***

> In 2019, we identified a quality issue with certain material purchased from one of our suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. As of December 31, 2019, we had a low warranty claim rate related to this matter. We have replaced and expect to continue to replace affected IGUs for the remainder of the period covered by the warranty. We analyzed the risk of failure of

the affected IGUs by analyzing failure rate as a function of time required for the IGU to fail since it was installed, and the geographical region where the IGU was ultimately installed.  Based on this analysis, *the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs, which comprise of materials, labor, and factory overhead. Based on its analysis, the Company recognized $24.5 million of expense for the estimated future cost to replace defective IGUs, which was classified in cost of revenue in its consolidated statement of comprehensive loss for the year ended December 31, 2019. The Company recognized a corresponding warranty liability of $1.6 million in accrued expenses and other current liabilities and $22.9 million in other liabilities on its consolidated balance sheet as of December 31, 2019. As of December 31, 2020, the warranty liability related to this matter included in accrued expenses and other current liabilities and other liabilities was $3.8 million and $18.3 million, respectively, on the consolidated balance sheet. It is reasonably possible that the amount of costs to be incurred to replace the defective IGUs could be materially different from the estimate. Considering the limited failure rate data available to-date and the uncertainty inherent in the failure analysis, including the projected costs to replace defective IGUs in future years, the actual timing of the failures, and the number of defective IGUs, the Company is unable to estimate the amount of any potential additional losses.*

1
2
3
4
5

> *The Company recorded a net credit of $1.0 million for the reduction in product warranties liability and an expense of $24.1 million for product warranties to cost of revenue in the consolidated statements of comprehensive loss for the years ended December 31, 2020 and 2019, respectively.*

6   110.   The March 12, 2021 8-K reported that View recorded Warranty accruals of

7   $18.694 million and $23.430 million for the years ended December 31, 2020 and 2019,

8   respectively.

9   111.   The above statements identified in ¶¶ 109-110 were materially false and/or

10   misleading, and failed to disclose material adverse facts about the Company at the time they were

11   made because, as alleged in Paragraphs 45-60, Defendants materially misstated certain of View's

12   warranty-related obligations, and the cost of revenue associated with the recognition of those

13   liabilities in 2019 and 2020 for the years ended December 31.  Defendants have admitted that, in

14   contrast to View's reported warranty accrual outlined above, View's restated warranty-related

15   accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, and

16   View's restated cost of revenue was $203.732 million as of December 31, 2019. Furthermore,

17   statements to the effect that View "estimated the number of IGUs expected to fail in the remaining

18   warranty period and applied an estimated cost to calculate the cost to replace the IGUs" failed to

19   disclose to investors that View inappropriately excluded from such "estimated cost" the

20   Installations Costs it intended to incur when replacing the IGUs.  Furthermore, Defendants failed

21   to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue

22   associated with the recognition of those liabilities, were materially false and misleading because

23   they excluded expenses View incurred and expected to incur due to significant quality issues related

24   to defective sealing components for its windows; (2) View falsely recorded the liabilities for

25   warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials

26   and workmanship, View inappropriately excluded from these liabilities the Installation Costs that

27   View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi,

28   determined by no later than early 2020 that View would cover for all customers whose windows

had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

### 2.     The April 7, 2021 Shelf Registration Statement

112.   On April 7, 2021, View filed a Shelf Registration Statement on Form S-1 (the "April 7, 2021 Shelf Registration Statement"), signed by Defendants Mulpuri and Prakash, relating to the issuance of up to 17,033,303 shares of common stock, consisting of (i) up to 366,666 shares of common stock issuable upon the exercise of private placement warrants originally issued in a private placement to CF Finance Holdings II, LLC, in connection with the initial public offering of CF II and (ii) up to 16,666,637 shares of common stock that are issuable upon the exercise of public warrants.

113.   The April 7, 2021 Shelf Registration Statement reported that the Company's cost of revenue decreased year-over-year in the year ended December 31, 2020, repeating substantially similar statements as identified above in ¶ 104. The April 7, 2021 Shelf Registration Statement also contained substantially the same statements as identified in ¶ 105, including the representation that the warranty liability was $24.5 million as of December 31, 2019.

114.   The above statements identified in ¶113 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made. For the same reasons set forth in ¶ 106.

115.   The April 7, 2021 Shelf Registration Statement also contained substantially the same statements as identified in ¶¶ 107, 109-110, which statements were materially false and/or misleading for the same reasons set forth in ¶¶ 108, 111.

### 3.     The May 12, 2021 Press Release

116.   On May 12, 2021, in a press release filed on Form 8-K with the SEC, signed by Defendant Prakash, View announced its first quarter 2021 financial results, stating in relevant part:

**First Quarter 2021 Highlights:**

- ***GAAP cost of revenue of $29.9 million, a 16% improvement***

*from Q1 2020 and a 5% improvement from Q4 2020 due to*
*production efficiencies.*

- *GAAP loss from operations of ($55.1) million, a 22%*
  *improvement compared to Q1 2020 and 4% improvement*
  *from Q4 2020.*

117. The above statements identified in ¶116 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 45-50, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accruals are $53 million and $48 million as of December 31, 2019 and 2020 respectively, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million.  Additionally, View's restated GAAP loss from operations for the three months ended March 31, 2021 was ($64.680) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities the Installation Costs that View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

### 4.    The May 17, 2021 10-Q

118.    On May 17, 2021, View filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 10-Q"), signed by Defendants Mulpuri and Prakash.   The 1Q21 10-Q reported that the Company's "***Cost of revenue decreased by $5.7 million or 16.0% in the three months ended March 31, 2021 [from $35.57 million] compared to the same period in the prior year, despite the increase in revenue. . . .***" (emphasis added).

119.    Regarding View's cash flows from operating activities for the three months ended March 31, 2021, the 1Q21 10-Q reported a ***net loss of $64.5 million***.

120.    The above statements identified in ¶¶ 118-119 were materially false and/or misleading, and failed to disclose material adverse facts about the Company at the time they were made because, as alleged in ¶¶ 45-50, in violation of GAAP, Defendants materially misstated certain of View's warranty-related obligations, the cost of revenue associated with the recognition of those liabilities, and loss from operations for the three months ended March 31, 2021. Defendants have admitted that, in contrast to View's reported cost of revenues and warranty accrual outlined above, View's restated warranty-related accrual is $48 million as of December 31, 2020, $47 million as of March 31, 2021, and View's restated GAAP cost of revenue for the three months ended March 31, 2021 was $36.179 million. Additionally, View's restated net loss for the three months ended March 31, 2021 was ($74.035) million. Furthermore, Defendants failed to disclose to investors that (1) View's warranty-related obligations, and the cost of revenue associated with the recognition of those liabilities, were materially false and misleading because they excluded expenses View incurred and expected to incur due to significant quality issues related to defective sealing components for its windows; (2) View falsely recorded the liabilities for warranty-related obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded from these liabilities the Installation Costs that View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for all customers whose windows had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were false

and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

121.    Regarding product warranties, the 1Q21 10-Q stated, in relevant part (emphasis added):

> **Product Warranties**
>
> ***The Company provides a standard assurance type warranty that its IGUs will be free from defects in materials and workmanship for generally 10 years from the date of delivery to customers.*** IGUs with sloped or laminated glass generally have a warranty of 5 years. Control systems associated with the sale of IGUs typically have a 5-year warranty. In resolving warranty claims, the Company generally has the option of either repairing or replacing the covered product.

122.    The statement identified in ¶ 121 was materially false and misleading, and failed to disclose to investors that by this time View had determined that, in addition to warrantying the IGUs' materials and workmanship, it would also cover the Installation Costs for all customers whose windows had the Defect.

123.    Regarding warranty accruals, the 1Q21 10-Q stated, in relevant part (emphasis added):

> ***Based on historical experience, the Company accrues for estimated returns of defective products at the time revenue is recognized. The Company monitors warranty obligations and may make revisions to its warranty reserve if actual costs of product repair and replacement are significantly higher or lower than estimated. Accruals for anticipated future warranty costs are recorded to cost of revenue in the condensed consolidated statements of comprehensive loss and included in other current liabilities and other liabilities on the condensed consolidated balance sheet. Warranty accruals are based on estimates that are updated on an***

*ongoing basis taking into consideration inputs such as changes in the volume of claims compared with the Company's historical experience, and the changes in the cost of servicing warranty claims. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead. The Company accounts for the effect of such changes in estimates prospectively.*

In 2019, the Company identified a quality issue with certain material purchased from one of its suppliers utilized in the manufacturing of certain IGUs. The Company stopped using the affected materials upon identification in 2019. The Company has had a low warranty claim rate to-date related to this matter. The Company has replaced and expects to continue to replace the affected IGUs for the remainder of the period covered by the warranty. The Company analyzed the risk of failure of the affected IGUs by analyzing historical failure rate as a function of time since the IGU installation. Based on this analysis, *the Company estimated the number of IGUs expected to fail in the remaining warranty period and applied an estimated cost to calculate the cost to replace the IGUs. The estimated cost includes the Company's expectations regarding future reductions in production costs which comprise of materials, labor, and factory overhead.*

*As of March 31, 2021 and December 31, 2020, the warranty liability included in accrued expenses and other current liabilities was $3.8 and $4.0 million and other liabilities was $18.1 million and $18.7 million, respectively, on the condensed consolidated balance sheets. During the three months ended March 31, 2021,*

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1

2

3

4

*the Company recorded a net credit of $0.3 million for the reduction*

*in product warranties and consumption of $0.5 million. During the*

*three months ended March 31, 2020, the Company recognized a*

*warranty expense of $0.5 million and consumption of $0.7 million.*

5

6      124.    The above statements identified in ¶ 124 were materially false and/or misleading,

7  and failed to disclose material adverse facts about the Company at the time they were made because,

8  as alleged in ¶¶ 45-50, in violation of GAAP, Defendants materially misstated certain of View's

9  warranty-related obligations, and the cost of revenue associated with the recognition of those

10 liabilities for the three months ends March 31, 2021 and 2020.  Defendants have admitted that, in

11 contrast to View's reported warranty accrual outlined above, View's restated warranty-related

12 accruals are $48 million and $42 million as of December 31, 2020 and 2021, respectively, and

13 $47 million as of the three months ended March 31, 2021. Furthermore, statements to the effect

14 that View "estimated the number of IGUs expected to fail in the remaining warranty period and

15 applied an estimated cost to calculate the cost to replace the IGUs" failed to disclose to investors

16 that View inappropriately excluded from such "estimated cost" the Installation Costs it intended to

17 incur when replacing the IGUs. Furthermore, Defendants failed to disclose to investors that (1)

18 View's warranty-related obligations, and the cost of revenue associated with the recognition of

19 those liabilities, were materially false and misleading because they excluded expenses View

20 incurred and expected to incur due to significant quality issues related to defective sealing

21 components for its windows; (2) View falsely recorded the liabilities for warranty-related

22 obligations and cost of revenue; (3) in addition to warrantying the IGUs' materials and

23 workmanship, View inappropriately excluded from these liabilities the Installation Costs that

24 View's leadership, including Defendant Mulpuri and its Chief Business Officer, Rahul Bammi,

25 determined by no later than early 2020 that View would cover for all customers whose windows

26 had the Defect; (4) as a result, the previously reported liabilities associated with warranty-related

27 obligations and the cost of revenue associated with the recognition of those liabilities were false

28

and materially misstated; and (5) that as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and materially misleading.

125.    Additionally, Defendants Mulpuri and Prakash appended certifications pursuant to Sections 302 and 906 of Sarbanes-Oxley Act of 2002, 15 U.S.C. Section 7241 ("SOX") to the 1Q21 10-Q, which were signed by Defendants Mulpuri and Prakash. Each signed a certification that stated, in part, as follows:

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> b.    [Paragraph intentionally omitted in accordance with SEC Release Nos.34-47986 and 34-54942];

   c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

  5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

  126. Defendants Mulpuri and Prakash also each signed a certification stating, in part, as follows:

  1.  the Report fully complies with the requirements of Section

13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

127.    Defendants Mulpuri and Prakash's representations were materially false and misleading and failed to disclose material facts at the time they were made because as set forth in ¶¶ 45-50, Defendants Mulpuri and Prakash have effectively admitted that at the time the 1Q21 10-Q was filed, they: 1) had not designed disclosure controls and procedures to ensure that material information relating to View was made known to them; 2) they had not designed internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external disclosure to the SEC and investors in accordance with GAAP; 3) View's disclosure controls and procedures were not effective; 4) they failed to disclose the change in View's internal control over financial reporting that occurred by at least the quarter ended March 31, 2021 that materially, negatively affected View's internal control over financial reporting; and 5) the Company's financial statements for the quarter ended March 31, 2021 were not prepared in accordance with GAAP.

## VIII.   THE TRUTH BEGINS TO EMERGE

128.    On August 16, 2021, after the market closed, in a press release filed on Form 8-K with the SEC, View announced that the Audit Committee of View's Board of Directors "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual." In an NT 10-Q filed on Form 12b-25 with the SEC filed on August 16, 2021, View stated (emphasis added):

View, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the three and six months ended June 30, 2021 ("Second Quarter 10-Q") within the prescribed time period because it requires additional time to complete the investigation described below. The Company is currently unable to predict when it will be able to file its Second

Quarter 10-Q, and does not currently expect to file by the extended filing date pursuant to Rule 12b-25.

**The Audit Committee of the Company's Board of Directors ("Audit Committee") recently began an independent investigation concerning the adequacy of the Company's previously disclosed warranty accrual.** The investigation is ongoing, and the Audit Committee continues to work diligently with independent counsel and advisors to complete the investigation as soon as possible. The Company cannot predict the duration of the investigation, eventual scope, its outcome, or its impact on the Company's financial results or the Company's assessment of its internal control over financial reporting for prior periods. **As a result, the Company has not finalized its financial statements or its assessment of the effectiveness of its disclosure controls and procedures and internal control over financial reporting for the three and six months ended June 30, 2021.** The Company expects that it will finalize its financial statements and file the related Second Quarter 10-Q as soon as practicable after the conclusion of the investigation.

On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

129.    On November 9, 2021, after the market closed, View announced that the Audit Committee "has now substantially completed its independent investigation and has concluded that the Company's previously reported liabilities associated with all warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated." As a result, the Company will be restating its previously issued 2019 and 2020 annual and certain unaudited interim financial statements and its Q1 2021 and 2020 unaudited interim financial

statements."  View further announced that expected to restate its previously reported $22 million warranty-related accrual as of March 31, 2021, to an amount in the range of $40 to $58 million over the course of the same ten-year product warranty period.  View further announced that Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

130.    On this news, the Company's share price fell $0.77, or 13.68%, to close at $5.63 per share on November 10, on unusually heavy trading volume.  The Company's share price fell an additional $0.22, or 3.9%, to close at $5.41 on November 11, on heavy trading volume.

131.    On February 24, 2022, in a Current Report filed on Form 8-K with the SEC ("Feb. 24, 2022 8-K"), View announced that Harold Hughes ("Hughes") resigned as Executive Chair, Principal Executive Officer and director of View on February 22, 2022, effective immediately.  The Feb. 24, 2022 8-K also announced that Tom Leppert ("Leppert") on that same date also submitted his resignation as a director of the Company, effective immediately. Additionally, View announced that "[i]t is the Company's understanding that Mr. Hughes and Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."

IX.    **RELEVANT POST CLASS PERIOD EVENTS**

132.    On May 31, 2022, in a press release filed on Form 8-K with the SEC, View reported that its restated warranty-related accruals would be $53 million, $48 million, and $42 million as of December 31, 2019, 2020, and 2021 respectively.

133.    That same day, View also announced that "Nasdaq has granted View until June 30, 2022, to file its delinquent 10-K and 10-Q filings, which View expects to file with the SEC on or prior to that date."  Those filings include View's 2021 Second Quarter 10-Q, Third Quarter 10-Q, Annual Report on Form 10-K, and 2022 First Quarter 10-Q.

134.    That same day, Defendant Mulpuri conducted a conference call with analysts and investors during which he provided an update on the financial restatement.  On that call Defendant Mulpuri admitted that View had decided to cover the Installation Costs for all customers, stating that "While we solved the problem [with the Defect] going forward [after 2019], we needed to

support the customers that experienced failed IGUs due to this issue.  Our standard warranty contractually covers only the parts we supply, and we have honored every contract by providing replacements.  ***In addition, we voluntarily went above and beyond our contractual obligation to care for affected customers, and as a result, incurred additional costs.***"

135.    On June 15, 2022, View filed its 2021 Annual Report on Form 10-K, and its 1Q21 10-Q/A, marking the completion of the financial restatement.  As set forth below, View's true warranty accrual, accrued expenses and other current liabilities, other liabilities, cost of revenue, and net loss were understated by material amounts.

136.    For example, for FYE 2020, the 2021 10-K reported amended and restated financial information as follows (the Warranty Accrual figures set forth in this chart and the similar charts herein were reported by the Company in a press release filed on Form 8-K with the SEC on May 31, 2022):

| Financial Metric FYE 2020 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $23 million | $48 million |
| Accrued expenses and other current liabilities | $36.480 million | $42.150 million |
| Other liabilities | $36.731 million | $56.844 million |

137.    For FYE 2019, the 2021 10-K reported amended and restated financial information as follows:

| Financial Metric FYE 2019 | As Previously Reported | As Restated |
|---|---|---|
| Warranty Accrual | $25 million | $ 53 million |
| Cost of revenue | $179.675 million | $203.732 million |
| Accrued expenses and other current liabilities | $26.779 million | $47.645 million |
| Other liabilities | $34.051 million | $53.290 million |
| Net loss | $289.904 million | $312.109 million |

1

**X.      LOSS CAUSATION**

2          138.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused

3   the economic loss suffered by Plaintiffs and the Class. During the Class Period, Plaintiffs and Class

4   members purchased View securities at artificially inflated prices. As detailed above, when the truth

5   about Defendants' misconduct was revealed, the value of the Company's stock declined

6   precipitously as the prior artificial inflation no longer inflated the stock's prices. The decline in the

7   price of View securities was the direct result of the nature and extent of Defendants' misconduct

8   finally being revealed to investors and the market. The timing and magnitude of the share price

9   declines negate any inference that the losses suffered by Plaintiffs and other members of the Class

10  were caused by changed market conditions, macroeconomic or industry factors, or Company

11  specific facts unrelated to the Defendants' misconduct. The economic loss, i.e., damages, suffered

12  by Plaintiffs and other members of the Class, was a direct result of Defendants' misconduct and the

13  subsequent significant decline in the value of the Company's stock when Defendants' prior

14  misrepresentations and other misconduct was revealed.

15         139.    At all relevant times, Defendants' materially false and misleading statements or

16  omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and

17  other members of the Class. Those statements were materially false and misleading through their

18  failure to disclose that (1) View expected to incur substantial warranty accrual expenses due to

19  significant quality issues related to defective sealing components for its windows; (2) View failed

20  to properly record the liabilities for warranty-related obligations and cost of revenue; (3) in addition

21  to warrantying the IGUs' materials and workmanship, when estimating these liabilities the

22  Company inappropriately excluded from these liabilities certain costs it intended to incur when

23  replacing the Company's IGUs that View's leadership, including Defendant Mulpuri and its Chief

24  Business Officer, Rahul Bammi, determined by no later than early 2020 that View would cover for

25  all customers whose windows had the Defect; (4) as a result, the previously reported liabilities

26  associated with warranty-related obligations and the cost of revenue associated with the recognition

27  of those liabilities were materially misstated; and (5) that as a result of the foregoing, Defendants'

28  positive statements about the Company's business, operations, and prospects were materially

misleading and/or lacked a reasonable basis. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of View securities to be artificially inflated. Plaintiffs and other Class members purchased View securities at those artificially inflated prices, causing them to suffer damages.

A.  **The August 16 and November 9, 2021 Corrective Disclosures Concerning View's Misstated Warranty Accruals**

140.  On August 16, 2021, after the market closed, View announced that its Audit Committee "began an independent investigation concerning the adequacy of the company's previously disclosed warranty accrual."

141.  On this news, the Company's share price fell $1.26, or over 24%, to close at $3.92 per share on August 17, 2021, on unusually heavy trading volume.

142.  Subsequently, on November, 9, 2021, after the market closed, View more fully disclosed the extent and severity of the warranty accrual issue when it announced that the Audit Committee "has now substantially completed its independent investigation and has concluded that the Company's previously reported liabilities associated with all warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated. As a result, the Company will be restating its previously issued 2019 and 2020 annual and certain unaudited interim financial statements and its Q1 2021 and 2020 unaudited interim financial statements."  View further announced that expected to restate its previously reported $22 million warranty-related accrual as of March 31, 2021, to an amount in the range of $40 to $58 million over the course of the same ten-year product warranty period.  View further announced that Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

143.  On this news, the Company's share price fell $0.77, or 13.68%, to close at $5.63 per share on November 10, on unusually heavy trading volume. The Company's share price fell an additional $0.22, or 3.9%, to close at $5.41 on November 11, on heavy trading volume.

144.  On May 31, 2022, in a press release filed on Form 8-K with the SEC, View reported that its restated warranty-related accruals would be $53 million, $48 million, and $42 million as of

December 31, 2019, 2020, and 2021 respectively.  View further reported "[r]ecord revenue of $74 million, up 125% year-over-year, and exceeding previous guidance range of $65 million to $70 million.

145.     On this news, the Company's share price did not fall, but rather increased $0.42, or 33.07%, to close at $1.69 per share on June 1, 2022, confirming that investors understood the earlier August 16 and November 9, 2021 announcements as at least partial disclosures of the inaccuracy of the previously reported warranty accruals.

146.     View also announced that "Nasdaq has granted View until June 30, 2022, to file its delinquent 10-K and 10-Q filings, which View expects to file with the SEC on or prior to that date." Those filings include View's 2021 Second Quarter 10-Q, Third Quarter 10-Q, Annual Report on Form 10-K, and 2022 First Quarter 10-Q.

147.     On June 15, 2022, View filed its 2021 Annual Report on Form 10-K, and its 1Q21 10-Q/A, marking the completion of the financial restatement.

148.     On this news, the Company's price per share remained unchanged, closing at $1.78 on both June 15 and 16, 2022, again confirming that investors understood the earlier August 16 and November 9, 2021 announcements as at least partial disclosures of the inaccuracy of the previously reported warranty accruals.

## XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

149.     Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(d)     Plaintiffs and other Class members purchased View securities between the time Defendants misrepresented or failed to disclose material facts and the

time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

150.    At all relevant times, the market for View securities was efficient for the following reasons, among others:

(a)    As a regulated issuer, View filed periodic public reports with the SEC and/or the Nasdaq;

(b)    View regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    View was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

(d)    The Company was covered by research analysts, including Cantor Fitzgerald, Goldman Sachs, and Raymond James.

151.    As a result of the foregoing, the market for View's securities promptly digested current information regarding View from all publicly available sources and reflected such information in View's share price. Under these circumstances, all purchasers of View's securities during the Class Period suffered similar injury through their purchase of View's securities at artificially inflated prices and a presumption of reliance applies.

152.    Further, to the extent that Defendants concealed or improperly failed to disclose material facts with the regard to the Company, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**XII.   CLASS ACTION ALLEGATIONS**

153.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), seeking to pursue remedies under the Exchange Act and Securities Act. The Class consists of:

> (i) all persons or entities who purchased or otherwise acquired View and/or CF II securities between November 30, 2020 and November 9, 2021, inclusive (the "Class Period"); and (ii) all persons or entities who were holders of CF II Class A common stock as of the January 27, 2021 record date (the "Record Date") that were entitled to vote to approve the Business Combination (as defined herein) between View and CF II as set forth in the February 16, 2021 Proxy Statement (defined herein) (the "Class").

154.    Excluded from the Class are Defendants, or their affiliates or subsidiaries, the current and/or former officers and directors of any non-natural Defendant named herein, members of the immediate family of any excluded person, heirs, successors and assigns of any excluded person or entity, and any entity in which any excluded person has or had a controlling interest.  Also excluded from the Class are persons who held shares of View's privately held common stock and preferred stock outstanding prior to closing of the Business Combination.

155.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, View's shares actively traded on the Nasdaq. While the exact number of members of the Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believes that there are at least hundreds or thousands of members in the proposed Class. Millions of View shares were traded publicly during the Class Period on the Nasdaq. Record owners and other members of the Class may be identified from records maintained by View or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

156.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

157.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

158.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about View's business and operations; and

(c)    Whether the price of View's securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

159.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**XIII.  COUNTS FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE EXCHANGE ACT**

**COUNT I**
**For Violation of § 14(a) of the Exchange Act and Rule 14a-9**
**Against All Defendants**

160.   Plaintiffs repeat and re-allege each and every allegation as set above as if fully set forth herein.  This Count is brought on behalf of all persons or entities who were holders of CF II Class A common stock as of the record date that were entitled to vote to approve the Business Combination between View and CF II as set forth in the February 16, 2021 Proxy Statement.

161.   For purposes of this Count, Plaintiffs do not allege that any Defendant named in this Count acted with fraudulent intent and expressly excludes and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This claim is based solely on negligence.

162.   The Proxy Statement, documents attached thereto and/or incorporated by reference therein, and other solicitations described above and herein contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

163.   Defendants named in this Count, jointly and severally, solicited or permitted use of their names in solicitations set forth above in Section IV and/or participated in the drafting of the Proxy Statement. CF II recommended that its shareholders vote "FOR" the proposed transaction(s).

164.   For example, Defendants gave interviews to public media outlets to promote the proposed merger throughout the Class Period.  For example, on November 30, 2020, following the announcement of the proposed merger, Defendant Mulpuri appeared on CNBC to promote the merger and tout View's prospects and technology.

165.   On December 1, 2020, Defendant Lutnick appeared on CNBC's Squawk Box following the announcement of the business combination transaction between View and CF II.  In describing the transaction, Defendant Lutnick touted the deal, noting that "three hundred million dollars has been raised – we have $300 million worth of institutional investors who have already put their money in and committed to the transaction at the $1.6 billion dollar valuation. . . . Here

you've got three hundred million dollars of investors who already committed their money, and now the SPAC investors, this morning, get to decide do they want to stay in or go out. So if you're a SPAC investor in CF Finance II's SPAC, you can decide "oh you know what? I like View, I'm sticking in" or "if I didn't like View, I can sell it." So you know the idea is, that SPAC investors have the option to stay in or go? But what they see now is PIPE investors, right? Pre- the transaction, have committed three hundred million dollars. So you know it's a good deal. It's already raised $300 million dollars. And now they have the option to stay in. And I think that's why you're going to see these things trade well. I really like the structured SPACs. You know that Cantor Fitzgerald has been number one in SPACs in 2018 and 2019. And now that SPACs have become so popular, you know, it's just a good way for a high growth company like View and its dynamic glass to go public. And I think you're going to see the investors really like it."

166.    On, February 1, 2021, Defendant Lutnick appeared on Bloomberg.  During the interview, Defendant Lutnick praised SPACs as allowing "private investors to be able to invest in these kind of [private equity type investment] companies through SPACs.  So I think it's really, really exciting. I think it's really exciting for the private investors to be able to invest in these kind of companies through SPACs. I think SPACs are here to stay. I think they are a great product because they fill that void, and they give individual investors the chance to invest. And I think they're going to be great. And you know Cantor was number one in 2017, 2018 and 2019 in SPACs. Now everybody thinks it's popular, but we have an incredible franchise."  *See* Cantor Fitzgerald CEO     Says     SPACs     Have     Democratized     IPO     Market, https://www.youtube.com/watch?v=nmpHb6oRJ44.

167.    During the interview, Defendant Lutnick went on describe the "opportunity" provided by SPACs: "what it does is, it lets a private equity type investment come in a public wrapper. So a public investor can have access to really cool technology early. Whether that's auto tech or biotech, insure tech, property tech. You know all these sort of high growth opportunities, they present themselves to the public investors and the public investors can decide - do they want to invest in it? They've been excluded from the private equity market. **They've really been excluded primarily from the IPO market for a while and this is an inclusive model.** So I think

1   that's the opportunity. You know if you have a lidar company when would the public be able to

2   invest in a lidar company early before they're in cars in 2024? And I think that's what's exciting

3   about the stock market. **It's really amazing and I think it democratizes the IPO market and the**

4   **private equity market**. And I think it's going to do really really well." *Id.*

5          168.    On January 28, 2021, Anshu Jain appeared on Bloomberg.  During the interview, in

6   response to a question regarding SPACs, Jain responded that "retail investors only make up a part

7   of it. The PIPE investors really are key drivers and validators of value. In general retail investors

8   have always driven a section of financial markets and will continue to." *See* Cantor Fitzgerald

9   President Anshu Jain's Outlook for 2021, https://www.bloomberg.com/news/videos/2021-01-

10  29/cantor-fitzgerald-president-anshu-jain-s-outlook-for-2021-video.

11         169.    CF II and Legacy View are issuers of the Proxy Statement.  As set forth in the

12  Merger Agreement, each were to participate in the preparation of the Registration Statement, of

13  which the Proxy Statement formed a part.

14         170.    CF II and Legacy View permitted the use of their names in the Proxy Statement by

15  allowing the Proxy Statement to make false and misleading representations set forth above.

16         171.    Defendant Lutnick signed the Proxy Statement and subsequent amendments, signed

17  the cover letter for the Proxy Statement "By Order of the CF II Board" and otherwise permitted the

18  use of his name in the Proxy Statement, and solicited the votes of shareholders in the November

19  30, 2020 press release and 8-K filing, the De-SPAC Registration Statement, of which the Proxy

20  Statement formed a part, and in oral communications to the media.  *See also* ¶ 31.

21         172.    Defendant Pion signed the Proxy Statement and subsequent amendments, and

22  otherwise permitted the use of his name in the Proxy Statement, and solicited the votes of

23  shareholders in the Proxy Statement.  *See* ¶ 32.

24         173.    Defendant Chan signed the Proxy Statement and subsequent amendments, and

25  otherwise permitted the use of her name in the Proxy Statement, and solicited the votes of

26  shareholders in the Proxy Statement.  *See* ¶ 33.

27

28

174.   Defendant Jain signed the Proxy Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See also* ¶ 34.

175.   Defendant Hochberg signed the Proxy Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See* ¶ 35.

176.   Defendant Blechman signed the Proxy Statement and subsequent amendments, and otherwise permitted the use of her name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See* ¶ 36.

177.   Defendant CF Holdings II permitted the use of its name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See* ¶ 38.

178.   Defendant CF&Co. permitted the use of its name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See* ¶ 39.

179.   Defendant Cantor permitted the use of its name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement.  Cantor was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary") in a slide titled "Overview of Sponsor" which touted that Cantor "is a leading investment Bank led by a highly experienced executive team in Howard Lutnick, Chairman and CEO and Anshu Jain, President.  Cantor [Fitzgerald, L.P.] is a leading SPAC franchise and the top SPAC underwriter in 2019" as well as Cantor's relevant credentials. *See also* ¶ 40.

180.   Defendant CFGM permitted the use of its name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement. *See* ¶ 41.

181.   Defendant Mulpuri permitted the use of his name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement and in oral communications to the media.  Mulpuri was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary" and one-page "Overview of Sponsor") in a slide titled "Overview of View Executives" which touted that he "[b]uilt View from

the ground up over the last 12 years" as well has his relevant experience and credentials. *See also* ¶ 27.

182.   Defendant Prakash permitted the use of his name in the Proxy Statement, and solicited the votes of shareholders in the Proxy Statement.  Prakash's name was used throughout the Proxy Statement: his name was mentioned over 20 times in the Proxy Statement as View's CFO; the statement included his biography, which noted that he joined View "with over 25 years of global finance and operations experience in private and public companies ranging from startups to Fortune 100"; and the Proxy Statement stated that Prakash would also be an executive officer (CFO) of the merged entity.  Prakash was also featured within the first few pages of the November 30, 2020 Investor Presentation (preceded only by a one-page "Transaction Summary" and one-page "Overview of Sponsor") in a slide titled "Overview of View Executives" which touted his "25 years of finance & operations experience scaling private and public companies" as well as his relevant experience and credentials.  *See also* ¶ 28.

183.   Each of the Defendants named in this Count acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued.

184.   The solicitations described herein were essential links in the accomplishment of the Business Combination. As a result of these solicitations, the CF II shareholders approved the Business Combination on March 5, 2021.  Had the true financial condition and operations of View been known, members of the Class eligible to vote on the Business Combination would have voted against it and/or sold their CF II securities.

185.   Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

186.   By reason of the foregoing, the Defendants named in this Count violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

187.    The Defendants named in this Count violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from members of the Class by means of a Proxy Statement that through these Defendants' negligence contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary to make the statements therein not false or misleading.

188.    The Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement and other proxy solicitation materials.

189.    Defendants named in this Count were required to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. Defendants named in this Count were also required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on March 5, 2021.

190.    Defendants named in this Count were aware (or should have been aware) that the Company had decided to cover all Installation Costs related to the Defect, as it was made at the highest levels of the Company and was discussed at executive staff meetings throughout 2019 to 2021. The decision was widely known, including at least by View's leadership (including Mulpuri, Bammi, and Prakash), the Defect Response Team, the Customer Success Department (the View staff responsible for managing the replacement of windows with the Defect at customer sites), and the Finance department. Defendants named in this Count, as stated in the Proxy Statement and as alleged herein, had access to the detailed financial records of View, including its contracts, historical and projected financial information.

191.    In addition to Accounting department records, the Installation Cost information that was excluded from the Company's warranty accruals was available from numerous sources, including in the purchase requisitions themselves (the requests to buy services for Installation Costs), from the Customer Success Department (the department that submitted purchase requisitions for the Installation Costs), the Finance department (the department through which

purchase requisitions for the Installation Costs were submitted), the Defect Response Team, and View's budget for Installation Costs which was prepared by Bammi.  For example, had Defendants reviewed the Installation Cost information (e.g., the purchase requisitions), Defendants would have uncovered that View *was covering the Installation Costs for all customers* with windows containing the Defect, meaning they were probable and reasonably estimable.  Therefore, an estimated loss from the Installation Costs should have been included in View's warranty accrual.  As such, having been provided reasonable access to all of View's books, contracts, and records, including View's books of account, ledgers, order books, and other financial documents reflecting all material information relating to View's business, which reflected the Installation Costs View decided to cover for all customers whose windows contained the Defect, Defendants named in this Count were negligent in failing to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed the Installation Costs and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. *See also* Chart of Alleged False or Misleading Statements, attached hereto as Exhibit A, Statements 1-8, Basis for Negligence.

192.    Additionally, as CFO, Defendant Prakash was responsible for ensuring that View properly accounted for and disclosed its liabilities for replacing windows with the Defect. Defendant Prakash was also responsible for ensuring that financial information concerning View provided to investors was both accurate and not misleading.   Defendant Prakash reviewed the portion of the Proxy/Statement Prospectus discussing the warranty liabilities before it was filed with the SEC.  As such, Defendant Prakash was negligent in failing to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed the Installation Costs and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. Defendants who signed the Proxy Statement either reviewed the Proxy Statement and were aware of its content or were negligent in failing to do so.

193.    Additionally, as CEO, Defendant Mulpuri was responsible for ensuring that financial information concerning View provided to investors was both accurate and not misleading.

As such, Defendant Mulpuri was negligent in failing to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed the Installation Costs and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision.

194.    By means of the Proxy Statement and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants named in this Count sought to secure Class members' approval of the Business Combination and solicited proxies from members of the Class.

195.    The false and misleading statements and omissions in the Proxy Statement and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the Business Combination and/or whether to exercise their cash conversion right(s). In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement, additional proxy solicitation materials, and in other information reasonably available to stockholders.

196.    Members of the Class eligible to vote on the Business Combination were misled by the false and misleading statements and omissions made by Defendants named in this Count, were denied the opportunity to make a fully informed decision in voting on the Business Combination with CF II without having been advised of material facts. Accordingly, members of the Class suffered damages and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein when the truth was disclosed, and the value of their View securities decreased in value.

197.    By reason of the foregoing, Defendants named in this Count violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, promulgated thereunder, 17 C.F.R. § 240.14a-9.

198.    This Count is brought within the applicable statute of limitations.

**COUNT II**
**For Violation of § 20(a) of the Exchange Act**
**Against the Individual View Defendants and CF II Defendants**

199.    Lead Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

200.    The CF II Defendants acted as controlling persons of CF II as within the meaning of Section 20(a) of the Exchange Act as alleged herein and Individual View Defendants acted as controlling persons of View within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the companies' operations, these defendants had the power and authority to cause CF II and View to engage in the wrongful conduct complained of herein. These defendants were able to, and did, control directly and indirectly, the content of the Proxy Statement there causing the dissemination of the materially false and/or misleading statements and omissions as alleged herein.

201.    In particular, the CF II Defendants participated in meetings and conference calls, reviewed the Business Combination and all of the underlying due diligence materials (as noted in the Proxy Statement), voted to approve the Business Combination, and solicited the approval of the Business Combination through CF II's management's recommendation to vote in favor of the Business Combination, which appeared in the Proxy Statement. Moreover, the Individual View Defendants reviewed the Business Combination, reviewed and furnished information for inclusion in the Proxy Statement, and solicited the approval of the Business Combination.

202.    As set forth above, the Individual View Defendants and those CFII Defendants that are individuals (the Individual CFII Defendants) in their capacities as officers and/or directors of CF II and View, participated in the misstatements and omissions set forth in Section IV above. Indeed, each of these defendants had access to information regarding the circumstances surrounding the Business Combination and View, including the terms of the Business Combination, analysis of View's operating results and financial condition, the valuation of View, and the due diligence that had and had not been performed. As a result, these defendants were individually and collectively control persons within the meaning of Section 20(a) of the Exchange Act.

203.    As set forth above, Defendants named in Count I violated Section 14(a) of the Exchange Act by their acts and omissions as alleged above. By virtue of their positions as controlling persons, Individual View Defendants and CF II Defendants are liable pursuant to Section 20(a) of the Exchange Act. Individual View Defendants and the CF II Defendants were culpable participants in the violations Section 14(a) alleged herein. As detailed above, during the respective times that these defendants served as officers and/or directors of CF II and View, each is responsible for the material misstatements and omissions made in the Proxy Statement.

204.    Plaintiffs and Class members eligible to vote on the Business Combination were denied the opportunity to make an informed decision in voting on the Business Combination and were damaged as a direct and proximate cause of the untrue statements and omissions in the Proxy Statement when those statements were revealed to be false and, as alleged herein, View securities declined in value.

205.    This Count is brought within the applicable statute of limitations.

**XIV.   ADDITIONAL FACTUAL ALLEGATIONS RELATING TO CLAIMS UNDER SECTION 10B AND RULE 10-b-5 OF THE EXCHANGE ACT**

**A.   Defendants View and Prakash Acted With Knowledge or Deliberate Recklessness**

206.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual View Defendants and the CF II Defendants, by virtue of their receipt of information reflecting the true facts regarding View, their control over, and/or receipt and/or modification of View's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning View, participated in the fraudulent scheme alleged herein.

1.    **Defendants View and Prakash Were Aware of the Installation Costs and Failed to Ensure the Ensure They Were Included in View's Warranty Liability[2]**

207.    As CFO, Defendant Prakash was responsible for ensuring that View properly accounted for and disclosed its liabilities for replacing windows with the Defect.

208.    Under US GAAP, a loss contingency, such as a warranty liability, should be accrued and disclosed if it is both "probable" and "can be reasonably estimated."

209.    Beginning around approximately late 2019 to early 2020, Prakash assembled a team consisting of members of View's accounting and finance groups to determine whether View should accrue a warranty liability for its projected expenses associated with addressing the Defect (the "Warranty Liability Team"). Prakash's role was to ensure that the Warranty Liability Team was supplied the information it needed for its work and to review and approve the final amount that the team determined should be accrued.

210.    By January 2020, Prakash had been told that View had decided to cover Installation Costs, notwithstanding View's determination that such costs were not covered by View's written warranty. Prakash nonetheless failed to ensure that the Warranty Liability Team considered View's decision and actual practice of covering Installation Costs when it prepared its recommendation.

211.    Prakash approved View's warranty liability despite knowing that it excluded Installation Costs which View had decided to incur.

212.    With Prakash's approval, in or around April 2020, View recorded a $24.5 million warranty liability for its projected cost of manufacturing replacement windows based on the Warranty Liability Team's recommendation. The warranty liability did not include any Installation Costs.

213.    In late 2020, Prakash asked Bammi, who was preparing View's 2021 budget for Installation Costs, whether View would continue to cover the Installation Costs for its customers

---

[2] The allegations in this section are based on the pleadings and other filings in the SEC Action. In the SEC Action, View provided the Commission staff with, *inter alia*, documents and witnesses (including both informal interviews and subpoenaed testimony) and detailed explanations and summaries of specific factual issues at all stages of the SEC staff's investigation. *See* July 3, 2023 C&D Order at 6-7. These allegations are further corroborated by the Audit Committee of the Board of Directors' own findings of both negligent and intentional conduct causing the Company's warranty accruals to be materially misstated.

1   with the Defect. Bammi responded that View needed to continue to cover Installation Costs for its
2   customers because the company was building market share and its reputation.

3      214.   Prakash did not ask Bammi what criteria the company would apply to determine
4   whether to stop covering Installation Costs for its customers.

5      215.   As set forth in more detail in the following section, on or around December 23, 2020,
6   CF II filed with the SEC the De-SPAC Registration Statement, of which the Proxy Statement
7   formed a part. All information regarding View in the publicly-available Form S-4 was supplied by
8   View.

9      216.   The Proxy Statement stated that View recognized $24.5 million in warranty
10  liabilities for the estimated cost to "replace" windows with the Defect. The Proxy Statement did
11  not disclose, and the financial statements contained therein did not reflect, that View had also
12  decided to cover Installation Costs.

13     217.   Prakash reviewed the portion of the Proxy Statement discussing the warranty
14  liabilities before it was filed with the SEC.

15     218.   By the time the December 23, 2020 De-SPAC Registration Statement was filed, of
16  which the Proxy Statement formed a part, Prakash had been told, and therefore knew or should
17  have known, that View had decided to cover Installation Costs for its customers. But even though,
18  as CFO, he was responsible for approving the warranty liability and had assembled the team that
19  worked on the warranty liability analysis, Prakash failed to ensure, as was his responsibility, that
20  the View staff involved in preparing the December 23, 2020 De-SPAC Registration Statement had
21  relevant information regarding View's decision to pay, or practice of paying, Installation Costs
22  such that they could analyze whether those costs should be included in the warranty liability.

23     219.   At that time, View had decided to pay the Installation Costs for the replacement
24  windows. Additionally, at that time, View's projected Installation Costs were probable, could be
25  reasonably estimated, and exceeded $20 million. Therefore, under US GAAP, View should have
26  accrued and disclosed a warranty liability including the Installation Costs.

27     220.   On or around January 18, 2021, View's controller forwarded an email to Prakash
28  stating that View spent $3.7 million on Installation Costs in 2020.

221.    On or around January 19, 2021, CF II received a Comment Letter from SEC staff in the Division of Corporation Finance regarding the December 23, 2020 De-SPAC Registration Statement. The Comment Letter asked CF II to amend the filing in several respects, including to: More fully explain the specific facts and circumstances related to the additional warranty you recorded, including the assumptions underlying the amount you accrued. If you believe an additional loss is reasonably possible, disclose that fact and disclose the amount of the estimated additional loss or, if applicable, disclose you are unable to estimate the amount of the additional loss and explain the reasons why.

222.    Prakash led View's effort to prepare a response to the Comment Letter, including assembling View's accounting and finance staff to discuss how to respond.

223.    Even though the Comment Letter explicitly asked whether "an additional loss is reasonably possible," and despite knowing that View had decided to cover Installation Costs for its customers as well as having recently received the email stating that View had spent $3.7 million on Installation Costs in 2020, Prakash failed to consult View's CEO, CBO, or its Customer Success team to determine how much in Installation Costs they anticipated, much less how much was "probable" and could be "reasonably estimated."

224.    Nor did Prakash ensure that the staff involved in preparing a response to the Comment Letter were aware of View's actual practice and decision to cover Installation Costs.

225.    In early February 2021, Prakash told View's independent, external auditor, Pricewaterhouse Coopers LLP ("PwC"), that View only paid Installation Costs for some customers, based on a case-by-case determination by View's CEO and CBO of whether View wanted to go "above and beyond" for that particular customer. This was not true; View did not assess whether to cover Installation Costs on a case-by-case basis, and neither the CEO nor CBO had told Prakash that it did.

226.    On or around April 7, 2021, View's controller forwarded Prakash an email from View's Vice President of Field Operations stating that View would pay for Installation Costs for 26 customers that View had identified as having windows with the Defect. The controller told

Prakash that, in light of the email, he had "concerns around implied performance obligations" regarding View paying Installation Costs.

227.    A few days later in April 2021, Prakash asked Bammi whether View would continue to cover Installation Costs for its customers, or whether View could instead do so on a case-by-case basis. Bammi responded that View needed to continue to cover the costs for its customers in order to protect View's reputation and maintain business; it could not do so on a case-by-case basis.

228.    On or around April 13, 2021, View's Vice President of Field Operation reiterated to Prakash that View had decided to cover Installation Costs for all customers with the Defect.

**B.    There Were Numerous Suspiciously-timed Resignations of View Executives and Directors**

229.    On February 22, 2022, Hughes resigned as Executive Chair, Principal Executive Officer and director of View. Also on February 22, 2022, Leppert resigned as a director of the Company.  Hughes served as chair of View's Audit Committee, and Leppert served as a member of View's Audit Committee, from March 8, 2021 to approximately February 22, 2022.   In connection with Hughes and Leppert's resignations, View announced that "[i]t is the Company's understanding that Mr. Hughes and Mr. Leppert believe that the Audit Committee's remedial recommendations were not fully implemented by the Board; they believe that the Board's determination of the responsibilities of Mr. Hughes as Executive Chair was inconsistent with what the Board had previously decided."

230.    Defendant Prakash resigned as CFO of the Company, effective November 8, 2021.

231.    On January 31, 2021, Defendant Pion resigned as CFO, director, and member of the Audit Committee of CF II.  The timing of Defendant Pion's resignation was suspicious as it occurred during the first quarter ended March 31, 2021 during which View, among other things, materially understated liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities and failed to properly record the liabilities for warranty-related obligations and cost of revenue.  The timing of Defendant Pion's resignation was also suspicious as it occurred following the due diligence processes the CF II

Defendants represented they undertook, and just five weeks prior to the consummation of the Business Combination.

232.   On March 19, 2021, Tom Cheung resigned as a member of View's board of directors.  Tom Cheung had served as a member of View's Board since August 2019.  The timing of Mr. Chung's resignation was suspicious as it occurred just 10 days following the consummation of the Business Combination.

**C.    Smart Glass Was View's Core Product and Its Operations Centered on A Relatively Narrow Customer, Supplier, and Manufacturing Framework**

233.   As alleged herein, Smart Glass or the IGUs were View's core product and, as detailed below, View's operations were relatively narrow such that Lead Plaintiff is entitled to the inference that the adverse facts were in plain view to Company insiders.

234.   First, as set forth in the Proxy Statement (defined herein), Defendants represented that as of December 15, 2020, View's Milpitas, California headquarters office "has a strong engineering base and a smaller research and development facility. Our products rely heavily on the strength of our research and development, as well as engineering capabilities, and we have 90 employees focused on these areas."

235.   Second, as of at least February 2021, View manufactured its smart glass product on a single production line.

236.   Third, View's customer and supplier base is relatively narrow.  As set forth in the 1Q21 10-Q, one customer represented 26.3% of total revenue for the three months ended March 31, 2021, and four customers accounted for 65.0% for the three months ended March 31, 2020.

237.   Fourth, as set forth in the 1Q21 10-Q, one customer represented 28.8% of accounts receivable, net as of March 31, 2021, and one customer accounted for 23.6% of accounts receivable, net as of December 31, 2020.  In the 10-K for the fiscal year ended December 31, 2021, filed June 15, 2022, View stated that two customers represented 24% of total revenue, and that for the years ended December 31, 2020 and December 31, 2019, one customer accounted for 10.2% and 11.2% of total revenue, respectively.

238.   Fifth, the Company purchases materials from a "limited number of suppliers."  For the three months ended March 31, 2021, "two suppliers accounted for 37.3% and 12.7% of total purchases" and for the three months ended March 31, 2020, "one supplier accounted for 48.6% of total purchases."  The glass components used in View products were from a single source supplier.

239.   Sixth, according to the 1Q21 10-Q, the Company "operates and manages its business as one reportable and operating segment."

**D.   View's Proxy Statement And Other SEC Filings Alleged Herein Included Financial Statements Not In Conformity With GAAP**

240.   According to the Company's filings with the SEC during the Class Period, View states that its consolidated financial statements were prepared in accordance with GAAP.  By engaging in clear violations of GAAP and the rules established by the SEC, View masked the Company's true financial condition and costs of revenues.  Indeed, given the restatement (discussed herein) and the violations of GAAP, View's financial condition and costs of revenue reported during the Class Period were materially false and misleading.

241.   As a registrant with the SEC, View was responsible for issuing and fairly presenting its consolidated financial statements in accordance with U.S. GAAP and SEC Rules.

242.   GAAP (also referred to herein as U.S. GAAP) is the set of conventions, rules and procedures, which constitute the professional standards of the accounting profession. During the Class Period, authoritative U.S. GAAP were promulgated by the Financial Accounting Standards Board ("FASB") and contained within the FASB's Accounting Standards Codification ("ASC"). U.S. GAAP brings consistency, conformity and, over time, comparability to financial reporting. It includes not only broad guidelines of general application, but also detailed practices and procedures. Those conventions, rules and procedures provide a standard by which to measure financial presentations.

243.   During the Class Period, View, through its management/directors (the Individual View Defendants) repeatedly assured investors that the Company's consolidated financial statements as filed with the SEC were fairly presented in accordance with U.S. GAAP.

244.    As set forth in connection with the issuance of the restatement, the Company was caused to state that: 1) its previously reported liabilities associated with warranty-related obligations and the cost of revenue associated with the recognition of those liabilities were materially misstated; 2) there was a failure to properly record the liabilities for warranty related obligations and cost of revenue; and 3) the installation labor and freight costs the Company incurred and expected to continue to incur were inappropriately excluded from the warranty obligation.  See *e.g.*, Form 10-Q/A Amendment No. 1 for period ended March 31, 2021 at page 20; Form 10-K for fiscal year ended December 31, 2021 ("2021 Form 10-K") at page 107.  As noted in the 2021 Form 10-K at page 107:

> As a result of these material misstatements, the Company's warranty liabilities were understated by $25.0 million as of December 31, 2020 and the Company's Cost of Revenue and Net Loss were overstated by $3.1 million and understated by $20.9 million for the years ended December 31, 2020 and 2019, respectively, as well as understated by $7.1 million for periods prior to 2019, which has been corrected for as an adjustment to Accumulated Deficit as of December 31, 2018.

**E.     View's Restatement Is An Admission That The Subject Financials Were Materially False As Initially Reported**

245.    GAAP requires prompt correction, by way of restatement, of previously issued materially misstated financial statements.  View's statements that it would restate its financial results constitutes an admission by management of the materiality of the misstatements in the Company's previously issued consolidated financial statements.

246.    Specifically, an "error in previously issued financial statements" is generally limited to material items under GAAP.  ASC 250, Accounting Changes and Error Corrections ("ASC 250") defines an error in previously issued financial statements as an "error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of [GAAP], or oversight or misuse of facts that existed at the time the financial

statements were prepared." ASC 250-10-20.  ASC 250 defines a "[r]estatement" as "[t]he process of revising previously issued financial statements to reflect the correction of an error in those financial statements." ASC 250-10-20.

247.   Under GAAP, where an error in financial statements discovered after such statements are issued is deemed to be material, GAAP requires that such errors be disclosed. Specifically, ASC 250 requires that such error "be reported as an error correction, by restating the prior-period financial statements." ASC 250-10-45-23.  Restatement requires that:

> • The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented;
>
> • An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period; and
>
> • Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

248.   Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error." ASC 250-10-45-23.

249.   The requirement to restate errors in previously issued financial statements does not apply to immaterial errors as ASC 250-10-S99 affirms: "Correcting prior year financial statements for immaterial errors would not require previously filed reports to be amended." ASC 250-10-S99.

250.   Therefore, in accordance with U.S. GAAP, View's restatement conclusion reflects its acknowledgement that for at least those annual and interim reporting periods set forth herein as part of the restatement were material errors at the time of issuance.:

> • GAAP misstatements existed in its previously issued financial statements;
>
> • The misstatements were material; and

- These misstatements resulted from oversight or misuse of facts that existed at the time the previously issued financial statements were originally presented.

### F. Corporate Scienter and *Respondeat Superior*

251. Individual View Defendants Mulpuri and Prakash were high-ranking management-level employee of View that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in their role as an executive employee and representative of View. The scienter of each of these individuals and all other management-level employees of View, is therefore imputed to Defendant View.

252. CF II Individual Defendants Lutnick, Pion, Chan, Jain were high-ranking management-level employee of CF II that either (i) made the false or misleading statements alleged herein; (ii) approved the false or misleading statements alleged herein; or (iii) approved the making or issuance of the false or misleading statements alleged herein. In so doing, each was acting in their role as an executive employee and representative of CF II (which subsequently was known as View). The scienter of each of these individuals and all other management-level employees of CF II, is therefore imputed to Defendant CF II/View.

## XV. NO SAFE HARBOR

253. CF II and/or View's "Safe Harbor" warnings accompanying any forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

254. Defendants are liable for any false or misleading FLS pleaded herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of CF II and/or View who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

255.    In addition, the FLS were contradicted by existing, undisclosed material negative facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

## XVI.    COUNTS FOR VIOLATIONS OF SECTIONS 10 AND 20(a) OF THE EXCHANGE ACT

### COUNT III
**For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b)**
**Against Defendants View and Prakash**

256.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

257.    During the Class Period, Defendants named in this Count disseminated or approved the false statements specified above by use of the means or instrumentalities of interstate commerce, which statements they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

258.    Defendants named in this Count violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

259.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiffs and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

260.   As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and/or acquisitions of View securities during the Class Period.  The price for View's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

261.   This Count is brought within the applicable statute of limitations.

<u>COUNT IV</u>
**For Violation of § 20(a) of the Exchange Act**
**Against Mulpuri, Prakash and the CF II Defendants (Except Blechman and Hochberg)**

262.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.  Defendants Mulpuri, Prakash and the CF II Defendants (except Blechman and Hochberg) are referred to herein as the "Control Defendants."

263.   The Control Defendants acted as controlling persons of CF II and/or View within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Control Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the CF II and View, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Control Defendants were provided with or had unlimited access to copies of the CF II's and View's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

264.   In particular, those Control Defendants who are natural persons (*i.e.*, Mulpuri, Prakash and the Individual CFII Defendants) had direct and supervisory involvement in the day-to-day operations of the CF II and/or View and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

265. As set forth above, View (formerly known as CF II), Mulpuri and Prakash, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Mulpuri, Prakash, and the other Control Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

266. This Count is brought within the applicable statute of limitations.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23, certifying Lead Plaintiff Stadium Capital and Plaintiff David Sherman as class representatives, and appointing undersigned Lead Counsel as class counsel;

B. Awarding Plaintiffs and the members of the Class damages and interest;

C. Awarding Plaintiffs reasonable costs, including attorneys' fees; and

D. Awarding such equitable injunctive or other relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

DATED: August 21, 2023        By:   /s/ *Laurence D. King*
                                         Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
*lking@kaplanfox.com*
*kherkenhoff@kaplanfox.com*
*breed@kaplanfox.com*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium Capital LLC,*
*Plaintiff David Sherman and the Proposed Class*

SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS