# EXHIBIT 14

MONIQUE C. WINKLER (Cal. Bar No. 213031)
JASON H. LEE (Cal. Bar No. 253140)
SUSAN F. LAMARCA (Cal. Bar No. 215231)
  lamarcas@sec.gov
THEIS FINLEV (Cal. Bar No. 264879)
  finlevt@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| VIDUL PRAKASH, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("the Commission" or "SEC") alleges:

**SUMMARY OF THE ACTION**

1.    This is a financial reporting and accounting fraud case arising from defendant Vidul Prakash's role in View, Inc.'s ("View") failure to accrue for and disclose over $20 million in liabilities, depriving investors of material information about View's financial condition.

2.    Prakash approved the liability amounts that View accrued and disclosed even though the amounts excluded costs which Prakash had been told View had decided to incur.

COMPLAINT                                        1

**Ex. 14 - 1**

3.  View is a manufacturer of "smart" windows headquartered in Milpitas, California. In 2019, View's management discovered a defect in many of its windows sold.

4.  As View's CFO, Prakash was responsible for ensuring that View accurately disclosed the costs associated with its warranty liability in compliance with generally accepted accounting principles in the United States ("US GAAP"). He was also responsible for ensuring that View's staff who prepared the company's liability for such warranty costs had the information needed to recommend an accurate warranty liability.

5.  In a series of reports and financial statements filed with the Securities and Exchange Commission from December 2020 to May 2021, View disclosed a warranty liability which ranged between approximately $22 million to $25 million, based upon the period covered, consisting largely of projected costs to *manufacture* replacements for windows with a particular defect.

6.  At the time of those SEC filings, Prakash had been told that View had decided to also pay the costs to *ship and install* the replacement windows (the "Installation Costs") for its customers, even though View did not believe it was required to do so under its written warranty. Prakash knew that the warranty liabilities that View disclosed *excluded Installation Costs*.

7.  At the time of those SEC filings, it was probable and could be reasonably estimated that View would spend over $20 million on Installation Costs, in addition to the $22 million to $25 million that it disclosed largely for its projected costs to manufacture replacement windows. Therefore, under US GAAP, View should have recognized and disclosed the Installation Costs as part of its warranty liabilities.

8.  Despite receiving queries from the SEC and from View's own controller that raised questions and concerns regarding the adequacy of View's disclosed warranty liabilities, Prakash failed to address those questions and concerns and continued to maintain View's warranty liabilities at a level that excluded the Installation Costs that View had decided to incur.

9.  As a result, View understated its warranty liabilities – and corresponding increases in expenses – by over $20 million, and its financial statements for fiscal years 2019 and 2020 and Q1 2021 were materially misstated. View acknowledged this fact when it restated

COMPLAINT                                    2

its financial statements for those periods in May 2022, increasing its previously reported warranty liabilities by more than 100%.

10.     By his actions, Prakash violated the antifraud, proxy disclosure, and books and records provisions of the federal securities laws. Specifically, Prakash violated Section 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78n(a)]; and Exchange Act Rules 14a-9 [17 C.F.R. § 240.14a-9] and 13b2-1 [17 C.F.R. § 240.13b2-1].

11.     The Commission requests, among other things, that the Court: (i) permanently restrain and enjoin Prakash from further violating the federal securities laws as alleged in this complaint; (ii) order Prakash to pay civil monetary penalties; and (iii) prohibit Prakash from acting as an officer or director of a publicly-traded company.

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

13.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v)] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa].

14.     Prakash, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

15.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. View is based in this District and filed its incorrect financial statements from its headquarters. The relevant offers and sales of securities also took place in this District.

COMPLAINT                                3

16.     Under Civil Local Rule 3-2(e), this civil action should be assigned to the San Jose Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in Santa Clara County, where View's principal place of business was located and where Prakash engaged in the relevant conduct.

## DEFENDANT

17.     **Vidul Prakash**, age 55, is a resident of Los Altos, California. Prakash served as View's CFO from in or around March 2019 through November 2021. He has an MBA degree and has worked in finance and operations for over 25 years in companies ranging from startups to Fortune 100.

## RELATED ENTITY

18.     **View, Inc**. is a Delaware corporation with its principal place of business in Milpitas, California. It is a manufacturer of smart windows, originally formed as a private company in 2007. On March 8, 2021, View merged with a subsidiary of CF Finance Acquisition Corp II ("CF II"), a special purpose acquisition company, and as a result, its post-merger shares became publicly traded. View's stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the Nasdaq Global Market under the ticker symbol, "VIEW."

19.     **CF Finance Acquisition Corp II** was a Delaware corporation with its principal place of business in New York. It was a special purpose acquisition company and an SEC-reporting company from May 2020 until its subsidiary merged with pre-merger View in March 2021. Prior to the merger, CF II's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Capital Market under the ticker symbol, "CFII."

## FACTUAL ALLEGATIONS

**I.    View Decides to Cover Costs of Installing Replacement Windows**

20.     View manufactures and sells a smart window whose pane adjusts in response to the sun by tinting from clear to dark states, and vice versa. View's smart windows have been sold to and installed at customer sites – mostly office buildings – across the country.

COMPLAINT                                          4

21. Prakash was hired as View's CFO in March 2019.

22. In 2019, View identified a defect in its windows related to a sealing component manufactured by a third-party (the "Defect").

23. View's standard 10-year written warranty provided for View to replace its windows with the Defect, but did not specifically state that View would pay the Installation Costs. Nonetheless, when View identified the Defect, its leadership, including its Chief Executive Officer ("CEO") and its Chief Business Officer ("CBO"), determined that View would cover the Installation Costs for its customers whose windows had the Defect because View was building its market, wanted to be good to its customers, and wanted repeat business.

24. As CFO, Prakash attended regular meetings of View's executive staff, which also included View's CEO, CBO, and other executives. The Defect was discussed at executive staff meetings throughout 2019 to 2021. During those meetings, the executives discussed View's decision to cover Installation Costs and how to communicate with View's customers about the Defect.

25. By no later than early 2020, View's CBO had told Prakash that View had decided to cover Installation Costs for its customers, even though View's management did not believe the warranty obligated it to do so.

26. Around early 2020, View's CBO assembled a team (the "Defect Response Team") to manage View's response to the Defect, including tracking Defects at customer sites, managing the process of replacing the windows, and training View's Customer Success department – the View staff responsible for managing the replacement of windows with the Defect at customer sites.

27. When View learned that a customer had a window with the Defect, View's Customer Success department advised the customer that View would cover the customer's Installation Costs (in addition to providing the customer replacement windows, as required under View's written warranty).

28. View's Customer Success department did not apply an individualized assessment to determine whether it would pay Installation Costs for any particular customer.

COMPLAINT                                                    5

29.     The Customer Success department hired third-party window installers, known as glaziers, to perform the actual installation of the replacement windows. To hire glaziers, the Customer Success department staff submitted purchase requisitions – a request to buy services – for the Installation Costs, through View's finance department.

30.     Prakash approved several purchase requisitions for Installation Costs for glaziers to install replacement windows from 2019 through 2021.

31.     Prakash never denied a purchase requisition for glaziers. In approving the purchase requisitions for glaziers, Prakash never questioned the Customer Success department's decision to cover Installation Costs for the particular customer at issue; he also did not question, or ask them to provide, the criteria they had applied, if any, in deciding to cover those costs.

32.     The Defect Response Team sent Prakash weekly updates tracking which customers had windows with the Defect, the number of windows affected, how many windows had already been replaced, and how many windows remained to be replaced.

33.     View spent more than $2 million dollars on Installation Costs in each of 2019, 2020 and 2021.

**II.     Prakash Fails to Ensure that Installation Costs are Included in View's Warranty Liability**

34.     As CFO, Prakash was responsible for ensuring that View properly accounted for and disclosed its liabilities for replacing windows with the Defect.

35.     Under US GAAP, a loss contingency, such as a warranty liability, should be accrued and disclosed if it is both "probable" and "can be reasonably estimated."

36.     Beginning around approximately late 2019 to early 2020, Prakash assembled a team consisting of members of View's accounting and finance groups to determine whether View should accrue a warranty liability for its projected expenses associated with addressing the Defect (the "Warranty Liability Team"). Prakash's role was to ensure that the Warranty Liability Team was supplied the information it needed for its work and to review and approve the final amount that the team determined should be accrued.

37.    In January 2020, a member of the Warranty Liability Team sent Prakash an internal presentation summarizing the team's warranty liability discussion at that time. In an Accounting Treatment section, the presentation stated, "[p]roduct warranty is a loss contingency that should be accrued if it is both probable and reasonably estimable." The presentation concluded that a loss contingency for the Defect was "probable" and "reasonably estimable" and that View would therefore accrue the cost of "replacing" windows with the Defect.

38.    The presentation also noted that, "[l]abor cost is not covered in View's warranty policy." The Warranty Liability Team recommended that View did not need to accrue for and disclose the Installation Costs as part of the warranty liability *because View's written warranty did not obligate View to pay Installation Costs.* The presentation failed to state that View had decided to cover Installation Costs, even though View's management believed its written warranty did not obligate it to do so; as a result, the presentation also failed to analyze whether those costs were thus "probable" and could be "reasonably estimated," and therefore should be accrued and included in the warranty liability.

39.    By the time of the presentation, Prakash had been told that View had decided to cover Installation Costs, notwithstanding View's determination that such costs were not covered by View's written warranty. Prakash nonetheless failed to ensure that the Warranty Liability Team considered View's decision and actual practice of covering Installation Costs when it prepared its recommendation.

40.    As a result, the Warranty Liability Team that Prakash assembled to assess View's warranty liability did so without considering View's decision to cover Installation Costs. The Warranty Liability Team therefore incorrectly recommended that View book a warranty liability that excluded Installation Costs.

41.    Prakash approved the proposed warranty liability despite knowing that it excluded Installation Costs which View had decided to incur.

42.    With Prakash's approval, in or around April 2020, View recorded a $24.5 million warranty liability for its projected cost of manufacturing replacement windows based on the

COMPLAINT                                            7

Warranty Liability Team's recommendation. The warranty liability did not include any Installation Costs.

43.     In late 2020, Prakash asked View's CBO, who was preparing View's 2021 budget for Installation Costs, whether View would continue to cover the Installation Costs for its customers with the Defect. The CBO responded that View needed to continue to cover Installation Costs for its customers because the company was building market share and its reputation.

44.     Prakash did not ask the CBO what criteria the company would apply to determine whether to stop covering Installation Costs for its customers. Nor did Prakash tell the CBO that View's practice of paying Installation Costs could have accounting implications.

**III.     View's Misleading SEC Filings**

45.     On or around December 23, 2020, CF II filed with the Commission a Form S-4 Registration and Proxy Statement in connection with its proposed merger with View. All information regarding View in the publicly-available Form S-4 was supplied by View.

46.     The Form S-4 stated that View recognized $24.5 million in warranty liabilities for the estimated cost to "replace" windows with the Defect. The Form S-4 did not disclose, and the financial statements contained therein did not reflect, that View had also decided to cover Installation Costs.

47.     Prakash reviewed the portion of the Form S-4 discussing the warranty liabilities before it was filed with the Commission.

48.     In addition, Prakash's name was used throughout the proxy statement: his name was mentioned over 20 times in the proxy statement as View's CFO; the statement included his biography, which noted that he joined View "with over 25 years of global finance and operations experience in private and public companies ranging from startups to Fortune 100"; and the proxy statement stated that Prakash would also be an executive officer (CFO) of the merged entity.

49.     By the time the Form S-4 was filed, Prakash had been told, and therefore knew or should have known, that View had decided to cover Installation Costs for its customers. But even though, as CFO, he was responsible for approving the warranty liability and had assembled

COMPLAINT                                          8

the team that worked on the warranty liability analysis, Prakash failed to ensure, as was his responsibility, that the View staff involved in preparing the Form S-4 had relevant information regarding View's decision to pay, or practice of paying, Installation Costs such that they could analyze whether those costs should be included in the warranty liability.

50.    At that time, View had decided to pay the Installation Costs for the replacement windows. Additionally, at that time, View's projected Installation Costs were probable, could be reasonably estimated, and exceeded $20 million. Therefore, under US GAAP, View should have accrued and disclosed a warranty liability including the Installation Costs.

51.    On or around January 18, 2021, View's controller forwarded an email to Prakash stating that View spent $3.7 million on Installation Costs in 2020.

52.    On or around January 19, 2021, CF II received a Comment Letter from SEC staff in the Division of Corporation Finance regarding CF II's Form S-4 filed in December 2020. The Comment Letter asked CF II to amend the Form S-4 in several respects, including to:

> More fully explain the specific facts and circumstances related to the additional warranty you recorded, including the assumptions underlying the amount you accrued. If you believe an additional loss is reasonably possible, disclose that fact and disclose the amount of the estimated additional loss or, if applicable, disclose you are unable to estimate the amount of the additional loss and explain the reasons why.

53.    Prakash led View's effort to prepare a response to the Comment Letter, including assembling View's accounting and finance staff to discuss how to respond.

54.    Even though the Comment Letter explicitly asked whether "an additional loss is reasonably possible," and despite knowing that View had decided to cover Installation Costs for its customers as well as having recently received the email stating that View had spent $3.7 million on Installation Costs in 2020, Prakash failed to consult View's CEO, CBO, or its Customer Success team to determine how much in Installation Costs they anticipated, much less how much was "probable" and could be "reasonably estimated."

55.    Nor did Prakash ensure that the staff involved in preparing a response to the Comment Letter were aware of View's actual practice and decision to cover Installation Costs.

COMPLAINT                                                    9

56. As a result, CF II's amended Form S-4, filed on or around January 26, 2021, continued to fail to disclose View's Installation Costs.

57. In early February 2021, Prakash told View's independent, external auditor, PwC, that View only paid Installation Costs for some customers, based on a case-by-case determination by View's CEO and CBO of whether View wanted to go "above and beyond" for that particular customer. This was not true; View did not assess whether to cover Installation Costs on a case-by-case basis, and neither the CEO nor CBO had told Prakash that it did.

58. On February 16, 2021, CF II filed with the Commission a Prospectus/Proxy Statement that included View's financial statements disclosing the $24.5 million warranty liability for the Defect as of December 2019. All information regarding View in the Prospectus/Proxy Statement had been supplied by View.

59. As with the December 23, 2020 Proxy and Registration Statement, Prakash's name was used throughout the February 16, 2021 Prospectus/Proxy Statement: his name was mentioned over 20 times as View's CFO; the statement included his biography; and the statement stated that Prakash would become an executive officer (CFO) of the merged entity.

60. On or around March 12, 2021, View filed with the Commission a Current Report on Form 8-K disclosing the consummation of the merger between CF II and View on March 8, 2021. The Form 8-K included View's financial statements disclosing the $24.5 million warranty liability for the Defect. The Form 8-K did not disclose Installation Costs.

61. Prakash reviewed the March 12, 2021 Form 8-K and signed it as View's CFO.

62. On or around April 7, 2021, View's controller forwarded Prakash an email from View's Vice President of Field Operations stating that View would pay for Installation Costs for 26 customers that View had identified as having windows with the Defect. The controller told Prakash that, in light of the email, he had "concerns around implied performance obligations" regarding View paying Installation Costs.

63. A few days later in April 2021, Prakash asked the CBO whether View would continue to cover Installation Costs for its customers, or whether View could instead do so on a case-by-case basis. The CBO responded that View needed to continue to cover the costs for its

COMPLAINT                    10

customers in order to protect View's reputation and maintain business; it could not do so on a case-by-case basis.

64.    On or around April 13, 2021, View's Vice President of Field Operation reiterated to Prakash that View had decided to cover Installation Costs for all customers with the Defect.

65.    Despite this information, Prakash still did not ensure that staff involved in preparing View's warranty liability analyzed whether View's Installation Costs were probable and could be reasonably estimated – and should therefore be accrued for and disclosed in View's warranty liability - in light of View's decision to cover those costs.

66.    On or around May 17, 2021, View filed with the Commission a Quarterly Report on Form 10-Q for the quarter ended March 31, 2021. The Form 10-Q disclosed that View's total warranty liability (including projected costs for both the Defect and all other warranty obligations) was $22.7 million as of December 31, 2020. The Form 10-Q further disclosed that the total warranty liability (including projected costs for both the Defect and all other warranty obligations) was $21.9 million as of March 31, 2021. The Form 10-Q did not disclose Installation Costs.

67.    Prakash reviewed the May 17, 2021 Form 10-Q and signed it as View's CFO.

68.    In connection with the Form 10-Q, Prakash signed a certification pursuant to Exchange Act Rules 13a-14(a) and 15d-14(a) certifying, among other items, that, along with View's other certifying officers, he is responsible for establishing and maintaining disclosure controls and procedures, and has

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared

69.    In connection with the May 17, 2021 Form 10-Q, Prakash also signed a certification pursuant to 18 U.S.C. Section 1350, certifying, among other items, that, to his knowledge, "the information contained in the [Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

COMPLAINT                                    11

70.    The May 17, 2021 Form 10-Q did not disclose, and the financial statements contained therein did not reflect, that View had decided to cover Installation Costs for the replacement windows. At that time, View had decided, and still intended, to pay those costs.

71.    At that time, View's projected Installation Costs were probable, could be reasonably estimated, and exceeded $20 million. Therefore, under US GAAP, View should have accrued and disclosed a warranty liability including the Installation Costs.

### IV.    View's Internal Investigation and Restatement

72.    On November 9, 2021, View filed with the Commission a Current Report on Form 8-K stating that its Audit Committee, in consultation with View's management, concluded that the previously-reported liabilities associated with the company's warranty-related obligations and the associated cost of revenue were materially misstated because the recorded liabilities excluded costs View intended to incur when replacing windows with the Defect. View also announced that had Prakash resigned "in connection with the internal investigation findings," effective November 8, 2021.

73.    On May 31, 2022, View issued a Form 8-K that restated its 2019 warranty liability as $53 million (previously reported as $25 million). View also restated its 2020 warranty liability as $48 million (originally stated as $23 million).

74.    On June 15, 2022, View issued a Form 10-K for fiscal year 2021 that included a restatement of its affected financial statements. In the Form 10-K, View disclosed that it identified material weaknesses in its internal control over financial reporting of its warranty related obligations, among other material weaknesses.

75.    During December 2020 through November 2021, the period that its financial statements were materially misstated, View obtained money or property from the sale of its securities, including from the sale of $440 million in shares pursuant to a private investment in public equity transaction and from payments received from the issuance of common stock upon the exercise of options.

**Ex. 14 - 12**

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a)(3) of the Securities Act

76.    The SEC re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 75, as if fully set forth herein.

77.    By engaging in the conduct described above, Prakash, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

78.    By engaging in the foregoing, Prakash violated, and unless restrained and enjoined, will continue violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 14(a) and Rule 14a-9 of the Exchange Act

79.    The SEC re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 78, as if fully set forth herein.

80.    By engaging in the conduct described above, Prakash directly or indirectly, by use of mails, or the means or instrumentalities of interstate commerce or any facility of a national securities exchange, or otherwise, in contravention of Rule 14a-9 of the Exchange Act, solicited or permitted the use of his name to solicit proxies, consents, or authorizations in respect of non-exempt securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], by means of a proxy statement, form of proxy statement, notice of meeting and other communications that contained statements, which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts or which omitted to state material facts necessary in order to make the statements made therein not false or misleading or necessary to correct statements in earlier communications with respect to the solicitation of a proxy for the same meeting or subject matter which became false or misleading.

COMPLAINT                                          13

**Ex. 14 - 13**

81. By engaging in the foregoing conduct, Prakash violated and, unless restrained and enjoined, will continue violating Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)] and Rule 14a-9 thereunder [17 C.F.R. § 240.14a-9].

### THIRD CLAIM FOR RELIEF

### Violations of Rule 13b2-1 of the Exchange Act

82. The Commission re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 81, as if fully set forth herein.

83. Prakash, by engaging in the acts and conduct described above, directly or indirectly, falsified or caused to be falsified books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

84. By reason of the foregoing, Prakash violated, and unless restrained and enjoined will continue to violate Rule 13b2-1 of the Exchange Act [17 C.F.R. § 240.13b2-1].

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

I.

Enter an order permanently restraining and enjoining Prakash from directly or indirectly violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)], Section 14(a) of the Exchange Act [15 U.S.C. § 78n(a)], and Exchange Act Rules 14a-9 [17 C.F.R. § 240.14a-9] and 13b2-1 [17 C.F.R. § 240.13b2-1].

II.

Enter an order requiring Prakash to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

III.

Enter an order barring Prakash from serving as an officer or director of any issuer having a class of securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1), (d)(5)].

**Ex. 14 - 14**

IV.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: July 3, 2023                              Respectfully submitted,

                                                 /s/  *Theis Finlev*
                                                 Theis Finlev
                                                 Attorney for Plaintiff
                                                 SECURITIES AND EXCHANGE COMMISSION

COMPLAINT                              15