Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
Emails: *lking@kaplanfox.com*
          *kherkenhoff@kaplanfox.com*
          *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
Emails:  *ffox@kaplanfox.com*
          *dhall@kaplanfox.com*
          *juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium
Capital LLC, Plaintiff David Sherman and the
Proposed Class*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., AND CF GROUP MANAGEMENT, INC., <br><br> Defendants. | Case No.: 5:21-cv-06374-BLF <br><br> **CLASS ACTION** <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** <br><br> Judge:  Hon. Beth L. Freeman <br> Courtroom:  3, 5th Floor <br> Date:  March 14, 2024 <br> Time:  9:00 a.m. |

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF FACTS ............................................................. 1

II.   ARGUMENT ................................................................................................................... 2

    A.    Section 14(a) and Rule 14a-9 Claims Are Alleged ................................................. 2

        1.    Each 14(a) Defendant Owed a Duty to Ensure Accurate Disclosures ........ 3

        2.    Each 14(a) Defendant Negligently Breached Their Duty ........................... 4

            a.    Each 14(a) Defendant Had Access To Information Reflecting the Decision to Cover Installation Costs ...................... 4

            b.    The 14(a) Claim Does Not Sound in Fraud ................................. 10

            c.    The 14(a) Claim Against Prakash is Even Stronger ..................... 11

        3.    The 14(a) Defendants Engaged in Solicitation ......................................... 12

        4.    Plaintiffs Plead Loss Causation for the 14(a) Claim ................................ 17

        5.    Delaware Code Section 102(b)(7) Does Not Apply ................................. 17

    B.    The Baseless and Procedurally Improper Motion to Strike Should Be Denied .................................................................................................................. 18

    C.    10(b) and Rule 10b-5 Claims are Alleged Against View and Prakash ................. 20

        1.    Plaintiffs' Allegations Support a Strong Inference of Scienter ................. 20

        2.    Plaintiffs Allege Loss Causation .............................................................. 23

    D.    Control Person Claims are Adequately Alleged .................................................... 27

    E.    Defendants' Attempt to Ignore Named Plaintiff Sherman Should be Rejected ................................................................................................................. 29

III.  CONCLUSION .............................................................................................................. 30

## TABLE OF AUTHORITIES

### CASES

*Adams v. AllianceOne, Inc.*,
  No. 08-CV-248-JAH(WVG), 2010 WL 11508282 (S.D. Cal. Mar. 22, 2010) ........................ 30

*Baertschiger v. Lopez*,
  No. CV 20-6635-ODW (KS), 2021 WL 4555613 (C.D. Cal. June 11, 2021) .......................... 18

*Bajjuri v. Raytheon Techs. Corp.*,
  No. CV-20-00468-TUC-JCH, 2023 WL 3650554 (D. Ariz. May 25, 2023) ........................... 25

*Barr v. Matria Healthcare, Inc.*,
  324 F. Supp. 2d 1369 (N.D. Ga. 2004) ................................................................................. 24

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................... 2, 11

*Bos. Ret. Sys. v. Uber Techs.*, Inc.,
  No. 19-CV-06361-RS, 2022 WL 2954937 (N.D. Cal. July 26, 2022) ................................... 29

*Brown v. Brewer*,
  No. CV 06-3731-GHK (JTLx), 2008 WL 6170885 (C.D. Cal. July 14, 2008) ...................... 17

*Brown v. Brewer*,
  No. CV06-3731-GHK SHX, 2010 WL 2472182 (C.D. Cal. June 17, 2010) .......................... 10

*Burgess v. Premier Corp.*,
  727 F.2d 826 (9th Cir. 1984) ................................................................................................. 27

*Costanzo v. DXC Tech. Co.*,
  No. 19-CV-05794-BLF, 2020 WL 4284838 (N.D. Cal. July 27, 2020) ................................. 14

*Delman v. GigAcquisitions3, LLC*,
  288 A.3d 692 (Del. Ch. 2023) ................................................................................................. 7

*Dolphin & Bradbury, Inc. v. SEC*,
  512 F.3d 634 (D.C. Cir. 2008) ................................................................................................. 9

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................................. 25

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) .............................................................................................................. 17

*Erickson v. Corinthian Colleges, Inc.*,
  No. CV137466GHKPJWX, 2015 WL 12732435 (C.D. Cal. Apr. 22, 2015) ......................... 19

*Evanston Police Pension Fund v. McKesson Corp.*,
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................................... 19

*Gould v. Am.-Hawaiian S. S. Co.*,
  535 F.2d 761 (3d Cir. 1976) ................................................................................................... 3

*Gru v. Axsome Therapeutics, Inc.*,
  No. 22 CIV. 3925 (LGS), 2023 WL 6214581 (S.D.N.Y. Sept. 25, 2023) ............................. 24

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF AUTHORITIES (cont.)

Pages(s)

*Havesi v. Citigroup, Inc.*,
  366 F.3d 70 (2d Cir. 2004) ................................................................................................... 30

*Hefler v. Wells Fargo & Co.*,
  No. 16-CV-05479-JST, 2018 WL 1070116  (N.D. Cal. Feb. 27, 2018) .................................. 27

*Hevesi v. Citigroup Inc.*,
  366 F.3d 70 (2d Cir. 2004) ................................................................................................... 29

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) .............................................................................................. 27

*Hunt v. Bloom Energy Corp.*,
  No. 19-CV-02935-HSG, 2021 WL 1110260 (N.D. Cal. Mar. 23, 2021) ................................ 29

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) ......................................................................... 3, 15, 17

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ................................................................................................ 20

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................................. 19

*In re Cylink Secs. Litig.*,
  178 F.Supp.2d 1077 (N.D. Cal. 2001) .................................................................................. 19

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
  238 F. Supp. 3d 799 (S.D. Tex. 2017) .................................................................................. 14

*In re Exodus Commc'ns, Inc. Sec. Litig.*,
  No. C-01-2661 MMC, 2006 WL 2355071 (N.D. Cal. Aug. 14, 2006) ................................... 30

*In re Facebook, Inc. Sec. Litig.*,
  84 F.4th 844 (9th Cir. 2023) ................................................................................................. 26

*In re Finisar Corp. Sec. Litig.*,
  646 F. App'x 506 (9th Cir. 2016) .................................................................................... 21, 22

*In re Finjan Holdings, Inc.*,
  58 F.4th 1048 (9th Cir. 2023) .............................................................................................. 2, 8

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................................... 29

*In re Impax Lab'ys, Inc. Sec. Litig.*,
  No. C 04-04802 JW, 2008 WL 1766943 (N.D. Cal. Apr. 17, 2008) ..................................... 30

*In re Infineon Techs. AG Sec. Litig.*,
  266 F.R.D. 386 (N.D. Cal. 2009) .......................................................................................... 30

*In re Initial Pub. Offering Sec. Litig.*,
  214 F.R.D. 117 (S.D.N.Y. 2002) ........................................................................................... 30

**TABLE OF AUTHORITIES (cont.)**

Pages(s)

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) ...................................................................... 3, 8, 12, 14

*In re Nutanix, Inc. Sec. Litig.*,
No. 19-CV-01651-WHO, 2021 WL 783579 (N.D. Cal. Mar. 1, 2021)..................................... 29

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
No. 17-CV-06687-RS, 2018 WL 7019481 (N.D. Cal. Oct. 16, 2018) ....................................... 7

*In re Snap Inc. Sec. Litig.*,
394 F.Supp.3d 1156 (C.D. Cal. 2019) .................................................................................... 29

*In re Tesla, Inc. Sec. Litig.*,
477 F. Supp. 3d 903 (N.D. Cal. 2020) .................................................................................... 18

*Kelley v. Rambus, Inc.,*
*No*. 07-1238, 2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) ................................................ 16, 17

*Knurr v. Orbital ATK Inc.*,
276 F. Supp. 3d 527 (E.D. Va. 2017)..................................................................................... 4, 7

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012) .................................................................................. 28

*Lewis v. Byrnes*,
538 F. Supp. 1221 (S.D.N.Y. 1982)................................................................................. 3, 14, 16

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
350 F.3d 1018 (9th Cir. 2003).............................................................................................. 30

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016)............................................................................... 1, 22, 24, 25

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014)............................................................................................ 1, 24

*Luna v. Marvell Tech. Grp.*,
No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017)................................... 27

*MacPhee v. MiMedx Grp., Inc.*,
73 F.4th 1220, 1237-38 (11th Cir. 2023) ............................................................................. 24

*Mauss v. NuVasive, Inc.*,
No. 13CV2005 JM (JLB), 2016 WL 3681831 (S.D. Cal. July 12, 2016).......................... 23, 25

*Mendell v. Greenberg*,
612 F. Supp. 1543 (S.D.N.Y. 1985)................................................................................. 14, 16

*Mendoza v. HF Foods Grp. Inc.*,
Case No. 2:20-CV-02929-ODW (JPRx), 2021 WL 3772850 (C.D. Cal. Aug. 25, 2021)......... 12

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008).......................................................................................... 22, 25

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

**TABLE OF AUTHORITIES (cont.)**

**Pages(s)**

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
 320 F.3d 920 (9th Cir. 2003)..................................................................................................27

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019)......................................................................................21

*Paracor Fin., Inc. v. General Elec. Capital Corp.*,
 96 F.3d 1151 (9th Cir. 1996)..................................................................................................27

*Pub. Emps. Ret. Sys. of Miss., Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*,
 769 F.3d 313 (5th Cir. 2014)............................................................................................25, 26

*S.E.C. v. Indigenous Glob. Dev. Corp.*,
 No. C-06-05600 JCS, 2008 WL 8853722 (N.D. Cal. June 30, 2008) .......................................9

*Schueneman v. Arena Pharms., Inc.*,
 840 F.3d 698 (9th Cir. 2016)..................................................................................................10

*SEC v. Falstaff Brewing Corp.*,
 629 F.2d 62 (D.C. Cir. 1980) ...........................................................................................14, 16

*SEC v. Hurgin*,
 484 F. Supp. 3d 98 (S.D.N.Y. 2020)......................................................................................16

*SEC v. Pocklington*,
 Case No. EDCV 18-0701 JGB (SPx), 2018 WL 6843665 (C.D. Cal. Nov. 29, 2018)..............11

*Sec. & Exch. Comm'n v. Hurgin*,
 No. 19-CV-5705 (MKV), 2022 WL 444856 (S.D.N.Y. Sept. 23, 2022)...................................15

*Skilstaf, Inc. v. CVS Caremark Corp.*,
 No. C 09-02514 SI, 2010 WL 199717 (N.D. Cal. Jan. 13, 2010).............................................30

*Tanne v. Autobytel, Inc.*,
 226 F.R.D. 659 (C.D. Cal. 2005) ...........................................................................................30

*Thomas v. Magnachip Semiconductor Corp.*,
 167 F. Supp. 3d 1029 (N.D. Cal. 2016) ..................................................................................28

*Turocy v. El Pollo Loco Holdings, Inc.*,
 No. SACV151343DOCKESX, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) ...........................21

*Webb v. Solarcity Corp.*,
 884 F.3d 844 (9th Cir. 2018)..................................................................................................22

*Wehlage v. EmpRes Healthcare Inc.*,
 821 F. Supp. 2d 1122 (N.D. Cal. 2011) ..................................................................................29

*Williams v. Gaylord*,
 186 U.S. 157 (1902)...............................................................................................................17

*Wilson v. Great Am. Indus., Inc.*,
 855 F.2d 987 (2d Cir. 1988)...................................................................................................12

**TABLE OF AUTHORITIES (cont.)**

**Pages(s)**

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021)........................................................................... 25

*Yamamoto v. Omiya*,
  564 F.2d 1319 (9th Cir. 1977).......................................................................... 14

*Zucker v. Zoran Corp.*,
  No. C 06-04843 WHA (N.D. Cal. Feb. 21, 2007) ......................................... 29

**STATUTES**

Private Securities Litigation Reform Act of 1995 (PSLRA) ..................................... 1, 10

**RULES**

Federal Rules of Civil Procedure
  Rule 8(a)(2) .......................................................................................................... 2
  Rule 9(b) ..................................................................................................... 1, 2, 10
  Rule 11(b)(3).......................................................................................................19
  Rule 11(c)(2).......................................................................................................18

Case No. 5:21-cv-06374-BLF

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## I.    INTRODUCTION AND SUMMARY OF FACTS

The Second Amended Complaint ("SAC") addresses the pleading issues identified by the Court in ECF No. 168 (the "Order").  The SAC delineates the distinct courses of conduct and factual underpinnings that respectively form the basis of Plaintiffs' two primary claims pursuant to the Securities Exchange Act of 1934 (the "Exchange Act"): (1) the Section 14(a) negligence claim, and (2) the Section 10(b) fraud claim. The SAC alleges each 14(a) Defendants' (1) duty to ensure that the decision cover all Installation Costs for customers whose windows had the Defect was fully and fairly disclosed in the Proxy Statement and related materials, (2) access to information reflecting the decision to cover the Installation Costs, and (3) negligent failure to exercise due care in the review of that information.  SAC ¶¶187-93, 169, 171-82, 57-60, 64, 7-9, 27-28, 38-41. In their motions to dismiss, however, Defendants fail to address Plaintiffs' negligence theory (and its underlying allegations), in an attempt to continue to convince the Court that the 14(a) claim is coterminous with the 10(b) claim and sounds in fraud.  In any event, although not required for the 14(a) claim, both claims have been pled in accordance with the higher pleading standards of Fed. R. Civ. P. Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

Perhaps recognizing that the SAC's loss causation allegations meet the pleading standards set forth by the Ninth Circuit in *Lloyd* and *Loos*, Defendants resort to mischaracterizing Plaintiffs' theory in order to make new and convoluted arguments based on a false premise that the alleged August 16, 2021 partial disclosure was not a corrective disclosure at all. ¶¶138-48. Equally unfounded is Defendants' attempt to frame the category of misleading statements that described View's warranty policy as limited to materials and workmanship, which failed to disclose the decision to cover the Installation Costs, as a "new theory" for which the truth was not disclosed until May 2022 even though that the same information was disclosed by the end of the Class Period.

Similarly, Defendants' assertion that additional named plaintiff Sherman's joining the case is an improper "substitut[ion] in as the lead for the whole class" is wrong on the facts and the law. Stadium Capital LLC is, and remains, the sole court-appointed lead plaintiff in this case.

Finally, Defendants' motion to strike certain allegations in the SAC based on the complaint in *SEC v. Prakash*, No. 3:23-cv-03300 (N.D. Cal. July 3, 2023) (ECF No. 1) (the "SEC Cpt."),

which Plaintiffs identified as such (¶¶72-83, 207-228), is both procedurally improper and substantively wrong. Defendants baselessly accuse Plaintiffs and their counsel of failing to independently investigate their claims in violation of Rule 11 despite having never inquired whether they had undertaken any independent investigation and ignore that that the Amended Complaint ("AC") (ECF No. 96) was filed *nearly a full year prior* to the filing of the SEC Cpt. Ultimately, Defendants overlook that the allegations in the SEC Cpt. merely provide additional support for, and are corroborated by, Plaintiffs' other longstanding allegations which were already based in part on ***View's own admission of its Audit Committee's finding of both negligent <u>and</u> intentional conduct by Prakash related to the disclosure of the Installation Costs***. ¶84.

## II.     ARGUMENT

The Court previously set out Rule 9(b), Rule 12(b)(6), and PSLRA pleading standards for securities fraud claims. Order at 5-7. As to Plaintiffs' Section 14(a) claim, the Court determined that "as currently pled, the Section 14 claim sounds in fraud because it is based on the same course of conduct as the Section 10(b) claims." Order at 23. As set forth below in Section II(A)(2)(b), the SAC clearly lays out and delineates the distinct courses of conduct that form the bases of the 14(a) and 10(b) claims, and therefore the 14(a) claim does not sound in fraud. *In re Finjan Holdings, Inc.*, 58 F.4th 1048, 1057, 1059 (9th Cir. 2023) (Rule 9(b) applied to 14(e) claim where the "claim asserts that [defendants] *knew* that the [statements] were incorrect" and "knowingly misrepresented [facts]" in order "to convince shareholders to accept [the deal]") (emphasis in original). As such, Plaintiffs' Section 14(a) negligence claim requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" and "does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing Fed. R. Civ. P. 8(a)(2)). However, in the event the Court finds that the 14(a) claim as pled sounds in fraud, the SAC has included allegations of negligence sufficient to withstand Rule 9(b)'s heightened pleading standards.

### A.     <u>Section 14(a) and Rule 14a-9 Claims Are Alleged</u>

Defendants fail to address Plaintiffs' 14(a) negligence theory. *See* ¶¶187-93, 169, 171-182, 57-60, 64; ECF No. 181 ("View Br.") at 10 (addressing only ¶¶74, 76-79, 81-83); ECF No. 183 ("CF Br.") at 1 (asserting "claims against the CF Defendants substantively unchanged").

### 1.       Each 14(a) Defendant Owed a Duty to Ensure Accurate Disclosures

Although "[t]he basis for Section 14(a) liability is not the nature of the duty between the defendant and a shareholder, but whether that defendant has solicited or permitted his or her name to be used in the allegedly unlawful proxy", *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 288 (S.D.N.Y. 2010), the SAC complies with the Court's instruction to "allege [for each defendant] the duty that they owed to the Plaintiff and how that duty was breached." Order at 24. Plaintiffs allege that (1) CF II (n/k/a View) and Legacy View are issuers of the Proxy Statement and that each were to participate in the preparation of the Registration Statement, of which the Proxy Statement formed a part (¶169); (2) each of Defendants Lutnick, Pion, Chan, Jain, Hochberg, and Blechman, signed the Proxy Statement and subsequent amendments and solicited shareholder votes in the Proxy Statement (SAC ¶¶171-76); and (3) each of CF Holdings II (CF II's Sponsor), CF&Co., Cantor, CFGM, Mulpuri and Prakash permitted the use of their names in the Proxy Statement, and solicited shareholder votes in the Proxy Statement. ¶¶177-182, 27-28, 38-41, 57-60, 64. On these bases, Plaintiffs allege that by soliciting proxies from Class members by means of the Proxy Statement, each of these defendants had a duty "to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision" and to "accurately update these statements between dissemination of these documents and the shareholder vote on March 5, 2021." ¶¶ 187, 189. *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1266 (N.D. Cal. 2000) ("anyone who knowingly participates in the distribution [of] a proxy solicitation should therefore expect to be held liable for false statements to *all* affected shareholders.") (emphasis in original); *Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 778 (3d Cir. 1976) ("directors owed a duty to the plaintiffs under section 14(a) of the Act fully and fairly to disclose the material facts in the proxy materials they issued to them."); *Lewis v. Byrnes*, 538 F. Supp. 1221, 1223-1225 (S.D.N.Y. 1982) (claim stated as to individual with "extensive involvement in the transactions underlying the proxy solicitation"). Prakash also had a duty to ensure that View properly accounted for and disclosed its liabilities for replacing windows with the Defect (¶192) and Mulpuri had a duty to ensure financial information concerning View provided to investors was

not misleading. ¶193. Defendants' arguments ignore these allegations and should be rejected. View Br. at 10-11, CF Br. at 3-4, ECF No. 184 ("Prakash Br.") at 4-5.

### 2.　　Each 14(a) Defendant Negligently Breached Their Duty

#### a.　　Each 14(a) Defendant Had Access To Information Reflecting the Decision to Cover Installation Costs

Whether any 14(a) Defendant breached their duty cannot be viewed in a vacuum. Here, the Defect (and the need to record a warranty accrual related to the Defect) was no secret. It was an issue well-known to each of the 14(a) Defendants because the Defect and related warranty accrual were made public in the Proxy itself. ¶89.  But as explained below, Defendants breached their duty to ensure that the Proxy fully and fairly disclosed all material facts, because, despite knowing of the negative financial impact caused by the Defect (as set forth by the warranty accrual) they negligently allowed the Proxy to materially understate View's liability for the defective IGUs even though the financial information they were each provided access to demonstrated that the Company's decision and practice of covering the Installation Costs to replace the defective IGUs caused View's disclosed liabilities to be understated by millions of dollars. *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 542 (E.D. Va. 2017) (allegation that "a prudent director [of acquiring company] would have looked more closely into the [issue due to red flags]" supported strong inference of negligence under PSLRA).

Each of the 14(a) Defendants were aware (or should have been aware) of the Company's decision to cover all Installation Costs related to the Defect, as it was made at the highest levels of the Company and was discussed at executive staff meetings throughout 2019 to 2021. ¶¶7-8, 190-91.  The decision was widely known, including at least by View's leadership (including Mulpuri, non-defendant Bammi, and Prakash), the Defect Response Team, the Customer Success Department (the View staff responsible for managing the replacement of windows with the Defect at customer sites), and the Finance department. *Id*. Further, in addition to Accounting department records, the Installation Cost information that was excluded from the Company's warranty accruals was available from numerous sources, including in the purchase requisitions themselves (the requests to buy services for Installation Costs), from the Customer Success Department (the

department that submitted purchase requisitions for the Installation Costs), the Finance department (the department through which purchase requisitions for the Installation Costs were submitted), the Defect Response Team, and View's budget for Installation Costs, which was prepared by Bammi. ¶¶9, 191.  Each of the 14(a) Defendants had access to all of these sources of information. ¶57.

Specifically, the SAC alleges that "*[e]ach* of the CF II Defendants" (*i.e.*, each of Lutnick, Pion, Chan, Jain, Hochberg, Blechman, CF Holdings II, CF&Co., Cantor, and CFGM) "was provided reasonable access to *all of View's properties, books, contracts, tax returns, records and appropriate officers and employees of View*, including View's books of account, ledgers, order books, and other financial documents *reflecting all material information relating to View's business and the nature of all transactions giving rise to its obligations*, as well as *representatives with all financial and operating data* and other information concerning the affairs of View that were in the possession of the View."  ¶57; *see also* Merger Agreement §5.2, ECF No. 182 ("Berry Decl.") Ex. 2 at 432-433 ("View "afford[ed] to [CF II] and its Representatives reasonable access [to all books. . . records . . . appropriate officers and employees. . .  and all financial and operating data and other information. . . "]); *id.* at 398 (defining "Representatives" to mean "collectively, officers, directors, employees, accountants, consultants, legal counsel, agents and other representatives of such Person or its Affiliates."); *id*. at 391 (defining "Affiliate" to mean "with respect to any specified Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person, whether through one or more intermediaries or otherwise."); *see also* ¶58-60 ("*Each* of the CF II Defendants were permitted access to a virtual data room containing diligence materials during the week of September 14, 2020" containing "due diligence materials [CF II] had requested from View.").  In addition to access, the SAC alleges that beginning on September 18, 2020 and continuing through the next several weeks "the CF II management team" (*i.e.*, the CF II Individual Defendants) "and its advisors" (*i.e.*, each of the CF II Entity Defendants: CF Holdings II (CF II's sponsor for the Business Combination), CF&Co. (CF II's financial and capital markets advisor in connection with the Business Combination), Cantor (sole member of the Sponsor), and CFGM (managing general partner of Cantor)) "continued its due diligence of View, including reviewing all materials in the Data Room, requesting additional

documentation, reviewing additional information provided, and holding various due diligence video and telephonic conferences with View's management team, employees and advisors." ¶60. The SAC also alleges that additional information was provided to the CF II Defendants, numerous follow-up diligence calls were held, and specific financial and legal information that was discussed and review, including detailed contract and legal documentation. *Id.*; *see also* ¶64 (detailing the extensive due diligence information reviewed by the CF II Board compiled as a "result[] of the due diligence conducted by *its management, employees of Cantor and CF II's advisors*").

As CEO and CFO of View, Mulpuri and Prakash had access to the same information, which was provided by View to the CF II Defendants. ¶57. Importantly, while the Audit Committee concluded that "[Prakash] and certain former accounting staff intentionally failed to disclose certain information to the [View] Board of Directors and [PwC], regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations", it *did not* find that any information was withheld from any of the CF II Defendants during the due diligence process. ¶84. In fact, as the SAC alleges, information concerning the Installation Costs was available from numerous sources, many of which Prakash and his accounting department did not have control over. ¶¶7-8, 190-91.

Had the 14(a) Defendants exercised due care in reviewing the Installation Cost information (e.g., the purchase requisitions), the SAC alleges they would have uncovered that View *was covering the Installation Costs for all customers* with windows containing the Defect, meaning they were probable and reasonably estimable. ¶191. Therefore, the decision to cover the Installation Costs should have been disclosed, and an estimated loss from the Installation Costs should have been included in View's warranty accrual. *Id.* As such, having been provided reasonable access to all of View's books and records which reflected the Installation Costs View decided to cover for all customers whose windows contained the Defect, as well as representatives with all financial and operating data, each of the 14(a) Defendants were negligent in failing to ensure that the Proxy Statement and all other proxy solicitation materials fully and fairly disclosed the Installation Costs and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. *Id.*

View, Mulpuri, and CF Defendants' primary theme in response is their conclusory assertion that the SAC fails to explain how each of them acted negligently. View Br. at 10-11; CF Br. at 4-6. This tired assertion fails for numerous reasons, including its failure to address any of the SAC's allegations concerning each of their involvement and access to information. *See infra*, at 4-5. As such, each of CFII's cases (which also sounded in fraud) are inapposite. CF Br. at 4; *see, e.g., In re Ocera Therapeutics, Inc. Sec. Litig.*, No. 17-CV-06687-RS, 2018 WL 7019481, at *10 (N.D. Cal. Oct. 16, 2018) ("there [were] no facts alleging Defendants failed to review certain materials, or were neglecting their responsibilities, or designed and oversaw a flawed review process.").

***First***, Plaintiffs' theory is that had the 14(a) Defendants properly reviewed information that they were provided access to, they would have uncovered that View *was covering the Installation Costs for all customers* with windows containing the Defect, meaning they were probable and reasonably estimable, and therefore should have ensured that they were fully and fairly disclosed. ¶191; *Knurr*, 276 F. Supp. 3d 527, 542 ("simply because defendants might not have been able to identify the *extent* of losses before the merger, does not mean defendants could not have identified the problem leading to and the potential for losses.") (emphasis in original); *Delman v. GigAcquisitions3, LLC*, 288 A.3d 692, 727 (Del. Ch. 2023) ("The nature of [target]'s business model was 'knowable' through the sort of diligence and analysis expected of the board of a Delaware corporation undertaking a major transaction."). Upon making this discovery, in exercising due care each of the 14(a) Defendants should have, at a minimum, followed up with the necessary personnel to confirm that the Installation Costs were being fully and fairly disclosed. ¶57 (CF Defendants were "provided reasonable access to . . . appropriate officers and employees of View, including . . . representatives with all financial and operating data"). The 14(a) Defendants failure to do so was negligent. *Knurr*, 276 F. Supp. 3d at 542 (rejecting argument that "even with due diligence, defendants could not have identified the losses [and accounting errors] . . . [because] it is essentially a disagreement with the allegations of the Complaint and thus a factual question not one related to the adequacy of pleading."). In fact, Mulpuri does not even dispute that he was aware of the decision to cover the Installation Costs. CF Defendants' assertion that the due diligence must have "revealed View's accounting errors" (CF Br. at 6), would be akin to a scienter requirement,

which is not an element of the 14(a) claim. *Finjan*, 58 F.4th at 1058-59 (discussing Section 14(e)).

***Second***, CF Defendants rely heavily on *McKesson*, 126 F. Supp. 2d at 1267-68, in which there were other facts pleaded in the complaint that "negate[d] an inference of negligence" where the complaint specifically alleged that the auditor was "being kept in the dark about the improprieties by the responsible HBOC executives, who had hidden side letters in places inaccessible to auditors." *Id*. at 1267; CFII Br. at 4. In an attempt to analogize this case to *McKesson*, CF Defendants mischaracterize the allegation in ¶240 (which relates only to Plaintiffs' ***10(b)*** claims against View and Prakash) as "alleg[ing] that the target (View) prevented others from discovering its misstatements." CFII Br. at 5. To the contrary, the allegation merely states that "***by engaging in clear violations of GAAP*** . . .View [f/k/a CFII] masked the Company's true financial condition. . . ." ¶240.  Key to the court's holding in *McKesson*, as CF Defendants point out, "[w]hile [target's auditor] may or may not have been negligent in failing to uncover the improprieties, ***there is no suggestion . . . [acquiror] could have known, even with reasonable diligence, that [target] was engaged in massive accounting fraud***." CF Br. at 4 (quoting *McKesson*, 126 F. Supp 2d at 1267-68; *see also* CF Br. at 5-6 (arguing that "[t]he SAC does not allege that this diligence was insufficient or should have revealed View's accounting errors").  But here, Plaintiffs *do allege* that proper due diligence should have revealed the decision to cover the Installation Costs.  ¶¶190-91. Unlike *McKesson*, the SAC alleges negligence by the CF Defendants separate from any purported reliance on View's auditor.  ¶¶57-60, 64, 7-8, 190-91.  Moreover, there is no allegation (nor do CF Defendants argue) that the books and records they were provided access to were not accurate, or that any employees the CF Defendants were provided access to (including Mulpuri, non-defendant Bammi, and personnel on the Finance, Defect Response, or Customer Success teams) withheld any information in the due diligence process. ¶¶7-8, 57-60, 64, Merger Agreement §5.2, Berry Decl. Ex. 2 at 432-433; *compare* CF Br. at 5 (noting that the Audit Committee found that "certain former View [accounting personnel, including Prakash]" had "***intentionally failed to disclose*** certain information to ***[View's] Board and [PwC]***" (i.e., *not* the CF II Defendants).  Moreover, the SAC does *not* allege (nor do CF II Defendants argue) that Prakash and certain former accounting personnel were the only sources of this information.  *Id*.

Nor can CF Defendants shift blame onto View's auditor because View's financial statements were only audited through 2019. Berry Decl., Ex. 2 at 218 (information after 2019 "derived from View's **unaudited** . . . financial statements"); *cf., e.g.*, ¶101 (Proxy stating "[t]here was no significant change in the warranty accrual in the nine months ended September 30, 2020"). Additionally, a reliance on advice of auditor defense *(to scienter)* is only available where "[that defendant] made full disclosure of the relevant facts to [the] auditors". *S.E.C. v. Indigenous Glob. Dev. Corp.*, No. C-06-05600 JCS, 2008 WL 8853722, at *14 (N.D. Cal. June 30, 2008); *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634, 642 (D.C. Cir. 2008) ("faulty assumptions underlying [advisor's conclusions] left [underwriter's] duties to investigate and disclose intact").

*Third*, having put all their eggs in the "accounting error" basket, 14(a) Defendants have failed to meaningfully address allegations that the Proxy Statement (and other SEC filings) failed to disclose the decision itself to cover the Installation Costs, which made its disclosures describing the company's warranty as limited to only *materials and workmanship* misleading.  *See* ¶¶93, 95, 99; *see also* 107, 121; CF Br. at 6; View Br. at 10-11. View and Mulpuri's only argument regarding these statements is that the decision to cover the Installation Costs did not need to be disclosed because the statement that View has "a standard assurance type warranty that our IGUs will be free from defects . . . for 10 years" "says nothing about View's specific contract obligations, much less what costs it was obligated to pay". View Br. at 8; *see also* CF Br. at 6 (joining in View's argument). But by selectively quoting the alleged misleading statement, View has omitted the exact language it claims is missing.  Indeed, the statement *does* speak to what View is obligated to pay under its warranty: "We provide a standard assurance type warranty that our IGUs will be free from defects *in materials and workmanship* for 10 years from the date of delivery to customers."  ¶¶93, 95, 99; *see also* ¶¶107, 121.  As such, this statement was materially false and misleading, and failed to disclose to investors that by this time View had determined that, in addition to warrantying the IGUs' materials and workmanship (disclosed), it would also cover the Installation Costs for all customers whose windows had the Defect (undisclosed). ¶94. Moreover, View's argument ignores that it is within this same "Product Warranties" section of the Proxy that the Company disclosed that it "recognized $24.5 million of expense for the estimated future *cost to replace* defective IGUs

. . ." indicating that there were no other costs View was responsible for. Berry Decl., Ex. 2 at 329. Having spoken on View's warranty, disclosing that it provides a 10 year warranty for materials and workmanship, and that it "recognized $24.5 million of expense for the estimated future *cost to replace* defective IGUs . . ." 14(a) Defendants "were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information within their possession]." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 707–08 (9th Cir. 2016) (brackets in original); *Brown v. Brewer*, No. CV06-3731-GHK SHX, 2010 WL 2472182, at *24 (C.D. Cal. June 17, 2010) ("As a matter of law, the preparation of a proxy statement . . . containing materially false or misleading statements or omitting a material fact [satisfies the] negligence standard.").

### b.    The 14(a) Claim Does Not Sound in Fraud

The 14(a) Defendants argue that the 14(a) claim is subject to Rule 9(b) and the PSLRA because it "continues to turn on the same alleged misstatements and underlying conduct as its Section 10(b) claim". View Br. at 10, CF Br. at 3. Defendants cite to Ex. A to the SAC and assert that it "identif[ies the] same disclosures and conduct for each claim" but ignore that it shows just the opposite. In fact, there is not a single overlapping misstatement between the 14(a) claim (brought only on statements contained within the Proxy (SAC, Ex. A, Statements 1-8)) and the 10(b) claim (only statements contained in disclosures *other than the Proxy* (*id.*, Statements 9-23)).

Moreover, the conduct underlying the 14(a) and 10(b) claims is distinct. *See generally* SAC, Ex. A (citing *different* underlying conduct). As set forth in Sections II(A)(1) and II(A)(2)(a) above, the 14(a) claim concerns the 14(a) Defendants' duty to ensure accuracy of the Proxy Statement, their access to relevant information, and their failure exercise due care in the review of that information. There is no allegation (nor do the 14(a) Defendants argue) that they did not have access to that information, or that they were blocked from reviewing it. Rather, only the 10(b) claim concerns Prakash's intentional withholding of information from View's Board and PwC (none of which are Defendants in the SAC, other than Mulpuri (who is not a 10(b) Defendant)). Additionally, except for Prakash and View, none of the 14(a) Defendants are 10(b) Defendants.

As such, Plaintiffs' negligence-based 14(a) claim is not subject to these heightened pleading standards. But, even assuming, *arguendo*, that these standards applied, the SAC easily meets them.

### c.    The 14(a) Claim Against Prakash is Even Stronger

Prakash fails to address the SAC's negligence allegations set forth above in Section II(A)(2)(a), which applies equally to him. Further, as the former CFO of View, Prakash was responsible for ensuring that View properly accounted for and disclosed its liabilities for replacing windows with the Defect with oversight over View's accounting department. ¶192. Additionally, View's own Audit Committee concluded that Prakash "negligently failed to properly record the liabilities for warranty-related obligations and cost of revenue." ¶84. This finding alone far surpasses Plaintiffs' pleading burden as to negligence. Prakash's only response to this finding is to assert that it is "insufficient" unless Plaintiffs *also* "alleg[e] the underlying facts on which those conclusions are based." Prakash Br. at 5. But that is not the pleading standard, and Prakash cites no legal support for this assertion. *See Twombly*, 550 U.S. at 555. In fact, it would be impossible for Plaintiffs to plead what *Defendant View's* Audit Committee based its conclusion on before discovery. Nevertheless, Plaintiffs have pled *additional* allegations explaining why Prakash, as CFO, was negligent in failing to ensure the Installation Costs were fully and fairly disclosed. ¶¶72-83. It is these allegations on which Prakash focuses most of his argument.

As detailed in the SAC and Chart, by January 2020 Prakash had been told that View had decided to cover Installation Costs, notwithstanding View's determination that such costs were not covered by View's written warranty. ¶73, 75. As CFO, Prakash attended regular meetings of View's executive staff, which also included View's CEO, CBO, and other executives, at which View's decision to cover Installation Costs for all customers whose windows had the Defect was discussed. ¶74. The Defect Response Team sent Prakash weekly updates tracking which customers had windows with the Defect, the number of windows affected, how many windows had already been replaced, and how many windows remained to be replaced. ¶82. Despite having been told of View's decision and practice of covering the Installation Costs, Prakash failed to ensure that the Warranty Liability Team (which he assembled and oversaw) considered View's decision and actual practice of covering Installation Costs when it prepared its recommendation. ¶210. Then, Prakash approved View's warranty liability despite knowing that it excluded Installation Costs which View had decided to incur. ¶211. That is textbook negligence. *See, e.g., SEC v. Pocklington*, 2018 WL

6843665, at *3, *8 (C.D. Cal. Nov. 29, 2018) (claim sounding in fraud pled negligence by alleging CFO approved some expenditures he knew were improper and others he failed to investigate); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1988) (failure to disclose decision that exposed Company to damages was a "deliberate decision . . . far in excess of negligence").

Prakash does not dispute, and in fact admits, that he assembled the Warranty Liability Team specifically to determine the warranty accrual for costs associated with the Defect. Prakash Br. at 5. Nor does he dispute that he failed to ensure that the Warranty Liability Team considered View's decision and actual practice of covering Installation Costs when it prepared its recommendation. Prakash Br. at 5. Rather, his only argument is that "error, even if material, does not plead a claim for negligence absence failure to exercise due care." *Id*. **First**, the facts here are nothing like those in the cases he cites. Prakash Br. at 5; *McKesson*, 126 F. Supp. 2d at 1265 (concerning financial advisor's fairness opinion); *Mendoza v. HF Foods Grp. Inc.*, Case No. 2:20-CV-02929-ODW (JPRx), 2021 WL 3772850, at *11 (C.D. Cal. Aug. 25, 2021) (boilerplate allegation of negligence "by virtue of . . .roles in the preparation of the . . . proxies" with no supporting facts). Prakash, as CFO was responsible for ensuring that View properly accounted for and disclosed its liabilities. ¶192. **Second**, his implicit assertion that he exercised his duty of care is unfounded. As Prakash admits, the warranty accrual issue was of such import that Prakash apparently felt the need to put together a dedicated Warranty Liability Team. Prakash Br. at 4. Further recognizing the importance of the Installation Cost issue, he confirmed his understanding of View's decision to cover Installation Costs multiple times with senior View personnel, but still failed to relay that information to his Warranty Liability Team or ensure that they had considered it in their analysis. ¶¶74-5, 213, 218, 224, 227. Moreover, despite his understanding, he accepted and approved the warranty accrual number proposed by his Warranty Liability Team despite being told that the Installation Costs were not covered on a case-by-case, but rather in all cases. *Id*.; *see also* ¶211.

### 3.    The 14(a) Defendants Engaged in Solicitation

Each of the CF Individual Defendants signed the Proxy. ¶¶31-36. Mulpuri was CEO, and Prakash was CFO, of Legacy View, and they were proposed in the Proxy to become CEO and Chairman of the Board, and CFO, respectively, of the Combined Entity. ¶¶27, 28. Thus, as

explained below, each is liable for solicitation under Section 14(a).

The CF Entity Defendants ignore the SAC's new allegations regarding their solicitation (which also provide additional context for Plaintiffs' previous allegations). CF Br. at 7-8; ¶¶38-41, 31, 165-67, 57-60, 64.  Plaintiffs allege that CF&Co. served as CF II's financial and capital markets advisor in connection with the Business Combination, for which it was to be paid substantial fees that were payable on consummation of the Business Transaction (which was achieved via the Proxy). ¶39.  A substantial part of CF&Co.'s role was to assist with the solicitation effort: to assist CFII with arranging stockholder meetings, introduce CFII to potential investors, assist CFII's efforts to obtain any stockholder approval for the proposed Business Combination, and assist with press releases and filings related to the Business Combination.  *Id*.

Cantor Fitzgerald L.P. ("Cantor"), along with Lutnick, its Chairman, President, and CEO (who was also CF II's Chairman and Chief Executive Officer prior to the Business Combination, ¶41), was featured within the first few pages of the November 30, 2020 Investor Presentation that was used by CF II and View as part of the solicitation effort for the Business Combination (preceded only by a one-page "Transaction Summary") in a slide titled "Overview of Sponsor" which touted Lutnick's relevant experience and credentials.  ¶31.  The slide also touted that Cantor "is a leading investment Bank led by a highly experienced executive team in Howard Lutnick, Chairman and CEO and Anshu Jain, President. Cantor is a leading SPAC franchise and the top SPAC underwriter in 2019" as well as Cantor's relevant credentials.  *Id*.  Additionally, following the proposed merger's announcement, Lutnick made numerous appearances on television, including on CNBC and Bloomberg, to tout the View deal and solicit investors. ¶¶165-67.  During those appearances Lutnick touted Cantor's role in consummating the deal, again hyping Cantor's involvement and the fact that "Cantor was number one in 2017, 2018 and 2019 in SPACs."  ¶¶165-66.

As set forth in Section II(D), CFII is controlled by the Sponsor, the Sponsor is controlled by Cantor, CFGM controls Cantor, and Defendant Lutnick controls CFGM. Lutnick also independently controls each entity.  In fact, CF II is in effect a shell company with no employees of its own and "all of [its] officers and our non-independent directors are employed by Cantor and/or certain of its affiliates." Herkenhoff Decl., Ex. 1 at 48 (filed herewith, of which

Plaintiffs request judicial notice). It was only through the actions and performance of the Cantor "franchise" (¶166) (*i.e.*, the CF Entity Defendants) that themselves performed all due diligence related to the Business Combination (¶¶57-60, 64) that the Business Combination was ultimately consummated. *See also, e.g.*, Herkenhoff Decl., Ex. 1 at 4, 86 ("we expect Cantor and its employees to provide us services so that we can capitalize on the substantial resources of Cantor and leverage Cantor's relationships . . . .").

Each of the CF Entity Defendants were provided access to all of View's books and records as part of the due diligence process and "advised" CF II (which had no independent employees) throughout the entire process. ¶¶60, 64. This representation assured shareholders that they were being provided accurate information as a result of the diligent efforts of the CF Defendants.

Solicitation may exist where there is a "substantial connection between the use of the person's name and the solicitation effort." *Yamamoto v. Omiya*, 564 F.2d 1319, 1323 (9th Cir. 1977); *see also SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 68-70 (D.C. Cir. 1980) (Section 14(a) claim stated as to acquiror's controlling shareholder mentioned several times by name in the proxy); *Lewis*, 538 F. Supp. at 1223-1225 ("extensive involvement in the transactions underlying the proxy solicitation" sufficient). CF II's cases, many of which do not even address solicitation, are distinguishable as none of them involved a SPAC franchise of related entities that were themselves the actual parties effectuating the underlying transaction. *McKesson*, 126 F. Supp. 2d at 1267 (allegation that defendants "acted negligently and without due dare in distributing [proxy]" insufficient to plead *negligence* under PSLRA); *Costanzo v. DXC Tech. Co.*, No. 19-CV-05794-BLF, 2020 WL 4284838, at *8 (N.D. Cal. July 27, 2020) (rejecting argument that merger "should be considered an offering by [another company]", effectively "ask[ing] this Court to treat . . . two legally distinct entities [] as one entity"); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 839 (S.D. Tex. 2017) (addressing "alter ego" theory); *Mendell v. Greenberg*, 612 F. Supp. 1543, 1552, n.1, n.3 (S.D.N.Y. 1985) (investment bank that acted as an independent professional advisor to the transaction). CF II Defendants' selective citation to solicitation allegations ignores the reality of the transaction at issue here: a merger pursued by CF II (managed and controlled by Lutnick through Sponsor, CFGM, and Cantor), through the sole efforts of Cantor

and its affiliates including CF&Co.  The involvement of these entities was touted to investors to solicit their votes by showing the deal was backed by the experience of Cantor and its affiliates.

View argues that it did not solicit shareholders because "the allegedly false proxy statement was issued by the SPAC, CF II, to convince CF II shareholders to vote in favor of the de-SPAC acquisition of [Legacy] View."  View Br. at 11.  This argument makes no sense and should be rejected out of hand because Defendant View *is* CF II.  ¶5 ("On March 8, 2021 . . . CF II and View combined via a business combination with CF II (now referred to as View) as the surviving, public entity").  Legacy View as a distinct entity no longer exists, and is not a defendant in this case.

View and Mulpuri also argue that "as the target company and CEO, [they] were not soliciting shareholders to vote on anything . . . [n]or does the SAC allege they were."  View Br. at 11.  Not so.  Plaintiffs have alleged that Mulpuri was a member of Legacy View's Board when the Proxy was disseminated, had the opportunity to review and edit the Proxy, unanimously approved the entry into the Merger Agreement, and determined that the Business Combination Proposal is in the best interests of View and its stockholders.  ¶¶27, 63, 68, 169.  Following the announcement of the proposed merger, Mulpuri appeared on CNBC to promote the merger and View.  ¶164.  Moreover, both CFII and Legacy View participated in the preparation of the Proxy.  ¶169; *see Bank of Am.*, 757 F. Supp. 2d at 288 ("courts have permitted Section 14(a) claims to go forward when [target company's] management misstated or omitted a material fact").

Mulpuri's and Prakash's argument that the SAC fails to plead that they "permitte[ed] the use of [their] name[s] to solicit any proxy" (Prakash Br. at 5-6) or "explain[] how [the use of their names] could have had a 'substantial connection'" to the solicitation effort is similarly meritless.  View Br. at 11-12 (citing *summary judgment* decision in *Sec. & Exch. Comm'n v. Hurgin*, No. 19-CV-5705 (MKV), 2022 WL 4448561, at *12 (S.D.N.Y. Sept. 23, 2022)).  As set forth in the Proxy, not only was Mulpuri seeking to become a director and CEO of the combined entity and Prakash seeking to become an executive officer (CFO)), but the Proxy also mentioned Mulpuri's and Prakash's names over 50 and 20 times, respectively, as CEO and CFO View and included their biographies which touted their relevant experience and credentials.  ¶¶27-28; *see also* ¶27 (stating that that "View believes Mr. Mulpuri is qualified to serve as a member of the Combined Entity

Board due to his extensive executive management and technology industry leadership experience as well as his deep knowledge of View's technology and business operations"); ‖28 (stating that Prakash joined View "with over 25 years of global finance and operations experience in private and public companies ranging from startups to Fortune 100" and noting that "executive officers" such as Prakash "have interests in" the proposals in the Proxy Statement). Additionally, the November 30, 2020 Investor Presentation that was used to solicit votes for the Business Combination features Mulpuri (preceded only by a one-page "Transaction Summary" and one-page "Overview of Sponsor") in a slide titled "Overview of View Executives" which touted that he "[b]uilt View from the ground up over the last 12 years" as well has his relevant experience and credentials. ‖27. The same slide touted Prakash's "25 years of finance & operations experience scaling private and public companies" as well as his relevant experience and credentials. ‖28. Thus, there was a substantial connection between the use of Defendants' names and the solicitation efforts. *See Falstaff*, 629 F.2d at 68 (defendant liable for 14(a) violation where his name was used 11 times in proxy, even though he was not part of management of company which issued the proxy); *SEC v. Hurgin*, 484 F. Supp. 3d 98, 117 (S.D.N.Y. 2020) (proxy materials "contained information about [defendant's] background, assured shareholders that he was a 'highly-talented . . . industry professional' who would bring his skills to the company after the merger", and "invoked his name" approximately 29 times); *Lewis*, 538 F. Supp. at 1224-1225 (therefore their "identit[ies] clearly could have been an inducing factor in a shareholder's grant of his proxy,"); ‖‖27-28, 181-82.

Prakash also argues that "Plaintiff [does not] allege that Prakash had control . . . over the contents of any proxy statement." Prakash Br. at 5-6. To the contrary, Plaintiffs specifically allege that as CFO, Defendant Prakash was responsible for ensuring that View properly accounted for and disclosed its liabilities for replacing windows with the Defect and that he reviewed the portion of the Proxy discussing the warranty liabilities before it was filed. ‖192; *Kelley v. Rambus, Inc., No.* 07-1238, 2008 WL 5170598, at *7 (N.D. Cal. Dec. 9, 2008) ("strong inference of Defendants' negligence" alleged where "the representations therein can be attributed to these defendants").

Unlike here, in the few cases Prakash relies on defendants did not even have a particular role in the merged entity, nor did they stand to benefit from the proposed transaction. *Mendell*, 612

F. Supp. 1543, 1552, n.1, n.3 (investment bank that acted as an independent advisor to the transaction); *Bank of Am.*, 757 F. Supp. 2d at 294-95 (officer whose only role was to pass upon the validity of any stock issued as acquisition consideration and to be the designated recipient of any notices made under the merger agreement); *Kelley*, 2008 WL 5170598, at *5 (company's auditor, where the Form 10-K which included the audit opinion was not even incorporated into the proxy statements and the complaint did not contain any indication that the auditor permitted the use of its name "in a manner sufficient to associate it with the proxy statement.").

### 4.   Plaintiffs Plead Loss Causation for the 14(a) Claim

Unable to attack named plaintiff Sherman's Class Period transactions, Defendants' only loss causation argument specific to the 14(a) claim continues to mischaracterize Plaintiffs' damages theory as derivative in nature. View Br. at 8-10; CF Br. at 9.  As to economic loss (loss causation), as the Court previously found (Order at 26), Plaintiffs' 14(a) claim is not derivative. As such each of Defendants' cited cases (View Br. at 9-10) are inapposite because they do not involve claims that the plaintiffs were damaged as a direct and proximate result of the untrue statements and omissions set forth herein ***when the truth was disclosed, and the value of their View securities decreased in value***. ¶¶162, 169. Defendants' attempts to re-frame Plaintiffs' damages theory as a different "multi-step theory" that was not alleged should similarly be rejected.  View Br. at 10; *Bank of Am.*, 757 F. Supp. 2d at 291-292 (stock price decline from corrective disclosures can form the basis for damage claim under 14(a)).  As to "transaction causation" (View Br. at 9), in the context of a merger, a proxy statement is recognized as an "essential link" in the accomplishment of the transaction (transaction causation). *Bank of Am.*, 757 F. Supp. 2d at 292, n.3; *Brown v. Brewer*, No. CV 06-3731-GHK (JTLx), 2008 WL 6170885, at *5 (C.D. Cal. July 14, 2008).

### 5.   Delaware Code Section 102(b)(7) Does Not Apply

The Exchange Act claims asserted herein fall outside the scope of internal corporate affairs. *See e.g.*, *Williams v. Gaylord*, 186 U.S. 157, 165 (1902) ("when a corporation . . . gives securities, it does business, and a statute regulating such transactions does not regulate the internal affairs of the corporation."); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (similar). The CF Defendants cite only inapposite derivative actions including allegations of breach of fiduciary duty

claims, and only addressing the exculpation issue as to whether plaintiffs therein sufficiently alleged demand futility. CF Br. at 7. In fact, the section of CFII's charter cited by the CF Defendants is explicit that it only applies to derivative ***breach of fiduciary duty*** claims.  CF Br. at 6.

### B.   The Baseless and Procedurally Improper Motion to Strike Should Be Denied

Despite referencing Fed. R. Civ. P. 12(f) in their motions, Defendants' briefs are devoid of any explanation as to how Plaintiffs' allegations based on the SEC Cpt. against Prakash are "'redundant, immaterial, impertinent, or scandalous matter,' as required to succeed on a Rule 12(f) motion to strike." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 920 (N.D. Cal. 2020).

Additionally, Defendants' reference to Rule 11 in this action is both utterly unfounded and procedurally improper.  Defendants overlooked the basic procedural requirements that a Rule 11 motion "must be made separately from any other motion," and "must be served under Rule 5, but it must not be filed or be presented to the court . . . within 21 days after service." Fed. R. Civ. P. 11(c)(2).  These requirements are mandatory.  *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 789 (9th Cir. 2001). Defendants did not file a separate motion, nor did they serve a Rule 11 motion on Plaintiff, as is required, before filing its motion to strike. Herkenhoff Decl. ¶2. As such, their request to strike under Rule 11 must be denied. *See* Fed. R. Civ. P. 11(c)(2); *Radcliffe*, 254 F.3d at 789; *Baertschiger v. Lopez*, No. CV 20-6635-ODW (KS), 2021 WL 4555613, at *7 (C.D. Cal. June 11, 2021) (Courts cannot consider a Rule 11 motion within a memorandum in opposition to a motion to dismiss "when the mandatory procedures of Rule 11 have not been followed").

In any event, Defendants' assertion that Plaintiffs and their counsel failed to conduct an "independent investigation" is unfounded.  View Br. at 1; View Br. at 10; *compare* Fed. R. Civ. P. 11(b)(3) (requiring an "inquiry reasonable under the circumstances").  The accusation ignores that Lead Plaintiff filed the AC, which Defendants do not dispute was the result of an "independent investigation" of its own, *nearly a full year prior* to the filing of the SEC Cpt.  Moreover, as a result of independent investigation, the SAC pleads numerous *additional* allegations that clarified and expanded on the 14(a) and 10(b) claims plead in the AC (*compare, e.g.,* AC, ¶¶24-25, 36-41, 43-46, 58-59, 69-70, 139, 160, 174-75, 225-46; SAC, ¶¶7-9, 17, 27-28, 31-36, 38-41, 57-60, 64, 84, 190-193) and Plaintiffs have informed the Court what other sources of information other than the

SEC Cpt. were relied on in formulating the claims. *See, e.g.*, SAC at 62, n.2 (Audit Committee's findings); *id.* at 19, n.1 (Mulpuri's admission that View made a decision to cover the Installation Costs); *id.* at 1 (listing sources, including, the July 3, 2023 SEC Order in which View **did not contest** the SEC finding that although "not require[d] to pay the costs of installing or shipping the replacement windows . . . View management decided that it would incur the [Installation Costs]"); *see also* Merger Agreement §5.2, Berry Decl. Ex. 2 at 432-433.

The allegations based on the SEC Cpt. provide additional support for, and are corroborated by, Plaintiffs' other allegations.  As such, this case is nothing like those cited by Defendants, in which plaintiff had done no independent investigation to investigate the claims at issue and allegations from another complaint served as the *sole* basis for the claim, and plaintiff provided no independent basis that went towards corroborating the allegations such that they were reasonable.  View Br. at 6; *see, e.g., In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (plaintiffs "rel[ied] *entirely* on another complaint as the sole basis for [the] allegations", "there apparently were no 'investigative efforts' to combine with plaintiffs' reliance on the SEC complaint", plaintiffs "ma[de] no effort to inform the Court what other sources of information besides the SEC complaint and press release they relied on in formulating their specific claims", and "the complaint itself [did not] indicate that any other sources were used as to these specific claim") (emphasis in original).  Courts in the Ninth Circuit have repeatedly held that reliance on third party materials, including government enforcement agency complaints, to substantiate claims is permissible, so long as those materials are not "the only basis" for the allegations. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (collecting cases and noting that "the Ninth Circuit has relied on comparable documents when deciding motions to dismiss"); *Erickson v. Corinthian Colleges, Inc.*, No. CV137466GHKPJWX, 2015 WL 12732435, at *5 n.5 (C.D. Cal. Apr. 22, 2015) ("it is appropriate for Plaintiff to offer these allegations [from the California AG's Complaint] 'to the extent that [they] corroborate[ ] plaintiff's own investigation and provide[ ] detailed factual allegations.'"); *In re Cylink Secs. Litig.,* 178 F.Supp.2d 1077, 1083 (N.D. Cal. 2001) ("[T]hese allegations, especially when combined with [those] in the SEC complaint, provide strong circumstantial evidence").

**C.      10(b) and Rule 10b-5 Claims are Alleged Against View and Prakash**

**1.      Plaintiffs' Allegations Support a Strong Inference of Scienter**

View's arguments against scienter similarly rely on the false assertion that the SAC's scienter allegations are "unchanged" from the AC other than the "improper" allegations based on the SEC Cpt. View Br. at 6. Not so. The SAC now specifically alleges that the Audit Committee concluded that "[Prakash] and certain former accounting staff intentionally failed to disclose certain information to the Board of Directors and [PwC], regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations." ¶84. View ignores this allegation, perhaps realizing that the conclusion of its *own Audit Committee*, is alone enough to support a strong inference of scienter. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015) ("a corporation is responsible for a corporate officer's fraud committed 'within the scope of his employment' or 'for a misleading statement made by an employee or other agent who has actual or apparent authority.'"); View Br. at 7-8 (arguing Prakash's scienter can't be imputed to View if only negligence is pled). As such, View's reliance on the Court's earlier scienter analysis is misplaced. View Br. at 6 (citing Order at 30-33).

View says almost nothing to substantively address the new scienter allegations based on the SEC Cpt. (¶¶207-228) other than to suggest that they "say nothing about" intent because the SEC only "charged" Prakash for his "negligent failure." View Br. at 6-8. That the SEC ultimately decided only to pursue negligence-based claims against Prakash does not change the factual nature of the claims – they are specific allegations that describe specific occurrences on specific dates. They describe what people (including Prakash and Mulpuri) knew, and when they knew it. *See, e.g.*, ¶¶209-11, 213, 217-18, 220-21, 223, 225-28. Describing them as "negligence-based" does not transform their factual content or determine whether they are sufficient to support (or contribute to) a strong inference of scienter. View also confusingly argues that this case is not about the failure to disclose "the costs to deal with the defect" because "[a]s the SAC acknowledges . . . although installation costs were mistakenly not added to the warranty accrual, those costs were booked and reported, each financial period, in View's income statement." (View Br. at 7 citing ¶83). But ¶83 does not even concern the content of View's public disclosures; rather it alleges that the Installation

Costs were reflected in View's *internal* books and records.

Nor does the purported absence of certain indicia that courts *sometimes* use to support an inference of scienter, such as confidential witnesses or suspicious stock sales support a finding that scienter has not been adequately plead. View Br. at 7; *see, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 38-39 (S.D.N.Y. 2019) (finding scienter and noting that "this Court is aware of no authority requiring confidential witness allegations"); *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV151343DOCKESX, 2017 WL 3328543, at *18 (C.D. Cal. Aug. 4, 2017) ("Defendants were incentivized to play down and/or conceal negative information on May 14, in light of the fact that they were barred from selling stock until May 19."). Regardless, View's argument ignores Mulpuri's and View's ***admissions*** of actual knowledge of the decision to cover the Installation Costs for all customers whose windows had the Defect, which alone support a strong inference of scienter. *See In re Finisar Corp. Sec. Litig.*, 646 F. App'x 506, 507 n.2 (9th Cir. 2016) ("An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."); ¶7 ("we voluntarily went above and beyond our contractual obligation . . . and as a result, incurred additional costs.").

View also argues that the SAC does not allege "that anybody knew GAAP required the [Installation Costs] to be included in the accrual calculation, or knew these costs were left out of that calculation." View Br. at 7. ***First***, the SAC *explicitly* alleges the Prakash knew they were left out of the accrual. ¶¶211. ***Second***, unlike the cases cited by View (View Br. at 7), the SAC does contain allegations to support an inference that Prakash (and View) knew that the Installation Costs should be accrued because under GAAP, a loss contingency, such as a warranty liability, should be accrued and disclosed if it is both "probable" and "can be reasonably estimated." ¶¶191, 208, 219; *see also* ¶209 (knowing that GAAP required such costs to be accrued, "Prakash assembled a team . . . to determine whether View should accrue a warranty liability for its projected expenses associated with addressing the Defect"). Because View was covering the Installation Costs for *all customers with windows containing the Defect*, which Prakash knew (¶¶210, 213, 227-28), the costs were undoubtedly at least "probable". Moreover, having already incurred Installation Costs in the

past, Defendants do not even argue that the Installation Costs were not "reasonably estimable."

Grasping at straws, Prakash asserts that View's announcement that he "intentionally failed" to provide "certain information" "raise[s] more questions than it answers" and doesn't specify [w]hat information [he] allegedly failed to disclose", as if that makes the finding any less damning. Prakash Br. at 3. In fact, View *did* specify that Prakash "intentionally failed to disclose certain information [to the Board and PwC] *regarding the applicable costs incurred and expected to be incurred in connection with the warranty-related obligations*." ¶84. The SAC also alleges that (i) Prakash knew his team excluded Installation Costs when determining View's liabilities because View's warranty terms did not require the payment of those costs (¶211-12); (ii) he knew the Company would cover those costs (¶¶210, 213, 227), regardless of whether it had to, undermining the reason for omitting the costs from the company's liabilities ( ¶210); (iii) the issue was important given Prakash's numerous confirmations (¶¶210, 213, 227-28), the amounts involved (¶49), and the inquiries it elicited from the SEC (¶¶221-24), View's Controller (¶226), and the company's auditor (¶225); (iv) he intentionally lied to PwC, telling them that View only paid Installation Costs for some customers, on a case-by-case basis (¶ 226); and (v) as a result, View restated its financials and he resigned (¶12). *See, e.g., Finisar*, 646 F. App'x at 507 n.2. Prakash's suggestion that the inference of scienter is not as compelling as the nonculpable inferences cannot be taken seriously, and his cited cases are nothing like the facts here. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016) ("the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter."); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) ("the TAC's factual allegations point *only to disagreement and questioning within Corinthian about [whether] the practice [was improper]*"); *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018) ("the accounting error was so subtle that it appears that even the company's specialized accounting division and professional auditors missed it: The error was not discovered *for seven consecutive quarters*" whereas, here, the error was discovered within 5 months of becoming a publicly traded company.).

Finally, View argues that scienter cannot be imputed to it through Mulpuri because his knowledge that View had decided to "cover all Installation Costs" is "far from alleging [he] knew

the accrual was misstated under complex GAAP accounting rules . . . ." View Br. at 7. As an initial matter, the warranty accrual was not misstated due to any purported "complex GAAP accounting rules," but rather, that the Installation Costs that "it had incurred and expected to continue to incur when replacing the [IGUs] were" entirely and "inappropriately excluded". View Br. at 7; ¶6.  More importantly, however, Defendants have not addressed, and therefore concede that both Mulpuri's and Prakash's scienter concerning the alleged misstatements regarding View's warranty policy (¶¶107, 121) can be imputed to View.  These statements concerning View's "standard assurance type warranty that [its] IGUs will be free from defects in materials and workmanship . . ." do not even arguably relate to GAAP, but rather required the disclosure of View's decision to cover the Installation Costs (of which they each admit they were aware) in order to make them not misleading.

### 2.   Plaintiffs Allege Loss Causation

The SAC alleges that on August 16, 2021, Defendants disclosed for the very first time that View's Audit Committee began an independent investigation concerning the adequacy of the company's previously disclosed warranty. ¶¶10, 140.  View's share price fell over 24% on the August 16 revelations to close at $3.92 per share on August 17, 2021. ¶¶11, 141.  Subsequently, on November 9, 2021, after the market closed, View more fully disclosed the extent and severity of the warranty accrual issue when it announced the substantial completion the investigation and its conclusion that the Company's previously reported warranty-related obligations were materially misstated, and the specific amounts by which View expected to restate its previously reported warranty-related accrual.  ¶¶12, 142. View also announced that Prakash resigned as CFO.  *Id*.; *see Mauss v. NuVasive, Inc.*, No. 13CV2005 JM (JLB), 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016) ("the announcement of [defendant]'s resignation can qualify as a partial disclosure").  On this news, the Company's share price fell 13.68% to close at $5.63 per share on November 10, and fell an additional 3.9% to close at $5.41 on November 11.  ¶143.

After the Class Period, on May 31, 2022, View reported its restated warranty-related accruals and also reported record revenues exceeding previous guidance. ¶144.  On this news, the Company's share price did not fall, but rather increased 33.07% to close at $1.69 per share on June 1, 2022, confirming that investors understood the earlier August 16 and November 9, 2021

announcements as at least partial disclosures of the inaccuracy of the previously reported warranty accruals. ¶145; *see also* ¶147-48 (no impact on stock price after completion of restatement). These allegations meet the pleading requirements set forth by the Ninth Circuit in *Lloyd and Loos*. *Lloyd*, 811 F.3d at 1210-11; *Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (rejecting loss causation theory where "the impact of [relevant post-class period] events on [the defendant's] stock price was not alleged" in the operative pleading); *see also* Order at 36.

Perhaps recognizing the sufficiency of the SAC's loss causation allegations, Defendants resort to mischaracterizing Plaintiffs' theory in order to make entirely new and convoluted arguments based on a false premise that the August 16 partial disclosure was not a corrective disclosure at all. View Br. at 3-4; ¶10. These arguments fail on both the facts and the law.

First, View argues that Lead Plaintiff cannot show loss causation because it sold all of its View shares before the final November 9, 2021 corrective disclosure, which according to Defendants is the "only . . . disclosure [that] revealed the allegedly concealed 'truth'" about View's warranty accruals. View Br. at 3-4. But View's argument ignores the SAC's allegation that the August 16 partial disclosure explicitly stated that the investigation related to View's previously disclosed warranty accrual. ¶140; *see also* Order at 36 ("The Court does agree with Plaintiff that the investigation was explicitly related to the alleged misstatements"). Tellingly, in each of View's out-of-circuit cases specifically found that the earlier alleged partial disclosures *were not* related to the alleged misstatements and were therefore not corrective disclosures at all. *Gru v. Axsome Therapeutics, Inc.*, No. 22 CIV. 3925 (LGS), 2023 WL 6214581, at *5 (S.D.N.Y. Sept. 25, 2023) (earlier disclosure was not a "corrective disclosure about [the undisclosed] manufacturing issues" and "[t]he Complaint itself state[d] that the [alleged partial corrective disclosure] 'did not give any indication that there were actual problems with the manufacturing process. . .'"); *Barr v. Matria Healthcare, Inc.*, 324 F. Supp. 2d 1369, 1380 (N.D. Ga. 2004) ("Because [the earlier disclosure] 'did not discuss the subject matter of the alleged fraud, as a matter of law, the decline in [the company's] trading price on that date cannot be considered a reaction to the disclosure of the alleged 'fraud.'") (cleaned up); *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1237-38, 1247-48 (11th Cir. 2023) ("there were *no corrective disclosures* before [plaintiff] sold all of its [stock]";

24

finding certain announcements of investigations "did not qualify as corrective disclosures").

Additionally, to the extent Defendants argue that the August 16 disclosure (on which date the truth is alleged to be partially understood by the market) can only be corrective depending on whether a specific named plaintiff continues to hold the stock at a later disclosure (rather than focusing on the *content* of that disclosure), such argument is illogical and would be at odds with both *Lloyd* and *Dura*. *Lloyd*, 811 F.3d at 1210 (details surrounding later disclosures can "confirm[] that investors understood [earlier investigation announcements] as at least a partial disclosure of the inaccuracy of the previous [alleged misstatements]"); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (loss incurred when sale occurs after "the relevant truth begins to leak out"); *see also Pub. Emps. Ret. Sys. of Miss., Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 325 (5th Cir. 2014) ("series of events [should be] viewed together and within the context of [later disclosures]"). Such a finding would lead to absurd results and suggest that in any given case a class member that held shares through an initial partial disclosure (*i.e.*, a day on which the truth begins to leak into the market) can only recover losses attributed to that disclosure if he or she continued to hold those shares through all of the alleged corrective disclosures. But that is not the law. *Dura*, 544 U.S. at 342; *NuVasive*, 2016 WL 3681831, at *11 ("The important consideration is the market's understanding of a given disclosure at the time it was made. Here, the announcement, followed by a significant drop in [price] and . . . the nature of the subpoena, sufficiently rendered this a partial disclosure under <u>Lloyd</u> and <u>Amedisys</u>.").

Defendants' "price recovery" argument is also meritless. View Br. at 4-5; CF Br. at 9. In *Wochos v. Tesla, Inc.*, following an alleged corrective disclosure, Defendant Tesla's stock fell 3.9% from $356.88. 985 F.3d 1180, 1198 (9th Cir. 2021). But, as Defendants' other cited case points out, "the stock recovered immediately, rising the ***next day*** to $355.59 and trading over the next week between $350 and $360." *Bajjuri v. Raytheon Techs. Corp.*, No. CV-20-00468-TUC-JCH, 2023 WL 3650554, at *15 (D. Ariz. May 25, 2023) (citing *Wochos*, 985 F.3d at 1198). Similarly, in *Bajjuri* plaintiffs alleged a 7% drop that recovered in four trading days. 2023 WL 3650554, at *16; *see also Metzler*, 540 F.3d at 1059, 1065 (stock price "rebounded within three trading days" and defendant also "persuasively explain[ed]" why the market did not understand the disclosure

25

"as a revelation of Corinthian's systematic manipulation."). Here, Defendants admit that any purported recovery in the stock price did not occur for *17 days (13 trading days)* following the August 16 disclosure. The impact of that partially corrective disclosure will be the subject of expert analysis, and is nothing like the price recoveries in the cases cited by defendants. *See Amedisys*, 769 F.3d at 325 ("Whether the connection between [the] misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point."); *see also In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 866 (9th Cir. 2023) ("loss causation is a matter of proof at trial so it is normally inappropriate to rule on loss causation at the pleading stage.") (internal quotations omitted).

Finally, Defendants' attempt to reframe Mulpuri's post-Class Period admission that he and others were aware of the decision to cover the Installation Costs as a corrective disclosure fails. The SAC does not "allege[ that] this practice was revealed in May 2022". View Br. at 5. Rather, Plaintiffs' theory has always been that Defendants' Class Period statements were misleading because they failed to fully and fairly disclose to investors the Installation Costs it intended to incur when replacing the IGUs. SAC, ¶6 (failed to disclose that, in addition to warrantying the IGUs' materials and workmanship, View inappropriately excluded the Installation Costs that View decided it would cover), ¶¶87, 92 (same); ¶98 (failed to disclose that "estimated cost" to replace IGUs inappropriately exclude the Installation Costs it intended to incur); ¶¶106, 111, 117, 120, 124 (same); *compare* AC ¶¶6, 79, 84, 88, 97, 100, 108, 111 (similar). Defendants' argument also fails because the Class Period ends on November 9, 2021, the date the SAC alleges that the full extent and impact of the "voluntary" going "above and beyond" decision was disclosed. ¶¶1, 84, 142; *see also* View's Nov. 9, 2021 8-K, Berry Decl., Ex. 7 at 2 ("The Company's warranty-related obligations . . . *arise out of standard warranties* that assure that the [IGUs] will be free from defects in materials and workmanship generally for ten years. The Audit Committee, in consultation with management, concluded that . . . the Company inappropriately excluded from these liabilities *certain costs it intended to incur when replacing the IGUs*."). Whether or not May 2022 was the first time Mulpuri referred to the decision to cover Installation Costs as going "above and beyond" is irrelevant given the market already digested that information by the end of the Class Period. As

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

such, View's cited cases involving alleged corrective disclosures are inapposite. View Br. at 5 (citing cases where "stock price went up" "*after alleged* corrective disclosures").  Similarly, unlike View's other out of circuit cases, Plaintiffs do not "rely upon [stock drops or corrective disclosures] for loss causation" that occurred "after the close of the class period." View Br. at 5.

### D.    Control Person Claims are Adequately Alleged

To state a claim for "controlling person" liability under 20(a), Plaintiffs need only allege an ability to control or influence (directly or indirectly) a primary violator but need not allege that such defendants actually exercised control or participated in the underlying violation. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003). Because determining control person status is an "intensely factual question", "'[c]ourts have found general allegations concerning an individual's title and responsibilities to be sufficient to establish control at the motion to dismiss stage.'" *Hefler v. Wells Fargo & Co.*, No. 16-CV-05479-JST, 2018 WL 1070116, at *13 (N.D. Cal. Feb. 27, 2018) (citations omitted). Here, Plaintiffs allege that each 20(a) defendant was in a position to control a primary violator.  ¶¶27-28, 31-36, 38-41, 63-64, 68, 192-93, 217, 200-04, 262-64.

Defendants' cases are inapplicable or support Plaintiff. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1067 n.13 (9th Cir. 2000) (decided on *summary judgment*, finding "no showing" of control and citing *Paracor Fin.*, *Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996) (plaintiffs introduced "no evidence that [the CEO] exercised direct or indirect control over" the transaction at issue "*in any way*")); *Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir. 1984) (decision *after trial* where evidence showed director wholly uninvolved with company's business or industry*); Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL 2171273, at *6 (N.D. Cal. May 17, 2017) (allegations that the company was "'family run and controlled' (by [other defendants]), and that the 'couple ... maintained unusually tight control over key decisions' . . . contradict[ed] any notion of control by [the CFO]").

The CFII Individual Defendants' arguments ignore almost entirely the SAC's individual allegations of control (¶¶31-36, 58, 63), citing numerous cases where defendants did not sign the misleading statements at issue and generic allegations of control were rejected.  CF Br. at 9-10.

But here, the CF Individual Defendants do not dispute that they *each* signed the Proxy. *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) ("[N]umerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status.") (collecting cases). Rather, their arguments appear to address Count IV only (20(a) control for the 10(b) claim). But again, they fail to grapple with the nature of the key misleading statement: a Nov. 30, 2020 Press Release on Form 8-K announcing the CFII Individual Defendants' own unanimous approval of the Merger Agreement. ¶¶85-87. The filing was signed by Lutnick and the Merger Agreement was signed by Pion. ¶¶31-32. Indeed, the eventual announcement of such a merger was the sole purpose of CF II. ¶54. In this scenario, to suggest they were not control persons is a non-starter. Additionally, Pion cites no support for his argument that "could not possibly have any liability . . . after his resignation." CF Br. at 10. After signing both the Merger Agreement and the misleading Proxy (and failing to correct it) (¶32), Pion cannot avoid liability by resigning prior to its issuance.

Finally, the CF II Entity Defendants say almost nothing to counter the allegations of control (¶¶38-41), citing cases where no indicia of control had been plead. CF Br. at 10. CFII's initial Registration Statement admits that the Sponsor and Lutnick control CFII. ¶38; s*ee, e.g., Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1048-49 (N.D. Cal. 2016) (finding sufficient statements in public filings that "[alleged controlling party] will continue to have significant influence over [the Company's] affairs for the foreseeable future" and "will be able to control most matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions"). Further, CF II's initial registration statement admits that "[w]e, our sponsor and CF&Co are controlled by Cantor." ¶40. That is because Cantor is the ***sole member*** of the Sponsor. *Id*. Moreover, CF Group Management, Inc. ("CFGM") is the ***managing general partner*** of Cantor. ¶41. Defendant Lutnick is the CEO of CFGM and is the trustee of CFGM's ***sole stockholder***. *Id*. As set forth in the Proxy, "[a]s such, each of Cantor, CFGM and Mr. Lutnick may be deemed to have beneficial ownership of the Common Stock held directly by the Sponsor." *Id*. Put simply, CFII is controlled by the Sponsor, the Sponsor is controlled by Cantor, CFGM controls Cantor, and Defendant Lutnick controls CFGM. Defendant Lutnick also

independently controls each entity. These allegations are sufficient to plead control.  As to CF&Co., CF Defendants argue that it did "not have day-to-day involvement with CFII (CF Br. at 10), but the SAC pleads the opposite.  ¶¶39, 57-60, 64.

**E.        Defendants' Attempt to Ignore Named Plaintiff Sherman Should be Rejected**

Defendants attack the addition of Plaintiff Sherman, yet *admit* that Sherman may "enter this case" upon "Court permission under Rule 15 (amendment)".  View Br. at 12; CF Br. at 9.  But the Court *did* grant leave to amend under Rule 15. Order at 43.  Moreover, contrary to Defendants' assertion, Stadium remains the sole Court-appointed Lead Plaintiff (View Br. at 12) and "nothing in the PSLRA requires court approval for the addition of additional named plaintiffs by the Lead Plaintiff." *Hunt v. Bloom Energy Corp.*, No. 19-CV-02935-HSG, 2021 WL 1110260, at *1 (N.D. Cal. Mar. 23, 2021) (citing *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("the PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class."); *Bos. Ret. Sys. v. Uber Techs.*, Inc., No. 19-CV-06361-RS, 2022 WL 2954937, at *4 (N.D. Cal. July 26, 2022) (same).  In fact, "Lead Plaintiffs have a ***responsibility*** to identify and include named plaintiffs who have standing to represent the various potential subclasses of plaintiff who may be determined, at the class certification stage, to have distinct interests or claims." *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 205 (S.D.N.Y. 2003); *see also Hunt*, 2021 WL 1110260, at *2 ("the additions [of new named plaintiffs in the SAC] are permissible and consistent with the Lead Plaintiff's duties").  Neither of Defendants' cited cases address this scenario are therefore inapplicable. *In re Nutanix, Inc. Sec. Litig.*, No. 19-CV-01651-WHO, 2021 WL 783579 (N.D. Cal. Mar. 1, 2021) (lead plaintiff could withdraw from the litigation, and substitute a replacement lead plaintiff of his choosing (rather than the court's)); *In re Snap Inc. Sec. Litig.*, 394 F.Supp.3d 1156 (C.D. Cal. 2019) (same).  Defendants' other cases are inapposite and unpersuasive. *Wehlage v. EmpRes Healthcare Inc.*, 821 F. Supp. 2d 1122, 1125 (N.D. Cal. 2011) (court granted leave to amend for limited purpose of adding alter ego allegations to specified claims); *Zucker v. Zoran Corp.*, No. C 06-04843 WHA (N.D. Cal. Feb. 21, 2007), Berry Decl., Ex. 16-1 at 1 (unpublished opinion where Judge Alsup did not consider whether his order to file a consolidated complaint was an order granting leave to amend under Rule 15, finding that additional plaintiff

must instead "move[] to intervene or to join as a representative plaintiff under Rule 20").

Defendants' remaining arguments related to standing are similarly unavailing. View Br. at 12-13. "[T]he fact that the lead plaintiff is to be selected in accordance with objective criteria that have nothing to do with the nature of the claims . . . strongly suggests the need for named plaintiffs in addition to any lead plaintiff." *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002); *see also Havesi v. Citigroup, Inc.*, 366 F.3d 70, 82 (2d Cir. 2004) (similar); *Tanne v. Autobytel, Inc.*, 226 F.R.D. 659, 669 (C.D. Cal. 2005) ("[i]rrespective of the lead plaintiff's standing to pursue a [specific] claim, the class may pursue any claim that at least one named plaintiff has standing to pursue."). In Defendants' cited cases, many of which were issued at the class certification stage, *none* of the named plaintiffs had standing to bring claims. View Br. at 13.

Finally, Defendants' subject matter jurisdiction argument ignores that Sherman is a named plaintiff, and their cases support Plaintiffs. *In re Impax Lab'ys, Inc. Sec. Litig.*, No. C 04-04802 JW, 2008 WL 1766943, at *8 (N.D. Cal. Apr. 17, 2008) ("Defendants ignore the fact that [the additional plaintiff] remains a named Plaintiff and since there has been no challenge to his standing to sue, the Court current has subject matter jurisdiction over this action"); *In re Infineon Techs. AG Sec. Litig.*, 266 F.R.D. 386, 394 (N.D. Cal. 2009) (granting class certification because other adequate named plaintiffs remained); *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (vacating class certification order where "none of the named plaintiffs" had standing); *Adams v. AllianceOne, Inc.*, No. 08-CV-248-JAH(WVG), 2010 WL 11508282, at *1 (S.D. Cal. Mar. 22, 2010) (same); *Skilstaf, Inc. v. CVS Caremark Corp.*, No. C 09-02514 SI, 2010 WL 199717, at *6 (N.D. Cal. Jan. 13, 2010) (antitrust case, not subject to the PSLRA, where sole named plaintiff was subject to a covenant not to sue and therefore could not pursue claims at issue); *In re Exodus Commc'ns, Inc. Sec. Litig.*, No. C-01-2661 MMC, 2006 WL 2355071, at *1 (N.D. Cal. Aug. 14, 2006) (following discovery and summary judgment, denying motion to intervene where neither of the named plaintiffs that had asserted claim at issue were found to have standing).

### III.    CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny the Motions. If any portion of the Motions are granted, Plaintiffs respectfully request leave to amend.

DATED: November 13, 2023          Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By:  /s/  *Laurence D. King*
            Laurence D. King

Laurence D. King (SBN 206423)
Kathleen A. Herkenhoff (SBN 168562)
Blair E. Reed (SBN 316971)
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile:   415-772-4707
*lking@kaplanfox.com*
*kherkenhoff@kaplanfox.com*
*breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:   212-687-7714
*ffox@kaplanfox.com*
*dhall@kaplanfox.com*
*juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium Capital LLC,
Plaintiff David Sherman and the Proposed Class*

MEMO OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## CERTIFICATE OF SERVICE

I, Laurence D. King, hereby certify that on November 14, 2023, I caused a copy of the foregoing Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss to be electronically filed using the Court's electronic case filing (CM/ECF) system, which automatically generated and sent a notice of electronic filing to the e-mail addresses of all counsel of record in this action.

/s/ Laurence D. King
Laurence D. King