# Exhibit 1

**EFiled:  Nov 20 2023 03:02PM EST**
**Transaction ID 71453159**
**Case No. 2023-1152-JTL**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |
|---|---|
| MARIANO SISELES and ZALMON UVAYDOV,<br><br>Plaintiffs,<br><br>v.<br><br>HOWARD LUTNICK, ANSHU JAIN, PAUL PION, ROBERT HOCHBERG, CHARLOTTE BLECHMAN, ALICE CHAN, CF FINANCE HOLDINGS II LLC, CANTOR FITZGERALD L.P., and CANTOR FITZGERALD & CO.,<br><br>Defendants. | C.A. No. 2023-1152-JTL<br><br>PUBLIC VERSION<br>Filed November 20, 2023 |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiffs Mariano Siseles and Zalmon Uvaydov ("Plaintiffs"), on behalf of themselves and similarly situated current and former stockholders of CF Finance Acquisition Corp. II ("CF II"), bring this Verified Class Action Complaint asserting: (i) breach of fiduciary duty claims arising from CF II's March 8, 2021 merger (the "Merger") with legacy View, Inc. ("Legacy View") against: (a) Howard Lutnick ("Lutnick"), Anshu Jain ("Jain"), Paul Pion ("Pion"), Robert Hochberg ("Hochberg"), Charlotte Blechman ("Blechman"), and Alice Chan ("Chan") in their capacities as members of CF II's Board of Directors (the "Board" or the "Director Defendants"); (b) Lutnick, CF II's Chief Executive Officer ("CEO") and Board Chairman; Jain, CF II's President; Pion, CF II's Chief Financial Officer ("CFO")

from September 2019 to January 2021; and Chan, CF II's CFO from January 2021 through the close of the Merger, in their capacities as CF II officers (together, the "Officer Defendants"); (c) CF Finance Holdings II, LLC (the "Sponsor") and Lutnick, in their capacities as CF II's controllers (together, the "Controller Defendants" and, together with the Director Defendants and the Officer Defendants, the "CF II Defendants"); (ii) aiding and abetting breach of fiduciary duty claims against Cantor Fitzgerald L.P. ("Cantor") and Cantor Fitzgerald & Co. ("CF&Co") (together, the "Aiding and Abetting Defendants"); and (iii) unjust enrichment claims against all Defendants.

These allegations are based on Plaintiffs' knowledge as to themselves and their own actions, and on information and belief, including counsel's investigation and review of publicly available information and review of the documents produced in response to Plaintiffs' demands for inspection of books and records under 8 *Del. C.* §220 (the "220 Documents"), as to all other matters.

## NATURE OF THE ACTION

1.    CF II, now renamed View, Inc. ("New View"), is a Delaware corporation that was formed as a special purpose acquisition company ("SPAC") by the Controller Defendants.  The Controller Defendants took CF II public.  A SPAC, also known as a "blank check company," is a publicly traded company without commercial operations that is formed strictly to raise capital through an initial public

2

offering ("IPO") for the purpose of entering into a business combination with another company within a specified period of time. The proceeds of the SPAC's IPO are held in trust for the benefit of public stockholders. When the SPAC agrees to a business combination, the SPAC's public stockholders are presented with a decision: they can elect to redeem all or a portion of their shares—and receive a proportionate share of the funds held in trust—*or* they can invest those funds in the post-combination company. If a SPAC does not close a business combination within the time specified in its charter, it is required to liquidate, in which circumstances public stockholders would receive a proportionate share of the liquidating distributions from the trust.

2.  CF II's history is part of a disturbing trend of SPAC transactions in which sponsors and insiders have placed their financial interests ahead of the interests of the SPAC's public stockholders, despite being legally bound to do the opposite. Instead, the CF II Defendants, aided and abetted by each other and the Aiding and Abetting Defendants, granted themselves significant financial interests in CF II that diverged from the interests of CF II's public stockholders and that were contingent on CF II entering into an "initial business combination" within the time specified by CF II's Charter.

3.  Defendants had a powerful incentive to cause CF II to enter into any business combination and avoid a liquidation. Prior to the IPO, the Controller

Defendants purchased 11,500,000 "Founder Shares"—shares of CF II Class B common stock—for a total of $25,000, or $0.002 per share. The Controller Defendants thereafter quickly transferred 30,000 Founder Shares to the Director Defendants, aligning their interests with those of the Controller Defendants. Following a sequence of stock splits and an IPO-related forfeiture of Founder Shares, at the time of the Merger, Defendants collectively held 12,500,000 Founder Shares.

4.      In addition, concurrently with the IPO, the Sponsor purchased 1,100,000 private placement units (the "Private Placement Units") at a price of $10 per unit, for a total for $11 million. Each Private Placement Unit consisted of one share of Class A common stock (the "Private Placement Shares"), and one-third of one warrant (the "Private Placement Warrants").[1]

5.      The CF II Defendants waived their liquidation and redemption rights with respect to all their Founder Shares and the Private Placement Shares. As a result, unlike the shares held by CF II's public stockholders, the shares that the CF II Defendants held would only have value if CF II closed a business combination. Similarly, the Private Placement Warrants would only be exercisable 30 days after

---

[1] Each whole Private Placement Warrant was exercisable for one share of Class A common stock at a price of $11.50 per share.

a business combination was completed.  They, too, therefore, would have value only if CF II closed a business combination.

6.    CF II's structure created an inherent conflict of interest between the Defendants and the public stockholders.  If CF II succeeded in consummating a business combination, the CF II Defendants would hold shares and warrants in the combined company.  But if CF II liquidated, the CF II Defendants' Founder Shares, Private Placement Shares, and Private Placement Warrants would be worthless—and the Sponsor would lose its entire investment.  Thus, these insiders' interests in getting any deal done—even a value-destructive one—to avoid liquidation provided them with a perverse incentive to complete a merger regardless of whether it was in the best interests of the Company's public stockholders.  Furthermore, since Defendants would continue to hold their shares and warrants after any business combination, they had an interest in discouraging public stockholders from redeeming their shares, as each share redeemed would decrease the amount of cash available to the post-Merger company in which they would own equity.

7.    Armed with these conflicting incentives, the Board approved the Merger and took steps to ensure its approval by disseminating a false and misleading proxy statement/prospectus (the "Proxy"), which omitted material information, to induce the stockholder vote in favor of the Merger and to deter CF II's public stockholders from exercising their redemption rights.  The Proxy contained

5

materially false and misleading representations about Legacy View's value and prospects, including financial projections disclosed in the Proxy (the "Proxy Projections"). Specifically, the Proxy stated that the New View Class A common stock that CF II common stock would be converted to post-Merger would be deemed to have a value of $10.00 per share: "Upon the consummation of the Business Combination, all holders of View Capital Stock, View Warrants, and View Options will receive or have the right to receive shares of the Combined Entity Class A Common Stock at a deemed value of $10.00 per share." This statement was false and misleading based on the actual post-close value of New View Class A Common Stock.

8.    Among other reasons, the Proxy Projections were unreliable because they materially understated warranty liability that Legacy View faced due to a defect in a substantial amount of the "smart" windows that it installed. Further, the Proxy omitted: (i) certain "Key Transaction Considerations" that had been disclosed to the Board and undermined the Proxy Projections; (ii) that the Proxy Projections assumed $723.6 million in total capital expenditures, which contradicted other statements in the Proxy indicating that Legacy View was only projecting $160 million in capital expenditures; (iii) that Legacy View would have to pay off an approximately $277 million loan if cash provided in the Merger was above a specified threshold; and (iv) that Legacy View's $560 million product pipeline—its so-called "Design-Win

6

Backlog"—was comprised almost entirely "non-contractual design wins" that were only "expected"—based on unspecified factors—to be converted into revenue.

9. On March 5, 2021, CF II's public stockholders approved the Merger during a special meeting. Burdened with the materially false and misleading Proxy, investors redeemed only 25% of CF II shares. On March 8, 2021, the Merger closed.

10. Soon after Merger closed, the truth about CF II began to emerge:

- On June 1, 2021, Jehoshaphat Research published a Short Report on New View titled "Driving Investors Through the Glass…Again" (the "Jehoshaphat Report") highlighting numerous negative aspects of New View, including: (1) the fact that its products cost four times more to manufacture than they sold for; (2) that Legacy View had burned through $900 million in cash over the prior three years and would need to spend an additional $660 million to meet Proxy Projection revenue; (3) the false and misleading statements in the Investor Presentation about Legacy View's Design-Win Backlog; and (4) Cantor's and Lutnick's conflicts of interest. The Jehoshaphat Report concluded that New View "stock is *intrinsically worthless* because the company has no path to profitability, the product is a solution in search of a problem, and the business consumes capital like a sinkhole."

- The day that the Jehoshaphat Report was published, New View's stock dropped down to $7.75 per share.

- On August 17, 2021, New View faced a delisting from the Nasdaq Stock Market LLC ("Nasdaq") due to the fact that its previously disclosed warranty accrual statement was incorrect and would require an internal investigation. That internal investigation resulted in New View restating its financials for the 2019 and 2020 fiscal years and for the first and second quarters of the 2021 fiscal year. New View would have to restate its warranty accrual as of March 31, 2021, to an amount in the range of $40 million to $58 million, and to an amount in the range of $46 million to $70 million as of

7

December 31, 2019, and to an amount in the range of $38 million to $55 million as of December 31, 2020.

- In connection with this investigation, New View's CFO, Vidul Prakash ("Prakash"), was forced to step down. The U.S. Securities and Exchange Commission ("SEC") began an investigation into New View and Prakash for potential fraud in connection with the warranty accrual restatements.

- On November 9, 2021, New View lowered its revenue guidance for 2021 down to a range of $65 million to $70 million, $5–$10 million less than the 2021 estimated revenue in the Proxy Projections.

- On May 10, 2022, New View disclosed that it had "substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of its 2021 Annual Report on Form 10-K."

- On May 31, 2022, New View announced full year 2022 revenue guidance of $100 million to $110 million—materially lower than the $216 million 2022 revenue guidance in the Proxy Projections. New View also reported that it had completed a $200 million financing through the sale of convertible senior notes, which would further dilute stockholder ownership of New View stock.

- As the truth about New View emerged over time, its stock price plummeted, falling to well below $1 per share. On February 16, 2023, New View disclosed that it had been threatened with a delisting from Nasdaq because its stock had failed to trade above $1 for 30 consecutive days. New View had 180 days to buoy its stock above $1 per share for a minimum of 10 consecutive business days. After trading at a high of $9.76 per share on June 9, 2021, New View stock dropped below $1 per share on December 28, 2022, and traded down to $0.67 per share on February 16, 2023.

- On March 29, 2023, New View announced full year 2022 actual revenue of $101 million, less than half of the $216 million revenue

for 2022 contained in the Proxy Projections. New View stock traded at $0.56 per share on this date.

- On May 9, 2023, New View announced full year 2023 revenue guidance of $125 million to $150 million, only 26.5% to 32% of the $470 million revenue for 2023 contained in the Proxy Projections. New View stock traded at $0.26 per share on this date.

- On July 3, 2023, the SEC announced that it had settled charges with View relating to its restatement of warranty accrual. On the same day, the SEC announced that it was charging Prakash with financial reporting and accounting fraud. The SEC asserted that Prakash knew that the warranty liabilities Legacy View disclosed in the Proxy did not include the costs of installation of the replacement products, even though Legacy View had decided it would cover all such installation costs. New View stock traded at $0.13 per share on this date.

- On July 26, 2023, New View announced a 60-for-1 reverse stock split in order to avoid Nasdaq delisting.

- Since the Merger, View's stock price has collapsed from at a high of $9.76 per share on June 9, 2021, down to $2.92 per share on November 1, 2023 (the functional equivalent of $0.05 per share but for the reverse stock split).

11. No director, officer, or controlling stockholder fulfilling its fiduciary duties to stockholders would have entered into the Merger with Legacy View, let alone recommended that the Merger was in the best interests of CF II's public stockholders. Defendants did.

12. CF II's deeply conflicted directors and officers breached their duties of loyalty and candor by entering into an unfair Merger and impairing public stockholders' redemption rights by providing materially false and misleading

9

information in the Proxy and omitting from the Proxy information that was highly material to public stockholders' decision whether to redeem their shares or invest in the Merger. Defendants did this to promote their own self-interest in seeing redemptions minimized and the Merger consummated to secure their windfall from their Founder Shares and Private Placement Warrants.

13. Although an abysmal deal for CF II public stockholders, the Merger provided a financial windfall to the CF II Defendants. On the day the Merger closed, March 8, 2021, the Founder Shares alone were worth $114,875,000—a return on their initial investment of over 459,500%.

14. Due to Defendants' conflicts of interest, the Merger requires judicial review for entire fairness. The Merger cannot meet the exacting entire fairness test. Plaintiffs seek monetary and/or rescissory damages against Defendants for their various breaches of fiduciary duty owed to CF II's public stockholders and/or aiding and abetting thereof.

## PARTIES

15. Plaintiff Mariano Siseles acquired CF II shares on March 3, 2021, held CF II shares at the time of the Merger, and is a current New View stockholder.

16. Plaintiff Zalmon Uvaydov acquired CF II shares on December 23, 2020, held CF II shares at the time of the Merger, and is a current New View stockholder.

10

17.    Defendant Sponsor was founded on September 27, 2019, and is based in New York.  The Sponsor is directly owned by Cantor, which is directly controlled by Lutnick.  At the time of the Merger, the Sponsor beneficially held 12,470,000 Founder Shares and 1,100,000 Private Placement Shares.  As of February 11, 2021, the record date in the Proxy, the Sponsor's Founder Shares were worth $136.5 million, and its Private Placement Units were worth $12,826,000.

18.    Defendant Lutnick was the Chairman and CEO of CF II from September 2019 to the close of the Merger.  Lutnick controlled the Sponsor through his control of CF Group Management, Inc. ("CFGM"), the managing partner of Cantor, which was the Sponsor's managing member.  Lutnick also controls Newmark & Company Real Estate, Inc. ("Newmark").  Lutnick was the Chairman and CEO of CF Finance Acquisition Corp. ("CF I") from October 2015 to November 2020.  Lutnick was the Chairman and CEO of CF Finance Acquisition Corp. III ("CF III") from March 2016 to August 2021.  Lutnick has served as the Chairman and CEO of CF Acquisition Corp. IV ("CF IV") since January 2020.  Lutnick was the Chairman and CEO of CF Acquisition Corp. V ("CF V") from April 2020 to January 2022.  Lutnick was the Chairman and CEO of CF Acquisition Corp. VI ("CF VI") from April 2020 to September 2022.  Lutnick has served as the Chairman and CEO of CF Acquisition Corp. VII ("CF VII") since July 2020.  Lutnick has served as the Chairman and CEO of CF Acquisition Corp. VIII ("CF VIII") since July 2020.  At

11

the time of the Merger, Lutnick beneficially held 12,470,000 Founder Shares and 1,100,000 Private Placement Shares. As of February 11, 2021, the record date in the Proxy, Lutnick's Founder Shares were worth $136.5 million, and his Private Placement Units were worth $12,826,000.

19. Defendant Jain was President of CF II from September 2019 to March 2021 and a director of CF II from August 2020 to March 2021. Jain also served as the President of Cantor from January 2017 to August 2022. Jain held similar positions with each of the CF SPACs. Jain was the President of CF I from January 2018 to November 2020 and a director from December 2018 to November 2020. Jain was President of CF III from March 2020 to August 2021 and a director from November 2020 to August 2021. Jain was President of CF IV from September 2020 through August 2022 and a director from December 2020 to August 2022. Jain was President of CF V from September 2020 through January 2022 and a director from January 2021 through January 2022. Jain was President of CF VI from October 202 to August 2022 and a director from February 2021 to August 2022. Jain was President of CF VII from January 2021 to August 2022 and a director from December 2021 to August 2022. Jain was President of CF VIII from January 2021 to August 2022 and a director from March 2021 to August 2022.

20. Defendant Pion served as the CFO of CF II from September 2019 to January 2021, and a director of CF II from August 2020 to January 2021. Pion held

12

similar positions at other members of the CF family of SPACs.  Pion was the CFO at CF I from January 2020 to November 2020 and director from June 2020 to November 2020.  Pion was the CFO at CF III from March 2020 to January 2021 and director from November 2020 to January 2021.  Pion was the CFO at CF IV from January 2020 to January 2021 and director from December 2020 to January 2021.  Pion has held other high-level roles at companies affiliated with Cantor.  Specifically, Pion has been the U.S. Chief Administrative Officer and Senior Managing Director of CF&Co.  Additionally, Pion serves as the CEO of Tower Bridge International Services LP, responsible for the back-office functions for all Cantor UK-based businesses.

21.    Defendant Hochberg was a director at CF II from August 2020 to March 2021.  Hochberg was gifted 20,000 Founder Shares by the Sponsor, worth $219,000 as of February 11, 2021, the record date in the Proxy.  Hochberg also served as a director of Rodin Income Trust, Inc. ("Rodin"), a publicly registered non-traded real estate investment trust ("REIT") that was sponsored by Cantor, from March 2018 to March 2021.  Lutnick served as the Chairman and CEO of Rodin from February 2017 to December 2022, and President of Rodin from January 2018 to December 2022.  Rodin has since assigned all of its assets to a Cantor affiliated fund and dissolved.  Hochberg has served as a director at other members of the CF family of SPACs.  Hochberg served as a director of CF I from January 2020 to

November 2020. Hochberg served as a director of CF III from November 2020 to August 2021, where Hochberg was given 20,000 CF III founder shares. Hochberg has served as a director of CF VIII since March 2021, where Hochberg was given 11,000 CFV VIII founder shares.

22. Defendant Blechman was a director at CF II from November 2020 to March 2021. Blechman was given 10,000 Founder Shares by the Sponsor, worth $109,500 as February 11, 2021, the record date in the Proxy. Blechman was also paid an additional $100,000 in cash as of March 9, 2021, for her position as director.[2] Blechman has served as a director at other members of the CF family of SPACs. Blechman has served as a director of CF IV since December 2020, where she was given 16,875 founder shares. Blechman has also served as a director of CF VIII since March 2021, where she was given 11,000 founder shares.

23. Defendant Chan served as the CFO and as a director of CF II from January 2021 to March 2021. Chan served as the Global Controller and as a Managing Director at Cantor from 2015 until July 2021. Chan took over as the CFO for the CF family of SPACs beginning in January 2021. Chan was the CFO and a director of CF III from January 2021 to July 2021. Chan was the CFO and a director of CF IV from January 2021 to July 2021. Chan was the CFO and a director of CF

---

[2] G&E-VIEW-00056653. All references to "G&E-VIEW-_____" are from the 220 Documents produced in response to Plaintiffs' inspection demands.

V from January 2021 to July 2021.  Chan was the CFO and a director of CF VI from January 2021 to July 2021.  Chan was the CFO and a director of CF VII from January 2021 to July 2021.  Chan was the CFO and a director of CF VIII from January 2021 to July 2021.

24.     Defendant Cantor is a Delaware limited partnership with its principal offices at 135 East 57th Street, New York, New York.  Cantor is the Sponsor's sole managing member.  Cantor is also the managing member of the sponsors for each of the additional related SPACs within the CF family.  Lutnick is the Chairman and CEO of Cantor, and the controller of Cantor.  Cantor owns and controls CF&Co and Newmark.  Cantor entered into a financing assistance contract with Legacy View, pursuant to which Cantor intended to establish one or more financing entities together with Legacy View to support the purchase and sale of View's products and services, and such financing entities would have the right to purchase View's products at a discount to the then actual selling price for comparably featured orders.

25.     Defendant CF&Co operates an investment bank and brokerage company.  It is organized as a New York general partnership and its managing general partner is a majority owned subsidiary of Cantor.  CF&Co is an affiliate of the Sponsor and is owned and controlled by Cantor.  According to a unanimous written consent by the CF II Audit Committee on October 3, 2020, Lutnick, Jain,

15

and Pion are each affiliated with CF&Co.[3]  This same written consent approved engagement of CF&Co for numerous financially lucrative actions that rendered Lutick, Jain, and Pion to be "Interested Parties" in connection with these engagements.  CF&Co was the underwriter for the IPO and was paid $10 million in underwriting discounts.  In addition to underwriting fees, CF&Co was also retained as financial advisor "to perform customary services for CF II" in connection with the Merger, for which it received an additional fee equivalent to $7.5 million (originally the fee was to be paid in cash, but later CF&Co agreed to be paid 750,000 shares of CF II Class A common in lieu of cash) that would only be paid upon the consummation of a business transaction.  CF&Co was engaged to hold investor meetings and "assist CF II in obtaining stockholder approval for [the Merger] and assist CF II with its press releases and public filings in connection with" the Merger.  CF&Co's total promised fee for these services was, according to the Proxy, equivalent to $17.5 million, contingent on consummation of the Merger.  CF&Co was also engaged as a co-lead placement agent for a private investment in public equity ("PIPE") investment in connection with the Merger for a placement fee equal to 1.5% of the gross proceeds of any sale of securities of CF II, amounting to an

---

[3] G&E-VIEW-00057903-06; 00056615-16.

additional $4.5 million. As the PIPE was conditional on the consummation of the Merger, so, too, was this additional $4.5 million fee.

## RELEVANT NON-PARTIES

26. New View is a Delaware corporation with principal executive offices at 195 South Milpitas Boulevard, Milpitas, California. New View produces and sells "smart" products designed to reduce energy consumption while improving the health and productivity of occupants. On November 30, 2020, Legacy View entered into a business combination agreement with CF II. Legacy View completed the business combination with CF II on March 8, 2021, and continues to operate as New View.

27. Newmark is an affiliate of the Sponsor and is owned and controlled by Cantor and Lutnick. Legacy View appointed Newmark as its exclusive provider of real estate services and commissioned house agent for referrals of sales of New View products or services installed in buildings in North America (other than certain verticals and customers, and subject to certain other exceptions), and Newmark would be entitled to commissions in respect of such sales and will also receive commissions on its referrals that are no less than the commissions granted to other referring parties.

28. CFGM is a New York corporation, and the managing general partner of Cantor. Lutnick is the Chairman and CEO of CFGM and the trustee of CFGM's sole stockholder.

17

## SUBSTANTIVE ALLEGATIONS

### A.    THE CONTROLLER DEFENDANTS FORMED CF II

29.    On September 27, 2019, the Controller Defendants incorporated CF II in Delaware as a SPAC for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.  CF II was controlled by the Sponsor, which was, in turn, controlled by Cantor and Lutnick.  The Sponsor and Lutnick selected and placed each director on the Board and selected and appointed each CF II officer.

30.    In September 2019, the Sponsor purchased 11,500,000 Founder Shares for $25,000, or approximately $0.002 per share.  The Sponsor transferred 30,000 Founder Shares to CF II's "independent" directors—at no cost—on February 11, 2021:  20,000 Founder Shares to Hochberg and 10,000 Founder Shares to Blechman.

31.    On August 31, 2020, CF II went public through an IPO, in which it sold 50,000,000 units to public investors at $10 per public unit ("Public Unit").  Each Public Unit consisted of one share of Class A common stock ("Public Share") and one-third of one whole warrant ("Public Warrant").  Each Public Warrant was exercisable in exchange for one share of Class A common stock at an exercise price of $11.50.  Each Public Share came with a redemption right that allowed those Public Shares to be redeemed at $10 per share plus any accrued interest from the trust held for the public stockholders' benefit in the event of a request to extend CF II's

liquidation deadline or a vote on a business combination.   Even if public stockholders redeemed their Public Shares, they would be permitted to retain their Public Warrants.  In the event of a liquidation, public stockholders were entitled to receive the same $10 per share plus interest from the trust.  Following the IPO, the Founder Shares held by the Sponsor and the Director Defendants comprised 20% of the outstanding equity of CF II.

32.     Simultaneously with the consummation of CF II's IPO, the Sponsor purchased 1,100,000 Private Placement Units at a price of $10 per unit, generating proceeds of approximately $11 million.   Each Private Placement Warrant was eligible to purchase one share of Class A common stock at $11.50 per share only if a business combination closed.

33.     Following a stock split and the forfeiture of certain Founder Shares in connection with the IPO, the Sponsor and Lutnick owned 12,470,000 Founder Shares at time of the Merger.  Hochberg continued to hold 20,000 Founder Shares and Blechman continued to hold 10,000 Founder Shares.  At the time of the Merger, the following table in the Proxy set forth ownership of Founder Shares and Private Placement Shares:

**Pre-Business Combination Beneficial Ownership Table of CF II**

| Name and Address of Beneficial Owner | CF II Class A Common Stock | | CF II Class B Common Stock(2) | | Total CF II Common Stock |
|---|---|---|---|---|---|
| | Number of Shares Beneficially Owned | % of Class | Number of Shares Beneficially Owned | % of Class | |
| **Directors and Executive Officers(1)** | | | | | |
| Howard Lutnick(3) | 1,100,000 | 2.2% | 12,470,000 | 99.8% | 21.3% |
| Anshu Jain | — | — | — | — | — |
| Alice Chan | — | — | — | — | — |
| Robert Hochberg | — | — | 20,000 | * | * |
| Charlotte Blechman | — | — | 10,000 | * | * |
| All executive officers and directors as a group (5 individuals) | 1,100,000 | 2.2% | 12,500,000 | 100% | 21.4% |

34.     The Founder Shares and Private Placement Shares would be worthless absent a business combination, as they were not entitled to any distributions from the trust in the event of a liquidation.  The Private Placement Warrants would also be worthless absent a business combination, because they were not exercisable until 30 days after the close of such a transaction.  Thus, each of the Defendants and their affiliated entities was heavily incentivized to get any deal done even if it was a bad deal for CF II's public stockholders.

35.     Pursuant to its Charter, CF II had until August 31, 2022, to close a business combination.  In the alternative, CF II could seek stockholder approval for an extension of the time period in which it could consummate a transaction, but in such circumstances, it would have to give public stockholders the option to redeem their shares at $10 per share plus interest.

**B.     SERIAL SPAC FOUNDER LUTNICK PACKS THE BOARD WITH LOYALISTS AND ENSURES THAT THEIR FINANCIAL INTERESTS ARE ALIGNED WITH HIS OWN**

36.     Lutnick joined Cantor in 1983 and has served as the President and CEO of Cantor since 1991, and as Chairman since 1996.  During the SPAC boom in the late 2010s to 2021, Cantor was heavily involved in underwriting SPACs as a lead left book-runner, sole book-runner, and PIPE agent.

37.     In 2018, Lutnick created the first SPAC in the CF family of SPACs. CF II was one of the eight SPACs in the CF family of SPACs.  In addition to CF II, four other SPACs in the CF family completed their de-SPAC transactions:  (i) CF I completed its business combination with Grosvenor Holdings, L.L.C. on November 18, 2020, and now operates as GCM Grosvenor, Inc.; (ii) CF III completed its business combination with AEye, Inc., on August 16, 2021, and now operates as AEye, Inc.; (iii) CF V completed its business combination with Nettar Group Inc. (d/b/a Satellogic), on January 25, 2022, and now operates as Satellogic, Inc.; and (iv) CF VI completed its business combination with Rumble, Inc., on September 15, 2022, and now operates as Rumble, Inc.  These entities all trade at a substantial discount to the $10 per share their respective CF SPAC investors could have redeemed for and thus each was a losing proposition for the CF SPAC investors.[4]

---

[4] As of November 1, 2023, GCM Grosvenor, Inc. trades at $8.17 per share; AEye, Inc. trades at $0.18 per share; Satellogic, Inc. trades at $0.81; and Rumble, Inc. trades at $4.61.

38.     Lutnick controlled each SPAC in the CF family:  a Cantor affiliate is the sole sponsor of each SPAC within the CF family, CFGM is Cantor's general managing partner, and Lutnick is the trustee of CFGM's sole stockholder. Additionally, Lutnick appointed himself the Chairman and CEO of each of the SPACs in the CF family of SPACs.

39.     In addition to his own Board seat, Lutnick appointed Jain, Chan, Hochberg, Pion, and Blechman to CF II's Board.  Each of these individuals was a repeat recipient of Lutnick's largesse, as he placed each of them in several lucrative positions, as follows:

- Lutnick appointed Jain as the President of Cantor and as the President and a director of each of CF I, CF II, CF III, CF IV, CF V, CF VI, CF VII, and CF VIII.

- Lutnick appointed Chan as the Global Controller and a Managing Director at Cantor, and as the CFO and a director of each of CF II, CF III, CF IV, CF V, CF VI, CF VII, and CF VIII.

- Lutnick appointed Hochberg to the boards of various entities, including the boards of CF I, CF II, CF III, and CF VIII, and Rodin, a publicly registered non-traded REIT sponsored by Cantor and of which Lutnick was CEO.[5]

- Lutnick appointed Pion to serve as the CFO and a director of CF I, CF II, CF III, and CF IV.

- Lutnick appointed Blechman to serve on the boards of CF II, CF IV, and CF VIII.

---

[5] Rodin has since assigned all of its assets to Cantor and has dissolved.

40.  Lutnick, Jain, Chan, Hochberg, Pion, and Blechman have worked extensively together, including on a number of SPACs, as shown by the following table:

| SPACs | Lutnick | Jain | Chan | Pion | Hochberg | Blechman |
|---|---|---|---|---|---|---|
| **Cantor Fitzgerald, L.P.** | - CEO and Chairman (1996 - Present) | - President (January 2017 - August 2022) | - Global Controller and Managing Director (March 2015 - Unknown) | | | |
| **CF Finance Acquisition Corp.** | - CEO and Chairman (October 2015 - November 2020) | - President (January 2018 - November 2020) Director (December 2018 - November 2020) | | - CFO (January 2020 to November 2020) Director (June 2020 - November 2020) | - Director (January 2020 - November 2020) | |
| **CF Finance Acquisition Corp. II (View, Inc.)** | - CEO and Chairman (September 2019 - March 2021) | - President (September 2019 - March 2021) Director (August 2020 - March 2021) | - CFO & Director January 2021 - July 2021) | - CFO (2019 - January 2021) Director (August 2020 to January 2021) | - Director (August 2020 - March 2021) | - Director (November 2020 - March 2021 |
| **CF Finance Acquisition Corp. III (AEye, Inc.)** | - CEO and Chairman (March 2016 - | - President (March 2020 - August 2021) Director | - CFO & Director January 2021 - July 2021) | - CFO (March 2020 - January 2021) Director | - Director (November 2020 - Ausust 2021) | |

| SPACs | Lutnick | Jain | Chan | Pion | Hochberg | Blechman |
|---|---|---|---|---|---|---|
| | August 2021) | (November 2020 - August 2021) | | (November 2020 - January 2021) | | |
| **CF Acquisition Corp. IV** | - CEO and Chairman (January 2020 - Present) | - President (September 2020 - August 2022) Director (December 2020 - August 2022) | - CFO & Director (At least March 2021 - July 2021) | - CFO (January 2020 - January 2021) Director (December 2020 - January 2021) | | - Director (December 2020 – Present) |
| **CF Acquisition Corp. V** | - CEO and Chairman (April 2020 - Present) | - President (September 2020 - January 2022) Director (January 2021 - January 2022) | - CFO & Director January 2021 - July 2021) | | | |
| **CF Acquisition Corp. VI (Rumble, Inc.)** | - CEO and Chairman (April 2020 - Present) | - President (October 2020 - August 2022) Director (February 2021 - August 2022) | - CFO & Director (At least February 2021 - July 2021) | | | |
| **CF Acquisition Corp. VII** | - CEO and Chairman (July 2020 - Present) | - President (January 2021 - August 2022) Director | - CFO (January 2021 - at least March 2021) Director | | | |

| SPACs | Lutnick | Jain | Chan | Pion | Hochberg | Blechman |
|---|---|---|---|---|---|---|
| | | (December 2021 - August 2022) | Nominee (At least January 2021 - at least March 2021) | | | |
| **CF Acquisition Corp. VIII** | - CEO and Chairman (July 2020 - Present) | - President (January 2021 - August 2022) Director (March 2021 - August 2022) | - CFO (January 2021 - July 2021) Director (March 2021 - July 2021) | | - Director (March 2021 - Present) | - Director (March 2021 - Present) |

## CF II ACQUIRES LEGACY VIEW THROUGH A FLAWED MERGER PROCESS

41.    Cantor, Lutnick, and CF&Co effectively controlled the Merger process. The Board met just three times before approving the Merger and did not have any regularly scheduled meetings.  In total, the Board spent just two hours and forty minutes reviewing and considering the Merger.  Indeed, the Merger was a *fait accompli* before CF II even came into existence.

42.    Before the IPO, Cantor and Lutnick had discussions with Legacy View about a potentially combining Legacy View with Lutnick's initial SPAC entity, CF I.  CF I ended discussions with Legacy View in August 2020, when CF I executed a transaction agreement with Grosvenor Holdings, L.L.C.

25

43.   On August 31, 2020, the same day CF II went public, a CF II representative reached out to a Legacy View representative.  The companies entered into a non-disclosure agreement the same day.

44.   On September 2, 2020, CF&Co gave Legacy View a due diligence request list.  On September 7, 2020, Legacy View began preparing a virtual data room (the "Data Room") with materials responsive to CF II's requested due diligence.  Over the following weeks, the Company conducted due diligence via the Data Room and in discussions with Legacy View management.  As part of this process, Legacy View provided the Company with a full financial projection model.

45.   On September 21, 2020, CF II engaged McKinsey & Company ("McKinsey") to prepare a report evaluating the smart glass industry, the total addressable market for such industry ("TAM"), and Legacy View's competitive position in such industry and market.

46.   On September 22, 2020, the CF II Board met for the first time.  Lutnick called the meeting to give the Board—then consisting of Lutnick, Jain, Pion, and Hochberg—a "status update of the Company's business combination negotiations." Lutnick and CF&Co representatives reviewed background information on Legacy View, the proposed terms of non-binding letter of intent for a deal between CF II and Legacy View, the progress of the due diligence CF&Co was conducting on behalf of the Company, and the fact of McKinsey's retention.  At the conclusion of

the perfunctory forty-seven-minute meeting, the Board unanimously approved the letter of intent.

47.    On October 2, 2020, McKinsey provided CF II with a "Smart Glass Market Scan Final Report" (the "McKinsey Report").   Although the McKinsey Report was primarily focused on TAM, it highlighted a number of "Headwinds" for Smart Glass:[6]

## Headwinds for adoption of Smart Glass

High | Medium | Low

| Description of the trend | Likelihood | Impact | Expert insights |
|---|---|---|---|
| **Smart glass has higher cost vs. regular architectural glass.** Thus, smart glass providers need to convince decision-makers that the value provided by smart glass exceeds the cost premium. This is complicated because in many cases the buyer or decision maker (e.g., developer) does not realize the full value on their own, or, the value is non-obvious (e.g., productivity and wellness benefit for occupants) | High | High | "Owner-operators care more about the users of their buildings long-term and are willing to accept long pay-back periods." **Former VP of Sales - EC-glass company**  "We are in our building for a while – the cost is worth the value we get from a superior work environment and increased productivity **COO, Financial company, current major user of View**" |
| **In the short and medium term, COVID has created large uncertainty in the new construction and renovation market.** COVID related recession may reduce the volume of new construction in next 2 years and reduce the use of premium products in projects. However, during recessions, developers could try to differentiate their buildings by adding amenities (e.g., smart glass) to make it more attractive for leasing | High | Medium | "Construction is at the tail end – we will see impacts 2 years after things start to turn around **Architect**"  "Value engineering is the buzzword during recessions **Former VP of Sales - EC-glass company**" |
| **In the long run, COVID has created uncertainty in the future of office work.** Companies are re-evaluating real estate footprints, with new construction expected as firms right-size, relocate and optimize existing footprint. Share of people who work remotely at least part of the week has grown from 30% to 41%, and the temporary shift to work from home may continue in some sectors/roles post-pandemic[1]. There may also be increased focus on increasing amenities to make people comfortable in the office which may create opportunities for smart glass. | Medium | Medium | "All bets are off how we recover from COVID – people are waiting to see how remote work plays out **Construction industry consultant**" |

1. Also evaluating other impacts of COVID, such as lower-density offices

Source: Expert interviews, Gartner                                                                 17

---

[6] G&E-VIEW-00058859-62.

# Headwind: Cost of Smart Glass is higher than regular architectural glass

| High ● | Medium ◗ | Low ○ |

| **Description of the trend** | **Expert insights** |
|---|---|

**Description of the trend**

Smart glass has a cost premium above regular architectural glass:
- Smart glass has ASP of ~$55/glass sf compared to ~$20-35/glass sf for regular architectural glass and blinds
- Smart glass can also enable cost reduction through HVAC capacity reduction, but also requires more expensive installation

In spite of expected cost reductions over time, experts expect smart glass to still have a cost premium over regular glass in the coming years

The value provided by smart glass includes significant components that are non-obvious (e.g., wellness and productivity improvements). Additionally, in many cases, the buying decision maker (e.g., developer) does not realize all the value on their own (e.g., from higher productivity).

Expert consensus indicates that at current price points, there are customers (e.g., owner/occupiers) who value the benefits of smart glass and will adopt the technology

**Expert insights**

- Owner-operators care more about the users of their buildings long-term and are willing to accept long pay-back periods.
  **Former VP of Sales - EC-glass company**
- We are in our building for a while – the cost is worth the value we get from a superior work environment and increased productivity
  **COO, Financial company, current major user of View**
- We look at a triple bottom line perspective – the cost of replacing automatic blinds every 8 years over a 40 year lifespan really made the financial case for smart glass
  **Director of sustainability, Airport, current major user of View**
- Developers tend to pass on costs to tenants, so they won't invest unless it can increase rents.
  **Architect**
- The problem from day 1 has been that its expensive – you need a much better value proposition than energy savings alone to justify cost
  **Construction Industry Consultant**

| Impact by segment | Likelihood | Impact |
|---|:---:|:---:|
| Owner-operated commercial | ● | ◗ |
| Private healthcare systems | ● | ◗ |
| Rental/developer commercial | ● | ● |
| Universities | ● | ◗ |
| Airports | ● | ● |
| Rental/developer multi-family residential | ● | ● |
| Overall | ● | ● |

Source: Expert interviews

18

# Headwind: In the short and medium term, COVID has created uncertainty in the new construction and renovation market

| High ● | Medium ◗ | Low ○ |

**Description of the trend**

COVID has created high amount of uncertainty in real estate market (e.g., share of sub-lease space in NYC rental market has increased significantly in the last 6 months).

COVID-related recession has disrupted new construction projects

While existing projects continue, since construction was deemed an essential activity, many investors are taking a 'wait and see' approach before starting new projects

Construction is at the tail end of a 9 month – 2 year design chain, implying that today's delays may be felt in 2021 or 2022

Projects that continue in recessions historically are value engineered and may reduce premium elements from the build. Offsetting this is a historical flight to quality, as renters seek out differentiated spaces

Expert consensus indicates that renovations / retrofits will increase, consistent with historical trends in a recession.

Retrofitting glass is considered a major retrofit project (frames and glass replaced) with high cost which may create opportunities for smart glass

At the same time, during recessions, developers may also try to differentiate their buildings by adding amenities to make it more attractive for leasing – which may create opportunity for smart glass

**Expert insights**

- There's a flight to quality in downturns - we've seen increased lease ups thanks to smart glass
  **Partner, Real Estate Developer, major user of View**
- Construction is at the tail end – we will see impacts 2 years after things start to turn around
  **Architect**
- Value engineering is the buzzword during recessions
  **Former VP of Sales - EC-glass company**
- Premium elements are the first to go in a recession
  **Architect**
- We see a lot of commercial retrofits right now as employees work from home and companies prepare to welcome them back
  **Construction Industry Consultant**
- Retrofits historically lead out of recessions; New York has enough stock for the next 5 years but needs retrofits.
  **Architect specialized in exterior glass**

| Impact by segment | Likelihood | Impact |
|---|:---:|:---:|
| Owner-operated commercial | ◗ | ◗ |
| Private healthcare systems | ◖ | ◗ |
| Rental/developer commercial | ● | ● |
| Universities | ◗ | ◗ |
| Airports | ● | ◗ |
| Rental/developer multi-family residential | ● | ● |
| Overall | ● | ◗ |

Source: Expert interviews

19

28

## Headwind: In the long term, COVID has created uncertainty in the future of office work

| Description of the trend | Expert insights | ● High | ◐ Medium | ○ Low |
|---|---|---|---|---|

**Description of the trend**

COVID has created uncertainty in the future of office work. Companies are re-evaluating real estate footprints, remote work arrangements, and office locations. This movement is expected to offer opportunities for new construction.

COVID has accelerated the growing trend of remote work. 30% of employees worked remotely at least some of the time pre-COVID, while 41% are expected to work remotely at least some of the time post-COVID

Employer attitudes towards remote work have shifted because of the pandemic:

- **Permanent:** 74% of corporate leaders plan to move at least 5% of the workforce to permanently remote positions (52% plan between 5-10% of the workforce, while 22% greater than 10%)

- **Part time:** 82% of leaders surveyed plan to permit remote work at least some of the time

Some employers are experimenting with partial-remote models in an effort to reduce real estate costs and footprint post-COVID

Employees have returned to work slowly, with a 10 city average occupancy at 25% as of 9/16, led by Dallas at 40% and New York and San Francisco trailing at 15% and 14% respectively[1]

In both the United States and Europe, remote work is correlated to highest earning jobs, including in finance, education, health, professional services, and information

**Expert insights**

The market is on a pause – companies have signed short term leases instead of expected long term leases as they wait to see what happens in the next 24 months
**SVP, Commercial real estate firm**

All bets are off how we recover from COVID – people waiting to see how remote work plays out
**Construction industry consultant**

Offices will be smaller but nicer
**Expert, Sustainability and Future of work**

If building occupancy is at 50% or less come Q1 2021 that will be a big sign to the market that rents need to fall farther to spur traffic and transactions
**SVP, Commercial real estate firm**

Companies are using COVID to test remote work models where only a percentage are in the building any given day – all in an effort to reduce their overall real estate cost
**Expert, Future of work and office design**

There will be more investment in at-home offices, which is a great application for smart glass technology
**Former Chief Engineer - EC-glass company**

**Impact by segment**

| Impact by segment | Likelihood | Impact |
|---|---|---|
| Owner-operated commercial | ◐ | ◐ |
| Private healthcare systems | ○ | ◐ |
| Rental/developer commercial | ● | ● |
| Universities | ◐ | ◐ |
| Airports | ● | ◐ |
| Rental/developer multi-family residential | ● | ◐ |
| Overall | ◐ | ◐ |

1. 10 city average of New York, San Francisco, Los Angeles, Chicago, Dallas, Houston, Washington D.C., San Jose, Philadelphia, and Austin

Source: Expert interviews, Gartner remote work survey (n=317 in April, n=127 in July), Oxford University/Citi Technology at Work v5.0 study, Kastle systems weekly occupancy report for 9/21/20

20

The Proxy did not disclose any of the specific headwinds the McKinsey Report identified.

48. On October 3, 2020, the Board had its second meeting. During the meeting, Lutnick discussed retaining Goldman Sachs & Co. LLC ("Goldman Sachs") to serve as a financial advisor for PIPE investments intended to bring cash in to the Merger.[7] Because Goldman Sachs was Legacy View's only financial advisor in connection with the Merger, its role in the PIPE investment created a conflict of interest.[8] Nonetheless, the Board—still comprised of Lutnick, Jain, Pion,

---

[7] G&E-VIEW-00056617-18.

[8] *Id.*

and Hochberg—hurriedly and unanimously approved retaining Goldman Sachs as the financial advisor for the PIPE investment.[9]  The meeting lasted 11 minutes.[10]

49.   During an Audit Committee meeting that same day, CF II retained CF&Co to serve as co-placement agents for the PIPE Investment.[11]  CF&Co would be paid $4.5 million for its PIPE placement engagement.

50.   In November 2020, CF&Co and Cantor completed due diligence and presented their "Project Vista Financial Due Diligence" findings (the "DD Presentation") to the Board.  The DD Presentation included an in-depth analysis of Legacy View's existing projections.   The projections included in the DD Presentation were subsequently *lowered* by approximately 15% to become the Proxy Projections:[12]

---

[9] *Id.*  On November 30, 2020, CF II entered into an initial PIPE agreement with a number of subscribers, including the Sponsor, pursuant to which the subscribers agreed to purchase up to 30,000,000 shares of CF II Class A common stock for $300 million in a private placement.  A second PIPE agreement was approved by the Board during a January 11, 2021 meeting—after the Merger was agreed to.  In the second PIPE agreement, CF II agreed to sell up to 17,777,778 shares of Class A common stock to GIC Private Ltd. for $11.25 per share.  Both PIPEs closed concurrently with the Merger.

[10] *Id.*

[11] G&E-VIEW-00056615-16.

[12] G&E-VIEW-00058917.

## Summary Forecast

| ($ in M) | Forecast | | | | | |
|---|---|---|---|---|---|---|
| | 2020[1] | 2021 | 2022 | 2023 | 2024 | 2025 |
| Revenue | 31 | 84 | 233 | 515 | 1,079 | 2,218 |
| Cost of goods sold | 114 | 135 | 182 | 292 | 558 | 883 |
| **Gross Profit** | **(83)** | **(51)** | **51** | **223** | **521** | **1,336** |
| *Gross Margin (%)* | *N/A* | *N/A* | *22%* | *43%* | *48%* | *60%* |
| Sales & Marketing | 40 | 40 | 46 | 65 | 124 | 246 |
| Research & Development | 66 | 63 | 72 | 99 | 151 | 235 |
| General & Administrative | 13 | 15 | 18 | 23 | 39 | 78 |
| **Operating Expenses** | **119** | **118** | **136** | **187** | **314** | **559** |
| *Opex (% of Revenue)* | *N/A* | *N/A* | *59%* | *36%* | *29%* | *25%* |
| **EBITDA** | **($179)** | **($144)** | **($57)** | **$84** | **$289** | **$878** |
| Change in Working Capital | 13 | (15) | (33) | (66) | (159) | (170) |
| Capex | (41) | (22) | (61) | (220) | (370) | (260) |
| **Free Cash Flow** | **($207)** | **($181)** | **($152)** | **($202)** | **($240)** | **$447** |

[1] Includes six months of actual results

**See subsequent slides for details**

51.     CF II did not disclose that the Proxy Projections represented a haircut case from the projections provided to the Board in connection with its negotiation of the Merger, nor is there any explanation for this reduction provided in either the Proxy or the 220 Documents. The DD Presentation identified numerous material issues with Legacy View's business prospects going forward. As set forth in the DD Presentation, Legacy View had a *negative* gross profit that would need to be mitigated by "large increases in production volume" and "new product offerings rolling out over the course of 2020-2022":[13]

---

[13] G&E-VIEW-00058913.



52.    In addition, the DD Presentation explained that the total revenue growth over the five-year forecast was predicated on (i) "$558M of Dynamic Glass Design-Win Backlog"; (ii) "$1.7B of additional Dynamic Glass Pipeline as represented by Management"; and (iii) "New Compute Platform products which have yet to be widely released."   The DD Presentation informed the Board that "[a]ny large shortfalls in the conversion of the design-win backlog and/or pipeline as well as the actual commercialization and market penetration of the new compute products would likely have a *material impact* in the Company's ability to generate positive EBITDA starting in FY22":[14]

---

[14] G&E-VIEW-00058914.



For additional information, the Board was referred to an additional slide to discuss the "Design-Win Backlog." As detailed in that slide, the entire Design-Win Backlog—Legacy View's pipeline—was comprised almost entirely of "$558M of *non-contractual* design wins" that Legacy View management only "expect[ed]" to be converted to revenue.[15] No basis for this "expect[ation]" was provided. The Proxy did not disclose that Legacy View's pipeline was comprised almost entirely of "non-contractual" wins that were only "expected"—based on unspecified factors—to be converted into revenue.

53. In addition, the DD Presentation flagged Legacy View's liability for replacement costs associated with its "Type II Spacer." As was publicly disclosed,

---

[15] G&E-VIEW-00058919.

Legacy View had already "recorded a $24.5M liability" for the product. However, the DD Presentation informed the Board that CF&Co and Cantor had "identified an additional $59mm of potential debt-like items at July'20" in addition to the $24.5 million reserved for the Type II Spacer replacement costs *and* that an additional investment would be needed to adhere to public reporting and filing requirements.[16]

None of this material information concerning expected increase in debt related to warranty accrual issues and the requirements for additional investments related to financial statement disclosures were disclosed in the Proxy, and would not be publicly disclosed until after the Merger, as discussed below.

---

[16] G&E-VIEW-00058916.

34

54.   On November 25, 2020, the Company filed an 8-K disclosing that Defendant Blechman had been appointed to the Board.

55.   On November 29, 2020, just days after Blechman joined the Board, Lutnick called a Board meeting to discuss whether to approve the Merger.[17] Cantor and CF&Co made a presentation to the Board (the "Merger Presentation") that contained a number of material issues that were not disclosed in the Proxy, including a list of "Key Transaction Considerations" that made clear that the Proxy Projections were utterly fantastical:[18]

**KEY TRANSACTION CONSIDERATIONS**

*Key transaction considerations include:*

- In 2020, View projects $32 million of revenues; View's entire value is contingent on successful execution of its business plan
- View has previously projected significant revenues, which did not materialize
- Majority of capital expenditures are purpose-built equipment with limited alternate use value
- View has granted significant dilutive equity previously and will grant additional options, RSUs and CEO incentives with the Transaction
- View has approximately $292 million in debt and interest obligations and is operating under a forbearance/ waiver over failing to maintain $75 million of equity value and violation of a going concern covenant
    - The debt matures on October 22, 2023
- Multiple layers of design, architecture, and installation must embrace View's Dynamic Glass product for the View business plan to be successful

56.   The Merger Presentation also highlighted significant debt issues, including "accrued interest related to the $250 million Greensill [Capital (UK)

---

[17] G&E-VIEW-00056822.

[18] G&E-VIEW-00058106.

Limited ("Greensill")] loan" that would require New View to "pay Greensill $277.3 million" if the post-Merger cash infusion was greater than $650 million.  The Proxy does not disclose the Greensill loan.  The Merger Presentation also highlighted that Legacy View was "negotiating a waiver from its lender for failing to maintain $75 million in equity";[19] this fact, too, was omitted from the Proxy.

57.    In addition, the Merger Presentation cautioned that the Proxy Projections assumed Total Capital Expenditures of $723.6 million from 2020 to 2025:[20]

### CAPITAL EXPENDITURE PLAN

*Planned capital expenditures are principally used to expand manufacturing capacity*

- View has flexibility to determine the need for additional capacity based on its sales pipeline

#### CAPITAL EXPENDITURES PROJECTION SUMMARY

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | ($ in millions) Total |
|---|---|---|---|---|---|---|---|
| Shipped Glass (Square Feet) | 552,447 | 1,220,256 | 2,768,638 | 4,952,229 | 9,540,782 | 18,724,927 | |
| Dynamic Glass Revenue | $31.5 | $67.5 | $162.8 | $292.2 | $562.9 | $1,104.8 | |
| **Olive Branch Facility - Increase Line 1 Efficiency:** | | | | | | | |
| Expansion to 4.5 million SF Capacity | $36.3 | $18.9 | $7.5 | $0.0 | $0.0 | $0.0 | $62.7 |
| **Olive Branch Facility - Complete Line 2:** | | | | | | | |
| Expansion to 7.0 million SF Capacity | 0.0 | 0.0 | 49.1 | 8.3 | 0.0 | 0.0 | 57.4 |
| Expansion to 10.0 million SF Capacity | 0.0 | 0.0 | 0.0 | 18.8 | 18.8 | 0.0 | 37.5 |
| Expansion to 12.5 million SF Capacity | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 37.5 | 37.5 |
| **Total Line 2** | $0.0 | $0.0 | $49.1 | $27.1 | $18.8 | $37.5 | $132.4 |
| **Total Olive Branch** | $36.3 | $18.9 | $56.6 | $27.1 | $18.8 | $37.5 | $195.1 |
| New Factory (22.5 million SF Capacity) | 0.0 | 0.0 | 0.0 | 187.5 | 312.5 | 0.0 | 500.0 |
| Compute | 0.4 | 1.7 | 1.2 | 1.2 | 1.2 | 1.2 | 6.9 |
| Milipitas HQ | 3.2 | 1.9 | 0.0 | 0.0 | 0.0 | 0.0 | 5.1 |
| Maintenance | 0.0 | 0.0 | 3.0 | 4.0 | 5.5 | 4.0 | 16.5 |
| **Total Capital Expenditures** | $39.9 | $22.5 | $60.8 | $219.8 | $338.0 | $42.7 | $723.6 |

Source: View Corporate Model dated November 2020.                                    **CANTOR**

---

[19] G&E-VIEW-00058113.

[20] G&E-VIEW-00058112.

The Proxy did not disclose this material fact. Instead, the Proxy misleading disclosed that Legacy View only expected to incur total capital expenditures of "approximately $160.0 million over the next two to four years"—*a staggering $563.6 less than the estimates in the Proxy Projections*.

58. At the November 29, 2020 meeting, the Board was also given a copy of the Investor Presentation that would be disseminated to stockholders the day the Merger was announced and that would subsequently be incorporated into the Proxy. The Investor Presentation highlighted Legacy View's Design-Win Backlog pipeline but again failed to disclose that virtually none of this pipeline was based on actual contractual agreements.

**Design-win backlog exceeds revenue required to achieve profitability**

37

59.    Following the one hour and forty-two-minute meeting, the Board unanimously approved the Merger.[21]

60.    The Proxy was disseminated to stockholders on February 16, 2021, and the stockholder vote was set for March 5, 2021.

61.    As of February 11, 2021, based on $500 million being held for the benefit of CF II's public stockholders in the trust, the estimated redemption value was approximately $10 per share.  Stockholders could have redeemed their shares regardless of how they voted on the Merger.  If they redeemed their shares, stockholders would still retain their warrants.

62.    On March 5, 2021, CF II stockholders approved the Merger, with stockholders redeeming only 25% of shares, or 12.6 million shares.  The Merger closed on March 8, 2021.

## THE FALSE AND MISLEADING PROXY

63.    The CF II Defendants, aided and abetted by the Aiding and Abetting Defendants, published a false and misleading Proxy that omitted material information that was known by or reasonably available to Defendants.

---

[21] G&E-VIEW-00056825-29.

64.    The Board had an affirmative duty to provide materially accurate and complete information to public stockholders in connection with the redemption decision and Merger vote.  It failed to do so.

### A.    THE PROXY CONTAINS MISSTATEMENTS AND OMISSION CONCERNING PROXY PROJECTIONS

65.    The Proxy disclosed the Proxy Projections:

| ($ in millions) | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Revenue | $ 31 | $ 75 | $ 216 | $470 | $949 | $1,892 |
| Gross Profit, excluding stock-based compensation expense | ($ 87) | ($ 52) | $ 40 | $201 | $434 | $1,113 |
| EBITDA, excluding stock-based compensation expense | ($192) | ($162) | ($ 82) | $ 64 | $253 | $ 735 |

(Year Ending December 31,)

66.    The Proxy did not disclose the Key Transaction Considerations set forth in the Merger Presentation, which laid out material issues undermining the Proxy Projections, including that: (i) Legacy View's "entire value is contingent on successful execution of its business plan"; (ii) Legacy "View has previously projected significant revenue, which did not materialize"; (iii) a majority of Legacy View capital expenditures "are purpose-built equipment with limited alternate use value"; and (iv) Legacy View has $292 million debt "and is operating under a forbearance/waiver over failing to maintain $75 million in equity value and violation of a going concern covenant."

67.    The Merger Presentation also informed the Board that the Proxy Projections included total capital expenditures for factory expansion through 2025 of $723.6 million.  The Proxy, on the other hand, misleadingly stated that Legacy View did not estimate that it would incur more than $160 million in capital

expenditures for factory growth costs over the next two to four years. In particular, the Proxy stated:

> As of September 30, 2020, we have invested $407.5M in capital expenditures, primarily in our factory. We expect to incur additional factory capital expenditure of up to approximately $160.0 million over the next two to four years with respect to facility automation and completion of the second production line to support the expected growth in demand for our products.

68. In determining whether to redeem their shares and/or whether to vote in favor of the Merger, a reasonable investor would have wanted to know these facts, which would have shed light on the reliability of the Proxy Projections and the post-Merger entity's prospects of success. The failure to disclose this information was a material omission.

### B. THE PROXY FAILED TO DISCLOSE THE GREENSILL LOAN

69. The Proxy failed to disclose Legacy View's potential obligation to pay Greensill up to $277.3 million in principal and accrued interest on a loan if the post-Merger cash infusion exceeded $650 million. Since the total cash infusion from the Merger was $815.2 million in gross proceeds, New View was required to repay the Greensill loan at the close of the Merger for the specific amount of $276.8 million (based on the closing date). This information was provided to the Board in the Merger Presentation but was not provided to stockholders.

70. In determining whether to redeem their shares and/or whether to vote in favor of the Merger, a reasonable investor would have wanted to know that the

40

post-Merger entity was going to have to repay this massive obligation.  The failure to disclose this information was a material omission.

### C.   THE PROXY CONTAINS MATERIAL OMISSIONS CONCERNING THE WARRANTY ACCRUAL

71.   The Proxy stated that Legacy View was subject to a decrease in "Cost of Revenue" based on a "one-time warranty accrual of $24.5 million."  As set forth in the DD Presentation, Cantor and CF&Co were well aware that Legacy View actually faced additional anticipated debt of anticipated $59 million in connection with Legacy View's warranty accrual obligations, which represented a potential substantial increase over the $24.5 million that was stated in the Proxy.

72.   As discussed below, soon after the Merger closed, New View would be forced to disclose that it had misstated its potential warranty accrual obligations and would have to conduct an internal investigation to restate its financials.  New View would eventually disclose that its warranty accruals would require payments of up to $58 million, essentially in line with the debt assessment in the DD Presentation.

73.   In determining whether to redeem their shares and/or whether to vote in favor of the Merger, a reasonable investor would have wanted to know the true extent of New View's expected liabilities relating to the warranty accruals.  The failure to disclose this information was a material omission.

**D.      THE PROXY OMITTED MATERIAL INFORMATION CONCERNING THE DESIGN-WIN BACKLOG**

74.     The Proxy failed to disclose that Legacy View's Design-Win Backlog pipeline was based almost entirely on "non-contractual design wins" that management "expected" (based on unspecified factors) to be converted to revenue. The Investor Presentation, incorporated in the Proxy, told stockholders that Legacy View had a Design-Win Backlog of $560 million and a Sales Pipeline of $1.7 billion:



75.     The Investor Presentation did not inform stockholders that the Design-Win Backlog was comprised almost entirely of "non-contractual design wins" that management merely "expected'" to convert to revenue—a material fact that was disclosed to the Board in the DD Presentation.

76.     In addition, the Proxy included a misleading discussion of the Design-Win Backlog.  The Proxy stated that the "design win is typically secured through a non-binding memorandum of understanding," but that stated that "[o]nce a design-

win is secured, the Company enters into separate legally binding agreements with its customers . . . that constitute the revenue contract." This statement created the misleading impression that the Design-Win Backlog was in fact contractual, or it would not be recognized as revenue.

77.    The Jehoshaphat Report provided stockholders with specific evidence that the Investor Presentation contained misleading statements:

6.    **Claims made by VIEW to investors are misleading, illusory, and/or withdrawn under scrutiny.**
  o    VIEW can't seem to get its story straight on how many buildings contain its glass. In 2017, it said its product was installed in 20 million square feet of buildings; in 2018, this square footage number grew to 35 million; but in 2019, it fell to 25 million; in March 2021, it fell again to 23 million, yet concurrently was listed elsewhere at 50 million.
  o    We suspect that older numbers may include "design wins" of VIEW glass, while newer numbers don't. If this is the explanation, it means that a large percentage of design "wins" fail to materialize as work.
  o    Case in point: the company claims in its investor deck to have a "design-win backlog" of $560m, but there's no mention of this number in its SEC documents (S-1, S-4, etc.). What is disclosed: contracted design wins of…$7m.
  o    Claims of increased employee productivity, backed by university studies, drive the supposed ROI of VIEW glass. These studies were not only paid for by VIEW, but were also designed, conducted, and written by its employees.

78.    The Jehoshaphat Report referenced exactly what New View would later be forced to reveal in its Registration Statement on Form S-1 filed with the SEC on April 7, 2021, just over a month after the Merger closed:

d.    The softer side of backlog

VIEW says in its investor presentation that its "design-win backlog" is $560m, but this number doesn't appear in the S-1. In the S-1, what appears is this:

> *Remaining performance obligations represent the amount of contracted future revenue, including both deferred revenue and non-cancelable contracted amounts that will be invoiced in future periods, not yet recognized as revenue* as the amount has been allocated to performance obligations not yet completed, or only partially completed, as of the end of the reporting period. The Company applies the practical expedient to not disclose information about remaining performance obligations that are part of a contract that has an original expected duration of one year or less. *The transaction price allocated to remaining performance obligations as of December 31, 2020 and 2019 was $7.3 million and $7.1 million, respectively, that the Company expects to recognize as it satisfies the performance obligations over the next 12 to 24 months* which are, among other things, dependent on the construction schedule of the site for which the Company's products and services are delivered.

A few things jump out here and none of them are good. First, what VIEW has actually contracted for future revenue to deliver between 12 and 24 months from 12/31/2020 is only $7.3m. Secondly, that number has grown by only $0.2m since 12/31/2019. This does not suggest much in the way of either future demand or growth.

43

79. The Jehoshaphat Report provided further evidence of these material misstatements via an interview with a former Legacy View sales executive that explained the backlog pipeline of only letters of intent and no actual contracts:

> What's the difference between that impressive $560m of "backlog" and this deeply unimpressive $7m of actually contracted future revenue? One former VIEW sales executive explains that VIEW's backlog, which consists of letters of intent, is far less meaningful when your product is a glaring "nice-to-have":
>
> > So what we'd do, we'd get in and ask owners to sign an LOI (or in California it's called an MOU, Memorandum of Understanding). **Then we'd show those MOUs to investors – "look at all these MOUs we have, give us money."**
> >
> > Well, they [VIEW] don't show you numbers of how those MOUs fell through over time. Sometimes the developer decides not to build the project. Sometimes the developer downsizes the project. Sometimes the developer starts digging and sees there is a lot more risk, or cost…that's the nature of construction. You can set a budget, put a POD, even put your shovels into the ground, but you can't understand the risks you face until you start digging. **And once your budget [starts going the wrong way], costly stuff goes by the wayside.** That was us. Our stuff isn't a little more pricey, it's 5x the price.

80. New View would continue to disclose meager "design-wins." On June 15, 2022, New View disclosed only $8.4 million in future performance obligations, and total of current contract assets of only $11.5 million for 2021.

### E. THE PROXY MISLED STOCKHOLDERS CONCERNING THE VALUE OF POST-MERGER NEW VIEW STOCK

81. The Proxy stated that the New View Class A common stock that CF II common stock would be converted to post-Merger would be deemed to have a value of $10.00 per share: "Upon the consummation of the Business Combination, all holders of View Capital Stock, View Warrants, and View Options will receive or have the right to receive shares of the Combined Entity Class A Common Stock at a deemed value of $10.00 per share." This statement was false and misleading based

on the actual post-close value of New View Class A Common Stock , which never traded above $10 since the close of the Merger.[22]

82.    In addition, based on the allegations set forth *supra*, the value of New View Class A Common Stock was materially less than $10 per share due to: (i) the Key Transaction Considerations; (ii) understated capital expenditures; (iii) the Greensill loan repayment; (iv) understated warranty accrual obligations; and (v) the materially misstated Design-Win Backlog.

## THE POST-MERGER REALITY SETS IN

83.    On June 1, 2021, the Jehoshaphat Report was published.    The Jehoshaphat Report—which was buttressed by extensive interviews with former Legacy View executives, industry participants, and outside consultants—detailed myriad reasons why New View's "business is permanently non-viable" and that "its foundational technology will never produce glass profitably."    In particular the Report stated:

> The technology can produce glass only at a unit cost that is far higher than any customer in the market would ever pay.  The result is a gross margin (even excluding inventory and warranty charges) of negative 150%-450%.  *The entire business is based on spending -$4 to make a product and sell it for $1.*

---

[22] New View effectuated a 60-for-1 reverse stock split on July 27, 2023.

The Jehoshaphat Report also flagged that View had burned through $900 million in free cash flow over the past three years and needed to spend at least "$660 million within several years to build the capacity needed to hit the rosy revenue estimates" in the Proxy Projections. The Report, supported by internal audits of New View's financials, explained how New View "*will run out of cash within about one year*."

84. As discussed *supra*, the Jehoshaphat Report also highlighted the false and misleading statements in the Investor Presentation about Legacy View's Design-Win Backlog that was undermined by statements in subsequent SEC filings concerning Legacy View's actual contractual agreements for its pipeline products.

85. The Jehoshaphat Report reached a damming conclusion: "VIEW stock is intrinsically worthless because the company has no path to profitability, the product is a solution in search of a problem, and the business consumes capital like a sinkhole."

86. In addition, the Jehoshaphat Report highlighted Cantor and Lutnick's conflicts of interest, noting that Cantor was sending out analyst reports to "pump[] VIEW as a Buy with lunatic growth and profit estimates" while it surreptitiously "filed a plan to dump its entire ownership stake. While Cantor says you need to get in, they're getting out—fast." The day that the Jehoshaphat Report was published, New View's stock was trading at $7.75 per share.

46

87.     On August 17, 2021, New View stock declined even further, from $5.18 per share down to $3.92 per share, when New View was pummeled with a delisting notice from Nasdaq due to the inadequacy of its previously disclosed warranty accrual.

88.     On November 9, 2021, New View disclosed that its Audit Committee had completed its investigation and determined that it would have to restate its financial statements for its 2019 and 2020 fiscal years and for the first and second quarters of its 2021 fiscal year.  In addition, New View disclosed that its previously reported warranty-related accrual of $22 million was false; it would have to restate its warranty accrual as of March 31, 2021 to an amount in the range of $40 million to $58 million.  Further, New View disclosed that it would have to restate its warranty-related accruals: (i) to an amount in the range of $46 million to $70 million as of December 31, 2019, compared to the previously recorded amount of $26 million; and (ii) to an amount in the range of $38 million to $55 million as of December 31, 2020, compared to the previously recorded amount of $23 million.

89.     In connection with this investigation, New View's CFO Prakash was forced to step down.  New View was also subjected to an SEC investigation for potential fraud in connection with the warranty accrual restatements.

90.     Also on November 9, 2021, New View updated its revenue guidance for 2021 down to a range of $65–$70 million, $5–$10 million less than the 2021

estimated revenue in the Proxy Projections. New View stock traded at $6.40 per share on this date.

91. Nasdaq initiated a delisting process in February 2022, because New View had failed to file Quarterly Reports for the second and third quarters of fiscal year 2021. Nasdaq granted New View a stay of delisting in April 2022, to permit New View to complete its restatement. On May 10, 2022, New View announced that it was continuing to work on completing its restatement, which it did complete by the end of June 2022.

92. Also on May 10, 2022, New View disclosed that it now had "substantial doubt about the Company's ability to continue as a going concern, as the Company does not currently have adequate financial resources to fund its forecasted operating costs and meet its obligations for at least twelve months from the expected issuance date of the 2021 Annual Report on Form 10-K." New View's stock fell from $1.36 on May 10, 2022 to $0.51 on May 11, 2022.

93. On May 31, 2022, New View announced full year 2022 revenue guidance of $100 million to $110 million—materially lower than $216 million projected revenue for 2022 contained in the Proxy Projections. New View also reported that it had completed $200 million financing through the sale of convertible senior notes, which would further dilute stockholder ownership of New View stock.

48

94.     On February 16, 2023, New View disclosed that it had been threatened with a delisting from Nasdaq because its stock had failed to trade above $1 for 30 consecutive days.  New View had 180 days to buoy its stock above $1 per share for a minimum of 10 consecutive business days.  New View stock was trading at $0.67 on this date, and had been trading under $1 per share since December 28, 2022.

95.     On March 29, 2023, New View announced full year 2022 actual revenue of $101 million, less than half of the revenue projected for 2022 in the Proxy Projections. New View's stock was trading at $0.56 on this date.

96.     On May 9, 2023, New View announced full year 2023 revenue guidance of $125 million to $150 million, only 26.5% to 32% of the $470 million revenue projected for 2023 in the Proxy Projections.  New View stock was trading at $0.26 per share on this date.

97.     On July 3, 2023, the SEC announced that it settled charges with View over its restatement of warranty accrual.  On the same day, the SEC announced that it was charging Prakash with financial reporting and accounting fraud.  The SEC asserted that Prakash knew that the warranty liabilities Legacy View disclosed in the Proxy did not include the costs of installation of the replacement products, even though Legacy View had decided it would cover all such installation costs.  New View stock was trading at $0.13 per share on this date.

98.     On July 26, 2023, New View announced a 60-for-1 reverse stock split in order to avoid Nasdaq's delisting threat for its paltry stock price trading.

99.     Since the Merger, View's stock price has collapsed by 99.5%, and is now trading at $2.92 per share, the equivalent of $0.05 per share but for the 60-for-1 reverse stock split.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

100.     In committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, Defendants further aided and abetted and/or assisted each other in the CF II Defendants' breaches of their respective duties.

101.     During all times relevant hereto, Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including public stockholders of CF II, regarding Legacy View's business, operations, and prospects; and (ii) enhance Defendants' profits, power, and prestige that they enjoyed as a result of holding favored positions vis-à-vis CF II and the CF II Defendants.  In furtherance of this plan, conspiracy, and course of conduct, Defendants, collectively and individually, took the actions set forth herein.

50

102.    The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment, and to mislead CF II's public stockholders concerning Legacy View's business, operations, and prospects.

103.    Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing CF II to release improper and false and misleading statements.  Because the actions described herein occurred under the authority of the Board, each of Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

104.    Each of Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his, her, or its overall contribution to and furtherance of the wrongdoing.

105.    Cantor and CF&Co are controlled by Lutnick.  CF&Co and Cantor were responsible for conducting due diligence on the Merger on behalf of the Board. CF&Co and Cantor delivered the DD Presentation and the Merger Presentation,

51

which, as stated above, contained a number of material facts that were not disclosed in the Proxy.  CF&Co went on to serve a number of other roles, including as a marketer, advisor, and placement agent, for which it received substantial fees, including a $17.5 million fee for "marketing" the Merger, which was paid for with funds held in the trust.

## CLASS ACTION ALLEGATIONS

106.   Plaintiffs bring this action individually and as a class action pursuant to Rule 23 of the Rules of the Court of Chancery of the State of Delaware on behalf of themselves and holders of CF II Class A common stock (the "Class") who held such stock as of the redemption deadline and who elected not to redeem all or some of their stock (except the Defendants herein, and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants) and their successors-in-interest.

107.   This action is properly maintainable as a class action.

108.   A class action is superior to other available methods of fair and efficient adjudication of this controversy.

109.   The Class is so numerous that joinder of all members is impracticable. The number of Class members is believed to be in the thousands, and they are likely scattered across the United States.  Moreover, damages suffered by individual Class

members may be small, making it overly expensive and burdensome for individual Class members to pursue redress on their own.

110. There are questions of law and fact that are common to all Class members and that predominate over any questions affecting only individuals, including, without limitation:

    (a)    whether Defendants owed fiduciary duties to Plaintiffs and the Class;

    (b)    whether the Controller Defendants controlled CF II;

    (c)    whether "entire fairness" is the applicable standard of review;

    (d)    which party or parties bears the burden of proof;

    (e)    whether Defendants breached their fiduciary duties to Plaintiffs and the Class;

    (f)    whether the Aiding and Abetting Defendants aided and abetted the Defendants' breaches of their fiduciary duties;

    (g)    the existence and extent of any injury to the Class or Plaintiffs caused by any breach;

    (h)    the availability and propriety of equitable re-opening of the Redemption Rights period; and

    (i)    the proper measure of the Class's damages.

111. Plaintiffs' claims are typical of the claims of other Class members, and Plaintiffs have no interests antagonistic or adverse to the interests of other Class members. Plaintiffs will fairly and adequately protect the interests of the Class.

53

112.   Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

113.   Defendants have acted in a manner that affects Plaintiffs and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

114.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

## <u>FIRST CAUSE OF ACTION</u>

**(Direct Claim for Breach of Fiduciary Duty
Against the Director Defendants)**

115.   Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

116.   As fiduciaries of CF II, the Director Defendants, in their capacities as directors of CF II, owed Plaintiffs and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to CF II stockholders.

54

117. These duties required the Director Defendants to place the interests of CF II stockholders above their personal interests and the interests of the Controller Defendants.

118. Through the events and actions described herein, the Director Defendants breached their fiduciary duties to Plaintiffs and the Class by prioritizing their own personal, financial, and reputational interests above those of CF II's stockholders. The Director Defendants also breached their fiduciary duty by approving the unfair Merger and by failing to inform stockholders of the material information necessary to allow them to make an informed redemption decision.

119. Plaintiffs and the Class were harmed as the Proxy contained false or misleading disclosures or omitted material information necessary for CF II's stockholders to make an informed decision whether to exercise their redemption rights or invest in the Merger.

120. The Merger was not fair, and the Director Defendants will be unable to carry their burden under entire fairness.

121. As a result, Plaintiffs and the Class were unable to mitigate or avoid the harm from the Director Defendants' breaches by exercising their Redemption Rights prior to the Merger.

122. The Class chose not to redeem their stock based on false and misleading information.

123.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

**(Direct Claim for Breach of Fiduciary Duty
Against the Officer Defendants)**

124.    Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

125.    As fiduciaries of CF II, the Officer Defendants, in their capacities as officers of CF II, owed Plaintiffs and the Class the utmost fiduciary duties of care and loyalty, which subsume an obligation to act in good faith, with candor, and to make accurate and complete material disclosures to CF II stockholders.

126.    These duties required the Officer Defendants, in their capacities as officers of CF II, to place the interests of CF II's stockholders above their personal interests and the interests of the Director Defendants and/or Sponsor.  The Officer Defendants are not exculpated from the breach of their duty of care for actions taken in their capacity as an officer (which include all actions set forth herein except their formal vote on the Merger).

127.    Through the events and actions described herein, the Officer Defendants breached their fiduciary duties to Plaintiffs and the Class by prioritizing their own personal, financial, and/or reputational interests, failing to adequately inform stockholders of material information necessary to allow them to make an

informed redemption decision, and approving the Merger, which was unfair to CF II's Class A stockholders.

128. The Merger was not fair, and the Officer Defendants will be unable to carry their burden under entire fairness.

129. As a result, Plaintiffs and the Class were unable to mitigate or avoid the harm from the Officer Defendants' breaches by exercising their Redemption Rights prior to the Merger.

130. The Class chose not to redeem their stock based on false and misleading information.

131. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## THIRD CAUSE OF ACTION

**(Direct Claim for Breach of Fiduciary Duty
Against the Controller Defendants)**

132. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

133. The Controller Defendants were CF II's controlling stockholders. Specifically, the Controller Defendants controlled all of the Class B Founder Shares, elected (and could remove at any time) the other members of the Board, and held officer roles at CF II.

134. The Controller Defendants owed Plaintiffs and the Class fiduciary duties of care and loyalty, which included an obligation to act in good faith, with candor, and to provide complete and accurate material disclosures to CF II stockholders.

135. At all relevant times, the Controller Defendants had the power to control, influence, and cause—and actually did control, influence, and cause—the Company to enter into the Merger.

136. The Merger was unfair, reflecting an unfair price and unfair process.

137. Through the events and actions described herein, the Controller Defendants breached their fiduciary duties to Plaintiffs and the Class by failing to adequately inform public stockholders of material information necessary to allow them to make an informed redemption decision and by agreeing to and entering into the Merger without ensuring that it was entirely fair to Plaintiffs and the Class.

138. As a result, Plaintiffs and the Class were harmed when, having been deceived by the false and misleading disclosures and the Board's approval of the Merger, they did not exercise their Redemption Rights prior to the Merger.

139. In addition, the majority of the Class approved the Merger based on false and misleading information.

140. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Direct Claim for Aiding and Abetting Breaches of Fiduciary Duties Against the Aiding and Abetting Defendants)

141. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

142. The Aiding and Abetting Defendants were aware that the CF II Defendants' fiduciary duties, as set forth above, required that the CF II Defendants ensure that CF II's public stockholders' ability to make an informed redemption decision not be impaired.

143. The Aiding and Abetting Defendants knowingly participated in the CF II Defendants' breaches of their fiduciary duties (and any exculpated care breaches by the Director Defendants), including the fiduciary duties of care and loyal, which included an obligation to act in good faith, with candor, and to provide accurate material disclosures to stockholders.

144. The Aiding and Abetting Defendants were responsible for conducting the due diligence in connection with the Merger process and provided the Director Defendants with the DD Presentation and the Merger Presentation. As a result, the Aiding and Abetting Defendants were aware of the material issue with Legacy View's business prospects, the shortfalls in its Design-Win Backlog, its potential debt issues, the key transaction considerations identified in the McKinsey Report, and View's projected exponential capital expenditures. Despite being aware of these

59

material facts, the Aiding and Abetting Defendants chose to assist the CF II Defendants in breaching their fiduciary duties by failing to disclose these materials to CF II's public stockholders and thereby impairing CF II's public stockholders right to make their redemption decision on a fully informed basis.

145. The Aiding and Abetting Defendants did so because they stood to gain a substantial monetary benefit, in the form of fees for its services that were paid, in part, by funds in the trust.

146. As a result of the Aiding and Abetting Defendants' aiding and abetting the CF II Defendants' breaches of fiduciary duty, Plaintiffs and the Class were harmed by not exercising their Redemption Rights prior to the Merger.

147. Plaintiffs and the Class suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

**(Direct Claim for Unjust Enrichment
Against the Controller Defendants, the Director Defendants,
and the Aiding and Abetting Defendants)**

148. Plaintiffs repeat and reallege each and every allegation above as if set forth in full herein.

149. As a result of the conduct described above, the Controller Defendants and the Director Defendants breached their duties to the Class and put their own interests ahead of those of the Class.

60

150. The Controller Defendants and the Director Defendants were unjustly enriched by the wrongful conduct detailed above.

151. The Aiding and Abetting Defendants unjustly enriched themselves by taking millions of dollars in fees, paid for by CF II's stockholders, for "marketing" the Merger, despite knowing the Merger was unfair to the Class.

152. All unjust profits realized by the Controller Defendants, the Director Defendants, and the Aiding and Abetting Defendants should be disgorged and recouped by the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment and relief in their favor and in favor of the Class, and against Defendants, as follows:

A. Declaring that this action is properly maintainable as a class action;

B. Finding the Director Defendants and Officer Defendants liable for breaching their fiduciary duties owed to Plaintiffs and the Class;

C. Finding the Controller Defendants liable for breaching their fiduciary duties, in their capacity as CF II's controlling stockholders, owed to Plaintiffs and the Class;

D. Finding the Aiding and Abetting Defendants liable for aiding and abetting the CF II Defendants' breaches of fiduciary duty owed to Plaintiffs and the Class by the CF II Defendants;

61

E.    Finding that the CF II Defendants and the Aiding and Abetting Defendants were disloyal fiduciaries that were unjustly enriched;

F.    Certifying the proposed Class;

G.    Awarding Plaintiffs and the other members of the Class damages in an amount to be proven at trial, together with interest thereon;

H.    Awarding rescission or rescissory damages to Plaintiffs and the Class;

I.    Ordering disgorgement of any unjust enrichment to the Class;

J.    Awarding Plaintiffs and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

K.    Awarding Plaintiffs and the Class such other relief as this Court deems just and equitable.

Dated:  November 13, 2023

**OF COUNSEL:**

**GRANT & EISENHOFER P.A.**
David Wissbroecker
(*pro hac vice* application to be filed)
2325 3rd Street, Suite 329
San Francisco, CA 94107
Tel: (302) 622-7000
Fax: (302) 622-7100

**GRANT & EISENHOFER P.A.**

*/s/ Christine M. Mackintosh*
Christine M. Mackintosh (#5085)
Kelly L. Tucker (#6382)
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Tel: (302) 622-7000
Fax: (302) 622-7100

*Counsel for Plaintiffs*

**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**

Christopher H. Lyons (Bar No. 5493)
Tayler D. Bolton (Bar No. 6640)
1521 Concord Pike, Suite 301
Wilmington, DE 19803
Tel: (302) 467-2660

**ROBBINS GELLER RUDMAN**
 **& DOWD LLP**

Randall J. Baron
Benny Goodman
Erik Luedeke
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: (619) 231-1058

**ROBBINS LLP**

Brian J. Robbins
Gregory Del Gaizo
Marion D. Valdovinos
5060 Shoreham Place, Suite 300
San Diego, CA 92122
Tel: (619) 525-3990

**MORRIS KANDINOV LLP**

Leonid Kandinov
Aaron Morris
550 West B Street, 4th Floor
San Diego, CA 92101
Tel: (619) 780-3993