UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| ASIF MEHEDI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) | C-21-06374 BLF SAN JOSE, CALIFORNIA |
| PLAINTIFFS, | ) ) | MARCH 14, 2024 |
| VS. | ) ) | PAGES 1-122 |
| VIEW, INC. F/K/A CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., AND CF GROUP MANAGEMENT, INC., DEFENDANTS. | ) ) ) ) ) ) ) ) ) ) ) ) ) | |

TRANSCRIPT OF ZOOM PROCEEDINGS
BEFORE THE HONORABLE BETH LABSON FREEMAN
UNITED STATES DISTRICT JUDGE

APPEARANCES ON THE NEXT PAGE

OFFICIAL COURT REPORTER:      LEE-ANNE SHORTRIDGE, CSR, CRR
                             CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

A P P E A R A N C E S:

FOR THE PLAINTIFFS:    KAPLAN FOX & KILSHEIMER LLP
                       BY:  JASON A. URIS
                       800 THIRD AVENUE, 38TH FLOOR
                       NEW YORK, NEW YORK  10022


FOR DEFENDANTS         WINSTON & STRAWN LLP:
LUTNICK, PION,         BY:  JEFFREY L. STEINFELD
CHANG, JAIN, HOCHBERG, 333 SOUTH GRAND AVENUE, 38TH FLOOR
BLECHMAN, AND CF       LOS ANGELES, CALIFORNIA  90071
DEFENDANTS:



FOR DEFENDANTS         MUNGER, TOLLES & OLSON LLP
VIEW AND MULPURI:      BY:  JOHN W. BERRY
                       350 SOUTH GRAND AVENUE, 50TH FLOOR
                       LOS ANGELES, CALIFORNIA  90071


FOR DEFENDANT          MORRISON & FOERSTER
PRAKASH:               BY:  ANNA ERICKSON WHITE
                       425 MARKET STREET
                       SAN FRANCISCO, CALIFORNIA  94105


ALSO PRESENT:          DAVID PAUL

SAN JOSE, CALIFORNIA                    MARCH 14, 2024

P R O C E E D I N G S

(ZOOM PROCEEDINGS CONVENED AT 9:49 A.M.)

THE COURT:  LET'S MOVE ON TO OUR SECOND CASE.

THE CLERK:  OKAY.  WE'RE GOING TO BE MOVING ON TO THE MEHEDI VERSUS VIEW, INC. CASE.

COUNSEL, IF YOU WOULD PLEASE RAISE YOUR HANDS.  AND, AGAIN, I DO HAVE QUITE A FEW REGISTERED COUNSEL, SO I'M GOING TO ASK ONLY THOSE THAT INTEND TO ARGUE THE MOTION RAISE YOUR HANDS TO BE --

THE COURT:  AND THAT COULD BE A LOT ALSO BECAUSE I HAVE THREE DIFFERENT SETS OF DEFENDANTS.

THE CLERK:  YES, YOUR HONOR.

OKAY.  AND IF YOU'D ACCEPT THE INVITATIONS TO JOIN, PLEASE.

(PAUSE IN PROCEEDINGS.)

THE CLERK:  OKAY.  I BELIEVE WE'RE READY TO BEGIN.

THE COURT:  ALL RIGHT.  GOOD MORNING, EVERYONE. LET'S CALL THE CASE AND GET YOUR APPEARANCES.

THE CLERK:  CALLING CASE 21-6374, MEHEDI, ET AL. VERSUS VIEW, INC., ET AL.

COUNSEL, IF YOU WOULD PLEASE STATE YOUR APPEARANCES, AND AGAIN IF WE COULD BEGIN WITH PLAINTIFFS AND THEN MOVE TO DEFENDANTS.

MR. URIS:  GOOD MORNING, YOUR HONOR.

JASON URIS FROM KAPLAN FOX & KILSHEIMER FOR PLAINTIFFS AND THE PROPOSED CLASS.

THE COURT:  GOOD MORNING.

MR. BERRY:  GOOD MORNING, YOUR HONOR.

JOHN BERRY OF MUNGER TOLLES FOR DEFENDANTS VIEW, INC. AND DR. RAO MULPURI.

THE COURT:  GOOD MORNING.

MS. WHITE:  GOOD MORNING, YOUR HONOR.

ANNA ERICKSON WHITE FROM MORRISON & FOERSTER FOR DEFENDANT MR. PRAKASH.

THE COURT:  GOOD MORNING.

MR. STEINFELD:  GOOD MORNING, YOUR HONOR.

JEFFREY STEINFELD OF WINSTON & STRAWN ON BEHALF OF DEFENDANTS HOWARD LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT HOCHBERG, CHARLOTTE BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD LP, AND CF GROUP MANAGEMENT, INC. THAT WE COLLECTIVELY REFER TO AS THE CF DEFENDANTS.

AND ALSO TUNING IN TO THIS PROCEEDING IS DAVID PAUL OF CANTOR FITZGERALD.

THE COURT:  GREAT, THANK YOU.  WELCOME TO ALL OF YOU.

ALL RIGHT.  WELL, LET'S SEE.  THIS IS OUR SECOND TIME THROUGH.  THE COMPLAINT HAS BEEN MODIFIED PRETTY SIGNIFICANTLY.

I WANT TO THANK YOU FOR THE CHARTS THAT YOU PROVIDED TO ME.  I -- THEY'RE A LOT OF WORK, BUT I WANT YOU TO KNOW I USE

THEM AND THEY'RE REALLY VERY HELPFUL.

SO I THINK TODAY I'D LIKE US TO FOCUS ON THE LOSS CAUSATION ISSUES.  I THINK THAT'S REALLY KEY.

AND, MR. STEINFELD, I THINK YOU'VE MADE SOME STRONG ARGUMENTS REGARDING AT LEAST THE CF ENTITY DEFENDANTS, AND MAYBE -- IS IT MR. PION WHO RESIGNED FROM THE BOARD BEFORE THE PROXY STATEMENT WAS ISSUED?  THOSE I THINK ARE STRONG.  I WANT TO HEAR MR. URIS'S ARGUMENT ON THAT.

BUT -- AND OF COURSE I'LL HEAR ARGUMENT ON EVERYTHING, BUT I JUST WANT TO GIVE YOU AN INDICATION.

ON THE LOSS CAUSATION, IT SEEMS TO ME THAT STADIUM CLEARLY DOES NOT HAVE STANDING ON THE SECTION 14(A) CLAIM.  SO -- AND IF I'M WRONG ON THAT, MR. URIS, PLEASE CORRECT ME.

BUT ON THE 10(B) CLAIM, THE ISSUE COMES DOWN TO WHEN THE TRUTH BEGAN TO LEAK OUT, I SUPPOSE, AND IT'S NOT CLEAR TO ME THAT YOU'VE ALLEGED ANY FACTS TO SHOW ANYTHING BUT A NOTICE OF AN INVESTIGATION BEFORE STADIUM SOLD ITS SHARES, THAT -- AND SO I CERTAINLY AGREE THAT UNDER THE CASE LAW, THERE CAN BE A TRICKLE OF FACTS LEAKING OUT, OR TRUTH LEAKING OUT, SO THAT THERE CAN BE MULTIPLE CORRECTIVE DISCLOSURES.

BUT I THINK THE CASE LAW IS PRETTY STRONG THAT THE MERE ANNOUNCEMENT OF AN INVESTIGATION ONLY CAUSES RANK SPECULATION.

SO THE QUESTION FOR ME IS THE -- YOU MAKE A STRONG POINT, MR. URIS, THAT THERE WASN'T ULTIMATELY A CORRECTIVE DISCLOSURE, IT DID RELATE TO EXACTLY THE SUBJECT MATTER THAT THE ORIGINAL

ANNOUNCEMENT OF AN INVESTIGATION REGARDING THESE ACCOUNTING ISSUES ON THE WARRANTY FORESHADOWED.

BUT IT -- WE DON'T TAKE THE CORRECTIVE DISCLOSURE AND THEN LOOK BACK IN QUITE THAT WAY.

I'M JUST CONCERNED THAT THE MACPHEE CASE IS GOING TO BE THE BIGGEST OBSTACLE FOR YOU ON STADIUM HAVING STANDING AT ALL.

AND IF IT DOESN'T HAVE STANDING ON EITHER OF THE CLAIMS, THEN I DON'T THINK WE CAN ADD MR. SHERMAN.

IF STADIUM HAS STANDING ON THE 10(B) CLAIM, THE FACT THAT IT LACKS STANDING ON THE 14(A) CLAIM I THINK IS NOT A PROBLEM, WE CAN ADD MR. SHERMAN.

AND, YES, YOU SHOULD HAVE ASKED ME FOR LEAVE TO AMEND, BUT I WOULD GRANT YOU THAT.  AND IF I DIDN'T GRANT IT TO YOU NOW, I WOULD GRANT IT -- IF I DIDN'T ALLOW IT NOW, I'D LET YOU FILE THAT MOTION TOMORROW AND WE'D BE BACK IN THIS PLACE.  SO I DON'T WANT TO GET TIED UP IN THAT.

SO THOSE ARE THE ISSUES THAT I AM PRIMARILY CONCERNED ABOUT, BUT THERE'S A -- AND I'M NOT OVERLOOKING THE SCIENTER. THAT'S ALWAYS A CONCERN, AND I -- YOU KNOW, THE QUESTION OF WHETHER THE FINDING OF THE AUDIT COMMITTEE IS ENOUGH, I TEND TO THINK IT IS.

AND, YOU KNOW, THE S.E.C. COMPLAINT BEING CUT AND PASTED INTO THIS COMPLAINT, I WENT THROUGH THAT WHEN I TALKED TO THE S.E.C. AND MR. PRAKASH A COUPLE WEEKS AGO.  YOU CAN MAKE A NEGLIGENCE CLAIM THAT ALLEGES FACTS THAT WOULD ALSO SHOW FRAUD.

SO I KNOW IT'S A NEGLIGENCE THEORY, BUT I CAN ALSO LOOK AT THE FACTS ALLEGED.

SO I'M INCLINED TO FIND THAT THAT'S OKAY.

THE QUESTION OF WHETHER THE 14(A) CLAIM NEEDS TO COMPLY WITH 9(B) IS A CLOSE CALL, AND I HAVE THAT PRETTY REMARKABLE CHART SHOWING THE OVERLAPPING CLAIMS.

THANK YOU FOR -- I THINK, MR. STEINFELD, YOU MAY HAVE DONE THAT FROM YOUR OFFICE. I THINK THAT CAME FROM YOU.

MR. STEINFELD: YES, YOUR HONOR.

THE COURT: THANK YOU.

MR. STEINFELD: OF COURSE.

THE COURT: THAT WAS A LOT OF WORK.

SO -- LET'S SEE. AS I SAY, I HAVE A LOT OF ISSUE HERE. WE HAVE CONTROL PERSON CLAIMS, ESPECIALLY INVOLVING THE -- AND THAT'S WHAT I WAS REFERRING TO WITH THE CF PARTIES. I THINK THOSE ARE -- THEY'RE NOT NECESSARILY GOING TO STAY IN.

ALL RIGHT. I'VE TOUCHED ON A LOT OF ISSUES WITHOUT GOOD ORDER TO THEM. I APOLOGIZE FOR THAT.

MR. BERRY, YOU FILED WHAT I'LL CALL THE LEAD BRIEF. I DON'T KNOW WHETHER YOU HAD ALL PLANNED THAT YOU WOULD START OFF IN THE ARGUMENT.

I HAVE ABOUT AN HOUR. I NEED TO TAKE A BREAK FOR ABOUT 15 MINUTES TO DO A CASE MANAGEMENT CONFERENCE. IF WE'RE NOT DONE, WE CAN COME BACK AFTER THAT.

BUT LET ME GET STARTED ON THIS, ON YOUR ARGUMENT.

MR. BERRY:  THANK YOU, YOUR HONOR.  AND WE DID, WE -- DEFENSE COUNSEL TALKED.  I THINK THE IDEA WAS I WOULD GO FIRST, AS YOU PREDICTED, AND THEN MS. WHITE WOULD GO NEXT TO TALK ABOUT MR. PRAKASH, AND THEN MR. STEINFELD TO TALK ABOUT THE CANTOR DEFENDANTS.

THE COURT:  OKAY.

MR. BERRY:  I'LL START, YOUR HONOR, WITH CAUSATION SINCE YOU RAISED THAT FIRST, AND I THINK YOU'RE EXACTLY RIGHT, STADIUM CAPITAL DOES NOT HAVE LOSS CAUSATION FOR ITS 14(A) CLAIM, SO I'M NOT GOING TO BELABOR THAT ANY FURTHER.  I DON'T THINK THERE'S ANY DISPUTE THERE.

ON THE 10(B) CLAIM, I DO NOT THINK THEY HAVE CAUSATION. YOU POINTED OUT THE MACPHEE CASE, AND I THINK THAT CASE IS DIRECTLY ON POINT AND SHOWS WHY THEY DON'T HAVE CAUSATION HERE FOR THE 10(B) CLAIM.

AND AS YOU ALLUDED TO, THERE ARE TWO CORRECTIVE DISCLOSURES HERE.  THERE IS THE AUGUST 2021 PRESS RELEASE THAT VIEW ISSUED WHERE ALL THEY DID WAS ANNOUNCE THAT THERE WAS AN INTERNAL INVESTIGATION INTO THEIR WARRANTY APPROVAL, AND THAT'S IT.

AND UNDER THE NINTH CIRCUIT HOLDING IN LOOS, THAT'S NOT ENOUGH TO BE A CORRECTIVE DISCLOSURE STANDING ON ITS OWN.

BUT THEY ALSO HAVE ANOTHER ALLEGED CORRECTIVE DISCLOSURE IN NOVEMBER 2021, AND THAT'S WHEN THE COMPANY ISSUED A PRESS RELEASE, A MUCH MORE FULSOME PRESS RELEASE THAT ANNOUNCED THE

RESULTS OF THE INTERNAL INVESTIGATION, ANNOUNCED THAT THEY WERE GOING TO RESTATE, THAT THE COMPANY WAS GOING TO RESTATE ITS FINANCIALS, AND ALSO ANNOUNCED THAT THE CFO WAS RESIGNING.

THIS IS WHY I WANT TO TURN TO MACPHEE, BECAUSE MACPHEE HAS BASICALLY THAT SAME FACT PATTERN.  IN MACPHEE, THERE'S A MEDICAL PRODUCTS COMPANY, AND THAT MEDICAL PRODUCTS COMPANY MADE A SERIES OF INITIAL PRESS RELEASES AND DISCLOSURES THAT DISCUSSED VARIOUS INVESTIGATIONS, BOTH INTERNAL AND GOVERNMENT INVESTIGATIONS.

AND THEN, JUST LIKE THIS CASE, THE COMPANY ULTIMATELY ANNOUNCED, IN A FINAL PRESS RELEASE, THAT IT HAD TO RESTATE ITS FINANCIALS, JUST LIKE HERE; IT ANNOUNCED ITS INVESTIGATIVE FINDINGS; AND, JUST LIKE HERE, IT ANNOUNCED THAT ITS CFO WAS RESIGNING.

SO THOSE FACTS ARE REMARKABLY SIMILAR TO THIS ONE.

AND THE ELEVENTH CIRCUIT -- BY THE WAY, THE ELEVENTH CIRCUIT HAS SIMILAR HOLDINGS IN OTHER CASES LIKE THE NINTH CIRCUIT HOLDING IN LOOS AND LLOYD, SO THEY FOLLOW THE SAME SORT OF REGIME IN TERMS OF ANALYZING THESE CORRECTIVE DISCLOSURES.

THE COURT:  OKAY.

MR. BERRY:  AND IN MACPHEE, THE ELEVENTH CIRCUIT SAID, LOOK, WE'VE GOT THESE TWO SEPARATE DISCLOSURES, BUT THE COURT SAID, I DON'T HAVE TO FIGURE OUT WHETHER OR NOT THIS FIRST SET OF DISCLOSURES -- THEY ALLEGED CORRECTIVE DISCLOSURES THAT JUST ANNOUNCED THE INVESTIGATION, SO WE DON'T HAVE TO

FIGURE OUT IF THAT COUNTS AS A CORRECTIVE DISCLOSURE FOR LOSS CAUSATION BECAUSE THE LEAD PLAINTIFF DIDN'T OWN ANY STOCK BY THE TIME THAT SECOND, MORE FULSOME CORRECTIVE DISCLOSURE WAS MADE ABOUT THE RESTATEMENT AND THE CFO RESIGNATION.

AND SO THAT'S EXACTLY THE SAME THING HERE.

THE COURT:  IN THE MACPHEE CASE -- I'M SORRY, I'VE GOT IT HERE, BUT I DON'T RECALL -- WAS THERE A SIGNIFICANT STOCK DROP LIKE THERE WAS HERE ON THE ANNOUNCEMENT OF THE INVESTIGATION?

MR. BERRY:  I DON'T KNOW IF I REMEMBER THAT THE COURT -- AND I'D HAVE TO LOOK BACK AS WELL, YOUR HONOR -- IF THE COURT WENT INTO WHAT THE STOCK DROP WAS THERE.  THERE WAS STOCK DROP WHEN IT ANNOUNCED THE RESTATEMENT AND THE RESIGNATION.

THE COURT:  RIGHT.  WELL, THAT'S THE ONLY REASON THAT THERE'S A LAWSUIT.

MR. BERRY:  RIGHT.  RIGHT.

BUT WHETHER OR NOT THERE'S A STOCK DROP OR NOT, I THINK IF YOU LOOK AT WHAT MACPHEE IS DOING, IT'S ACTUALLY CONSISTENT WITH WHAT THE NINTH CIRCUIT DID IN LLOYD.  THE NINTH CIRCUIT IN LLOYD SAID IF YOU'VE GOT AN INITIAL DISCLOSURE OF JUST THE INITIATION OF THE INVESTIGATION, THAT, STANDING ALONE, CAN'T BE ENOUGH FOR CORRECTIVE DISCLOSURE FOR LOSS CAUSATION.

BUT IF THERE'S A SUBSEQUENT ONE THAT'S MORE FULSOME, YOU CAN VIEW THESE TWO TOGETHER, AND THEN YOU CAN USE THEM AS SORT

OF LIKE WHAT YOU ALLUDED TO, YOUR HONOR, OF THE TRUTH LEAKING OUT.  BUT YOU HAVE TO VIEW THEM TOGETHER.  THAT'S WHAT LLOYD SAID.

THE COURT:  SO IN LLOYD, WAS THAT JUST A MATTER OF INCREASING THE LENGTH OF THE CLASS PERIOD?  BECAUSE --

MR. BERRY:  I'M NOT SURE --

THE COURT:  I'M SORRY.  LET ME SEE IF I CAN -- SO THERE WAS AN ANNOUNCEMENT OF AN INVESTIGATION ALONE, AND IN THE LLOYD COURT THEY FOLLOWED LOOS AND SAID IF THAT'S ALL THERE IS, THAT'S NOT LOSS CAUSATION.

BUT THEY SAID, BUT, IF THERE'S AN INVESTIGATION AND A LATER CORRECTIVE DISCLOSURE, THAT WOULD BE LOSS CAUSATION.

IS THE ONLY DIFFERENCE IN MACPHEE WHETHER -- THAT STADIUM DIDN'T OWN STOCK ANYMORE?

MR. BERRY:  THAT'S THE MOST IMPORTANT DIFFERENCE.

I THINK THERE ARE OTHER DISTINCTIONS WITH THE FACT PATTERN IN LLOYD THAT I CAN GET INTO.  BUT THE MAIN POINT IS THAT THE LEAD PLAINTIFF IN MACPHEE, JUST LIKE HERE --

THE COURT:  OKAY.

MR. BERRY:  -- DIDN'T OWN ITS STOCK.

AND SO THE LEAD PLAINTIFF HAD TO OWN STOCK WHEN THAT SECOND DISCLOSURE WAS MADE, IN NOVEMBER 2021, FOR THERE TO BE A CORRECTIVE DISCLOSURE FOR LOSS CAUSATION PURPOSES.

BECAUSE THAT'S WHEN -- AND LET ME PUT IT THIS WAY, YOUR HONOR:  THE LEAD PLAINTIFF COULD NOT HAVE SUFFERED ANY LOSS

FROM THE ALLEGED FRAUD BECAUSE IT OWNED NO STOCK IN NOVEMBER, AND THAT'S WHEN THE LEAD PLAINTIFF ALLEGES THAT THE INFLATED VALUE OF THE STOCK FROM THE ALLEGED FRAUD WAS FINALLY CORRECTED.

AND SO WHAT MACPHEE IS SAYING IS BECAUSE THE FIRST SET OF DISCLOSURES, STANDING ALONE, CAN'T BE CORRECTIVE DISCLOSURE, YOU'VE GOT TO CONSIDER THEM TOGETHER AND, THEREFORE, FOR THERE TO BE LOSS CAUSATION, THE LEAD PLAINTIFF MUST HAVE OWNED THE STOCK AT THE SECOND SET OF DISCLOSURES FOR THIS TO WORK.

THE COURT:  SO LET ME ASK YOU ANOTHER QUESTION, AND I'M JUST TRYING TO UNDERSTAND THE DIFFERENCE.

IN LLOYD, THERE WAS AN ANNOUNCEMENT OF AN INVESTIGATION, AND LATER, WHILE THE PLAINTIFF STILL OWNED STOCK, A CORRECTIVE DISCLOSURE.

IF THE STOCK DECLINED IN VALUE AFTER THE INVESTIGATION, AND LET'S SAY DECLINED AGAIN AFTER THE CORRECTIVE DISCLOSURE, WE'RE LOOKING AT THEM, IS THE MEASURE OF DAMAGES THE DECLINE AFTER THE INVESTIGATION, PLUS ANY ADDITIONAL DECLINE AFTER THE CORRECTIVE ACTION?

IT MUST BE.  OTHERWISE WE DON'T CARE ABOUT AN ANNOUNCEMENT OF ANY INVESTIGATION.

MR. BERRY:  I -- IT MAY BE, YOUR HONOR.

BUT I'M NOT SURE THAT MATTERS FOR PURPOSES OF WHAT'S GOING ON HERE.

THE COURT:  THEN WHY DOES THE ANNOUNCEMENT OF AN

INVESTIGATION EVER MATTER?  THAT'S WHAT I'M TRYING TO UNDERSTAND.  IF THE --

MR. BERRY:  WELL, THAT'S --

THE COURT:  IF THE ANNOUNCEMENT OF AN INVESTIGATION, STANDING ALONE, DOES NOT CREATE EVIDENCE OF LOSS CAUSATION, THEN WHY IS IT STILL RELEVANT IF THERE'S A FINAL FINDING BY THE COMPANY OF A CORRECTIVE ACTION?  I'M JUST TRYING TO PUT IT TOGETHER.

MR. BERRY:  SURE.  LET ME TRY TO EXPLAIN IT IN TWO WAYS.

THE COURT:  OKAY.

MR. BERRY:  FIRST, IF YOU THINK ABOUT WHAT HAPPENED IN LLOYD, IN LLOYD, THE BANK REPORTED THAT IT HAD RECEIVED AN S.E.C. SUBPOENA.

THE COURT:  YEAH.

MR. BERRY:  AND THEN IT DETAILED WHAT THAT S.E.C. SUBPOENA WAS ABOUT IN EXCRUCIATING DETAIL.

THE COURT:  RIGHT.

MR. BERRY:  AND THE NINTH CIRCUIT POINTED OUT THAT THE ANALYSTS COVERING THE STOCK SAID, HEY, THIS IS SORT OF CONFIRMING OUR SUSPICIONS THAT SOMETHING IS WRONG WITH THE BANK'S LOAN PORTFOLIO.  SO THE STOCK PRICE DROPPED.

WHEN THEY FINALLY ANNOUNCED THAT THERE'S GOING TO BE A RESTATEMENT AND THAT THE BIGGEST LOAN TO ITS BIGGEST BORROWER WAS GOING TO HAVE TO BE WRITTEN DOWN, THE STOCK PRICE DIDN'T

MOVE AT ALL.

THE COURT:  BECAUSE THE MARKET HAD ALREADY ACCOUNTED FOR IT.

MR. BERRY:  EXACTLY.  SO THOSE FACTS ARE VERY DIFFERENT FROM THIS ONE.

THE COURT:  WELL, BUT THAT'S ACTUALLY -- MR. URIS ARGUES THAT WHEN THE ACTUAL CORRECTED FINANCIALS WERE ANNOUNCED, THE STOCK STAYED THE SAME.  SO HE SAYS -- HE SAYS EXACTLY THE SAME, THAT THE MARKET UNDERSTOOD COMPLETELY WHAT THE ANNOUNCEMENT OF THE INVESTIGATION MEANT AND REACTED EARLY AND DIDN'T NEED TO REACT ANYMORE BECAUSE IT HAD ALREADY REACTED.

MR. BERRY:  WELL, HE'S TALKING ABOUT DISCLOSURES THAT ACTUALLY HAPPENED WELL AFTER THE CLASS PERIOD ENDS.

THE COURT:  YES, I UNDERSTAND THAT.

MR. BERRY:  SO -- BUT I DO THINK LLOYD IS DIFFERENT ON THAT BASIS, BECAUSE I DON'T THINK THAT MATTERS THAT, I THINK IT'S SIX MONTHS LATER, THEY FINALLY ISSUED -- THE COMPANY FINALLY ISSUES THE RESTATEMENT.

BY THEN WHO KNOWS WHAT THE MARKET IS REACTING TO OR NOT REACTING TO AT THAT POINT.

THE COURT:  UM-HUM.

MR. BERRY:  THE KEY IS WHAT'S HAPPENING IN NOVEMBER, AND THE STOCK PRICE REACTING NEGATIVELY WHEN THEY FINALLY SAY, HEY, LOOK, OUR CFO IS RESIGNING AND THIS ALL HAS TO DO WITH OUR

INTERNAL INVESTIGATION THAT WE ANNOUNCED IN AUGUST THAT WE DIDN'T TELL YOU ANYTHING ABOUT UNTIL NOW, AND NOW IN NOVEMBER WE'RE ACTUALLY GOING TO TELL YOU ABOUT WHAT'S GOING ON.  THE CFO IS RESIGNING, WE HAVE SOME FINDINGS THAT WE'RE DISCLOSING, AND WE'RE GOING TO BE RESTATING ALL OF THIS.

NONE OF THAT WAS KNOWN IN AUGUST.  ALL THEY KNEW IN AUGUST WAS THAT THE COMPANY WAS DOING AN INVESTIGATION.

THE COURT:  LET ME SEE IF I CAN REVISIT THIS QUESTION.  LET'S TAKE MR. SHERMAN, I KNOW YOU DON'T WANT ME TO CONSIDER HIM, BUT I'VE GOT SOMEONE, A SHAREHOLDER, WHO OWNS STOCK ON THE DAY BEFORE THE ANNOUNCEMENT OF AN INVESTIGATION, AND STILL OWNS STOCK THE DAY OF THE NOVEMBER CORRECTIVE STATEMENT.  OKAY?  THAT'S THE SCENARIO I WANT.

SO THE STOCK DROPPED 24 PERCENT AFTER THE ANNOUNCEMENT OF THE INVESTIGATION, AND IT DROPPED, I THINK, 13 PERCENT THE DAY AFTER -- ON THE BASIS OF THE NOVEMBER DISCLOSURE.

IS THE MEASURE OF DAMAGES JUST THE 13 PERCENT?  OR WOULD YOU BE ABLE TO GO BACK AND SCOOP UP THE 24 PERCENT AS WELL?

MR. BERRY:  YOU'RE SAYING --

THE COURT:  SO IT WOULD BE THE DIFFERENCE BETWEEN THE VALUE OF THE STOCK THE DAY BEFORE THE AUGUST ANNOUNCEMENT UNTIL THE DAY AFTER THE NOVEMBER ANNOUNCEMENT.  OR IS IT ONLY THE DAY BEFORE THE NOVEMBER ANNOUNCEMENT AND THE DAY AFTER?

MR. BERRY:  I THINK, YOUR HONOR, THE PROPER WAY TO MEASURE DAMAGES IN THAT CIRCUMSTANCE, IN THE WAY I UNDERSTAND

DAMAGES ARE MEASURED IN CASES LIKE THIS, IT'S THE NOVEMBER STOCK DROP.

THE COURT:  IT'S ONLY THE NOVEMBER -- SO THE INVESTIGATION --

MR. BERRY:  BECAUSE THE STOCK PRICE IS GOING UP AND DOWN AND SO YOU'RE MEASURING WHEN THEY SELL.

THE COURT:  ALL RIGHT.

MR. BERRY:  OR AT THE END OF THE CLASS PERIOD IN THE 90 DAY LOOK BACK.

THE COURT:  SO THE INVESTIGATION -- THE CIRCUMSTANCES OF THE STOCK VALUE THE DAY AFTER THE ANNOUNCEMENT OF AN INVESTIGATION, WHETHER IT GOES UP OR DOWN, IS NEVER -- IN YOUR VIEW, NEVER A MEASURE OF DAMAGES?

MR. BERRY:  WELL, IT CAN BE IF THERE'S A PLAINTIFF -- IF THE PLAINTIFF OR A MEMBER OF THE CLASS SOLD IN BETWEEN.

BUT THAT WOULD ONLY WORK, AS WE'RE POINTING OUT, IF WE DON'T HAVE THE MACPHEE PROBLEM.  SO, YES, THAT WOULD NOT BE A MEASURE OF DAMAGES.

THE COURT:  OKAY.  THANK YOU.

I INTERRUPTED YOU.  GO AHEAD WITH YOUR ARGUMENT.

MR. BERRY:  THAT'S ALL RIGHT.

I DO THINK -- AND I'M NOT SURE THERE'S MUCH MORE TO SAY HERE, EXCEPT I DO THINK MACPHEE, THE LOGIC AND THE RATIONALE OF MACPHEE DIRECTLY APPLIES TO THIS CASE.  I'M NOT SURE HOW ELSE TO DISTINGUISH IT.

THEY TRY TO DISTINGUISH IT IN WAYS THAT I THINK ARE INCORRECT FACTUALLY, AND IF YOU CAN'T DISTINGUISH THESE TWO CASES FACTUALLY, I THINK IT'S DIRECTLY ON POINT.

AND AS I SAID, THE ELEVENTH CIRCUIT BASICALLY FOLLOWS WHAT THE NINTH CIRCUIT DOES IN TERMS OF LOSS CAUSATION ANALYSIS AND CORRECTIVE DISCLOSURE ANALYSIS.  THEIR HOLDINGS ARE CONSISTENT WITH LLOYD AND LOOS AND OTHER CASES, SO I THINK THERE'S NO REASON NOT TO APPLY THE REASONING OF MACPHEE HERE TO THE LOSS CAUSATION ISSUE FOR THE CASE.

THE COURT:  OKAY.

MR. BERRY:  SO THAT I THINK ADDRESSES YOUR FIRST QUESTION, YOUR HONOR, ABOUT STADIUM CAPITAL DOES NOT HAVE STANDING FOR EITHER ITS 14(A) CLAIM OR ITS 10(B) CLAIM.

NOW, I CAN GET INTO THE, THE ISSUE, YOUR HONOR, OF WHETHER OR NOT ADDING DAVID SHERMAN CAN ACTUALLY FIX THIS.  WE DON'T THINK IT CAN.  DAVID SHERMAN IS A VERY SMALL SHAREHOLDER HERE. HE ONLY OWNS A THOUSAND SHARES.  HE WAS NEVER PART OF THIS CASE, NEVER BEEN A NAMED PLAINTIFF.

AND I THINK IT'S IMPORTANT TO REMEMBER HOW WE GOT HERE. SO THE --

THE COURT:  I REMEMBER.

MR. BERRY:  OKAY.  ALL RIGHT.

SO THIS IS FILED BACK IN AUGUST OF 2021.  MR. MEHEDI WAS THE NAMED PLAINTIFF.  AND BACK THEN, THE CASE WAS ONLY ABOUT THE AUGUST DISCLOSURE.

IT WENT THROUGH A LOT TO GET WHERE WE ARE.  IT WENT THROUGH -- YOU KNOW, YOUR HONOR -- IT WENT TO THE NINTH CIRCUIT.  IT WENT ALL THE WAY TO THE NINTH CIRCUIT.

YOUR HONOR APPOINTED STADIUM CAPITAL AS THE LEAD PLAINTIFF, AND THAT WAS BASED ON STADIUM CAPITAL, YOUR HONOR'S DETERMINING THAT STADIUM CAPITAL HAD THE GREATEST FINANCIAL LOSS, AND THAT LOSS WAS BASED ON ONLY THE AUGUST DISCLOSURES BECAUSE THAT WAS THE ONLY TIME THAT THEY ACTUALLY OWNED STOCK.

NOW, LAST YEAR WHEN YOU DISMISSED THIS CASE, THEY HAVE SINCE AMENDED THEIR THEORY IN MAKING THE NOVEMBER DISCLOSURE THE KEY CORRECTIVE DISCLOSURE HERE, AND THEY DID THAT BECAUSE THEY DIDN'T HAVE LOSS CAUSATION FOR THE AUGUST DISCLOSURE.

THE COURT:  YES.

MR. BERRY:  BUT NOW THEY HAVE A PROBLEM THAT THEY DON'T HAVE LOSS CAUSATION -- STADIUM CAPITAL DOES NOT HAVE LOSS CAUSATION FOR THE NOVEMBER DISCLOSURE, AND THAT'S WHY THEY'RE TRYING TO INSERT MR. SHERMAN INTO THIS CASE.

BUT THE NINTH CIRCUIT IS VERY CLEAR ABOUT THIS.  THE LEAD PLAINTIFF MUST HAVE STANDING FOR AT LEAST ONE OF THE CLAIMS IN THE CASE.

THE COURT:  YES.

MR. BERRY:  THE ONLY WAY THEY CAN DO WHAT THEY'RE TRYING TO DO IS IF THEY HAVE STANDING FOR ONE OF THESE CLAIMS, 14(A) AND 10(B).

AND AS I SAID, IT'S OUR POSITION THAT THEY DON'T HAVE A

14(A), IT SOUNDS LIKE YOU AGREE.

THEY ALSO DON'T HAVE IT FOR 10(B) BECAUSE OF MACPHEE.

EVERY CASE THEY CITE IN THEIR OPPOSITION BRIEF ON THIS ISSUE INVOLVES A SITUATION WHERE THE LEAD PLAINTIFF HAD STANDING FOR AT LEAST ONE CLAIM SO THEY COULD ADD OTHER PLAINTIFFS TO HELP THEM MANAGE THE CASE, LIKE SUBCLASSES AND THINGS LIKE THAT.

THE COURT:  SURE.

MR. BERRY:  SO THERE IS NO VIABLE CASE HERE FOR THE LEAD PLAINTIFF BECAUSE THEY DON'T HAVE STANDING FOR EITHER ONE, AND SINCE THERE'S NO VIABLE CASE, THERE IS NO VIABLE CASE FOR YOU TO ADD A NEW PLAINTIFF TO.

AND I THINK -- I JUST POINT YOU TO THIS ZAPIEN OR ZAPIEN -- I'M NOT SURE HOW TO PRONOUNCE IT -- THE ZAPIEN CASE IN THE SOUTHERN DISTRICT OF CALIFORNIA, IT'S A WASHINGTON MUTUAL SECURITIES FRAUD CASE.

AND THE JUDGE THERE WAS DEALING WITH A VERY SIMILAR SITUATION.  THE JUDGE HAD DISMISSED THE FIRST AMENDED COMPLAINT IN THAT CASE BECAUSE THE LEAD PLAINTIFF DID NOT HAVE STANDING TO BRING IT, AND HE DIDN'T HAVE STANDING BECAUSE THE LEAD PLAINTIFF THERE DID NOT PURCHASE STOCK IN THE TRANSACTION THAT WAS BEING CHALLENGED.

SO THE LEAD PLAINTIFF WENT BACK AND ADDED A NEW PLAINTIFF WHO DID PURCHASE SHARES IN THAT TRANSACTION -- THE NEW PLAINTIFF HAPPENED TO BE HIS MOTHER -- AND SHE PURCHASED

TRANSACTIONS -- SHARES OF STOCK IN THAT TRANSACTION.

AND THE DISTRICT COURT IN ZAPIEN SAID, YOU CAN'T DO THAT. YOU DON'T HAVE -- YOU, LEAD PLAINTIFF, DON'T HAVE STANDING TO BRING THIS CLAIM, SO I'M DISMISSING YOU FROM THIS CASE.  AND SINCE YOU DON'T HAVE A CASE, YOU CAN'T ADD ANOTHER PLAINTIFF INTO THIS CASE.

THAT'S EXACTLY THE SITUATION HERE.  SO I THINK, YOUR HONOR, IF YOU AGREE WITH US, AND I THINK YOU -- IT'S THE RIGHT WAY TO GO WITH MACPHEE, THEY DON'T HAVE STANDING, SO THEY CAN'T ADD DAVID SHERMAN TO THIS CASE.

THE COURT:  BUT WHAT IF -- A COUPLE OF THINGS.  FIRST OF ALL, I DIDN'T HAVE TIME TO GO BACK AND READ THE ORIGINAL COMPLAINT, BECAUSE I -- I REMEMBER HOW ARDUOUS IT WAS TO WORK THROUGH THE LEAD PLAINTIFF CONTEST AND THAT WE WAITED FOR THE NINTH CIRCUIT AND ALL.

BUT I DIDN'T RECALL THAT THE ORIGINAL COMPLAINT WAS BASED ONLY ON THE AUGUST DISCLOSURE.  THAT ANSWERS THE QUESTION FOR ME AS TO HOW THE OTHER ATTORNEYS VYING FOR LEAD PLAINTIFF MISSED THIS.  THEY DIDN'T MISS IT AT ALL.

MR. BERRY:  CORRECT.

THE COURT:  OKAY.  SO THAT'S --

MR. BERRY:  THE INITIAL COMPLAINT WAS FILED TWO DAYS AFTER THAT AUGUST DISCLOSURE.

THE COURT:  OKAY.  GOT IT.  SO THAT TAKES CARE OF THAT.

BUT WHAT IF, IN THE LEAD UP TO MY APPOINTING LEAD PLAINTIFF, STADIUM HAD PARTNERED WITH MR. SHERMAN?  BECAUSE YOU CAN -- A GROUP OF SMALL INVESTORS CAN GET TOGETHER AND POOL AND BE A TEAM FOR LEAD PLAINTIFF; CORRECT?

MR. BERRY:  THAT CAN HAPPEN, YES, YOUR HONOR.

THE COURT:  SO IF MR. SHERMAN HAD JOINED WITH STADIUM ORIGINALLY, HE COULD STAND ALONE AND GO FORWARD WITH THE CLAIMS?

YOU'RE SAYING THAT -- BUT YOU'RE SAYING IN THIS PROCEDURAL POSTURE WHERE STADIUM, STANDING ALONE, LACKS STANDING, THEN I LOSE JURISDICTION TO ALLOW THE AMENDMENT TO ADD A NEW NAMED -- NEW LEAD PLAINTIFF.

MR. BERRY:  THAT'S EXACTLY RIGHT, YOUR HONOR.

THE COURT:  OKAY.

MR. BERRY:  AND, YOU KNOW, WE CITED A HOST OF NINTH CIRCUIT AND NORTHERN DISTRICT CASES THAT DEAL WITH THAT KIND OF SITUATION, SOME IN THE SECURITIES FRAUD CONTEXT CASES, AND SOME OUTSIDE.

THE COURT:  ALL RIGHT.

MR. BERRY:  BUT THEY'RE ALL DEALING WITH THE SITUATION WHERE THE LEAD PLAINTIFF OR THE CLASS REP OR THE NAMED PLAINTIFF DOESN'T HAVE STANDING TO BRING THE CLAIM.

THE COURT:  OKAY.

MR. BERRY:  AND I THINK THE SITUATION YOU DESCRIBE, YOUR HONOR, IS LIKE THE IMPAX CASE THAT WE CITED, AND I THINK

PLAINTIFF CITED AS WELL. THEY ACTUALLY HAD A NAMED PLAINTIFF THAT WAS ADDED TO THE COMPLAINT EARLIER AND IT WAS SPECIFICALLY ALLOWED TO BE THAT WAY, AND THAT'S NOT NORMAL. USUALLY, YOU KNOW, WHEN THE LEAD PLAINTIFF GETS APPOINTED, THE NAMED PLAINTIFF IS NO LONGER PART OF THE CASE. BUT IN THAT UNUSUAL CIRCUMSTANCE, THE COURT DID ALLOW IT TO GO FORWARD.

BUT THAT DID NOT HAPPEN HERE, AND SO SINCE IT DID NOT HAPPEN HERE, I THINK THE NINTH CIRCUIT LAW IS VERY CLEAR THAT STADIUM CAPITAL CAN'T ADD SOMEBODY BECAUSE YOU DON'T HAVE A VIABLE CASE IN FRONT OF YOU.

AND TO PUT THAT IN CONTEXT, THIS CASE WAS FILED IN AUGUST OF 2021. THEY HAD A LONG TIME TO AMEND TO FIGURE THIS OUT.

THEY ALSO HAD TIME TO FIGURE THIS OUT GOING THROUGH THE ENTIRE LEAD PLAINTIFF PROCESS. THEY'RE THE ONES THAT CHOSE TO CHANGE THEIR THEORY. THEY'RE THE ONES THAT CHOSE TO HAVE THEIR INITIAL CASE FOCUS ON THE AUGUST 21 DISCLOSURE.

SO IF YOU'RE SUGGESTING THAT IT MIGHT BE UNFAIR GIVEN THE PROCEDURAL CONTEXT, WE DIDN'T CREATE THIS PROCEDURAL CONTEXT.

THE COURT: I'M NOT LOOKING AT THE FAIRNESS. THIS IS MERELY JUST VERY TECHNICAL, AND IT'S -- IT'S JUST A TOUCHY ISSUE ON WHETHER THE LACK -- WHETHER THERE'S A LACK OF STANDING.

AND THERE'S ALSO A QUESTION IN MY MIND AS TO WHETHER THERE'S A FACTUAL DISPUTE AS TO, QUOTE, WHEN THE TRUTH BEGAN TO LEAK OUT.

I THINK MR. URIS IS PROBABLY -- I KNOW HE BRIEFED THAT, SO I'M GOING TO HEAR ABOUT THAT.

MR. BERRY, YOU CAN WAIT AND ADDRESS HIS COMMENTS IN YOUR CLOSING COMMENTS.

BUT I HAVE TO BE SURE THAT THERE ARE NO FACTS ALLEGED FROM WHICH A REASONABLE INFERENCE COULD BE APPLIED THAT THERE WAS -- THAT THE TRUTH BEGAN TO EMERGE EARLIER BEFORE STADIUM SOLD.

MR. BERRY:  I UNDERSTAND, YOUR HONOR.  I'LL LET MR. URIS GO, BUT I THINK IT'S PRETTY CLEAR, THE AUGUST DISCLOSURE ONLY SAYS THERE'S AN INTERNAL INVESTIGATION --

THE COURT:  RIGHT.

MR. BERRY:  -- ABOUT A WARRANTY ACCRUAL AND SAYS NOTHING ELSE.

THE COURT:  RIGHT.

MR. BERRY:  THE INVESTING PUBLIC AT THAT TIME HAS NO IDEA IF THE WARRANTY ACCRUAL IS GOING TO BE RESTATED OR NOT.

THE COURT:  THAT WAS A BIG STOCK DROP, THOUGH.  THAT WAS A BIG STOCK DROP.

MR. BERRY:  SURE.  BUT THAT GOES TO LOOS, RIGHT? THERE ARE BIG STOCK DROPS ALL THE TIME WITH THE ANNOUNCEMENT OF AN INVESTIGATION, MERELY BECAUSE OF THE UNCERTAINTY.  BUT THAT DOESN'T MEAN THERE'S A FRAUD THERE.

THE COURT:  RIGHT.  THAT'S CERTAINLY TRUE.

ALL RIGHT.  AND AM I REMEMBERING CORRECTLY, STADIUM SOLD PRETTY QUICKLY AFTER THE AUGUST ANNOUNCEMENT?

MR. BERRY:  I DON'T HAVE THEIR TRADING HISTORY IN FRONT OF ME.  I KNOW, FOR EXAMPLE, THEY HAD SHARES ON THE RECORD DATE IN JANUARY AND THEN THEY SOLD IN MARCH.

THE COURT:  RIGHT.

MR. BERRY:  THEY'RE A PRETTY ACTIVE TRADER.  I THINK THEY BOUGHT AFTER THAT.

I THINK THEY ULTIMATELY SOLD EVERYTHING BY SEPTEMBER OF 2021, TWO MONTHS BEFORE THE NOVEMBER DISCLOSURE.  BUT I THINK I'D HAVE TO CHECK THAT, OR MR. URIS CAN CORRECT ME IF I GOT THAT WRONG.

THE COURT:  SO IF MR. URIS CAN ALLEGE ANY FACTS THAT -- WELL, I DON'T -- HE DOESN'T HAVE AN EVENT THAT OCCURRED BEFORE SEPTEMBER.

MR. BERRY:  THERE IS NOTHING IN BETWEEN AUGUST AND NOVEMBER, YOUR HONOR.  IT'S JUST THE AUGUST DISCLOSURE THAT BASICALLY JUST SAID THERE'S AN INVESTIGATION.  THE STOCK PRICE DROP YOU'RE TALKING ABOUT, AS I SAID, IS TYPICAL GIVEN THAT UNCERTAINTY, AND THE ONLY NEXT EVENT THAT ACTUALLY MATTERS IS THE NOVEMBER DISCLOSURE.

THE COURT:  OKAY.

MR. BERRY:  THAT'S ALL THAT'S IN THE COMPLAINT.

THE COURT:  OKAY.  GO AHEAD.  OTHER ARGUMENT?  THERE ARE A LOT OF OTHER ISSUES.

MR. BERRY:  SURE.

SO WHY DON'T I TURN TO SCIENTER AND NEGLIGENCE, AND I

THINK IT'S IMPORTANT -- I GUESS, ONE, BEFORE I GET INTO THAT, I THINK IT'S IMPORTANT TO THINK ABOUT WHAT THIS CASE IS ABOUT.

THE COURT:  UM-HUM.

MR. BERRY:  THIS IS AN ALLEGED ACCOUNTING FRAUD CASE. IT'S NOT A CASE SAYING THAT VIEW DIDN'T DISCLOSE THE DEFECT IN ITS WINDOWS, BECAUSE IT DID.  IT'S NOT A CASE SAYING THAT IT WAS HIDING COSTS TO FIX THIS MISTAKE, BECAUSE THEY DID BOOK THOSE COSTS AS THEY WERE REPLACING THE WINDOWS.

IT'S ONLY AN ACCOUNTING JUDGMENT CASE.  AND THE ACCOUNTING HERE THAT -- THE COMPLAINT DOESN'T ALLEGE IT, BECAUSE THEY CAN'T -- IT'S NOT STRAIGHTFORWARD.  THE ACCOUNTING QUESTION HERE HAD TO DO WITH AN ACCOUNTING ACCRUAL, AND AN ACCOUNTING ACCRUAL FOR A WARRANTY IS AN ESTIMATE OF WHAT THE COMPANY THINKS IT MIGHT HAVE TO SPEND DURING THE LIFE OF THE WARRANTY, IN THIS CASE IT WAS A TEN YEAR WARRANTY TYPICALLY.

AND SO THE ACCOUNTING QUESTION THAT THE COMPANY WAS CONFRONTED WITH WAS WHETHER, UNDER GAAP, THEY SHOULD CALCULATE THAT WARRANTY ACCRUAL BASED ON WHAT THE WARRANTY CONTRACT SAID, AND THE WARRANTY CONTRACT SAID VIEW DIDN'T HAVE TO PAY THE COST TO INSTALL THE REPLACEMENT WINDOW; OR SHOULD THEY CALCULATE THE ACCRUAL BASED ON WHAT THE COMPANY WAS ACTUALLY DOING, BECAUSE THEY WERE ACTUALLY PAYING FOR THE INSTALLATION COSTS.

THE COURT:  UM-HUM.

MR. BERRY:  NOW, THAT'S UNDER GAAP, AND THEY DON'T SAY THAT'S AN EASY DETERMINATION UNDER GAAP, AND THAT'S

CORRECT, IT'S ACTUALLY COMPLICATED.

AND SO WHEN THEY FIRST BOOKED THE WARRANTY ACCRUAL, THEY BASED IT ON THE TERMS OF THE WARRANTY, AND THAT -- SO THEY DIDN'T INCLUDE THE INSTALLATION COSTS.

BUT THEN LOOKING BACK AT IT AGAIN -- AND I CAN TELL YOU, WE BECAME A FORENSIC ACCOUNTANT TO FIGURE THIS OUT -- THEY REALIZED PROBABLY THE BETTER WAY TO DO THIS IS TO DO IT BASED ON WHAT WAS ACTUALLY BEING SPENT, AND SO THEY RECALCULATED THAT WARRANTY ACCRUAL.

THE COURT:  WELL, BUT YOU ARE LEAVING OUT THE CRITICAL ISSUE, AND THAT IS THAT THE COMPLAINT ALLEGES THAT THE INITIAL WARRANTY ACCRUAL DETERMINATION WAS BASED ON INFORMATION WHERE IT'S ALLEGED MR. PRAKASH INTENTIONALLY WITHHELD THE BOARD'S DECISION TO COVER, RETROACTIVELY AND GOING FORWARD, ALL OF THE INSTALLATION AND DELIVERY COSTS.

MR. BERRY:  I DIDN'T WANT TO -- I WASN'T TRYING TO LEAVE IT OUT, I WAS GOING TO GET INTO THAT, BECAUSE I THINK YOU MIGHT HAVE OVERSTATED IT, YOUR HONOR.

THE COURT:  I THINK MR. URIS STATES IT THAT STRONGLY.

I MEAN, I DON'T HAVE A VIEW OF ANYTHING.  I'M JUST READING HIS COMPLAINT AND DRAWING THE INFERENCES IN HIS FAVOR.

MR. BERRY:  SURE.

SO LET ME DO THIS BY GETTING INTO THE WEEDS OF THESE ALLEGATIONS.

THE COURT:  OKAY.

MR. BERRY:  BUT FIRST TALK ABOUT -- WE'VE GOT TWO INDIVIDUAL DEFENDANTS HERE, AND THEY ARE ALLEGING THAT MY CORPORATE CLIENT, VIEW, INC., LIABILITY CAN BE IMPUTED FROM THESE, SO I NEED TO TALK ABOUT BOTH EVEN THOUGH I ONLY REPRESENT ONE.

BUT LET ME FIRST TALK ABOUT DR. RAO MULPURI, THE CEO. THAT'S THE CLIENT AND THE DEFENDANT THAT I DO REPRESENT.

THE COURT:  YES.

MR. BERRY:  AND I THINK WHEN WE THINK ABOUT THE ALLEGATIONS HERE, THE NEW ALLEGATIONS, BECAUSE THAT'S -- YOU'VE ALREADY SAID THEIR OLD ALLEGATIONS DIDN'T WORK, SO WE'VE GOT TO FOCUS ON WHAT THEIR NEW ALLEGATIONS ARE.

THE COURT:  RIGHT.

MR. BERRY:  THERE ARE BASICALLY THREE BUCKETS OF NEW ALLEGATIONS THAT THEY'VE ADDED TO THEIR COMPLAINT.

THE FIRST SET OF ALLEGATIONS THAT THEY ADDED ARE JUST ALLEGATIONS THAT JUST SAY THAT PEOPLE AT THE COMPANY, THE MANAGEMENT TEAM, KNEW THAT VIEW WAS PAYING FOR THESE INSTALLATION COSTS AND EVERYONE KNEW THAT THIS WAS GOING -- THE LANGUAGE THEY USE IS ABOVE AND BEYOND WHAT THE WARRANTY REQUIRED.  SO THAT'S THE FIRST SET OF ALLEGATIONS.

THE SECOND SET OF ALLEGATIONS IS A SINGLE PARAGRAPH THAT QUOTES THE NOVEMBER 2021 VIEW PRESS RELEASE, AND I THINK THIS IS WHAT YOU WERE TALKING ABOUT, YOUR HONOR.  THAT PRESS RELEASE -- AS WE TALKED ABOUT EARLIER, THAT PRESS RELEASE

ANNOUNCES THE END OF THE INTERNAL INVESTIGATION; IT ANNOUNCES THE CFO, VIDUL PRAKASH, RESIGNED; AND IT ANNOUNCES THE INVESTIGATIVE FINDINGS; AND THESE ARE THE TWO THAT YOU WERE TALKING ABOUT, IT ANNOUNCES THAT THE INVESTIGATION HAD DETERMINED THAT THE VIEW FINANCE TEAM HAD INTENTIONALLY WITHHELD INFORMATION ABOUT THE ACCRUAL FROM THE BOARD AND THE AUDITORS; AND THE VIEW FINANCIAL TEAM HAD NEGLIGENTLY BOOKED THE WARRANTY ACCRUAL.

AND THE OTHER THING THAT THIS ANNOUNCEMENT DOES IS ANNOUNCE THAT THE WARRANTY ACCRUAL HAS TO BE RESTATED.

SO THAT'S THE SECOND SET.  IT'S ONLY ONE PARAGRAPH IN THE COMPLAINT.  IT JUST QUOTES THE PRESS RELEASE.

THE COURT:  RIGHT.

MR. BERRY:  THE BIGGEST SET OF ALLEGATIONS THAT THEY PUT IN THE COMPLAINT ARE THE ONES THAT ARE COPIED FROM THE S.E.C. CASE.  THERE ARE 33 PARAGRAPHS IN THIS GROUP.  IT'S PARAGRAPHS 72 TO 83, AND 207 TO 228 IN THE SECOND AMENDED COMPLAINT.

NOW, I DON'T THINK, AND IT'S OUR POSITION, THAT NONE OF THESE THREE SETS CAN PLEAD SCIENTER OR NEGLIGENCE FOR ANY OF THE DEFENDANTS HERE.

SO LET ME FIRST START, BECAUSE I THINK THE EASIEST ONE TO DEAL WITH IS THE CEO, DR. MULPURI.  SO, CRITICALLY, THEY DO NOT ALLEGE OR ASSERT A 10(B) CLAIM AGAINST MR. MULPURI.  IT'S ONLY THE 14(A) CLAIM.  AND THE 14(A) IS A NEGLIGENCE-BASED CLAIM, SO

WE'VE GOT TO LOOK AT WHETHER OR NOT THEY HAVE PLED NEGLIGENCE AGAINST HIM.

AND I THINK YOU WERE CORRECT LAST TIME, YOUR HONOR, WHEN YOU SAID THAT THIS CASE, THE 14(A) CLAIM SOUNDS IN FRAUD.

I DON'T THINK THEY'VE DONE ANYTHING TO CHANGE THAT FACT. IT'S STILL ABOUT THE SAME MISSTATEMENTS AND THE SAME CONDUCT, SO I THINK THIS CLAIM SOUNDS IN FRAUD.

AND BASED ON YOUR LAST HOLDING, YOU WERE CORRECT TO SAY THEY'VE GOT TO PLEAD WITH PARTICULARITY A NEGLIGENCE CLAIM.

AND WE DID THIS LAST TIME.  THE NINTH CIRCUIT HAD THE RECENT FINJAN HOLDING THAT SAID YOU DON'T HAVE TO PLEAD THE STRONG INFERENCE FROM THE NEGLIGENCE CLAIM, BUT YOU DO, UNDER THE PSLRA AND 9(B), HAVE TO PLEAD NEGLIGENCE WITH PARTICULARITY.

SO LET'S LOOK AT THE THREE NEW ALLEGATIONS FOR DR. MULPURI.  TWO OF THOSE THREE ALLEGATIONS, SETS OF NEW ALLEGATIONS THAT I DESCRIBED HAVE NOTHING TO DO WITH DR. MULPURI.

SO THE NOVEMBER 2021 PRESS RELEASE, THAT DOESN'T SAY ANYTHING ABOUT DR. MULPURI.  THOSE FINDINGS ABOUT INTENTIONALITY AND NEGLIGENCE HAVE NOTHING TO DO WITH HIM.

AND THE SET OF COPIED AND PASTED ALLEGATIONS FROM THE S.E.C. COMPLAINT DON'T MENTION DR. MULPURI.  THEY DON'T HAVE ANYTHING TO DO WITH HIM.  IT'S ALL ABOUT MR. PRAKASH, THE CFO.

SO OF THE THREE NEW SETS OF ALLEGATIONS THAT THEY'VE ADDED

IN THIS COMPLAINT, ONLY ONE SET HAS TO DO WITH DR. MULPURI, AND THAT'S THE FIRST SET, AND THOSE ONLY SAY THAT EVERYONE IN MANAGEMENT KNEW THAT THE COMPANY WAS GOING ABOVE AND BEYOND WHAT THE WARRANTY REQUIRED AND WERE PAYING INSTALLATION COSTS.

BUT HERE'S THE CRITICAL POINT:  FOR DR. MULPURI, THE COMPLAINT, WHILE IT SAYS THAT HE KNEW ABOUT THIS PRACTICE, DOES NOT ALLEGE THAT HE KNEW OR SHOULD HAVE KNOWN WHAT THE GAAP ACCOUNTING STANDARDS WERE FOR WARRANTY ACCRUALS.

IT ALSO DOESN'T ALLEGE THAT HE KNEW OR SHOULD HAVE KNOWN THAT THE ACCOUNTING WAS WRONG.  IT DOESN'T EVEN ALLEGE THAT HE WAS EVEN INVOLVED AT ALL IN THE ACCOUNTING DECISION.

THEY DON'T ALLEGE ANY PARTICULARS ABOUT HIS ROLE AS CEO IN ANY DISCUSSIONS OR COMMUNICATIONS OR DELIBERATIONS ABOUT THE ACCOUNTING THAT IS AT THE HEART OF THIS CASE.

THE COURT:  BUT MAYBE THIS BLEEDS INTO THE DISCUSSION THAT WE'LL HAVE WITH MR. STEINFELD ON THE THEORY THAT BECAUSE ALL OF THESE DEFENDANTS HAD ACCESS TO THE DATA ROOM, THEY COULD HAVE REVIEWED THE DATA AND MADE -- AND COME UP -- AND UNDERSTOOD THAT THERE WAS AN ACCOUNTING ISSUE AND REPORTED IT OUT.

NOW, I HAVE REAL PROBLEMS WITH THAT THEORY.  I'M NOT SURE IT'S PLAUSIBLE.

BUT LET'S FOCUS ON DR. MULPURI HERE AS TO -- HE CERTAINLY HAD ACCESS TO EVERYTHING.  AND WE'RE NOT DEALING WITH SCIENTER FOR HIM BECAUSE HE'S NOT CHARGED IN THE 10(B) CLAIM.

BUT IN TERMS OF NEGLIGENCE, THERE IS THIS OVERARCHING NEW NEGLIGENCE THEORY THAT TOOK ME AWHILE TO WRAP MY HEAD AROUND, BUT THAT BASICALLY SAYS, YOU HAD THE WAREHOUSE AVAILABLE TO YOU AND YOU WERE NEGLIGENT BY NOT READING EVERY DOCUMENT, GOING TO BUSINESS SCHOOL AND GETTING A NEW DEGREE IN FINANCE IF YOU ALREADY HAD ONE IN SOMETHING ELSE, AND BECOMING A CPA AND DOING THE GAAP ACCOUNTING AND THEN KNOWING THAT THERE WAS A PROBLEM.

I'M STRUGGLING WITH THAT, WHETHER THAT'S PLAUSIBLE. BUT -- AND I'VE OVERSTATED IT IN YOUR FAVOR NOW, I SUPPOSE, MR. BERRY.  BUT THAT'S WHAT'S GOING ON.

MR. BERRY:  YEAH, AND I ACTUALLY THINK YOU DESCRIBED THE LEAP THAT YOU WOULD HAVE TO MAKE CORRECTLY HERE.

I ACTUALLY THINK THE DATA ROOM IS SPECIFIC TO, IF I UNDERSTAND THE COMPLAINT, IS SPECIFICALLY THE CANTOR FITZGERALD DEFENDANT.

THE COURT:  IT IS TALKED ABOUT THERE, BUT I DON'T KNOW WHY IT WOULDN'T APPLY TO DR. MULPURI.

MR. BERRY:  I THINK THEY DO ALLEGE THAT HE KNEW THAT THEY WERE PAYING FOR THE INSTALLATION COSTS.

THE COURT:  HE JUST HAD ACTUAL KNOWLEDGE, OKAY.

MR. BERRY:  THEY ALLEGE IT.

BUT THE PROBLEM IS THEY DON'T ALLEGE WHY THAT WOULD SHOW HIM TO BE NEGLIGENT ON AN ACCOUNTING ISSUE.

THE COURT:  OKAY.

MR. BERRY:  KNOWING THAT THE COMPANY IS PAYING

INSTALLATION COSTS IS A FAR CRY FROM NEGLIGENTLY MISSTATING THE ACCOUNTING FOR THE ACCRUAL APPLYING VERY COMPLEX GAAP RULES. AND SO IT'S THE LACK OF PARTICULARITY ABOUT WHAT THIS MEANS ABOUT THAT KNOWLEDGE.

JUST -- YOU KNOW, ONE WAY TO THINK ABOUT IT, YOUR HONOR, IS IF MERE KNOWLEDGE THAT THE COMPANY IS PAYING THESE COSTS IS ENOUGH, THEN EVERYBODY IN THE COMPANY WHO KNEW THIS WOULD BE SUSCEPTIBLE TO NEGLIGENT FRAUD, AND THAT DOESN'T MAKE ANY SENSE.

AND IF YOU LOOK AT WHAT THE S.E.C. DID, I THINK THAT JUST UNDERSCORES MY POINT.

THE COURT:  YOU WOULDN'T NEED AUDITORS WHO ARE SPECIALLY TRAINED IF EVERYBODY KNOWS HOW TO REPORT GAAP.

MR. BERRY:  EXACTLY.  AND THERE ARE NO ALLEGATIONS IN THE COMPLAINT THAT HE -- AGAIN, NOT ONLY NO ALLEGATIONS HE WAS INVOLVED IN THE GAAP DECISIONS, THAT HE EVEN UNDERSTOOD WHAT THE GAAP STANDARDS WERE, AND I THINK THOSE ARE CRITICAL TO BE ABLE TO MAKE OUT A NEGLIGENCE CLAIM AGAINST DR. MULPURI.

AND IF YOU LOOK AT WHAT THE S.E.C. DID, YOUR HONOR, THEY INVESTIGATED THIS FOR TWO YEARS.

THE COURT:  RIGHT.

MR. BERRY:  THEY DIDN'T CHARGE DR. MULPURI WITH ANYTHING, NOT EVEN NEGLIGENCE IN THEIR CASE, AND I THINK THAT'S CONSISTENT WITH WHAT THE SECOND AMENDED COMPLAINT IS DOING.

THE COURT:  OKAY.

MR. BERRY:  IT DOESN'T HAVE THE ALLEGATIONS THERE.
SO THAT'S --

THE COURT:  OKAY.  I'M HOPING TO FINISH UP ALL OF THE
DEFENDANTS' INITIAL PRESENTATION BY 11:00.  IS THAT DOABLE?
AND I'VE TAKEN A LOT OF YOUR TIME.  I RECOGNIZE THAT.

MR. BERRY:  I THINK I CAN WRAP UP PRETTY QUICKLY
BECAUSE I KNOW MS. WHITE IS GOING TO TALK ABOUT MR. PRAKASH AS
WELL.

THE COURT:  SURE.

MR. BERRY:  I JUST WANT TO HAMMER SOME POINTS,
BECAUSE THEY ARE ARGUING THAT MY CLIENT, VIEW, CAN BE HELD
LIABLE FOR HIS CONDUCT, SO LET ME JUST BRIEFLY TALK ABOUT HIM.

I SAID THERE WERE THREE SETS OF ALLEGATIONS, NEW SETS OF
ALLEGATIONS, AND I SAID TWO OF THOSE --

THE COURT:  YOU'RE TALKING ABOUT THE CONTROL PERSON
SECTION 28 CLAIM AS IT RELATES TO THE 10(B) NOW?

MR. BERRY:  THAT -- PART OF THAT AS WELL, PART OF
JUST THEIR ARGUMENT, JUST GENERAL IMPUTATION OF CONDUCT OF AN
OFFICER TO A COMPANY.

THE COURT:  OKAY.

MR. BERRY:  THAT'S WHAT THEY'RE ARGUING.

SO I MENTIONED HOW THERE ARE THREE SETS OF NEW ALLEGATIONS
AND HOW TWO OF THOSE HAVE NOTHING TO DO WITH DR. MULPURI, AND
THE ONE SET THAT DOES ISN'T EVEN CLOSE TO PARTICULAR ENOUGH FOR
DR. MULPURI.

THESE THREE SETS OF NEW ALLEGATIONS DO DISCUSS MR. PRAKASH, ALL THREE.

BUT THE BIGGEST AND MOST MEATY OF THEM IS COPIED AND PASTED FROM THE S.E.C. COMPLAINT, AND THERE ARE TWO PROBLEMS WITH THESE COPIED AND PASTED ALLEGATIONS.

ONE PROBLEM OBVIOUSLY IS THAT THEY ARE COPIED AND PASTED.

THE OTHER PROBLEM IS THEY DON'T HAVE THE PARTICULARITY REQUIREMENT, AND I'M GOING TO GET INTO THAT FOR SCIENTER AND NEGLIGENCE CLAIMS.

NOW, JUST REAL QUICK ON THE COPY AND PASTING.  I MENTIONED WHERE THESE PARAGRAPHS ARE.  IT IS -- NOWHERE DOES LEAD PLAINTIFF IN THE COMPLAINT, BUT ALSO THEY DON'T EVEN SAY IT IN THE OPPOSITION BRIEF AFTER WE POINTED THIS OUT, NOWHERE DO THEY SAY THAT THEY DID AN INDEPENDENT VERIFICATION OF THESE ALLEGATIONS.

AND, YOUR HONOR, YOU CAN LOOK AT THESE ALLEGATIONS.  THEY ARE LITERALLY WORD FOR WORD COPIED AND PASTED.  AND THEY HAVE REFERENCES TO EMAILS.  FOR EXAMPLE, THERE'S A JANUARY 2021 EMAIL THAT THEY REFERENCE, AN APRIL 2021 EMAIL THAT THEY REFERENCE INVOLVING MR. PRAKASH, ALLEGATIONS COPIED WORD FOR WORD FROM THE COMPLAINT.

THERE'S NOTHING IN THEIR COMPLAINT AND THERE'S NOTHING IN THEIR OPPOSITION BRIEF WHERE THEY SAY THEY ACTUALLY SAW OR VERIFIED THE CONTENTS OF THESE EMAILS TO MAKE THAT KIND OF ALLEGATION.

AND THAT'S EXACTLY WHAT RULE 11 REQUIRES.  YOUR HONOR, YOU FACED A SIMILAR SITUATION IN THE GOOGLE RICO TRADE SECRET CASE, THE ATTIA V. GOOGLE CASE, AND YOUR HONOR SAID THAT WHAT THEY'RE SUPPOSED TO DO UNDER RULE 11 IS, AND I'M QUOTING, "SPEAK DIRECTLY TO THE SOURCES OR EXAMINE THE DOCUMENTS CITED IN THE ALLEGATIONS."

THAT'S WHAT RULE 11 REQUIRES, AND THEY DIDN'T DO THAT, AT LEAST THEY DON'T SAY THEY EVER DID THAT.

NOW, I SHOULD POINT OUT, IT DOES NOT MATTER, IN CASE YOU'RE CURIOUS, THAT THIS IS A CASE -- THAT THE COMPLAINT THAT THEY'RE COPYING AND PASTING FROM IS FROM THE GOVERNMENT.  MAYBE IT'S BECAUSE I WAS AT THE S.E.C., SO I CAN SAY THIS WITH A STRAIGHT FACE, BUT THAT DOESN'T MATTER.  RULE 11 IS AGNOSTIC TO THE SOURCE.

THE COURT:  YEAH.

MR. BERRY:  SO WE CITE THE CANAGUS COURT CASE WHICH IS OUT OF THIS DISTRICT.  JUDGE ILLSTON DEALT WITH THE EXACT SAME THING.  THE PLAINTIFF COPIED AND PASTED FROM THE S.E.C. COMPLAINT AND WAS NEVER ABLE TO ALLEGE AND NEVER SAID IN THEIR PAPERS THAT THEY VERIFIED IT INDEPENDENTLY, AND SO THOSE THINGS HAD TO BE STRUCK.

SO OUR POSITION IS THAT THIS THIRD SET, THE MOST MEATY OF THE ONES THAT THEY ADDED TO THE COMPLAINT, MUST BE DISREGARDED UNDER RULE 11.  YOU CAN'T DO THIS.

NOW, IF YOU TAKE THOSE OUT, THEN YOU'RE ONLY LEFT WITH THE

NOVEMBER PRESS RELEASE AND THE ALLEGATIONS ABOUT THE ABOVE AND BEYOND PRACTICE OF PAYING FOR THE INSTALLATION COSTS.

SO JUST REAL QUICKLY, YOU MENTIONED YOU HAD SOME CONCERN ABOUT THIS NOVEMBER PRESS RELEASE THAT DOES HAVE A FINDING --

THE COURT:  YEAH.

MR. BERRY:  -- THAT THE FINANCE TEAM INTENTIONALLY WITHHELD INFORMATION AND NEGLIGENTLY ACCOUNTED FOR THE WARRANTY ACCRUAL.

BUT ALL THE -- ALL THOSE TWO FINDINGS SAY IS THE FINANCE TEAM AND MR. PRAKASH ACTED NEGLIGENTLY AND INTENTIONALLY WITHHELD INFORMATION.

THEY DON'T HAVE ANY PARTICULARS OTHER THAN THAT.  THERE'S NO WHO, WHAT, WHEN, WHERE, OR HOW, ANYTHING, NO DETAILS AT ALL.

AND COURTS HAVE ADDRESSED THIS SITUATION AND SAID YOU CAN'T USE A PRESS RELEASE WITH A ONE LINER LIKE THIS TO ESTABLISH SCIENTER IN A CASE.  WE CITE THE NINTH CIRCUIT CASE OF GLAZER CAPITAL MANAGEMENT.  THERE THERE WAS A NON-PROSECUTION AGREEMENT WITH THE D.O.J.  THE COMPANY ADMITTED IN THAT AGREEMENT, IN A PUBLIC AGREEMENT, THAT ITS NEW EMPLOYEES WERE BRIBING FOREIGN OFFICIALS AND THAT THEY HAD IMPROPERLY ACCOUNTED FOR THE ACCOUNTING.

AND THE NINTH CIRCUIT AFFIRMED THE DISTRICT COURT RULING WHICH SAID THAT CAN'T ESTABLISH SCIENTER.  IT DOESN'T SATISFY THE PSLRA BECAUSE IT DOESN'T HAVE ANY OF THE PARTICULARS OR SPECIFICS.  YOU'VE GOT TO DO A LOT MORE IN A PRIVATE LAWSUIT

THAN JUST SAY THERE'S A PRESS RELEASE OUT THERE THAT THE COMPANY SAID THERE WAS SOME NEGLIGENCE.  THAT DOESN'T WORK.

AND THEN THE ABOVE AND BEYOND ALLEGATIONS, IF YOU LOOK AT THOSE SET, THERE ARE ONLY TWO THAT ACTUALLY TALK ABOUT MR. PRAKASH, AND THAT'S PARAGRAPH 8 AND PARAGRAPH 190.  AND ALL THEY SAY -- THEY SAY THE SAME THING -- WAS THAT THIS PRACTICE OF PAYING -- THIS ABOVE AND BEYOND PRACTICE OF PAYING INSTALLATION COSTS WAS, AND I QUOTE, WIDELY KNOWN BY VIEW'S LEADERSHIP, INCLUDING MR. PRAKASH.  THAT'S IT.

THERE ARE NO ALLEGATIONS IN THE COMPLAINT, IF YOU TAKE OUT THE STRICKEN COPIED AND PASTED ALLEGATIONS, OF HOW HE WOULD HAVE LEARNED ABOUT THIS PRACTICE, WHO TOLD HIM, WHAT EXACTLY DID HE KNOW, OR WHEN HE LEARNED IT.  IT'S JUST A BLANKET STATEMENT.

THE COURT:  WELL, I GUESS I'M STRUGGLING WITH THIS BECAUSE THIS WAS A BOARD DECISION.  IT'S ALLEGED TO HAVE BEEN A BOARD DECISION, AND THE SENIOR OFFICERS WOULD HAVE BEEN PRESENT AT THE BOARD MEETING.

SO "WIDELY" DOESN'T HELP ME MUCH.  I AGREE THAT'S NOT A HELPFUL THING.

BUT IT'S NOT LIKE MR. PRAKASH IS SOME, YOU KNOW, YOUNG MEMBER OF THE ACCOUNTING DEPARTMENT BURIED SOMEWHERE IN THE BASEMENT TO BE WIDELY KNOWN.

THESE ARE THE SENIOR EXECUTIVES OF THE COMPANY KNOWING THE, THE DECISION OF THEIR BOARD TO COVER THE WARRANTY, THE

COSTS AND INSTALLATION RETROACTIVELY AND GOING FORWARD.

MR. BERRY:  I DON'T THINK -- AND I MAY BE WRONG -- I DON'T THINK THE COMPLAINT, BECAUSE I THINK IT WOULD BE INCORRECT, IS ALLEGING THAT THE BOARD IS THE ONE THAT DETERMINED THE ACCOUNTING TREATMENT FOR THIS WARRANTY ACCRUAL.

THE COURT:  NOT THE ACCOUNTING TREATMENT, BUT THE DECISION TO PAY THE COSTS.

MR. BERRY:  I DON'T THINK IT SAYS THAT EITHER.

I THINK WHAT IT SAYS IS THAT THE MANAGEMENT TEAM GOT TOGETHER, MAINLY DR. MULPURI AND THEIR OPERATING OFFICER, MR. BAMMI, GOT TOGETHER AND DECIDED, WE'RE A YOUNG COMPANY AND --

THE COURT:  OH, OKAY.

MR. BERRY:  -- WE NEED TO PAY THESE COSTS.  SO THE MANAGEMENT TEAM DID.

BUT THE BOARD DID NOT DO THAT.

THE COURT:  BUT IT IS ALLEGED THAT MR. PRAKASH CONSULTED WITH OTHERS TO CONFIRM THAT THESE COSTS WERE GOING TO BE PAID.  SO HE KNEW AND HE TALKED TO OTHERS AND CONFIRMED THAT THESE COSTS WERE GOING TO BE PAID.

SO I -- SO IT WAS CLEARLY KNOWN, AND IT'S ALLEGED THROUGH THE NOVEMBER PRESS RELEASE THAT IT WAS THEN INTENTIONALLY WITHHELD FROM THE PEOPLE MAKING THE ACCOUNTING DECISIONS.

MR. BERRY:  SO A COUPLE CLARIFICATIONS ON THAT, YOUR HONOR.

ONE, THE PRESS RELEASE SAYS THAT MR. PRAKASH AND THE FINANCE TEAM INTENTIONALLY WITHHELD INFORMATION -- IT DOESN'T SAY WHAT -- FROM THE BOARD ABOUT THE ACCOUNTING ACCRUAL.

THE COURT:  WELL, I THINK IT SAYS MORE THAN JUST INFORMATION, AND I DON'T --

MR. BERRY:  IT SAYS INFORMATION ABOUT THE ACCRUAL.  I FORGET THE EXACT LANGUAGE.

THE COURT:  INFORMATION ABOUT THE ACCRUAL, YES.

MR. BERRY:  BUT THE BOARD WASN'T MAKING A DECISION ABOUT THE ACCRUAL ITSELF.

THE COURT:  OKAY.

MR. BERRY:  SO MANAGEMENT HAD MADE THAT --

THE COURT:  WITHHELD FROM THE AUDITORS, TOO, THOUGH. DOESN'T IT SAY --

MR. BERRY:  AND THEY WITHHELD INFORMATION FROM THE AUDITORS AS WELL.

THE COURT:  RIGHT.

MR. BERRY:  OKAY.  BUT I THINK WHAT THE NINTH CIRCUIT IN GLAZER IS SAYING IS THAT'S NOT ENOUGH, YOU'VE GOT TO HAVE MORE.

AND RIGHT NOW, I'M TALKING IN THE REGIME, IF YOU TAKE OUT THE COPIED AND PASTED ALLEGATIONS BECAUSE THEY DON'T SATISFY RULE 11 --

THE COURT:  UM-HUM.

MR. BERRY:  -- YOU DON'T HAVE ANYTHING ELSE.  YOU'VE

GOT A ONE SENTENCE, ONE PARAGRAPH ALLEGATION THAT QUOTES THIS PRESS RELEASE, AND THEY HAD TWO MORE PARAGRAPHS THAT JUST SAYS HE KNEW ABOUT THE PRACTICE.  THAT'S IT.

IT DOESN'T SAY HOW HE LEARNED ABOUT THE PRACTICE, WHAT -- IT DOESN'T EVEN SAY THAT MR. PRAKASH UNDERSTOOD THAT THIS PRACTICE WOULD IMPACT THE ACCOUNTING, WHICH IS AN IMPORTANT ALLEGATION IN AN ACCOUNTING FRAUD CASE.  THEY NEED TO ALLEGE WITH PARTICULARITY THAT HE ACTUALLY KNEW OR SHOULD HAVE KNOWN FROM THE NEGLIGENCE CASE HOW THIS COULD POSSIBLY HAVE IMPACTED THE ACCOUNTING UNDER VERY COMPLICATED GAAP RULES.

SO THAT'S WHAT'S MISSING.  THOSE ARE PRETTY FUNDAMENTAL ALLEGATIONS IN AN ACCOUNTING FRAUD CASE THAT ARE COMPLETELY DEVOID FROM THIS COMPLAINT.

NOW, I GUESS JUST REAL QUICK, THAT'S ALL -- IF YOU STRIKE THE ALLEGATIONS, THEY'RE LEFT WITH THREE PARAGRAPHS ABOUT MR. PRAKASH AND THEY'RE PRETTY BARE BONES, WAY TOO BARE BONES TO SATISFY THE PSLRA.

BUT IF YOU INCLUDE THE ALLEGATIONS FROM THE S.E.C. COMPLAINT, IT'S STILL, I THINK -- AND I KNOW MS. WHITE IS GOING TO GET INTO THIS SO I'LL SAY THIS QUICKLY -- IT STILL DOESN'T ALLEGE SCIENTER OR NEGLIGENCE AGAINST MR. PRAKASH, AND I THINK THEY CERTAINLY DON'T ALLEGE SCIENTER.

THE S.E.C. PLEADED A NEGLIGENCE CASE AGAINST HIM.

NOW, IF THE S.E.C. CAN'T PLEAD A SCIENTER CASE BASED ON THESE ALLEGATIONS, I DON'T SEE WHY COPYING THEM AND PASTING

THEM IN THIS CASE ALL OF A SUDDEN MAGICALLY MAKES THEM NOW PLEADING A SCIENTER CASE.

AND THEY DON'T PLEAD SCIENTER BECAUSE THEY DON'T HAVE ANYTHING THAT DESCRIBES HIM KNOWING -- IF YOU WANT TO PLEAD SCIENTER, AN INTENTIONAL ACCOUNTING FRAUD CASE, THEY NEEDED TO HAVE SAID THE PARTICULARS OF HOW HE KNEW THAT THIS PRACTICE WAS GOING TO ACTUALLY IMPACT THE GAAP ACCOUNTING, AND THAT'S COMPLETELY ABSENT FROM THIS COMPLAINT.

NOW, REAL QUICK, I KNOW YOUR HONOR DID SAY IN THE S.E.C. CASE, WELL, THEY DO PLEAD NEGLIGENCE.

THE COURT:  YEAH.

MR. BERRY:  LET ME EXPLAIN BRIEFLY WHY THAT HOLDING DOESN'T APPLY HERE, AND THIS IS IMPORTANT BECAUSE THE S.E.C. HAS A FAR LOWER PLEADING STANDARD THAN PRIVATE PLAINTIFFS IN A PSLRA CASE.  THEY DON'T HAVE TO FOLLOW THE PSLRA, BUT STADIUM CAPITAL DOES.

AND THE THEORY OF THIS NEGLIGENCE CASE IS THAT THE FINANCE TEAM DIDN'T KNOW ABOUT THE PRACTICE OF PAYING FOR THESE INSTALLATION COSTS, AND THE THEORY IS THAT MR. PRAKASH WAS NEGLIGENT BY NOT ENSURING -- THAT'S THE LANGUAGE THEY USE IN THE CLAIM, HE FAILED TO ENSURE IS THE LANGUAGE THEY USE -- TO MAKE SURE THAT THE FINANCE TEAM KNEW ABOUT THIS PRACTICE BECAUSE THEY ALLEGE HE DID KNOW.

AND HERE'S THE KEY:  THE S.E.C. COMPLAINT AND THE COMPLAINT HERE, BECAUSE THEY COPIED IT, DOES NOT ALLEGE THAT

THE FINANCE TEAM ACTUALLY DIDN'T KNOW ABOUT THIS PRACTICE. IT'S NEVER STATED IN THE COMPLAINT.  THEY DON'T ALLEGE ANY DETAILS OF WHY OR HOW THIS FINANCE TEAM WOULDN'T KNOW ABOUT THIS FACT WHEN THE COMPLAINT IS ALSO SAYING THAT IT WAS WIDELY KNOWN AT THE COMPANY.

AND IF I UNDERSTAND YOUR HONOR'S ORDER IN THE S.E.C. CASE, YOUR HONOR CONCLUDED THAT IT WAS OKAY THAT THE S.E.C. CASE DIDN'T HAVE THIS SORT OF BASIC ALLEGED FACT BECAUSE YOU COULD MAKE AN INFERENCE FROM THE OTHER GENERAL ALLEGATIONS IN THE S.E.C.'S CASE.

BUT THE PSLRA DOESN'T ALLOW PRIVATE PLAINTIFFS TO MAKE THAT KIND OF LEAP.  THEY'VE GOT TO ALLEGE MUCH MORE DETAIL OF HOW IT CAME TO BE THAT THE FINANCE TEAM WOULD NOT KNOW THAT THE PRACTICE WAS TO PAY FOR THESE COSTS WHEN EVERYBODY ELSE DID. THERE'S NOTHING IN THE COMPLAINT ABOUT THAT.

YOU CAN MAKE THE INFERENTIAL LEAP IN A LOWER STANDARD S.E.C. CASE, BUT YOU CAN'T DO THAT HERE.  AND SO THAT'S WHY I THINK EVEN WITH THE NEGLIGENCE CASE, EVEN IF IT'S COPIED AND PASTED FROM THE S.E.C. CASE, IT DOESN'T PLEAD A NEGLIGENCE CASE AGAINST MR. PRAKASH.

SO I HAVE TALKED WAY TOO MUCH, SO I'M GOING TO STOP NOW AND LET MY CO-DEFENDANTS' COUNSEL TALK, UNLESS YOU HAVE ANY QUESTIONS FOR ME.

THE COURT:  WE'LL COME BACK.

MS. WHITE, I UNDERSTOOD YOU WERE GOING TO BE SECOND.

MS. WHITE:  I AM.  THANK YOU, YOUR HONOR.

AND BECAUSE MR. BERRY ALREADY TALKED ABOUT A LOT OF THIS, I'LL TRY TO KEEP MY COMMENTS POINTED AND BRIEF.

BUT ONE POINT MR. BERRY MADE, WHICH I THINK IS REALLY IMPORTANT FOR THE COURT TO KEEP FOCUSSED ON, IS WHAT THE CLAIMS ARE HERE ABOUT MR. PRAKASH.  IT'S NOT A CLAIM THAT HE KNEW THE GAAP REQUIRED FOR THE INSTALLATION COSTS, FOR THE WARRANTY RELATED TO THE INSTALLATION COSTS.  AS MR. BERRY SAID, THOSE ARE VERY COMPLEX ACCOUNTING JUDGMENTS, AND THERE IS NO ALLEGATION IN THE COMPLAINT HERE THAT WHAT HE UNDERSTOOD, THAT THE RIGHT WARRANTY ACCRUAL WAS TO INCLUDE THE INSTALLATION COSTS IN THE WARRANTY ACCRUAL.

AND, IN FACT, WHAT HE DOES AND WHAT WE HAVE ARE ALLEGATIONS THAT HE COMPILED A TEAM OF FINANCE AND ACCOUNTING EXPERTS TO HELP HIM MAKE A DETERMINATION OF WHAT WAS THE RIGHT ACCOUNTING.

THERE IS NO INDICATION IN THE COMPLAINT -- IT'S THE EXACT OPPOSITE -- THAT HE WAS NEGLIGENT AT FAILING TO GET THE RIGHT EXPERTS TO HELP ADVISE HIM ABOUT HOW TO MAKE THE WARRANTY ACCRUAL, WHAT WAS AN APPROPRIATE WARRANTY ACCRUAL.

SO WHAT THE ALLEGATION REALLY IS IS THAT, AS MR. BERRY SAID, THAT HE FAILED TO ENSURE THAT THE WARRANTY ACCOUNTING -- THAT THE ACCRUAL TEAM UNDERSTOOD THAT THE COMPANY HAD A PRACTICE OF PAYING FOR THE INSTALLATION COSTS.

AND THE ONLY ALLEGATION THAT THE PLAINTIFFS HAVE WITH

THAT -- IN REGARD TO THAT IS PARAGRAPH 210, I BELIEVE, WHERE THEY JUST ADOPT WHOLESALE THE CONCLUSION BY THE S.E.C.  AS MR. BERRY SAID, WE DO NOT THINK THAT SATISFIES THE REFORM ACT'S PARTICULARITY REQUIREMENT OR THE VERY DIFFERENT STANDARD FOR THE S.E.C.

IN ADDITION, THOUGH, THERE ARE NEW ALLEGATIONS IN THIS COMPLAINT WHICH ARE -- FROM WHICH THE COURT, WE BELIEVE, SHOULD DRAW THE OPPOSITE INFERENCE, THAT THE WARRANTY ACCRUAL TEAM, IN FACT, DID KNOW ABOUT THE COMPANY'S PRACTICE, IT WAS JUST EVERYBODY WAS GETTING THE GAAP STANDARD WRONG.  IT WASN'T AN INTENTIONAL DECISION.  IT WAS A COMPLEX ACCOUNTING JUDGMENT WHERE THEY GOT IT WRONG.

AND WE WOULD POINT THE COURT PARTICULARLY TO PARAGRAPHS 190 AND 191, WHICH HAVE ALREADY BEEN DISCUSSED, WHERE IT SAYS IT WAS WIDELY KNOWN, AND INCLUDED IN THOSE PARAGRAPHS, IT SAYS BOTH THE FINANCE TEAM AND THE ACCOUNTING TEAM KNEW ABOUT THE COMPANY'S PRACTICE RELATING TO INSTALLATION COSTS.

SO IF AN INFERENCE IS DRAWN ABOUT WHAT THE WARRANTY ACCOUNTING ACCRUAL TEAM KNEW, IN THIS INSTANCE AND FROM THIS COMPLAINT, IT SAID THEY DID KNOW ABOUT THE COMPANY'S PRACTICE, THEY JUST ENDED UP GETTING IT WRONG.

THAT IS NOT A NEGLIGENCE CLAIM AND IT'S NOT, CERTAINLY NOT A CLAIM FOR -- IT DOESN'T SATISFY THE REQUIREMENTS FOR SCIENTER.

AND THEN TURNING BRIEFLY, YOUR HONOR, TO THIS -- TO THE

10(B) CLAIM, THE -- AGAIN, I THINK IT'S IMPORTANT TO REALLY, TO UNDERSTAND WHAT THE CLAIM IS THERE -- IS THAT THEY WOULD HAVE TO SHOW THAT HE HAD INTENT TO MAKE MISLEADING STATEMENTS, RIGHT, TO MAKE MISLEADING STATEMENTS TO THE INVESTORS ABOUT WHAT THE -- WHAT HE BELIEVED THE WARRANTY ACCRUAL SHOULD BE.

THEY DO NOT COME CLOSE TO ALLEGING THAT.  AS WE'VE GONE OVER BEFORE, THEY DON'T HAVE ANY PARTICULARIZED ALLEGATIONS OF C.W.'S, NO STOCK SALES, NO MOTIVE, NO EXPLANATION FOR WHY MR. PRAKASH WOULD DO THAT.  THERE'S NO ALLEGATIONS ABOUT WHAT HE UNDERSTOOD THE APPROPRIATE GAAP RULES WERE OR THAT IT WAS SO STRAIGHTFORWARD THAT HE SHOULD HAVE KNOWN.

AND, IN FACT, WHAT WE DO HAVE IS THAT AFTER THE INVESTIGATION, AS MR. BERRY SAID, THE S.E.C. DECIDED IT WAS A NEGLIGENCE CLAIM AND, IN FACT, THAT'S EXACTLY WHAT THE AUDIT COMMITTEE DECIDED AND WAS IN THE PRESS RELEASE.

THE PRESS RELEASE ALSO SAYS THAT HE AND THE FINANCIAL TEAM INTENTIONALLY WITHHELD CERTAIN INFORMATION -- SO UNDEFINED INFORMATION, THAT'S ALL THEY SAY -- FROM THE BOARD AND FROM THE OUTSIDE AUDITORS, NOT THE INTERNAL AUDITORS, ABOUT THE ISSUES RELATED TO THE WARRANTY ACCRUAL.

THAT'S IT.  THERE'S NO OTHER INFORMATION ABOUT WHAT THAT INFORMATION WAS, OR REALLY IF IT WENT TO HIS INTENT TO MAKE MISLEADING STATEMENTS TO THE -- TO VIEW'S INVESTORS.

THE COURT:  OKAY.  ANY OTHER COMMENTS YOU WISH TO MAKE, OR SHOULD I TURN TO MR. STEINFELD?

MS. WHITE:  I'LL LET YOU TURN TO MR. STEINFELD.

THE COURT:  OKAY.

SO, MR. STEINFELD, I AM GOING TO INTERRUPT YOU IN ABOUT 15 MINUTES IF YOU DON'T MIND, BUT I'M NOT GOING TO CUT YOU OFF. I'LL JUST NEED TO TAKE A BREAK FOR THIS OTHER CASE I HAVE.

MR. STEINFELD:  SURE, YOUR HONOR, AND I APPRECIATE THAT.  I'LL TRY MY BEST, BUT I'M NOT SURE I'LL BE ABLE TO COMPLETE IN 15 MINUTES.  BUT I -- I'LL TRY TO SYNTHESIZE.

THE COURT:  WELL, I ACTUALLY HAVE -- I FIND THIS PART OF IT TO BE CONFUSING BECAUSE THERE'S SO MANY DIFFERENT DEFENDANTS, AND I KNOW I HAVE TO CONSIDER THEM INDIVIDUALLY. THIS IS WHERE I'M THINKING THAT I MAY MAKE SOME CUTS, SO I WANT TO MAKE SURE I'M DOING IT RIGHT.

MR. STEINFELD:  SURE.  LET'S SPEND AS MUCH TIME AS NECESSARY THEN.

SO I WANT TO START, I THINK TO YOUR POINT, ABOUT THE NUMBER OF DEFENDANTS AND PARTIES AND JUST TO REFRESH THE RECORD ON WHO THE CF DEFENDANTS ARE AND WHO THEY ARE NOT.

AND AS YOUR HONOR KNOWS, THIS CASE INVOLVES A MERGER BETWEEN A SPAC, WHICH WAS CALLED CF FINANCE ACQUISITION CORP. II -- AND THE SHORTHAND FOR THAT I THINK HAS BEEN CF II -- AND A PRIVATE OPERATING COMPANY NAMED VIEW THAT WE CAN SAY BEFORE THE MERGER, THAT'S LEGACY VIEW, AND THEN WE CAN REFER TO POST-MERGER VIEW AS JUST VIEW.

THE COURT:  UM-HUM.

MR. STEINFELD:  THERE'S NO ALLEGATION, NOR COULD THERE BE, THAT THIS WAS AN INTERESTED PARTY TRANSACTION OR ANYTHING OF THAT NATURE.  THE SPAC CF II WAS COMPLETELY DISTINCT FROM VIEW BEFORE THE MERGER.  THIS WAS AN ARM'S LENGTH COUNTERPARTY AND ARM'S LENGTH MERGER.

THE CF DEFENDANTS, IMPORTANTLY, DO NOT INCLUDE THE SPAC. MY CLIENTS DO NOT INCLUDE CF II.  CF II BECAME VIEW.  SO THE ENTITY DEFENDANT VIEW IS REPRESENTED BY MR. BERRY.

THE CF DEFENDANTS, THE CF INDIVIDUALS, WERE THE DIRECTORS OF THE SPAC, BUT ONLY DURING THE TIME IT WAS THE SPAC.  THEY HAD NO INVOLVEMENT WITH LEGACY VIEW, NOR DID THEY HAVE ANY INVOLVEMENT WITH VIEW POST-MERGER, UNLIKE OTHER SPAC TRANSACTIONS WHERE SOMETIMES THE SPAC'S DIRECTORS JOINED THE TARGET'S BOARD.  THAT DID NOT OCCUR HERE, IT'S NOT ALLEGED TO HAVE OCCURRED HERE.

THE CF ENTITIES THAT I REPRESENT, AGAIN, NOT THE SPAC, ARE CF & CO., WHICH WAS THE FINANCIAL ADVISOR TO CF II, SITTING ACROSS THE TABLE FROM VIEW, FROM LEGACY VIEW.

THE OTHER ENTITIES ARE THE, WHAT WE'LL CALL THE SPONSOR. AND JUST SO WE'RE CLEAR WHAT I'M REFERRING TO WHEN I SAY "SPONSOR," THAT'S CF FINANCIAL HOLDINGS II LLC, AND AT THE TIME OF THE ALLEGED WRONGDOING, AT THE TIME OF THE MERGER FOR THE SECTION 14 CLAIM, SPONSOR WAS A MINORITY SHAREHOLDER OF THE PUBLICLY TRADED COMPANY.

THE OTHER ENTITY DEFENDANTS ON THE CF SIDE ARE

CANTOR FITZGERALD LP, WHICH IS ALLEGED TO BE AN AFFILIATE OF SPONSOR; AND THEN CF GM IS ALLEGED TO BE AN AFFILIATE OF CANTOR FITZGERALD LP.

SO THESE ENTITIES ARE MULTIPLE LEVELS SEPARATED FROM THE SPAC, AND IN THE CASE OF CF & CO., IT'S KIND OF OFF TO THE SIDE AS AN ADVISOR.  SO THESE ARE NOT PARTIES THAT HAVE ANY NATURAL INSIGHT OR ABILITY TO KNOW ANYTHING ABOUT VIEW.  THEY'RE JUST AN ARM'S LENGTH MERGER PARTY.

THE CLAIMS HERE, AND WHAT'S LEFT OF THE CLAIMS, WHICH IS JUST THE SECTION 14 CLAIM AND THEN CONTROL CLAIMS -- THE SECURITIES ACTS CLAIMS, AS YOUR HONOR KNOWS, HAVE BEEN DISMISSED AND WE WERE NEVER -- NONE OF OUR CLIENTS WERE EVER IN THE 10(B) CLAIM FOR AT LEAST FOUR INDEPENDENT REASONS.

NEGLIGENCE -- THERE ARE NO ALLEGATIONS OF NEGLIGENCE SUFFICIENT TO OVERCOME THE 9(B) PLEADING STANDARD, OR REALLY ANY PLEADING STANDARD.

AND JUST BRIEFLY ON THAT POINT AND THEN I'LL DIVE IN, I THINK AS MR. BERRY NOTED, YOUR HONOR PREVIOUSLY DETERMINED -- AND THIS IS ON PAGE 23 OF YOUR PRIOR ORDER -- THE CONDUCT FORMING THE BASIS OF PLAINTIFFS' SECTION 14 CLAIM IS THE SAME AS THE CONDUCT PLAINTIFFS -- CONDUCT PLAINTIFFS FORMING THE BASIS OF THE SECTION 10(B) CLAIMS, WHICH CONFIRMS THAT THE SECTION 14 CLAIM IS GROUNDED IN FRAUD AND THEREFORE SUBJECT TO RULE 9(B)'S HEIGHTENED PLEADING STANDARD.

THERE -- THE SECOND AMENDED COMPLAINT AS TO MY CLIENTS IS

ESSENTIALLY NO DIFFERENT IN TERMS OF THE GENERAL SCHEME OR ALLEGATION OF WHAT'S MISLEADING, WHICH IS THE WARRANTY ACCRUAL NUMBER, AS THE AMENDED COMPLAINT.

AS MR. BERRY TALKED ABOUT, IF ANYTHING, THERE WAS COPIED AND PASTED ALLEGATIONS FROM AN S.E.C. ACTION THAT DOESN'T MENTION MY CLIENTS AT ALL ADDED TO THE COMPLAINT.

BUT WE DON'T BELIEVE ANYTHING SHOULD CHANGE IN TERMS OF THE 9(B) DETERMINATION.

AND I'LL TALK ABOUT WHY THE ALLEGATIONS FAIL TO SATISFY THE NEGLIGENCE STANDARD HERE IN JUST A MINUTE, BUT JUST TO QUICKLY HIT THE INDEPENDENT REASONS, ON SECTION 14, LOSS CAUSATION, I THINK AS YOUR HONOR SAID AT THE OUTSET, THERE'S REALLY NO DISPUTE THAT LEAD PLAINTIFF HAS NO STANDING TO ALLEGE LOSS CAUSATION IN THIS CASE.

TO HAVE SECTION 14 LOSS CAUSATION, PLAINTIFF HAS TO HOLD SHARES AS OF THE RECORD DATE, AND THEN THEY HAVE TO HOLD THEM THROUGH THE ALLEGED CORRECTIVE DISCLOSURE.

HERE PLAINTIFF DID NOT DO THAT.  PLAINTIFF SOLD THE DAY AFTER THE MERGER.

TWO MORE INDEPENDENT REASONS, EACH ONE THAT APPLIES TO A SUBSET OF MY CLIENTS.

AS TO THE CF ENTITIES, AGAIN, NOT THE SPAC, BUT THE CF DEFENDANT ENTITIES, PLAINTIFF FAILS TO ALLEGE SECTION 14 SOLICITATION.

AND THEN AS TO THE CF INDIVIDUALS, THEY ARE EXCULPATED BY

THE COMPANY'S CHARTER, WHICH CONTAINS AN EXCULPATION PROVISION FOR NEGLIGENCE-BASED CLAIMS, AND I'LL TALK ABOUT THAT IN A LITTLE MORE DETAIL, INCLUDING AS BROUGHT BY THE COMPANY'S SHAREHOLDERS, WHICH IS EXACTLY WHAT THIS ACTION IS.

SO IF WE START WITH THE NEGLIGENCE AND THE FAILURE TO ALLEGE NEGLIGENCE, YOUR HONOR'S PRIOR ORDER ORDERED THE DEFENDANTS TO, QUOTE, MAKE INDIVIDUAL ALLEGATIONS OF NEGLIGENCE AND TO ALLEGE, QUOTE, FOR EACH DEFENDANT THE DUTY THAT THEY OWED TO PLAINTIFF AND HOW THAT DUTY WAS BREACHED.

YET THE S.A.C. STILL RELIES ON BOILERPLATE AND GROUP PLEADING.

THE COURT:  WELL, MR. URIS THAT DOES INDICATE THAT I APPLIED THE WRONG STANDARD HERE, AND I DON'T THINK YOU ADDRESSED THAT.

DO YOU AGREE WITH HIM THAT IN MY PRIOR ORDER, I APPLIED THE WRONG STANDARD.

MR. STEINFELD:  NO, WE DON'T AGREE.

IN RE: OCERA THERAPEUTICS, 2018 WL 7019481 AT 11, PLAINTIFF MUST STILL SATISFY THE PSLRA, QUOTE, BY CLEARLY ARTICULATING THE DUTY EACH DEFENDANT HAD TO PLAINTIFF AND HOW THEIR FAILURE TO SATISFY THAT DUTY GAVE RISE TO NEGLIGENCE, END QUOTE.

THAT DECISION WAS AFFIRMED IN AN UNPUBLISHED NINTH CIRCUIT OPINION.

SO WE BELIEVE THE STANDARD WAS CORRECT AND THEY FAIL TO

APPLY THAT STANDARD.

AND EVEN OUTSIDE OF THAT STANDARD, I THINK IT'S UNDISPUTED THAT GROUP PLEADING DOES NOT SURVIVE THE PSLRA.

THE COURT:  WELL, WITH THE INDIVIDUAL DEFENDANTS, THEY'RE ALLEGED TO EACH HAVE BEEN A BOARD MEMBER OF THE --

MR. STEINFELD:  CORRECT.

THE COURT:  SO ONCE YOU SAY THAT, WHAT CAN YOU SAY ABOUT EACH OF THEM INDIVIDUALLY?

MR. STEINFELD:  WELL, THE -- I UNDERSTAND YOUR HONOR'S QUESTION.

THE COURT:  YEAH.

MR. STEINFELD:  I THINK WHAT THE PSLRA, AND ESSENTIALLY 9(B) REQUIRES, IS MORE THAN JUST THEY'RE A BOARD MEMBER, THEREFORE, THEY HAD DILIGENCE OR DID DILIGENCE --

THE COURT:  OKAY.

MR. STEINFELD:  -- IN TERMS OF WHAT DILIGENCE DID THEY DO OR DID THEY NOT DO, AND WHAT ACTIONS DID THEY TAKE OR NOT TAKE, WHAT DOCUMENTS DID THEY LOOK AT OR NOT LOOK AT?

BUT I CAN TALK ABOUT THAT IN JUST A SECOND.  I JUST WANTED TO SET FORTH THE STANDARD THAT'S OUT THERE.

AND THEN AS TO THE ENTITY DEFENDANTS, AGAIN, THEY, THEY JUST GROUP PLEAD THEM IN TERMS OF THEIR DUTIES AND THEIR ACTIONS.

NOW, YOU SAID THAT THE INDIVIDUALS ARE BOARD MEMBERS, AND THAT'S TRUE.  BUT THEY'RE BOARD MEMBERS OF CF II.

THEY WERE NEVER BOARD MEMBERS OF VIEW OR LEGACY VIEW, SO THEY'RE NOT BOARD MEMBERS OF THE COMPANY OR THE COMPANY WHOSE FINANCIAL STATEMENTS WERE WRONG HERE, OR ALLEGEDLY WRONG HERE.

RATHER, THEY ARE AN ARM'S LENGTH MERGER COUNTER-PARTY.

THEY ARE REMOVED FURTHER FROM THESE MISSTATEMENTS THAN THE COMPANY'S AUDITORS --

THE COURT:  BUT THEY SIGNED THE PROXY STATEMENT, DIDN'T THEY?

MR. STEINFELD:  THEY DID SIGN THE PROXY STATEMENT, YOUR HONOR.

AND THE PROXY STATEMENT, AS ALLEGED BY PLAINTIFF IN PARAGRAPH 215, ALL THE INFORMATION ABOUT VIEW WAS PROVIDED BY VIEW.  AND THE FINANCIAL STATEMENTS THAT WERE PROVIDED IN THE PROXY WERE PROVIDED BECAUSE -- EXCUSE ME -- WERE PROVIDED PURSUANT TO THE REPORT OF PWC, QUOTE, GIVEN ON THE AUTHORITY OF SAID FIRM AS EXPERTS IN AUDITING AND ACCOUNTING WHO CERTIFY THAT VIEW'S FINANCIAL STATEMENTS WERE, QUOTE, IN CONFORMITY WITH GAAP AND WERE FREE FROM MATERIAL MISSTATEMENT, WHETHER DUE TO ERROR OR FRAUD.

AND THE POINT I'M TRYING TO MAKE IS THE CF DEFENDANTS, INDIVIDUALS OR ENTITIES, ARE FURTHER REMOVED FROM THE ACCOUNTING ERRORS THAN THE COMPANY'S AUDITOR, PWC, AND FURTHER REMOVED FROM THE COMPANY'S OUTSIDE DIRECTORS ON THE AUDIT COMMITTEE, BOTH OF WHICH HAVE BEEN DISMISSED FROM THIS CASE.

AND THERE ARE TWO -- THERE ARE -- AND NOT ONLY DID

PLAINTIFF ALLEGE -- AND I DON'T THINK IT'S DISPUTED -- THAT PWC CERTIFIED WHAT I'VE JUST SAID, THE COMPLAINT ALSO ALLEGES AT 243 THAT VIEW, THROUGH ITS MANAGEMENT/DIRECTORS AND VIEW'S EXTERNAL AUDITOR, PWC, REPEATEDLY ASSURED THAT THE COMPANY'S CONSOLIDATED FINANCIAL STATEMENTS WERE PRESENTED IN ACCORDANCE WITH GAAP.

AND SO THERE'S TWO CASES -- JUST A COUPLE MORE ALLEGATIONS AND THEN I'LL TALK ABOUT THE TWO CASES THAT REALLY CONTROL HERE.

PLAINTIFF ALLEGES IN THE S.A.C.'S -- AND THAT'S THE SECOND AMENDED COMPLAINT'S -- CORE THEORY THAT VIEW'S ACCOUNTING STAFF, QUOTE, INTENTIONALLY FAILED TO DISCLOSE CERTAIN INFORMATION REGARDING THE WARRANTY RELATED OBLIGATION TO VIEW'S BOARD, AND TO ITS AUDITOR, PWC, WHO THEN CERTIFIED THE FINANCIAL STATEMENTS.

IT IS NOT REASONABLE THAT AN OUTSIDE COUNTER-PARTY CANNOT RELY ON AUDITED FINANCIAL STATEMENTS OF THEIR COUNTER-PARTY. THE AUDITOR IS THE EXPERT ON THAT.

AND THE OTHER PART THAT THEY'VE ALLEGED IS THAT VIEW'S PERSONNEL, QUOTE, INTENTIONALLY LIED TO PWC, AND THAT'S OPPOSITION AT 22, CITING S.A.C. AT 225 TO 226.  AND, AGAIN, AS I SAID, ALL INFORMATION REGARDING VIEW IN THE PROXY WAS SUPPLIED BY VIEW, S.A.C. AT 215.

SO MCKESSON, WHICH IS 126 F.SUPP. 2D 1248, WHICH WE FOCUSSED A LOT ON IN THE BRIEFING AND WHICH I'LL GET INTO IN A

SECOND, AND ALSO OCERA WE BELIEVE ARE DIRECTLY ON POINT AND SPEAK TO THE ISSUES HERE.

NOW, IT'S JUST ABOUT 11:00.  DOES YOUR HONOR WANT TO BREAK BEFORE I DIVE INTO THESE TWO CASES?

THE COURT:  WHY DON'T WE DO THAT?  THAT WAY YOU CAN COME BACK AND DO THAT.

WHY DON'T WE MAKE THIS, JUST SO THAT YOU KNOW, MAKE THIS A 15 MINUTE BREAK.  DON'T TURN OFF YOUR COMPUTER, JUST TURN OFF YOUR SCREEN AND MUTE YOURSELVES SO THAT I CAN JUST DO THE OTHER, AND WE'LL COME BACK AT 11:15.

MR. STEINFELD:  THANK YOU, YOUR HONOR.

THE COURT:  THANK YOU.

(RECESS FROM 10:59 A.M. UNTIL 11:21 A.M.)

THE COURT:  OKAY.  LET'S BRING EVERYBODY BACK.

ALL RIGHT.  AND -- YES, AND LEE-ANNE IS BACK.

LET'S PICK UP WHERE WE LEFT OFF.

MR. STEINFELD, YOU WERE ABOUT TO TALK TO ME ABOUT THE MCKESSON CASE.  IS THAT WHERE YOU'D LIKE TO PICK UP?

MR. STEINFELD:  THAT IS, YOUR HONOR.

I'D LIKE TO START BY FOCUSSING ON MCKESSON, AND THEN I'LL GET INTO OCERA AND ANSWER ANY QUESTIONS AND HIT A COUPLE DIFFERENT TOPICS.

BUT WE BELIEVE THAT MCKESSON IS ON ALL FOURS AND IS INSTRUCTIVE IN THIS CASE.  THE FACTS IN MCKESSON ARE NEARLY IDENTICAL TO THE FACTS HERE.  MCKESSON INVOLVED A SECTION 14(A)

CLAIM IN A MERGER SITUATION, AND THE CLAIM WAS BROUGHT AGAINST THE, QUOTE, ACQUIRER DEFENDANTS, WHICH IN MCKESSON INCLUDED THE ACQUIRER'S OFFICERS AND DIRECTORS, VERY SIMILAR TO THE CF INDIVIDUALS HERE, AND IT WAS ALSO AGAINST THE ACQUIRER ENTITY ITSELF.

AND IN THAT CASE, AS HERE, THE ALLEGED MISSTATEMENTS WERE FINANCIAL STATEMENTS OF THE TARGET.  AND JUST LIKE THERE, AND HERE, THE AUDITOR IN BOTH PLACES CERTIFIED, AS WE TALKED ABOUT, THAT THE FINANCIAL STATEMENTS OF THE TARGET WERE FREE FROM ERROR, WHETHER DUE -- OR FREE FROM FRAUD AND FREE FROM ERROR AND WERE IN CONFORMITY WITH GAAP.

AND THE ALLEGATION -- AND WHILE THE COURT SAID THAT THE TARGET'S AUDITOR WAS KEPT IN THE DARK ABOUT THE IMPROPRIETIES BY THE RESPONSIBLE TARGET EXECUTIVES WHO HAD HIDDEN INFORMATION FROM THE AUDITORS, AND THAT WHILE THE TARGET'S AUDITOR MAY OR MAY NOT HAVE BEEN NEGLIGENT IN FAILING TO UNCOVER THE ACCOUNTING IMPROPRIETIES, THERE'S NO SUGGESTION IN THE COMPLAINT THAT THE ACQUIRERS COULD HAVE KNOWN, EVEN WITH REASONABLE DILIGENCE, THAT THE TARGET WAS ENGAGED IN MASSIVE ACCOUNTING FRAUD.

AND THAT'S EXACTLY WHAT HAPPENED HERE BECAUSE IT'S THE SAME RELIANCE ON THE TARGET'S AUDITOR.

AND JUST LIKE HERE, IN MCKESSON, THE PLAINTIFFS ALLEGED THAT BETTER DILIGENCE, MORE DILIGENCE, WOULD HAVE TURNED UP THE ALLEGED FRAUD, THE MISSTATEMENTS.  BUT THE COURT STILL

DISMISSED DESPITE THAT ALLEGATION.

AND VERY SIMILAR IN THAT CASE, THERE WERE ALLEGATIONS IN OUR COMPLAINT THAT THE S.E.C. ALLEGES THAT THE TARGET VIEW PREVENTED OTHERS FROM DISCOVERING HIS MISSTATEMENTS BY, QUOTE, MASKING THE COMPANY'S TRUE FINANCIAL CONDITION.  THAT'S 240.

AND IN MCKESSON IT WAS THE TARGET, QUOTE, KEPT OTHERS IN THE DARK ABOUT THE IMPROPRIETIES.

SO WE SEE MCKESSON AS DIRECTLY ON POINT HERE.  IT'S AN ACQUIRER DEFENDANT ON A NEGLIGENCE STANDARD WHERE THERE WAS AUDITED FINANCIALS AND CERTIFIED FINANCIALS, AND THAT'S THE ONLY MISSTATEMENT AT ISSUE.

THE SECOND CASE I WANT TO DISCUSS BRIEFLY IS IN RE: OCERA THERAPEUTICS, 2018 WL 7019481.  OCERA ALSO DISMISSED A SECTION 14 CLAIM INVOLVING A MERGER.  THE COURT FOUND THAT BASED ON ALLEGATIONS IN THE COMPLAINT, IT WAS NOT PLAUSIBLE THAT THE DEFENDANTS WERE NEGLIGENT.

THERE WAS -- AND THIS IS A QUOTE FROM THE CASE:  THERE ARE NO FACTS ALLEGING DEFENDANTS FAILED TO REVIEW CERTAIN MATERIALS OR WERE NEGLECTING THEIR RESPONSIBILITIES OR DESIGNED AND OVERSAW A FLAWED -- REVIEWED A FLAWED REVIEW PROCESS.

INDEED, AS THE CASE DISCUSSED, THE TIMELINE ACKNOWLEDGED IN THE COMPLAINT REFLECTS THE MERGER RESULTED FROM AN EXTENSIVE AND THOROUGH REVIEW PROCESS THAT WAS NOT RUSHED, BIASED, OR CONFLICTED.  THAT'S AT PAGE 10.

THAT'S EXACTLY WHAT'S ACTUALLY ALLEGED HERE IN THE

COMPLAINT.  PARAGRAPH 64 OF THE COMPLAINT SAYS, AND IT'S LENGTHY, DURING THE WEEK OF SEPTEMBER 14, 2020, CF AND ITS REPRESENTATIVES WERE INVITED INTO THE DATA ROOM SO CF COULD BEGIN ITS DILIGENCE REVIEW, AND THEN IT DESCRIBES THE EXTENSIVE DILIGENCE THAT THE CF FOLKS DID.

BEGINNING ON SEPTEMBER 18, 2020, AND CONTINUING THROUGH THE NEXT SEVERAL WEEKS, THE CF II MANAGEMENT, WHICH INCLUDES THE CF INDIVIDUAL DEFENDANTS HERE, AND ITS ADVISORS CONTINUED ITS DUE DILIGENCE OF VIEW, INCLUDING REVIEWING ALL MATERIALS IN THE DATA ROOM, REQUESTING ADDITIONAL DOCUMENTATION, REVIEWING ADDITIONAL INFORMATION PROVIDED, AND HOLDING VARIOUS DUE DILIGENCE VIDEO CONFERENCE AND TELEPHONE CONFERENCES WITH VIEW'S MANAGEMENT TEAM, EMPLOYEES, AND ADVISORS.

THEN THE COMPLAINT, IN THAT SAME PARAGRAPH, ALLEGES THAT A NUMBER OF FOLLOW-UP DILIGENCE CALLS WERE HOSTED OVER THE NEXT SEVERAL WEEKS AS REQUESTED BY CF II, AND THEN IT GOES ON TO SAY ALL THE THINGS THEY DISCUSSED.

AND THEN IT ALLEGES IN THAT SAME PARAGRAPH, SUCH DILIGENCE CONTINUED AS REQUESTED BY CF II UP THROUGH NEGOTIATION AND FINALIZATION OF THE DEFINITIVE DOCUMENTATION.

IN PARAGRAPH 64, BEFORE REACHING ITS DECISION, THE CF II BOARD REVIEWED THE RESULTS OF THE DUE DILIGENCE CONDUCTED BY ITS MANAGEMENT, EMPLOYEES OF CANTOR, AND CF II'S ADVISORS, WHICH INCLUDED, AND THERE'S SIX LISTS:  ONE, EXTENSIVE MEETINGS AND CALLS WITH MANAGEMENT TEAM AND ADVISORS OF VIEW REGARDING,

AMONG OTHER THINGS, OPERATIONS AND FORECASTS.  NUMBER SIX IS FINANCIAL AND VALUATION ANALYSIS, AND THERE'S FIVE MORE SANDWICHED IN THERE.

IN OCERA, JUST LIKE HERE, THE COURT HELD PLAINTIFF'S NEGLIGENCE THEORY REQUIRES THE IMPLAUSIBLE INFERENCE THAT DESPITE THIS REVIEW PROCESS, THE ABSENCE -- AND THE ABSENCE OF IMPROPER BIAS OR DERELICTION OF DUTY, THE DEFENDANTS ACTED NEGLIGENTLY.

PLAINTIFFS DON'T CLAIM THAT THE CF INDIVIDUALS OR THE ENTITIES DISCOVERED THE FRAUD AFTER THIS EXTENSIVE DILIGENCE AND THEN HID IT.  THAT WOULD BE A FRAUD CLAIM.

IN FACT, THEY EXPRESSLY DISCLAIM ANY RECKLESSNESS.  THEY DISCLAIM ANY INTENTIONALITY.  IT'S SIMPLY NEGLIGENCE.

AND IT'S NOT REASONABLE, IT'S NOT PLAUSIBLE THAT GIVEN THESE ALLEGATIONS OF THE EXTENSIVE DILIGENCE THAT WAS DONE, THAT IT COULD HAVE TURNED UP THE ACCOUNTING FRAUD, OR THE ALLEGED ACCOUNTING FRAUD OR MISSTATEMENTS, ESPECIALLY GIVEN THAT PWC, VIEW'S AUDITORS, HAD CERTIFIED THAT THEY WERE TRUE AND CORRECT AND THAT THEY WERE IN CONFORMITY WITH GAAP.

AS YOUR HONOR HELD IN THE PRIOR ORDER WITH RESPECT TO THE SECTION 11 CLAIM, WHICH IS STRICT LIABILITY -- NOT EVEN NEGLIGENCE, STRICT LIABILITY -- DEFENDANTS MAY REASONABLY RELY ON AUDITOR'S STATEMENTS ABSENT RED FLAGS THAT DEFENDANTS WERE IN A POSITION TO SEE, AND THAT PLAINTIFF HAS NOT MADE ANY ALLEGATIONS INDICATING IT WAS UNREASONABLE FOR THE CF

DEFENDANTS TO RELY ON THE STATEMENTS OF PWC OR VIEW.  AND THAT'S FOR A STRICT LIABILITY.

HERE YOU HAVE TO GO FURTHER TO GET TO NEGLIGENCE.  AND IT'S SIMPLY NOT PLAUSIBLE UNDER OCERA OR UNDER MCKESSON THAT THESE DEFENDANTS WERE NEGLIGENT GIVEN, AGAIN, THAT THEY'RE AN ARM'S LENGTH MERGER COUNTER-PARTY, THEY'RE NOT ON THE BOARD OF VIEW, THEY'RE NOT ON VIEW'S MANAGEMENT TEAM.  THEY ARE SEPARATE AND APART.

THE COURT:  MR. STEINFELD, WOULD THIS ARGUMENT -- AND THIS IS ONE THEORY IN THE COMPLAINT.  WOULD THIS APPLY, IN YOUR VIEW, TO THE INDIVIDUAL AND ENTITY CF DEFENDANTS?

MR. STEINFELD:  YES, YOUR HONOR.

THE COURT:  OKAY.

MR. STEINFELD:  AND AS THE DILIGENCE THAT I JUST DESCRIBED AND THAT'S ALLEGED OR CONCEDED IN 60 AND 64 AND THROUGHOUT THE COMPLAINT SPEAKS TO CF II'S MANAGEMENT, WHICH ARE THE INDIVIDUAL DEFENDANTS, SPEAKS TO THE BOARD IN 64 AND ITS, QUOTE, ADVISORS, WHICH INCLUDES CF & CO., AND THE ALLEGATIONS ARE THAT THE OTHER ENTITIES ADVISED ON THE TRANSACTION.

SO, YES, IT WOULD SPEAK TO ALL THE CF DEFENDANTS IN TERMS OF NEGLIGENCE.

THE COURT:  AND THIS IS SEPARATE FROM WHETHER THERE WAS SOLICITATION?

MR. STEINFELD:  EXACTLY, YOUR HONOR.  THAT'S AN

ADDITIONAL INDEPENDENT REASON FOR DISMISSAL.

AND UNLESS YOU HAVE MORE QUESTIONS ON THE NEGLIGENCE POINT, I'M HAPPY TO TURN TO THAT NOW.

THE COURT:  GO AHEAD.

MR. STEINFELD:  THE LAST THING I'LL SAY ON THE NEGLIGENCE POINT, BECAUSE I REMEMBER YOUR HONOR STATING EARLIER THAT THESE DEFENDANTS WOULD HAVE TO BECOME ACCOUNTANTS OR HAVE SOME ADDITIONAL EXPERTISE, AND WE, OF COURSE, AGREE WITH THAT STATEMENT.  IT'S SIMPLY NOT REASONABLE OR PLAUSIBLE THAT AN OUTSIDE PARTY WOULD BE ABLE TO TURN UP, EVEN WITH THIS DILIGENCE, WHAT THE COMPANY'S OWN AUDITORS, WHO HAVE COMPLETE ACCESS TO THE COMPANY'S RECORDS, COULD NOT TURN UP.

SO THEN MOVING TO SOLICITATION, WHICH WE'RE ONLY ARGUING SOLICITATION AS TO THE CF ENTITIES, OR LACK OF SOLICITATION I SHOULD SAY.

IT'S A SECTION 14 SOLICITATION, WHICH MEANS THAT PLAINTIFFS, QUOTE, AT THE VERY LEAST MUST PLEAD FACTS SHOWING THE SUBSTANTIAL CONNECTION BETWEEN THE USE OF A DEFENDANT'S NAME AND THE SOLICITATION EFFORT.

AND YOUR HONOR QUOTED, I BELIEVE, IN YOUR ORDER LAST TIME AROUND THE YAMAMOTO CASE, 564 F.2D 1319 AT 1323, NINTH CIRCUIT.

THE COURT:  UM-HUM.

MR. STEINFELD:  SIMPLY HAVING ONE'S NAME IN THE PROXY DOES NOT FORM SECTION 11 LIABILITY.  THAT'S KELLEY V. RAMBUS, 2008 WL 5170598 AT STAR 5.

AND HERE THE CF ENTITIES, AGAIN, THEY'RE NOT THE ISSUER. THEY'RE NOT THE SPAC.  LET'S TAKE CF GM, FOR EXAMPLE.  CF GM IS AT LEAST THREE LEVELS REMOVED FROM THE ISSUER HERE, AND CF GM IS ONLY MENTIONED FOUR TIMES IN THE ENTIRE 278 PAGE PROXY.

THERE IS NO SUBSTANTIAL CONNECTION FOR CF GM.

THIS SAME THING IS TRUE, FOR EXAMPLE, OF CF & CO. CF & CO. IS MERELY THE FINANCIAL ADVISOR TO THE SPAC, AND THE MENTIONS OF CF & CO. IN THE PROXY ARE JUST STATING THAT IT WAS THE FINANCIAL ADVISOR, AND THEN WHAT'S REALLY BECOME REQUIRED DISCLOSURES BY THE S.E.C., WHAT FEES WERE GOING TO BE PAID TO THE FINANCIAL ADVISOR IN THE DEAL.

AND THERE'S LONG-STANDING CASE LAW, SUCH AS THE MENDELL CASE, THAT SAYS FINANCIAL ADVISORS ARE NOT SUBJECT TO SECTION 14 LIABILITY ABSENT SOMETHING COMPLETELY DIFFERENT THAN WHAT WE HAVE HERE.

THE REMAINING TWO ENTITIES ARE SPONSOR, WHO BY THE TIME OF THE WRONGDOING WAS MERELY A 20 PERCENT SHAREHOLDER, AND THEN CANTOR FITZGERALD LP.  AND AS TO CANTOR -- AND CANTOR FITZGERALD LP IS ALLEGED TO BE AN AFFILIATE OF SPONSOR, SO AT TWO LEVELS REALLY FROM THE ISSUER.

AND THE ONLY ALLEGATION THAT WAS ADDED TO THE COMPLAINT HERE FROM THE FIRST GO ROUND WAS THAT THERE WAS AN INVESTOR PRESENTATION IN NOVEMBER THAT MENTIONED CANTOR LP IN THE FIRST COUPLE OF SLIDES.

THAT'S NOT THE PROXY, AND THAT'S MONTHS BEFORE THE

SOLICITATION EFFORT THAT OCCURS IN FEBRUARY AND MARCH.  IT DOESN'T CHANGE THE CALCULUS.

AND THEY -- PLAINTIFFS FOCUS ON HOW LUTNICK WAS BEING MENTIONED THERE AS WELL, BUT, AGAIN, FOR THE SOLICITATION ARGUMENT, IT'S ONLY MADE ON THE ENTITIES' BEHALF, OUR ARGUMENT, AND NOT ON THE INDIVIDUALS.

UNLESS YOUR HONOR HAS ANY QUESTIONS ON SOLICITATION, I'LL MOVE ON TO THE NEXT INDEPENDENT GROUND FOR DISMISSAL --

THE COURT:  OKAY.

MR. STEINFELD:  -- WHICH IS EXCULPATION FOR THE INDIVIDUALS, THE CF INDIVIDUALS.

THE COMPLAINT IS CLEAR THAT THE SECTION 14(A) CLAIM IS BASED, QUOTE, SOLELY ON NEGLIGENCE, AND IT DISCLAIMS, QUOTE, ANY ALLEGATION SOUNDING IN FRAUD OR INTENTIONAL OR RECKLESS CONDUCT.  THAT'S PARAGRAPH 161.

THIS IS FATAL FOR THE INDIVIDUALS, FOR THE CLAIM AGAINST THE INDIVIDUALS.

IN RE: WELLS FARGO, SO A RECENT CASE, 2022 WL 345066 AT STAR 5, IT'S A NORTHERN DISTRICT CASE, QUOTE, NUMEROUS COURTS IN CONSIDERING FEDERAL SECURITIES CLAIMS, INCLUDING CLAIMS BROUGHT UNDER SECTION 14(A), HAVE UPHELD APPLICATION OF EXCULPATION CLAUSES ADOPTED PURSUANT TO SECTION 102(B)(7), WHICH IS THE PROVISION OURS IS UNDER, AND ALTHOUGH THE STATUTE WAS ENACTED OVER 35 YEARS AGO, THERE ARE NOT -- TO THE COURT'S KNOWLEDGE AT THAT TIME, THERE ARE NO CASES HOLDING TO THE

CONTRARY.

AND INDEED, PLAINTIFF DOES NOT CITE A SINGLE CASE TO THE CONTRARY.  AND IN OUR PAPERS, WE CITE A FEW ADDITIONAL CASES. AND IT'S NOT JUST IN THIS DISTRICT.  IT'S PRETTY MUCH NATIONWIDE AGREEMENT, IN RE: KRAFT, 2023 WL 2745118 AT STAR 9, THAT'S THE NORTHERN DISTRICT OF ILLINOIS FROM MARCH 31, 2023. UNDER SECTION 14, IF, QUOTE, PLAINTIFFS HAVE NOT PLEADED THE DEFENDANTS ACTED KNOWINGLY, INTENTIONALLY, OR IN BAD FAITH, THEN THE CLAIM DOES NOT EXCEED THE PROTECTIONS OF THE EXCULPATORY PROVISION.

THERE'S CENTRAL DISTRICT CASE LAW.  THERE'S DELAWARE CHANCERY CASE LAW.  THIS IS IN OUR MOVING PAPERS ON PAGES 6 AND 7.

THEREFORE, WE SHOULD WIN ON THE NEGLIGENCE, AND AS WE DISCUSSED, THE ENTITIES SHOULD WIN ON SOLICITATION.

BUT EVEN IF THERE WAS NEGLIGENCE, THE CF INDIVIDUALS ARE EXCULPATED FOR A NEGLIGENCE CLAIM AND CANNOT BE LIABLE HERE, AND THAT'S GROUNDS FOR DISMISSAL WITH PREJUDICE.

THE COURT:  ALL RIGHT.

MR. STEINFELD:  FINALLY, IT WAS THE LOSS CAUSE -- I JUST WANT TO WRAP IT UP.  THE LOSS CAUSATION ARGUMENT APPLIES TO BOTH SETS OF CF DEFENDANTS, AND I DON'T NEED TO BELABOR THE POINT.

THE COURT:  NO.

MR. STEINFELD:  THERE IS NO LOSS CAUSATION ON

SECTION 14 HERE.

I'M HAPPY TO ANSWER ANY QUESTIONS YOUR HONOR HAS, AND IF NOT AT THIS MOMENT, I'LL WAIT FOR REBUTTAL.

THE COURT:  OKAY.  THANK YOU.

MR. STEINFELD:  THANK YOU.

THE COURT:  MR. URIS, YOU'VE BEEN SITTING HERE FOR A LONG TIME LISTENING TO A LOT.  IT'S GETTING LATE, BUT I WANT TO GIVE YOU AMPLE OPPORTUNITY TO REBUT THIS OR MAKE ANY OTHER COMMENTS.

MR. URIS:  THANK YOU, YOUR HONOR.

YES, THERE WAS CERTAINLY A LOT, A LOT THERE, AND I'LL TRY AND ADDRESS ALL THE POINTS THAT WERE MADE AND CERTAINLY ANSWER ANY OTHER QUESTIONS THAT YOU HAVE, SO PLEASE LET ME KNOW IF I MISS ANYTHING.

THE COURT:  OKAY.

MR. URIS:  BUT I THINK IT WOULD MAKE SENSE TO KIND OF START, START AGAIN FROM THE BEGINNING AND KIND OF JUST EXPLAIN WHAT THE TWO DIFFERENT PRIMARY CLAIMS ARE HERE, AND THEN I'LL GET INTO THE DUTY WITH RESPECT TO THE 14(A) CLAIM AND THE NEGLIGENCE, AND I'LL ADDRESS SOME OF THE POINTS THAT WERE RAISED BY DEFENDANTS.

THE COURT:  OKAY.

MR. URIS:  SO IN PARTICULAR, I WANT TO POINT OUT THAT IN THE SECOND AMENDED COMPLAINT, WE CLEARLY DELINEATED DISTINCT COURSES OF CONDUCT THAT FORMED THE BASES OF PLAINTIFFS' TWO

PRIMARY CLAIMS:  ONE IS THE 14(A) NEGLIGENCE CLAIM; AND TWO IS THE 10(B) FRAUD CLAIM THAT'S BROUGHT AGAINST ONLY PRAKASH AND VIEW.

THE COURT:  UM-HUM.

MR. URIS:  THE 10(B) CLAIM AGAINST PRAKASH AND VIEW CONCERNS PRAKASH'S INTENTIONAL WITHHOLDING OF INFORMATION FROM VIEW'S BOARD OF DIRECTORS AND FROM PWC, VIEW'S AUDITOR.

IT ALSO RELATES TO ALLEGATIONS CONCERNING PRAKASH'S ACTIONS SURROUNDING VIEW'S DETERMINATION OF AND HIS APPROVAL OF THE WARRANTY ACCRUAL, DESPITE KNOWING THAT THE COMPANY'S DECISION TO COVER INSTALLATION COSTS FOR ALL CUSTOMERS AFFECTED BY THE DEFECT UNDERMINE THE REASON FOR EXCLUDING SUCH COSTS FROM THE WARRANTY ACCRUAL THAT WAS GIVEN BY THE WARRANTY LIABILITY TEAM WHICH PRAKASH ASSEMBLED AND OVERSAW.

ON THE OTHER HAND, THE 14(A) NEGLIGENCE CLAIM CONCERNS ALL DEFENDANTS' SOLICITATIONS WITH RESPECT TO THE PROXY STATEMENT AND RELATED MATERIALS AND THE DUTIES OWED IN A DE-SPAC MERGER TRANSACTION TO INVESTIGATE AND DISCLOSE AND BECOME FAMILIAR WITH THE CORE OPERATIONS OF THE COMPANY.

AND I THINK HERE I JUST WANT TO ADDRESS THE ELEPHANT IN THE ROOM, WHICH I'LL TRY TO LEAVE TO THE SIDE FOR NOW.  BUT AS WE SAW IN THE DUE DILIGENCE PRESENTATION THAT WAS THE SUBJECT OF OUR MOTION FOR JUDICIAL NOTICE, THE CANTOR FITZGERALD DEFENDANTS APPARENTLY DID UNCOVER IN THEIR INVESTIGATION THAT THE INSTALLATION COSTS HAD BEEN EXCLUDED FROM THE WARRANTY

ACCRUAL.  WE ALLEGE THAT PROPER DUE DILIGENCE WOULD HAVE UNCOVERED THIS, AND IT APPEARS THAT IT DID.

BUT I'D LIKE TO ADDRESS THE DUTY THAT'S OWED WITH RESPECT TO THE 14(A) CLAIM.

NOW, THE SECOND AMENDED COMPLAINT ALLEGES HOW EACH OF THE 14(A) DEFENDANTS SOLICITED PROXIES FROM CLASS MEMBERS BY MEANS OF THE PROXY STATEMENT AND, THEREFORE, HAD A DUTY TO ENSURE THAT THE PROXY STATEMENT AND ALL OTHER PROXY SOLICITATION MATERIALS FULLY AND FAIRLY DISCLOSED ALL MATERIAL FACTS TO ALLOW AN INVESTOR TO MAKE AN INFORMED INVESTMENT DECISION AND TO ACCURATELY UPDATE THESE STATEMENTS BETWEEN THE DISSEMINATION OF THESE DOCUMENTS AND THE SHAREHOLDER VOTE ON MARCH 5TH, 2021. THOSE DUTY ALLEGATIONS ARE IN PARAGRAPHS 187 TO 189.

WE ALSO ALLEGE ADDITIONAL DUTIES AS TO PRAKASH AND MULPURI IN PARAGRAPHS 192 AND 193.

NOW, TO THAT END, YOUR HONOR, AS YOUR HONOR MORE SPECIFICALLY NOTED IN YOUR RECENT DECISION IN THE S.E.C.'S CASE AGAINST PRAKASH, WHICH WAS RELATED TO THIS CASE IN AUGUST OF LAST YEAR --

THE COURT:  YEAH.

MR. URIS:  -- SIGNATORIES TO S.E.C. FILINGS HAVE A DUTY TO FAMILIARIZE THEMSELVES WITH THE FACTS RELEVANT TO THE CORE OPERATIONS OF THE COMPANY, AND THE FINANCIAL REPORTING OF THOSE OPERATIONS.

NOW, FOR A SPAC CASE LIKE THIS, I THINK THE PRECISE SCOPE

OF THE DUTY OWED WOULD ULTIMATELY DEPEND ON THE FACTS OF EACH CASE, BUT I THINK THE CLEAR TOUCH POINT IS THAT THERE WAS A DUTY TO INVESTIGATE AND DISCLOSE.

WE REFERENCED THAT DUTY WITH RESPECT TO UNDERWRITERS ON PAGE 9 OF OUR OPPOSITION BRIEF WHERE WE CITE THE DOLPHIN V. BRADBURY CASE WHICH DEALT WITH AN UNDERWRITER'S DUTY TO INVESTIGATE AND DISCLOSE.

IN DOLPHIN, THE COURT DESCRIBES THAT AN UNDERWRITER OCCUPIES A VITAL POSITION IN A SECURITIES OFFERING BECAUSE INVESTORS RELY ON ITS REPUTATION, INTEGRITY, INDEPENDENCE, AND EXPERTISE, AND IT NOTED HOW AN UNDERWRITER MUST INVESTIGATE AND DISCLOSE MATERIAL FACTS THAT ARE KNOWN OR REASONABLY ASCERTAINABLE.

NOW, DESPITE THIS DUTY, THE CANTOR FITZGERALD DEFENDANTS SEEM TO BE SUGGESTING THAT THEY WERE PERMITTED TO BLINDLY RELY ON THE REPRESENTATIONS MADE BY VIEW'S MANAGEMENT AND THEIR AUDITOR, BUT DOLPHIN INDICATES THAT THAT IS NOT PERMITTED.

AND AS SET FORTH IN OUR OPPOSITION AT PAGE 9 WHERE WE ALSO CITE THE INDIGENOUS GLOBE CASE, A RELIANCE ON AUDITOR DEFENSE, WHICH IS AN AFFIRMATIVE DEFENSE NOT USUALLY APPROPRIATE FOR RESOLUTION ON A MOTION TO DISMISS, DOESN'T APPLY BECAUSE DEFENDANTS HAVE NOT SHOWN THAT THEY THEMSELVES MADE FULL DISCLOSURES OF THE RELEVANT FACTS TO THE AUDITORS.

THEY APPEAR TO CONCEDE THIS POINT AND THEY HAVEN'T ADDRESSED IT ANYWHERE IN THEIR BRIEFS.

AND I THINK MAYBE THE MOST INSTRUCTIVE CASE ON THIS POINT IS THE KNURR V. ORBITAL ATK CASE, WHICH WE CITED MULTIPLE TIMES IN OUR OPPOSITION AND DEFENDANTS COMPLETELY IGNORED IN THEIR REPLIES.  THE ORBITAL CASE ALSO SPOKE TO AN ACQUIRER'S DUTY TO INVESTIGATE THE FINANCES OF THE COMPANY THEY PLAN TO MERGE WITH.

THERE THE COURT FOUND THAT EVEN IF THE PSLRA'S HEIGHTENED PLEADING STANDARD WERE TO APPLY, PLAINTIFFS HAVE PLED A STRONG INFERENCE OF -- A STRONG INFERENCE OF NEGLIGENCE WHERE PLAINTIFFS ALLEGE THAT THE ACQUIRERS HAVE A DUTY TO INVESTIGATE THAT RED FLAGS EXISTED SIGNALLING THAT THE ACQUIRER SHOULD LOOK PARTICULARLY AT A CERTAIN CONTRACT, AND THAT HAD THEY INQUIRED INTO THAT CONTRACT, THEY WOULD HAVE DISCOVERED THE ACCOUNTING ERRORS AT ISSUE IN THAT CASE.  AND I THINK THAT'S VERY IMPORTANT THAT THAT CASE ALSO INVOLVED ACCOUNTING ERRORS.

HERE THE FACTS ARE VERY SIMILAR.  HERE THE CANTOR FITZGERALD DEFENDANTS, AS SPAC UNDERWRITERS, HAD A DUTY TO INVESTIGATE.  AGAIN, THAT WAS IN PARAGRAPHS 187 AND 189.

HERE HUGE RED FLAGS EXISTED, NAMELY, ONE THAT THE --

THE COURT:  YOU DIDN'T ALLEGE -- I'M SORRY.  YOU DIDN'T ALLEGE ANY RED FLAGS.  I DON'T THINK YOU USED THAT WORD IN THE COMPLAINT, DID YOU?

MR. URIS:  WE, WE MAY NOT HAVE USED THAT WORD.

THE COURT:  WELL, THAT'S A REALLY IMPORTANT -- THAT'S A REALLY IMPORTANT CONCEPT, BECAUSE THERE ARE KNOWN RED FLAGS.

YOU CAN'T JUST CALL SOMETHING A RED FLAG BECAUSE YOU WANT TO.

BUT YOU DIDN'T LABEL IT SO THAT ANYONE COULD EVEN REFUTE THAT SOMETHING WAS A RED FLAG.  YOU CAN'T -- I MEAN, THAT'S A -- I'M NOT GOING TO ALLOW YOU TO MAKE THAT MODIFICATION TO YOUR COMPLAINT.

MR. URIS:  I MEAN, THESE FACTS ARE, ARE ALLEGED IN THE COMPLAINT.  I MEAN, I --

THE COURT:  IF I'M MISTAKEN -- I DON'T HAVE A COMPLETE RECALL OF THE ENTIRE COMPLAINT, BUT I WAS LOOKING FOR ALLEGATIONS OF RED FLAGS.

MR. URIS:  YEAH, I --

THE COURT:  I DON'T RECALL SEEING THAT YOU ALLEGED THAT THERE WERE KNOWN RED FLAGS.

MR. URIS:  YOUR HONOR -- YOU MAY BE CORRECT, YOUR HONOR, THAT WE DON'T REFER TO THEM AS RED FLAGS.

THE COURT:  THEN THEY AREN'T RED FLAGS.

MR. URIS:  WELL, YOUR HONOR, I THINK THIS WOULD STILL GO TO WHAT FACTS WERE -- I THINK IT WOULD GO TO WHETHER OR NOT DEFENDANTS WERE NEGLIGENT, AND IT GOES TO WHAT FACTS WERE AVAILABLE, YOU KNOW, AT THE TIME THAT THEY WERE DOING THEIR INVESTIGATION.

SO, YOU KNOW, I THINK WHETHER OR NOT THEY WERE REFERRED TO AS RED FLAGS, DEFENDANTS KNEW THAT THE PROXY ITSELF WAS DISCLOSING A WARRANTY ACCRUAL RELATED TO THE DEFECT.

THE COURT:  YES.

MR. URIS:  AND, TWO, CF II RECEIVED A COMMENT LETTER FROM THE S.E.C. ASKING CF II TO MORE FULLY EXPLAIN THE SPECIFIC FACTS AND CIRCUMSTANCES RELATED TO THE WARRANTY ACCRUAL AND SPECIFICALLY ASKED WHETHER IT BELIEVED AN ADDITIONAL LOSS IS REASONABLY POSSIBLE AND TO DISCLOSE THAT FACT.  THAT'S IN PARAGRAPH 221.

AND FINALLY, WE ALLEGE THAT HAD THEY PROPERLY INQUIRED INTO THE ISSUES SURROUNDING THE WARRANTY ACCRUAL, THEY WOULD HAVE UNCOVERED THAT A BUSINESS DECISION WAS MADE TO COVER THE INSTALLATION COSTS FOR ALL CUSTOMERS, MEANING THAT THERE WERE THESE ADDITIONAL INSTALLATION COSTS THAT WERE PROBABLE AND REASONABLY ESTIMABLE AND THEREFORE NEEDED TO BE DISCLOSED. THAT'S IN PARAGRAPH 191.

AND I WOULD -- AS TO THE NEGLIGENCE, AND PARTICULARLY RELATED TO THE DUE DILIGENCE THAT WAS CONDUCTED, HERE WE HAVE ALLEGED THAT DUE DILIGENCE WAS CONDUCTED BY EMPLOYEES OF CANTOR AND CF II'S ADVISORS.  THAT'S AT PARAGRAPH 64.

WE ALLEGE THAT CF II'S FINANCIAL ADVISOR IN CONNECTION WITH THE BUSINESS COMBINATION IS CF & CO.  THAT'S PARAGRAPH 39.

WE ALLEGE DETAILS REGARDING THE DUE DILIGENCE THAT WAS CONDUCTED.  THAT'S IN PARAGRAPHS 57 THROUGH 60 AND PARAGRAPH 64.

AND WE ALLEGE THAT CANTOR IS AN INVESTMENT BANK LED BY, IN THEIR OWN WORDS, QUOTE, A HIGHLY EXPERIENCED EXECUTIVE TEAM IN HOWARD LUTNICK AND IS THE LEADING SPAC FRANCHISE AND THE TOP

SPAC UNDERWRITER IN 2019.  THAT'S IN PARAGRAPH 40.

AND CF II'S INITIAL REGISTRATION STATEMENT ADMITS THAT IT, ITS SPONSOR, CF HOLDINGS II AND CF & CO., ARE ALL CONTROLLED BY CANTOR.  THAT'S PARAGRAPH 40.

THE OTHER REMAINING ENTITY, CF GROUP MANAGEMENT, IS THE MANAGING GENERAL PARTNER OF CANTOR.  THAT'S IN PARAGRAPHS 38 AND 40.

AND LUTNICK IS ALSO THE CEO OF CF GROUP MANAGEMENT AND IS THE TRUSTEE OF ITS SOLE STOCKHOLDER.  THAT'S AT PARAGRAPH 38.

NOW, WE ALLEGE THAT EACH OF THE CANTOR FITZGERALD DEFENDANTS WAS PROVIDED ACCESS TO ALL OF VIEW'S BOOKS, CONTRACTS, AND RECORDS, AND ALL FINANCIAL DOCUMENTS REFLECTING ALL MATERIAL INFORMATION RELATED TO VIEW'S BUSINESS AND THE NATURE OF ITS TRANSACTIONS.

THAT MEANS ALL OF THE UNDERLYING BUSINESS RECORDS, YOUR HONOR, NOT JUST THE AUDITED AND UNAUDITED FINANCIAL STATEMENTS AS DEFENDANTS SEEM TO SUGGEST.

AND, YOUR HONOR, THE TYPE OF DUE DILIGENCE THAT IS EXPECTED IN A TRANSACTION LIKE THIS IS NOT JUST REVIEWING THE AUDITED FINANCIALS.  THE WHOLE POINT OF BEING PROVIDED ACCESS TO THE UNDERLYING BOOKS AND RECORDS IS THAT A SOPHISTICATED ACQUIRER LIKE CANTOR FITZGERALD CAN DO ITS OWN ASSESSMENT OF WHAT'S SUMMARIZED IN THE FINANCIALS.

AND, AGAIN, THE DEFECT IN THE WARRANTY ACCRUAL ASSOCIATED WITH THE DEFECTS WERE KNOWN ISSUES.

THEY DON'T DISPUTE THAT PROPER DUE DILIGENCE WOULD HAVE UNCOVERED THE DECISION TO COVER INSTALLATION COSTS, AND WE ALLEGE THAT VIEW INCURRED MILLIONS OF DOLLARS IN INSTALLATION COSTS IN EACH OF 2019, 2020, AND 2021.  THEY WOULD HAVE SEEN THAT.

NOW, YOUR HONOR, THE CANTOR FITZGERALD DEFENDANTS RELY HEAVILY ON THE MCKESSON CASE, SO I'D LIKE TO DISCUSS THAT BRIEFLY.

THE COURT:  OKAY.

MR. URIS:  AND THE ORBITAL CASE THAT I CITED TO ACTUALLY DISTINGUISHES MCKESSON.  AS THE ORBITAL COURT NOTED, THAT CASE, THE MCKESSON CASE STANDS FOR THE PROPOSITION THAT IF THERE IS NO WAY CORPORATE OFFICIALS COULD HAVE KNOWN THE INFORMATION IN QUESTION, EVEN WITH REASONABLE DILIGENCE, THOSE OFFICIALS CANNOT BE NEGLIGENT FOR FAILING TO INCLUDE IT IN THE PROXY STATEMENT.

AND THE COURT NOTED THAT IN THAT CASE, UNLIKE MCKESSON WHERE THE DIRECTORS OF THE ACQUIREE AFFIRMATIVELY HID EVIDENCE THAT THE AUDITORS SOUGHT, THERE ARE NO ALLEGATIONS THAT INFORMATION WAS AFFIRMATIVELY WITHHELD FROM THE ACQUIRING COMPANY'S DIRECTORS WHEN THEY INVESTIGATED THE SPECIFIC CONTRACT.

THE SAME IS TRUE HERE.  VIEW'S AUDIT COMMITTEE FOUND THAT PRAKASH AND OTHERS HID INFORMATION FROM PWC AND VIEW'S BOARD, NOT THE CF DEFENDANTS.

IN ANY EVENT, WE ALLEGE THAT GREATER DILIGENCE WOULD HAVE UNCOVERED THIS BECAUSE THE INFORMATION WAS AVAILABLE FROM VARIOUS OTHER SOURCES.  WE ALLEGE THOSE SOURCES IN PARAGRAPHS 190 AND 191.

AND A KEY FACT --

THE COURT:  SO LET ME JUST JUMP AHEAD ON THIS, BECAUSE I THINK -- I THINK YOU'VE DONE A VERY GOOD JOB ON THIS, MR. URIS, BUT I'M REALLY CONCERNED ABOUT THE EXCULPATION AND THE -- FOR THE INDIVIDUALS AND THE FAILURE TO SHOW SOLICITATION ON THE PART OF THE ENTITIES.  I THINK THAT'S WHERE WE'VE GOT WEAKNESS.

MR. URIS:  YES, SO I'M HAPPY TO ADDRESS IT.  THAT WAS THE EXCULPATION AND, I'M SORRY, WHAT WAS THE SECOND --

THE COURT:  AND THE LACK OF ALLEGATIONS OF SOLICITATION ON THE PART OF THE CF ENTITIES.

MR. URIS:  OKAY.  AND JUST ONE FINAL POINT ON MCKESSON, YOUR HONOR.

THE COURT:  OF COURSE.

MR. URIS:  A KEY FACT IN MCKESSON WAS THAT THE COMPLAINT THERE DID NOT ALLEGE SPECIFICS AS TO WHAT INFORMATION WAS AVAILABLE AND WHAT THOSE SOURCES WERE.

THE COURT:  OKAY.

MR. URIS:  I'M HAPPY TO GET INTO MORE DETAIL ON THE MCKESSON CASE, BUT I'VE REVIEWED THAT CLOSELY --

THE COURT:  SO IT'S 11 MINUTES TO 12:00 AND THEN

WE'RE DONE, UNLESS YOU ALL WANT TO COME BACK AT 1:30, WHICH I REALLY DON'T WANT TO DO.  SO LET'S KEEP GOING.

MR. URIS:  OKAY.  I WOULD NOTE THAT THE MCKESSON CASE WAS VERY DIFFERENT WHERE THE INFORMATION WAS AFFIRMATIVELY HIDDEN AND THERE WAS NO WAY THAT IT COULD HAVE BEEN UNCOVERED.

THE COURT:  OKAY.

MR. URIS:  SO AS TO EXCULPATION, I DON'T THINK THIS IS REALLY AN ISSUE THAT REQUIRES MUCH ATTENTION.  I THINK IF WE LOOK AT THE EXCULPATION CLAUSE AT ISSUE, IT'S CLEAR BY ITS TERMS THAT IT ONLY APPLIES TO CLAIMS OF FIDUCIARY DUTY, AND DEFENDANTS DON'T ADDRESS THAT.

SO WE DON'T ALLEGE A BREACH OF FIDUCIARY DUTY, AND SO --

THE COURT:  IS THIS EXCULPATION CLAUSE DIFFERENT THAN WHAT OTHER COMPANIES USE?

MR. URIS:  I BELIEVE -- I DON'T WANT TO MAKE A DEFINITIVE REPRESENTATION, BUT I BELIEVE --

THE COURT:  WELL, MR. STEINFELD SUGGESTED TO ME THAT THERE IS -- THAT THE CASES ARE ALL IN ACCORD THAT THE EXCULPATION CLAUSE APPLIES TO THESE SECTION 14 CLAIMS.

SO THEN I'M ASKING, IS THIS A PARTICULARLY NARROW EXCULPATION CLAUSE?

MR. URIS:  NO, YOUR HONOR.  THE CASES THAT THEY CITE ALL INVOLVE A BREACH OF FIDUCIARY DUTY CLAIM.

THE COURT:  OKAY.

MR. URIS:  AND SO I THINK THEY FOCUSSED ON THE FACT

THAT IT CAN APPLY TO THE FEDERAL SECURITIES LAWS, BUT IN THOSE CASES, EVEN WHERE IT INVOLVES A 14(A) CLAIM, IT'S A DERIVATIVE 14(A) CLAIM FOR BREACH OF FIDUCIARY DUTY.

AND THAT IS NOT THE CLAIM THAT WE'VE SET FORTH HERE, YOUR HONOR, AND SO THE EXCULPATION CLAUSE JUST -- IT DOESN'T APPLY ON THE FACE OF IT --

THE COURT:  OKAY.

MR. URIS:  -- BY THE TERMS OF THE LANGUAGE.

THE COURT:  AND YOU CERTAINLY DISCUSS THAT AT LENGTH IN YOUR BRIEF.

MR. URIS:  YES.

SO AS TO THE SOLICITATION ISSUE, AND I BELIEVE WAS THAT SPECIFIC TO THE CANTOR --

THE COURT:  THE CANTOR ENTITIES.

MR. URIS:  YES.  SO AS TO THE CANTOR ENTITIES -- WELL, AS TO THE INDIVIDUALS, WE ALLEGE THAT THEY ALL SIGNED THE PROXY STATEMENT.  I DON'T THINK THERE'S ANY DISPUTE THAT THAT QUALIFIES AS SOLICITATION.

THE COURT:  I DON'T THINK THE SOLICITATION ARGUMENT -- I DON'T THINK IT'S EVEN MADE IN REGARD TO THE INDIVIDUALS.

MR. URIS:  YES.

THE COURT:  IT'S EXCULPATION.

SO THE SOLICITATION IS ONLY THE CF ENTITIES.

MR. URIS:  YES, YOUR HONOR.

SO AS TO CANTOR, WE ALLEGE THAT THE NOVEMBER 30, 2020 INVESTOR PRESENTATION, IN THAT PRESENTATION, THE SLIDE TOUTED CANTOR, WHICH IS CANTOR FITZGERALD LP, AS A LEADING INVESTMENT BANK LED BY A HIGHLY EXPERIENCED EXECUTIVE TEAM IN HOWARD LUTNICK, WHO'S THE CHAIRMAN AND CEO, AND ANSHU JAIN, THE PRESIDENT, AND ALSO REPRESENTS THAT CANTOR IS A LEADING SPAC FRANCHISE AND TOP SPAC UNDERWRITER IN 2019, AND IT ALSO LISTS CANTOR FITZGERALD'S RELEVANT CREDENTIALS.  THAT'S IN PARAGRAPHS 31 AND 40.

CF II'S INITIAL REGISTRATION STATEMENT ALSO ADMITS THAT IT, ITS SPONSOR, CF HOLDINGS II AND CF & CO., ARE CONTROLLED BY CANTOR.

AND THEN WE ALLEGE IN PARAGRAPHS 165 AND 166 THAT WHEN DEFENDANT LUTNICK WENT ON CNBC AND BLOOMBERG AND TOUTED THE CANTOR FRANCHISE, HE WENT ON TV TO SELL INVESTORS ON THIS VIEW OPPORTUNITY AND TOUTED THE EXPERIENCE AND REPUTATION OF THE CANTOR FRANCHISE, WHICH IS -- WHICH IS THE CANTOR ENTITIES.

WE ALSO ALLEGE IN PARAGRAPH 64 THAT EMPLOYEES OF CANTOR AND CF & CO. ARE THE ONES THAT CONDUCTED THE DUE DILIGENCE. THAT'S DISCLOSED IN THE PROXY.  AND THE PROXY DESCRIBES THE ACCESS TO INFORMATION AND DUE DILIGENCE THAT WAS CONDUCTED.

SO CLEARLY THESE NAMED -- THE NAMES OF THE CANTOR FRANCHISE AND THE CF ENTITIES IS BEING USED TO COMFORT INVESTORS INTO BELIEVING THAT THEY ARE RECEIVING ACCURATE INFORMATION BY VIRTUE OF THE EXPERIENCE AND REPUTATION OF THE

CANTOR FITZGERALD ENTITIES.

THE COURT:  UM-HUM.

MR. URIS:  AS TO CF FINANCE HOLDING II, THAT'S CF II'S SPONSOR.  WE ALLEGE THAT IN PARAGRAPH 38.

AND, YOUR HONOR, I WOULD SUBMIT THAT THAT ALLEGATION ALONE COULD BE SIGNIFICANT TO SHOW A SUBSTANTIAL CONNECTION BETWEEN THE USE OF ITS NAME AND THE SOLICITATION EFFORT.  I MEAN, THE ENTIRE SPAC PROCESS, INCLUDING THE FORMATION OF CF II ITSELF, IS INITIATED BY THE SPONSOR, AND THAT'S TRUE OF ANY SPAC IN EXISTENCE.

CF II'S INITIAL REGISTRATION STATEMENT ADMITS THAT SPONSOR CONTROLS CF II.  IT STATES THAT OUR INITIAL STOCKHOLDERS, WHICH IS SPONSOR AND LUTNICK, WILL CONTROL THE ELECTION OF OUR BOARD UNTIL CONSUMMATION OF THE BUSINESS COMBINATION AND WILL HOLD A SUBSTANTIAL INTEREST IN US.  AS A RESULT, THEY WILL ELECT ALL OF OUR DIRECTORS PRIOR TO THE CONSUMMATION OF OUR INITIAL BUSINESS COMBINATION AND MAY EXERT SUBSTANTIAL INFLUENCE ON ACTIONS REQUIRING A SHAREHOLDER VOTE.  THAT'S PARAGRAPH 38.

CF II'S INITIAL REGISTRATION STATEMENT ALSO ADMITS THAT OUR INITIAL STOCKHOLDERS, WHICH IS LUTNICK AND THE SPONSOR, EFFECTIVELY INFLUENCED THE OUTCOME OF ALL MATTERS REQUIRING APPROVAL BY OUR STOCKHOLDERS, INCLUDING APPROVAL OF OUR BUSINESS COMBINATION.  THAT'S ALSO PARAGRAPH 38.

AGAIN, THIS IS SIMILAR TO THE REPS ABOUT THE CANTOR FRANCHISE.  INVESTORS UNDERSTAND THIS TO MEAN THAT THE SPONSOR

IS RUNNING THE SHOW AND MAKING THE DECISIONS. IT'S SOMEWHAT OF A NON SEQUITUR, YOUR HONOR, TO SUGGEST THAT THE SPONSOR DIDN'T SUFFICIENTLY SOLICIT WITH RESPECT TO THE MERGER.

AS TO CF & CO., CF & CO. SERVED AS CF II'S FINANCIAL AND CAPITAL MARKETS ADVISOR IN CONNECTION WITH THE BUSINESS COMBINATION. THAT'S IN PARAGRAPH 39.

WE ALLEGE THAT THEIR EMPLOYEES CONDUCTED DUE DILIGENCE AND THAT'S DISCLOSED IN THE PROXY. THAT'S PARAGRAPH 64. AGAIN, THE PROXY DESCRIBES THE ACCESS TO INFORMATION AND THE DUE DILIGENCE THAT WAS CONDUCTED IN PARAGRAPHS 57 THROUGH 60 AND PARAGRAPH 64.

AND CF & CO.'S ROLE WAS, AT LEAST IN PART, TO ASSIST CF II WITH ARRANGING STOCKHOLDER MEETINGS, INTRODUCING CF II TO POTENTIAL INVESTORS, ASSISTING CF II'S EFFORTS TO OBTAIN STOCKHOLDER APPROVAL. I MEAN, THAT'S -- THAT'S PARAGRAPH 39. I MEAN, PART OF THEIR ROLE WAS EXPLICITLY TO SOLICIT INVESTORS TO APPROVE THIS TRANSACTION.

AND THEN FINALLY, CF GROUP MANAGEMENT, LUTNICK IS THE -- IS CF II'S CHAIRMAN AND CHIEF EXECUTIVE OFFICER AND HE'S THE TRUSTEE OF CF GROUP MANAGEMENT'S SOLE STOCKHOLDER. THAT'S PARAGRAPH 41. THAT'S AN ENTITY THAT CONTROLS CANTOR AS ITS MANAGING GENERAL PARTNER.

AND THAT'S WHAT I WOULD REFER YOUR HONOR TO ON THE SOLICITATION ISSUE.

THE COURT: THANK YOU.

MR. URIS:  AND UNLESS THERE ARE PARTICULAR ISSUES YOU'D LIKE TO DISCUSS, I'M HAPPY TO CONTINUE.  THERE WERE A FEW, OBVIOUSLY, A FEW ISSUES THAT WERE RAISED.

THE COURT:  THERE ARE STILL SOME BIG ISSUES TO COVER.

MR. URIS:  YEAH, THERE ARE STILL SOME BIG ISSUES, SO I WILL CONTINUE ALONG.

ON THE -- ON THE ASSERTION THAT WE, THAT WE COPIED, THAT WE DIDN'T INVESTIGATE THE ALLEGATIONS RELATED TO THE S.E.C.'S COMPLAINT AGAINST PRAKASH, I MEAN, I THINK WE COVERED THIS IN OUR OPPOSITION AT 18 TO 19.  BUT, YOU KNOW, I'M HAPPY TO ADDRESS IT.

I DO THINK THE ARGUMENT IS A BIT ABSURD, AND I THINK IT'S IMPORTANT TO LOOK AT THE HISTORY OF THIS CASE WHICH SHOWS THAT WE, OF COURSE, DID INVESTIGATE THE CLAIMS.  THE INITIAL COMPLAINT WAS FILED IN AUGUST OF 2021 AND WE FILED THE AMENDED COMPLAINT IN JULY OF 2022, WHICH ALLEGED BOTH 14(A) AND 10(B) CLAIMS NEARLY A FULL YEAR PRIOR TO THE S.E.C. FILING THEIR COMPLAINT IN JULY OF 2023.

THE COURT:  SO I THINK THIS ARGUMENT IS ACTUALLY MORE NARROW.  I DON'T THINK THERE'S ANY SUGGESTION THAT YOU DID NOT INVESTIGATE THE CASE.  IT'S THAT YOU DIDN'T INVESTIGATE THE PARAGRAPHS THAT YOU'VE NOW PUT INTO THE SECOND AMENDED COMPLAINT THAT ARE TAKEN DIRECTLY FROM THE S.E.C. COMPLAINT.  I THINK IT'S MORE NARROW.

MR. URIS:  YEAH.  SO I'LL -- YES, I'LL ADDRESS THAT.

I GUESS THERE'S ONE POINT BEFORE I ADDRESS THAT DIRECTLY.

THE COURT:  OKAY.

MR. URIS:  I WOULD NOTE THAT THE CASES THAT THEY CITE FOR THE PROPOSITION THAT ALLEGATIONS FROM ANOTHER COMPLAINT MAY BE DISREGARDED IF THEY ARE -- THEY STAND FOR THE PROPOSITION THAT THEY MAY BE DISREGARDED ONLY IF THEY SERVED AS THE SOLE BASIS OF THE CLAIM --

THE COURT:  YEAH.

MR. URIS:  -- AND WHERE PLAINTIFF PROVIDED NO INDEPENDENT BASIS FOR CORROBORATING THOSE ALLEGATIONS.

SO HERE THE S.E.C. ALLEGATIONS ARE NOT THE SOLE BASIS FOR OUR CLAIM, AND WE INFORMED THE COURT WHAT OTHER SOURCES WE RELIED ON.

THE COURT:  YES.

MR. URIS:  THAT'S IN OUR OPPOSITION AT THE TOP OF PAGE 19 WHERE WE SPECIFICALLY REFERENCE -- IN THE SECOND AMENDED COMPLAINT AT FOOTNOTE 2, WE REFERENCE THE AUDIT COMMITTEE'S OWN FINDINGS OF INTENTIONAL AND NEGLIGENT CONDUCT. WE REFERENCE MULPURI'S ADMISSION THAT VIEW MADE A DECISION TO COVER THE INSTALLATION COSTS.

AND WE ALSO REFERENCE THE S.E.C. ORDER IN WHICH VIEW DID NOT CONTEST THAT THIS DECISION WAS MADE BY VIEW MANAGEMENT.

THE COURT:  YEAH.

MR. URIS:  BUT AS TO THE SPECIFIC POINT THAT YOU RAISED, YOUR HONOR, WE HAVE REVIEWED ALL OF THE PUBLICLY

AVAILABLE INFORMATION SURROUNDING THE S.E.C.'S CASE.  AS WE NOTED IN THE AMENDED COMPLAINT, IN THE S.E.C. ACTION, THE -- VIEW WAS PROVIDED -- VIEW PROVIDED THE COMMISSION STAFF WITH DOCUMENTS AND WITNESSES, INCLUDING BOTH INFORMAL INTERVIEWS AND SUBPOENAED TESTIMONY AND DETAILED EXPLANATIONS AND SUMMARIES OF SPECIFIC FACTUAL ISSUES AT ALL STAGES OF THE S.E.C.'S INVESTIGATION.  THAT'S IN FOOTNOTE 1 OF THE SECOND AMENDED COMPLAINT AT PAGES 19 TO 20.  SO WE DID INVESTIGATE ALL OF THE PUBLICLY AVAILABLE INFORMATION.

AND, YOUR HONOR, AS TO WHETHER OR NOT WE INVESTIGATED THE SPECIFIC ALLEGATIONS, I -- I WANT TO BE CAREFUL NOT TO WAIVE ANY PROTECTIONS AS TO COUNSEL'S INVESTIGATIONS OF THE CLAIMS.

THE COURT:  OF COURSE.

MR. URIS:  BUT, YOU KNOW, I WILL REPRESENT THAT WE SERVED A FOIA REQUEST ON THE S.E.C. BOTH BEFORE AND AFTER THEY FILED THEIR COMPLAINT, AND THAT REQUEST WAS --

THE COURT:  THAT'S A PUBLIC DOCUMENT.

MR. URIS:  YES.

THE COURT:  YEAH.

MR. URIS:  AND THAT REQUEST WAS DENIED BOTH TIMES.

SO I REALLY DON'T THINK THAT THERE'S ANY MERIT TO THE SUGGESTION THAT WE DIDN'T INVESTIGATION THESE ALLEGATIONS.

AND, AGAIN, THEY WERE CONSISTENT WITH THE ALLEGATIONS THAT WE MADE.

THE COURT:  SO WE HAVE REACHED 12:00 O'CLOCK.  WE'RE

NOT GOING TO BE DONE IN TEN MINUTES, SO WE'RE GOING TO NEED TO BREAK FOR LUNCH.

TIFFANY, ARE YOU AVAILABLE AT 1:30?

THE CLERK:  YES, YOUR HONOR.

THE COURT:  AND, LEE-ANNE, ARE YOU AVAILABLE AT 1:30?

THE REPORTER:  YES, I AM, YOUR HONOR.  THANK YOU.

THE COURT:  ALL RIGHT.  WELL, I THINK THAT -- WE'VE BEEN GOING NON-STOP SINCE 9:00 O'CLOCK, SO I JUST NEED A BREAK, AND MAYBE YOU DO AS WELL.

SO LET'S COME BACK AT 1:30.  I'M GOING TO HAVE YOU SIGN OFF NOW AND SIGN BACK ON AT 1:30 ON THE SAME LINK.  OKAY?

MR. STEINFELD:  THANK YOU, YOUR HONOR.

MR. URIS:  THANK YOU, YOUR HONOR.

THE COURT:  ALL RIGHT.  THANK YOU.  WE'LL BE IN RECESS.

(THE LUNCH RECESS WAS TAKEN FROM 12:01 P.M. UNTIL 1:30 P.M.)

**AFTERNOON SESSION**

THE CLERK:  IF YOU WOULD ALL ENGAGE YOUR VIDEOS, PLEASE.

OKAY, YOUR HONOR, I BELIEVE WE'RE READY TO BEGIN.

THE COURT:  WELCOME BACK, EVERYONE.  THANK YOU FOR THE BREAK FOR LUNCH.  I NEEDED IT.  I'M SURE YOU DID, TOO.

ALL RIGHT.  LET'S GO BACK TO WHERE WE LEFT OFF.

MR. URIS, YOU -- WE INTERRUPTED YOUR PRESENTATION, AND I DON'T KNOW WHETHER YOU WANT TO PICK UP WHERE YOU LEFT OFF, OR OVER THE BREAK IF YOU'VE HAD -- IF YOU WANT TO SHIFT GEARS.  BUT I'LL LEAVE IT IN YOUR HANDS.

MR. URIS:  YES.  THANK YOU, YOUR HONOR.

I THINK I WAS JUST ABOUT READY TO SHIFT OVER TO THE LOSS CAUSATION ISSUE, AND THEN A FEW OF THE OTHER ARGUMENTS THAT DEFENDANTS RAISED.

BUT BEFORE I DO THAT, I JUST WANTED TO MAKE ONE OTHER QUICK COMMENT ON THE MCKESSON CASE, WHICH WAS JUST TO POINT OUT THAT IN ADDITION TO THE FACT THAT THERE THE UNDERLYING DOCUMENTS HAD LITERALLY BEEN DELETED, FIVE MEMBERS OF THE ACQUIRED COMPANY'S BOARD HAD PARTICIPATED IN THE ORGANIZED FRAUD, AND NO ALLEGATIONS WERE MADE AS TO WHAT OTHER SOURCES OF INFORMATION COULD HAVE BEEN OBTAINED IN DUE DILIGENCE.

THE COURT ALSO NOTED IN FOOTNOTE 9 THAT THE AFFIRMATIVE DEFENSE OF A REASONABLE RELIANCE ON EXPERTS IS APPLICABLE ONLY TO SECTION 11 CLAIMS.

SO I JUST WANTED TO POINT THAT OUT --

THE COURT:  THAT'S HELPFUL.

MR. URIS:  -- TO THE EXTENT THAT WASN'T CLEAR.

AND WITH THAT, I THINK WE CAN MOVE TO THE LOSS CAUSATION QUESTION.

THE COURT:  LET ME -- BEFORE WE MAKE THAT MOVE, OR MAYBE YOU'RE GOING TO COME BACK TO IT, MR. STEINFELD GAVE ME A CHART, HIS EXHIBIT A TO MAYBE THE REPLY, THAT COMPARED THE OVERLAP ON THE 10(B) AND THE 14(A) ALLEGATIONS, AND I WOULD -- AND YOU GAVE ME A CHART WITH THE AMENDED COMPLAINT IDENTIFYING YOUR 14(A) FALSE OR MISLEADING STATEMENTS.

YOU DIDN'T MEAN FALSE OR MISLEADING THERE, DID YOU?  I DON'T KNOW WHY YOU IDENTIFIED YOUR 14(A) STATEMENTS AS FALSE OR MISLEADING.

MR. URIS:  I'M NOT SURE I UNDERSTAND THE QUESTION.  I MEAN, THE --

THE COURT:  WELL, FIRST -- YOUR 14(A) CLAIM IS A NEGLIGENCE CLAIM.

MR. URIS:  RIGHT.  BUT YOU STILL NEED A FALSE AND MISLEADING STATEMENT.  IT'S THAT THOSE --

THE COURT:  I SEE.

MR. URIS:  -- FALSE AND MISLEADING STATEMENTS WERE ISSUED DUE TO DEFENDANTS' NEGLIGENCE.

BUT I THINK --

THE COURT:  THEN YOU GIVE ME THE BASIS FOR THE

NEGLIGENCE.

MR. URIS:  YES.  SO, YOUR HONOR, I THINK THE CONFUSION MIGHT BE -- YOU KNOW, THE PURPOSE OF THE CHART THAT WAS ATTACHED TO THE AMENDED COMPLAINT WAS TO EXPLAIN THE BASIS -- YOU HAD ASKED FOR THE BASIS FOR SCIENTER.

THE COURT:  THAT'S RIGHT.

MR. URIS:  SO WE DID THAT WITH RESPECT TO THE 10(B) CLAIM.

BUT AS TO THE 14(A) CLAIM, IT'S NEGLIGENCE.

AND I THINK THE CONFUSION IS THE CHART THAT DEFENDANTS PUT FORTH IS, I GUESS, THEIR COUNTER OF THAT, BUT THEY KIND OF CHANGED THE FOCUS.  THEY FOCUS ON THE REASONS FOR FALSITY, WHICH IS NOT KIND OF --

THE COURT:  I SEE.

MR. URIS:  IT KIND OF MISSES THE MARK.

THE QUESTION IS, IS THE ALLEGED COURSE OF CONDUCT DIFFERENT, AND SO WE WERE FOCUSSED ON THE BASIS FOR NEGLIGENCE, WHICH WE ALLEGE IS A COMPLETE -- A COMPLETELY SEPARATE COURSE OF CONDUCT THAN THE CONDUCT THAT UNDERLIES THE 10(B) CLAIM.

SO I THINK THEIR CHART JUST POINTS OUT THAT THE STATEMENTS ARE MISLEADING FOR THE SAME REASONS.

THE COURT:  I SEE.  THANK YOU.

I APPRECIATE THAT.  THAT'S HELPFUL.

OKAY.  SO WE'LL GO BACK TO YOUR ARGUMENT.  BUT I DID -- I DIDN'T WANT TO MISS CLEARING THAT UP.

MR. URIS:  NO, THAT'S QUITE ALL RIGHT.

SO AS TO THE LOSS CAUSATION QUESTION, IN THEIR OPENING BRIEF, DEFENDANTS -- THE VIEW DEFENDANTS FOCUS ON MACPHEE, OF COURSE, WHICH IS AN ELEVENTH CIRCUIT CASE AND DIDN'T ADDRESS LLOYD AT ALL ON THIS QUESTION OF LOSS CAUSATION.

AND DESPITE EVERYTHING THAT YOU HEARD THIS MORNING, YOUR HONOR, AND ALL THE DISCUSSION THAT WAS HAD, MACPHEE IS NOT CONSISTENT WITH NINTH CIRCUIT LAW, INCLUDING LLOYD AND CASES INTERPRETING LLOYD.  AND, IN FACT, MACPHEE EXPLICITLY REJECTED LLOYD IN A FOOTNOTE, FINDING THAT THE ELEVENTH CIRCUIT'S EARLIER DECISION IN THE FINDWHAT CASE FORECLOSED THEM FROM FOLLOWING LLOYD.  THAT'S FOOTNOTE 12 IN THE MACPHEE CASE.

SO, YOUR HONOR, THE MACPHEE COURT BASICALLY ACKNOWLEDGED THAT ITS DECISION WAS NOT CONSISTENT WITH NINTH CIRCUIT LAW.

LLOYD, ON THE OTHER HAND, STOOD FOR THE PROPOSITION THAT THE ANNOUNCEMENT OF AN INVESTIGATION CAN FORM THE BASIS OF A VIABLE LOSS CAUSATION THEORY IF THE COMPLAINT ALSO ALLEGES A SUBSEQUENT CORRECTIVE DISCLOSURE BY THE DEFENDANT, I.E., A SUBSEQUENT DISCLOSURE OF ACTUAL WRONGDOING.

AND THAT'S EXACTLY WHAT WE HAVE HERE, YOUR HONOR.  WE ALLEGE THE SUBSEQUENT CORRECTIVE DISCLOSURE OCCURRED ON NOVEMBER 9TH, 2021, AND THERE'S NO DISPUTE THAT THE ANNOUNCEMENT OF THE INVESTIGATION ANNOUNCED ON AUGUST 16TH WAS EXPLICITLY RELATED TO THE ALLEGED MISSTATEMENTS.  WE ADDRESS THAT AT PAGE 23 OF OUR OPPOSITION.

THE COURT:  UM-HUM.

MR. URIS:  NOW, A FEW POINTS ON LLOYD.

THEY ARGUE -- IT WAS ARGUED THIS MORNING THAT THE ANNOUNCEMENT IN LLOYD WAS, WAS MORE DETAILED.

BUT LLOYD INVOLVED THE ANNOUNCEMENT OF A SUBPOENA REGARDING ITS LENDING PRACTICES, AND IT WAS FROM THE DETAILS OF THE SUBPOENA THAT BLOGGERS CLAIMED THAT IT APPEARED TO PERTAIN TO THE ADEQUACY OF ITS LARGEST BORROWER'S RESERVES.  SO INVESTORS THERE NEEDED TO MAKE AN INFERENCE AS TO WHAT IT PERTAINED TO.

HERE NO ONE DISPUTES THAT THE INVESTIGATION CONCERNED THE ADEQUACY OF VIEW'S WARRANTY ACCRUAL.

ANOTHER POINT ON LLOYD IS THAT THEY ALSO ARGUE THAT THE SUBSEQUENT DISCLOSURES WERE ONLY IN PLAY BECAUSE THE PLAINTIFF IN LLOYD OWNED STOCK WHEN THE TWO SETS OF CORRECTIVE DISCLOSURES WERE MADE.

THAT ARGUMENT IS WRONG FOR MULTIPLE REASONS.  FIRST, DEFENDANTS HAVE NO BASIS TO CLAIM THAT THE PLAINTIFF IN LLOYD OWNED STOCK WHEN THE SUBSEQUENT DISCLOSURES WERE MADE.  I ACTUALLY PULLED THE OPERATIVE COMPLAINT THERE, AND THE CLASS PERIOD IN LLOYD WAS OCTOBER 2009 TO AUGUST 2010, THE DATE WHEN THE COMPANY ANNOUNCED RECEIPT OF THE SUBPOENA AT ISSUE.

THE SUBSEQUENT CORRECTIVE DISCLOSURES OCCURRED AFTER THE CLASS PERIOD ENDED IN SEPTEMBER 2010, AND I THINK THERE WAS A LATER DISCLOSURE IN JANUARY OR FEBRUARY OF 2011.

AND SO THERE, AS REQUIRED, THE LEAD PLAINTIFF SUBMITTED ITS TRANSACTIONS THAT OCCURRED DURING THE CLASS PERIOD ONLY. SO WE DON'T KNOW WHETHER LEAD PLAINTIFF SOLD ITS SHARES PRIOR TO THOSE SUBSEQUENT DISCLOSURES THAT OCCURRED AFTER THE CLASS PERIOD.

AND THEN SECOND, AND I THINK EVEN MORE IMPORTANT, IS THAT LLOYD NEVER SAID THAT THE LATER DISCLOSURE WAS ONLY IN PLAY BECAUSE PLAINTIFFS STILL OWNED THE STOCK.

IN FACT, WE CITED CASES WITHIN THIS CIRCUIT, INCLUDING THE NORTHERN DISTRICT OF CALIFORNIA, EXPLAINING WHY THAT MAKES NO SENSE AND IT ISN'T THE RULE IN THIS CIRCUIT, AND ONE OF THOSE CASES IS THE NUVASIVE CASE THAT WE CITE, AND THAT'S ANOTHER KEY CASE THAT DEFENDANTS COMPLETELY IGNORED IN THEIR REPLY.

THE COURT:  WHICH CASE IS THAT, MR. URIS?

MR. URIS:  YES.

THE COURT:  GIVE ME THE NAME OF THAT CASE AGAIN.

MR. URIS:  SORRY.  THAT'S, I DON'T KNOW HOW TO PRONOUNCE IT, BUT MAUSS V. NUVASIVE, INC.

THE COURT:  GOT IT.

MR. URIS:  AND CITE IS 2016 WESTLAW 3681831.  AND THAT'S FROM THE SOUTHERN DISTRICT OF -- SORRY.  I GUESS THAT'S A SOUTHERN DISTRICT OF CALIFORNIA CASE.

THE COURT:  OKAY.

MR. URIS:  AND, YEAH, SO THAT -- THESE CASES EXPLAIN WHY THAT MAKES NO SENSE AND ISN'T THE RULE IN THIS CIRCUIT.

THE COURT:  WHY DON'T THE -- I DON'T THINK -- SO I JUST DON'T HAVE ANY NINTH CIRCUIT LAW ON THIS ISSUE OF WHETHER YOU NEED TO OWN THE STOCK ON THE DATE OF THE CORRECTIVE DISCLOSURE.

MR. URIS:  YEAH.  I MEAN, I THINK LLOYD -- IT'S IMPLIED FROM LLOYD THAT IT'S NOT --

THE COURT:  I CAN'T IMPLY THAT.  I CAN'T IMPLY THAT.  THAT'S NOT A RULING FROM THE NINTH CIRCUIT.  IT MAY NOT HAVE BEEN BRIEFED, BUT I CAN'T -- I CAN'T IMPLY THAT OWNERSHIP ON THE -- OR LACK OF OWNERSHIP.  IT JUST WASN'T CONSIDERED.

MR. URIS:  YES, YOUR HONOR.

AND I GUESS I WOULD STILL POINT YOUR HONOR TO NUVASIVE, WHICH IS AT LEAST A DISTRICT COURT CASE WITHIN THE NINTH CIRCUIT --

THE COURT:  SURE.

MR. URIS:  -- THAT EXPLAINS THE REASONING.

AND THERE THE COURT MADE CLEAR THAT, QUOTE, THE IMPORTANT CONSIDERATION IS THE MARKET'S UNDERSTANDING OF A GIVEN DISCLOSURE AT THE TIME IT WAS MADE.

AND SO I -- FOR DEFENDANTS TO ARGUE THAT THE LATER DISCLOSURE CAN ONLY BE IN PLAY IF ANY GIVEN CLASS MEMBER STILL OWNS STOCK, IT JUST DOESN'T MAKE ANY SENSE.

THE QUESTION IS, WHAT DID THEY UNDERSTAND AT THE TIME THAT FIRST DISCLOSURE WAS MADE, AND WE ALLEGE THAT THAT INITIAL DISCLOSURE IS WHEN THE TRUTH BEGAN TO LEAK OUT.

WHETHER OR NOT --

THE COURT:  BUT THEN YOU'RE IGNORING LOOS, THOUGH, AREN'T YOU?  LOOS DOESN'T SAY THAT -- THERE'S NO TRUTH LEAKING OUT IN -- IS IT -- THE NINTH CIRCUIT DID NOT OVERRULE LOOS WHEN THEY ISSUED THE LLOYD DECISION.  THEY BUILT ON IT.

MR. URIS:  YES.  SO, YOUR HONOR, LOOS LEFT OPEN THE QUESTION OF WHETHER THE ANNOUNCEMENT OF AN INVESTIGATION, STANDING ALONE, WAS ENOUGH.

AND WHAT LLOYD SAID WAS YOU NEED TO HAVE A LATER DISCLOSURE THAT BASICALLY CONFIRMS THE WRONGDOING.

THE COURT:  RIGHT.

MR. URIS:  SO, YOU KNOW, WHEN YOU'RE ALLEGING THAT SOMEONE UNDERSTOOD THAT INITIAL DISCLOSURE TO BE A DISCLOSURE OF THE TRUTH, THEY CAN'T REALLY HAVE UNDERSTOOD THAT UNLESS IT WAS ACTUALLY CONFIRMED LATER ON THAT THAT WAS THE CASE.

BUT WHETHER OR NOT THEY STILL HOLD THE STOCK DOESN'T MATTER.  THAT LATER DISCLOSURE STILL CONFIRMS THAT WHAT THEY UNDERSTOOD ON THAT EARLIER DATE WAS SOMETHING THAT WAS TRUE.

THE COURT:  OKAY.

MR. URIS:  AND ON THIS POINT, THEY ALSO CITE IN THEIR REPLY BRIEF THIS ROK V. IDENTIV CASE, AND I DON'T NEED TO GO INTO MUCH DETAIL ON THAT, BUT I WOULD JUST POINT OUT THAT THERE THE COURT FOUND THAT THE CORRECTIVE DISCLOSURES DID NOT RELATE TO AN ACTUAL MATERIAL MISREPRESENTATION.

THE COURT:  UM-HUM.

MR. URIS:  AND THE COURT EVEN FOUND THAT WHEN -- THAT THE SUBSEQUENT ANNOUNCEMENTS DID NOT REVEAL ANY FRAUD OR EVEN THE OUTCOME OF THE SPECIAL COMMITTEE'S INVESTIGATION.

SO, I MEAN, THAT'S EXACTLY WHAT HAPPENED HERE.

THE COURT:  UM-HUM.

MR. URIS:  SO THE CASE IS JUST NOT RELEVANT.

THE COURT:  OKAY.

MR. URIS:  AND THE COURT THERE ALSO DID FIND THAT THE STOCK DROP MAY HAVE RELATED TO OTHER CONCERNS OF OTHER MATERIAL WEAKNESSES THAT WERE ALSO DISCLOSED.

THE COURT:  UM-HUM.

MR. URIS:  SO WITH THAT, I THINK I WOULD STOP THERE ON THE LOSS CAUSATION ISSUE.

THE COURT:  OKAY.

MR. URIS:  AND THERE ARE A FEW OTHER POINTS THAT I CAN HOPEFULLY ADDRESS RELATIVELY QUICKLY.

THE COURT:  OKAY.

MR. URIS:  SO THERE -- I THINK VIEW AND MULPURI AND I BELIEVE PRAKASH ALSO MAKE -- THEY MAKE AN ARGUMENT THAT -- SORRY.  I LOST MY --

THE COURT:  THERE'S A LOT THERE.

MR. URIS:  YEAH, SORRY.  LET ME JUST GATHER MY PLACE HERE.

SO THEY MAKE THE ARGUMENT THAT, YOU KNOW, WE DON'T ALLEGE THAT, YOU KNOW, IT WAS KNOWN THAT THE WARRANTY ACCOUNTING WAS

INCORRECT OR THAT, YOU KNOW, IT WAS KNOWN WHAT THE APPLICABLE ACCOUNTING RULES WERE.

BUT, YOU KNOW, I WOULD JUST POINT OUT, YOU KNOW, AS TO PRAKASH, THE -- THE -- VIEW'S AUDIT COMMITTEE FOUND THAT HE INTENTIONALLY LIED TO THE BOARD AND VIEW'S AUDITOR, AND I WOULD SUBMIT THAT THAT ALONE SUPPORTS A STRONG INFERENCE OF SCIENTER. I MEAN, THERE'S NO OTHER REASON THAT ONE WOULD LIE TO THE BOARD AND TO THE AUDITOR IF NOT TO AVOID DISCLOSURE OF THEIR COSTS.

AND, AGAIN, WE DON'T NEED TO PROVE THAT ANYONE KNEW THE ACCOUNTING WAS IMPROPER.  AS TO THE 10(B) CLAIM, WE JUST NEED TO ALLEGE A STRONG INFERENCE OF SCIENTER, WHICH ALSO INCLUDES DELIBERATE RECKLESSNESS.

THE COURT:  I DON'T THINK THAT'S CORRECT.  I DON'T THINK YOU'VE STATED SCIENTER LAW CORRECTLY THERE.  WE CAN ALL GO BACK TO TELLABS.

WE CAN MOVE ON.

(PAUSE IN PROCEEDINGS.)

MR. URIS:  WELL, AGAIN, YOUR HONOR, I WOULD POINT TO THE FACT THAT, YOU KNOW, THAT THE DECISION TO COVER THE COSTS WERE KNOWN, AND THEN PRAKASH LIED TO PWC ABOUT THAT, WHICH SHOWS AN INFERENCE -- WHICH SHOWS AN INTENT TO AVOID DISCLOSURE.  WE ADDRESS THAT IN THE BRIEF AT PAGE 12.

THE COURT:  UM-HUM.  THANK YOU.

MR. URIS:  THERE WERE A FEW OTHER POINTS THAT I THINK WERE WORTH ADDRESSING, AND THE FIRST IS THIS ARGUMENT THAT

VIEW'S OWN FINDING OF INTENTIONAL CONDUCT BY PRAKASH IS SOMEHOW A CONCLUSORY ALLEGATION THAT CANNOT ESTABLISH SCIENTER FOR PRAKASH AND VIEW.

I'D POINT OUT THAT THAT IS NOT AN ARGUMENT THAT WAS MADE IN THEIR OPENING BRIEF.  IN FACT, IN THEIR OPENING BRIEF, THEY REFER TO TWO SETS OF ALLEGATIONS CONCERNING SCIENTER AND COMPLETELY NEGLECTED THIS SET, AND THEN IT WASN'T UNTIL THEIR REPLY THAT THEY CONCEDED THAT THERE WAS ANOTHER SET OF ALLEGATIONS ON THE SCIENTER POINT.

THE COURT:  UM-HUM.

MR. URIS:  AND ON THAT POINT, I WOULD JUST NOTE OUT THAT, THAT THE -- THAT IT'S NOT A CONCLUSORY ALLEGATION, AND UNLIKE THEIR CITED CASES, THE AUDIT COMMITTEE DID, IN FACT, MAKE A SPECIFIC -- MADE SPECIFIC FACTUAL FINDINGS THAT PRAKASH INTENTIONALLY FAILED TO DISCLOSE CERTAIN INFORMATION TO THE VIEW BOARD AND PWC REGARDING THE APPLICABLE COSTS INCURRED AND EXPECTED TO BE INCURRED IN CONNECTION WITH THE WARRANTY RELATED OBLIGATIONS.

THAT IS -- THAT'S A FINDING OF FACT.

THE COURT:  UM-HUM.

MR. URIS:  THAT STANDS IN CONTRAST TO THE CASES THAT THEY CITE, WHICH IS THIS GLAZER CASE.  AND THERE THAT CASE INVOLVED A SETTLEMENT AGREEMENT, AND THE COURT THERE NOTED THAT THERE WAS NOTHING IN THE SETTLEMENT AGREEMENT THAT WOULD SUPPORT THE CONCLUSION THAT THE INDIVIDUAL DEFENDANTS HAD

KNOWLEDGE OF THE VIOLATIONS, WHERE THE ADMISSIONS IN THE SETTLEMENT AGREEMENT SUGGESTED ONLY THAT THERE WAS -- THERE WERE -- SUGGESTED, QUOTE, THE MERE FACT THAT SOMEONE AT THE COMPANY HAD KNOWLEDGE OF THE ILLEGAL TRANSACTIONS.

SO HERE THE FINDING WAS SPECIFIC AS TO PRAKASH.  THERE THERE WAS JUST AN ADMISSION IN THE SETTLEMENT AGREEMENT THAT SOMEONE AT THE COMPANY ACKNOWLEDGED, SO THAT WASN'T SPECIFIC ENOUGH THERE.

AND THEN THEY CITE THIS IN RE: BALLY TOTAL FITNESS CASE, AND THERE THAT CASE CONCERNED FINDINGS OF AGGRESSIVE ACCOUNTING, AND THE COURT THERE NOTED THAT THE FACT THAT THE COMPANY ACKNOWLEDGED THAT FALSE STATEMENTS WERE MADE IS NOT EQUIVALENT TO ADMITTING SCIENTER.  A FALSE STATEMENT IS ONE ELEMENT OF THE SECURITIES FRAUD CLAIM.  SCIENTER IS A WHOLLY SEPARATE ELEMENT.

AND THEN THEY NOTED THAT THE AUDIT COMMITTEE'S FINDINGS ARE ESSENTIALLY OF NEGLIGENCE, BUT NOT SCIENTER.

SO THERE THERE WERE, QUOTE-UNQUOTE, AGGRESSIVE ACCOUNTING, WHICH STANDS, I THINK, IN CONTRACT -- IN CONTRAST TO HERE WHERE THEY FOUND THAT PRAKASH INTENTIONALLY WITHHELD INFORMATION.

ANOTHER POINT THAT WAS RAISED FOR THE FIRST TIME ON REPLY BY DEFENDANTS VIEW AND PRAKASH WAS THAT PRAKASH'S SCIENTER CANNOT BE IMPUTED TO VIEW DUE TO THE ADVERSE INTEREST EXCEPTION TO THE GENERAL IMPUTATION RULE, AND AGAIN, THAT IS NOT SOMETHING THAT WAS RAISED IN THEIR OPENING BRIEF.

AND ON THAT POINT, VIEW ARGUES THAT THE S.A.C. ALLEGES THAT PRAKASH LIED TO VIEW'S BOARD ABOUT INSTALLATION AND FREIGHT COSTS AND THEREFORE SCIENTER CANNOT BE IMPUTED UNDER THE ADVERSE INTEREST EXCEPTION BECAUSE A ROGUE AGENT'S KNOWLEDGE IS NOT IMPUTED TO HIS PRINCIPAL IF HE ACTS ADVERSELY TO THE PRINCIPAL.  THAT'S IN THEIR REPLY AT PAGE 6.

THE COURT:  UM-HUM.

MR. URIS:  FIRST, I WOULD NOTE THAT THEY OMITTED KEY LANGUAGE FROM THE EXCEPTION, WHICH IS THAT A ROGUE AGENT'S ACTIONS OR KNOWLEDGE ARE NOT IMPUTED TO THE PRINCIPAL IF THE AGENT ACTS ADVERSELY TO THE PRINCIPAL IN A TRANSACTION OR MATTER INTENDING TO ACT SOLELY FOR THE AGENT'S OWN PURPOSES OR THOSE OF ANOTHER PERSON.

SO I THINK THE ARGUMENT FAILS ON THAT POINT ALONE BECAUSE THEY HAVE NOT EXPLAINED HOW PRAKASH'S ACTIONS WERE INTENDED SOLELY FOR HIS OWN PURPOSE OR THOSE OF ANOTHER PERSON.

SECOND, AS -- AND THE SECOND POINT I WOULD MAKE IS THAT EVEN IF THE ADVERSE INTEREST EXCEPTION APPLIED, THE CORPORATION REMAINS RESPONSIBLE WHEN AN INNOCENT THIRD PARTY RELIES ON REPRESENTATIONS MADE WITHIN A PARENT AUTHORITY.

AND AS IN CHINACAST -- THAT'S FROM THE CHINACAST CASE.

AND AS IN CHINACAST, VIEW AND MULPURI DO NOT DISPUTE THAT PRAKASH ACTED WITHIN THE SCOPE OF HIS AUTHORITY.

AND I WOULD JUST REFER YOUR HONOR TO THE IN RE: PETROBRAS CASE.  THE CITE FOR THAT CASE IS 116 F.SUPP.3D 368, AND THAT

WAS A SOUTHERN DISTRICT OF NEW YORK CASE. BUT THERE THE COURT FOUND THAT, EFFECTIVELY THAT THE EVENTUAL ISSUANCE OF THE MISLEADING STATEMENTS OPERATED AS A FRAUD ON THE INVESTING PUBLIC AND NOT ON PETROBRAS ITSELF.

AND THEN I BELIEVE IT WAS COUNSEL FOR PRAKASH THIS MORNING RAISED AN ARGUMENT THAT -- I THINK THEY MAY HAVE RAISED IT THIS MORNING, BUT THIS WAS ALSO AN ARGUMENT THAT WAS FOUND IN VIEW, IN DEFENDANT VIEW AND MULPURI'S REPLY IN WHICH THEY CITE A SLEW OF NEW CASES AND NEWLY ARGUE THAT TO PLEAD FRAUD UNDER SECTION 10(B), THE COMPLAINT MUST ALLEGE THAT PRAKASH ACTED WITH INTENT TO MISLEAD INVESTORS SPECIFICALLY. THEY CITE THE GLAZER CASE THERE.

AND ON THAT, I WOULD JUST NOTE THAT, YOU KNOW, AGAIN, I WOULD SAY, YOU KNOW, AGAIN, LYING TO AUDITORS CLEARLY SHOWS AN INTENT TO AVOID PUBLIC DISCLOSURE TO INVESTORS.

AND IN THE GLAZER CASE, WHICH IS THEIR CASE, THE COURT DEFINES SCIENTER AS USED IN FEDERAL SECURITIES LAWS TO MEAN INTENT TO MISLEAD INVESTORS OR DELIBERATE RECKLESSNESS TO AN OBVIOUS DANGER OF MISLEADING INVESTORS.

AND I DON'T THINK THERE CAN BE ANY SERIOUS DISPUTE THAT LYING TO AUDITORS SHOWS AT LEAST DELIBERATE RECKLESSNESS TO AN OBVIOUS DANGER OF MISLEADING INVESTORS.

I BELIEVE THAT MIGHT BE ALL I WANTED TO ADDRESS.

I DON'T KNOW -- I THINK YOUR HONOR HAD ALSO RAISED, AT THE VERY BEGINNING OF THIS HEARING, WHICH I KNOW WAS A LONG TIME

AGO --

THE COURT:  THAT WAS A LONG TIME AGO.

MR. URIS:  -- A QUESTION AS TO DEFENDANT PION.

THE COURT:  RIGHT.

MR. URIS:  SO I JUST WANTED TO QUICKLY RESPOND ON THAT POINT.

AND ON THAT POINT, I WOULD NOTE THAT -- SO DEFENDANT PION, I BELIEVE HE WAS THE FORMER CFO OF CF II, AND HE -- SO HE SIGNED THE MERGER AGREEMENT ITSELF.  HE SIGNED THE PRELIMINARY PROXY STATEMENT THAT WAS FILED IN DECEMBER OF 2020.  HE ALSO SIGNED THE FIRST AMENDMENT TO THE PROXY STATEMENT WHICH I BELIEVE WAS FILED IN JANUARY.

AND THOSE DOCUMENTS ALL, WITH THE EXCEPTION OF THE MERGER AGREEMENT, THOSE DOCUMENTS ALL CONTAINED THE ALLEGED MISLEADING STATEMENTS.

AND HE WAS THERE WHEN ALL OF THE DUE DILIGENCE WAS DONE, AND SO, YOU KNOW, WHILE HE DID RESIGN BEFORE THE PROXY STATEMENT WAS DECLARED EFFECTIVE, THE DEFENDANTS HAVE NOT CITED ANY CASE TO SUGGEST THAT HE CAN SOMEHOW AVOID LIABILITY BY RESIGNING PRIOR TO THE PROXY STATEMENT'S ISSUANCE WHEN HE SIGNED THOSE SAME STATEMENTS, YOU KNOW, AND WAS THERE WHEN, YOU KNOW, THEY WERE SOLICITING THIS, THIS MERGER.

THE COURT:  I GUESS THE REAL ISSUE COMES DOWN TO WHETHER THERE'S ANY ALLEGATION OF SOLICITATION ON HIM.

MR. URIS:  YEAH.  WELL, SO HE SIGNED -- HE SIGNED THE

MERGER AGREEMENT ITSELF, WHICH I THINK MAKES REPRESENTATIONS AS TO THE BOARD'S APPROVAL OF THE TRANSACTION.  SO TO ME THAT'S A CLEAR SOLICITATION.

YOU KNOW, HE'S RECOMMENDING --

THE COURT:  IS THERE A CASE THAT SAYS SIGNING A MERGER AGREEMENT IS ENOUGH FOR SOLICITATION?  I'M NOT AWARE OF THAT.

MR. URIS:  I LOOKED FOR ONE, YOUR HONOR.  I WAS NOT ABLE TO FIND ONE DIRECTLY ON POINT.

THE COURT:  OKAY.

ALL RIGHT.  WELL, YOUR CASE DOESN'T DEPEND ON EVERY SINGLE ONE OF THESE DEFENDANTS REMAINING IN.  IT'S A LOT OF, A LOT OF DEFENDANTS THAT YOU'VE BROUGHT IN.

SO IF YOUR CASE SURVIVES, THE -- AND, FRANKLY, IT LOOKS LIKE IT WILL.  I JUST DON'T KNOW WHICH PARTS OF IT AND WHICH DEFENDANTS.

ALL RIGHT.  DOES THAT TAKE CARE OF YOUR ARGUMENT, MR. URIS?

MR. URIS:  YES, YOUR HONOR.

THE COURT:  THANK YOU.

MR. URIS:  UNLESS YOU HAVE ANY ADDITIONAL QUESTIONS YOU'D LIKE TO ASK ME.

THE COURT:  NOT NOW, NO.

MR. BERRY, I'M GOING TO RETURN TO YOU, AND I'LL MAKE THE ROUNDS OF THE DEFENSE COUNSEL.

MR. BERRY:  SORRY.  I WAS ON MUTE.  THAT DOES NOT HELP.

THE COURT:  NO.

MR. BERRY:  THANK YOU, YOUR HONOR.  SO I'LL TRY TO BE BRIEF.

I WANT TO FIRST ADDRESS SORT OF THE OVERARCHING ISSUE HERE WHEN WE THINK ABOUT THE SCIENTER AND NEGLIGENCE ALLEGATIONS.

THEIR COMPLAINT ESSENTIALLY SAYS THAT THE TWO EXECUTIVES, THE CEO AND THE CFO, KNEW THAT THE COMPANY WAS PAYING INSTALLATION COSTS ABOVE AND BEYOND WHAT THE WARRANTY REQUIRED.  THAT'S WHAT THEY HAVE AN ALLEGATION OF.

THE COURT:  UM-HUM.

MR. BERRY:  AND THEY'RE TRYING TO SAY THAT THAT AMOUNTS TO SCIENTER FOR MR. PRAKASH, AND NEGLIGENCE FOR MR. PRAKASH AND MR. MULPURI JUST BECAUSE THEY KNEW OF THIS PRACTICE.

AND I THINK YOU WERE -- YOU ASKED MR. URIS ABOUT, IS THAT REALLY THE SCIENTER STANDARD?

AND I THINK YOU'RE RIGHT.  AND I THINK THE CASE TO LOOK AT IS THE WEBB CASE, THE NINTH CIRCUIT CASE THAT WE CITE, BECAUSE THAT GOES SQUARELY TO THIS ISSUE.

THERE -- THAT CASE, LIKE THIS ONE, HAD AN ACCOUNTING ERROR.  IT WAS A COMPLICATED ACCOUNTING ERROR HAVING TO DO WITH -- IT WAS SOLARCITY AND THEY LEASED THEIR SOLAR EQUIPMENT AND THEY SCREWED UP THE ACCOUNTING FORMULAS FOR HOW TO ACCOUNT

FOR THE OVERHEAD COSTS WITH RESPECT TO THOSE LEASES.

AND THE NINTH CIRCUIT AGREED WITH THE DISTRICT COURT, BECAUSE THE DISTRICT COURT HAD FOUND THAT THE --

THE COURT:  THAT WAS MY CASE, WASN'T IT?

MR. BERRY:  I THINK SO, YOUR HONOR.

AND THEY AGREED THAT IF YOU'RE NOT GOING TO ALLEGE THAT THE HIGH LEVEL EXECUTIVES KNEW ABOUT THE ACCOUNTING OR KNEW THE ACCOUNTING STANDARDS, THEN YOU CAN'T ALLEGE SCIENTER.  JUST ALLEGING THAT THEY MAY HAVE KNOWN A LITTLE BIT ABOUT THE CIRCUMSTANCES, THE FACTUAL CIRCUMSTANCES OF THE BUSINESS OPERATIONS DOESN'T EQUATE TO ACCOUNTING FRAUD IF YOU'RE NOT ALSO ALLEGING THAT THEY KNEW ABOUT THE ACCOUNTING ERROR.

AND THAT'S ESPECIALLY TRUE FOR DR. MULPURI, THE CEO.

THE COURT:  UM-HUM.

MR. BERRY:  THERE'S NO ALLEGATION IN THIS COMPLAINT AT ALL THAT HE WAS INVOLVED IN THE ACCOUNTING DECISION, SO I DON'T KNOW HOW YOU CAN EVEN GET TO NEGLIGENCE WITH HIM.

AND, AGAIN, THE S.E.C. DIDN'T FOR I THINK THIS VERY REASON.

THERE'S NO ALLEGATION IN THIS COMPLAINT THAT HE WAS INVOLVED AT ALL IN THE ACCOUNTING DECISION, AND I THINK IT'S JUST TOO MUCH OF A LEAP TO MAKE IT SO THAT HE CAN BE HELD LIABLE FOR NEGLIGENCE WHEN HE WAS NOT DOING THE ACCOUNTING.

THIS WAS VERY COMPLICATED ACCOUNTING.  I'M NOT GOING TO READ FROM IT, BUT IF YOU LOOK AT OUR EXHIBIT 10 TO MY

DECLARATION, WE PUT IN THE 10-K THAT WAS FILED WITH THE RESTATEMENT.  ON PAGE 84, IT SORT OF DESCRIBES HOW COMPLICATED THIS ACCOUNTING WAS.  IT INVOLVED STATISTICAL ANALYSIS AND PREDICTIONS OF FUTURE COSTS.

SO JUST KNOWING THAT THE COMPANY IS PAYING THESE COSTS DOES NOT EQUATE TO PURPOSEFULLY OR EVEN NEGLIGENTLY GETTING THE ACCOUNTING WRONG.  THAT'S A VERY DIFFERENT ISSUE, AND I THINK THE NINTH CIRCUIT IN THE WEBB CASE IS SQUARELY ON POINT THERE.

NOW, THE OTHER THING I THINK THAT IS REALLY IMPORTANT TO BE TOUCHED ON, I THINK IT MIGHT HAVE GOTTEN LOST IN THE SHUFFLE, THEIR NEW ALLEGATIONS FOR RAO MULPURI, HE'S NOT MENTIONED IN ANY OF THESE INVESTIGATIVE FINDINGS AT ALL, SO THE STUFF ABOUT INTENTIONALITY AND NEGLIGENCE DOESN'T INVOLVE HIM AT ALL.

IN FACT, HE'S ON THE BOARD, AND SO ONE OF THOSE FINDINGS IS THAT SOMEBODY INTENTIONALLY WITHHELD INFORMATION FROM HIM. HE'S ON THE BOARD.

SO THAT DOESN'T IMPACT WHETHER OR NOT NEGLIGENCE HAS BEEN PLED FOR HIM BECAUSE IT DOESN'T INVOLVE HIM.

AND ALL THOSE COPIED AND PASTED ALLEGATIONS WHICH ARE, FRANKLY, THE MEAT OF WHAT THEY'RE TRYING TO DO TO SUPPORT THEIR SCIENTER AND NEGLIGENCE ALLEGATIONS, THEY HAVE NOTHING TO DO WITH HIM.  I THINK HE MIGHT BE MENTIONED TANGENTIALLY IN ONE OF THOSE 33 PARAGRAPHS THAT WERE COPIED AND PASTED.

NOW, I SHOULD TOUCH ON, THERE WAS SOME SUGGESTION THAT

THIS CASE DOESN'T SOUND IN FRAUD.

I THINK THAT IT'S IMPORTANT TO REALIZE THAT THIS CASE DEFINITELY SOUNDS IN FRAUD, CERTAINLY THE 14(A) CLAIM, AND THAT'S WHY THERE HAS TO BE PARTICULARIZED ALLEGATIONS OF DR. MULPURI'S SUPPOSED NEGLIGENCE HERE.

THE 14(A) CLAIM IS ABOUT THE SAME MISSTATEMENTS.  IT'S ALL THE SAME.  10(B) AND 14(A) ARE ALL ABOUT THE MISSTATED WARRANTY.

AND IF YOU LOOK AT HOW THEY PLED THEIR CASE, THEY COPIED AND PASTED -- AND, AGAIN, THOSE COPIED AND PASTED ALLEGATIONS FROM THE S.E.C. ARE THE ONES WHERE THEY ACTUALLY TALK ABOUT EVENTS.  THAT'S THE ONLY PARTICULAR PLACE WHERE THERE'S AN ATTEMPT TO GET THE PARTICULARIZED ALLEGATIONS.

THEY PUT THAT INTO THE COMPLAINT.  THEY PUT THAT INTO THEIR SCIENTER SECTION FOR THEIR 10(B) CLAIM.

AND SO WHEN MR. URIS WAS TALKING ABOUT HOW THEY HAVE PLED THINGS SUFFICIENTLY FOR THE 14(A), HE'S USING THOSE ALLEGATIONS THAT HE'S GOT IN THEIR SCIENTER SECTION TO SUPPORT THEIR 14(A), AND I JUST THINK THAT UNDERSCORES THIS 14(A) CLAIM, UNDISPUTEDLY, SOUNDS IN FRAUD.

SO THEY'VE GOT TO PLEAD NEGLIGENCE FOR MR. MULPURI -- OR DR. MULPURI WITH PARTICULARITY, WHICH THEY DON'T COME CLOSE TO BECAUSE HE WASN'T INVOLVED IN THE ACCOUNTING DECISIONS AT ALL, NOT ALLEGED AT ALL.

BRIEFLY ABOUT MR. PRAKASH, I KNOW MS. WHITE IS GOING TO

TOUCH INTO IT, I JUST WANT TO TOUCH BASE ON THAT THEY COPIED AND PASTED.

RULE 11 REQUIRES THEM, AS YOU HELD IN THE GOOGLE RICO CASE, THEY'VE GOT TO INDEPENDENTLY VERIFY THEIR ALLEGATIONS.

I THINK IT'S BASICALLY BEEN ACKNOWLEDGED THAT THEY DIDN'T. THE ONLY THING I THINK MR. URIS POINTED TO WAS THEY'VE BEEN LITIGATING FOR TWO YEARS AND FILED A BUNCH OF COMPLAINTS.  THAT CLEARLY ISN'T AN INDEPENDENT INVESTIGATION OF THESE NEW ALLEGATIONS BECAUSE THEY JUST SHOWED UP AND THEY'RE COPIED AND PASTED FROM THE S.E.C.

HE MENTIONED HE DID A FOIA REQUEST OF THE S.E.C.  NOT SURPRISING THEY DIDN'T RESPOND.

BUT THEY DIDN'T, RIGHT?  AND SO THAT CLEARLY DIDN'T VERIFY ANY OF THESE ALLEGATIONS BECAUSE HE DIDN'T GET ANY INFORMATION.

SO THEY ARE -- THEY HAVE ALLEGATIONS ABOUT EMAILS AND MEETINGS AND THEY HAVE NO INDEPENDENT VERIFICATION OF THAT, AND YOUR DECISION IN THE GOOGLE CASE SAYS THOSE NEED TO BE DISREGARDED BECAUSE THEY HAVEN'T BEEN ABLE TO DO THAT.

THEY DON'T HAVE CONFIDENTIAL WITNESSES.  THEY DON'T HAVE THE DOCUMENTS.  THEY DON'T HAVE ANYTHING.

AND HE CERTAINLY HASN'T SAID THAT THEY DO, SO I THINK RULE 11 DOES APPLY AND I THINK THEY DO NEED TO BE STRUCK.

LAST POINT.  WE TALKED ABOUT THE CAUSATION.  NOW, YOU ASKED SOME GOOD QUESTIONS ABOUT THE STOCK PRICE DROP IN THE MACPHEE CASE, SO DURING RECESS, I WENT BACK AND LOOKED AT THE

ELEVENTH CIRCUIT DECISION, AND ON PAGE 1231 OF THE ELEVENTH CIRCUIT DECISION, THE ELEVENTH CIRCUIT POINTS OUT THAT THE COMPLAINT ALLEGES THAT EVERY CORRECTIVE DISCLOSURE IN THE CASE, FROM THE ONES THAT ARE MORE LIKE LOOS, WHICH ARE JUST ANNOUNCING INVESTIGATIONS, I THINK THERE ARE LIKE FOUR OR FIVE OF THOSE, TO EVERY OTHER CORRECTIVE DISCLOSURE THEY'VE GOT IN THE CASE HAD ALL HAD A PRICE DROP.

AND I ACTUALLY ALSO WENT BACK TO THE ACTUAL COMPLAINT IN THAT CASE, IT'S ACTUALLY DOCKET 122 ON THE DOCKET, AND THEY ACTUALLY HAVE A NICE LITTLE CHART AND IT SHOWS THE PERCENT PRICE DROP FOR EACH ONE OF THESE ANNOUNCEMENTS.  AND EVERY, I CALL THEM LOOS-LIKE CORRECTIVE DISCLOSURES WHERE ALL THEY'RE DOING IS ANNOUNCING AN INVESTIGATION, SIGNIFICANT PRICE DROPS.

SO THAT'S EXACTLY WHAT WE'VE GOT HERE.  WE'VE GOT PRICE DROPS IN AUGUST WHERE THEY'RE JUST ANNOUNCING AN INVESTIGATION, AND WE'VE GOT A PRICE DROP IN NOVEMBER WHEN VIEW IS ANNOUNCING THE ACTUAL RESULTS OF THE INVESTIGATION.

SO I THINK THAT ALSO SHOWS, I THINK, WHY MACPHEE APPLIES.

THE COURT:  SO LET ME JUST GO BACK ON A POINT THAT MR. URIS MAKES IN HIS, I THINK IT'S IN HIS OPPOSITION, THAT IF YOUR VIEW OF THE LAW WERE CORRECT, THEN IT WOULD INCENTIVIZE A COMPANY TO ANNOUNCE AN INVESTIGATION, TAKE THE HIT ON THE STOCK, AND THEN HOPE BY THE TIME IT ISSUES THE CORRECTIVE ACTION THAT IT CAN'T BE SUED BECAUSE THE MARKET HAS ALREADY ADJUSTED.

AND MR. URIS ARGUES THAT THAT WOULD BE AN ABSURD RESULT. I -- THAT'S A -- IT'S A STRONG ARGUMENT.

WHAT'S YOUR RESPONSE TO THAT?

MR. BERRY: WELL, I GUESS I HAVE TWO RESPONSES. ONE IS JUST THE PRACTICALITY OF IT, HAVING GONE THROUGH THIS A NUMBER OF TIMES WITH COMPANIES.

THE COURT: YEAH.

MR. BERRY: COMPANIES AREN'T INCENTIVIZED BY WHAT HAPPENS IN THESE CASES. THEY'RE INCENTIVIZED BY THE S.E.C. DISCLOSURE RULES OF WHAT THEY NEED TO DISCLOSE AND WHAT THEY DON'T NEED TO DISCLOSE.

THE COURT: YES, THEY ARE.

MR. BERRY: AND WHEN THERE'S AN INVESTIGATION, THEY'VE GOT TO DISCLOSE THAT.

BUT WHEN THEY DISCLOSE IT, THEY DON'T KNOW THE RESULTS OF IT.

SO WHETHER OR NOT THEY'RE INCENTIVIZED OR NOT --

THE COURT: I SEE.

MR. BERRY: -- THEY HAVE TO DO IT THIS WAY.

BUT THE OTHER ISSUE IS THE LEGAL PIECE HERE. IT'S THE WAY LOSS CAUSATION CORRECTIVE DISCLOSURE WORKS.

NOW, I ACTUALLY THINK MACPHEE IS CONSISTENT WITH LLOYD.

MR. URIS POINTED TO FOOTNOTE 12 IN THE MACPHEE DECISION SAYING THAT SHOWS THE ELEVENTH CIRCUIT DOESN'T AGREE WITH LLOYD. I DON'T THINK THAT'S CORRECT.

AS I SAID, MACPHEE GOES OUT OF ITS WAY TO SAY WE, THE ELEVENTH CIRCUIT, DON'T NEED TO DECIDE THIS LOOS/LLOYD ISSUE, THAT IS, THE ISSUE OF WHETHER OR NOT A DISCLOSURE ABOUT INVESTIGATION COUNTS AS A CORRECTIVE DISCLOSURE BECAUSE THE LEAD PLAINTIFF DIDN'T OWN STOCK THROUGHOUT THE WHOLE PERIOD.

SO THAT'S WHAT THAT FOOTNOTE IS SAYING.  IT'S SAYING WE'RE NOT PERSUADED BY THE PLAINTIFF'S CITATION TO LLOYD FOR THE REASONS ABOVE, AND THE REASONS ABOVE WERE BECAUSE WE'RE ALL TALKING ABOUT THE FACT THAT THE LEAD PLAINTIFF DIDN'T OWN STOCK.

SO THEY'RE NOT SAYING THEY DISAGREE WITH LLOYD.  THEY'RE JUST SAYING WE DON'T NEED TO -- WE'RE NOT PERSUADED BY LLOYD HERE BECAUSE IT DOESN'T MATTER.  WE DON'T NEED TO REACH THE DECISION.

SO THAT'S ONE POINT THAT I THINK IS IMPORTANT TO POINT OUT.

I ALSO WANT TO MAKE SURE WE ARE THINKING ABOUT MACPHEE IN TERMS OF THE RATIONALE OF THAT DECISION, AND THAT'S WHY I THINK IT IS CONSISTENT WITH LLOYD.

LOOS, THE NINTH CIRCUIT LOOS DECISION SAYS STANDALONE INVESTIGATION, REPORT OF INVESTIGATION, TOO SPECULATIVE, IT CAN'T BE A CORRECTIVE DISCLOSURE.

AND AS YOU POINTED OUT, THAT IS STILL GOOD LAW.

THE COURT:  YEAH.

MR. BERRY:  LLOYD COMES IN AND SAYS, WELL, IF YOU

HAVE SOMETHING AFTER THAT THAT'S MORE ROBUST --

THE COURT:  UM-HUM.

MR. BERRY:  -- AND MORE FULSOME, AND AS MR. URIS POINTS OUT, AND CAN CONFIRM WHATEVER HAPPENED BEFORE WITH THE INITIAL DISCLOSURE, IF THOSE TWO READ TOGETHER CAN SHOW THAT THE TRUTH WAS REVEALED, THEN THEY BOTH CAN BE CORRECTIVE DISCLOSURES.

SO IF YOU'RE GOING TO USE LLOYD TO SAY THAT BOTH DISCLOSURES COUNT AS CORRECTIVE DISCLOSURES, THEN IT ONLY MAKES SENSE LEGALLY THAT YOU'VE GOT TO OWN STOCK IN BOTH INSTANCES.

AND THAT IS ALL THAT MACPHEE IS SAYING I THINK, YOUR HONOR, AND I THINK IT'S CONSISTENT WITH LLOYD, AND I THINK IT'S THE RIGHT DECISION AND CORRECT RATIONALE FOR HOW LOSS CAUSATION WORKS.  IF THERE'S A DROP LATER THAT'S WHERE ALL THE TRUTH ACTUALLY IS BEING, OR THE ALLEGED TRUTH IS BEING REVEALED, YOU NEED TO OWN STOCK, AND STADIUM CAPITAL UNDISPUTEDLY DID NOT OWN STOCK AT THAT POINT.

AND I GUESS -- MR. URIS ALSO MENTIONED THAT LLOYD DOESN'T TALK ABOUT WHETHER OR NOT THE PLAINTIFF IN THAT CASE -- THAT DOESN'T MATTER.

I THINK IT'S, AS YOU POINT OUT, IT'S UNCLEAR WHAT HAPPENED IN THAT CASE, BUT WE CAN'T DRAW ANYTHING FROM THAT.

THE COURT:  ALL RIGHT.

MR. BERRY:  MY LAST POINT, I DON'T THINK I CAN LET THIS GO UNCHALLENGED, THERE WAS A DISCUSSION ABOUT THEY

REQUESTED JUDICIAL NOTICE OF THIS COMPLAINT THAT WAS FILED IN DELAWARE.  THAT'S A COMPLAINT -- A CLASS ACTION.  IT'S ONLY AGAINST THE CANTOR INDIVIDUALS, SO I'M SURE MR. STEINFELD IS GOING TO WANT TO TALK ABOUT THIS, TOO.

BUT MR. URIS, AND I THINK THE LEAD PLAINTIFF HERE, IS TRYING TO INSINUATE THAT BOTH CANTOR AND VIEW KNEW THAT THE WARRANTY ACCRUAL WAS BIGGER THAN IT WAS REPORTED WHEN THEY DID THE SPAC MERGER BECAUSE -- THIS IS THEIR THEORY -- IF YOU LOOK AT THAT COMPLAINT, IT'S GOT AN EXCERPT OF A DUE DILIGENCE POWERPOINT THAT SAYS 59 MILLION AND REFERENCES THE WARRANTY ACCRUAL.  IT'S A $59 MILLION TOTAL OF LIABILITIES.

THE WARRANTY ACCRUAL BOOKED WHEN VIEW WENT PUBLIC WAS 24 MILLION.

THE COURT:  RIGHT.

MR. BERRY:  SO WHAT MR. URIS IS SAYING IS, SEE, LOOK AT WHAT THIS COMPLAINT SAYS.  VIEW AND CANTOR KNEW IT WAS 59 MILLION, NOT 24 MILLION.  I THINK HE EVEN SUGGESTED THAT'S WHY IF THEY HAD JUST DONE THEIR DILIGENCE -- THEY DID THEIR DILIGENCE AND THEY KNEW IT AND THEY HID IT.

A COUPLE POINTS.  YOUR HONOR SHOULD NOT BE CONSIDERING THAT AT ALL FOR A NUMBER OF I THINK CRITICAL POINTS.

ONE, THAT POWERPOINT IS NOT REFERENCED IN THEIR COMPLAINT AT ALL.  IT'S ENTIRELY NEW.  NOTHING ABOUT THAT POWERPOINT IS MENTIONED IN THEIR COMPLAINT, SO YOU CAN'T INCORPORATE IT BY REFERENCE UNDER JUDICIAL NOTICE LAW.

TWO, JUDICIAL NOTICE LAW, IF YOU'RE GOING TO TAKE JUDICIAL NOTICE OF A COMPLAINT, THE JUDICIAL NOTICE THAT YOU'RE SUPPOSED TO TAKE, THAT THE COURT IS SUPPOSED TO TAKE IS JUST THE FACT THAT THE COMPLAINT WAS FILED.

CERTAINLY THE COURT'S NOT ALLOWED TO TAKE JUDICIAL NOTICE OF AN EXCERPT OF A MULTI-PAGE POWERPOINT AND WE'RE ONLY LOOKING AT ONE SLIDE AND NOT SEE THE ENTIRE SLIDE.

SO UNDER JUDICIAL NOTICE LAW AND INCORPORATION BY REFERENCE LAW, THIS SHOULD NOT BE CONSIDERED AT ALL.

THE THIRD POINT, WHICH MAY BE THE MOST IMPORTANT POINT, IS WHAT THEY ARE SUGGESTING IN DELAWARE AND WHAT MR. URIS IS NOW SUGGESTING JUST IS FACTUALLY INCORRECT, WHICH JUST UNDERSCORES WHY IT WOULD BE SO WRONG TO TAKE JUDICIAL NOTICE OF THIS DOCUMENT.

IF YOU LOOK AT THE FULL POWERPOINT, THERE ARE OTHER PAGES IN THAT POWERPOINT THAT, FOR WHATEVER REASON, THE PLAINTIFFS IN DELAWARE DIDN'T DECIDE TO DISCLOSE IN A COMPLAINT.  THAT FULL POWERPOINT SHOWS THE COMPONENTS OF THE 59 MILLION, AND IT'S VERY CLEAR THAT IT'S 24 MILLION AS ORIGINALLY BOOKED, AND THERE ARE A BUNCH OF OTHER LIABILITIES THAT ADD TO 59.

IT DOES NOT SHOW THAT ANYBODY AT THE TIME KNEW OR THOUGHT THAT THE WARRANTY ACCRUAL COULD BE AS BIG AS 59 MILLION.  THE REST OF THE POWERPOINT MAKES THAT CLEAR.

BUT BECAUSE IT'S EXCERPTED IN THE DELAWARE COMPLAINT, YOU DON'T SEE THAT IN THE COMPLAINT.  IT JUST UNDERSCORES WHY THERE

SHOULD BE NO JUDICIAL NOTICE OF THAT INTERPLEADER DOCUMENT.

THE COURT:  UM-HUM.

MR. BERRY:  SO THAT'S ALL I HAVE, YOUR HONOR, UNLESS YOU HAVE MORE QUESTIONS FOR ME.

THE COURT:  NO.

ANY OF THE OTHER POINTS ON SCIENTER, NEGLIGENCE THAT YOU WANTED TO TOUCH ON?

MR. BERRY:  I THINK THE MOST IMPORTANT POINT, YOUR HONOR, IS THE POINT OF WHAT I SAID ABOUT DR. MULPURI.  AT A MINIMUM, THEY DON'T HAVE A CASE AGAINST HIM.

THE COURT:  OKAY.

MR. BERRY:  I THINK IT'S VERY CLEAR ON THAT.

THE COURT:  ALL RIGHT.

MS. WHITE, LET ME TURN TO YOU FOR MR. PRAKASH.

MS. WHITE:  YES, THANK YOU, YOUR HONOR.

AND I AM GOING TO START BY STRESSING A POINT THAT MR. BERRY MADE, WHICH IS WHAT THE RIGHT STANDARD IS FOR LOOKING AT SCIENTER AS TO MR. PRAKASH.

SO IT IS NOT, AS I THINK HAS BEEN SUGGESTED DURING THIS VERY LONG ARGUMENT, THAT HIS KNOWLEDGE OF WHETHER THERE -- THE COMPANY WAS GOING TO PAY FOR INSTALLATION COSTS.  THAT'S NOT THE ISSUE.

THE ISSUE IS, VERY SPECIFICALLY, IS WHAT HE KNEW AT THE TIME REGARDING THE COMPANY'S METHODOLOGY FOR DETERMINING THE WARRANTY ACCRUAL AND WHETHER HE KNEW IT WAS INAPPROPRIATE.

SO WHETHER OR NOT HE KNEW THAT THE COMPANY'S PRACTICE WAS TO COVER INSTALLATION COSTS IS NOT THE ISSUE.  THAT DOESN'T GET THEM TO SCIENTER.

AND THERE ARE ZERO ALLEGATIONS IN THE COMPLAINT ABOUT HIS KNOWLEDGE ABOUT WHAT THE APPROPRIATE WARRANTY ACCRUAL SHOULD BE.  ZERO.

IT ALL GOES TO HIS KNOWLEDGE ABOUT THE INSTALLATION COSTS AND WHAT THE COMPANY'S PRACTICE WAS.

AND MR. BERRY POINTED YOU TO ONE NINTH CIRCUIT CASE, THE SOLARCITY CASE, BUT I'LL POINT YOU ALSO BACK TO THE LLOYD CASE, WHICH THERE'S BEEN A LOT OF DISCUSSION ON IN TERMS OF LOSS CAUSATION.  IT ALSO ADDRESSES THIS ISSUE ABOUT SCIENTER IN AN ACCOUNTING CASE, AND IT SAYS VERY SPECIFICALLY AT 1207, TO RAISE A STRONG INFERENCE OF SCIENTER, THE S.A.C., THE COMPLAINT, MUST ALLEGE FACTS DEMONSTRATING THE DEFENDANTS KNOWINGLY AND RECKLESSLY ENGAGED IN IMPROPER ACCOUNTING PRACTICE, FOR EXAMPLE, THAT A COMPANY'S CFO WAS AWARE THAT THE PRACTICE WAS IMPROPER.

AND IT GOES ON TO TALK ABOUT THEIR KNOWLEDGE OF GAAP PRINCIPLES.

AGAIN, MR. PRAKASH WAS NOT AN ACCOUNTANT.  HE HAD -- HE USED HIS ACCOUNTING STAFF TO HELP DETERMINE WHAT THE WARRANTY ACCRUAL WAS.  HE DENIED -- HE CANNOT BE -- IT CANNOT BE INFERRED THAT HE HAD THAT KNOWLEDGE HIMSELF.

AND THEN THE SECOND POINT I WANT TO MAKE IS THAT THERE --

I THINK THERE HAS BEEN, YOU KNOW, A NUMBER -- THERE'S BEEN A LOT OF DISCUSSION ABOUT THE 8-K AND WHAT THE AUDIT COMMITTEE'S CONCLUSIONS WERE, AND JUST RECENTLY MR. URIS SAID REPEATEDLY THAT IT SAYS THAT HE LIED, THAT HE INTENTIONALLY LIED TO THE AUDITORS.

NOWHERE DOES IT SAY THAT HE LIED TO THE AUDITORS.  THAT IS NOT WHAT IT SAYS.  IF YOU LOOK AT THE 8-K, IT'S IN PARAGRAPH 84 OF THE COMPLAINT, IT SAYS, FIRST, THAT AFTER THE INVESTIGATION, THAT THEY DETERMINED THAT HE WAS NEGLIGENT, NOT THAT -- IN HIS -- IN RECORDING THE LIABILITIES RELATED TO WARRANTY RELATED OBLIGATIONS.  HE WAS NEGLIGENT.  HE DIDN'T INTENTIONALLY DO THE WRONG ACCOUNTING.  HE WAS NEGLIGENT WHEN IT CAME TO THAT.

AND THAT HE WAS -- THAT HE INTENTIONALLY FAILED TO DISCLOSE CERTAIN UNDISCLOSED -- THEY DON'T TELL YOU WHAT THE INFORMATION IS -- BUT CERTAIN INFORMATION TO THE BOARD AND PWC ABOUT THE COSTS RELATED TO THE WARRANTY.

THOSE ARE TWO VERY DIFFERENT THINGS.  NOWHERE DOES IT SAY THAT HE LIED TO THE AUDITORS.  AND, AGAIN, IT VERY SPECIFICALLY SAYS THAT HE WAS NEGLIGENT IN HOW HE APPROACHED THE ACCOUNTING.

SO WITH THE VERY CLEAR NINTH CIRCUIT LAW WITH THE LACK OF ANY SPECIFIC ALLEGATIONS IN THE COMPLAINT, WE THINK IT'S VERY CLEAR THAT THEY HAVE NOT ALLEGED SCIENTER AS TO MR. PRAKASH.

AND WITH THAT I WILL TURN IT OVER TO -- UNLESS YOU HAVE ANY OTHER QUESTIONS, YOUR HONOR, I'LL TURN IT OVER.

THE COURT:  NO.  THANK YOU.

MR. STEINFELD, DO YOU WANT TO FINISH IT UP?

MR. STEINFELD:  I DO, YOUR HONOR.  GOOD AFTERNOON NOW.  GOOD MORNING, GOOD AFTERNOON ALL IN ONE DAY IS ALWAYS A GOOD TIME.

(LAUGHTER.)

MR. STEINFELD:  SO I HAVE A HANDFUL OF POINTS TO MAKE.  I'LL TRY NOT TO REPEAT WHAT ANY OF THE PRIOR COUNSEL ON THE DEFENSE SIDE SAID.

BUT ON THE SOUNDS IN FRAUD POINT, GIVEN THAT WE PUT TOGETHER THE CHART, WHICH I THINK CLEARLY SHOWS -- AND WE HAVE THE PARAGRAPHS CITED -- THE SAME EXACT REASONS FOR FALSITY AND THE SAME EXACT ALLEGED MISSTATEMENTS FOR THE 10(B)(5) CLAIM AND THE 14(A) CLAIM.  I DON'T THINK THERE'S ANY DISPUTE ABOUT THAT.

AND THE LAW IS NOT WHAT PLAINTIFFS' COUNSEL SAID.  THE LAW IS CLEAR, IN RE: RIGAL PHARMS, 697 F.3D 869 AT 886, IT'S NINTH CIRCUIT FROM 2012, THAT CASE HOLDS THAT SECTION 11, A STRICT LIABILITY STATUTE, SOUNDS IN FRAUD BECAUSE IT WAS THE SAME ALLEGED MISREPRESENTATIONS.

AND WHAT THE COURT SAID IS, QUOTE, ALTHOUGH THE SECTION 11 CLAIM DOES NOT ADOPT ALL OF THE ALLEGATIONS CONTAINED IN THE REST OF THE COMPLAINT, IT DOES NOT ALLEGE DIFFERENT MISREPRESENTATIONS.  INSTEAD, IT MERELY RELIES ON THE SAME ALLEGED MISREPRESENTATIONS FROM THE DECEMBER 13TH, 2007 PRESS RELEASE THAT ARE CENTRAL TO PLAINTIFF'S SECTION 10(B) FRAUD CLAIM.  ACCORDINGLY, PLAINTIFF'S SECTION 11 CLAIM IS GROUNDED

IN FRAUD AND PLAINTIFFS MUST MEET RULE 9(B)'S PLEADING REQUIREMENT.

THAT'S EXACTLY WHAT WE HAVE HERE.  IT'S THE SAME -- THERE ARE ADDITIONAL FILINGS AFTER THE PROXY THAT ARE IN THE 10(B) CLAIM.  BUT THE 14(A) CLAIM AND THE PROXY, THEY'RE IN THE 10(B) CLAIM.  THE MISSTATEMENT ON THE WARRANTY ACCRUAL IS THE EXACT SAME STATEMENT.

AND JUST LAST MONTH, ON FEBRUARY 20TH, 2024, IN NG V. BERKELEY LIGHTS, WHICH IS 2024 WL 695699 AT STAR 19, JUDGE GILLIAM OF THIS DISTRICT FOUND THE EXACT SAME THING WITH ESSENTIALLY THE EXACT SAME QUOTE RELYING ON THE NINTH CIRCUIT IN RIGAL.

SO I THINK THE LAW IS VERY CLEAR THAT RULE 9(B) APPLIES.

WITH THAT SAID, FOCUSSING FIRST ON THE NEGLIGENCE PORTION ON THE CF DEFENDANTS, WHAT I HEAR FROM PLAINTIFFS' COUNSEL IS THAT PLAINTIFF WANTS TO HAVE ITS CAKE AND EAT IT, TOO. PLAINTIFFS' COUNSEL SAID NUMEROUS TIMES DURING THE PRESENTATION, HE EMPHASIZED THAT VIEW PERSONNEL WAS, QUOTE, LYING TO AUDITORS.

I TRIED TO WRITE DOWN EACH TIME, BUT I LOST COUNT.

IF VIEW PERSONNEL, IF THAT'S THE CORE TO THEIR THEORY, THEY'RE NOT -- IF THAT'S THE CORE OF THEIR THEORY AND THERE IS FRAUD AND THE AUDITORS AND VIEW WERE LIED TO AND VIEW'S AUDITORS UNDISPUTEDLY GAVE A CLEAN AUDIT, THE FINANCIAL STATEMENTS ARE FREE FROM MISSTATEMENT, IT'S SIMPLY NOT

PLAUSIBLE, IT'S NOT REASONABLE THAT ANY AMOUNT OF DILIGENCE BY AN ARM'S LENGTH MERGER PARTY WOULD HAVE TURNED UP THAT ACCOUNTING FRAUD WHEN THEIR THEORY IS PEOPLE WERE LYING ABOUT IT.

INDEED, THEY TRY TO DRAW THIS VERY THIN LINE THAT THE ALLEGED MISREPRESENTATIONS BY VIEW PERSONNEL WERE WITHHELD OR INFORMATION WAS WITHHELD FROM THE AUDITOR AND VIEW'S BOARD, BUT THEY DON'T ALLEGE THAT THOSE SAME PEOPLE GAVE TRUTHFUL INFORMATION TO CF II'S BOARD OR ANY OF THE CF DEFENDANTS.

IT'S NOT PLAUSIBLE THAT THE SAME INDIVIDUALS ARE LYING TO THEIR AUDITORS AND LYING TO THEIR OWN BOARD, BUT ARE BEING TRUTHFULNESS TO AN ARM'S LENGTH MERGER PARTY.

SECOND POINT.  THE CF DEFENDANTS, WHETHER THE INDIVIDUALS OR THE ENTITIES, ARE NOT UNDERWRITERS ON THIS TRANSACTION.  I HEARD THAT TERM A LOT, UNDERWRITER, UNDERWRITER, UNDERWRITER.

BUT, AGAIN, THE CF INDIVIDUALS ARE THE BOARD IN AN ARM'S LENGTH MERGER PARTY, AND THE CF ENTITIES ARE EITHER AFFILIATES OF THE SPAC, WHICH IS NOT AN UNDERWRITER, OR THE FINANCIAL M&A ADVISOR.

THERE'S NO UNDERWRITER.  THIS WAS AN M&A TRANSACTION.

THERE WAS -- CF & CO. WAS AN UNDERWRITER ON THE SPAC'S IPO THAT OCCURRED SIX MONTHS OR MORE BEFORE THE MERGER, BUT THAT'S NOT AT ISSUE IN THIS CASE.  THERE'S NO ALLEGATION THAT THE PROSPECTUS WHEN THE SPAC WENT PUBLIC WAS MISLEADING.  THAT'S NOT THE CLASS.  THAT'S NOT THE ALLEGED SECTION 14 CLAIM.

SO THIS CASE LAW ABOUT UNDERWRITERS AND UNDERWRITER'S DUTY AND WHAT UNDERWRITES HAVE TO RELY ON OR CANNOT RELY ON IS, FRANKLY, IRRELEVANT.

AND THE CASES THEY CITE, DOLPHIN AND BRADBURY VERSUS S.E.C. AND S.E.C. VERSUS INDIGENOUS GLOBAL DEVELOPMENT CORP., A, ARE S.E.C. CASES, NOT 9(B) PSLRA CASES; BUT, DOLPHIN IS ALSO AN UNDERWRITER CASE, WHICH HAS NOTHING TO DO WITH THE CF DEFENDANTS HERE.

AND THEN THERE'S -- JUST TO ADDRESS IT, THE KNURR CASE, K-N-U-R-R, WHICH IS THE EASTERN DISTRICT OF VIRGINIA CASE, AND IMPORTANTLY, KNURR DOESN'T DISAGREE WITH MCKESSON.  IN FACT, IN CITES MCKESSON FAVORABLY.

BUT WHAT IT DOES IS IT DISTINGUISHES IT ON THE FACTS OF ITS OWN CASE WHERE -- UNLIKE HERE AND UNLIKE IN MCKESSON WHERE THERE'S ALLEGATIONS OF WITHHOLDING INFORMATION, ALLEGATIONS OF FRAUD, ALLEGATIONS OF LYING, THE COURT SAYS, HERE, BY CONTRAST, THERE ARE NO ALLEGATIONS THAT THE TARGET AFFIRMATIVELY HID INFORMATION.  THEREFORE, IT'S DIFFERENT THAN MCKESSON. DEFENDANT ACKNOWLEDGED HE HAD CLEAR VISIBILITY INTO THE DEFENDANT'S FINANCES DUE TO THE FACT THAT THE COMPANIES HAD KNOWN AND WORKED TOGETHER CLOSELY FOR MANY YEARS PRIOR TO THE MERGER.

NONE OF THAT IS TRUE HERE.  THERE IS AN EXPRESS ALLEGATION BY PLAINTIFF THAT CERTAIN VIEW PERSONNEL WERE WITHHOLDING INFORMATION.  AND SO KNURR ACTUALLY CITES MCKESSON FAVORABLY,

BUT DISTINGUISHES IT ON THE FACTS.

AND ALSO, FOR FURTHER SUPPORT, THE COURT CITES BOND OPPORTUNITY FUND V. UNILAB CORP., 2003 WL 21058251 AT 10, SOUTHERN DISTRICT OF NEW YORK, FINDING NO INFERENCE OF NEGLIGENCE BECAUSE PLAINTIFFS ALLEGE THAT DUE TO THE ALLEGED WRONGDOER'S OVERREACHING, THE DIRECTOR DEFENDANTS WERE AFFIRMATIVELY MISLED BY THE ALLEGED WRONGDOER.

SO IF ANYTHING, KNURR SUPPORTS DISMISSAL ON THE NEGLIGENCE PIECE FOR THE CF DEFENDANTS UNDER THE FACTS OF OUR CASE.

THERE'S CERTAIN ALLEGATIONS THAT PLAINTIFFS' COUNSEL DISCUSSED.  HE DISCUSSED PARAGRAPH 221 OF THE SECOND AMENDED COMPLAINT, WHICH IS THE S.E.C.'S REQUEST FOR A COMMENT LETTER.

THE COURT:  YES.

MR. STEINFELD:  THAT FALLS UNDER THE HEADING OF PAGE 61, ADDITIONAL FACTUAL ALLEGATIONS RELATING TO CLAIMS UNDER SECTION 10(B) AND RULE 10(B)(5) OF THE EXCHANGE ACT.

AND PLAINTIFF HAS BEEN VERY CLEAR THAT THEY DESIGNED THIS COMPLAINT SUCH THAT THESE ALLEGATIONS ARE NOT IMPUTED -- AND THEY DISCLAIM IT ACTUALLY -- ARE NOT IMPUTED ON THE 14(A) CLAIM.

SO THE COURT CAN'T EVEN LOOK TO THAT AS AGAINST THE CF DEFENDANTS.

BUT IN ANY EVENT, AS I PREVIOUSLY TALKED ABOUT, THE NEXT PARAGRAPH, 222, STATES, PRAKASH LED VIEW'S EFFORT TO PREPARE A RESPONSE TO THE COMMENT LETTER, INCLUDING ASSEMBLING VIEW'S

ACCOUNTING AND FINANCE STAFF TO DISCUSS HOW TO RESPOND, AND THEN 215, ALL IN THAT SAME SECTION, ALL INFORMATION REGARDING VIEW IN THE PUBLICLY AVAILABLE FORM S-4 WAS SUPPLIED BY VIEW.

SO THERE'S NO ACTUAL ALLEGATION THAT THE CF DEFENDANTS RESPONDED TO THAT COMMENT LETTER WITH ANY MISLEADING INFORMATION.

SO, AGAIN, ON NEGLIGENCE, WE REALLY BELIEVE THAT MCKESSON AND OCERA SHOW THAT THE ALLEGATIONS HERE FALL FAR FLAT OF WHAT IS REQUIRED FOR A NEGLIGENCE CASE, AND ESPECIALLY A 9(B) NEGLIGENCE CASE.

WITH THAT, I HAVE THE EXCULPATION, AND WHAT PLAINTIFFS SAID HERE WAS THE CASES ONLY RELATE TO BREACHES OF FIDUCIARY DUTY.

BUT OF COURSE THAT'S INCORRECT.  EVERY CASE THAT WE CITED IN OUR BRIEF AND THAT I READ TO YOUR HONOR TODAY, THE PORTION OF THE CASE THAT WE ARE READING IS A SECTION 14 CLAIM THAT IS BEING DISMISSED BECAUSE OF AN EXCULPATION PROVISION.

A SECTION 14 CLAIM IS NOT A BREACH OF FIDUCIARY DUTY CLAIM IN AND OF ITSELF.  EVERY SECTION 14 CLAIM HAS THE SAME ELEMENTS, THE ELEMENTS THAT WE FACE HERE, AND THOSE CASES ALL DISMISS SECTION 14(A) BASED ON THE EXCULPATION PROVISION. THERE'S NOT A SINGLE CASE TO THE CONTRARY.

AND, AGAIN, IT'S CLEAR THAT THE CHARTER, AS YOUR HONOR ASKED ABOUT, IN THE EXCULPATION PROVISION SAYS THAT IT SHIELDS THE CF DIRECTORS FROM LIABILITY FOR NEGLIGENCE TO THE

CORPORATION OR TO ITS SHAREHOLDERS.  SO IT'S NOT JUST ABOUT DERIVATIVE CASES.

THAT BRINGS ME TO SOLICITATION.  AND I THINK WE NEED TO BE CLEAR ON WHAT SOLICITATION IS.  IT'S -- SECTION 14 PROXY SOLICITATION IS WHAT WE'RE TALKING ABOUT, BECAUSE SECTION 14 IS ONLY RELATED TO THE PROXY STATEMENT, AND IT -- THE ONLY ONES WHO HAVE -- THE ONLY SHAREHOLDERS WHO HAVE STANDING TO BRING ANY CLAIM ARE RECORD HOLDERS AS OF A DATE WHERE ACTION IS REQUIRED.

SO DILIGENCE AND WHO DID DILIGENCE IS NOT SOLICITATION.  IN FACT, IT HAS NOTHING TO DO WITH SOLICITATION.  THAT HAS TO DO WITH WORKING ON AN M&A TRANSACTION.

THERE WAS ALSO DISCUSSION ABOUT CONTROL, WHO'S CONTROLLING.  MAYBE THAT'S RELEVANT TO THE CONTROLLER CLAIMS, WHICH WE STILL, AS WE PUT IN OUR PAPERS, AND I DON'T WANT TO BELABOR IT, ARE NOT PLED HERE.

BUT CONTROL IS NOT SOLICITATION.  OTHERWISE ANY SUBSIDIARY, THAT MEANS EVERY PARENT AUTOMATICALLY, AUTOMATICALLY IS A SOLICITOR UNDER SECTION 14, EVEN IF THEY'RE NOT MENTIONED IN THE PROXY.

OF COURSE, AS YOUR HONOR ASKED, SIGNING AN M&A AGREEMENT OR BEING INVOLVED IN THE M&A AGREEMENT -- WHICH IS BETWEEN ENTITY AND ENTITY, IT HAS NOTHING TO DO WITH THE SHAREHOLDERS -- IS NOT PROXY SOLICITATION.

AND SO MR. PION, HE WAS NOT INVOLVED IN THE OPERATIVE

PROXY.  WHAT MORE -- ASSUME THERE WAS SOME TYPE OF WRONGDOING AND SOMEONE THOUGHT THERE WAS WRONGDOING AND WANTED TO WITHDRAW FROM IT.  WHAT MORE COULD SOMEONE DO THAN RESIGN FROM THE BOARD?

AND OF COURSE WE'RE NOT SAYING THERE'S ANY WRONGDOING HERE.  BUT MR. PION CERTAINLY DID NOT SOLICIT AS AN INDIVIDUAL, AND THE ENTITY'S DILIGENCE, PARTICIPATING IN DILIGENCE, HAVING SOME FORM OF CONTROL, ASSOCIATION, INVOLVED IN THE MERGER PROCESS, NONE OF THAT IS SECTION 14 SOLICITATION OF SHAREHOLDER VOTE OR SHAREHOLDER ACTION.

SO THOSE ARE THE MAIN POINTS I WANTED TO DISCUSS.

AND THE FINAL POINT IS JUST THE RJN, THE REQUEST FOR JUDICIAL NOTICE.

I THINK YOUR HONOR KNOWS, AND THE LAW IS VERY CLEAR, THAT YOU CAN'T TAKE JUDICIAL NOTICE OF THE FACTS PLED IN A COMPLAINT.  THAT'S ANOTHER COMPLAINT, THEY'RE MAKING ALLEGATIONS, ALLEGATIONS THAT ARE HEAVILY CONTESTED.

AND THE FACT THAT A COMPLAINT WAS FILED, THAT MAY BE SUBJECT TO JUDICIAL NOTICE.

BUT THAT'S IRRELEVANT TO THE COURT'S DECISION THERE.

THE COURT:  YEAH.

MR. STEINFELD:  SO THERE'S NO NEED FOR ME TO LOOK FURTHER, TO ARGUE WHETHER THAT DECK IS RIGHT OR WRONG, THE SLIDE DECK.

THE FACT IS, THE COURT SHOULD NOT AND CANNOT, UNDER THE

LAW, CONSIDER THE FACTS IN A COMPLAINT WHICH ARE MERE ALLEGATIONS.

IF YOUR HONOR HAS ANY QUESTIONS, I'D LOVE TO ADDRESS THEM. IF NOT, I THANK YOU FOR ALL YOUR TIME TODAY.

THE COURT:  ALL RIGHT.  THANK YOU.

ALL RIGHT.  WELL, THIS HAS BEEN VERY HELPFUL.  THANK YOU ALL.

THIS IS A -- IT'S SUCH A SPRAWLING SET OF ISSUES THAT I, I CERTAINLY APPRECIATE THAT EVERYONE IS WORKING HARD TO ADDRESS THEM.

THE DEFENDANTS DIVIDED THIS AMONG THREE OF YOU, AND MR. URIS ABLY DEALT WITH ALL OF THAT BY HIMSELF.

THIS IS THE SECOND TIME I'VE BEEN THROUGH THIS CASE, AND I GUESS THE -- I ALWAYS WORRY THAT THE WEAKNESS MAY BE IN A FAILURE TO ALLOW FURTHER AMENDMENT, ALTHOUGH I WROTE A LENGTHY OPINION THE FIRST TIME THROUGH.  THERE'S NO QUESTION.  AND THIS ONE IS PROBABLY NOT GOING TO BE ANY LESS SO.

SO I'M NOT INCLINED TO -- I'VE HEARD NO INDICATION THAT THERE'S MORE THAT COULD BE SAID, SO I JUST WANT TO INDICATE THAT I'M NOT LIKELY TO GRANT FURTHER LEAVE TO AMEND.

MR. URIS:  WELL, YOUR HONOR, I WOULD SAY, TO THE EXTENT -- YOU KNOW, ON THE -- IF -- IT'S HARD TO SAY WITHOUT SEEING YOUR OPINION, BUT, YOU KNOW, I WOULD JUST MENTION THAT, YOU KNOW, DEPENDING ON WHAT THE OPINION LOOKS LIKE, YOU KNOW, THERE MIGHT BE ADDITIONAL ALLEGATIONS THAT COULD CURE ANY

DEFICIENCIES THAT YOU INDICATE.

THE COURT:  SO MY OPINION IS NOT GOING TO GO BEYOND THE ARGUMENTS MADE BY THE DEFENDANTS, SO YOU'RE FULLY ADVISED OF THAT.  I'M NOT GOING TO COME UP WITH THINGS ON MY OWN.

MR. URIS:  OKAY.

THE COURT:  OKAY.  THAT'S FINE.

ALL RIGHT.  THIS IS GOING TO TAKE ME AWHILE, AND I THINK YOU'RE USED TO THAT.  I KNOW WHENEVER I ISSUE AN ORDER, YOU WANT 60 DAYS OR MORE TO RESPOND TO IT AS WELL.

IN A PSLRA CASE, THE MOTION TO DISMISS IS THE KEY MOTION IN THE CASE, SO I TAKE IT SERIOUSLY.  EVEN WHEN I KNOW I'M GRANTING LEAVE TO AMEND, I TRY TO LAY IT ALL OUT SO THAT YOU KNOW WHAT MY THINKING IS AND EITHER YOU CAN TELL ME I WAS WRONG OR COMPLY WITH IT BECAUSE I GOT IT RIGHT.

BUT THANK YOU FOR THIS LENGTHY ARGUMENT, FOR RETURNING AFTER LUNCH, AND WE'LL GET TO WORK ON IT, BUT IT WON'T BE QUICK.

ALL RIGHT.  THANK YOU ALL.

MR. BERRY:  THANK YOU, YOUR HONOR.

MR. STEINFELD:  THANK YOU, YOUR HONOR.

MR. URIS:  THANK YOU, YOUR HONOR.

THE CLERK:  COURT IS ADJOURNED.

(THE PROCEEDINGS WERE CONCLUDED AT 2:28 P.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF ZOOM PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  APRIL 16, 2024