Laurence D. King (SBN 206423)
Blair E. Reed (SBN 316971)
**KAPLAN FOX & KILSHEIMER LLP**
1999 Harrison Street, Suite 1560
Oakland, CA 94612
Telephone:  415-772-4700
Facsimile: 415-772-4707
Emails: *lking@kaplanfox.com*
        *breed@kaplanfox.com*

**KAPLAN FOX & KILSHEIMER LLP**
Frederic S. Fox (admitted *pro hac vice*)
Donald R. Hall (admitted *pro hac vice*)
Jason A. Uris (admitted *pro hac vice*)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: 212-687-1980
Facsimile: 212-687-7714
Emails:  *ffox@kaplanfox.com*
        *dhall@kaplanfox.com*
        *juris@kaplanfox.com*

*Lead Counsel for Lead Plaintiff Stadium*
*Capital LLC, Plaintiff David Sherman and the*
*Proposed Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| ASIF MEHEDI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VIEW, INC. f/k/a CF FINANCE ACQUISITION CORP. II, RAO MULPURI, VIDUL PRAKASH, HOWARD W. LUTNICK, PAUL PION, ALICE CHAN, ANSHU JAIN, ROBERT J. HOCHBERG, CHARLOTTE S. BLECHMAN, CF FINANCE HOLDINGS II, LLC, CANTOR FITZGERALD & CO., CANTOR FITZGERALD, L.P., AND CF GROUP MANAGEMENT, INC.,<br><br>Defendants. | Case No.: 5:21-cv-06374-BLF<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JASON A. URIS IN SUPPORT OF (A) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (B) LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES**<br><br>Judge:  Hon. Beth L. Freeman<br>Courtroom:  1, 5th Floor<br>Date:  November 6, 2025<br>Time: 9:00 a.m. |

Case No. 5:21-cv-06374-BLF

I, Jason A. Uris, declare as follows:

## I.    PRELIMINARY STATEMENT

1.    I am a partner of the firm Kaplan Fox & Kilsheimer LLP ("Kaplan Fox").  I am admitted to the bar of the State of New York and am in good standing.  I am admitted to this Court *pro hac vice*.  ECF No. 55.

2.    Kaplan Fox serves as Court appointed Lead Counsel ("Lead Counsel") for Lead Plaintiff Stadium Capital LLC (the "Lead Plaintiff") in the above-captioned consolidated action (the "Action").

3.    I submit this declaration in support of (A) Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Motions").  I make this declaration based on personal knowledge, and if called to testify, I could and would do so competently.

4.    The proposed Settlement before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $11,000,000, plus interest, for the benefit of the Settlement Class.[1]  The Settlement Amount has been paid into an escrow account and is earning interest.  We believe that the Settlement is a highly favorable outcome for the class members while avoiding the significant risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

5.    The case has been vigorously litigated from its commencement in August 2021 through the execution of the Stipulation. The Settlement is the result of extensive efforts by Plaintiffs and Lead Counsel, which included, among other things: (i) conducting a thorough investigation concerning the alleged misrepresentations/omissions made by Defendants; (ii) researching and drafting an opposition to a lead plaintiff movant's petition for a writ of mandamus requesting that the Ninth Circuit vacate the Court's order appointing Stadium Capital as Lead Plaintiff; (iii) researching

---

[1] All capitalized terms set forth herein have the same meaning as in the Stipulation and Agreement of Settlement, dated April 25, 2025 (ECF No. 246-1), unless otherwise indicated.

and drafting an opposition to a lead plaintiff movant's motion to stay this Action pending disposition of the writ of mandamus; (iv) preparing and filing a detailed Amended Complaint for Violations of the Federal Securities Laws ("First Amended Complaint"); (v) researching and drafting an opposition to each of Defendants' motions to dismiss the First Amended Complaint; (vi) preparing and filing a detailed Second Amended Complaint for Violations of the Federal Securities Laws ("Second Amended Complaint") after the Court's order granting Defendants' motions to dismiss the First Amended Complaint; (vii) researching and drafting an opposition to each of Defendants' motions to dismiss the Second Amended Complaint; (viii) researching and filing a motion for reconsideration ("Reconsideration Motion") following an order of the Court granting Defendants' motions to dismiss the Second Amended Complaint and entering Judgment for Defendants; (ix) researching and drafting an opposition and surreply to Defendants' motion to certify for interlocutory appeal the Court's order granting the Reconsideration Motion; (x) researching and drafting an opposition and surreply, and conditional cross-petition, to Defendants' petition for interlocutory appeal before the Ninth Circuit; (xi) retaining bankruptcy counsel and filing an extensive objection to the prepackaged plan of reorganization before the bankruptcy court seeking to preserve various claims and causes of action against many of the Defendants in this case, which would have otherwise been released; (xii) filing an objection and appearing at the settlement hearing in the *Siseles* Action to ensure that the claims in this action would not be released as a result of that settlement; (xiii) working closely with experts to analyze loss causation and damages issues; (xiv) engaging in thorough mediation efforts, which included three separate mediation sessions and the exchange of comprehensive opening mediation briefs and reply papers.  Due to these extensive efforts, Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the Settlement.

6.    As set forth in the accompanying Declaration of Tina Chiango Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of Summary Notice; (C) Report on Requests for Exclusion to Date (attached as Exhibit 1 hereto) (the "Chiango Decl."), pursuant to the Court's July 18, 2025 Preliminary Approval Order (ECF No. 258), RG/2 mailed 51,557 copies of the Settlement Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and

Nominees. Chiango Decl. at ¶ 8. In addition, RG/2 posted the Notice and Claim Form, along with other relevant documents on a dedicated website (the "Settlement Website") at http://www.viewsecuritieslitigation.com, and caused the Summary Notice to be published in Investors' Business Daily and transmitted over the internet via the PR Newswire. *Id*. at ¶¶ 9-10.  RG/2 has also established and maintained a call center that is staffed by live operators during business hours, and Class members may call with questions about the Settlement or the claims process. *Id*. at ¶ 11. Although the deadline for submitting requests for exclusion from the Settlement is not until October 16, 2025 and objections to the Settlement (or any aspect thereof) are also not due until then, to date no objections have been submitted to the Court, nor have any opt out requests been received by the Claims Administrator. *Id*. at ¶ 12[2]

7.    The Court, after a hearing, entered its Preliminary Approval Order, having found that (subject to further review at the Fairness Hearing) the proposed Settlement appeared to meet all relevant criteria for approval as "fair, reasonable and adequate" in light of the risks and challenges faced by Plaintiffs and the Class in proving, and collecting on, the Released Claims. Due notice having been issued, the Court should now grant final approval.

8.    Lead Plaintiff also requests the Court's final approval of the proposed Plan of Allocation ("POA"). The POA provides for a *pro rata* distribution of the Settlement Fund, based on "Recognized Loss Amounts" that take into account the different per share losses that Class members suffered depending on when they bought and (if applicable) sold their View or CFII securities. It is respectfully submitted that this kind of *pro rata* distribution plan, which was prepared by Lead Counsel and an experienced expert in such matters, is entirely customary in cases of this type, and should also be approved as fair, reasonable, and adequate.

9.    I also respectfully submit that Lead Counsel's request for attorneys' fees equal to 33 $^1/_3$% of the $11,000,000 Settlement Fund and reimbursement of $363,336.68 in litigation expenses (plus interest at the same rate as earned by the Settlement Fund) for their work in connection with the

---

[2] Lead Counsel will address any objections or exclusions that may yet be received in their Reply papers, which are due on October 23, 2025.

Case No. 5:21-cv-06374-BLF

settled claims is fair and reasonable. As detailed in the accompanying Fee Memorandum, while the requested fee is above the Ninth Circuit's "benchmark" of 25%, Lead Counsel believes several factors support an above-benchmark award, including, *inter alia*, the substantial difficulty and risks of litigation in this case, the substantial work performed by Lead Counsel in this and other courts, and the substantial recovery for the proposed Settlement Class obtained. Moreover, as detailed below at §VI, the requested fee for all time spent by Lead Counsel, in litigating and settling this matter equates to a negative "multiplier" of roughly 0.84 on counsel's "lodestar" (*i.e.*, counsel's current hourly rates multiplied by the hours spent on litigating and settling those claims). Given that "positive" multipliers of 2x to 4x are commonly awarded – and given the superior results achieved here in the face of substantial litigation risk – it is respectfully submitted that the negative multiplier here strongly confirms the reasonableness of the requested fee. *See also* §VI below and Exhibits 1 and 2 filed herewith.

10.    Finally, Lead Counsel supports Lead Plaintiff Stadium Capital's request for an award of $10,000, and plaintiff David Sherman's request for an award of $2,500, pursuant to 15 U.S.C §78u-4(a)(4) as fair and reasonable, based on the time they each spent on this matter.

## II.    BACKGROUND

### A.    History of the Action

11.    On August 18, 2021, the initial complaint was filed in this District on behalf of investors in View, alleging violations of the federal securities laws.  ECF No. 1.

12.    Following the filing of competing motions to appoint lead plaintiff and lead counsel, on February 8, 2022, this Court issued an Order appointing Stadium Capital as Lead Plaintiff and appointing Kaplan Fox & Kilsheimer ("Kaplan Fox") as Lead Counsel.  ECF No. 67.

13.    On March 17, 2022, one of the movants that filed a competing motion to be appointed Lead Plaintiff filed a petition for a writ of mandamus requesting that the Ninth Circuit vacate the Court's order appointing Stadium as Lead Plaintiff and moved to stay this Action pending disposition of the mandamus petition.  ECF No. 77.  On April 11, 2022, the Court denied the stay motion.  ECF No. 82.  On August 17, 2022, after briefing and oral argument, the Ninth Circuit denied the writ.  ECF No 117.

14. On July 15, 2022, Lead Plaintiff filed the Amended Complaint for Violations of the Federal Securities Laws (the "Amended Complaint"). ECF No. 96.

15. On October 6, 2022, Defendants filed their motions to dismiss the Amended Complaint. ECF Nos. 135, 137, 139, 141, 146. On November 15, 2022 Lead Plaintiff filed its opposition to Defendants' motions to dismiss. ECF No. 149. On December 14, 2022, Defendants filed replies in further support of their motions to dismiss. ECF Nos. 150-154.

16. On April 20, 2023, the Court held oral argument on Defendants' motions to dismiss the Amended Complaint (ECF No. 161), and on May 22, 2023, the Court issued an order granting Defendants' motions to dismiss in full but with leave to amend. ECF No. 168.

17. The Second Amended Complaint for Violations of the Federal Securities Laws ("Second Amended Complaint") was filed on August 21, 2023. ECF No. 175. The Second Amended Complaint asserts claims against Defendants under Sections 10(b), 14(a), and 20(a) of the Exchange Act on behalf of a class consisting of (i) all persons or entities who purchased or otherwise acquired View and/or CF II securities between November 30, 2020 and November 9, 2021, inclusive and (ii) all persons or entities who were holders of CF II Class A common stock as of the January 27, 2021 record date (the "Record Date") that were entitled to vote to approve the Business Combination between View and CF II as set forth in the February 16, 2021 Proxy Statement.

18. On October 2, 2023, Defendants filed motions to dismiss the Second Amended Complaint. ECF Nos. 181, 183, 184. On November 14, 2023, Lead Plaintiff filed its opposition to Defendants' motions to dismiss. ECF No. 185. On December 8, 2023, Defendants filed replies in further support of their motions to dismiss the Second Amended Complaint. ECF Nos. 188-90.

19. On March 14, 2024, the Court held oral argument on Defendants' motions to dismiss the Second Amended Complaint (ECF No. 197), and on April 9, 2024, the Court issued an order granting Defendants' motions to dismiss the Second Amended Complaint without leave to amend, and entered judgment for Defendants and against Plaintiffs. ECF Nos. 200-01.

20. On April 17, 2024, Plaintiffs filed a motion for reconsideration under Fed. R. Civ. P.

59(e) and 60(b). ECF No. 203.[3] On May 1, 2024, Defendants filed a joint opposition to Plaintiffs' motion for reconsideration. ECF No. 208. On May 8, 2024 Plaintiffs filed a reply in further support of their motion for reconsideration. ECF No. 211.

21. On June 12, 2024, the Court granted Plaintiffs' motion and vacated the Judgment. ECF No. 212. On June 28, 2024, the Court issued an Amended Order on Defendants' motions to dismiss the Second Amended Complaint, granting in part and denying in part Defendants' motions. ECF No. 214. In particular, the Court upheld the Section 14(a) claim, and 20(a) claim for control person liability based on the 14(a) claim, with respect to certain Defendants. The Court granted the motion to dismiss (with leave to amend) with respect to Defendants View, Mulpuri, and Prakash on the 10(b) claim for failure to allege scienter, and with respect to additional defendants on the 20(a) claim for control person liability based on the 10(b) claim for failure to allege a primary violation of Section 10(b). *Id*.

22. At the same time, Defendant View sought confirmation, on an expedited basis, of a prepackaged plan of reorganization of View, Inc. and its debtor affiliates (the "Plan"). As proposed, the Plan sought to extinguish various claims and causes of action that third parties may have not only against the debtors, but also against a slew of non-debtor third parties. The proposed release, if approved, would have released Plaintiffs' (and the proposed class's) claims in this Action against all of the Defendants (with the exception of Prakash).

23. As a result, on May 8, 2024, Plaintiff filed an extensive objection to the Plan seeking to expressly exclude Plaintiffs' claims in this Action against the non-debtor Defendants from the

---

[3] On April 23, 2024 Lead Plaintiff provided notice that, in consideration of View Inc. f/k/a CF Finance Acquisition Corp. II's filing a voluntary petition under the provisions of chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Chapter 11 Case"), and in recognition of the automatic stay provided by section 362(a)(1) of the Bankruptcy Code, it is withdrawing Plaintiffs' reconsideration motion solely with respect to View. ECF No. 205. On June 18, 2024, the parties jointly provided notice that, as of May 22, 2024, pursuant to the terms of the prepackaged plan and confirmation order in the Chapter 11 Case, Plaintiff's claims were no longer stayed pursuant to the automatic stay (under section 362(a) of the Bankruptcy Code) as to View, with any recovery as to View in this action being limited to and solely to the extent of available insurance. ECF No. 213.

release and Plan injunction. *In re: View, Inc., et al.*, Case No. 24-10692-CTG (Bankr. D. Del. May 8, 2024), ECF No. 159.

24.     Following Plaintiffs' objection and subsequent negotiations with View's bankruptcy counsel, the Plan was amended to include the requested carveout, which included language allowing for Plaintiffs' claims to proceed against View (the Debtor) to the extent of available insurance. *Id.*, ECF No. 213.  Additionally, the Plan was also amended to require the debtors and reorganized debtors to preserve documents related to this Action. *In re: View, Inc., et al.*, Case No. 24-10692-CTG (Bankr. D. Del. May 8, 2024) at ECF No. 190 at 57.

25.     Following the Court's denial of Defendants' motions to dismiss in part, the Court set an initial case management conference for October 31, 2024.  ECF No. 216.  The parties began negotiating a case schedule and Lead Plaintiff served fifty-seven requests for the production of documents on Defendants on August 5, 2024.

26.     On July 12, 2024, Defendants filed a joint motion to certify the Court's Order granting reconsideration (ECF No. 212) for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) and for a stay pending resolution of interlocutory appeal.  ECF No. 219.  On July 26, 2024, Lead Plaintiff filed its opposition to Defendants' joint motion (ECF No. 223), and on August 2, 2024, Defendants filed a joint reply in further support.  ECF No. 226.

27.     On August 8, 2024, the Court granted Defendants' joint motion, certified an interlocutory appeal to the Ninth Circuit, and stayed the case.  ECF No. 227.  On August 12, 2024, Lead Plaintiff filed a motion to lift the stay for the limited purpose of seeking leave to file a surreply.  ECF No. 228.  On August 14, 2024, the Court granted Lead Plaintiff's motion and confirmed its August 8, 2024 Order.  ECF No. 229.

28.     On August 16, 2024, Defendants filed their petition for permission to appeal under 28 U.S.C. § 1292(b) with the Ninth Circuit.  *Stadium Capital LLC, et al. v. View, Inc. f/k/a CF Finance Acquisition Corp. II, et al.*, No. 24-5051 (9th Cir. 2024), ECF No. 1.  On August 26, 2024, Plaintiffs filed an answer opposing Defendants' petition for permission to appeal and conditional

cross-petition. *Id.*, ECF No. 4.[4] On September 5, 2024, Defendants filed a motion for leave to file a reply in further support of their petition. *Id.*, ECF No. 5. On September 12, 2024, Plaintiffs filed a motion for leave to file a surreply in opposition to Defendants' petition. *Id.*, ECF No. 6.

29. On September 19, 2024, a Ninth Circuit motions panel granted Defendants' petition for permission to appeal, and granted Plaintiffs' conditional cross-petition. *Id.*, ECF No. 7.

30. On August 22, 2024, the parties in *Siseles v. Lutnick, et al.*, Case No. 2023-1152-JTL (Del. Ch.) (the "*Siseles* Action"), a proposed class action bringing claims for breach of fiduciary duty against certain of the CF Defendants in this Action, submitted a settlement agreement for approval by the Court of Chancery. A Settlement Hearing was set for, and occurred on, December 6, 2024. Based on conversations with counsel for plaintiffs in the *Siseles* Action, Plaintiffs understood that counsel to plaintiffs and defense counsel that negotiated the *Siseles* Settlement Stipulation understood that the *Siseles* release was only intended to release claims that were, or could have been brought, in the *Siseles* Action. Lead Counsel contacted defense counsel in the *Siseles* Action to request that language be added to the Proposed Order and Final Judgment to make explicit that, for the avoidance of doubt, the claims asserted in this Action under the Securities Exchange Act of 1934 are not being released pursuant to the release in the *Siseles* settlement. However, defense counsel in the *Siseles* Action would not agree. Therefore, on November 22, 2024, Plaintiffs filed an objection to the proposed settlement in the *Siseles* Action to the extent it purported to release the Exchange Act claims brought in this Action. *Siseles v. Lutnick, et al.*, Case No. 2023-1152-JTL (Del. Ch.), Transaction ID 75068235. On December 6, 2024, Lead Counsel appeared at the *Siseles* settlement hearing to present their objection to the proposed settlement. At the hearing, the Chancery Court confirmed its understanding that "th[e] release is not encompassing the Mehedi action."

---

[4] The question presented in Plaintiffs' conditional cross-petition was whether the district court erred when it held that Lead Plaintiff had not sufficiently plead loss causation.

- 8 -                                                      Case No. 5:21-cv-06374-BLF

**B.     Settlement Negotiations and Mediation**

31.     In April of 2024, the Parties agreed to discuss a possible resolution of the Action. To facilitate their negotiations, the Parties scheduled a formal mediation with Greg Danilow of Phillips ADR Enterprises.   Stipulation at ¶ I.   *See also* Exhibit B to ECF No. 246-2 (Mr. Danilow's biography, obtained from the Phillips ADR Enterprises website); *see also* https://phillipsadr.com/our-team/greg-danilow/.

32.     On May 3, 2024, the parties engaged in a mediation session but did not reach an agreement to settle the Action.   On September 23, 2024, the parties engaged in an additional mediation session but again were unable to reach an agreement to settle. In advance of the mediation, pursuant to Mr. Danilow's instructions (as Mediator), both Lead Plaintiff and Defendants prepared and exchanged comprehensive opening mediation briefs and supporting materials on September 10, and submitted additional reply papers and supporting materials on September 18, 2024.

33.     Lead Counsel also participated in pre-mediation conference calls with the Mediator to review the Parties' positions on specific legal and factual issues raised by the Mediator.   The September 2024 session was conducted face-to-face in New York City.

34.     On January 8, 2025, the parties engaged in a third mediation session, and with the assistance of Mr. Danilow, the Parties agreed to resolve the matter for $11 million and executed a term sheet setting forth the material terms of their agreement on January 22, 2025.

35.     On April 25, 2025, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 246-1), which set forth the complete terms of the Parties' agreement to settle all claims asserted in the Action for $11,000,000, subject to the approval of the Court.   On the same day, the Parties entered into a confidential Supplemental Agreement, which gives Defendants the right to terminate the Settlement if valid requests for exclusion from persons and entities entitled to be members of the Settlement Class exceed an amount agreed to by the Parties.

**C.     The Court's Preliminary Approval of the Settlement**

36.     On May 1, 2025, Lead Plaintiff filed its motion for preliminary approval of the Settlement, together with the Stipulation and exhibits thereto, and a supporting memorandum of law and declaration.   ECF No. 246.

37.    After a hearing on July 17, 2025, on July 18, 2025, the Court entered its Preliminary Approval Order (ECF No. 258) which, among other things: (1) preliminarily approved the Settlement; approved the form of Settlement Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Settlement Notice and Claim Form, posting the Settlement Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *Investor's Business Daily* and over the *PR Newswire*; (3) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the fee and expense application; and (4) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application. The Preliminary Approval Order also scheduled the Settlement Hearing to determine, among other things, whether the Settlement should be finally approved.

## III.    THE NOTICE AND ADMINISTRATION OF THE SETTLEMENT

38.    In the Preliminary Approval Order the Court preliminarily approved the Settlement and approved the forms of notice to the Settlement Class. Pursuant to the Preliminary Approval Order, the Court appointed RG/2 Claims Administration LLC ("RG/2") as Claims Administrator and instructed RG/2 to disseminate copies of the (1) Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Motion for Attorneys' Fees and Reimbursement of Litigation Expenses; and (III) Settlement Fairness Hearing, and (2) Proof of Claim and Release (collectively the "Notice Packet") by mail and to disseminate the Summary Notice of Pendency of Class Action, Proposed Settlement, and Motion for Attorneys' Fees and Expenses.

39.    The Settlement Notice, attached as Exhibit A to the Chiango Declaration, provides potential Settlement Class Members with information about the terms of the Settlement and, among other things: their right to exclude themselves from the Settlement Class; their right to object to any aspect of the Settlement, the Plan of Allocation, or the Fee and Expense Application; and the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement. The Notice also informs Settlement Class Members of Lead Counsel's intention to apply

for an award of attorneys' fees of no more than 33 $^1/_3$% of the Settlement Fund and for payment of expenses in an amount not to exceed $375,000.

40.     As detailed in the Chiango Decl., on August 7, 2025, RG/2 caused the Notice Packet to be sent by first-class mail to potential Settlement Class Members as well as banks, brokerage firms, and other third party nominees whose clients may be Settlement Class Members. Chiango Decl. at ¶¶ 3-8. In total, to date, RG/2 has mailed 51,557 Notice Packets to potential nominees and Settlement Class Members by first-class mail, postage prepaid. *Id.* at ¶ 8. To disseminate the Settlement Notice, RG/2 obtained the names and addresses of potential Settlement Class Members from listings provided by View and from banks, brokers, and other nominees. *See id.* at ¶¶ 3-5.

41.     On August 11, 2025, RG/2 caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over *PR Newswire*. *Id.* at ¶ 9 and Exhibit B attached thereto.

42.     RG/2 also maintains and posts information regarding the Settlement on a dedicated website established for the Action, www.viewsecuritieslitigation.com, to provide Settlement Class Members with information, as well as downloadable copies of the Notice Packet and the Stipulation. *Id*. at ¶ 10. That website became operational on August 6, 2025. *Id*.  Lead Counsel and RG/2 will continue to monitor and to update the settlement website as the settlement process continues. For example, Lead Counsel's papers in support of their motion for attorneys' fees and litigation expenses and Lead Plaintiffs' papers in support of their motion for final approval of the Settlement will be made available on the website after they are filed, and any orders entered by the Court in connection with the motions will also be posted.

43.     Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application, or to request exclusion from the Settlement Class is October 16, 2025. To date, no objections have been received by the Court, and the Claims Administrator has not received any requests for exclusion from the Settlement Class. *Id*. at ¶ 12.

44.     Should any objections or requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due October 23 2025.

45.    Counsel for View has informed Lead Counsel that View served CAFA notices as required by 28 U.S.C. §1715(b) on or about May 12, 2022.  To date, Lead Plaintiff has not been informed of any responses to the CAFA notice.

## IV.    THE SIGNIFICANT BENEFITS OF THE PROPOSED SETTLEMENT VS. THE MATERIAL RISKS OF CONTINUED LITIGATION

46.    Although Lead Plaintiff believes that the claims in the Action have merit, it also recognizes that there were considerable risks in continuing the Action against Defendants.  Lead Plaintiff and its counsel carefully considered these risks during the months leading up to the Settlement and throughout the settlement discussions with Defendants and the Mediator.

47.    In agreeing to settle, Lead Plaintiff and Lead Counsel weighed, among other things, the substantial cash benefit to Settlement Class Members against: (i) the uncertainties associated with trying complex securities cases; (ii) the difficulties and challenges involved in proving each element of the claims at issue in this particular case; (iii) the difficulties and challenges involved in certifying a class; (iv) the fact that, even if Lead Plaintiff prevailed at summary judgment and trial, any monetary recovery could have been less than the Settlement Amount; and (v) the delays that would follow even a favorable final judgment, including appeals. For example, the Court's order granting in part and denying in part Defendants' motions to dismiss the Second Amended Complaint (the "MTD Order") dismissed Plaintiffs' 10(b) claims, finding that Plaintiffs failed to allege scienter.  The MTD Order also found that certain alleged misstatements related to View's practice relative to its product warranties were not materially misleading. Lead Plaintiff recognizes the expense and length of continued proceedings necessary to pursue its claims against Defendants through the Court's ruling on class certification, summary judgment, pre-trial motions, a trial, and appeals, as well as the very substantial risks they would face in establishing liability and damages.

48.    Defendants also had substantial loss causation defenses. This case, for example, did not involve a single drop in View's share price in response to a "clean" disclosure that one or more of the Company's prior statements about the Company's warranty-related obligations had been false. Instead, this case involved multiple alleged corrective disclosures with Lead Plaintiff alleging that the truth about Defendants' alleged misstatement emerged gradually as View more fully disclosed the

Case No. 5:21-cv-06374-BLF

DECL. OF JASON A. URIS ISO LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

extent and severity of the warranty accrual issue. On the facts alleged, proving loss causation was particularly challenging because View did not report its restated warranty-related accruals until May 31, 2022. On that same date, View reported "'[r]ecord revenue of $74 million, up 125% year-over-year, and exceeding previous guidance range of $65 million to $70 million.'" While Lead Plaintiff alleges that the fact that the Company's share price did not fall (but rather increased) on this announcement confirmed that investors understood the earlier alleged partial corrective disclosures as at least partial disclosures of the inaccuracy of the previously reported warranty accruals, the fact that View also announced positive news (which was potentially "confounding") unrelated to the Company's warranty accrual, would likely make proving loss causation with respect to the observed price declines on the alleged partial corrective disclosure dates difficult. Moreover, Defendants likely would have strenuously argued for the exclusion of each of the alleged corrective disclosures on the grounds Lead Plaintiff could not sufficiently link each to Defendants' alleged fraud, and that when any confounding non-fraud related information on those dates are disaggregated the amount of alleged damages are significantly reduced. If these arguments prevailed at class certification, summary judgment, or trial, the Settlement Class could have recovered significantly less or, indeed, nothing.

49.     While Lead Counsel is confident that the Settlement Class meets the requirements for certification, the Class had not yet been certified, and Lead Counsel is aware that there is a risk the Court could disagree. Even if the Court were to certify the Class, there is always a risk that the Class could be decertified at a later stage in the proceedings. *See, e.g.*, *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) (even if a class is certified, "there is no guarantee the certification would survive through trial, as Defendants might have sought decertification or modification of the class"). Thus, the risks and uncertainty surrounding class certification also support approval of the Settlement, as Defendants undoubtedly would have challenged class certification if the Action had reached that stage.

50.     Without the proposed Settlement, continued litigation would have required further extensive briefing on Defendants' interlocutory appeal (and Plaintiffs' conditional cross-appeal) before the Ninth Circuit, to be followed by (assuming that Plaintiffs prevailed before the Ninth

Circuit): (i) the undertaking of comprehensive document discovery that, to a significant degree, would have involved technical materials regarding View's warranty accrual, warranty policy, quality issues identified in 2019 related to defective sealing components for the Company's IGUs, costs View incurred and intended to incur when replacing the Company's insulated glass units (including installation labor and freight costs), View's accounting policies, and due diligence conducted in connection with the Business Combination; (ii) the taking of depositions of numerous View and CF II officers and employees on the details of those same topics; (iii) an expert discovery process that was expected to include, at a minimum, both sides retaining experts on loss causation and damages issues; (iv) full briefing of a contested class certification motion, and related expert discovery; (v) overcoming Defendants' anticipated summary judgment motion (vi) extensive pre-trial motion practice such as motions *in limine* and *Daubert* motions; (vii) trial; and (viii) likely post-trial motions, and thereafter appeals, by the losing side. The continued litigation and appeals would have been costly and would have substantially delayed any recovery for Class Members, possibly for years.

51.     Based on my numerous discussions with Lead Plaintiff's damages expert, it is my understanding that the $11 million settlement represents 16.3% to 32.8% of the estimated recoverable damages in this case, depending on certain variables and assumptions.  The high end of the estimated recoverable damages assumes that Lead Plaintiff would prevail entirely on all issues of liability, loss causation and damages in the litigation.  Unsurprisingly, Defendants contended that maximum recoverable damages were a mere fraction of such amounts.

52.     The recovery exceeds the median 7.5% recovery in cases alleging claims under the Exchange Act between 2015 and 2024, and exceeds the median settlement amount of $10.0 million in the Ninth Circuit. *See* Laarni T. Bulan & Eric Tam, *Securities Class Action Settlements: 2024 Review and Analysis*, CORNERSTONE RESEARCH, at 20 (2025), https://www.cornerstone.com/wp-content/uploads/2025/03/Securities-Class-Action-Settlements-2024-Review-and-Analysis.pdf.

53.     Moreover, even if Lead Plaintiff had prevailed in full on all its claims against Defendants, the Class's ability to actually collect on a judgment significantly greater than $11 million (let alone one anywhere near the Class's maximum estimated recoverable damages) is doubtful at

best. For example, View's business had been in sharp decline throughout the pendency of the litigation, and in fact, in April 2024 View filed for Chapter 11 bankruptcy.  ECF No. 205.

54.    Given the significant risks of establishing liability and loss causation here, Lead Counsel believe that this level of recovery represents an excellent result for the Settlement Class and that this factor strongly warrants final approval.

55.    Further, in the absence of a settlement, the continued litigation of the Action would require the expenditure of substantial additional sums of time and money at trial and beyond, with no guarantee that any additional benefit would be provided to the Settlement Class. Even if Lead Plaintiff prevailed at trial and met its burdens in establishing falsity, materiality, and loss causation, the measure of per-share damages (if any), and control person liability, the case would still be far from over. For example, Defendants would have had the opportunity to challenge an individual Settlement Class Member's membership in the Class, the presumption of reliance for any Settlement Class Member, and the amount of damages due to each Settlement Class Member. Moreover, Defendants would have certainly filed an appeal, which would further delay (and risk entirely) any additional benefit received via trial.

56.    Nearly two years after the initial complaint in this Action was filed, and nearly a year after the first amended complaint was filed, on July 3, 2023 it was announced that as a result of View's self-reporting its failure to properly account for its warranty accrual, prompt undertaking of remedial measures, and cooperation with SEC staff's investigation, View reached a Settlement with the SEC in connection with which the SEC decided not to impose civil penalties.  While the cease-and-desist order did find that View had violated Section 14(a) of the Exchange Act, the cease-and-desist order was limited solely to defendant View.  Similarly, while the SEC concurrently filed a complaint charging defendant Prakash with violations of Sections 17(a)(3), 14(a), and 14b2-1 of the Exchange Act, that complaint was brought solely against defendant Prakash.  Moreover, even with respect to Lead Plaintiff's 14(a) claim against Prakash, Lead Plaintiff still had to plead, and would ultimately need to prove liability, including with respect to loss causation and damages.  As described above at ¶¶ 47-55, Lead Plaintiff would have faced substantial challenges in doing so.

## V.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE

57.     The proposed Plan of Allocation (the "POA") is set forth at pp. 8-13 of the Settlement Notice.  Chiango Decl., Exhibit A.  The Plan of Allocation was drafted with the assistance of Lead Plaintiff's damages expert, based on the measure of damages for claims under the Exchange Act. Lead Counsel believes it is a fair, reasonable, and adequate method for allocating the Net Settlement Fund amongst eligible claimants.

58.     The Plan of Allocation is designed to equitably distribute the Net Settlement Fund among members of the Settlement Class who Class Members who submit valid and timely Claim Forms. The POA provides for the calculation of a "Recognized Loss" amount for each properly documented purchase or acquisition of View and/or CF II securities during the Class Period, and each properly documented purchase or acquisition of CF II Class A common stock held stock as of the January 27, 2021 record date that were entitled to vote to approve the Business Combination. A claimant's total Recognized Losses will depend on, among other things, when their securities were purchased and/or sold in relation to the disclosure dates alleged in the Action, whether the shares were held through or sold during the statutory 90-day look-back period, *see* 15 U.S.C. § 78u- 4(e) (providing methodology for limiting damages in securities fraud actions), and the value of the shares when they were sold or held. The sum of a claimant's Recognized Losses is the Claimant's "Recognized Claim." Settlement Notice, Chiango Decl., Exhibit A, at ¶ 45.

59.     The Recognized Loss formulas are tied to liability and damages. In developing the Plan of Allocation, the Lead Plaintiff's damages expert considered the amount of artificial inflation alleged to be present in View and/or CF II securities throughout the Class Period that was purportedly caused by the alleged fraud. For shares sold between August 17, 2021 and November 9, 2021, Recognized Loss Amounts for Class Members with 14(a) claims will be discounted to 50% in recognition of the Court's finding that loss causation was not pled for shares held through the August 16, 2021 disclosure that were sold prior to the November 9, 2021 disclosure. Based upon consultation with Lead Plaintiff's damages expert, all Recognized Loss Amounts for Class members with 10(b) claims will be discounted to 50% in recognition of, among other factors, the Court's dismissal of

DECL. OF JASON A. URIS ISO LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

these claims and the particular challenges to being able to establish liability and damages.[5] For shares purchased before May 10, 2022 and held through this disclosure, the alleged artificial inflation will be discounted to 10% given the Court's dismissal of these claims and the particular challenges to being able to establish liability and damages. An inflation table was created and is set forth in the Settlement Notice as part of the Plan of Allocation. The table will be utilized by the Claims Administrator in calculating Recognized Loss amounts for claimants.

60.    Because the Settlement does not recover 100% of alleged damages, the Claims Administrator will determine each eligible claimant's *pro rata* share of the Net Settlement Fund based upon each claimant's total "Recognized Claim" compared to the aggregate Recognized Claims of all eligible claimants.  In Lead Counsel's experience, this type of *pro rata* POA (which, in the interest of reducing administrative costs, also provides that an otherwise Recognized Claim Amount must be at least $10 to qualify for a payment) is customary in securities class actions and ensures that each Settlement Class Member's recovery is based upon the relative losses he or she sustained, and that eligible Settlement Class Members will receive distributions calculated in the same manner.

61.    In sum, the proposed Plan of Allocation, developed in consultation with Lead Plaintiff's damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## VI.    LEAD COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENESES

62.    Lead Counsel is applying to the Court for an award of attorneys' fees of 33 $^1/_3$% of the Settlement Fund, or $3,666,666.67, plus interest earned on that amount at the same rate as earned by the Settlement Fund (the "Fee Application"). Lead Counsel also moves for payment for expenses that Lead Counsel incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $363,336.68.

---

[5] Class Members who purchased between November 30, 2020 and January 25, 2021 and who were common shares or unit owners of record on January 27, 2021 will recover only for the loss, if any, calculated pursuant to their 14(a) Claim.

63.     The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's accompanying Fee Memorandum. As discussed in the Fee Memorandum, while the 33 $^1/_3$% fee award requested is above the Ninth Circuit benchmark of 25%, Lead Counsel believes several factors support an above-benchmark award, including, *inter alia*, the substantial difficulty and risks of litigation in case, the substantial work performed by Lead Counsel in this and other courts, the substantial recovery for the proposed Settlement Class obtained, and a negative lodestar multiplier.

64.     For the efforts of Lead Counsel on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis, which, as discussed in the accompanying Fee Memorandum, is the standard and appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interests of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances.

### A.     The Fee Application

#### 1.     Lead Plaintiff Supports the Fee Application

65.     Lead Plaintiff has closely supervised and monitored the prosecution and settlement of this Action. *See* Declaration of Joseph Zicherman in Support of (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses ("Zicherman Decl.")[6], attached hereto as Exhibit 7, at ¶ 4. Lead Plaintiff has evaluated the Fee Application and fully supports the fee requested. *Id*. ¶ 7. Lead Plaintiff believes that the proposed fee of 33 $^1/_3$% is fair and reasonable in light of the result obtained for the Settlement Class, the amount and quality of the work performed by Lead Counsel, and the significant litigation risks counsel faced. *Id*.

---

[6] Lead Counsel spoke with Mr. Zicherman on September 30, 2025 to review his declaration. On that call Mr. Zicherman stated that he intended to return a signed copy to Lead Counsel the following morning. However, due to personal reasons unrelated to the case that arose since the time of the call, Mr. Zicherman was unable to sign his declaration in advance of today's filings. Once Mr. Zicherman is able to sign his declaration, Lead Counsel will immediately file it with the Court.

### 2. Lead Counsel Performed Extensive Work in this Action

66. Lead Counsel devoted substantial time to the prosecution of the Action. As discussed above, the work that Lead Counsel performed in this Action included, among other things: (i) conducting a thorough investigation concerning the alleged misrepresentations/omissions made by Defendants; (ii) researching and drafting an opposition to a lead plaintiff movant's petition for a writ of mandamus requesting that the Ninth Circuit vacate the Court's order appointing Stadium Capital as Lead Plaintiff; (iii) researching and drafting an opposition to a lead plaintiff movant's motion to stay this Action pending disposition of the writ of mandamus; (iv) preparing and filing a detailed First Amended Complaint; (v) researching and drafting an opposition to each of Defendants' motions to dismiss the First Amended Complaint; (vi) preparing and filing a detailed Second Amended Complaint after the Court's order granting Defendants' motions to dismiss the First Amended Complaint; (vii) researching and drafting an opposition to each of Defendants' motions to dismiss the Second Amended Complaint; (viii) researching and filing the Reconsideration Motion following an order of the Court granting Defendants' motions to dismiss the Second Amended Complaint and entering Judgment for Defendants; (ix) researching and drafting an opposition and surreply to Defendants' motion to certify for interlocutory appeal the Court's order granting the Reconsideration Motion; (x) researching and drafting an opposition and surreply, and conditional cross-petition, to Defendants' petition for interlocutory appeal before the Ninth Circuit; (xi) retaining bankruptcy counsel and filing an extensive objection to the prepackaged plan of reorganization before the bankruptcy court seeking to preserve various claims and causes of action against many of the Defendants in this case, which would have otherwise been released; (xii) filing an objection and appearing at the settlement hearing in the *Siseles* Action to ensure that the claims in this action would not be released as a result of that settlement; (xiii) working closely with experts to analyze loss causation and damages issues; (xiv) engaging in thorough mediation efforts, which included three separate mediation sessions and the exchange of comprehensive opening mediation briefs and reply papers.

67. Exhibit 2 contains a summary chart of the hours expended and lodestar amounts for

my firm.[7]    Lead Counsel believes that the time reflected in my firm's lodestar calculations is reasonable in amount and was reasonably necessary for the effective prosecution and resolution of this Action. Moreover, the billing rates reflected for the partners, attorneys, and other professional support staff are the firm's current standard billing rates for contingent cases, and are the same (or comparable to, after adjusting for periodic rate increases) as those accepted by courts, including those in this Circuit, in other contingent-fee securities class action, and similarly complex commercial class and/or derivative litigation. The firm's rates are set based on an annual analysis of rates that are charged by firms performing comparable work and that have been approved by courts. Different timekeepers within the same employment category (*e.g.*, partners, associates, paralegals, etc.) may have different rates based on a variety of factors, including years of practice, years at the firm, year in the current position (*e.g.*, years as a partner), relevant experience, relative expertise, and the rates of similarly experienced peers at our firm or other firms. For personnel who are no longer employed by Kaplan Fox, the billing rate used for all lodestar calculations is based upon the rate for that person in his or her final year of employment with the firm.

68.    No time expended in preparing the application for fees and expenses has been included. Lead Counsel also note that there will not be any additional fees charged for any work by counsel following this application, notwithstanding that counsel will continue to invest substantial time and effort in this case after September 23, 2025 (the date through which Lead Counsel has included their time), including working with the Claims' Administrator and Class members to facilitate the claims administration process (assuming that the Settlement is approved), and preparing and filing an appropriate final distribution motion and related papers. The information set forth in Exhibits 2 and 3 regarding the amount and nature of time spent on the Action by attorneys and

---

[7] After the Ninth Circuit motions panel granted Defendants' petition for permission to appeal, and granted Plaintiffs' conditional cross-petition (*see Stadium Capital LLC, et al. v. View, Inc. f/k/a CF Finance Acquisition Corp. II, et al.*, No. 24-5051 (9th Cir. Aug. 16, 2024), ECF No. 7), Lead Counsel retained the law firm Stris & Maher LLP to assist with the appeal.  Given that the Parties agreed to resolve this Action prior to the filing of additional briefing before the merits panel, Stris & Maher only expended approximately 65 hours on this matter.  The remainder of the 4,170.9 hours is time spent by Lead Counsel working on the Action.  A declaration from Stris & Maher LLP in support of the motion for attorneys' fees and litigation expenses is attached hereto as Exhibit 4.

professional staff at my firm is based on daily time records regularly prepared and maintained by my firm, which are available at the Court's request. I am the lead partner who primarily oversaw and conducted the day-to-day activities in this matter, and I and others at my firm reviewed these daily time records in preparing this Declaration to confirm their accuracy, as well as the reasonableness of the time billed to the litigation. All time expended in preparing this application for fees and expenses was excluded.

69.     Included within the Exhibits to this Declaration are schedules summarizing the hours and lodestar of Lead Counsel from the inception of the case through September 23, 2025, and a summary of Litigation Expenses, by category, and a firm resume, among other documents. Consistent with the Northern District of California's Procedural Guidance for Class Action Settlements and the Court's Standing Order on Civil Cases, the Exhibits to this Declaration include a chart that reflects the hours spent by each timekeeper during the course of the Action, broken down using the following task categories:

A. **Factual Investigation** (803.40 hours). This billing category is designed to include time spent on the thorough factual investigation into the claims asserted in the Action, including reviewing the voluminous public record and identifying, contacting, and interviewing potential witnesses.

B. **Pleadings** (690.50 hours). This billing category is designed to include work related to the factual and legal research related to the First Amended Complaint and Second Amended Complaint, and the drafting of those two complaints. The tasks included in these projects included, among other things, review and analysis of public filings made by View with the SEC, press releases and media reports issued by and disseminated by View, analyst reports, media reports, and other publicly disclosed reports and information about View, conference calls with Company executives, analysts, and investors, and publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of View and/or CF II securities. This work also includes meetings and strategic discussions with Plaintiffs and members of Lead Counsel's litigation team concerning further amendments that were contemplated during the course of the Action.

Case No. 5:21-cv-06374-BLF
DECL. OF JASON A. URIS ISO LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

C. **Discovery** (96.90 hours). This billing category is designed to include work related to discovery and discovery disputes.  This includes, among other things, drafting and analyzing discovery requests.

D. **Case Management and Client Communications** (60.70 hours). This billing category is designed to include time spent (i) communicating with Plaintiffs the case developments and status, and (ii) general case management matters.

E. **Motions and Legal Research** (1,256.50 hours).  This billing category is designed to include work related to researching and preparing various motion papers over the course of this litigation, including comprehensive briefs and accompanying declarations and exhibits (i) in support of Stadium Capital's motion to be appointed, along with Kaplan Fox, as lead plaintiff and lead counsel respectively; (ii) in opposition to a lead plaintiff movant's motion to stay this Action pending disposition of their writ of mandamus requesting that the Ninth Circuit vacate the Court's order appointing Stadium as Lead Plaintiff; (iii) in opposition to Defendants' motions to dismiss the First Amended Complaint; (iv) in opposition to Defendants' motions to dismiss the Second Amended Complaint; (v)  in support of Lead Plaintiff's Reconsideration Motion; (vi) in opposition to Defendants' motion to certify for interlocutory appeal the Court's order granting the Reconsideration Motion; (vii) in opposition to Defendants' petition for interlocutory appeal before the Ninth Circuit (including Lead Plaintiff's conditional cross-petition); (viii) in support of objection to the prepackaged plan of reorganization before the bankruptcy court; (ix) in support of Lead Plaintiff's objection at the settlement hearing in the *Siseles* Action; (x) in support of Lead Plaintiff's Motion for Preliminary Approval; (xi) in support of Lead Plaintiff's Motion for Final Approval.  As previously noted, however, my firm's submitted time and lodestar *excludes* all time spent on Lead Counsel's motion to approve the Fee and Expense Application.

F. **Court Appearances and Preparation** (231.70 hours).  This billing category is designed to include work related to court conferences, including the filing of any status conference reports, and work done in preparing for the hearings (i) on Defendants' motions to dismiss

Case No. 5:21-cv-06374-BLF

the First Amended Complaint, (ii) Defendants' motions to dismiss the Second Amended Complaint, and (iii) Lead Plaintiff's motion for preliminary approval.

G. **Experts** (25.70 hours). This billing category is designed to include work related to time spent working with our damages expert to analyze and understand damages and loss causation matters in this Action.

H. **Mediation and Settlement** (707.70 hours). This billing category is designed to include work related to the settlement process, including preparations for and attendance at three mediation sessions with Greg Danilow, as well as strategic decisions with the Lead Counsel litigation team and/or Lead Plaintiff, preparation and analysis of damages analyses, and consultations with damages and loss causation experts. This billing category also includes work related to the Proposed Settlement, including, but not limited to, the Motion for Preliminary Approval, preparation of the proposed plan of allocation, retention of an Escrow Agent and creation of a qualified settlement fund, the development of the Settlement Notice and related documents, the notice and claims process, and communications with the RG/2.

I. **Appeals** (181.10 hours). This billing category is designed to include projects related to work conducted related to the analysis or filing of any appeals in the Action, (i) opposing a competing lead plaintiff movants' writ of mandamus requesting that the Ninth Circuit vacate the Court's order appointing Stadium as Lead Plaintiff, and (ii) opposing Defendants' petition for permission to appeal the Court's Reconsideration Order (and filing a related cross-petition).

J. **Litigation Strategy and Analysis** (51.60 hours). This billing category is designed to include time incurred by my firm on overall case strategy and analysis that is not otherwise reflected in the preceding categories.

### 3. The Favorable Settlement Achieved

70. For the reasons summarized above at ¶¶ 46-55 above and further discussed in both the Final Approval Brief and the Fee Brief, Lead Counsel respectfully submits that the $11,000,000 Settlement is a favorable and reasonable result when considered in view of the substantial risks and

DECL. OF JASON A. URIS ISO LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

obstacles to recovery if the Action were to continue through summary judgment, to trial, and through likely post-trial motions and appeals, and when compared to the average or median securities class action settlement. Accordingly, Lead Counsel respectfully submit that this important factor weighs strongly in favor of awarding the requested fee.

### 4.    The Substantial Risks of the Litigation

71.    As summarized at ¶¶ 46-55 above and further discussed in both the Final Approval Brief and the Fee Brief, Lead Counsel respectfully submits that the risks assumed by Lead Counsel here were immense.

72.    Moreover, my firm's prosecution of these claims was undertaken on a fully contingent-fee basis, leaving Lead Counsel fully exposed to the risk that they would recover little or nothing if they were unable to bring this Action to a successful result for the Class.

73.    From the outset, Lead Counsel understood that it was embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that prosecuting the case would require. In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands. Because complex shareholder litigation often proceeds for several years before reaching any resolution, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Lead Counsel has received no compensation during the course of this Action, nor has it received any reimbursement for the $363,336.68 in expenses they have incurred to date in prosecuting this matter for the benefit of the Settlement Class.

74.    Lead Counsel also bore the risk that no recovery would be achieved (or that a judgment could not be collected, in whole or in part). Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured. It takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial,

or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

75. As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Lead Plaintiff's success was by no means assured. Defendants disputed, and would continue to dispute, whether Lead Plaintiff could establish liability and would no doubt contend, as the case proceeded to trial, that even if liability existed, the amount of damages was substantially lower than Lead Plaintiff alleged. Were this Settlement not achieved, and even if Lead Plaintiff prevailed at trial, Lead Plaintiff and Lead Counsel faced potentially years of costly and risky appellate litigation against Defendants, with ultimate success far from certain and the prospect of no recovery significant. It is also possible that a jury could have found no liability or no damages. Lead Counsel therefore respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

76. Indeed, after initially granting the motions to dismiss the second amended complaint and entering Judgment for Defendants, it was only after Lead Plaintiff filed a motion for reconsideration that the Court issued an amended order granting in part and denying in part the MTDs the SAC. Defendants then moved to certify for interlocutory appeal the Court's order granting reconsideration, which the Court granted. Following briefing before the Ninth Circuit motions panel, the Ninth Circuit agreed to hear Defendants' interlocutory appeal, and Lead Plaintiff's related cross-appeal.

77. Defendant View also went through Bankruptcy in the Spring of 2024. While Lead Plaintiff's motion for reconsideration was still pending, Lead Plaintiff filed an extensive objection to the prepackaged plan of reorganization before the bankruptcy court seeking to preserve various claims and causes of action against many of the Defendants in this case, which would have otherwise been released. Additionally, in the Fall and Winter of 2024, the parties in a proposed class action in Delaware Chancery Court bringing claims for breach of fiduciary duty against certain of the Defendants in this action sought approval of a settlement agreement in that action. Lead Plaintiff similarly undertook various efforts to ensure that the claims in this action would not be released as a result of that settlement. *See infra* ¶ 30.

78. Ultimately, it was only after three separate mediation sessions over the course of many months, and as the parties were preparing their respective appeals before the Ninth Circuit merits panel, that the parties agreed to settle this Action.

79. Having achieved a commendable result in the face of the kind of multiple and very significant risks that were present here, Lead Counsel respectfully submit that the litigation risk factor also weighs strongly in favor of the requested fee.

### 5.    The Skill required and Quality of Work Performed

80. Lead Counsel, Kaplan Fox, is among the most experienced and skilled practitioners in the securities litigation field, and the firm has a long and successful track record in securities cases throughout the country, including within this District.  A true and correct copy of Kaplan Fox's firm resume is attached as Exhibit 6 hereto.

81. Lead Counsel's reputation as experienced counsel in complex securities cases facilitated Lead Counsel's ability to negotiate the Settlement, ultimately resulting in the $11 million recovery. Lead Counsel achieved this substantial recovery for the benefit of the Settlement Class, notwithstanding that they were opposed in this Action by numerous highly skilled and well-respected lawyers, who likewise vigorously advocated for their clients

### 6.    The Standing and Caliber of Defendants' Counsel

82. The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants in this Action were represented by highly experienced lawyers from three of the nation's most prestigious law firms: Munger, Tolles & Olson LLP, Winston & Strawn LLP, and Morrison & Foerster LLP.  Defendants' counsel litigated the Action skillfully and aggressively, and were paid by Defendants' insurance coverage, to my understanding and belief.  Lead Counsel faced this strong defense with equal advocacy at every step, and was able to develop a compelling case for violations of the federal securities laws that was sufficiently strong to persuade Defendants and their counsel to settle the case for $11 million.

### 7.    The Fully Contingent Nature of the Representation

83. From inception, Lead Counsel has undertaken to represent Lead Plaintiff and the Class on a *fully* contingent basis and to advance all litigation costs, such that my firm would recover neither

any attorneys' fees nor any expense reimbursements absent a recovery for the Settlement Class. As also noted at ¶¶ 71-79 above, this factor also strongly supports the requested fee.

### 8.    Reaction of the Class

84.    Finally, although 51,557 Notice Packets have been sent to potential Class Members and Nominees advising them that Lead Plaintiff's Counsel would apply for attorneys' fees of up to 33 $^{1}/_{3}$% of the Settlement Fund (see Chiango Decl. ¶ 8), to date, no objections to the requested fee request for attorneys' fees have been filed or received.  Should any objections be filed or received before the Fairness Hearing, Lead Counsel will address them in reply papers.

### B.    The Expense Application

85.    Lead Counsel also seeks reimbursement of litigation expenses from the Settlement Fund in the amount of $363,336.68, for expenses that were reasonably incurred in connection with the prosecution of this Action.

86.    From the outset of the Action, Lead Counsel has been aware that it might not recover any of the expenses it incurred, and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action. Consequently, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

87.    As set forth in Exhibit 5 hereto, Lead Counsel has paid or incurred a total of $363,336.68 in litigation expenses in connection with the prosecution of the Action. Exhibit 5 identifies each category of expense (e.g., experts and consultants, online legal and factual research, court fees, copying costs) and the amount incurred for each category. These expenses are reflected in the books and records maintained by my firm, which are prepared from expense vouchers, check records, and other source materials, and which are an accurate record of the expenses incurred. In my experience the categories of expenses at issue here are routinely submitted to courts for separate reimbursement by my firm in contingent cases and are not duplicated by my firms' billing rates.

88.     A significant component of Lead Counsel's expenses is the cost of bankruptcy counsel, which totals $174,072.95 or approximately 48% of total expenses.  As discussed above, Defendant View went through Bankruptcy in the Spring of 2024.  Lead Counsel retained top bankruptcy counsel from Lowenstein Sandler LLP that we have worked with in other cases and filed an extensive objection to the prepackaged plan of reorganization before the bankruptcy court seeking to preserve various claims and causes of action against many of the Defendants in this case, which would have otherwise been released.  The retention of bankruptcy counsel was necessary, essential, and resulted in the successful preservation of the Class's claims.

89.     Another large component of Lead Counsel's expenses is the cost of a damages expert and an accounting expert, which totals $26,005.00 or approximately 7% of total expenses. The services of Lead Plaintiff's consulting damages expert were necessary for preparing estimates of damages, analyzing loss causation issues, and assisting with the preparation of the Plan of Allocation. Lead Plaintiff's accounting expert was used to assist Lead Counsel's assessment of the alleged misstatements in the Action.

90.     Another large component of the litigation expenses was for online legal and factual research, which was necessary to prepare the complaints, research the law pertaining to the claims asserted in the Action, oppose Defendants' motions to dismiss the First Amended Complaint and Second Amended Complaint, prepare Lead Plaintiff's Reconsideration Motion, oppose Defendants' motion to certify for interlocutory appeal the Court's order granting the Reconsideration Motion, oppose Defendants' petition for interlocutory appeal before the Ninth Circuit, object to the settlement in the *Siseles* Action, and prepare mediation submissions. The total charges for on-line research amounted to $120,758.40 or approximately 33% of the total amount of expenses.

91.     Another component of Lead Counsel's expenses is the cost of local Delaware counsel, which totals $15,960.16 or approximately 4% of total expenses.  As discussed above, the parties in the *Siseles* Action submitted a settlement agreement for approval by the Court of Chancery.  On November 22, 2024, Plaintiffs filed an objection to the proposed settlement in the *Siseles* Action to the extent it purported to release the Exchange Act claims brought in this Action. Lead Counsel retained local Delaware counsel to assist with the process of filing that objection and appearing at the

DECL. OF JASON A. URIS ISO LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL
OF SETTLEMENT AND MOTION FOR ATTORNEYS' FEES AND EXPENSES

*Siseles* settlement hearing. The retention of local Delaware counsel was necessary and essential in order to file the objection. The objection ensured that the claims in this action would not be released as a result of the *Siseles* settlement. *See infra* ¶ 30.

92.     The Parties retained Greg Danilow of Philips ADR Enterprises, whom is an experienced mediator of securities class actions and other complex litigation, to assist with settlement negotiations in the Action, including the three formal mediation sessions in May 2024, September 2024, and January 2025. The mediation expenses were apportioned between the Parties. Lead Plaintiff's total share of the costs for Philips ADR Enterprises' services was $12,500.

93.     The other expenses for which Lead Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, postage expenses, and copying costs.

94.     All of the litigation expenses incurred by Lead Counsel were reasonable and necessary to the successful litigation of the Action, and have been approved by Lead Plaintiff. *See* Zicherman Decl. ¶ 8.

95.     The amount requested for Lead Counsel's expenses, $363,336.68, is below the $375,000 that Settlement Class Members were advised could be sought in the Settlement Notice. To date, no objection has been raised as to the maximum amount of expenses set forth in the Settlement Notice.

**C.     Plaintiffs' Requested Awards un 15 U.S.C. §78u-4(a)(4) Are Reasonable**

96.     Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Lead Plaintiff Stadium Capital and plaintiff David Sherman seeks reimbursement of their reasonable costs and expenses (including lost wages) incurred in connection with their work representing the class in the amounts of $10,000 and $2,500, respectively. The amount of time and effort devoted to this Action by Plaintiffs is detailed in their accompanying declarations, attached hereto as Exhibits 7 and 8.

97.     As discussed in the Fee Brief and in the Lead Plaintiff's declaration, Stadium Capital has been committed to pursuing the class's claims since it became involved in the litigation back in 2021. Stadium Capital has actively and effectively fulfilled its obligation as a representative of the class, complying with all of the many demands placed upon it during the litigation and settlement of

the Action, and providing valuable assistance to Lead Counsel. Among other things, Stadium Capital met with Lead Counsel and spoke with them on a regular basis to discuss the status of the case and counsel's strategy for the prosecution, and eventual settlement, of the case. Stadium Capital also reviewed pleadings and other material documents during the litigation. Zicherman Decl. at ¶¶ 4-5. These efforts required Mr. Zicherman to dedicate time and resources to the Action that they would have otherwise devoted to his regular duties.

98. Similarly, Mr. Sherman has been committed to pursuing the class's claims since he became involved in the case in 2023. He has actively and effectively fulfilled his obligation as a representative of the class, complying with all of the many demands placed upon it during the litigation and settlement of the Action, and providing valuable assistance to Lead Counsel. Among other things, Mr. Sherman met with Lead Counsel and spoke with them on a regular basis to discuss the status of the case and counsel's strategy for the prosecution, and eventual settlement, of the case. Stadium Capital also reviewed pleadings and other material documents during the litigation. Declaration of David Sherman in Support of (A) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses, attached hereto as Exhibit 8 at ¶ 5.

99. The efforts expended by Plaintiffs during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives, and support their requests for reimbursement.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 2nd day of October, 2025 at New York, New York.

        /s/ *Jason A. Uris*
         Jason A. Uris

Case No. 5:21-cv-06374-BLF